# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**BRADLEY EDWARD COCHRANE**;
**THE TRAVELING ATTORNEY**, *P.C.*; *and*
*All others similarly situated,*

*Plaintiffs.*

*v.*

**GOVERNOR GRETCHEN WHITMER;
ATTORNEY GENERAL DANA NESSEL;
BOARD OF GOVERNORS OF WAYNE
STATE UNIVERSITY; KIMBERLY
ANDREWS ESPY; MASAO ROY WILSON;
LOUIS LESSEM; LAURA JOHNSTON;
NIKKI WRIGHT; LINDA LOWE; ROBERT
FORSYTHE; KIANTEE-RUPERT JONES;
DAVID J. STRAUSS; JOHN C. TAYLOR;
JAMES T. LOW;** *and* **DEBORAH L. HABEL,**

*Defendants.*

***PUNATIVE CLASS ACTION
REQUEST***

**PROVISSIONALLY FILED UNDER SEAL
PURSUANT TO 42 U.S.S. § 1232g**
***Commonly known as* F.E.R.P.A.**

---

Case No. 2:24—cv—10648

**Honorable Judges: Paul D. Borman**

**Curtis Ivy, *Jr*.**, *Magistrate Judge*

**PLAINTIFFS' INITIAL COMPLAINT
FOR VIOLATIONS OF:**

(*1*) **United States Constitution**

(2) **Higher Education Act**

(*3*) *42* U.S.C. § *1983*

(4) *42* U.S.C. § *1985*

(5) **Constitution of the State of Michigan**

(*6*) **Elliot-Larsen Civil Rights Act**

(*7*) **Breach of Contract**

(8) **Fraudulent Inducement**

(*9*) **Fraudulent Misrepresentation**

(*10*) **Intentional Infliction of Emotional Distress**

(12) **Gross Negligence**

(13) **Tortious Interference with a Business**

(14) **Unfair Competition**

(15) **Civil Conspiracy**

(16) **Unjust Enrichment**

***CLAIMS OF UNCONSTITUTIONALITY***

### ***ATTORNEY FOR PLAINTIFFS***

Bradley E. Cochrane, *Esq.*, *M.B.A.*, (*P82640*) (**Admitted to the Eastern District on 8/7/2023**)
*In Pro Per*
as *General Counsel* for The Traveling Attorney, *P.C.*®
as *Proposed Punitive Class Counsel* pending acceptance and appointment by this Honorable Court

Primary *Office*: *51150* Washington Street      March 15th, 2024
Room A113
New Baltimore, MI *48047*
*Tx*: 586.419.1632                      */s/ Bradley Edward Cochrane*
*Email*: Cochrane@TravelingAttorney.com      Bradley Edward Cochrane, *Esq.*, *M.B.A.*

***Plaintiffs reserve the express right to in full or in part consistent with stare decisis and Court rule amend this Complaint to remedy any deficiency identified by this Honorable Court or through error. ***

## TABLE OF CONTENTS

**EXECUTIVE OVERVIEW**……………………………………………….....…....... Page 5

**INTRODUCTION**………………………………………………………....….........Page 9

**PARTIES, JURISDICTION, & VENUE**…………………………………...…....…...Page 12

**VENUE**………....……………………………………………………….....…....Page 12

**SUBJECT MATTER JURISDICTION**………………………….…….……....….….Page 12

**STANDING**………………………………………………………….....…….........Page 13
▪ *Individual Standing Of Mr. Bradley E. Cochrane, Esq., M.B.A*…………………….Page 16
▪ *Individual Standing Of The Traveling Attorney, P.C.®* …………………………….Page 17
▪ *Standing Of The Proposed Classes Of Individuals **And** Entities*…………………….Page 18

**DEFENDANTS**…………………………………………………...……………….Page 18
▪ *Gretchen Whitmer, Governor Of The State Of Michigan*……………………….Page 18
▪ *Dana Nessel, Attorney General For The State Of Michigan*……………………Page 19
▪ *Wayne State University Board Of Governors*…………………………………….Page 19
▪ *Kimberly Andrews Espy, President of Wayne State University*……………………Page 20
▪ *Masao Roy Wilson, Former President Of Wayne State University*………………Page 20
▪ *Louis Lessem, Emeritus Vice President & Former General Counsel Of Wayne State University*……………………………………………………………….Page 26
▪ *Laura Johnston, Deputy General Counsel Of Wayne State University*………………Page 31

▪ *Nikki Wright, Assistant Vice President Of The Wayne State University Office Of Equal Opportunity*..............................................................................Page 32
▪ *Linda Lowe, Wayne State University FOIA Coordinator*................................Page 34
▪ *David J. Strauss, Wayne State University Dean Of Students*.........................Page 34
▪ *John C. Taylor, Wayne State University Mike Ilitch School of Business Marketing And  Supply Chain Management Director*.............................................Page 38
▪ *James T. Low, Wayne State University Mike Ilitch School Of Business Marketing And Supply Chain Management Emeritus Professor*................................Page 39
▪ *Deborah Habel, Wayne State University Mike Ilitch School Of Business Marketing And  Supply Chain Management Lecturer/Associate Professor*.................Page 40
▪ *Robert Forsythe, Dean Of Wayne State University Mike Ilitch School Of Business* .....Page 40
▪ *Kiantee-Rupert Jones, Assistant Dean Of Graduate Programs Wayne State University Mike Ilitch School Of Business*.......................................................Page 41

**DEFENDANTS DO NOT HAVE IMMUNITY**……………………......……………. Page 42
1. *Defendants Do Not Have Sovereign Immunity*...............................................Page 42
2. *Defendants Do Not Have Qualified Immunity*.................................................Page 45
3. *MCL § 691.1407 Abrogates Liability For Intentional Torts*........................Page 46

**BACKGROUND FACTUAL ALLEGATIONS**...…………..………………......……...Page 48
▪ *Defendants' Attachment To The Theory Of Constraints* ...............................Page 48
▪ *Defendants' Strategic Plans Are the Theory of Constraints*..........................Page 55
▪ *Defendants' Use Of Theory Of Constraints At Wayne State University Medical School As Decisive Competitive Edge*...................................................................Page 75
▪ *Crippled WSUMED Forced to Partner with Ascension St. John Hospital*.....................Page 93
▪ *WSUMED & WSUMISB Offer a Concurrent M.D.—M.B.A*.............................Page 98
▪ *The Wayne State University Double Dip*.......................................................Page 100
▪ *Defendants' Discrimination and Ongoing Retaliation as an Effect of the Plaintiffs' Internal Whistleblowing*...............................................................................Page 115
▪ *Wayne State University, Covid-19's Pandemic Effect, & The Principal Door*..............Page 124
▪ *Wayne State University's Integrated Marketing Campaign as Decisive Competitive Edge Leveraged to Harm Plaintiffs*..............................................................Page 127
▪ *Background Factual Allegations Conclusion: Eight Avenues of Action*........................Page 303
    ▪ *Wayne State University's Institutional Review Board Overview*..............................Page 333

**DR. ELIYAHU GOLDRATT'S THEORY OF CONSTRAINTS**……………..……….Page 389

**COCHRANE'S THEORY OF CONSTRAINTS' FULL FLEX**...............................Page 422

**THE THEORY OF CONSTRAINTS AND HIGHER EDUCATION**.......................Page 508

**PRINCIPAL FACTUAL ALLEGATIONS**……………………………….................Page 518

***GARY B., v. WHITMER* AND THE EFFECT OF SUE SPONTE MOOTNESS**.........Page 527

**THE STORY OF EDUCATION: PAST, PRESENT, & FUTURE**……...……....…. Page 606

**CLASS ACTION ALLEGATIONS**………...……………………........…......……....Page 627

**CAUSES OF ACTION**…………………………………………………….......Page 635

**REQUEST FOR RELIEF**………………………………..……………....Page 770

**CONCLUSION**……………………………………………………...…...........Page 776

**LR 83.4 STATEMENT OF DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST**...............................................................................Page 779

*LEFT INTENTIONALLY BLANK*

# **EXECUTIVE OVERVIEW**

*1.* Everything written is cumulatively stated based upon personal knowledge, information and belief stemming from a nearly three-year (*3*) year investigation following the occurrence of the principal factual allegations and retaliation that followed as identified *herein* this Complaint.

*2.* *Respectfully*, this is *not* a 'typical' lawsuit.

*3.* Moreover, this Complaint is protected by the First Amendment of the United States Constitution and is a verified Complaint in affidavit form and goes beyond mere notice pleadings to mitigate the damages of the parties involved and to advance the rights *herein identified* expeditiously.

*4.* Simply, the Plaintiffs here have recreated in totality the matrix for which this Honorable Court may derive its' understanding of the factual reality necessary to fully render proper adjudication of the merits to be litigated.

*5.* When referring to the Defendants inclusively, the Michigan Governor and Attorney General are excluded, and they will otherwise be identified explicitly by proper title when necessary. Otherwise, the 'Defendants' includes all those captioned with the explicit identification of individual Defendants throughout as necessary.

*6.* My objective here is to demonstrate ***beyond a reasonable doubt***, that what would otherwise be described as "*impossible*" has only by pure necessity-of-survival, does the following materialize to demonstrate what is afoot amongst us all. Specifically, as to the Defendants, it is my mission to identify and educate this Honorable Court that of: (1) what Defendants did *wrong*; (2) what Defendants are still doing *wrong*; (3) how they have done and continue to do *wrong*, *and* (4) why Defendants did *and* are still doing *wrong—more specifically I* will demonstrate within this Complaint the following in no particular order:

    *A.* WSU is a public research institution established by the citizens of the State of Michigan.

**B.** WSU has a corporate culture and specific-strategic mission to "<u>research</u>" at all costs by "*engaging Students at all levels.*"

**C.** WSU is systematically conducting "research" on their **STUDENTS** that is contrary to well established law and public policy.

**D.** WSU has infused this corporate-strategic mission at every level of operation and vigorously enforced offensively the right to remedy *inadequate* research and underperformance amongst its' intellectual ranks.

**E.** WSU has developed a "Decisive Competitive Edge" in its' integrated marketing campaign given the Defendants' strategic partnerships, by leveraging its' location (Detroit), and its' vogue operative tactics (affiliate marketing/strategic alliances).

**F.** WSU has commingled the pedagogical mission of the State (*and Nation*) unconstitutionally with private interests through leveraging the pedagogical advantages of strategic planning and operational oversights given the Defendants' individual positioning throughout the whole.

**G.** WSU has disregarded all necessary conditions associated with the identified specifically intended unconstitutional research on its' **STUDENTS**.

**H.** WSU is not just researching **STUDENTS**, but it is researching industry too through its **STUDENTS**; this "research" is synonymous with espionage.

**I.** WSU uses this "researched" data and information obtained from its' **STUDENTS' FREE SPEECH** unjustly for strategic-operational purposes to increase "**Throughput**," inventory, and decrease operating expenses as an intended-unconstitutional taking.

**J.** WSU and more specifically the Defendants, use the "research" data and information obtained from its' **STUDENTS** unjustly for private-individual gain as a form of an unconstitutional taking.

**K.** WSU has engaged in this behavior for *at least* twenty (20) years, and more so significantly in the last seven (7) years specifically developing its' integrated-marketing campaign as a "Decisive Competitive Edge."

**L.** WSU has exploited its' **STUDENTS** by fraud, discrimination, harassment, threats, coercion, and undue influence for unconstitutional enrichment.

**M.** WSU is exploiting the residents of Wayne County, and more specifically the citizens of the City of Detroit and State of Michigan.

**N.** WSU is exploiting **STUDENTS** intentionally to cause the effect of establishing a 'Decisive Competitive Edge' in the form of <u>knowledge</u> and idea <u>generation</u>, reducing loss in the form of excess capacity (*ideas*) while simultaneously sparking forward progress given that these same *ideas* generate knowledge as inventory to be again leveraged by this unjust system.

**O.** WSU and select Defendants were Early Adopters of Dr. Eli Goldratt's Theory of Constraints even before "*Critical Chain*" was released by Dr. Goldratt on September 4th, 1997, and have helped shape what TOC is known as today *Globally*.

**P.** WSU and select Defendants materially advanced the application of and expansion of the Theory of Constraints as a knowledge based *after* the release of *Critical Chain*.

**Q.** In furtherance of its' strategic mission as Supplier of inventory (*a*) Employable Students, and (*b*) Intellectual advancements, the Defendants have designed the experience at WSU to manipulate the market in a way contrary to WSU Policy and well-established law.

**R.** WSU intentionally discriminates against the Plaintiffs because of their status as "**STUDENTS**" as a pseudo-protected class of citizens by providing curriculum designed to research the **STUDENTS** secluded from other **STUDENTS** on similar-program paths which has been strategically designed to generate knowledge.

**S.** WSU and the Defendants intentionally violate International and Federal Research Standards by exploiting **STUDENTS** as Human Subjects by failing to provide necessary conditions prior to researching the Plaintiffs' purposefully and have done so for over twenty years (20) in violation of the National Research Act and the post-World World II Geneva Convention.

**T.** WSU has discriminated against the Plaintiffs and **STUDENTS** alike by manipulating in the least this selected pedagogical offering by creation of this peril and affirmatively as intended by strategic plan probed the sequestered **STUDENTS** without proper informed consent through discrimination, harassment, threats, coercion, duress, and fraud with intentional malice.

**U.** WSU and select Defendants continuously improved the "Critical Chain" and "[*VERY*] Ambitious Goal" applications of the Theory of Constraints for the specific and premeditated purpose of unconstitutional takings, *i.e.*, economic

espionage of intellectual property. Specifically, the Defendants have 'researched' diligently and continuously improved relative applications of the Theory of Constraints to enrich the entire WSU system with the intended effect of the attachment of this pedagogical "advancement" to "generate knowledge" and "*use these [**STUDENTS**] as bridges to companies,*" in an constitutionally repugnant manner.

*V.* WSU routinely rewarded select Defendants for their continued participation in the advancement of the systems' objectives. Even more, after WSU disregarded the Plaintiffs' Formal Complaint with the Wayne State University Office of Equal Opportunity, WSU *again* promoted Professor Habel to an elevated teaching status still using this infective curriculum; *perhaps* it was that 2022 undisclosed "donation" Professor Habel made following this formal rebuke that helped mitigate the effect.

*W.* WSU, the Defendants, and other faculty as co-conspirators failed to address the issues presented by Plaintiffs and affirmatively disregarded valid and objective evidence effectively discriminating against the Plaintiffs by foreclosing WSU Policy, Federal, and State law leading to the unlawful debt collection of Plaintiff Cochrane in retaliation to this whistleblowing.

*X.* Defendants' specific and intentional conduct is invalid against the United States Constitution.

*Y.* Defendants' specific and intentional conduct is invalid against Codified Federal and State Law.

*Z.* Defendants have designed its' system to exploit **STUDENTS** as Human Research Subjects in violation of the National Research Act; Nuremburg Code; Declaration of Helsinki; the Belmont Report depriving under color or law those rights to free speech and autonomy of the individual.

*7. Here*, the Defendants have irreparably damaged the reputation of the American Education System by exploiting **STUDENTS** for personal enrichment and unconstitutional gains as self-endowed Philosopher Kings. In doing this the system itself, our demonocracy, as a whole simply carries the burden of this unjust enrichment *unreasonably* into the future; this **ECHO**ed throughout our educational ecosystem and stretched through time *is* unsustainable. The road we are on, *without change*, will become a chapter written expressing only the downfall of *our* Great Republic repeating the history of the Greek's Sophists as the invading-dark forces *seep* in.

"**Eureka*!*** Give me a firm place to stand, and *I* shall move the World; *do not disturb my circles*."

### *Archimedes*

## <u>INTRODUCTION</u>

**8. <u>*FOCUS*</u>**. Read these words *s-l-o-w-l-y*, *intentionally*, and digest them, learn from them you will…*many variables lay in the balance there are.*

**9.** There comes a time, when a man must sacrifice all he has in exchange for a <u>clear</u> conscious, and for liberty *without* undue restraint by *his* Tyrant Government. *This is my last stand, and I am all in as every <u>Warrior</u> would be!*

**10.** There is a great deal to explain, *but* how do *I* accomplish such a task? *Of course*! By using the **<u>THEORY OF CONSTRAINTS</u>**! *Hold onto your butts*; this is <span style="color:red">red pill</span> territory. <u>You</u> will <u>gain</u> <u>value</u> *if* you plunge into this rabbit hole with intellectually *curiosity* and learn the facets of the Theory of Constraints. While it is my purpose here to mount my case against the Defendants, my primary intent is to keep you drawn to the page, reading *each* word, *not* because you have to, *but* because <u>*you want to*</u>. This is the <u>*only*</u> way you will broaden *your subjective* reality enough to accept *this subjective* interpretation of *my reality*, *and*…if *I* succeed in my purpose, even if only one individual is persuaded—*I* still increase "**Throughput**" and build *objective* credibility for my claims.

**11.** *Now*, before you think *I am crazy*, and that this is just some cockamamie Complaint drawn up by a disgruntled-formed **STUDENT**, *or*…respectfully, *whatever else* the Defendants will attempt to throw at the wall to evade my flawless identification of the—***TRUTH*!** *This is <u>not</u> my conspiracy*. I was *forced* by the Defendants to take the <span style="color:red">red pill</span>. <u>I was then *used* by the Defendants as a Human Research Subject **WITHOUT** having obtained the proper *data* to effectively give *informed* consent for my participation.</u> This is the *crux* of the Defendants' defense. **But**, *ask yourself*, as I did while stalking this fact pattern, *is it really only, one professor*? *Is it really only,*

one course? *Is it really that simple*? **No**. Nothing ever is, *and nothing ever will be*, and that is why ***objective truth is uncontrollably powerful***.

*12.*     You will come to understand that there are <u>no</u> <u>limits</u> to the application of the Theory of Constraints, the only limits are the users' *imagination*. Childlike curiosity, something *I* have <u>*endless*</u> amounts of, this ideology is the bedrock of what Dr. Eliyahu Moshe Goldratt, *Ph.D.*, trumpeted for nearly thirty years as the creator of the Theory of Constraints before his death on June *11, 2011*; *may his soul rest in peace*. **Exhibit 1—***Dr. Goldratt's Wiki Biography.*

*13.* It was Dr. Goldratt's life mission to—<u>*Teach the World How to Think*</u>. It is with this notion, that in order to adequately compute the requisite analysis to maintain the standards of zealous advocacy, *I* used the "**Thinking Processes**" of the Theory of Constraints to probe my hypothesizes as Dr. Goldratt would have demanded in any forum of deliberation.

*14.* My objectives *here* are in the same way based firmly in the belief that this is a reflection point, *a <u>time</u> <u>to</u> <u>think</u>* in American History—***THE GREAT AWOKENING***, and *every*-individual citizen has a voice in how our Great Nation moves forward, to establish a *new* "objective" reality for civil society to *understand who we are* and *how we move forward together*. This is <u>not</u> a political statement. This is *my* "subjective" reality; a *purposed* 'objective' reality *I* have *decoded* based upon *my individual* "subjective" experiences. A *level* of "wokeness" *I* have *attained*, whereby if my persuasion is adequate, you may ascend to the same level *by accepting* my "subjective" interpretation of the invalid 'objective' reality the Defendants have fed me.

*15.* Being "*woke*" does not designate party affiliation, there is *too much power* in positioning that ideology in one camp. Becoming "*woke*" is overcoming an <u>*individual*</u> subjective-intellectual ignorance, whereby an individual's "subjective" reality *rejects* 'objective' reality, *because* that individual's "subjective" interpretation decodes a *different* "objective" reality based on the *communication cycle* that individual engages in. This is your <u>*intuition*</u> screaming that something

is wrong. *But*, for that *suspicion* to be valid, it **must** be supported by *valid* and "objective" evidence. *Then*, the 'objective' reality you have been fed *can* *be* *dispelled* against your *valid* "objective" reality founded upon *proper* decision making.

*16.* The *most important* aspects of our collective "objective" reality is the "objective" evidence that supports the firmware of that reality. It is this "objective" evidence that which allows others to decode the "subjective" interpretation of another and *accept* that "subjective" reality too, which it is *this acceptance* that turns a "subjective" interpretation into "objective" reality for *the whole*. Meaning, if my "subjective" interpretation of my "subjective" reality is *not* founded upon *valid* and "objective" evidence, then you, and others, *will not* "subjectively" interpret the same outcome *I* have, and therefore *my* "subjective" reality *will not* become "objective" reality for the whole *because* it was *rejected*.

*17.* Again, *I am* not *crazy,* these ideas are in line with what Dr. Goldratt was peddling as the Theory of Constraints, what the Defendants are offerings as '*curriculum*' to their **STUDENTS**; *deep* thinking, mechanical idea generation, strategic-continuous improvement focusing on *exploiting* weaknesses (*e.g*., policies, or laws), *and the list goes on*. Truly, the Theory of Constraints, if it were a beast in physical form, it would most likely resemble a horcrux-*the-Hydra*, each head with its own purpose and intent.

*18.* **But**, the Theory of Constraints *is* often used to solve 'unsolvable' problems, *much like the one I have solved here*, and that is why it is *important* to use the "**Thinking Processes**" of the Theory of Constraints *thoroughly* for *proper* decision making. You will find, that, *quite ironically*, "***the devil is in the detail!***"

*19.* The keystone of Dr. Goldratt's mission was focused on teaching the World **HOW** to think *for* ***THEMSEVLES***…*to* *not* *become a sheep and be led to slaughter*. To challenge authority, and 'policy' by exploiting its weaknesses. *This* Complaint is the predicate of such an *idea—to ask*

*why*. Why is *this*, *ok*? Or, *is it*? **I need to know**. The questions I have *surround* the most pivotal area of the law that our Great Nation *must* recognize in *my* lifetime.

**20.** Through the Defendants' callous and constitutionally repugnant specific intent devoid of social value, *objectively*, **_I will show you_** that:

> **A Fundamental Right to a Public Education _Free Of_ Discrimination, Harassment, Threats, and Coercion _For All_ Students _Regardless_ of Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth—_EXISTS_ in the United States—_unequivocally_!**

## PARTIES, JURISDICTION, & VENUE

### VENUE

**21. Venue is proper** in that the parties described below are composed as individual **_STUDENTS and ENTITIES_** being situated and having minimum contacts within South-Eastern Michigan, where the conduct giving rise to the declared damages took place, with the United States District Court: Eastern District of Michigan having competent authority for the causes of action identified within *this* Complaint pursuant to 28 U.S.C. § 1391 (b). [L.1]

### SUBJECT MATTER JURISDICTION

**22.** Subject Matter Jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. §§ 1985 and 1988, based upon **Federal Question is proper** in that the Plaintiffs have raised Constitutional Challenges to the Defendants' premeditated conduct in violation of 42 U.S.C. § 1983, and to other well-established Federal law.

**23.** *Specifically*, the Federal Questions encompass the unconstitutional solicitation and compulsion of research on human subjects by way of disguised fraudulent-intellectual trick *without* obtaining proper necessary conditions prior to conducting this *so-called*-pedagogical research, thus causing the Plaintiffs' actual harm in the process. Also, *even if* these Constitutional

Challenges fail, under 28 U.S.C. §§ 1332 (a) and (d), **Diversity Jurisdiction is proper** in the alternative given that minimal diversity of domicile exists between multiple members of the proposed-classes of Plaintiffs, *and* that the damages sustained are in excess of the statutory requirement of $*5,000,000.00*, *excluding* interest, costs, and attorneys' fees, *respectfully*.

*24.* Furthermore, **Supplemental Jurisdiction is proper** over the Plaintiffs' state law claims pursuant to Fed. R. Civ. P. 18 and 28 U.S.C. § 1367.

*25.* Moreover, this Honorable Court has jurisdiction to issue **Declaratory** and **Injunctive Relief is proper** in consideration with 28 U.S.C. §§ 2201 and 2202.

## <u>STANDING</u>

*26.* Standing to bring suit must be determined at the time the complaint is filed. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004), cert. denied, 544 U.S. 949 (2005). The Supreme Court "repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–83 (1982) (internal quotation marks omitted). A plaintiff must meet both constitutional and prudential requirements to establish individual standing.  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

*27.* To meet the minimum constitutional standards for individual standing under Article III:

> "a plaintiff must show (*1*) it has suffered an 'injury in fact' that is (*a*) concrete and particularized and (*b*) actual or imminent, not conjectural or hypothetical; (*2*) the injury is fairly traceable to the challenged action of the defendant; and (*3*) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.* (TOC),  Inc., 528 U.S. 167, 180–81 (2000).

28. A plaintiff must also meet the following prudential requirements for standing developed by the Supreme Court. ***First***, a "plaintiff generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 474 (internal quotation marks omitted). ***Second***, a plaintiff must present a claim that is "more than a generalized grievance." *City of Cleveland v. Ohio*, 508 F.3d 827, 835 (6th Cir. 2007) (internal quotation marks omitted). ***Finally***, the complaint must "fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge*, 454 U.S. at 475 (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).

29. Under the prudential limitations on standing, however, even when litigants have established a substantial injury from a government action, they "cannot challenge its constitutionality unless [they] can show that [they are] within the class whose constitutional rights are allegedly infringed. "*Barrows v. Jackson*, 346 U.S. 249, 256 (1953). Alternatively, one may not generally claim standing to vindicate the constitutional rights of some third party. *Id.* at 255. Though, the Supreme Court has found that the "rule against third-party standing is not absolute." *Kowalski v. Tesmer*, 543/0 U.S. 125, 129 (2004). Instead, the Court has considered "two factual elements":

> The **first** is the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.

*Id.* at 130–31. The Court has described this test as requiring that "the party asserting the right has a 'close' relationship with the person who possesses the right," and that "there is a 'hindrance' to the possessor's ability to protect his own interests;" *i.e.*, as for example in *this*

Complaint, being unknowingly *probed* and *manipulated* by our *self*-proclaimed Philosopher Kings. *Id.* at 131 (quoting Powers *v. Ohio*, 499 U.S. 400, 411 (1991)); *see also*, *Singleton*, 428 U.S. at 116–17:

> "If there is some *genuine obstacle* to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and ***the party who is in court becomes by default the right's best available proponent***." (*Emphasis added*).

**30.** The Supreme Court "has found an adequate 'relation' . . . when nothing more than a buyer-seller connection was at stake." *Kowalski*, 543 U.S. at 139 (Ginsburg, J., dissenting) (citing cases). The **<u>second</u>** factual element the Court considers are these hinderances that the third party must overcome to protect their rights, and the Court has developed a variety of measures to determine the balance of allowing standing. *Smith et al v. Jefferson County Bd. Of School Comm'rs et al*. 641 F.3d 197, 208-209 (6th Cir. 2011).

**31.** Specifically, evidence that the third party might be deterred from suing. See, e.g., *Singleton*, 428 U.S. at 117 (allowing physicians to challenge exclusion of abortions from Medicaid coverage when women would be harmed by desire to protect privacy); *Eisenstadt v. Baird*, 405 U.S. 438, 445–46 (1972) (allowing seller of contraceptives to assert equal-protection rights of potential purchasers for the same reason); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (allowing physicians to challenge a law criminalizing use of contraceptives on behalf  of married couples for the same reason); *NAACP v. Alabama*, 357 U.S. 449, 459 (1958) (allowing organization to asserts its members' rights to nondisclosure of membership lists to prevent "nullification of the right at the very moment of its assertion"). The Court has also considered the "systemic practical challenges to filing suit, see, *e.g.*, *Powers*, 499 U.S. at 414 (allowing

criminal defendants to raise potential jurors' equal-protection rights against race-based peremptory strikes).

### **INDIVIDUAL STANDING OF MR. BRADLEY EDWARD COCHRANE, *ESQ., M.B.A.***

*32. In this case,* the *individual* standing of Attorney, **MR. BRADLEY EDWARD COCHRANE**, is the catalyst for the claims in *this* Complaint, being that his relationship with the Defendants began in the Fall of *2018* as a Professional Student at the Wayne State University: Mike Ilitch School of Business, in Detroit, Michigan.

*33. I* made the decision to pursue a Master of Business Administration (*M.B.A.*) concentrated in Marketing as a tool to differentiate my knowledge and skills from my future competition given my limited experience working in a traditional-legal environment and my journey becoming an Attorney overall. At the time *I choose* to embark on this intellectual journey, *I* was establishing by clear and convincing evidence to the State of Michigan through the Character and Fitness process, that *I*, meet the character requirements necessary to be called an Attorney. *I* graduated from Western Michigan University: Thomas M. Cooley Law School in May of 2016 and passed the July 2016 Michigan Bar Exam on my *first* attempt.

*34. I*, Attorney, Bradley Edward Cochrane, was sworn in as an Attorney on June 25th, 2018, in the County of Oakland, Michigan, before the Honorable Daniel Patrick O' Brien, of the Oakland County Circuit Court. **Exhibit 2**—*Order of Admission to the Bar. This period* of my life, specifically the Character & Fitness Process, provided me with a mechanism to confront my stigmatic idealism of my life up to that point, and allowed me to grow emotionally in the acceptance of the *open expression* of my anxiety, fears, and *ideas*. This process allowed me to understand the unnecessary-psychological weight that *I* was carrying, much of this *guilt* had dictated my path towards obtaining my law degree in the first place, *ultimately* my business degree too. The arduous journey that *I* have taken to reach this station in life today has been a

ten-year grind in establishing my position in becoming the man *I* choose to be. *I* am not perfect, *no one is*, but *I strive daily to **do good*** with the knowledge of the good *I* have come to acquire.

**35.** *I* have risked **everything**, my future, my families' future, all for <u>my ideas</u>, <u>my</u> business, for <u>my</u> **American Dream**—*and*, the **DEFENDANTS** unknowingly sprung their **intellectual *trap*** on the <u>wrong</u> individual. These facts that follow, they have now unequivocally become a part of my life's story, *my essence* and *being*, and now *I* recall each vertex of data from *my education* and life *experiences* for the specific purpose of pursuing Justice, *blindly through faith*.

**36.** The **DEFENDANTS** have composed my station in life for me, *ironically*, and *I* stand at a moral crossroad: do *I* become who *I* claim to be <u>or</u> do *I* avoid who *I* am forever? Candidly, *I* will not be the shackled-intellectual slave the **DEFENDANTS**, *and the system itself*, have created. *I* am the Intellectual Dissenter, a martyr for the American People to learn from me what they can do *if* they so choose to permissively follow <u>curiosity</u>—just as the Puritans did *escaping the corrupt tyranny* of the European World sparking the reality we collectively share today.

### <u>INDIVIDUAL STANDING OF THE TRAVELING ATTORNEY, *P.C.*®</u>

**37.** In brief, though wholly owned and operated by Attorney, Mr. Bradley Edward Cochrane, it is necessary to identify that The Traveling Attorney, *P.C.*®, is a *separate* and *distinct* entity from Mr. Cochrane, and that by *itself* as a registered Professional Corporation in Good Standing with the State of Michigan, it therefore *has standing of its own* as designated within *this* Complaint. ***Exhibit 3****—The Traveling Attorney, P.C.® LARA Summary;* ***Exhibit 4****—The Traveling Attorney, P.C.® Certificate of Good Standing*. The rights attributable to The Traveling Attorney, *P.C.*®, are representative of the same or similarly situated prospective-***ENTITIES*** thus **third-party standing is proper**.

## STANDING OF THE PROPOSED-CLASSES OF INDIVIDUALS *AND* ENTITIES

*38.* It is with this reasoning above as to standing, that Mr. Cochrane *individually* sparks the class of similarly situated **STUDENTS** that have undoubtedly the same individual standing as Mr. Cochrane. **And**, that The Traveling Attorney, *P.C.*®, ignites the distinctive standing for the class of similarly situated **ENTITES** that unequivocally have third-party standing capacities too. This privity of standing will become clear once the foundation for *this* Complaint is methodically laid before you. Respectfully, without Mr. Cochrane's research into the "**Effect-Cause-Effect Logic**" sparked by Defendant, Dr. James T. Low's, June 17th, 2020, Theory of Constraints "**MAFIA OFFER**" expressly demanding detailed-trade secrets related to The Traveling Attorney, *P.C.*®—*this* Complaint *most certainly* **would _not_ exist**.

*39.* In consideration of these two (*2*) Proposed-Classes of **STUDENTS** and **ENTITIES**, submitted to *this* Honorable Court in conjunction with *this* Complaint is a Motions for Class Certification & Appointment of Class Counsel pursuant to the Fed. R. Civ. P. 23 and the Class Action Fairness Act of *2005*, *respectfully*.

### DEFENDANTS

### GRETCHEN WHITMER, GOVERNOR OF THE STATE OF MICHIGAN

*40.* The position of Governor of the State of Michigan is named in **official capacity only** as a Defendant in consideration only to the **declaratory** and **injunctive** remedies sought by the **PLAINTIFFS**. At this present time, the **Governor** of the State of Michigan is **MRS. GRETCHEN WHITMER, ESQ.**, sworn to uphold justice, the oversight of the educational system, and legal ethics in the State of Michigan. Now that Mrs. Whitmer has *this* information, she may act in consideration with her duties and the rulings of *this* Honorable Court should a Declaratory and Injunctive Order, or *Writ of Mandamus* follow.

**DANA NESSEL, ATTORNEY GENERAL FOR THE STATE OF MICHIGAN**

*41.* The position of Attorney General for the State of Michigan is named in **official capacity only** as Defendant in consideration only as to **declaratory** and **injunctive** remedies sought by the Plaintiffs. At this present time, the **Attorney General** for the State of Michigan is **MRS. DANA NESSEL, *ESQ.*,** sworn to uphold justice, the oversight of the educational system, and legal ethics in the State of Michigan. Now that Mrs. Nessel has *this* information she may act in consideration with her duties and the rulings of *this* Honorable Court should Declaratory and Injunctive Order, or *Writ of Mandamus* follow.

*42.* Also, based upon information and belief, the 2019 infighting objectively documented by the Defendants identifies that the Attorney General has actual knowledge of the dispute among the Board of Governors of Wayne State University and Dr. M. Roy Wilson, *then* President of Wayne State University. *See*, **Exhibit 5—***The South End December 6, 2019, Article*.

**WAYNE STATE UNIVERSITY OF BOARD OF GOVERNORS**

*43.* The Board of Governors of Wayne State University are being sued in their **official capacities only** for having fostered the peril that follows. The State of Michigan has designated under Article VIII, § 5, of the Michigan Constitution, that Wayne State University is a body corporate, granting-operative authority to "the Board of Governors of Wayne State University." Specifically, the Board of Governors was charged with the general supervision of its institution along with the control and direction of all expenditures from the institution's funds; this is including electing an institution president. Each Governor is elected in accordance with Michigan Election law and serves a period of eight years; the entire Board consists of eight members, including the chair.

*44. Respectfully*, the following is a list of the current Board of Governors of Wayne State University:

| | |
|---|---|
| **(1) MARILYN KELLY**, *Chair* | <u>**Term**</u>: 01/01/2022—12/31/2030 **Exhibit 6; Exhibit 7** |
| **(2) BRYAN C. BARNHILL, *II*** | <u>**Term**</u>: 01/01/2019—12/31/2026 **Exhibit 8** |
| **(3) MICHAEL BUSITO** | <u>**Term**</u>: 01/01/2017—12/31/2024 **Exhibit 9** |
| **(4) MARK GAFFNEY** | <u>**Term**</u>: 01/01/2017—12/31/2024 **Exhibit 10** |
| **(5) ANIL KUMAR** | <u>**Term**</u>: 01/01/2019—12/31/2026 **Exhibit 11** |
| **(6) TERRI LYNN LAND** | <u>**Term**</u>: 01/01/2021—12/31/2028 **Exhibit 12** |
| **(7) SHIRLEY STANCATO** | <u>**Term**</u>: 01/01/2021—12/31/2028 **Exhibit 13** |
| **(8) DANIELLE ATKINSON** | <u>**Term**</u>: 01/01/2022—12/31/2030 |

**\***Attorney Dana Thompson *did not* **s**eek reelection in 2022; **Exhibit 14; Exhibit 15**

\*It is relevant to note that (1) is currently a licensed Michigan Attorney in Good Standing.

## <u>KIMBERLY ANDREWS ESPY, PRESIDENT OF WAYNE STATE UNIVERSITY</u>

**45.** Respectfully, Kimberly Andrews Espy, is being sued in her **official capacity only** as President of Wayne State University having taken the rein of authority from Defendant, Dr. M. Roy Wilson, during the time which Plaintiffs have researched and written this Complaint despite the Defendants' ongoing retaliation in an effort to subvert this subjective reality from becoming the objective reality of our Nation.

## <u>MASAO ROY WILSON, *FORMER* PRESIDENT OF WAYNE STATE UNIVERSITY</u>

**46.** *Respectfully*, Dr. Masao Roy Wilson, is being sued in his <u>**individual capacity**</u> as *former* President of Wayne State University.  Wayne State University has a long-standing strategic *focus* of demanding that faculty rigorously conduct continual-academic research in the name of Wayne State University; this is evident for our purposes here from the late 1980's to the present. This bloodlust policy for research *spiked* on August 1st, 2013, when Dr. Wilson became the 12th President of Wayne State University. **Exhibit 16**—*Biography of Dr. M. Roy Wilson*.

**47.** It was Dr. Wilson's *focus* to energize Wayne State University towards becoming a Globally recognized "preeminent public urban research university known for academic and research excellence," that sets the stage for the travesties within. *Id.*

**48.** *Building off* the successes and accomplishments of the 2007—2012 Wayne State University School of Business Strategic Plan, and with a newly energized Dr. Wilson at the helm, Wayne State University faculty *and* community stakeholders devised a strategic plan for the Wayne State University School of Business for 2013—2018. **Exhibit 17**—*Wayne State University School of Business 2013—2018 Strategic Plan*.

**49.** The development of this 2013—2018 Strategic Plan, and the extensive research conducted, identified the need to integrate the University's systems' *focus* of academic research and local-business connectivity, to develop brand value through marketing Wayne State University holistically. This integrated affiliation with education and industry becomes reality in part when Wayne State University accepts a *$40*-million-dollar gift from Mike and Marian Ilitch; this gift sparked the *2015* marketing initiative of rebranding the Wayne State University School of Business *to the* Wayne State University Mike Ilitch School of Business ("WSUMISB"). **Exhibit 18**—*October 30, 2015, WSU Article*.

**50.** Additionally, the 2013—2018 Wayne State University School of Business Strategic Plan integrates *seamlessly* with and is of the same-substantive makeup in comparison to the Universities' overall 2016—2021 "*Distinctively Wayne State University*" Strategic Plan. **Exhibit 19**—*Wayne State 2016—2021 "Distinctively Wayne State University" Strategic Plan*.

**51.** Interestingly, these plans were *later extended* and continued linked in form as (*1*) WSUMISB 2019—2022 Strategic Plan, *and* (*2*) 2022—2027 Wayne State University "***Our Moment In Time***" Strategic Plan. *See*, **Exhibit 20**—*WSU MISB 2019—2022 Strategic Plan*; **Exhibit 21**—Wayne State 2022—2027 "*Our Moment In Time*" Strategic Plan *in Brief*; **Exhibit 22**—Wayne State 2022—2027 "*Our Moment In Time*" Strategic Plan *in Full*; **Exhibit 23**—WSU website: 2022-2027 Strategic Plan Website.

*52.* In fact, the WSUMISB altered and reduced the length of its strategic planning cycle from every five (*5*) to two (*2*) years to *sync* with the University's overall strategic-planning cycle to leverage the *systems'* focus on strategic planning in lieu of a fragmented implementation.

*53.* Each of these Strategic Plans **focuses** heavily on *built-in* measurements, "exploiting" research opportunities, "mutually beneficial" relationships between faculty and students, and the "acquisition of data for planning purposes." *See*, **Exhibit 19**, *at p*. 27.

*54.* Objectively clear, "***research and discovery***" <u>is</u> "***an unrelenting quest***," and it seems that given these facts *herein* the Defendants will at-*all*-costs reach its' objectives. *See again,* **Exhibit 19***, at p.* 17; **Exhibit 17**, *at p*. 25*;* **Exhibit 21***, at p.* 9*.*

*55.* Interestingly, ***The Barthwell Group, Inc.,*** was retained by WSU President, M. Roy Wilson, sometime after May 2013 to develop both (*1*) 2013—2018 Wayne State University School of Business Strategic Plan, *and* (*2*) 2016—2021 "*Distinctively Wayne State University*" Strategic Plan. **Exhibit 17**, *at pp*. 11; 16-17; 25-27; 29; 31-32; **Exhibit 19**, *at pp*. 6; 30; 36; *see also*, **Exhibit 24**—*Wayne State 2016-2021 Standing Committee Notice*; **Exhibit 25**—*Akosua Barthwell Evans Biography #1*; **Exhibit 26**—Dr. Akosua Barthwell-Evans Biography #2.

*56.* The Barthwell Group went to *great lengths* conducting targeted research on behalf of the Defendants by directly soliciting more than thirty (*30*) premier businesses and private-equity firms in and around Detroit, Michigan. *See again*, **Exhibit 17**, *at pp*. 11; 17; 25-32; *see also*, **Exhibit 27**—*WSU Board of Visitors for 2013—2021 Strategic Plan.*

*57.* Principally, The Barthwell Group was formed by the <u>New</u> <u>York</u> Attorney, Ms. Mary Akosua Barthwell Evans, and her son, Mr. Walter K. Evans, sometime in and around September 15th, 2005. **Exhibit 28**—*New York Attorney Search: Attorney #2437432, Mary Akosua-Barthwell-Evans*; **Exhibit 29**—*Martindale Hubble Advertisement: Mary Jane Akosua B. Evans*; ***Exhibit 30***—*Avvo Advertisement: Mary Akosua Barthwell Evans;* **Exhibit 31**—*Mary Akosua Barthwell*

*Biography #3;* **Exhibit 32**—*Walter K. Evans Biography #1*; **Exhibit 33**—*Walter K. Evans Biography #2.*

**58.** The Barthwell Group is registered with the Michigan Department of License and Regulatory Affairs ("LARA") as a Foreign Profit Corporation incorporated under the laws of the State of Delaware sometime in and around September 27th, 2005. *See*, **Exhibit 34**—*The Barthwell Group, Inc., Delaware Entity Registry*; **Exhibit 35**—*Application for Certificate of Authority to Transact Business or Conduct Affairs in Michigan*; **Exhibit 36**—*The Barthwell Group, Inc., SAM Registration*; **Exhibit 37**—*2011 Annual Report by Authorized Officer or Agent: Mr. Jason F. Gizowski*; **Exhibit 38**—*2017 Annual Report naming Walter Evans as Director*; **Exhibit 39**—*The Barthwell Group, Inc., LARA Overview*; **Exhibit 40**—*The Barthwell Group Website.*

**59.** Based upon information and belief, Ms. Mary Akosua Barthwell Evans, is *also* practicing unauthorized law contrary to MCL 600.916 out of the same 2035 W. Boston Blvd., Detroit, 48206, property used as The Barthwell Group's principal place of business. *See later*, **Exhibit 41**—*Michigan Attorney Grievance Commission Request for Investigation of Ms. Mary Jane Akosua Barthwell-Evans for Unauthorized Practice of Law (to be filed upon authorization). See again*, **Exhibit 28**—**Exhibit 31**; **Exhibit 34**—**Exhibit 40**.

**60.** After these Strategic Plans were developed by The Barthwell Group and the Defendants through the development of a customized matrix of the "Critical Chain Application" of TOC leveraging support from the surrounding community of Detroit, Michigan, *only then* did the *effects* began to reverberate as a "*win-win*" solution for "everyone" involved; customized matrix of targeted businesses is now known as the "Board of Visitors." *See again*, **Exhibit 27**.

**61.** This "Critical Chain Application" of TOC is the connectivity of education *and* industry *through* the educational experience, our new form of the old-nationalistic *engine of change*. Whereas the Defendants understand it now, the Educator can "*use these* [**STUDENTS**] *as bridges to*

*companies*," promoting *and* manipulating the direction and natural evolution of the nationalistic mission of the State ***and*** while simultaneously personally profiting too. **Exhibit 42**—*Critical Chain*, *Ekiyahu M. Goldratt, The North River Press, September 4th, 1997*, *at pp. 9-10*; **Exhibit 43**—*Critical Chain Synopsis*, *at pp.* 4-5. It was the exploitation of the pedagogical experience that began the Defendants *upward* climb through the intellectual ranks.

**62.** We see sometime in and around *2021-2022* the Defendants pivot from The Barthwell Group to the foreign for-profit Tampa-Florida based external-strategic think tank, ***MGT of America Consulting, L.L.C.***, who *takes off with the baton* to continue developing, implementing, researching, and overseeing the *complexities* of the WSU Strategic Plans. *See again*, **Exhibit 23**, *at p.* 2; *referenced there at the bottom overtly as* "*MGT Consulting*."

**63.** It is relevant to point out that "MGT" is an abbreviation for "management" in full and before this corporation merged in *2016*, it was chiefly known as "[Management] of America, *Inc.*," *curiously*. **Exhibit 44**—*Articles of Merger of MGT OF AMERICA, INC.*

**64.** In fact, as "education clients" the Defendants have pivoted to [Management] of America, *Inc.*, while still *leveraging* through its' integrated-marketing campaign the entrepreneurial spirit of The Barthwell Group's founders' father's entrepreneurial story *here in* Detroit, being that of the well-known franchisor, Mr. Sydney Barthwell, *Sr.*, *respectfully*. **Exhibit 45**—*The Story of Sydney Barthwell*.

**65.** As of March *21*, *2017*, [Management] of America, *Inc.*, is a certified and registered-foreign corporation with LARA. **Exhibit 46**—*Application for Certificate of Authority to Transact Business in Michigan*; **Exhibit 47**—*Certificate of Correction; Florida address correction*.

**66.** Also, it is relevant to note that a (*1*) Mr. Fred Seamon *and* (*2*) Mr. John Bradley Burgess, both authorized Managers, are not actively listed as "*People*" on [Management] of America, *Inc.*'s

website. **Exhibit 48**—*2022 MGT of America Consulting, L.L.C., Annual Report*; **Exhibit 49**—*Division of Corporations Website*; **Exhibit 50**—*MGT of America Consulting, L.L.C., website*.

**67.** *Importantly*, the objectively cataloged capabilities these consultants conjure clearly includes *curriculum* <u>review</u> *and* <u>selection</u>…"*quite frankly*" <u>too</u> . **Exhibit 50**, *at p.* 24.

**68. *Remember this*** when you learn about "Mrs. Murillo's" CDC *in the future*. We also receive several-small glimpses of objective truth in [Management] of America, *Inc.'s*, blog-of-sorts, culminating on April 7, 2022, identifying that Texas A&M has *also* implemented a "*continuous improvement process*" of sorts. **Exhibit 50**, *at p.* 51. Perhaps, on May 11th, 2022, Ms. Kasey Price, Director of MGT Education *with* MGT of America Consulting, was tipping us off more objectively when she confessed; ***remember this*** too when you learn about CHEN *in the future*:

> **"There is definitely an art to balancing the very real human element to change with the necessity of change to prepare an organization to be situated for future success—um—<u>and sometimes those aren't things that you can really write in the report</u>**. *Ugh*. You know, you can't write feelings into a final report, but you absolutely, and we do have a lot of conversations with, *um*, institutional leaders and with our clients…"
>
> **Exhibit 50**, *at p.* 52; **Exhibit 51**—*MGT Education Video: Leaders Talk Series: Innovation in Education MP4, at* 00:59 *et seq*.; **Exhibit 52**—*Innovation in Education Transcript, at p.* 3. *Emphasis Added.*

**69.** This intentionally *crooked* paradigm of '*research first students second'* has permeated throughout the body corporate of Wayne State University—*truly*, the ***<u>entire</u>*** educational ***<u>ecosystem</u>***. This integrated-outward expression by Wayne State University administrators, explicitly Mr. Wilson, propelled Wayne State University, its affiliates, and faculty on an *upward* climb through the intellectual ranks leading to and **<u>supported by</u>** in part the *facts* that follow…remember ***one-more thing***, in that <u>without</u> **STUDENTS**—***none of this exists***.

**70. Now**, *as this Complaint is being finalized*—Dr. Wilson has announced he will be stepping down as President of Wayne State University on July 31, 2023. As of September 2022, the "presidential search process" has begun with the anticipated completion date of sometime in May 2023. **Exhibit 131**—*Presidential Search Committee Calendar*.

## LOUIS LESSEM, EMERITUS VICE PRESIDENT & GENERAL COUNSEL OF WAYNE STATE UNIVERSITY

**71.** *Respectfully*, Mr. Louis Lessem, *Esq*., is being sued in his **individual** and **official capacity** as Emeritus Vice President & General Counsel of Wayne State University. **Exhibit 53**—*Biography of Mr. Louis Lessem*; **Exhibit 54**—*Organizational Chart for Mr. Lessem*; **Exhibit 55**—*State Bar of Michigan Attorney Search: Mr. Louis Lessem*.

**72.** It took a lot of time to individually understand and digest this knowledge to properly reengineer what is *truly* occurring here; proper thought takes time and the *right* data. During this period of research, *I* submitted complaints to Wayne State University generating invalid action; copied Mr. Lessem on correspondences to the Wayne State University Office of Equal Opportunity; *I* requested various records through the Freedom of Information Act, specifically on March 10th, 2021, and those responsive records are being unjustly withheld *still* more than two-year later after payment; *and I* was *compelled* to notify Mr. Lessem of *my* '*intent*' to file a lawsuit against the Defendant based on the 'as-applied' *vague* and *overbroad language* of MCL 600.6431 *et. seq*., regarding the Michigan Court of Claims' Notice Requirements. **Exhibit 56—***Notice of Intent to File Claim Filed 5/5/2021*.

**73.** Filing this Notice of Intent was a taxing decision because the zealous advocate within wanted to forgo giving the Defendants any notice, to starve the Defendants of the <u>*data*</u> of my direction of thought. But, I *reluctantly* filed this Notice of Intent and delivered a copy to both the Michigan Attorney General, Ms. Dana Nessel, and the Defendants through Mr. Lessem and his *then* Office of General Counsel.

**74.** In complying with this compulsive language, my compelled-communication was an effort to *mitigate* my damages and avoid unnecessary noise by the Defendants in the form of a frivolous Motion for Summary Disposition for failure to give 'proper notice' under MCL§ 600.6431 as a necessary-condition precedent to litigate. Or *simply*, to then repel unjustified defensive arguments by the Defendants made to obtain a 'time buffers' which would allow the Defendants to que additional defensive stratagem, *i.e.*, if I *did not* give the Defendants' notice under MCL§ 600.6431, they would move to strike my entire Complaint for failure to give proper notice.

**75.** This is *important* to note, because the Defendants have used this open-question-quasi-legal defense to stall proceedings in multiple venues, little has resulted in materially rectifying this constraining and frivolous argument. First, in *Steckloff v. Wayne State University (2019),* the Honorable Senior United States District Judge for the Eastern District of Michigan *unequivocally states* that the *"*Defendant[s] *improperly* construes § 600.6431(1) in a vacuum*."* Continuing on by clearly identifying the proper application of law:

> "The Court *need only* its <u>*common sense*</u> to deduce that the Court of Claims Act sets forth the applicable procedures for cases litigates in the Court of Claims, <u>*not*</u> in every other court across the state of Michigan."

**76.** Despite this, the Defendants' most recent attempt to raise this quasi-legal defense was noted in the *2021* unpublished Michigan Court of Appeals decision, *Susan Christie v. Wayne State University*, where the *Defendants appealed* this *exact* question of law.

**77.** The Michigan Court of Appeals positioned the Defendants' argument as though "[a]ccording to defendant (Wayne State University), compliance with MCL 600.6431 is a condition precedent to suing it; this, if the statute is not followed, the lawsuit must be dismissed." *Id*. The Court in *Susan Christie disagreed* with the Defendants' argument, citing another *unpublished* case involving the *same* question of law, that time it was the University of Michigan raising this

**buffering** technique. *See more recently, Tyrrell v. University of Michigan 335 Mich. App. 254, 271-72 (2020).*

*78.* The Defendants' belief that a Notice of Intent is a prerequisite to file suit in *every* venue outside the Michigan Court of Claims **is absolutely flawed** and would be a frivolous claim designed to create a defensive-time-buffer and confuse the substance of dispute, ultimately this effect is just misleading the Tribunal. *In this instance though*, it is how Mr. Lessem has used the effect of this vague and overbroad language, my mitigation and coerced speech in the form of this Notice of Intent, along with the information gleaned defensively from internal processes to offensively defend and that is what triggers the complexity of this case further as demonstrative of the ongoing retaliation as a direct result of Plaintiff Attorney Cochrane's whistleblowing.

*79.* Here, Mr. Lessem has everything needed to begin the Defendants' defense and that is exactly what has done *in retaliation* to my **lawful pursuit** of data via the internal complaint ***and*** FOIA processes violating the law, legal ethics, and in retaliating against this whistleblowing.

*80.* The careful dissemination of data is a strategic process in all information warfare. But, the sequence of events and Mr. Lessem's conflicted-authority structure, *I believe*, this conduct amounts to the deliberate disobedience of Wayne State University Policy and established law.

*81.* According to Mr. Lessem's Wayne State University Biography: **Exhibit 53**; **54**; *& 55*

   (*1*) "[h]e determines the legal strategy for the University in litigation;"

   (*2*) "[h]e supervises the Office of the General Counsel and the Office of Equal Opportunity;"

   (*3*) Mr. Lessem also controls the FOIA requests made on the University; *and*

   (**4**) Mr. Lessem also serves as General Counsel for the Wayne State University Foundation [including the Wayne State University Institutional Review Board.

**82.** Now, my February 5th, 2021, complaint with the Wayne State University Office of Equal Opportunity, contained ample evidence at the time based upon Plaintiff's knowledge of this dispute at the time and demonstrated **concrete** discrimination, harassment, threats, and coercion and despite this my complaint was *summarily dismissed* with an **unintelligible** response by Mr. Lessem's Office of Equal Opportunity. **Exhibit 57**—*WSU Office of Equal Opportunity Closure Letter*.

**83.** The Office of General Counsel through the Office of Equal Opportunity completely foreclosed the Wayne State University 2005-03 Discrimination and Harassment Complaint Process.

**84.** Also, in failing to follow proper procedure, the Office of General Counsel through the Office of Equal Opportunity failed to act in violation of Wayne State University Code Annotated 2.28.01 Non-Discrimination/Affirmative Action Policy and 2.28.06 Sexual Harassment Policy.

**85.** The complete foreclosure of the discrimination and harassment policy by the Defendants *collectively*, in violation of Federal and State law, amounts to the actual deprivation of the Plaintiffs' rights and liberties under color of law in **retaliation** to the objective truth submitted by Plaintiff, Attorney Cochrane.

**86.** Next, *before* I filed the Notice of Intent, much of the initial FOIA requests I submitted to the Wayne State University FOIA Coordinator went answered with no records available. As of this Complaint though, <u>one</u> of my original FOIA requests from March 10, 2021, is <u>still</u> <u>outstanding</u>, <u>even</u> <u>with</u> payment-in-full being negotiated properly in retaliation to *this* reality. **Exhibit 58**— *March 9th, 2021, WSU FOIA Request*; **Exhibit 59**—*November 17, 2021, FOIA Response Email*; **Exhibit 60**—*November 17, 2021 FOIA Response Fee Itemization*; **Exhibit 61**—*November 30, 2021, Final Payment & Clarification Cover Letter*; **Exhibit 62**—*November 30, 2021, Personal Money Order #35438336*; **Exhibit 63**—*USPS Tracking # 9505512125321334212853 for* **Exhibit 61** *&* **Exhibit 62**.

**87.** This specific FOIA request *is* valid, the Defendants **have** identified responsive records that exist, have been paid for in full, and despite this Mr. Lessem has failed to deliver this data for *more than two year* exacerbating the Plaintiffs' damages.

**88.** The outstanding-responsive records are being unlawfully withheld by the Defendants thus causing the actual deprivation of the Plaintiffs' rights and liberties under color of law now by Mr. Lessem's replacement in retaliation to Plaintiffs' whistleblowing.

**89.** Moreover, it is **clear** that Dr. James T. Low, the Wayne State University Mike Ilitch School of Business Marketing and Supply Chain Management Emeritus Professor who ignited this dispute, is working with both the Wayne State University FOIA Coordinator, Mrs. Linda Lowe, and Wayne State University Assistant General Counsel, Mr. Thomas Cavalier, both of which are under the direct supervision of Mr. Lessem. **Exhibit 64—***Dr. James T. Low WSU Organizational Chart*.

**90.** This collusion, behind the façade of the organizational structure that is Wayne State University, has allowed Mr. Lessem to *selectively* act on the 'best interests of the corporation', and in this case the effect of that action has caused and is *still* causing the actual deprivation of the Plaintiffs' rights and liberties under color of law in violation of criminal law and the MRPC.

**91.** Finally, *having all this data*, Mr. Lessem knows, *strategically*, exactly what *I* am up against financially, morally, personally, and professionally in pursuing these **valid** questions—as *I* am being *squeezed* and *ripped apart* by the **toxic stress** of *my* constraints which have become in part *the system* itself. It is therefore my belief that Mr. Lessem has acted outside his authority under color of law to intentionally leverage his conflicted position to impede and delay my lawful pursuit of justice given the collusion of oversight authority and the data he has received from each of these arms of communication. *See too*, **Exhibit 66**—*Michigan Attorney Grievance Commission Request for Investigation of Mr. Louis Lessem (to be filed per authorization).*

**LAURA JOHNSTON, DEPUTY GENERAL COUNSEL OF WAYNE STATE UNIVERSITY**

*92. Respectfully*, Mrs. Laura Johnston, *Esq*., is being sued in her **individual** and **official capacity** as Deputy General Counsel of Wayne State University having served as Interim Vice President following Mr. Louis Lessem's departure. **Exhibit 67**—*Organizational Chart of Laura Johnston;* **Exhibit 68**—*April 2022 Office of General Counsel Organizational Chart*; **Exhibit 69**— *State Bar of Michigan Attorney Search: Laura Johnston.*

*93.* On or about April 7th, 2022, the Defendants updated the Wayne State University General Counsel website to reflect Mr. Louis Lessem's 'retirement' sometime before this period in and around the beginning of 2022, and also that Attorney, Mrs. Laura Johnston ("Mrs. Johnston"), thereafter has assumed this vacated position by acting as the Defendants' "Interim Vice President and General Counsel." **Exhibit 70**—*WSU General Counsel Update.*

*94.* It is relevant to identify that Mrs. Laura Johnston was appointed from *within* and has *extensive* knowledge of the innerworkings of the Defendants' organization given her individual-positioning *and* intellectual expertise. *Id*. Aside from Mr. Lessem's thirty-four (*34*) years of service beginning in 1988, *the year I was born*, Mrs. Johnston has the *third*-highest seniority of the General Counsel's Office with twenty-four (*24*) years; this is four (*4*) years shy of the now-*highest*-seniority member, Assistant General Counsel, Mrs. Pamela R. Galloway, with twenty-eight (*28*) years, *respectfully*. *Id*.

*95.* Assuming the authority of Mr. Lessem wholly transferred to Mrs. Johnston—*her express and intentional failure* to disseminate the outstanding March 10th, 2021, paid for FOIA Requests signals her *defensive acquiescence* to the Defendants' unethical and illegal decision making through Mr. Lessem's **retaliation to silence** this objective **truth**, *and thus* while now in her *new* capacity this failure to act has *and* will continue to deprive the Plaintiffs of their right to redress their government under color of law given *this objectively*-colluding-state enterprise.

*See also,* **Exhibit 71**—*Michigan Attorney Grievance Commission Request for Investigation of Mrs. Laura Johnston (to be filed upon authorization).*

**96. Now**, as this Complaint is being finalized, the Defendants have filled this vacancy by hiring from <u>outside</u> its' system appointing Michigan Attorney, Michael Poterala, as Vice President & General Counsel for Wayne State University. **Exhibit 132**—*Poterala Notice of Appointment*; **Exhibit 133**—*WSU Website Notice*; **Exhibit 134**—*State Bar of Michigan Attorney Search: Michael Poterala.*

### NIKKI WRIGHT, ASSISTANT VICE PRESIDENT OF THE WAYNE STATE UNIVERSITY OFFICE OF EQUAL OPPORTUNITY

**97.** *Respectfully*, Ms. Nikki Wright, *Esq.*, is being sued in her **<u>individual capacity</u>** as former Assistant Vice President of the Office of Equal Opportunity at Wayne State University. **Exhibit 72**—*Organizational Chart of Ms. Nikki Wright*; **Exhibit 73**—*State Bar of Michigan Attorney Search: Ms. Nikki Wright.*

**98.** Specifically, Ms. Nikki Wright has acted in her official capacity under color of law *as* Assistant Vice President of the Office of Equal Opportunity by colluding with Mr. Lessem's foreclosure of Wayne State University Policy and well-established law resulting in the actual deprivation of the Plaintiffs' rights and liberties under color of law. *See too*, **Exhibit 74**—*Attorney Grievance Commission Request for Investigation of Ms. Nikki Wright (filed post authorization).*

**99.** It is relevant to note here in brief and which will otherwise be identified expressly later, that on or about March 16th, 2021, *then acting* Assistant Vice President of the Office of Equal Opportunity at Wayne State University, Ms. Nikki Wright, issued the barren and devoid reasoning that follows summarily dismissing the Office of Equal Opportunity Discrimination and Harassment Complaint *I* filed with Ms. Wright's (*and* Mr. Lessem's) Wayne State University Office of Equal Opportunity on February 5th, 2021:

"*I* have conducted this initial assessment based upon the information you provided to the OEO. *Unfortunately*, this information *does not* set forth any allegations that establish a *potential* violation of the non-discrimination or harassment policies *of* Wayne State University. *Accordingly*, the Office of Equal Opportunity *will not take any further action in this matter*."

**Exhibit 57**—*March 16, 2021, Nikki Wright Closure Letter*
*Emphasis Added.*

**100.**   *In fact*, we know objectively that sometime following the July 13th, 2021, "*notice for efforts to give back*" article we find that Ms. Nikki Wright has too vacated her position and was otherwise replaced by Associate Vice President for Equal Opportunity, Ms. Amy Stirling Lammers, who *herself* has worked within the Wayne State University Office of the General Counsel from *2007*, fifteen-years (*15*) ago; the year I graduated *high* school. *See again*, **Exhibit 70**; *also*, **Exhibit 75**—*July 13, 2021, Wright Advertisement;* **Exhibit 76**—*WSU Office of Equal Opportunity Office Roster*; **Exhibit 77**—*WSU Office of Equal Opportunity Organization Chart;* **Exhibit 78**—*Organizational Chart of Amy Lammers*.

**101.**   Also, as a plainly objective fact, the Wayne State University Office of Equal Opportunity, controlled by Mr. Lessem and Ms. Wright, affirmatively supported the Defendants' overall objective of "*creating knowledge*" through the ideological "*research*" focus supporting the University. **Exhibit 79**—*2007 OEO Register Volume 1, Issue 10, see Page 1 "WSU MISSION*."

**102.**   *This* choice of words *is* in essence the Defendants <u>true</u> mission—the *unwritten* mission— atop their new-founded Acropolis this communication objectively identifies the self-endowed position the Defendants have chosen for themselves as our new-age *self-proclaimed* Philosopher Kings; *How will you live* [*the Defendants'*] *mission*?" *Id*.

**103.**   This bizarre phraseology, *explicitly* <u>amplified</u> *by* the Defendants' integrated-marketing campaign ("IMC"), was just *one* chosen representative communication designed to **ECHO** the Defendants' objectives reaching just *a little bit* further into the ethos of reality. *Id*.

104.   ***COMMUNICATION HINT***: Recognizing a silos' ***ECHO*** to the whole will allow you to connect additional vertices of the main communications' effect. This is particularly useful where there is a *strategically un*recorded acquiescence to an unrecorded objective. *Simply*, a pick-up-game of basketball; euchre; poker; **the order** has been established and you either follow suit and silently acquiesce, **or you get *bounced* out**. Every group or system has this inherent-structured effect, *i.e.*, the status quo, and the boundaries are intrinsically known.

105.   This "*part*" of the Defendants' whole "*system*" was in tune with the overall objective of the whole system as representative *of* the Defendants' Strategic Plans.

106.   Frankly—even Mr. Lessem advanced the Defendants' "*research*" objectives by speaking at a Higher Education Law Seminar in 2014 objectively communicating his ***ECHO*** too. **Exhibit 80**—*American Conference Institute's Forum on Higher Education Law, at pp. 6, see* Track C, at 1:15.

### LINDA LOWE, WAYNE STATE UNIVERSITY FOIA COORDINATOR

107.   *Respectfully*, Mrs. Linda Lowe, is being sued in her **official capacity only** as the FOIA Coordinator at Wayne State University. **Exhibit 81**—*Organizational Chart of Mrs. Linda Lowe*. Specifically, Mrs. Linda Lowe has acted in her official capacity under color of law as the Wayne State University FOIA Coordinator by colluding with the Defendants foreclosure of Wayne State University policy and established law resulting in the actual deprivation of the Plaintiffs' rights and liberties.

### DAVID J. STRAUSS, WAYNE STATE UNVIERSITY DEAN OF STUDENTS

108.   *Respectfully*, Dr. David J. Strauss is being sued in his **individual and official capacity** as Wayne State University Dean of Students. **Exhibit 82**—*David Strauss Biography*; **Exhibit 83**—*Organizational Chart of Dr. David Strauss*.

*109.* Specifically, Dr. Strauss has acted in his official capacity under color of law as the Wayne State University Dean of Students by colluding with Mr. Louis Lessem, Ms. Nikki Wright, Mr. John Taylor, Dr. James T. Low, and Mrs. Deborah Habel in violation of Wayne State University policy and well-established state and federal law resulting in the actual deprivation of the Plaintiffs' rights and liberties.

*110.* It is prudent and relevant for the record to candidly identify my entire professional experience at Wayne State University that involves *specifically* Dr. David Strauss given the ethical-Pandora's box the Defendants have placed me to *defensively silence me*—quashing and constraining my clearly established Constitutional Due Process Rights.

*111.* *First,* on March 16th, 2018, the Wayne State University Student Senate emailed the student body and sought only five (*5*) **STUDENTS** to join the Wayne State University Student Newspaper Publications Board. **Exhibit 84**—*The South End Advertisement*.

*112.* This point in time and space is representative of my first term at Wayne State University in the Winter of 2018; I took four (*4*) classes from January 10th to April 25th, 2018. After receiving this email, the next day on March 17th, 2018, *I* contacted the Wayne State University Student Senate Vice President and identified my interest in joining the Defendants. *See below*, **Exhibit 85**—*Student Publication Board Introduction Email*.

*113.* Next, on March 19th, 2018, the Senate Vice President communicated confirmation my credentials were beings reviewed and that she "hope[ed] to have a response back to [me] by April 2nd." *Id*.

*114.* Indeed, on April 2nd, 2018, *I* received an email from the WSU Student Senate *congratulating* me on my appointment to the Wayne State University Student Publication Board. **Exhibit 86**—*Wayne State Student Senate Congratulations Email*. Objectively, this was my ***first encounter*** with Dr. David Strauss by way of digital-carbon copy. *Id*.

*115.*    Next, on April 3rd, 2018, Dr. David Strauss emailed to welcome the group of presumably seven (7) **STUDENTS** and highlighted several dates, notably April 23rd, 2018, as the deadline to vote for the next Editor in Chief and Managing Editor of *The South End*. **Exhibit 87**—*First contact with Dr. David Strauss*.

*116.*    This April 3rd email from Dr. Strauss was the <u>true</u>-***first encounter*** I had with the WSU MISB Dean of Students and Adjunct Lecturer of the Department of Economics in a professional setting. *Id*.

*117.*    Next, on April 20th, 2018, Dr. Strauss emailed the same seven (7) STUDENTS and attached five (5) applications of candidates for *The South End* Editor in Chief and Managing Editor. **Exhibit 88**—*Second contact with Dr. David Strauss*. The same day, I communicated my vote and availability to Dr. Strauss contacting him directly by email. *Id*. Unfortunately, on April 30th, 2018, I emailed Dr. Strauss to rescind by availability to attend in-person interviews of the selected candidates because my wife was "battling some intense morning sickness," and *I* was unable to meet that commitment. **Exhibit 89**—*Third contact with Dr. David Strauss*.

*118.*    After this initial vote and the recission of my availability to attend these "interviews," *I* did not receive any further communications from Dr. Strauss directly. Instead, on September 20th, 2018, Ms. Ibrahim contacted me to determine whether I was "interested in being reappointed to the Student Publication Board for the 2018/2019 school year." **Exhibit 90**—*Student Publication Reappointment Email*.

*119.*    Plainly, I expressed the desire to be reappointed and inquired into how I could go about writing an article for the paper. *Id*. Responding, the Senate V.P. acknowledged forwarding my reappointment and identified the parameters of the potential for a conflict of interest given my position as a member on the Publication Board which she would follow up on. *Id*.

*120.*    Finally, on September 26th, 2018, the Senate V.P. confirmed that my position as an appointed Member of the Student Publication Board created a conflict of interest in any affiliation with *The South End* directly. *Id*. In response to the V.P's email, I expressed my preference in my appointment as Member of the Student Publication Board. **Exhibit 91**— *Reappointment Follow Up Email*. To date, *these are all* the actions and communications I have made as Member of the Student Publication Board at Wayne State University.

*121.*    Next, my **_Second_**-true encounter with Dr. Strauss occurred on September 24th, 2020, when he jumped rank and ceased communication as I *began* to seek formal remediation of the facts *herein*. **Exhibit 92**—*David Strauss Stop Communication Email*. Specifically, in reviewing this email chain you can clearly *see the spark* igniting *this* Complaint as *I then* sought to understand what *I now know* as the objective truth *herein*.

*122.*    Following this unequivocal cease and desist of further communication, the Dean of Students Office through Dr. David Strauss <u>actively</u> <u>participated</u> in furtherance of the Defendants' <u>ongoing</u> **fraud** by mailing the fraudulently leveraged artifice (**WSU JONAH CERTIFICATE**) through the United States Postal Service (USPS).

*123.*    Where, on September 27th, 2020, *I* received my *damaged* WSU Jonah Certificate in the mail to perhaps quiet my legitimate dissent. **Exhibit 93**—*Damaged WSU Jonah Certificate*.

*124.*    Further, the "*Attested to*" date and signature of Dr. James T. Low is a further example of the Defendants' deep fraud given the impossibility of such signature date given that objectively Professor Habel on September 18th, 2020, identifies at that time the failed fulfilment of these invalid certificates. Moreover, *as you will see later*, prior to class on June 17th, 2020, Professor Habel <u>unequivocally</u> identifies the *fraudulent* certificates are as follows:

> "*I am going to print them and mail them from home; I*
> *have envelopes and stuff here.*"

*125.* *Finally*, the last encounter with Dr. David Strauss had the effect of placing me, Attorney Cochrane, inside this ethical-Pandora's box, was on March 18th, 2021. **Exhibit 94**—*David Strauss Office of Equal Opportunity Follow Up Email*.

*126.* Briefly, on February 5th, 2021, *I* filed a Discrimination and Harassment Complaint with the Defendants' Office of Equal Opportunity identifying (1) Dr. James T. Low; (2) Professor Deborah Habel; and (3) Dr. David Strauss as those who have acted against my rights. Then, on March 4th, 2021, Mr. Tommy Martin, Wayne State University Office of Equal Opportunity Intake Specialist, verbally confirms and identifies Dr. David Strauss as an accused too.

*127.* Yet, *illogically*, Ms. Nikki Wright (and presumably then in control, Mr. Louis Lessem) directs Dr. David Strauss to "follow up" on my Discrimination and Harassment Complaint raising these ethical walls given my *in pro per* positioning at this time. *Id*.

## JOHN C. TAYLOR, WAYNE STATE UNIVERSITY MIKE ILITCH SCHOOL OF BUSINESS MARKETING AND SUPPLY CHAIN MANAGEMENT DIRECTOR

*128.* *Respectfully*, Dr. John C. Taylor is being sued in his **individual** and **official capacity** as former Wayne State University Associate Professor and Chair of the Department of Marketing and Supply Chain Management at the Wayne State University Mike Ilitch School of Business. **Exhibit 95**—*John C. Taylor Biography*; **Exhibit 96**—*John C. Taylor Organizational Chart*.

*129.* *Do note* that **Exhibit 96** identifies Mr. Sachin Modi *is now* a former successor to Dr. Taylor's role himself having taken and vacated thereafter, relevant for this record, this *only* occurred after my investigation connected Dr. Taylor to the facts *herein* and that was objectively identified to the Defendants. Interestingly, sometime in or around 2016 Dr. Taylor "[h]ired new tenure track faculty members Dr. Schin Modi" as noted in **Exhibit 97** below on page 21-22.

*130.* Specifically, Dr. Taylor has acted in his official capacity as Associate Professor and *former* Chair of the Department of Marketing and Supply Chain Management at the Wayne State

University Mike Ilitch School of Business by <u>managing</u> the <u>implementation</u> of the Defendants' intellectual trap and colluding with *including but not limited to* Dr. David Strauss, Dr. James T. Low, and Mrs. Deborah Habel in violation of Wayne State University policy and established law resulting in the actual deprivation of the Plaintiffs' rights and liberties under color of law.

*131.* More specifically, Dr. John Taylor's involvement <u>is</u> significant given his incredibly in-depth role as principal marketer for the Defendants. **Exhibit 97**—*Resume of Dr. John C. Taylor*. Further, as will be discussed later, the attachment of the Theory of Constraints to Wayne State University as a whole was Dr. John Taylor's role as principal Member of the *Wayne State University School of Business 2013—2018 Strategic Plan* Strategic Implementation Team. *See again*, **Exhibit 17**, *at p.* 20, *Appendix 3*. Where, after this attachment of the Theory of Constraints was infused with the Defendants' Strategic Plan**s**—Dr. John C. Taylor carried over this authority <u>and</u> mission by avoiding the proper conditional precedents for institutional approval of such intrusive curriculum and participating in the unsanctioned <u>and</u> unconstitutional **HUMAN RESEARCH** <u>on</u> unknowing **STUDENTS** *by* Dr. James T. Low <u>and</u> Professor Deborah Habel…ultimately which conduct ripens *this* Complaint.

### JAMES T. LOW, WAYNE STATE UNIVERSITY MIKE ILITCH SCHOOL OF BUSINESS MARKETING AND SUPPLY CHAIN MANAGEMENT EMERITUS PROFESSOR

*132.* *Respectfully*, Dr. James T. Low, is being sued in his **individual** <u>and</u> **official capacity** as Associate Emeritus Professor for the Marketing and Supply Chain Management Program at the Wayne State University Mike Ilitch School of Business. *See*, **Exhibit 64**; *see also*, **Exhibit 98**— *WSU Biography of Dr. James T. Low*; **Exhibit 99**—*TOCICO Biography of Dr. James T. Low*; **Exhibit 100**—*WSU Biography of Dr. James T. Low #2*; **Exhibit 101**—*WSU TedTalkX Biography of Dr. James T. Low*; **Exhibit 102**—*APICS Biography of Dr. James T. Low*.

*133.* Specifically, Dr. Low has acted in his official capacity under color of law as Associate Emeritus Professor by defrauding the Plaintiffs *and* colluding with *including but not limited to*

1   Dr. David Strauss, Dr. John Taylor, Mrs. Deborah Habel, and Mr. Louis Lessem in violation of

2   Wayne State University policy and established law resulting in the actual deprivation of the

3   Plaintiffs' rights and liberties.

4   **134.**    As identified later in the Background Factual Allegations—it is my *genuine belief* that the

5   root cause of *this* Complaint *and* the direct link between the Defendants and Dr. Eliyahu

6   Goldratt <u>is</u> in fact—*Dr. James T. Low*.

7   **DEBORAH HABEL, WAYNE STATE UNIVERSITY MIKE ILITCH SCHOOL OF**
8   **BUSINESS MARKETING AND SUPPLY CHAIN MANAGEMENT LECTURER**

9   **135.**    *Respectfully*, Mrs. Deborah Habel, is being sued in her <u>**individual**</u> and **official capacity** as

10   Lecturer/Associate Professor for the Marketing and Supply Chain Management Program at the

11   Wayne State University Mike Ilitch School of Business. **Exhibit 103**—*WSU Biography of*

12   *Deborah Habel*; **Exhibit 104**—*Organizational Chart of Deborah Habel*.

13   **136.**    Do note, that **Exhibit 104** identifies Mrs. Deborah Habel's *promoted* credentials of

14   "*Associate Professor*" *and* despite my unequivocal identification of the **TRUTH** herein.

15   **137.**    Specifically, Mrs. Habel has acted in her official capacity under color of law as Lecturer—

16   now *continuing* as *Associate Professor*—by defrauding the Plaintiffs in conformity with the

17   Defendants' common ideological motives *and* otherwise colluding with *including but not*

18   *limited to* Dr. David Strauss, Dr. John Taylor, and Dr. James T. Low in violation of Wayne

19   State University policy and well-established law resulting in the actual deprivation of the

20   Plaintiffs' rights and liberties.

21   **ROBERT FORSYTHE, DEAN OF WAYNE STATE UNIVERSITY**
22   **MIKE ILITCH SCHOOL OF BUSINESS**
23

24   **138.**    *Respectfully*, Dr. Robert Forsythe, is being sued in his <u>**individual capacity**</u> as *former* Dean

25   of the Wayne State University: Mike Ilitch School of Business. **Exhibit 105**—*Appointment of*

*Dr. Robert Forsythe Biographical Article*; **Exhibit 106**—*Organizational Chart of Dr. Robert Forsythe*.

*139.* Specifically, Dr. Forsythe has acted in his official-oversight capacity under color of law as Dean of Wayne State University's Mike Ilitch School of Business. Specifically, by defrauding the Plaintiffs in conformity with Defendants' common ideological motives, Dr. Forsythe has materially advanced the clear institutional objectives by colluding with *including but not limited to* President Wilson, Mr. Louis Lessem, Dr. David Strauss, Dr. John Taylor, Dr. James T. Low, Mrs. Deborah Habel, *and* Mrs. Kiantee-Rupert Jones violating Wayne State University policy and well-established law resulting in the actual deprivation of the Plaintiffs' rights and liberties.

*140.* **Now**, as this Complaint is being finalized, the Defendants have too sought to fill the vacancy by the departing Mr. Forsythe and have hired from <u>outside</u> its' internal ranks by selecting Virginia Kleist as his replacement. **Exhibit 135**—*Dean Kleist Notice of Appointment*; **Exhibit 136**—*Meet Dean Kleist Bulletin*; **Exhibit 137**—*Dean Kleist Email Introduction*.

*141.* Interestingly, even Dean Kleist understands that Wayne State is "uniquely situated to establish a pipeline of talented graduates" though this Critical Chain pipeline is already established. **Exhibit 137**.

*142.* And too, of the eleven (11) individuals involved, seven (7) have vacated their positions following Plaintiffs' objections and the retaliatory conduct that followed.

<u>**KIANTEE-RUPERT JONES, ASSISTANT DEAN OF GRADUATE PROGRAMS WAYNE STATE UNIVERSITY MIKE ILITCH SCHOOL OF BUSINESS**</u>

*143.* *Respectfully*, Mrs. Kiantee-Rupert Jones, is being sued in her **official capacity** as Assistant Dean of Graduate Programs at the Wayne State University: Mike Ilitch School of Business. **Exhibit 107**—*WSU Biography of Mrs. Kiantee-Rupert Jones*; **Exhibit 108**—*Organizational Chart of Mrs. Kiantte-Rupert Jones*. Specifically, Mrs. Rupert-Jones has acted in her official-oversight capacity under color of law as Assistant Dean by acting in conformity with *and*

materially advancing the Defendants' common motives and otherwise has colluded with *including but not limited to* President Wilson, Mr. Louis Lessem, Dr. David Strauss, Mr. John Taylor, Dr. James T. Low, and Mrs. Deborah Habel, and Mr. Forsythe in violation of Wayne State University policy and established law resulting in the actual deprivation of the Plaintiffs' rights and liberties.

## DEFENDANTS DO NOT HAVE IMMUNITY

*144.* The factual allegations ripening *this* Complaint patently identifies the Defendants' premeditated-unconstitutional conduct that which **forbids** immunity under *all* types including specifically: Sovereign Immunity; Qualified Immunity; the Governmental Tort Liability Act ("GTLA"), MCL 691.1407 *et. seq.*; *or* any other form claimed by the Defendants.

*145.* To be clear, the Defendants' conduct individually <u>and</u> collectively **objectively shocks the conscious** and absent Court intervention this invasion of liberty *and of* the involuntarily coerced **STUDENTS** who *does not know* the true effect of their participation in this discriminatory assault on the pedagogical foundation will continue as the Defendants leverage these **STUDENTS'** pedagogical experience using the unjust gains for public and private benefit without just compensation nor providing informed consent to conduct human subject research.

## 1. DEFENDANTS DO NOT HAVE SOVEREIGN IMMUNITY

*146.* The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Further, it bars suits against a state by its own citizens, and by citizens of another state. *See, e.g.*, *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

*147.* "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Id.*

**148.** "The entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Lowe v. Hamilton Cty. Dep't of Job & Family Servs.*, 610 F.3d 321, 324 (6th Cir. 2010)(brackets and citation omitted). The Court has identified four factors relevant to "whether an entity is an 'arm of the State' on the one hand or a 'political subdivision' on the other": "(*1*) the State's potential liability for a judgment against the entity; (*2*) the language by which state statutes, and state courts refer to the entity and **the degree of state control** and veto power **over the entity's actions**; (*3*) whether state or local officials appoint the board members of the entity; and (*4*) whether the entity's functions fall within the traditional purview of state or local government." *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (en banc) (internal citations omitted).

**149.** The Sixth Circuit outlined the issue of Sovereign Immunity related <u>specifically</u> <u>to</u> the Defendant clearly in *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 776-777 (6th Cir. 2015), and unequivocally concluded that Wayne State University is an "arm of the state" generally entitled to Sovereign Immunity. It is important to note that the Court's analysis of the *Ernst* factors gives us a piece of the Defendants' organizational mindset that adds to the *later* analysis of the clear wrongdoing. Therefore, it is relevant to begin with the general identification of relevant information related to the Defendant, Wayne State University ("WSU"), given that "WSU and its Board of Governors *are* one and the same." *Id*.

**150.** Here, the Defendants are being sued in <u>both</u> **official** *and* **individual** capacities under a variety of legal theories given the breadth of law the Defendants have intentionally violated to advance their material "*win-win*" unconstitutional gain while illegally leveraging **STUDENTS** as human-research subjects.

**151.** "The Michigan legislature established WSU as a "state institution of higher education" that "shall be maintained by the state of Michigan" in MCL § 390.641. The Michigan Constitution

provides that the "legislature shall appropriate monies to maintain. . . Wayne State University," [Mich. Const. *Art*. 8, § 4], and establishes that "the governors of Wayne State University and their successors in office shall constitute a body corporate known as the Board of Governors of Wayne State University." Mich. Const. Art. 8, § 5. "Appropriations to WSU are received from the state's general fund pursuant to MCL § 390.649." *Kreipke*, at *777*. "Consequently, the state legislature provided that any judgment against the Board of Governors will be collected in (and paid out of) the state tax under MCL § 600.6095." *Id*.

152.     In *Kreipke* the "District Court found that this factor strongly supported its determination that WSU was an arm of the state," with the Court of Appeals finding that "this factor weighs heavily in our analysis and creates a strong presumption that WSU is an arm of the state." *Id*.

153.     But, it was the Court's analysis that **yielded relevant evidence** in that "*WSU concedes* that **the state does not have** significant **control over WSU** or veto power over its actions." *Id*.

154.     **This unequivocal acknowledgement** was made sometime in *late 2015* and positions the Defendants as though knowledgeable of its ability to act in the exposed-*rogue* manner independently from the State of Michigan, yet just close enough to reap the rewards as conspirators openly usurping the liberties of **STUDENTS** under color of law.

155.     Generally, there are three (*3*) ways in which Sovereign Immunity may be dissolved, the **first** being non-applicable here in that Congress has not abrogated any applicable laws subjecting the State of Michigan to liability. The **second** exception is commonly known as the **Ex parte Young Doctrine** and is related to injunctive and declaratory relief when challenging the constitutionality of a Defendants' conduct which is discussed below. The **third** is State Abrogation, or consent to being sued, relating for example to the MCL § 691. 1407 Michigan Government Torts Liability Act ("GTLA").

156.    As to *Ex parte Young*, the Supreme Court has consistently held that equity provides a cause of action against an official charged with enforcing state law to challenge the constitutionality of that law. *Ex parte Young*, 209 U.S. 123, 156-157 (1908).

157.    Under *Ex parte Young*, the proper defendant in a suit seeking judicial declaratory relief, writs of mandamus, and suits to enjoin the enforcement of an unconstitutional state law is the official who has "some connection" to the enforcement of the allegedly unconstitutional conduct. *Id*. at 157. Distinguishably, although "courts cannot control the exercise of the discretion of an executive officer, an injunction preventing such officer from enforcing an unconstitutional statute is not an interference with" this discretion." *Id*.

158.    **Here**, the **Defendants <u>do not</u> have Sovereign Immunity** as plead in *this* Complaint.

159.    Specifically, consistent with Article XI, § 1; Article V § 8; and Article V § 10 of the Constitution of the State of Michigan. and in addition to MCL 14.29, the **MICHIGAN GOVENOR** and **ATTORNEY GENERAL**, based on the *Ex parte Young* Doctrine the *Official Capacity* causes of action are valid and seek **injunctive** *and* **declaratory** relief directing by injunction and/or Writ of Mandamus that the alleged conduct **<u>is</u>** void and unconstitutional, corrupt, and that which objectively shocks the conscious calling for enforcement of Federal and State law, including the adaption of the laws of the State of Michigan.

## 2. <u>DEFENDANTS DO NOT HAVE QUALIFIED IMMUNITY</u>

160.    *Once raised*, a plaintiff bears the burden of showing that a defendant **is not** entitled to qualified immunity. *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)(*internal quotation marks omitted*). Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It is not a "mere defense to liability"; the doctrine provides "immunity from suit." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). This immunity "gives government officials

breathing room to make *reasonable* but mistaken judgements about open legal questions," and "protect[ing] all <u>but</u> the *plainly incompetent or those who knowingly violate the law*." *Ascroft v. al-Kidd*, 563 U.S. 731, 743 (2011)(internal quotation marks omitted). A plaintiff must show "(*1*) that the official violated a statutory or constitutional right, and (*2*) that the right was clearly established at the time of the challenged conduct."(internal quotation marks omitted).*Id.* at 735. **HERE**, the Defendants' "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe… [their conduct] is constitutionally permissible..." *Doe v. Claiborne County ex rel. Claiborne County Board of Education, 103 F.3d 495 (6th Cir. 1996).*

161.    **Here**, the **Defendants <u>do</u> <u>not</u> have Qualified Immunity** as plead in this Complaint in that the causes of action against the *Individual Capacity Defendants* are valid given that the Defendants have <u>and</u> continue to violate the Plaintiffs' clearly established statutory and constitutional rights in a manner that is void and unconstitutional, corrupt, illegal <u>and</u> that which objectively shocks the conscious. Furthermore, *and again*, under *Ex parte Young*, the causes of action for declaratory and prospective-injunctive relief directing the *Official Capacity Defendants*, and their successors, to avoid this corrupt conduct leveraging **STUDENTS** as human research subjects under color of law *herein* as void thus—**this** challenge **is proper**.

### 3. <u>MCL § 691.1407 ABROGATES LIABILITY FOR INTENTIONAL TORTS</u>

162.    The Michigan Legislature enacted the Government Torts Liability Act ('GTLA") which in part immunizes State Officers from tort liability. However, the "[i]mmunity provided in MCL § 691.1407(2) encompasses only negligent tort liability because Michigan's Government Tort Liability Act expressly preserves the law of intentional torts as it existed before July 7, 1986." *Kreipke*, at 783-784. The test for determining a governmental actors' liability for <u>intentional</u>

torts, as it existed under Michigan law before July 7, 1986, is set forth in *Ross v. Consumers Power Co.* Under that test, a governmental actor establishes immunity by showing:

> (1) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (2) the acts were undertaken in good faith, or were <u>not</u> undertaken with malice, ***and***
>
> (3) the acts were discretionary, as opposed to ministerial.
>
> *Odom v. Wayne Co.*, 760 N.W.2d at 222.

*163.*    The Michigan Supreme Court defined a lack of good faith, under the second element, as "**malicious** intent, **capricious** action or **corrupt conduct**" or "**willful** and **corrupt misconduct**." *Id at 225;* (quoting *Veldman v. Grand Rapids, 275 Mich. 100, 265 N.W. 790, 794 (Mich. 1936)*; *Amperse v. Winslow, 75 Mich. 234, 42 N.W. 823, 827 (Mich. 1889))*. "Willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Id.* (quoting *Burnett v. City of Adrian, 414 Mich. 448, 326 N.W.2d 810, 812 (Mich. 1982))*. Under the third element, whether the acts were discretionary or ministerial, the Michigan Supreme Court has stated that ministerial acts "constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice." *Id. at 226* (quoting *Ross, 363 N.W.2d at 668*). Discretionary acts, on the other hand, "require personal deliberation, decision and judgment." *Id.* (quoting *Ross, 363 N.W.2d at 668*). "Entitlement to immunity under the *Ross* test is an affirmative defense that must be proven by the governmental actor." *Kreipke*, at 783-784.

*164.*    Here, the Defendants set out to <u>intellectually rape</u> **STUDENTS** gaining in disguise as 'research' proprietary information through malicious discrimination, harassment, threats, and

coercive while deceptively using the Theory of Constraints "[**VERY**] Ambitious Goal Curriculum" absent good faith in violation of well-established statutory and constitutional law.

**165.**    Simply, consistent with the ruling in *District of Columbia v. Wesby*, 583 U.S., the specific intent identified herein places the unconstitutionality of the Defendants' conduct "beyond debate," as the Supreme Court explained:

> "In other words, existing law must have placed the constitutionality of the officer's conduct '*beyond debate*.' This demanding standard protects 'all <u>but</u> the *plainly incompetent* <u>or</u> those who *knowingly <u>violate</u> <u>the</u> <u>law</u>*." (*Emphasis added*).

## **BACKGROUND FACTUAL ALLEGATIONS**

**166.**    The merits of *this* Complaint are ripe to be *heard* in that the facts have matured into an existing substantive controversy warranting judicial intervention for every Plaintiff named individually and as a proposed class member.

## **DEFENDANTS' ATTACHMENT TO THE THEORY OF CONSTRAINTS**

**167.**    ***NOW***—understand that *this reality* ballooned quickly as *I frantically* worked to understand these facts in "**Effect-Cause-Effect Logic**" to determine (*1*) <u>WHO</u> was attacking me, and (*2*) <u>WHAT</u> was attacking me, among *other things*. As my analysis grew, the research necessary to support the objective truth involved required validation by objective evidence too. Therefore, my objective research found that the "*research components*" of the Theory of Constraints ("TOC") are commingled *on all levels* of the Defendants' organization given the system-thinking *focus* of TOC and the Defendants' deliberate implementation of various applications of this ideology *throughout* its' ranks and organizational design.

**168.**    **First**, the dissertation of the former Wayne State University Graduate Student, Mrs. Audrey G. Taylor, gives us a broad look into the indoctrination of TOC throughout Wayne State University from *the beginning*. **Exhibit 109**—*Mrs. Audrey Taylor's 2002 Dissertation Preview*.

**169.**   In *2002*, Mrs. Taylor submitted to the Graduate School of Wayne State University in partial fulfillment for the degree of Doctor of Philosophy the following thesis: this exhibit is only a portion available online, direct requests to Mrs. Taylor for the full version were ignored:

> **"AN EMPIRICAL INVESTIGATION OF THE CHANGE AGENTS AND PREFORMANCE MEASUREMENTS EFFECTIVE IN THE DIFFUSION OF THE THEORY OF CONSTRAINTS FOR EDUCATION (*TOCFE*) AND IMPLICATIONS FOR BUSINESS ENTITIES."**

**Exhibit 109** (*Emphasis added*)

**170.**   Interestingly, Dr. James T. Low is one of the five Wayne State Staff Members who **approved** this thesis and deemed those facts within incontrovertible. In fact, Mrs. Taylor acknowledges Dr. Low individually by proclaiming:

> "Specifically, I want to thank…. **Dr. James Low** for introducing me to the Theory of Constraints and for being my mentor and ***partner in infecting*** the Business School of Wayne State University with the theorie*s* of Eliyahu Goldratt."

**Exhibit 109**, *p.* iii, (*Emphasis added*)

**171.**   The **focus** of Mrs. Taylor's dissertation is that "[e]veryone seems to agree that schools need to change," and that what her "research hopes to answer is how to initiate and maintain meaningful change in educational systems [sic]." *Id.* at v. (*Emphasis added*). Explicitly, "[t]he research **focus**es on one specific change method in education, The Theory of Constraints." *Id.*

**172.**   The dissertation continues providing valuable insight into the background of TOC, TOCFE, and WSU's individual connection to and organizational use of TOC and TOCFE curriculum. *At first*, I thought Mrs. Taylor was a victim, but further investigative research identified that this State Actor *is not* an ordinary student. To the contrary, Mrs. Taylor announces this herself by bragging that "[i]n a gathering called by Dr. Eli Goldratt of the top TOC experts in the United States *of which I was an invited member.*" *Id.* at 4. (*Emphasis added*). It seems that this **STUDENT** of Dr. James T. Low was being summoned by Dr. Eli Goldratt himself; I hypothesis that Dr. Low was summoned too. *As will become obvious from the facts*:

> "Dr. Goldratt stated that nine out of ten TOC applications eventually fail, not because of incorrect methodology, but because the implementation is local in nature. Dr. Goldratt emphasized during the discussion, that the implementations had all initially been successful,

and yet the **implementers had** either **left** their company, <u>**gone underground**</u> with the use of **TOC within their company** or had stopped using TOC entirely."

**Exhibit 109**, *p.* 5

*173.*   <u>Most</u> importantly though is Mrs. Taylor's sworn statement regarding the formation of the Theory of Constraints for Education ("TOCFE") organization in *1995*. The formation of TOCFE is significant because this is Dr. Goldratt's arm of TOC that legitimized the "***Ambitious Goal Application***" Curriculum which is used by TOCFE to teach students how to use the "**Thinking Processes**" of the Theory of Constraints at every level of intellectual growth <u>*all over the Globe*</u>.

*174.*   Plainly, Theory of Constraints in general requires a User to contemplate with depth, *Inception* like abstract thought, but with decision making and strategic planning *focus* from a <u>**whole systems' perspective**</u> (known generically *herein* as "**Systems' Thinking Logic**").

*175.*   In brief, the Defendants are using the "Critical Chain Application" of TOC to obtain unconstitutional value through the inherent-research characteristics of the "Ambitious Goal Application" of TOCFE, *or* the "*[VERY]* Ambitious Goal Application" as framed by the Defendants' as curriculum which is thereby linked with businesses to create an intellectual-supply chain—value is derived from information and control of the supply chain, or the **STUDENTS**.

*176.*   The Defendants have intentionally fostered and tied this corrupt "**Decisive Competitive Edge**" to its' organizational Strategic Plan**S** from 2013 to 2027.

*177.*   *For now*, understand that a "**Decisive Competitive Edge**" <u>*is*</u> <u>**what**</u> the Defendants have in their organizational structure and of its' operation by using Theory of Constraints concepts cohesively throughout its ranks, consciously *and* unconsciously, given that the system was *itself* strategically formed using the Theory of Constraints. *Simply*, WSU has leveraged excess capital as the *fruits* of the "*[VERY]* Ambitious Goal Application" of TOC in connection with its' "Critical Chain Application" of TOC through establishment of the initial 2013—2018 Wayne State University School of Business Strategic Plan. *See again*, **Exhibit 17**.

**178.** *Even more direct*, the "[*VERY*] Ambitious Goal Application" of TOC *is the mechanism* the Defendants have leveraged to create this unconstitutional public and private taking through the continuous improvement of the manipulation and exploitation of the **STUDENTS**' educational experience at WSU over the past twenty (*20*) years.

**179.** It is beyond a reasonable doubt, that the Defendants have used the fruits (*fraudulently stolen*-industry intellectual property) from this backdoor-to-industry ("[*VERY*] Ambitious Goal Application" of TOC) to design, recreate, control, and even manipulate reality, *candidly in their favor*, creating a lopsided "win-win" by underlined generating knowledge for excess capacity as a "**Decisive Competitive Edge**" while "professionally" and "financially" gaining too under the guise of 'pedagogical research'.

**180.** Based upon information and belief, Defendant, Deborah Habel, is still teaching a course using this authoritatively established system offering [*VERY*] Ambitious Goal Curriculum to Student as one carrying the torch passed by Dr. James T. Low—simultaneously pursuing a Ph. D Dissertation *focused directly* on the Theory of Constraints.

**181.** Does this not create an objectionable conflict-of-interest due proper informed consent?

**182.** Does this not illuminate the unjustified public and private taking that occurs when **STUDENTS** are used as human research subjects without obtaining informed consent of the form and function of the Defendants' research prior to participation?

**183.** The originating 2013—2018 Wayne State University School of Business Administration Strategic Plan was the culmination of years of preparation and "*focus*" by key members of the Wayne State University School of Business Administration Staff.

**184.** *Ultimately*, at the direction of Defendant former WSU President, Dr. M. Roy Wilson, the WSU SBA 2013—2018 Strategic Plan incorporated the system-thinking and thought-provoking "**Thinking Processes**" of TOC *in the formulation* of all of Defendants' strategic plans, structured

in macro form as the "Critical Chain Application" of TOC, *with* the micro "[*VERY*] Ambitious Goal Application" of TOCFE as the life blood of this operation embedded *deeply* within Mr. John Taylor's Marketing and Supply Chain Management Department *disguised* as curriculum and academic research. **THEREFORE**, based upon information and belief—the conduct of Dr. James T. Low and Mrs. Deborah Habel **IS IMPUTED TO THE *WHOLE*** organization given that this collusion is traceable from the systematic *effect-cause-effect* relationship of the Defendants' premeditated taking by fraudulent trick resulting in theft of **THE *HIGHEST DEGREE***.

*185.*     **Moreover**, we see definitively that Wayne State University was an Early Adopter of Mr. Eli Goldratt and his Theory of Constraints. The critical fact in the *preview* of Mrs. Taylor's dissertation identifies that the "first time [Mrs. Kathy Suerken] met [Dr. Eli Goldratt] was in Dearborn, Michigan, at the *1993* International Jonah Conference **sponsored by Wayne State University**." **Exhibit 109**, at p. 7. (*Emphasis added*). This is significant in that Mrs. Suerken is *the current* and *only* President to operate TOCFE from its incorporation in 1995. It was Mrs. Suerken who presented Dr. Goldratt with the idea to disseminate TOC to millions of children around the World; later developing together the "*Ambitious Goal Application*" Curriculum to accomplish this feat. This triangulation of idea formation and individual connectivity is an inescapable crossroad for the Defendants. Objectively, *as time passed*, the Defendants methodically used the ill-gotten effect of their conduct to continuously improve their corruptible ways under the guise of a supposed-legitimate-pedagogical objective.

*186.*     Clearly, the Defendants' <u>early</u> adoption is seen evolving through the twenty (*20*) year-period-of-*research* that Dr. Low and *other* Wayne State University Staff have used and taught TOC to students *and* staff. Overall, my research identifies that WSU and Dr. Low have offered TOC in *at least ten* (*10*) different courses over this period, with the most recent and relevant type at question here in GSC 7260 and GSC 5670. As of this Complaint, the Defendants are **still**

exploiting this unconstitutional system by offering GSC 7260 and GSC 5670 to students at the Wayne State University Mike Ilitch School of Business in the **Spring of 2022**. In sum and _at minimum_, the Defendants have offered TOC at the <u>_very_</u> <u>_least_</u> in the following courses:

1. _2022_—GSC 7260, Section 002, CRN 32008; Commonly known as: Theory of Constraints: Breakthrough Solutions. **Exhibit 110**—2022 GSC 7260 Course Details; **Exhibit 111**—_GSC 7260 Spring 2022 Enrollment (6 Students) as of 5/15/2022_; **Exhibit 112**—_GSC 7260 Enrollment (5 Students, presuming one dropped) as of 10/20/2022._

2. _2022_—GSC 5670, Section 003, CRN 32007; Commonly known as: Theory of Constraints: Breakthrough Solutions or Special Topics in Supply Chain Management. **Exhibit 113**—_2022 GSC 5670 Course Details_; **Exhibit 114**—_GSC 5670 Spring 2022 Enrollment (9 Students)._

3. _2021_—GSC 7260, Section 001, CRN 32008; Commonly known as: Theory of Constraints: Breakthrough Solutions. **Exhibit 115**—_2021 GSC 5670 & 7260 Theory of Constraints: Breakthrough Solutions Joint Syllabus_; **Exhibit 116**—_2021 GSC 7260 Seat Availability._

4. _2021_—GSC 5670, Section 001, CRN 32007; Commonly known as: Theory of Constraints: Breakthrough Solutions or Special Topics in Supply Chain Management. **Exhibit 115**; **Exhibit 117**—_2021 GSC 5670 Seat Availability._

5. _2020_—GSC 7260, Section 001, CRN 32007; Commonly known as: Theory of Constraints: Breakthrough Solutions. **Exhibit 118**—_2020 GSC 7260 Syllabus_**;** **Exhibit 119**—_GSC 7260 Course Description_**;** **Exhibit 120**—_2020 GSC 7260 Seat Availability._

6. _2020_—GSC 5670, Section 001, CRN 32008; Commonly known as: Theory of Constraints: Breakthrough Solutions or Special Topics in Supply Chain Management. _See again_, **Exhibit 119**; **Exhibit 121**—_2020 GSC 5670 Syllabus_; **Exhibit 122**—_2020 GSC 5670 Seat Availability_**.**

7. _2019_—GSC 7260; Theory of Constraints: Breakthrough Solutions. **Exhibit 293**—_Spring 2019, March Syllabus Course Email._

8. _2018_—GSC 7260, Section 33229; Theory of Constraints: Breakthrough Solutions, taught at **Schoolcraft College** in Livonia, MI. **Exhibit 294**—_Spring 2018 GSC 7260 Syllabus._

9. _2017_—ACC 7260; Commonly known as: Theory of Constraints Approach of Management Accounting. **Exhibit 123**—_WSU April 18th, 2017, TOC Marketing Announcement._

10. _2017_—BA 7260; Commonly known as: Theory of Constraints Approach of Management Accounting. _Id._

*11. 2013*—FIN 6240, Section 17861-901; Engineering Financial and Accounting Concepts. **Exhibit 124—***2013 FIN 6240 Syllabus*.

It is important to **emphasis** *here* that this course was **not** taught by Dr. Low, but instead Dr. Low appears as a *guest speaker* on multiple TOC topics. This past use demonstrates the Defendants' *control* over how they attach this 'curriculum' to a variety of pedagogical offerings. This also identifies that past research was performed on STUDENTS to explore <u>different</u> ways to probe and use TOC, of which led to the development of the future controls leading to and directly causing the facts in *this* Complaint. Also, you will come to know the University of Georgia is another American Educational Institution that uses TOC in its' curriculum; Harvard Business School also <u>requires</u> <u>all</u> **STUDENTS** to read Dr. Goldratt's *The Goal*. Specifically, the syllabus structure found in **Exhibit 124** is similar to that from the University of Georgia: Terry College of Business, where a single day "Guest Speak" would give a lecture on TOC. **Exhibit 125—***Georgia University: Terry College of Business Fall 2021 MGMT 4000 Course Syllabus, see p. 2*.

10. *2007*—BA 7260. **Exhibit 126—***Rate My Professor Comments*.
  *The year Plaintiff, Attorney Cochrane, *graduated* from *Highschool*.

11. *2005*—BA 7530. *Id*.

12. *2005*—BA 7350. *Id*.

*187.* Also, important to note that Mrs. Audrey Taylor's Dissertation holds true again, where given the Defendants' TOCFE "[*VERY*] Ambitious Goal" curriculum, the corporate espionage arm of their "Critical Chain Application" of TOC, is faltering as Mrs. Deborah Habel fails to draw the same attention that Dr. Low had.

*188.* Yet, this course **was** still being **offered** to **STUDENTS** by the Defendants, even after my explicit notice of the *herein* violations, until at least 2021 and 2022. **Exhibit 109**, *at p.* 5 (*see again* **Exhibit 110; Exhibit 111; Exhibit 112; Exhibit 113; & Exhibit 114**).

*189.* Overall, in **2022** only **14/40 (35%)** of the class was filled, though up from **2021** where only **06/40 (15%)** was filled.

**190.**     Remember, the manipulation of the **STUDENTS** inside these classes has more combined value than the fraudulently requested payments for the course each **STUDENT** pays to unknowingly submit themselves as human research subjects. **Exhibit 110**; **Exhibit 111**; **Exhibit 112**; **Exhibit 114**; **Exhibit 116**; **Exhibit 117; Exhibit 120; Exhibit 122.**

### <u>DEFENDANTS' STRATEGIC PLANS *ARE* THE THEORY OF CONSTRAINTS</u>

**191.**     **Next**, *plainly stated*, the Defendants' <u>current</u> Strategic Plans, *globally*, have leveraged TOC and in fact were premeditatedly developed for these <u>exact</u> effects of "exploiting" **STUDENTS** by capturing excess value at various intersections during the journey through the Defendants' processes of the educational-supply chain.

**192.**     In WSU's Design Process two main variables involved are (a) knowledge as inventory, and (b) **STUDENTS** as inventory with a feedback loop of potential excess capacity for unjustifiable public and private gain which supports the primary objective of (a) "research" and "generate knowledge" as inventory for (b), *unsustainably*.

**193.**     To begin, the Wayne State University School of Business Administration 2013—2018 Strategic Plan ("**WSU SBA 2013—2018 Strategic Plan**") **infused** the Defendants **intent** on the global scale and was itself *developed* using the "**Thinking Processes**" of TOC for strategic-planning purposes using a Critical Chain model of education. **Exhibit 17**.

**194.**     *Continuing*, the Defendants' 2016—2021 "Distinctively Wayne State University" Strategic Plan ("**WSU 2016—2021 Strategic Plan**") was developed using the "**Thinking Processes**" of TOC for strategic planning too. **Exhibit 19**.

**195.**     It was again the strategic-management consulting firm, **The Barthwell Group**, who was retained by President Wilson to assist the Defendants with the development of these Strategic Plans, both of which are nearly identical in scope by *focusing* on openly and explicitly exploiting the same *focus—research*.

**196.**     In fact, the Defendants' have exploited *the effects* of these Strategic Plans by mimicking the "Critical Chain Application" of TOC in tandem with the "[**VERY**] Ambitious Goal" Curriculum of TOCFE, incorporating this *ongoing* and *continuously improving* "***focus***" into the following subsequent Strategic Plans too:

> (*a*) 2019—2022 Wayne State University Mike Ilitch School of Business Strategic Plan ("**WSU MISB 2019—2022 Strategic Plan**"); *and*

> **Exhibit 20**—*WSU MISB 2019—2022 Strategic Plan*

> (*b*) 2022—2027 Wayne State University "Our Moment in Time" Strategic Plan ("**WSU 2022—2027 Strategic Plan**").

> **Exhibit 21**—*WSU 2022—2027 Strategic Plan*; **Exhibit 22**.

**197.**     Indeed, the Defendants have not announced publicly that they used TOC to formulate these Strategic Plans; it is the *intent*, *effect*, and *language from within* these Strategic Plans that establishes this as objective fact, and too the objective traceability of TOC throughout the enterprise. This is bolstered in that the WSU SBA 2013—2018 Strategic Plan School of Business Administration Board of Visitors "**stressed** that *the plan* be characterized by "***focus***" and that it includes *metrics* to determine whether or not goals have been accomplished," *i.e.* a process of ongoing improvement. **Exhibit 17**—*WSU SBA 2013—2018 Strategic Plan, p. 2*. (*Emphasis added*).

**198.**     "*Stated simply*," the (*a*) WSU SBA 2013—2018 Strategic Plan; (*b*) WSU 2016—2021 Strategic Plan; (*c*) WSU MISB 2019—2022 Strategic Plan; *and* (*d*) WSU 2022—2027 Strategic Plan are all designed to **exploit** the **STUDENTS** of Wayne State University **and** the sanctity of Academia in the United States:

> "*Stated simply*, this strategic plan ***targets*** initiatives and activities which will improve student success, **activate** and support student and faculty **engagement**, and **support** and encourage enhancements to both basic and applied **research**. **By design, we seek to fully exploit the points of intersection**

**between these foci**. The following sections highlight the current thinking regarding goals, objectives and critical aspects of implementation pertaining to each of the three areas of emphasis. **Points of intersection exist throughout**. **We regard the planning effort as a dynamic process, subject to the impact of additional constraints and opportunities**. Therefore, **this plan sets forth a foundation for the efforts which will be undertaken in the months and years ahead**, to be further expressed in action plans which will identify oversight, resource requirements and accountability. **Embracing the principles of continuous improvement**, these efforts, **and existing programs and activities will be the focus of regular review and adjustments**. Toward this end, we will be establishing benchmarks and **gathering data to track** performance and progress with respect to several key metrics and **outcomes** associated with these three areas of emphasis."

**Exhibit 17**—*WSU SBA 2013—2018 Strategic Plan at p. 4-5*.
(*Emphasis added*)

**199.**    It is this "*foundation*" that which allowed the Members of the WSU SBA 2013—2018 Strategic Plan Implementation Team ("**2013—2018 Implementation Team**") to identify requirements for 'effective' implementation. *Id*. at 2.

**200.**    This originating "**Implementation Team**" meet during the Summer and Fall of 2013 to devise *the plan* in how the *then* named "Wayne State University School of Business Administration" would achieve the following three (*3*) objectives: (*1*) Student Success; (*2*) Engagement; *and* (*3*) Basic and Applied **Research**. *Id*.

**201.**    Based upon information and belief, the 2013—2018 Implementation Team was made up of fourteen (*14*) members of Wayne State University Staff with notable figures as (*1*) Mr. Steven Townsend, as an orchestrator of the $40M Gift establishing the "Wayne State University *Mike Ilitch School of Business*," (*2*) Mr. Jeff Stoltman as Chair of the 2013—2018 Strategic Planning Committee, *and* (*3*) Mr. John Taylor, *then* Chair of the Marketing and Supply Chain Management Department. *See again*, **Exhibit 95—98**; **Exhibit 127**—*Mr. Jeffery Stoltman Organizational Chart*; **Exhibit 128**—*Mr. Steven Townsend Biography*.

202.    It is **important to note** here to develop the *alternative perspective* that Mr. Stoltman was superior to Dr. Taylor regarding the WSU SBA 2013—2018 Strategic Plan, *but* really as Department Chair, Dr. Taylor <u>was</u> superior to Mr. Stoltman given that he was only an Associate Professor of Marketing in *Dr. Taylor's* Marketing and Supply Chain Management Department.

203.    Marketing and Supply Chain Management Department is the <u>exact</u> location of the Defendants' **intellectual trap**:

"[***VERY***] Ambitious Goal Curriculum."

204.    Importantly, this groundwork to attach TOC to Wayne State University was in the works organizationally **long before** these Strategic Plans were being contemplated. Again, remember that Wayne State University supported and sponsored Dr. Goldratt in **<u>1993</u>** as early adopters of what was then and now has evolved into what is TOC <u>and</u> TOCFE.

205.    And, you will learn *later* that TOC as a knowledge base was *revealed* in **<u>1984</u>** and thereafter has evolved principally through the sporadic dissemination of ideological advances made by TOC's creator Dr. Goldratt and *his selected* Jonah's Jonahs as time progressed and ***these ideas evolved***. It was often, in the academic settings, the students of these individuals who contributed to the expansion of this relatively new knowledge base through dissertations. And in the context of business operations, just like other intellectual property, much of the knowledge developments derived from using TOC is hidden away and guarded.

206.    During this primordial stage of evolution, we witness three (*3*) members of the Wayne State University School of Business Administration <u>*Staff*</u> (*1*) Mr. George C. Jackson; (*2*) Mrs. Audrey Taylor; <u>*and*</u> (*3*) Mr. Stoltman, <u>join</u> as co-authors in **<u>1994</u>** to pen an <u>early</u> TOC article introducing the TOC Evaporating Clouds: *Moving Beyond Trade-Offs,* in the International Journal of Physical Distribution & Logistics Management, Vol. *24* No. *1, 1994*, pp. *4-10*. **Exhibit 129**—*Moving Beyond Trade-Offs, 1994.*

*(For the record, I was 6 years old and in the first grade for the first time in 1994.)*

**207.**   This early collaboration demonstrates that Mr. Stoltman has been involved with TOC *from the beginning* too; identifying in 1994 the need to tie TOC with strategic planning. *Id.* at 8; 10.

**208.**   Also, that Mrs. Audrey Taylor was a 'Lecturer' in the Accounting Department at the Wayne State University School of Business Administration. *Id.*

**209.**   Moreover, this demonstrates too Mr. George C. Jackson's competence of TOC; this is also evident by *an underlined earlier* collaboration with Dr. Low in the **1993** TOC article: *Constraint Management: A Description and Assessment*, in The International Journal of Logistics Management, Vol. *4*, No. *2*, *1993*, pp. *41-48*. **Exhibit 130**—*Constraint Management, 1993*. The duo writes, "[i]f a **policy** can be shown to be keeping the organization from its goal, the ***first*** step is to **exploit it**." (*Emphasis added*). *Id.* at 47. And, *even more precisely* the Defendants forecast for us the *future* integration of TOC into the organization's strategic planning in *1993*:

> "There is the need to integrate [TOC] into the strategic planning process. If the ***focus*** of the organization is on the constraint, it is critical that the policies developed to support the constraint be consistent with the mission and strategic plan of the organization. Also, since the location of the constraint can be influenced by management, an important strategic issue would be to decide where it should be located to best meet the goals of the organization."

**Exhibit 130**—*Constraint Management, 1993*
(*Emphasis added*)

**210.**   Meaning, TOC flows throughout Wayne State University directly from each vein of authority. Most importantly, this article triangulates **the root *infection*** of TOC at Wayne State University to Dr. Goldratt's first *Global* Marketing Jonah's Jonah and Wayne State University Marketing and Supply Chain Management Emeritus Professor: ***Dr. James T. Low***

**211.**   Collectively, these articles give us a *glimpse* of a reality at Wayne State University *prior to* Dr. Goldratt's dissemination of the "Critical Chain Application" of TOC on September 4th, 1997,

**and** *after that*, in the Defendants' *shifted* **focus** into the systematic exploitation of this weaponized knowledge base having evolved an academic arm explicitly to exploit **STUDENTS** as a so-called "*win-win*" by combining the "Critical Chain Application" of TOC with the legitimization of the "Ambitious Goal Application" of *TOCFE*.

*212.*     Again, from top (*1*) to bottom (*7*) the Defendants have deployed this **deep fake** at a macro level to capture excess capacity from the management's placement of their intellectual trap "[**VERY**] Ambitious Goal Curriculum" on the micro level—*focus:*

> *(1)* the Wayne State BOG supporting Dr. Goldratt (at **Exhibit 109**, at p. 7.);
>
> *(2)* Sponsoring the International Jonah Conference in 1993; *Id.*
>
> *(3)* Principally contributing to the creation of TOCFE by ongoing research; *Id.*
>
> *(4)* Where in 2013 the newly-elected President's *shifted focus* to exploit "research" and integrate the "Critical Chain Application" of TOC into the WSU SBA 2013—2018 Strategic Plan and *every other* Strategic Plan that has followed during his reign and beyond to have the effect of an "improved brand;" **Exhibit 17,** *Appendix 6*, *p.* 27-30; **Exhibit 40**, *at p.* 5.
>
> *(5)* Specifically, to the Interim Dean, Dr. Margaret Williams, of the Wayne State University School of Business Administration for *beginning the process* of developing the WSU SBA 2013—2018 Strategic Plan in February 2013, based on the same failing business school plot-aligning characteristics as in Dr. Goldratt's 1997 academic demonstrable novel, *Critical Chain*; **Exhibit 17**, *at p.* 25.
>
> *(6)* Flowing next to the 2014 School of Business Administration Faculty Senate and Academic Assembly for "unanimously" endorsing the Strategic Planning Process leading to the development of the 2013—2018 Implementation Team; *Id.*, *and*
>
> *(7)* Then finally to Dr. James T. Low *and now* Mrs. Deborah Habel *through* Mr. John Taylor as Member of the WSU SBA 2013—2018 Implementation Plan *and* Chair of the Marketing and Supply Chain Management Department in which the Defendants have used the "[**VERY**] Ambitious Goal Application" of TOCFE to intentionally interfere with the **STUDENTS**' educational experience *for the purpose of* obtaining industry-intellectual property resulting in an unconstitutional public and private taking by this massively active and concealed fraud.
>
> **Exhibit 17**, *at p.* 20.

*213.*     Based upon information and belief, Defendant, Dr. John Taylor, was a vital aspect of this *puzzle* and that he worked feverishly to advance the three (*3*) objectives as a Member of the 2013—2018 Implementation Team; it is Mr. John Taylor's thirty-seven (*37*) page resume that clearly identifies this fury. **Exhibit 97**.

*214.*     Beginning his reign in 2012 and *ending* sometime in 2021, it was Dr. John Taylor as Chair of the Marketing and Supply Chain Management Department who led this charge on the research of **STUDENTS** and **ENTITIES**.

*215.*     During his tenure, Dr. Taylor actively databased **STUDENT** data, he head-hunted **STUDENTS** within the Wayne State University Law School and Medical Schools, he even hired his former replacement who implemented TOC also, "Dr. Sachin [sic] Modi." *Id*. at 21-22.

*216.*     Indeed, Defendant Dr. Taylor even developed "scheduling matrixes" and "new SCM Major Directed Elective list of courses by *adding* to and subtracting from the [sic] current list of *courses* students take," and *even* "[o]btained *approval* to rename and re-prefix courses" for reorganization and *marketing purposes*. *Id. at 23*; *See also*, **Exhibit 138**.

*217.*     Under the direct supervision of Dr. John Taylor, both Defendants Dr. James T. Low and Mrs. Deborah Habel were *actively* manipulating their **STUDENTS**' educational speech for 'research' purposes without obtaining informed consent exploiting the pedagogical experience by phishing for industry-intellectual property by fraudulently inducing the inherent unconstitutional compulsion of research as the direct and systematic effect of "[*VERY*] Ambitious Goal Curriculum on the unknowing human research subject—**STUDENT**S.

*218.*     Next, the inherent research effect of the "[*VERY*] Ambitious Goal Curriculum on **STUDENTS** yields voluminous data given the way the Defendants have <u>structured</u> the GSC 7260 and GSC 5670 courses. You will learn *later* that the "**Thinking Processes**" of TOC are **<u>a system of systems</u>** used specifically for *proper* <u>decision</u> <u>making</u>. The Defendants exploited the

subjectivity of these "cascading" systems by designing these courses to permit **STUDENTS** up to three (*3*) submission attempts for homework projects as a tool to reconstruct the constructs of the **ENTITIES**' relative reality being reengineered by the participating **STUDENTS**.

*219.*     On my first submission, *I* was given a **<u>zero</u>** and was directed to submit up to four (*4*) attempts that allowed for the system operator, here Defendants, Dr. Low and Professor Habel, to obtain a *deeper* and more personalized data set as they manipulated the zoom and breadth of my original Current Reality Tree that mapped the Legal Industry. **Exhibit 139**—*Cochrane Current Reality Tree_Submission 1*.  Explicitly demanding:

> "it's not the [Current Reality Tree] for <u>The Traveling Attorney</u> or the <u>Cochrane family</u>. <u>Reframe this</u> project <u>as</u> the **reality** for your family **and** your company</u> and <u>resubmit</u> it. We will count this as submission #0. You will still have three submissions for points."

*220.*     This <u>system</u> allows **<u>*any*</u>** Educator, *here* Dr. Low and Mrs. Habel, to subjectively target the **STUDENTS**' individual "[*VERY*] Ambitious Goal" homework—**ACADEMIC FREE SPEECH**—by issuing a *lower*-initial grade on *targeted* work.

*221.*     This act might be intentional to solicit additional data sets, built-in user bias simply probing out of curiosity, or even germane feedback such as to structural formation of the *visual thought reality—either way* the product is the same effect—the **STUDENTS' EDUCATIONAL FREE SPEECH** is being actively manipulated with the intent to trigger a new compelled data set for a 'better' grade sparking the continual and inherent unauthorized private and public taking. **Exhibit 140**—*Tiered Grading Scheme Diagram*.

*222.*     In a 2014 email sent to fifty (*50*) TOC "friends" **<u>Dr. Low</u> confessed** that *he has intellectual probed* "<u>well</u> **over 250 former** [**STUDENTS**] of the course out there now, working in a variety of industries and locations around Southeast [sic] Michigan." **Exhibit 141**—*May 25, 2014, James Low Confession*; **Exhibit 142**—*James Low STUDENTS' Records*. (*Emphasis added*).

*223.*     You will see what is **Exhibit 142** attached to Dr. Low's **confession** is a continuation of his solicitation to sell his **STUDENTS'** work to other TOC "friends" *around the globe—for example*, Mr. Eli Schragenheim is *not* an American Academic, rather he is a Foreign National, an early figure tied to Dr. Goldratt, the Avraham Goldratt Institute ("AGI"), the Theory of Constraints International Certification Organization ("TOCICO"), and TOCFE.

*224.*     Specifically, Dr. Low quotes "verbatim" the **STUDENTS'** individual educational records that is the trade secrets and intellectual property of the **ENTITIES**:

**"James T. Low
Results from student individual projects
in GSC7260 Theory of Constraints Breakthrough Solutions**:

Note that the results cited below are quoted verbatim from the final reports on individual student projects in the GSC7260 Breakthrough Solutions course, or from unsolicited email messages received after completion of the course. The student projects used Theory of Constraints (TOC) cause-effect logic problem solving tools to deal with major unresolved problems. Note that some of the companies described below have considered the results of these student projects to be so important as a competitive advantage, that they do not wish to have the results publicly identified. For reasons of confidentiality, individual student names and company identifications have been abbreviated or disguised. Note that there are a lot of other equally impressive results that have not been included here.

*1)* M. S.: Major Automotive Company Distribution Center.
   "With 4 distribution centers in the network as well as 3 assembly plants that build vehicles with different load density, this project is expected to supply (Company Name) **an annual savings of approximately $2 million**."

*2)* J. F.: Logistics Company serving a Major Automotive Company
   "When the plant manager came back from a meeting I showed him what I was able to put together (for free). The plant manager was ecstatic and told the supervisor to get working on this. The supervisor didn't get very far, but he got enough trailers unloaded yesterday so that they would have a little work today. The superintendent came back today and I gave him an updated sequence with today's information. He jumped all over it and he is bringing in every trailer based on my sequence." … "I will have enough data then to ask for a reduction of a full day of TRT, **which is a save of $5 million**." "I really enjoyed this course and it is making a huge impact on (Automotive Company Name), (Logistics Company Name) and my career. Thank you."

*3)* N. H.: Major Automotive Company, Production Operations
   "The project was implemented and closed in October, 2002. **This year the project saved $225,000** in outbound freight cost for (Company Name). **The projected annual**

savings is **$895,000**."

[…]

*11)* <u>W. T. P.: Management Company, Building Management</u>
"Over the course of this Fall, I have been working on this problem with my Department Director." "The facility runs on a $9 million annual budget. Of that amount approximately 50% is fixed cost; property taxes, utilities, maintenance, etc. After December 31, 2003 the effective burden on (Company Name), after considering tenant revenue and 2004 forecasted expenditures is ($4,000,000). If the building was converted and fully occupied the contribution to (Company Name) would be +$750,000 per year. After adjusting for the investment for the conversions there would be a loss of $200,000 for 2004, and a **profit of $500,000 for 2005, and a positive income of $750,000 every year following**."

[…]

*13*) <u>D. M.: Major Automotive Parts Supplier</u>
" (Company Name) has attempted to gain alternator business with GM in North America since 1978, and has not been successful." "The Current Reality Tree (CRT) was an excellent tool in diagnosing the situation between (Company Name) and General Motors. Through analysis of this relationship using the CRT, 2 main problems were determined: (1) (Company Name) has not put enough resources towards development of regulators for GM, and (2) General Motors did not have the resources to quickly and effectively evaluate (Company Name) regulators submitted for testing. The Evaporating Cloud (EC) was a useful tool in solving the core problem regarding GM resources. We ended up explaining to GM that we would fully validate, and guarantee that our regulators would pass GM's internal validation. It was a dangerous guarantee for me in that there was a chance we would fail. Fortunately, GM was able to validate our regulators in a single day. Significantly less time than it took other suppliers, usually 2-3 weeks." "The Intermediate Objective (IO) Map was a great tool in solving the problem of (Company Name) resource issues. I was able to go through this map **with the President of our North American operations**, and was able to gain his agreement regarding the resource issue." "He lit a fire under [engineering management], and our engineering provided more support than ever towards GM." "**We are currently in a position to win a program of about 450,000 pieces per year**. We are the leader for this project. (Company Name) management was hoping to win a small program of about 100,000 units to get a start with GM. **Now we are on the verge of winning a program more than 4 times our hopes**."

[…]

*18*) <u>K. W.: Major University, Sponsored Programs Administration</u>
"I can honestly say that without the TOC tools, the problem, solutions and potential pitfalls would not have been so clear and the solutions so apparent. Using the tools was like a light appearing above my head in many, many instances." "

**Exhibit 142**—*James Low Student Results (Emphasis added).*

**225.**   …***note*** *that **GM** was not obscured by Dr. Low in any disclosure…*

**226.** Pointedly, the inherent-unconstitutional public and private taking is undetachable from the Defendants' "[*VERY*] Ambitious Goal Application" of TOC. These results above are compelled-**STUDENT**-educational records that Dr. Low is, *with authority on behalf of Wayne State University*, peddling as '*academic research*' to anyone who will bite.

**227.** *It works*, Baylor University Emeritus Professor, Mrs. Charlene S. Budd, responds to Dr. to Low's email blast sometime around June 3rd, 2014:

> "*Hi, James*. My, *you have been busy.*"

**Exhibit 141**

**228.** Further, Mrs. Budd continues by offering Dr. Low the following:

> "We have retired to a small lake about an hour from the Atlanta airport. However, I did manage to make a couple of presentations on Throughput Accounting **in** Moscow, **Russia**, last month.
>
> Let me know if you are in Atlanta or passing through with a layover. We can pick you up and show you our retirement retreat if you have time."

> *Id.*

**229.** And we know from the *same* email chain, identified by Mr. James F. Cox, III, another original member of Dr. Goldratt's inner circle *and* Emeritus Professor from the University of Georgia Terry College of Business, that "Baylor had more TOC faculty than any other school for a while with Charlene, the Umbles, Marjorie Cooper, and someone in IS." *Id.*

**230.** All told, *not* including Wayne State University, Mr. Cox identifies six (*6*) Universities with then active TOC Academic Networks: (*1*) Washington State University; (*2*) University of Louisville; (*3*) University of Victoria at Wellington, New Zealand; (*4*) University of Georgia ("UGA"); (*5*) University of Tennessee; *and* (*6*) Baylor University. *Id.*

1   ***231.***   Moreover, Mr. Cox *concedes*: "[a]t UGA we taught academic Jonah courses for a number
2   of years **for** Eli and AGI but that died with the split of Eli and AGI." ***Id***. (*Emphasis added*).

3   ***232.***   Interestingly, it is Mr. James Cox who is currently serving on the TOCICO Board of
4   Directors, where the *focus* has shifted heavily to the **Healthcare** Industry based on the Theory of
5   Constraints' "**Systems' Thinking Logic**" as COIVD-19's debilitating supply-chain crisis lingers
6   still among us in truly *all* industries.

7   ***233.***   *More* interestingly though, Dr. Low responds to Mrs. Budd's offer by counter-offering a
8   post "Critical Chain Application" article written in *2010* with co-authors, Mrs. Audrey Taylor and
9   a *former* **STUDENT**: *Making Money from Available Capacity*: *A Proposed Model for Fostering*
10  *Innovation*, *Management Accounting Quarterly*, Vol. *11*, No. *4*, *2010*, pp. *10-28*. ***Exhibit 143***—
11  *Making Money from Available Capacity: A Proposed Model for Fostering Innovation Article*.

12  ***234.***   This article describes "The Model" which is a "system where ideas can be entered
13  anonymously," where "[t]o ensure that managers in the chain of command review and promote
14  good ideas, those analysts and managers encouraging good ideas also should get a portion of the
15  profit produced or cost reduced." *Id*. at 21-22.

16  ***235.***   This "Model" encapsulates what is the early essence of the WSU SBA 2013—2018
17  Strategic Plan; the Defendants' use of the "[***VERY***] Ambitious Goal Application" of TOC.

18  ***236.***   Further, the article identifies a similarity to the Defendants' tiered-grading scheme:

19  "As soon as the project is deemed to be unprofitable, that
20  message would be sent back to the innovator with the cost
21  analysis. If the innovator disagrees, he or she can do the
22  groundwork to strengthen the argument and resubmit the idea."

23  **Exhibit 143**. at p. 26

24  ***237.***   We *also* find by reading **Exhibit 143** further that, *with near certainty*, Dr. Low ***is*** *the root*
25  *source* of TOC at Wayne State University:

"Two of the authors were **_personally instructed_** in the Theory of Constraints ["**Thinking Processes**"] Tools **_by Dr. Eliyahu Goldratt_** at the Jonah Course offered to academics. **James Low** attended the Jonah Course with the *first group* of *six academics* in **1989**. **Audrey Taylor** attended the first Jonah Course dedicated to academics in **1991**."

**Exhibit 143**, at p. 28. (Emphasis added).

*238.*    Moreover, the **STUDENTS**' compelled submissions **do not sit idle** in the Defendants' possession; this *generated knowledge* is excess-available capacity for which the Defendants use to *replenish* inventory—*i.e.*, *knowledge*, *ideas*, *research*, and *strategic decisions*.

*239.*    To be clear, the Defendants' inventory is in part **knowledge** *through* education, and *fresh* '*ideas*' avoid the constraint of time and space in that the Educator can "*use these [STUDENTS] as bridges to companies*," capturing the data relevant to replicate and manipulate the reality involved in lieu a *traditional* sabbatical. See again, **Exhibit 42**—*Critical Chain*, *at pp. 9-10*; **Exhibit 43**—*Critical Chain Synopsis*, *at pp*. 4-5.

*240.*    **OH**, *to the contrary*, the Defendants have cataloged this public and private taking storing the results on the Wayne State University Canvas Servers disguised as 'academic research.'

*241.*    The term "Canvas" represented a "learning management system" in the form of a digital interface **STUDENTS** and the Defendants use to facilitate online communication and transfer academic files, administer exams, communicate through direct and message board type communication.

*242.*    *Objectively*, the Defendants **have more than *6,100,000*** ("6.1M") refined files methodically databased from GSC 7260 and GSC 5670 alone. **Exhibit 145**—*Canvas File Announcement*.

*243.*    This objective fact is clear given that the following absolute-file paths identify the root location of the fruits of the Defendants' illegal conduct: First within the Canvas Website Directory under "course files" and "128516," followed then by "files" and the "#number" of the retained compelled-**STUDENTS**' educational record *in disguise* as 'academic research.'

*244.*     For example, one of the Canvas File Announcements contained four (*4*) files of *former* **STUDENTS**' TOC Transition Trees that Dr. Low and Mrs. Habel gave to **STUDENTS** in 2020 *as examples* on formation of this logic tool.

*245.*     Three (*3*) of these examples contain descriptive data that either identified (*1*) the **STUDENT** involved, (*2*) the **ENTITIES** involved, *or* (*3*) both the **STUDENT** and ENTITIES involved. *See again*, **Exhibit 145**. (Highly emphasized)

*246.*     *Even further* to demonstrate that Dr. Low and Mrs. Deborah Habel are **not** rogue agents, and instead to demonstrate that the infestation of TOC encompasses *the entire* Wayne State University organization—the use of TOC at Wayne State University is not limited to the Marketing and Supply Chain Management Department.

*247.*     *Instead*, Dr. Low's authority can be seen again influencing another peer-published-post *Critical Chain* TOC empirical article in 2005: "*Language Program Articulation: Developing a Theoretical Foundation*; Chapter 2: *The Theory of Constraints Thinking Process: An Approach to the Challenges of Curriculum Articulation*," *2005*, pp. *27*. **Exhibit 146**—*Language Program Articulation: Developing a Theoretical Foundation, 2005.*

*248.*     The Chapter 2 Author there, Ms. Adriana Murillo, announces objectively that the "[t]he tools for this case were developed in Fall [sic] 2003 for the Breaking-Through Solutions Theory of Constraints course (*BA 7260*), conducted by Dr. James Low at WSU." *Id*. at 42.

*249.*     Continuing by thanking Dr. Low for his "*significant feedback* on the *appropriate* way to apply the TOC Thinking Process tools *to this case*." *Id.* at 43. (Emphasis added)

*250.*     Next, the abstract reads as follows:

> "Language program articulation presents ongoing challenges to educators, in part because the descriptive nature of much of the published work is not sufficiently generalizable to the variety of contexts in which articulation must occur. As such, this chapter addresses the issue of foreign language (FL) curriculum articulation using Theory of Constraints (TOC) Thinking Process logic and tools,

which offer a generalizable, process-focused alternative to previous approaches to articulation. This business-oriented model of organizational problem solving has the potential to develop effective solutions to the challenges of FL program articulation, while facilitating communication, collaboration, and agreement among participants. To introduce the reader to the TOC Thinking Process and facilitate the understanding of each tool, the key elements of this theory are summarized. **Next, the TOC Thinking Process tools <u>are applied</u> to the Wayne State University undergraduate Spanish program**. **Implications for improvements to articulation and for the language program director emerge as a result of this case analysis**. **A discussion of the use of the TOC Thinking Process as a theoretical model of articulation**, generalizable across language programs, concludes the chapter."

**Exhibit 146**, at p. 21. *(*Emphasis added*)*

*251.* This chapter gives us a glimpse of the behind-the-veil installation of TOC as this article illustrates a *mechanism* used to create and control connectivity at each vertex within the Defendants' organization.

*252.* Interestingly, "[t]he discussion includes a description of the key characteristics of the program, the application of the Theory of Constraints "**Thinking Processes**" to the articulation of the undergraduate curriculum, and the implication of this model for language program directors (LPDs) and other program participants." *Id*. at 29.

*253.* Specifically, Mrs. Murillo, *through* Dr. Low's "significant" manipulation describes an organizational structure similar to that which emulates "The Model" and that allows for organizational control through the oversight of the implementing departments' transfer of knowledge, *i.e.*, a communication and censorship mechanism.

*254.* *Here*, Mrs. Murillo identifies that "[p]art three presents a case study in the application of TOC Thinking Process tools to a *specific* curricular context—that of the Wayne State University (WSU) *undergraduate Spanish program*." *Id*. at 22.

*255.* Moreover, Mrs. Murillo *unequivocally* identifies similar TOCFE ideology related to problem solving:

"[T]he TOC Thinking Process has been used as a tool to help teach complex classes that cover a relatively large and fluid subject matter (Sirias 2002). The focus in these courses has been on using cooperative learning to stimulate students to work as a team on a specific case and solve problems….The TOC Thinking Process has also been used to solve problems within the K-12 educational setting."

**Exhibit 46***, at p. 24.*

*256.* This chapter continues by declaring that "to have a *good* program, faculty members must spend time *collaborating* and communicating about articulation," but also "need to dedicate their time to <u>research</u> to be current in their respective fields and to be rewarded *professionally and financially* for 'their' work." *Id*. at 34. (Emphasis added).

*257.* These needs described, as 'Mrs. Murillo' writes, are based on two assumptions: "(*1*) the need to share disciplinary knowledge among faculty members to improve communication, *and* (*2*) the need to develop common standards and goals for every course and for *the overall program*." *Id*. at 35. (Emphasis added).

*258.* The *injection* purposed to align inter-departmental **focus** is described as follows:

"An injection with the potential to break the conflict and create a win-win situation is to develop a new position within the Spanish Program, that of curriculum development coordinator (CDC), to enhance communication among program participants, initiate, manage, and oversee curricular innovations and revisions, assist faculty members in implementing all aspects of the curriculum, and regularly monitor progress. The CDC role is proposed to complement the existing administrative structure of the WSU Spanish program. Whereas the LPD focuses on issues of articulation at the introductory level, the purpose of the proposed CDC position is to coordinate, assist, and facilitate all aspects of curriculum development across the undergraduate curriculum."

**Exhibit 146** at p. 36.

*259.* Stated simply, "[u]sually by stating the opposite of the core problem one can find its solution, or **objective** (*e.g*., if the core problem is that faculty are not rewarded for articulation efforts, the objective, or opposite of the core problem, is that they are rewarded for these efforts). In some cases, the objective is not straightforward because of a conflict or dilemma that **<u>must</u>** be resolved using an **injection**, a ***win-win solution***." *Id*. at 26-27. (Emphasis added).

260.    The entrenchment of the CDC is the underlying *mechanism* identified by Mrs. Murillo's 'theoretical' system as the 'injection,' or plainly, the solution to the framed objective of curriculum articulation *and research* by the Defendants. *Id*. at 36.

261.    This supposed governmental actor is positioned individually for unconstitutional "professionally and financially" public and private gain *as* the proposed win-win solution.

262.    Every knowledge silo that implants 'Mrs. Murillo's' suggested "[A]gent of [C]hange" becomes inherently *itself* a target to insulate and protect given that the gain and authority of the CDC allows for control over the content delivered to **STUDENTS** and the data that flows within as a direct-intended result of that 'curriculum.' *Id*. at 40.

263.    Next, Mrs. Murillo continues by describing the structure of the Buffer Management process and/or timing of the designed-intellectual invasion where, *at first,* the CDC will work to develop rapport and respect with the implementing departments' directors and other organizational stakeholders. *Id*. at 38

264.    This predatory stalking is of the same style and substance of Dr. Low and Professor Habel as they ease tension of the 'curriculum' while also establishing rapport as would any Socratic Orator before diving into such structural-cognitive depth to mask the effects of this intentional-intellectual-manipulative invasion.

265.    But, just as Dr. Low and Mrs. Habel stressed to my class in GSC 7260/GSC 5670 and as I will teach you later that—you must *ALWAYS* consider the negative effects of your strategic plan—Mrs. Murillo identifies:

> "A negative result of having a [CDC] beyond the introductory level is that faculty might feel threatened by the periodic observation and supervision of their classes. Full-time faculty members are not accustomed to supervision and evaluation of their courses at the advanced level; they have had the freedom to determine the content and assessment criteria of their own courses and to instruct based upon their own methodological choices. To avoid the potential negative effects of increased supervision and evaluation, it is important to work on communication and cooperation *before* establishing periodic observations.

If faculty members teaching at the <u>advanced level</u> have a <u>clear understanding</u> of the CDC's role, <u>and see it as</u> *essential to the success of the overall program*, *<u>they may be more open to supervision</u> and feedback*."

**Exhibit 146***. at p. 38. (Emphasis added)

**266.** This *false front* <u>is</u> *designed* to infiltrate the targets' trust for the purpose of subsequent manipulation intentionally for the CDCs' "collection [of] information essential to improving departmental articulation efforts," <u>and</u> "research." *Id*. at 37.

**267.** This exact "skill" is seen in an <u>alternative</u> <u>form</u> in the unconstitutional exploitation of the "[***VERY***] Ambitious Goal" curriculum of TOCFE the Defendants **are** **still** **using** to leech onto **STUDENTS** and Industry for unjust gain.

**268.** Pointedly, 'Mrs. Murillo's' article serves as *telegraphed intent* and has the same effect that is unconscionably tied to the **STUDENTS**' educational experience in the Defendants' intellectual drag net in the form of the "[***VERY***] Ambitious Goal' 'curriculum' for <u>every</u> participating **STUDENT** **WITHOUT** providing the requisite informed consent for a "clear understanding" of Dr. Low and Mrs. Habel's role as Educators; Researchers; intellectual CDCs; *etc*.

**269.** The Defendants <u>failed</u> to follow Wayne State University Institutional Review Board protocol to validate this 'research' on the **STUDENTS** as human research subjects—*therefore*, this 'research' is void and compounds the issues given the intentional criminal conduct that has and continues to take place.

**270.** In contrast, *let me be clear*, Mrs. Murillo it seems is using the "**Thinking Processes**" of TOC to create robust and cohesively interconnected curriculum from the introductory to expert level using the proper decision making and the "**Systems' Thinking Logic**" *focus* of TOC *through* this CDC position, e.g., this is an administrative member floating through departments, using TOC *or not*, though positionally used in each vein of administration for infiltration, monitoring, communication, and action *when* necessary.

*271.* This leverage of rapport and position is also similarly seen by the suggestive February 12th, 2005, Rate My Professor comment suggesting Dr. Low's successive courses leads to a payoff for compliance practice:

> "Take this TOC Class [BA 7350] before taking his [Dr. Low's] BA 7050 class *and you'll get an easy A* in 7050. This is one of the best 3 class offered in the MBA program and Dr. Low is very passionate about the material. Lots of 'perceived work' but doable with a little effort. Highly recommended."

**Exhibit 126** *(*Emphasis added*)*

*272.* Explicitly, the Defendants' note that "[a]nother important injection is the cultivation of positive *perceptions* about this new departmental role among program participants;" exactly like the Defendants' integrated marketing of GSC 7260 and GSC 5670 continuously beating at the **STUDENTS**' subjective psychology reaffirming the path into the Defendants' **[VERY]** Ambitious Goal intellectual trap. **Exhibit 146**, at p. 37.

*273.* Moreover, the CDC must *do* and have the following *skills*:

(*1*) "establish credibility so that other members of the department trust *her* perspectives and opinions;"

(*2*) "*she* must develop relationships that encourage departmental faculty and staff to consider and support new proposals; program participants will be more open to change **if** **they** **perceive** the CDC as a neutral, honest, steady, and reliable person;" *and*

(3) "[f]inally, the CDC must be **skilled** **at** **listening** **to** **the** **ideas** and concerns **of** **all** **program** **participants**. Through **informal** **conversations**, meetings, **and other** **encounters**, the **CDC** **can** **collect** **information** *essential to improving departmental articulation efforts.*

*Once* the CDC is *perceived* as an *important* part of the department's effort to improve articulation, [then] another injection is necessary: the establishment of periodic meetings that provide a common ground on which communication between different disciplines (literature, cultural studies, and linguistics) and functions (administration, service, teaching, and coordination) within the program is possible and valuable. With this common ground established, program participants are able to identify shared benefits from enhancing the curriculum. As a result, a lack of cooperation is less and obstacle to articulation...When the solutions come from group consensus, the people involved are more likely to support and carry out *the implementation plan*."

**Exhibit 146,** at pp. 37-38. *(*Emphasis added*)*.

274.   *Focus* your mind on the timing of these meetings and the need to be "skilled" in "collect[ing] information essential to improving 'departmental efforts'" in such an "informal" way. The objectiveness of this evidence is undeniable, and the effect is the <u>systematic research</u> as the focal point of the CDCs' mole-*ish* function.

275.   Here, it seems that, *more likely than not*, Dr. Low and Mrs. Habel are in fact a *form* of CDCs for the Marketing and Supply Chain Management Department collaborating with Mr. John Taylor as Chair who is himself, *also more likely than not*, a form of mole-*ish* CDC for the administrative vein of communication researching industry by manipulating the **STUDENTS**' educational experience as a human research project because of this ability to manipulate reality.

276.   *Continuing*, Mrs. Murillo objectively references the use of a TOC Transition Tree: "It [TOC Transition Tree] is recognized as a powerful communication tool because it explains to everyone involved what to expect along the way and why to expect it." *Id*. at 39.

277.   Using TOC Transitions Trees in a collaborative setting "**forces participants** to **work together** and discover the need for change." *Id*. at 41.

278.   For example using the Transition Tree on page 39, moving from the bottom up, the obstacles and reason why the Defendants' needs arise is on the right, the solutions as 'Action" (**injection**) are on the left, with the desired need *as the effect of* the injection in the center *after* the action occurs, and at the top the "**AMBITIOUS GOAL**:" where the concentrated conduct contributes to variably increase or decrease "**Throughput**" [another TOC concept discussed *later*]. *Id*.

279.   Finally, Mrs. Murillo's *research* concludes:

> "**To <u>overcome</u>** the natural **<u>resistance</u>** to change **that** potentially **<u>slows down</u>** any **<u>implementation plan</u>**, **faculty** members **<u>and other</u>** program **<u>participants must be transformed into agents of change</u>**. The result is that they are able to adapt to changes faster every time they incorporate a new idea. **Empowering and informing is one way to accomplish this objective**. Change is more likely to happen if people discover by themselves that there is a need for change. **Using** case analysis and problem-solving

tools such as the **TOC** Thinking Process **raises awareness and
__empower the group__**."

[…]

"Not only is it important to have an LPD to coordinate the
introductory level, and a CDC to coordinate the intermediate and
advanced levels, but **it is** also **necessary** for both **to __work
together__. __When this happens__, __it is possible__ to __control quality__,
__content__**, and **__interconnectedness__** in each course and develop
general and specific standards for every level and every course
**__within each level__**."

[…]

"When the **__parties__ __involved__ __agree__** on the *standards for
the program*, a **__unified vision__** for **__the overall program__** emerges.
The **__key__ to __this__** development **__relies__ __on__** the **__active__ __participation__
of __all__ program __members__**, **__not__ __just__** the LPD or CDC. **As a
result**, **__everybody__ __shares__ __the__ __responsibility__** of ensuring
**constant   curricular   coherence   and   maintenance**."

**Exhibit 146,** at pp. 40. (*Emphasis added*)

*280.*    Again, *to be clear*, the *mechanism* identified in 'Mrs. Murillo's' 'theoretical' case study, the

CDC, **CAN** be used outside the Spanish program, __in fact__, the position of 'CDC' is applicable to

*all* knowledge *silos* and at any educational institutions.

*281.*    In closing Mrs. Murillo reminds the readers what the Defendants are truly **focused** on: "the

most salient conflict is faculty time devoted to the tasks of articulation *versus* faculty time devoted

to **research** and *other* functions." *Id.* at 41. (*Emphasis added*).

*282.*    Meaning simply, if faculty is burdened by what to teach, they will not be as effective

researchers for the Defendants.


### DEFENDANTS' USE OF WAYNE STATE UNIVERSITY MEDICAL SCHOOL
### *AS* THEORY OF CONSTRAINTS DECISIVE COMPETITIVE EDGE

*283.*    Specifically, the Defendants have *supported* this position with its' many public separations

from various faculty, where to highlight in 2017 the Defendant WSU President Dr. M. Roy

Wilson, <u>unprecedently</u> began de-tenure proceedings on five (*5*) WSU Professors because they were ""grossly underperforming" and "not doing anything," he said, making it difficult to move the university toward its mission as a premier urban research institution," The Detroit News continued. **Exhibit 147**—*March 29, 2017, Detroit News Article*.

**284.**   It may be true that those faculty members were underperforming, regardless this action establishes the *focus* and extent to which the Defendants are willing to go to achieve their objectives; only two other times in the University's *154*-year history has Wayne State University moved to remove tenure from a Tenured Professor. *Id*.

**285.**   This same Detroit News Article also mentions that thirty-seven (*37*) Wayne State University Medical School Faculty <u>were</u> <u>also</u> <u>targeted</u> for "underperforming in their academic assignments" according to the Defendants. *Id*.

**286.**   Moreover, the Defendants too during this period terminated contracts for "38 percent of the lecturers at Wayne State's College of Liberal Arts and Sciences (CLAS)," in and around March 2020. *See*, **Exhibit 148—CLAS Protest Article**.

**287.**   Objectively, <u>***yes***</u>, we know too that the Wayne State University Medical School ("WSUMED") <u>is</u> *also* using TOC to "*use these [**STUDENTS**] as bridges to companies*," as Dr. Goldratt phrased it in his 1997 demonstrative novel, *Critical Chain*. *See again*, **Exhibit 42**—*<u>Critical Chain</u>, Ekiyahu M. Goldratt, The North River Press, September 4th, 1997, at pp. 9-10*; **Exhibit 43**—*Critical Chain Synopsis, at pp*. 4-5.

**288.**   To establish this, <u>we</u> <u>remember</u> 'Mrs. Murillo's' systems' requirement to <u>**control**</u> its' pedagogy <u>entirely</u> *and* we consider the *objective* evidence in relation to the Defendants' historic and very-public *separation from* the Detroit Medical Center ("DMC") culminating in large part sometime in and around 2021:

**289.** For *more than* 100 years the Defendants, WSUMED, and DMC have coexisted as separate entities moving towards common objectives given their individual-unique positioning as Medical Provider and Medical Educator in and around Detroit, Michigan. **Exhibit 149**—*August 31, 2016, The Detroit News Article.*

**290.** "The DMC is southeast Michigan's largest health care provider and has five contracts with WSU doctors. The largest is the [Wayne State] University Physician Group ("WSUPG," *or verbally*, "*What's Up G*"), which represents WSU doctors in fields such as family medicine, neurology, psychiatry, cancer, surgery, urology and dermatology. DMC also has contracts with physicians practicing in pediatrics, emergency medicine, anesthesiology and radiology. The rest of the hospital system—with more than 2, 000 licensed beds and 3,000 affiliated physicians—is served by private physician groups." *Id.*

**291.** Sometime in 2010, "DMC and the [Wayne State] University Physician Group…[a]fter a funding dispute, the two sides agreed in 2010 to transfer 10 WSU faculty physician groups to the DMC under a five-year agreement aimed at overhauling the relationship." *Id.*

**292.** After executing the 2010 Agreement between DMC and WSUPG, "Vanguard Health purchased DMC in March 2010, turning it from a nonprofit to a for-profit system." *Id.*

**293.** In October 2013, the *current owners* of DMC, "Tenet Healthcare Corporation acquired Vanguard Health," and expressly assumed the 2010 WSUPG Agreement. *Id.*

**294.** During 2016, WSUPG represented 18% of DMC's overall business. *Id.*

**295.** The DMC and WSUPG's contract expired March 2016, bringing both sides to the negotiating table where, "contract negotiations between DMC," now owned by Tenet Healthcare Corporation ("Tenet"), "and [WSUPG] have broken off in pertinent part to "non solicitation" language demanded by WSUPG. According to an email sent by *then* dean of WSUMED, Mr. Jack Sobel, the stalled talks will have "cascading implications." *Id.*

*296.* Sometime in and around August 2016, during renegotiations between DMC and WSUPG, "[DMC] also included a controversial offer by the DMC to acquire the physician group, which was declined by the university. **WSU officials**, meanwhile, **had been lobbying for a more <u>transformative</u> <u>alliance</u> between the medical school and the DMC**, with the hospital system **becoming more of an <u>academic</u> <u>partner</u> rather than taking over the physicians group**." *Id.*

*297.* At the same time the August 2016 renegotiations between DMC and WSUPG stalled, "DMC officials [were] dealing with a visit…from state and federal regulators investigating issues with **improperly cleaned surgical instruments**," though at the same time WSUMED was struggling with "a financial crisis." *Id.*

*298.* Sometime in and around late 2015, "WSU officials acknowledged a $29 million deficit spread among the physician group, the Fund for Medical Research and Education, and the medical school. Officials said then it would take three years to eliminate. Of that amount, $13 million had been attributed to the University Physician Group…reduced to about $1 million due to expense reductions." *Id.*

*299.* At this time, in 2016, the Defendants made its position clear as stated by Mr. Jack Sobel: "I believe this provides [WSUMED] with an **opportunity to plot our own course consistent with our vision** and values…We have been rightly **focused** on **improving our own operational management in both the School of Medicine and in the WSUPG** (*sic*), and **we are not beholden to short-tern profitability and shareholder returns**," wrote then WSUMED Dean of Students and Chairman of the Board of Directors for the Wayne State University Physician Group, Mr. Jack D. Sobel. *Id.* (*Emphasis added*).

*300.* The relationship between DMC (Tenet) and the Defendants, specifically through WSUPG, rapidly changed sometime in and around April 19th, 2018, following a letter by Mr. Jack D. Sobel, in which he (*1*) leverages the "**Decisive Competitive Edge**" that WSUMED has in advocating for

more than four hundred (*400*) physicians and thousands of students 'backed' by the Defendants'

overall brand position, and (*2*) the *manner* in which Mr. Sobel leverages his position by way of a

written "**MAFIA OFFER**" that has the effect to bully DMC (Tenet) into contractual submission.

*See* **Exhibit 150**—*April 19, 2018, WSUMED Mafia Offer to DMC.*

*301.*    Mr. Sobel's letter is <u>unequivocally</u> by <u>definition</u> a "**MAFIA OFFER**:"

> "We understand the reason for this extension is for you to review
> the contract with your corporate Board, scheduled to meet this
> first week of May [2018]. However, I want to be clear and insist
> that if the negotiations and contract are not finalized by midnight
> May 15th, 2018, elective and non-emergency clinical <u>services</u>
> provided by [WSUPG] will <u>cease</u> to be provided." *Id.*

> ***\*\*\*IMPORTANT NOTE\*\*\****

*302.*    For now, a Theory of Constraints "**MAFIA OFFER**" or "Un-Refusable Offer" ("URO") as

coined by Dr. Goldratt, *is like something out of a movie*, an offer that the Receiver <u>cannot</u> refuse,

*easily*. A "**MAFIA OFFER**" is not easily conveyed, the Sender must be *uniquely positioned* to

properly leverage their "**Decisive Competitive Edge.**" Again, for now, understand that a

"**Decisive Competitive Edge**" <u>*is*</u> what the Defendants have developed in their organizational

structure, integrated-marketing plan, and operation by using the Theory of Constraints cohesively

throughout its ranks, consciously *and* unconsciously, given that the system was *itself* formed using

TOC for continuous improvement.

*303.*    Understand too that Mr. Sobel's "**MAFIA OFFER**" not only leveraged operations, but *time*

*too* in that narrowly defined window (April 30, 2018, to May 15th, 2018).

*304.*    The direct and subsequent *effect* of Mr. Sobel's "**MAFIA OFFER**," which is always the

inherent risk in advocating such *stark* position, was DMC's (Tenet's) equally pointed response

the following day on April 20th, 2018, by Chief Executive Officer, Mr. Anthony J. Tedeschi. *See*

*in part*, **Exhibit 151**—*April 20, 2018, DMC Rejection Letter.*

*305.* Immediately, Mr. Tedeshi identifies: "The tone of the letter and the explicit threat to the Detroit Medical Center's (DMC) ability to deliver critical healthcare services to patients in Detroit beyond May 15 are simply unacceptable." *Id.*

*306.* Continuing further, Mr. Tedeshi unequivocally denounced the Defendants' explicit *threat*:

> "Wayne State University's (WSU) refusal to extend negotiations if necessary to reach a mutually agreeable resolution could leave DMC without critical services to sustain operations in serving the greater Detroit community. Moreover, reports that WSU is engaged in affiliation discussions with other healthcare institutions raises questions about your commitment to a long term relationship with DMC. With this threat, DMC now finds itself in the position to explore alternative plans so that we can continue providing critical care to our patients uninterrupted."

**Exhibit 151**.

*307.* On November 7th, 2018, WSUPG filed for Chapter 11 bankruptcy in the United Stated Bankruptcy Court in the Eastern District of Michigan (Detroit) under Bankruptcy Petition # 18-55138-mar. **Exhibit 152**—*US Bankruptcy Petition #18-55138-mar*.

*308.* On November 8th, 2018, The Detroit News reported an article titled: "University Physician Group files for bankruptcy reorganization." *See*, **Exhibit 153**—*Detroit News Article: WSUPG Files for Bankruptcy*.

*309.* Quoting the affidavit of WSUPG CEO, Mr. Charles J. Shanley: "We've been doing everything we can to avoid reorganization under Chapter 11." *Id.*

*310.* *Continuing*, "[t]his is a restructuring—this is not a liquidation, it's not a closure…. Our operations will continue (and) our employee compensation and benefits will continue," Mr. Shanley added. *Id.*

*311.* Moreover, Mr. Shanley said that WSUPG's "clinical operations are no longer sustainable "in the absence of long-term **subsidy**" due to a 50 percent decline in the number of its physician members over the past decade." *(Emphasis added)*. *Id.*

312.     "Asked why so many physicians left UPG [WSUPG] over the past decade, Shanley alluded to a period of instability that culminated in the near-split with DMC last spring [*2017*]. Negotiations for a new contract stalled, and both sides said they were ready to end their 100-year partnership. The standoff ended in September [*2018*] when the parties entered into a new five-year contract." *Id.*

313.     The DMC issued its own public statement to support the exploited partnership: "The DMC is committed to our collaboration with the Wayne State University Physician Group and we value the access, expertise and specialized care that these physicians provide to our patients." *Id.*

314.     In the same November 8th, 2018, The Detroit News article, sometime in and around September 2018 "[i]ndependant of UPG, Henry Ford Health System and Wayne State University…signed a non-binding letter of intent to expand their long-term partnership. They hope of finalize the agreement in early 2019." *Id.*

315.     "The envisioned partnership would designate Henry Ford Hospital as the primary institutional affiliate for the Wayne State University School of Medicine, College of Nursing, and College of Pharmacy and Health Sciences." *Id.*

316.     In closing, Mr. Shanley clearly identifies that "[WSUPG] began as an *academic referral practice* on the DMC campus—we're really just going back to our roots." (*Emphasis added*). *Id.*

317.     In a May 6th, 2020, Crain's Detroit Business article, we learn too that "[l]ast year [2019], Wayne State sought to make Henry Ford Health Systems its primary affiliate, **but** infighting on the WSU board of governors scuttled the negotiations." **Exhibit 154**—*Crains Detroit May 6, 2020, Article.*

318.     We know objectively that during 2019 the WSU Board of Governors, in-part led by Mr. Michael Busito, sought to remove WSU President Wilson in a 4-4 vote during a disputed-open meeting. **Exhibit 5**—*South End Dec 19, 2020, Article.*

**319.**   The infighting sparked a December 6th, 2019, letter responding to Mr. Louis Lessem's **defense of** Dr. Wilson from the State of Michigan Department of Attorney General, where the Office of the Attorney General **found** that formalities did not tie Dr. Wilson to the vote. *Id.*

**320.**   During the meeting to vote Dr. Wilson from his post:

> "[t]he floor was opened to public comments, and former WSU President Allan Gilmour said the infighting in the board needs to stop. "**So these accomplishments around this whole university are a direct result of President Wilson**. I think it's clear that anyone who looks at the real-life will recognize that his leadership has been exceptional," he said." Gilmour continued, mentioning that "the ongoing complexities have been personal and political."

> *Id. at p. 2. (Emphasis added)*

**321.**   The separation between DMC and WSUMED grows wider when the "Detroit Medical Center says it will bar Wayne State *Pediatricians* (sic) from Children's Hospital," following WSU's decision to develop the competing practice group called Wayne Pediatrics sometime in early 2019. *See again,* **Exhibit 134**.

**322.**   Specifically, DMC's notice to WSU identified "that about 25 pediatricians affiliated with its new academic pediatric group, Wayne Pediatrics, will no longer be welcome to admit or treat patients at Children's Hospital of Michigan after July 1, [2020]." *Id.*

**323.**   Moreover, "Wayne Pediatrics was formed last year (2019) by Wayne State's medical school after University Pediatricians, once a clinical partner of Wayne State, chose to leave the university early in 2019 and affiliate with Central Michigan University," following in toe with WSUPG's separation over *money* and *control*. *Id.*

**324.**   At the time of this breakup, "University Pediatricians [was] a nonprofit practice plan that includes nearly 250 physicians that have provided health care services at the DMC Children's Hospital of Michigan for decades." Interestingly, WSU President:

> "Dr. M. Roy Wilson, President (sic) of Wayne State University, **told Crain's** that the decision, if allowed to stand, could result in

a disruption of pediatric care for dozens of Detroit children and force the university to possibly take unspecified *retaliatory* action against DMC." *Id.*

*(Emphasis added…Not mitigation, but retaliatory conduct).*

*325.*    In the same May 6th, 2020, article, Dr. Wilson "**also said** he consulted Monday with Wayne State's Health Affairs Committee (sic) about DMC's plan. He said the board expressed concern and *supported efforts* to prevent DMC from blocking WSU pediatricians from Children's Hospital." *Id.*

*326.*    Continuing even further, "Wilson **said** he discussed the issue with legal counsel and was told removing physicians from hospital medical staffs for economic reasons or barring credentialed doctors from admitting patients violates a number of state and federal antitrust laws." *Id.*

*327.*    The May 6th, 2020, Crain's article is the direct effect of a "mischaracterization" in "recent events," namely, "Wayne State Pediatricians banned from DMC Children's Hospital," says University Pediatricians ("UP") in a memo to Crain's Detroit Business. *Id.*

*328.*    Indeed, this May 6th article is a direct effect of the May 5th, 2020, The Detroit News article: *Children's Hospital bans Wayne State University Pediatricians (sic)*," identifies UP. *Id. See also in full,* **Exhibit 156**—*Detroit News May 5th, 2020, Article.*

*329.*    In responding to this May 5th, 2020, article UP's Memo to Crain's Detroit Business makes its' position clear:

"Normally, University Pediatricians does not address matters of pending litigation, but we are compelled to address the mischaracterization of our practice and portrayal of recent events in: "***Memo - Wayne State Pediatricians banned from DMC Children's Hospital***."

The claim is blatantly false. A very small number of disgruntled pediatricians have decided to terminate their relationship with University Pediatricians and forgo the benefits of our longstanding relationship with the DMC Children's Hospital.

The DMC did not impose a blanket ban of "Wayne State Pediatricians" from Children's Hospital. Indeed, it is ridiculous that Wayne State University would claim to have been banned from the DMC Children's Hospital when just weeks ago Wayne State terminated its contracts with almost all of the very same physicians who are members of University Pediatricians and who steadfastly care for their young patients at the DMC Children's Hospital.

University Pediatricians maintains its strong commitment to serve the DMC Children's Hospital by providing exceptional health care to countless poor and underserved children and families in the surrounding region. Nothing will change our commitment to the community we serve. University Pediatricians is thrilled to have recently renewed its partnership with the DMC Children's Hospital and its physicians will continue to serve the children of Detroit for years to come. Together with its new academic partner, Central Michigan University College of Medicine, University

Pediatricians will continue to provide excellent health care for children, conduct research, and train the doctors of tomorrow for our community.

Wayne Pediatrics was formed last year by Wayne State's medical school after University Pediatricians, once a clinical partner of Wayne State, choose to leave the university early in 2019 and affiliate with Central Michigan University.

The dispute between University Pediatricians, a 220-member group affiliated with DMC Children's Hospital, and Wayne State University School of Medicine goes back years.

In mid-March, Wayne State sent faculty termination letters to more than 115 members of University Pediatricians, giving them 30 days to decide if they want to join Wayne Pediatrics. The termination decision was delayed from last October to give UP doctors more time to consider their options.

At the time, UP management owed Wayne State $13 million based on a salary reimbursement agreement that UP was not paying the university. In July, WSU sued UP for the owed funding. The owned money is now up to more than $26.1 million, an amount a top WSU official called "staggering "and "unsustainable."

UP last made a salary reimbursement agreement payment in February 2019. The salary reimbursement agreement with UP allowed Wayne State to cut a single check to faculty members that paid pediatrician compensation upfront, including faculty salaries and benefits."

**Exhibit 154**, *at pp.2-3.*

*330.*    The UP Memo left Crain's unsatisfied as to, weirdly specific, "whether the 25 pediatricians now part of Wayne Pediatrics would be able to admit patients to DMC Children's Hospital after July 1." *Id*.

*331.*    The Crain's article identifies further a subsequent statement by DMC regarding the issue of exclusivity:

> "Hospitals commonly enter into exclusive contracts so that they can assure high quality coverage of critical patient care and teaching services," the statement said. "Children's Hospital of Michigan has had an exclusive arrangement in place with University Pediatricians for many years. University Pediatricians reputation in the community for primary and specialty care pediatrics is broadly recognized.
>
> DMC regrets that Wayne State chose to develop a competing pediatric group which has resulted in a potential separation in the pediatric community that has been a hallmark of excellence in Detroit and at Children's Hospital of Michigan for decades. Physicians who left to join Wayne Pediatrics will remain members of the Detroit Medical Center medical staff. Wayne Pediatrics physicians can care for patients at Children's Hospital of Michigan for specialty services which are not part of the exclusive contract with University Pediatricians, and can care for their patients at all other DMC facilities."

**Exhibit 154***, at p. 3.*

*332.*    In this same Crain's article, intimate details of at least three (*3*) emails between WSU Attorney, "David French of Hall Render," and "Arthur O'Reilly of Jones Day," are revealed. *Id*.

*333.*    This engagement sparked by Mr. French's "April 29th, 2020, letter to [Audrey] Gregory [CEO of DMC]," where "French asked her to clarify whether the new policy covers physicians in other private medical groups from obtaining privileges at DMC." *Id*.

*334.*    The need to clarify the definitive positions of each entity is important identified by "Dr. Herman Gray, Chair (*sic*) of the Pediatrics Department at WSU's Medical School (*sic*), said the university was informed of Tenet DMC's decision by Dr. Eric McGrath, a faculty pediatrician specializing in infectious disease who recently joined Wayne Pediatrics." *Id*.

*335.*     Continuing, "Gray said he is [in] (*sic*) contact with more than a dozen pediatricians who recently left the University Pediatricians for Wayne Pediatrics: "They are worried….They are *highly trained*. They don't know how this will end up," and "[t]hey steadfastly want to be *academic physicians*." *Id*. (*Emphasis added*).

*336.*     Interestingly, Dr. Herman Gray has been intimately affiliated with DMC, specifically the Children's Hospital of Michigan, for more than forty (*40*) years, serving as Chief Operating Officer, and then as President and Chief Executive Officer from [August] 2005 to 2015. **Exhibit 157**—*Dr. Herman Gray WSU Website Biography*.

*337.*     We also know that *during this time* at DMC, Dr. Gray has also worked his way through the ranks with the Defendants as "associate dean for graduate medical education at [WSUMED]," and "[h]e continues to serve as a clinical associate professor in pediatrics," at least as of March 10th, 2010. **Exhibit 158**—*DMC Board of Trustees Information Packet, pp. 8*.

*338.*     Before becoming CEO of Wayne Pediatrics, Dr. Gray *was also* the President and CEO of United Way; announcing his *unexpected* resignation given "his background uniquely qualifies him for this new role," leaving the National nonprofit "implementing its CEO Succession Plan." **Exhibit 159**—*United Way: Herman Gray Resigns*.

*339.*     Specifically, on or about August 13th, 2019, Dr. Gray's priorities of 'research' by exploiting the children and citizens of the City of Detroit <u>are</u> <u>clear</u> and in line with the Defendants' overarching mission as stated in an WDET 101.9FM news article: "*Wayne State Looks to 'Reboot' Urban Pediatrics Program*." **Exhibit 160**—*WDET August 13, 2019, Article*.

*340.*     *Like any collector*, understand that Dr. Gray is a highly trained and experienced Medical Educator, and this position *is* built for him—he only seeks the unique and more interesting cases that arise within his prevue of operation, much like the Defendants in their own individual fields.

*341.*     Importantly, according to Dr. Gray himself—the Defendants' plan is specific:

"the department [Wayne Pediatrics] is "**taking advantage of this opportunity** [referring to the separating of UP faculty], **quite frankly**, to sort of reboot what a department of pediatrics in an urban setting—**literally an urban research laboratory like Detroit** which has the highest percentage of children under the age of five who live in poverty or extreme poverty—*take an opportunity* to reboot and reimagine how we deliver care to those children and their families. Gray also talks about the wider health care disparities that exist, both in Detroit and around the country. "Certainly, poverty and racism are pretty much universally acknowledges as the foundational components of societal disparities," says Gray. "**We believe that being minimized, being disrespected, being uncertain of your place in society induces <u>toxic stress</u>**."

**Exhibit 160** *(Emphasis added)*

*342.*   We can see behind the Defendants' veil with Dr. Gray's August 13th, 2019, letter that WSUMED was "*taking advantage of this opportunity*, *quite frankly*," to start anew as UP pediatricians separated with WSU to affiliate with Central Michigan University and DMC.

*343.*   It is the tone of Dr. Gray's May 21st, 2020, The Detroit News Opinion, "*Letter: Don't take doctors from children*," that is in *stark* comparison to his usual tone. **Exhibit 161**—*Detroit News May 21, 2020, Dr. Gray Letter*.

*344.*   Here, Dr. Gray leverages his own *unique* "**Decisive Competitive Edge**" given his positioning as a turncoat in the Defendants' army of "[A]gents of [C]hange;" he issues a rather subtle "**MAFIA OFFER**," but with an open solicitation to Tenet and Children's Hospital of Michigan ("CHM") attempting to set the table as identified in snippets below:

"*If* WSU doctors could continue to work besides their UP colleagues, as they do now, *CHM would benefit financially*, and from the experience of the WSU faculty as well as *their long-term relationships with patients. If this eviction stands*, CHM will lose the specialists that care for children and young adults with HIV/AIDS as an example, and many other talented pediatricians." *Id*.

"**This is about money and control**," Dr. Gray continues. *Id*.

"Banning WSU pediatricians from Children's Hospital creates a monopoly for the University Pediatricians group, which, rather than negotiate with the university, chose to leave Wayne State and affiliate

with Central Michigan University located 155 miles from the children and city of Detroit. The only apparent reason for DMC/Tenet to enforce an exclusivity clause with UP is to exclude WSU faculty doctors. There is no efficiency or quality to be gained by this." *Id.*

**345.**   In addition to positioning a rival pediatrics brand in Detroit (University Pediatrics *vs*. Wayne Pediatrics) *and* securing the rivalries' former President and likely one of the most qualified individuals in the region in Dr. Herman Gray, all the Defendants had to do is obtain property "*so close to the hospital*" that WSUMED can compete on a territorial basis too *for the children* of Detroit. **Exhibit 154**, *at pp. 5*.

**346.**   Crain's Detroit frames it as: "Wilson said it is clear to him that DMC's decision to prohibit Wayne Pediatrics-affiliated doctors from treating patients at Children's Hospital is an effort to "break the back of Wayne Pediatrics."" *Id*. President Wilson continuing, "[t]he reason we (want to buy) 400 W. Mack Ave (building) is to have a location *so close to* the hospital." *Id*.

**347.**   And, on September 15th, 2020, the Defendants did exactly that and began serving patients at "400 Mack Ave., a newly renovated 50,000-square-foot health care facility," home to newly renamed WSUPG—Wayne Health. **Exhibit 162**—*Wayne Health Opens at 400 Mack*.

**348.**   In September 2020, "400 Mack Detroit Health Center represents another new chapter in the evolution of the newly renamed Wayne Health," said Mr. Charles Shanley. *Id. at p.3*.

**349.**   Continuing with the publicized intent, "[t]he 400 Mack Health Center's **overarching focus** is population health improvement, with the Center for Population Health Accountability at the core of these efforts." *Id*. (*Emphasis added*).

**350.**   Explicitly, "Wayne Pediatrics, another WSU clinical partner organization, will launch medical services for children at 400 Mack through a new Urban Children's Health Collaborative aimed at building a healthier future for children and families through primary and specialty pediatric care, medical education and training, and population-based *research*." *Id. at p.4*.

**351.** In fact, the Defendants even re-emphasized its rebranding of WSUPG marketing to Wayne Health on September 9th, 2020, using this opportunity to also declare that Wayne Pediatrics is accepting patients at 400 Mack too. **Exhibit 163**—*WSUPG Rebrands Article.*

**352.** In this article the Defendants pull the veil back a little bit further, as CEO and President of Wayne Health, Mr. Charles Shanley explains:

> "Our new name and logo signal a bold, new vision **focused** on providing *integrated whole*-person care that will be realized with the opening of a new *multidisciplinary* health *center*…. The new 400 Mack Detroit Health Center will offer a full range of *integrated* primary and preventive health services, including specialists in internal medicine, family medicine, obstetrics and gynecology, and behavioral health. Another Wayne State University partner organization, Wayne Pediatrics, is co-locating clinical services for children at the location, **completing a continuum of care across the lifecycle** [of a Patient] at the new 50,0000-square-foot facility.

> "Wayne Health specialists and advanced practice providers care for patients with the most complex medical conditions, especially those from at-risk and vulnerable populations," Dr. Shanley explained. "As Wayne State University School of Medicine faculty members, our physicians have a mission-based commitment to train the next generation of physicians and conduct leading-edge *research. This* gives our patients access to the latest, most advanced medical treatments."

> The word "Health" in the new name signifies Wayne Health's vision to provide **integrated** "*whole-person*" physical, behavioral and preventive health services, including *innovative partnerships* and programs *to address* social determinants of health. The ultimate goal is to improve the health of the metropolitan Detroit community, especially its most vulnerable residents."

> *Id. at p. 1-2 (Emphasis added)*

**353.** In the same September 9th, 2020, WSUMED article the Defendants leveraged this marketing opportunity to demonstrate how vertical integration of the system took WSUMED quickly from restructured WSUPG into a *direct competitor* with DMC, and a *profitable* one at that:

> ""This is a new chapter in the evolution of UPG, demonstrating our commitment and efforts to move on

from past challenges and *focus* on a brighter future," Dr. Shanley said.

In November 2018, WSUPG filed for Chapter 11 protection and began a reorganization process to address years of financial and operational challenges, completing its bankruptcy emergence in less than a year. The organization turned its finances around by shrinking its footprint, investing in new information technology systems, improving business processes and stabilizing its provider base. As a result, Wayne Health <u>pivoted</u> from a pre-bankruptcy $4.1 million loss in fiscal year 2018 to a $5.27 million unaudited surplus as of the third quarter of fiscal year 2020 (June 30)."

**Exhibit 163**, *at p. 2. (Emphasis added).*

*354.* *Again*, to draw you in, we are watching the Defendants through the traceability of authority act in ways that are representative of TOC's strategic planning and operational decision making using WSUMED during our relevant timeframe.

*355.* The Defendants' stated "**focus**" on "whole-person" "integrated" health, ingeniously including too "social-determinants of health," that bridges the "Critical Chain Application" of TOC in "win-win" fashion where the Defendants will join forces with "innovative partnerships," to "*use these [STUDENTS] as bridges to companies,*" from a *medical perspective Id*; *See again*, **Exhibit 42**—<u>*Critical Chain*</u>, *at pp. 9-10*; **Exhibit 43**—*Critical Chain Synopsis*, *at pp.* 4-5.

*356.* Or, simply, this utopic plan is designed to treat a "whole" patient by capturing maximum value from the single source over the lifespan of that source, *from childhood to senior*, improving the variable 'social-determinants' that may also be impacting the patient.

*357.* In relation to the split of DMC and WSUPG, *now* Wayne Health, and UP and Wayne Pediatrics, the administration at Wayne State University was "***angered*" by Tenet's decision to oust Wayne Pediatrics from DMC Children's Hospital of Michigan. *See*, Exhibit 164—*WSU May 7th, 2020, Angered Article.*

**358.** The following day, on May 8th, 2020, newly minted dean of WSUMED, Dr. Mark Schweitzer, *reminds* the listeners of WDET [*owned by WSU*] about the benefits about owning a monopoly: **"…*the listeners know, monopolies benefit the companies who own the monopolies…,*"** displaying his *fresh* loyalty to the Defendants. (*Emphasis added*). *See*, **Exhibit 165**—*WDET May 8, 2020, Radio Interview Article*; **Exhibit 166**—*WDET May 8, 2020, Radio Interview Audio*; **Exhibit 167**—*WDET May 8, 2020, Radio Interview Transcript*.

**359.** This communication cracks the mold *a bit more* as the Defendants' use another tentacle of its' 'Decisive Competitive Edge' and "monopoly" arm, 101.9FM WDET, to deepen the fissure between DMC and WSUMED as, "*quite frankly,*" the Defendants "[take] *advantage of this opportunity*." *Id*; *see also*, **Exhibit 160**.

**360.** Continuing the interview, Dr. Schweitzer highlights two important issues the Defendants are also lobbying in the background aside from a more "*transformative alliance*" (*see*, **Exhibit 149**): (*1*) they "*want nothing more than…to train [its] medical students*," and (*2*) a "…modest, but at least some *subsidy to* the medical school." **Exhibit 167**, *at pp. 5-6.*

**361.** This is not the first time the **subsidy** issue has appeared to us in the foreground:

> "In an *affidavit filed with the court*, *Shanley said* the group's clinical operations are no longer sustainable "in the absence of long-term external **subsidy**" due to a 50% decline in the number of its physician members over the past decade."

> **Exhibit 153** *(Emphasis added).*

**362.** This is **important** to note, because again the Defendants through WSUMED are leveraging these negotiations to obtain "*money and control*" by "*quite frankly*," "*taking advantage of these opportunities*." *See again*, **Exhibit 160**.

**363.** Remembering again, "the Model" and Mrs. Murillo's CDCs, this breakdown between DMC and WSUMED is, *objectively*, about: (*1*) *more* organizational control over the faculty physicians, and (*2*) to reduce the Defendants expenses (or differently, the Defendants substantially gain) given

the germane fact that roughly 18% of DMC's profits are attributable to these *same* faculty physicians. *See*, **Exhibit 149**.

*364.* The ***focus on control*** over the faculty physicians through the demanded non-solicitation language, *in itself* is the effect of DMC's previous offer to purchase WSUPG outright, which *would have had* the effect of WSUMED *losing substantial, if not all control* over how these faculty physicians teach and research WSUMED **STUDENTS.**

*365.* Clearly, the Defendants failed in its "lobbying" attempt for a more "transformative alliance" with the DMC becoming more of an "academic partner," and instead crippled WSUMED for two things— "*money and control.*" *See* **Exhibit 149***; See also,* **Exhibit 161**.

*366.* In fact, the August 13, 2019, "reboot" article by Dr. Gray paints a clear idea of the intellectual landscape the Defendants shared in its objective to control the pedagogy commingled within *the practice* of medicine. *Then*, the Defendants did not have the means to control each variable involved, *now*, the Defendants have positioned a 50,000 sq. ft. state-of-the-art multidisciplinary medical facility in direct competition with DMC. The Defendants are not competing today with DMC, they are competing for the patients of *tomorrow*—Detroit, and will "not beholden to short-tern profitability and shareholder returns." *See*, **Exhibit 149**.

*367.* In fact, in June 2020, WSU filed a lawsuit against DMC over this very issue of pedagogy articulation. *See*, **Exhibit 168**—*DMC Prevails News Article*. "Wayne State University medical students *will* *not* be supervised by the university's pediatric faculty if they do their clinical rotation at Children's Hospital of Michigan, following a ruling" by "Wayne County Circuit Court Judge Brian Sullivan." *Id*.

*368.* "The agreement provides in part that the program is available at DMC; that it is run by DMC; the physician choice is made by DMC; and that is consistent with DMC running the hospital," Sullivan concluded in part." *Id*.

369.     Continuing, "[n]othing in the contract suggests DMC intended to surrender such authority to WSU." *Id.*

370.     In the same article, WSU spokesman "Matt Lockwood said while medical students do clinical rotations in pediatrics at other venues such as Henry Ford Health Systems, Ascension Michigan hospitals and private pediatric offices, the "vast majority" complete that part of their training at Children's." *Id.*

371.     **In the end**, the Defendants' exploitation of the DMC relationship is an example of strategic use of key TOC logic at the organizational level that *broke* paradigms or structural constraints that enabled WSU to grow stronger while avoiding *negative inertia* where the Defendants did several things to stabilize strategic operation of WSUMED with two *relevant* decisions explained here: (*1*) the Defendants were forced to partner with *Ascension* St. John Children's Hospital given that Henry Ford Hospital folded talks after it saw the ongoing *food fight* between the WSU Board of Governors, and (*2*) WSUMED aligned with the Wayne State University Mike Ilitch School of Business ("WSUMISB") to offer a 'concurrent' M.D.—M.B.A. Program.

## *Crippled WSUMED Forced to Partner with Ascension St. John Hospital*

372.     Sometime in and around June 16th, 2021, following the breakups of University Pediatrics, Wayne Pediatrics, the DMC, and WSUPG, *now known as* Wayne Health, the Defendants *took a step back*, to re-adjust WSUMED's strategic positioning given the *crippling* effects these breakups caused.

373.     *Specifically*, the Defendants, through WSUMED, Wayne Health, and Wayne Pediatrics, partnered and affiliated with Ascension St. John Hospital to offer services to the citizens, *to the children*, of Metro Detroit. *See*, **Exhibit 169**—*Ascension St. John Hospital Partnership Article*.

**374.** This **_injection_** was designed to replicate the former DMC relationship to restabilize the WSUMED 'Decisive Competitive Edge' in that the *100* yearlong partnership *was now nearly entirely dissolved*.

**375.** Furthermore, **Exhibit 169** continues:

> "We're thrilled to *combine our resources* and *align with* Wayne Pediatrics and Wayne State University School of Medicine to offer world-class-care, _while_ _also_ creating an environment that fosters excellence in teaching, _research_ and training the next generation of clinicians and *researchers*," said Michael Wiemann, M.D., president of Ascension Medical Group." *Id*. (*Emphasis added*).

> "*In addition to* expanded _research_, _integration_ and _coordination of services_, this collaboration widens the scope of pediatric specialty care available to families from experts dedicated to providing excellent health outcomes _for_ _Michigan's_ _children_," said Herman Gray, M.A. *Id*; (*Emphasis added*).

**376.** Locked-in-step trading marketing plugs and quotes, we can see through this façade and still know definitively that Ascension and WSUMED have aligned purely for "**money and control**," and "*quite frankly*," to redefine their businesses' footprints towards a more "transformative alliance"—what better time this do this than during the ongoing 2020 Global Pandemic where the Medical Industry was tested and *truly found* where its' *exposure* lies.

> "As the largest non-profit and *Catholic health system* in the United State., *(sic)* Ascension is committed to delivering compassionate, personalized care to all, with special attention to persons living in poverty and those most vulnerable. In FY2020, Ascension provided $2.4 billion in care of person living in poverty and other community benefit programs. Ascension includes more than 160,000 associates and 40,000 aligned providers. The national health system operates more than 2,600 sites of care—including 145 hospitals and more than 40 senior living facilities—in 19 states and the District of Columbia, while providing a variety of services, including clinical and network services, *venture capital investing*, investment management, biomedical engineering, facilities

management, risk management and contracting through Ascension's own group purchasing organization.

In Michigan, Ascension operates 16 hospitals and hundreds of related health care facilities that together employ more than 23,000 associates. Across the state, Ascension provided more than $311 million in community benefit and care of persons living in poverty in FY2020. Serving Michigan for more than 140 years, Ascension is a *faith-based* health care organization dedicated to transformation through innovation *across the continuum of care*."

**Exhibit 169**, *p. 2.* (*Emphasis added*)

(*See also*, **Exhibit 163**, *at pp*. 1-2)

*377.*   *Now*…this "*continuum of care*," the current designed process of service offerings was <u>not</u> WSUMED's first choice, we know this *objectively*, Henry Ford Hospital was the primary target.

*378.*   Instead, WSUMED *settled* by aligning with this so-called "<u>*faith*</u>-based health care organization," and "largest *Catholic* health system in the United States" when it partnered with Ascension St. John Hospital ("Ascension"). **Exhibit 169**, *p.* 2.

*379.*   We also know *objectively* that <u>this</u> <u>was</u> a difficult decision for the Defendants *given its previous unsuccessful attacks on Christianity* as displayed in *InterVarsity Christian Fellowship v. Wayne State University*. But, the Defendants did not have an acceptable-alternative avenue to exploit, "*quite frankly*," so *Ascension was* <u>*chosen.*</u> **Exhibit 160**.

*380.*   Reflected in the *2018* case, *InterVarsity Christian Fellowship* v. *Wayne State University*, the Defendants <u>targeted</u> a <u>Christian</u> **STUDENTS**' organization that had operated for 75 years on the campus of Wayne State University and other college campuses throughout the United States, for 'violation' of the Wayne State University Non-Discrimination Policy.

*381.*   In *InterVarsity Christian Fellowship* ("*InterVarsity*"), prior to filing you see InterVarsity President, Tom Lin, at Case 1:18-cv-00231 ECF No.1 filed 03/06/18 PageID.45 to PageID.51 where Mr. Lin cites logic and relevant cases revelation for this matter:

"Importantly, these and other related First Amendment protections are particularly applicable "in the community of American universities." *Dube v. State University of New York*, 900 F.2d 587, 597-98 (2nd Cir. 1990). In the content of higher education, the First Amendment rejects "any straight jacket" that "'cast[s] a pall of orthodoxy' over the free exchange of ideas." Id. (quoting *Sweezy v. New Hampshire*, 354 U.S. 237, 250 (1957), and *Keyishian v. Bd. Of Regents*, 385 U.S. 589, 603 (1967), and finding that university officials could be personally liable for damages for censoring free speech."

1:18-cv-00231 ECF No.1 filed 03/06/18 PageID.50

**382.** As pertinent to **this** Complaint *and* the case of *InterVarsity*, the Wayne State University Code Annotated ("WSUCA") Non-Discrimination & Affirmative Action Policy at 2.28.01.020 reads *in full* as follows:

"This policy *embraces* *all* *persons* *regardless of* race, color, sex (including gender identity), national origin, religion, age, sexual orientation, familial status, marital status, height, weight, disability, or veteran status *and expressly forbids sexual harassment* and *discrimination* in hiring, terms of employment, tenure, promotion, placement and discharge of employees, admission, training and treatment of students, extracurricular activities, the use of University services, facilities, and the awarding of contracts. This *policy* also *forbids retaliation* and/or *any form* of harassment against an individual as a result of filing a complaint of discrimination or harassment, or participating in an investigation of a complaint of discrimination or harassment. It shall not preclude the University from implementing those affirmative action measures which are designed to achieve full equity for minorities and women."

*WSUCA 2.28.01.020*
*See,* **Exhibit 170***, pp. 3. (Emphasis added).*

**383.** Also, *again*, even despite precedent in the 6th Circuit (*see, Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 837 (6th Cir. 2015), establishing InverVarsity's **right** as a religious organization to choose its' ministerial leadership, the Defendants challenged through derecognition of IVCF this precedent despite longstanding freedom of the practice of roughly 200

*other* **STUDENT** organizations permitting the same or substantially similar requirements for organizational leaders to be of that denomination.

*384.* That unjustified conduct being in pertinent part simply to disrupt the effective recruitment of the IVCF National Brand *at* WSU:

> "80.  In a December 14 [2017] e-mail, **Mr. Lessem** stated that the conflict between InterVarsity and Wayne State should be "a solvable problem" and expressed a desire "to attempt to reach a mutually amicable arrangement...*before either of us is compelled to take aggressive measures*," which InterVarsity understood as a *threat of further retaliatory action* against the student chapter or its members. And in response to Mr. Lin's concern about missing the upcoming *student organization recruiting event*, **Mr. Lessem** stated that *no such event existed* and that the *delay in* finding a *solution* might *extend for six months*: "if there are concentrated recruiting events held in January or February, I am not aware of them. I believe the next opportunity for student organizations to recruit new members is more than half a year hence. There is time and then some to reach attempt to reach a mutually amicable settlement." [L24]

> "81. On January 11, 2018, Mr. Lin responded, explained that six months would be far too long to leave InterVarsity derecognized and informing **Mr. Lessem** that there *was* an upcoming student group recruitment event— "WinterFest"—held on January 24. Mr. Lin expressing a willingness to continue dialogue with Wayne State on the reinstatement of InterVarsity, but due to the ongoing hardships of derecognition, Mr. Lin requested that Wayne State provisionally reinstate the organization while negotiations continued, so that would have the same status that it had in the late spring and early fall of 2017. Provisional re-instatement would also allow it to fully participate in WinterFest." [L24]

> "82. However, on January 18, **Thomas F. Cavalier**, Assistant General Counsel for Wayne State, responded and refused the request to provisionally reinstate InterVarsity. He stated that "the University does not provide provisional approval for recognized student organization status once it has determined that the group is not eligible for that status." He acknowledged that he "[c]ertainly underst[oo]d InterVarsity's desire to participate in Winterfest, a January 24, 2018 recruiting event." But rather than being allowed to participate in WinterFest on an equal footing with 16 other student groups on campus, Mr. Cavalier suggested that InterVarsity "may reserve a vendor table" for a fee and on a *different floor* of the Student Center." [L24; H4]

> "83. On January 24, WinterFest took place in the second-floor ballroom of the student center. Recognized (*sic*) student organizations were permitted to reserve free tables to reach out to interested students. InterVarsity paid a $ 80 fee, but was not permitted to operate in the second-floor ballroom with

the other student groups. It was relegated to a vendor space downstairs. The space was far from the entrance doors and was out of the way for many students who were going directly to the ballroom for WinterFest."

*See Case 1:18-cv-00231 ECF No. 1 filed 03/06/2018 PageID.15 to 17. (Emphasis added)*

**385.**     This is how the Defendants drown out the **STUDENTS** and religion they disagree with, *until they must partner with them in kind*. We see this dichotomy in the "alignment" of this "transformative alliance" between Ascension and WSUMED. <u>Do</u> <u>not</u> <u>be</u> *fooled* by the *fictitious façade* Ascension *flaunts* as a "*faith*-based organization[al]," *fraud*. Oh, *to the contrary*, Ascension has unclean hands as *it also* leveraged the 2020 Global Pandemic to galvanize its' *system* against free thinkers through the application of the acute COVID-19 Vaccine Mandate.

**386.**     ***Let-me-be-clear*** when *I* say that Ascension's false front <u>is</u> just as translucent as the 'theoretical' CDCs' role and "*the Model*." *See*, **Exhibit 143**, at *pp. 21-22*; **Exhibit 146**, at p. 36.

**387.**     Given the unique *privity* of Ascension, the Defendants, it is only fitting to provide for the record relevant evidence indicative of the damages the Plaintiffs has sustained, as, my *patient* wife and *I* have endured as the <u>direct</u> <u>effect</u> of the conduct <u>of **both**</u> the Defendants *and* Ascension given that my wife was terminated despite adequate reasons to forgo the mandate losing in the process an income at a time where *this* Complaint stalled my career.

**388.**     The effect of the totality of these circumstances continue to compound on my wife and my family exacerbated by the "**toxic stress**" induced by the Defendants leaving our home with a larger financial burden.

## <u>*WSUMED & WSUMISB Offer a Concurrent M.D.—M.B.A.*</u>

**389.**     This next point **is** where you may feel that you are on an endless *rollercoaster* of sorts, *which*, I would reply—*yes*—yes you are, and this is the part *I* call the "**Wayne State University Double Dip**;" "informal conversations" *to* "*collect information…essential to improving departmental articulation efforts*," **<u>they said</u>**. *See*, **Exhibit 146**, at *pp*. 37-38.

**390.** **On or about October 22, 2021,** the Defendants introduced a new and improved concurrent M.D.—M.B.A. program, "*quite frankly,*" offering some strong representations and warranties to interested Physicians. **Exhibit 172**—*WSUMED MBA Offer*. The Defendants' integrated marketing plan at work, communicating in part:

> "The curriculum will provide students with core courses in both medicine and business, as well as supporting elective courses in each field, and specialized courses in both. Upon successful completion of the program, students will be prepared for employment as physicians and in a wide range of additional settings in the public and private sector." *Id.*

**391.** Specially, Dean of WSUMED, Dr. Mark Schweitzer, leveraging the systems expressly unrolls the *warranties'* carpet to prospective physician **STUDENTS**:

> "The joint M.D.—M.B.A. program will open career pathways to leadership roles in hospital administration, to more effective participation in health care policy research **and** policy development, **and** to opportunities with pharmaceutical, medical device, health tech **and** insurance companies," **and** "[t]his program also opens *the door* **to** entrepreneurial endeavors ranging from the creation of a private practice **to** the establishment of a non-profit focused on efforts **to** address health disparities, **to** a potential role of founder **or** medical advisor **to health care** startups."

> **Exhibit 172** *(Emphasis added).*

**392.** *Next*, to make this "**MAFIA OFFER**" even more *enticing* for prospective-Physician **STUDENTS**, "WSU allows [**STUDENTS**] to complete both degrees in four years." *Id.*

**393.** This timing is aggressive; "[s]everal M.D.—M.B.A. programs already exist at other medical schools, but the majority are *five*-year programs, which require medical students to pull out of their medical education programs for a year, *delaying graduation* and the start of residency programs." *Id. (Emphasis added).*

**394.** *Adding to the puffery*, the dean of the Wayne State University Mike Ilitch School of Business *and* American Economist, **Mr. Bob Forsythe**, proclaims: "The health care industry is **large and complex component of** both our **local** and global **economy**." *Id.*

**395.** The concurrent M.D.—M.B.A. plan in place is as follows:

"Medical students enrolled in the program will take M.B.A. courses concurrently during the <u>18</u>-month Pre-Clerkship and <u>14</u>-month Post-Clerkship phases of their medical degree education. Students are first granted admission to the medical degree program and then apply to the M.B.A. program during their first year of study. <u>Students complete a **minimum** of **36** credits for the M.B.A. degree</u>, with nine credits transferred from the M.D. program. Nine credit hours are ***double-counted*** to fulfill requirements for *both degrees*, *saving students time and money*."

**Exhibit 172** *(Emphasis added)*.

**396.** Concluding, "[p]hysicians who have both a medical degree and master's of business administration degree <u>will</u> <u>be</u> <u>highly</u> <u>sought</u> for leadership positions at hospitals, healthcare systems, and health and medical-related businesses." *(Emphasis added)*. *Id*.

**397.** **Candidly**, any Physician candidates who hear this—***ECHO***—<u>should</u> <u>consider</u> <u>this</u> <u>offer</u> <u>sincerely</u>, the <u>hard</u> <u>skills</u> you will obtain to upgrade your tool-belt firmware *is* necessary to *keep up*. <u>Plus</u>, "[*t*]*his program also opens the door*," and allows you to do the…

… **Wayne State University *Double Dip*.**

***\*\*Now***—when **faith** can be seen calling upon ***fate***
*transcending* <u>space</u> and <u>time</u>—*what do <u>you</u> call it*? **\*\***

# <u>THE WAYNE STATE UNIVERSITY DOUBLE DIP</u>

*Stepping out of the WSU School of Medicine and into the reality shaping this Compliant.*

**398.** **On or about** <u>April</u> <u>30</u>, <u>*2018*</u>, *I unknowingly* placed *an **epic*** objection onto the record regarding the Defendants' MBA program's requirements. **Exhibit 173**—*Double Dip Email to Registration Office;* **Exhibit 174**—*Double Dip Email to Graduate Business*. *Plainly stated*:

"*My question is* – if I completed the courses for my Marketing Concentration, say MKT 7450, MKT 7430, and MKT 7950 – would that (*sic*) complete the requirements for the MBA Core as well? Some schools don't allow you to '**double dip**' per se, so I just want to make sure I have the right train-of-thought. *I'm trying not to take more classes than necessary*." *Id*; *(Emphasis added)*.

**399.** *Curious* choice of words— "***double dip***," and "***double-counted***;" in relation to <u>the</u> <u>same</u> <u>idea</u> too…*do* you think *this* is a coincidence too?

**400.**     This <u>one</u> is important, because I *really* went out of my way to clarify this issue with the WSUMISB Administration after my two (2) emails on **April 30th**, **2018**, went unanswered; three years before Defendant Forsythe offered 'his' "**double counted**" offer. *See again*, **Exhibit 173**; **Exhibit 174**.

**401.**     **Plus**, **_this_** **_position_** by the Defendants **_is_** **_the_** **_root_** **_cause_** of *this* Complaint *though not* the direct effect; plainly, I would have completed my studies, instead I was *pushed further*.

**402.**     On February 1st, 2019, I **tried again**, first being directed automatically to the WSU's physical and digital addresses. Next, on February 2nd, 2019, WSU Academic Advisor, Mrs. Melissa Sweda, responded to my inquiry. **Exhibit 175**— *Melissa Sweda Email Chain 1*. Here, in this email chain there are important morsels of data relevant to pocket mentally:

(*1*) **My *first choice* of electives were memorialized as follows**:

> "I really need these classes scheduled,
> otherwise my *entire graduation will be*
> *pushed back*…
>
> 
>
> **MKT 7450**
> **MKT 7470**
> **MKT 7950**"
>
> 

> *And,* (*2*) "*[a]* **Dr. John Taylor**, Chair of Marketing **would approve *substitution courses*,**" referencing if one of the classes for my concentration identified was full. *Id*. "Please register…for MKT 7470 and *either* MKT 7950 *or* MGT 7950 (*[b]*Business and Sustainability is **cross-listed** as *both MKT* and *MGT*, however, **either will count** towards your marketing concentration).

**Exhibit 175** *(Emphasis added)*

**403.**     Here is direct evidence of Dr. Taylor's "scheduling matrixes" in action, *exactly like* GSC 7260 and GSC 5670 the *cross-listed* courses at issue in **this** Complaint; *understand too* this demonstrates Dr. Taylor's authority to *break* **his** matrixes. *See,* **Exhibit 97** *at* 22.

**404.** *Next*, I had an important conversation memorializing the inequitable aspects of the **Wayne State University** *Double Dip* at the *next level. See*, **Exhibit 176**—*NO Double Dip Confirmation Email Chain*.

**405.** My November 3rd, 2019, reply email to Assistant Dean of Graduate Students, Mrs. Kiantee Rupert-Jones, beings our *interpretation* disagreement. To start the set, Mrs. Rupert-Jones serves:

> "Also, you are not qualified to take BA 7080 in the Winter 2020 term as you have not met the prerequisite to do so. To take BA 7080, you must have taken all other core courses in the MBA program AND be within your last 12 credits of the program. You will be in your last *15 credits* after the Fall 2019 term."

*Id*. (*Emphasis added*).

**406.** On November 3rd, 2019, I memorialize the following objection and begin to dig deeper into the premise of the **Wayne State University** *Double Dip* interpretation:

> "I should not have had to submit a override for this class BA 7080. After the fall term I will have had taken all five core courses required and be within 6 credits of graduation; I only need two classes to graduate: BA 7080 and MKT 7450. I registered the morning of registration for BA 7080, CRN 74878, 001 and the program said I was registered."

*Id*. (*Emphasis added*).

**407.** Next, attaching my "MBA program *plan of work*," to her email, Mrs. Rupert-Jones replies further:

> "Since there are eligibility requirements to take BA 7080, all students must submit an override request to take the course. This includes you as well. According to your attached MBA program *plan of work*, you need three electives, BA 7080 and MKT 7450 as part of your selected Marketing concentration. This counts (*sic*) as 5 courses—15 credit hours. You are not officially registered for BA 7080 in the Winter 2020 term."

*Id*; *See also*, **Exhibit 177**—*Cochrane's MBA Plan of Work as of 11/4/2019*.

**408.** On November 6th, 2019, I sent my rebuttal to Mrs. Rupert-Jones, **copying** the Dean of the WSUMISB, **Mr. Robert Forsythe**, and *Interim* Dean of the WSU Graduate School, Mrs. Ingrid

Guerra-Lopez, to **my** email in order to memorialize ***my interpretation*** of the **Wayne State University *Double Dip*** at this *next* level:

> "Respectfully, I believe your analogy is flawed.
>
> According [to] (*sic*) my Wayne State University <u>*Degree Works*</u> course requirements, I need only the following courses to obtain my degree following the Fall 2019 term:
>
> MKT 7450 AND BA 7080
>
> I qualify to take BA 7080 in my current terms; I am only twelve credits away from graduation—your system should have recognized that I have already met the criteria for BA 7080. On Monday, October 28th, (2019), I registered for MKT 7450 and BA 7080. At that time, I was unjustly restricted in my attempt to registered (sic) for the online BA 7080 course I selected.
>
> ***I will suffer irreparable harm should I*** be forced to commute to your campus *and/or* **wait** *until* the *Spring/Summer 2020 term* as you improperly suggest. My commute is over an hour long through some of the most dangerous roads in Michigan— my harm is also incalculably exacerbated by the impending Michigan Winter! I am a self-employed entrepreneur that operates two businesses out of my house while being the primary caretaker for a ten-month-old infant while my wife is away working her two full-time jobs.
>
> I believe this is an easy situation to remedy. Thank you for your time in advance.
>
> Sincerely,
>
> Bradley E. Cochrane, *Esq*."

**Exhibit 176**

***409.*** Aside from my *babyish complaining* about the Michigan Roads, this is where we really entrench into the **Wayne State University *Double Dip*** logic as Mrs. Rupert-Jones responds quickly within thirty-one (*31*) minutes:

> "Thank you however the MBA program *plan of work* (which was attached to the email I sent previously) is the document we use in the Mike Ilitch School of Business for students to follow and grant degrees, not *Degree Works*. This is also the reason we send the program *plan*

*of work* to students by email when they are admitted into our program and remind them to follow it.

<u>*Degree*</u> <u>*Works*</u> <u>does</u> <u>however</u> <u>indicate</u> that you have 3 electives still needed in the program in addition to your Concentration requirements in Marketing – which are satisfied by taking MKT 7450, MKT 7470 and MKT 7950. These courses **DO NOT** count as general electives **AND** concentration requirements. They count as concentration requirements *only*. Thus you will still need after the Fall 2019 term:

        3 general MBA electives – 9 credits

        MKT 7450 – 3 credits

        BA 7080 – 3 credits

        This equals 15 credits….

department permission is required to take BA 7080 as it is a capstone course and eligibility must be confirmed and met before we process an override allowing a student to register for it. BA 7080 is *not open* for any students to register on their own *for this very reason*.

I can bring your concerns in taking the course in the Winter 2020 term with our **Graduate Committee** for review and consideration at their next meeting on November 13, 2019 if you wish and let them review your request however in the interim, *your request is respectively denied*."

*Id. See also,* **Exhibit 177** *(Emphasis added).*

***410.***     Realizing Mrs. Rupert-Jones was not comprehending what I am communicating, I explained

my **Wayne State University *Double Dip*** interpretation more explicitly:

"I disagree wholeheartedly in the ***application*** of the courses required to complete my degree—**I believe a flaw exists in your MBA program** and that flaw has quite possibly given rise to inequity and unjust enrichment in your favor not only in my situation, but for countless other students as well.

To start, the Degree Plan I received on November 7th, 2017, explicitly states that the MBA Concentration is an "option," and such is not required to obtain the MBA degree offered. The plan also identifies that "six electives * must be taken to fulfill graduation requirements. The courses must be offered by the School of Business and be at the 7000-level or higher." The " * " identifies, " *NOTE: If selected one MBA concentration, up to three business electives

must be completed in addition to the concentration requirements. If two MBA concentrations are selected, the electives requirements will be met."

Alternatively, the Degree Works Disclaimer states, "*You are encouraged* to use this degree audit report as a guide when planning your progress toward completion of the above requirements. Your academic advisor of the Registrar's Office *may* be contacted for assistance in interpreting this report. This audit is not your academic transcript and is not official notification of completion of degree or certificate requirements. Please contact the Registrar's Office regarding this degree audit report, your official degree/certificate completion status, or to obtain a copy of your academic transcript." Moreover, Degree Works explicitly identifies that the MBA Core Electives requires: "3 Classes in ACC 7000:7999 or BA 7000:7999 or BLW 7000:7999 or EI 7000:7999 or FIN 7000:7999 or GSC 7000:7999 or ISM 7000:7999 or MGT 7000:7999 or MKT 7000:7999 or SEM 7000:7999." Furthermore, when selecting "MKT 7000:7999" on Degree Works, the applicable courses that meet the elective requirements explicitly identify "MKT 7450; MKT 7470; and MKT 7950."

By requiring me to take an additional three electives, when the classes I have already taken and registered for all qualify for the elective requirements under the MBA Core Electives—such action will amount to an unjust enrichment in your favor and add to the damages I have already sustained. By encouraging your students to use the Degree Works platform to monitor their progress towards the "completion of the above requirements," (*sic*) you create confusion and add to the vagueness present as to the terms required to complete the MBA degree; specifically, as to the marketing concentration seeing only three electives are required.

I can understand a scenario where the concentration requirement are different than those qualifying electives required under the MBA Core Electives— however, that is not the case here. To be clear, I qualify for BA 7080 by taking MKT 7450 and MKT 7470 in the Fall 2019 term and those also qualify as MBA Core Electives simultaneously. It is my belief that Wayne State should not be able to enrich itself through requiring students to take unnecessary courses where its practices are vague and misleading—this is one of the primary reasons why our country has such a significant student loan crisis. Should I be required to take these three additional courses—I will sustain further damages by doing so. What purposes does the Degree Works platform serve if students are unable to rely on the express content it contains?

Again, this is an easy situation to resolve and [I believe that it should] (*sic*) absolutely be brought to the attention of the Graduate Committee for review."

**Exhibit 176**. (*Emphasis added*).

***411.*** *Literally*, one-minute after this reply, Mrs. Rupert-Jones identified that I "can contact [*her*] by phone," to "discuss degree requirements for the MBA program." *Id*. To which I explained that

"I would prefer to continue our conversation through a documented source," identifying that email was my preferred form of communication; still **Mr. Robert Forsythe** and Mrs. Guerra-Lopez copied to each email. *Id*. Finally, Mrs. Rupert-Jones **confirms** **three** key pieces of evidence to conclude these talks:

> (*1*) **_On Degree Works_**, "it also states for you: Electives - STILL NEEDED: "3 Classes in ACC 7000:7999 or BA 7000:7999 or BLW 7000:7999 or EI 7000:7999 or FIN 7000:7999 or GSC 7000:7999 or ISM 7000:7999 or MGT 7000:7999 or ***MKT 7000:7999*** or SEM 7000:7999;"""

> (*2*) **Under the area on Degree Works** entitled - Concentration in Marketing, the courses listed are:

> MKT 7450—Winter 2020

> MKT 7470—Fall 2019

> MKT 7950—Fall 2019

> (All in progress); *and*

> (*3*) The MBA program "is **36 credit hours** (12 course program) which requires **6 core courses and 6 electives**."

> **Exhibit 176**. (*Emphasis added*).

*412.*    There you have it—**_NO_**—**Wayne State University _Double Dip_** for me and *my* MBA.

*413.*    *I* even *risked* my own "**Decisive Competitive Edge,**" by leveraging my networking when *I* directly contacted the *highest level* in *then* Wayne State University Board of Governors, Mrs. Kimberly Trent, to see if I could get further clarification on my "***Double Dip***" interpretation. **Exhibit 178**—*Email to Wayne State University Board of Governors*.

*414.*    My November 6th, 2019, initial email to Mrs. Trent identifies my disagreement with Mrs. Rupert-Jones about her "claims I do not qualify based on the courses and concentration I have selected to pursue." *Id*.

*415.* I also expressed to Mrs. Trent that "I believe this is a ***flaw*** in the degree program and concentration requirements ***as a whole***." *Id.* (*Emphasis added*).

*416.* Unfortunately, Mrs. Trent was unable to comment, and *sensing this*, I capped off the conversation with the following *for the record*:

> "Alright.
>
> At the very least, since the Marketing Concentration is an option, I should therefore have the ability to *choose how to apply* the courses I complete.
>
> For example, I have completed MKT 7470 & 7950—both courses satisfy the elective requirements for the core requirements *and* the marketing concentration given the language on Degree Works and my Plan of Work. The disconnect arises with the word "optional," if the concentration is optional, I should have the ***option to direct how to apply those courses I have completed***, as I mentioned above. I find this process increasingly misleading, and the majority of students I explain this to (*sic*) understand my concern when explained thoroughly; I've had several students explain to me similar situations as ***they have taken more classes than necessary to graduate***. Why would the courses I've taken be applied to the concentration first, before the MBA degree? **Would it not be in the student's best interest to apply these completed courses to the MBA degree itself**—seeing that is the main reason for attending in the first place? Is there some type of internal hierarchy as to how these courses are applied when a concentration is pursued?
>
> Again, **this is much more than just a simple (*sic*) scheduling issue—this is a <u>public-policy issue your board should consider reconciling</u>**. I have taken courses at three different institutions, all of which ***allowed for concentration courses to count towards core electives when that course is listed as an available course to satisfy either requirement***."

**Exhibit 178**. (*Emphasis added*).

*417.* Again, *no dice*. On, January 21st, 2020, preparing for graduation…***I tried again*** to discuss my "***DOULBE DIP***" interpretation with Mrs. Rupert-Jones:

> "Basically, I would no longer wish to pursue a concentration and would like to graduate ***as fast as possible***.
>
> What classes would I need to take to do this, and what is the earliest possible graduation date?"

*See,* **Exhibit 179**. (*Emphasis added*).

*418.*     Instead, Mrs. Sweda responds in Mrs. Rupert-Jones' place, and thereafter Mrs. Rupert-Jones

drops off the communication chain *entirely*; Mrs. Sweda opening on January 21st, 2020:

> "Thank you for your inquiry. I am responding on behalf of Assistant Dean Rupert-Jones. I have attached a copy of your updated MBA *plan of work* for your review with you current registration to date. Assuming you successfully complete MKT 7450/Business Research and Methodology in Winter 2020, you will have completed your three electives courses that fulfill your Marketing concentration.
>
> You will still have to complete three elective courses outside of your Marketing concentration to fulfill your total six elective courses requirements required for completion of your MBA program as well as your Capstone course, BA 7080/Strategic Management assuming you successfully complete MKT 7450 in Winter 2020 to complete your MBA program.
>
> Since you have only declared on (Marketing) concentration. Your three elective courses outside of your Marketing concentration courses can be graduate courses from any area of business which would include: Accounting, Entrepreneurship & Innovation, Finance, Global Supply Chain, Marketing, Management, or Sport & Entertainment Management."

**Exhibit 179***; See also*, **Exhibit 180**—*MBA Plan of Work from 1/21/2020.*

*419.*     At the time of this email, I had taken forty-one (*41*) credits for my MBA according to Degree

Works and *my* plan of work, I *desperately* replied:

> "I understand what you are saying. However, I would like to forgo my option to receive a marketing concentration upon graduation, and instead, **apply those three courses** I've taken (assuming I successfully complete MKT 7450 in Winter 2020) to **complete the MBA program requirements**.
>
> Therefore, I would be within the criteria to register for BA 7080/Strategic Management and would like to do that this coming 2020 Spring/Summer Term. Then, once I successfully complete that course, I would be eligible to receive my diploma for the MBA—without any concentration designations."

**Exhibit 179**.

**420.**   *Holding the line*, on January 22nd, 2020, Mrs. Sweda does not engage and diffuses my objection immediately by reaffirming the Defendants' position <u>against</u> the **Double Dip**:

> "Thank you for your email. In order to complete your MBA program, you need to complete a total of six elective courses (within or outside of concentrations) in addition to your foundation and core course requirements. If you remove your Marketing concentration, you still need to complete three additional elective courses outside of the two elective courses you have completed (MKT 7470 and MKT 7950) and the third elective course in progress (MKT 7450). Assuming you complete MKT 7450 in Winter 2020, you can take your Capstone, BA 7080 in Spring/Summer 2020. However, you will also need to complete three additional elective courses for a total of six elective courses to complete your MBA program regardless of if your Marketing concentration is declared, or not. *Your MBA program is a nineteen course/<u>fifty credit hour program</u> (seven foundation/fourteen credit hours, six core, eighteen credit hours, six elective/eighteen credit hours) regardless of if concentrations are declared, or not.*"

> *Id*. (*Emphasis added*).

**421.**   *Reading the room*, I did not push the "***DOULBE DIP***" interpretation with Mrs. Sweda any further. Instead, *I sought* her *help* in determining "what classes" to take and "the fastest way to complete the requirements [,]" for the MBA program. *Id*.

**422.**   Directly, Mrs. Sweda identified that she "cannot take full responsibility for choosing [my] remaining electives courses." *Id*.

**423.**   I understood this and explicitly asked Mrs. Sweda for a "list of all courses that will satisfy the remaining courses…that will count towards completion of my degree. I would like to obtain the degree as fast as possible, so electives with prerequisites (*sic*) would obviously be avoided." *Id*. Finally replying, Mrs. Sweda identified:

> "MBA program elective courses are *seven thousand level courses* from business subject areas which are: accounting, entrepreneurship, finance, *global supply chain management*, *marketing*, management, and sport and entertainment management."

> **Exhibit 179** (*Emphasis added*).

*424.* As mentioned, the effect of *this* position by the Defendants *is broad* and thus it is important to reiterate key portions of evidence now while *fresh* to explain those *causes* more simply later. **Exhibit 183—***M.B.A. Comparison Chart*

*425.* Also, it is necessary to compare Degree Works and the "MBA program plan of work," which establishes further the variable use of applicability that causes confusion and vagueness as the argued for "double-dip" interpretation describes. **Exhibit 185—***Degree Works & M.B.A. Plan of Work Comparison Charts*

*426.* **_Focus_**. We are standing now at a point in time and space consciously where *I* have now tried just about everything to "***Double Dip***" and essentially bow out of the Defendants' M.B.A. program from mental exhaustion and financial necessity. Yet, *still*…

*We are almost to the Principal Door*.

*427.* I had two interviews during this time and *both* of the 'big law' firms did not select me due to principally my M.B.A. pursuit, or *more precise*, my *time constraints*.

*428.* Clearly, you can see the lengths I went to purge this "***Double Dip***" interpretation—I **still** think this argument *was* **valid** *then* **and** more credible now thanks to the bolstering of **Mr. Robert Forsythe's "double counted"** logic in **Exhibit 172**. Why did I have to take so many credits? Why is the "***Double Dip***" available to one segment of students, but not the other? Is this just another stolen idea?

*429.* There is little reason why I should be required to graduate with fifty (*50*) credits, when in less time too, the M.D.—M.B.A. is obtainable by utilization of the "**Wayne State University Double Dip**," transferring the *same* nine (*9*) credits I would have "double counted," qualifying for graduation with a minimum of thirty-six (*36*) credits; applying this logic, I was eligible for BA 7080 and graduation in January 2020 with forty-one (*41*) accumulated credits.

*430.* Mrs. Rupert-Jones was superficially arguing *quantity*—I was arguing that the Defendants' flaw exists in the *application*, *timing*, and now disparate effect given this blatant discrimination.

*431.* If a **STUDENT** qualifies by accumulated credit for graduation, **_and_** they have successfully completed "Business Electives" comparable to that which satisfy either the three (*3*) MBA Electives and/or three (*3*) Concentration Electives—why can they not do the following when other similarly situated **STUDENTS** are expressly permitted this advantage:

> (*a*) **Early Graduation**: Apply those accumulated comparable Business Electives towards the *actual* MBA Degree Electives *before* the Concentration Electives, thus qualifying for graduation after taking BA 7080 by credit hour—*unfortunately*, Mrs. Rupert Jones reminds us that the Defendants' "*override*" process requires "*department permission*" "for any student to register on their own *for this very reason*." **Exhibit 177**. (*Emphasis added*).

> *and/or*

> (*b*) **Early Graduation & Double-Counted Concentration**: Apply those accumulated comparable Business Electives towards the *actual* MBA Degree Electives *before* the Concentration Electives qualifying for graduation after taking BA 7080 by credit hour—and then, those "Business Electives" accumulated for the M.B.A. Elective Requirements are "*double-counted*" when they are within the following ranges *and* could technically be applied to *both* criteria.

> For example, *see* **Exhibit 189**, the recycled "cross listed courses," and otherwise *not excluded* explicitly (which there are **_no_** exclusions), again the following parameters were confirmed by Mrs. Rupert-Jones for the M.B.A. Degree Electives:

> "3 Classes in ACC 7000:7999 or BA 7000:7999 or BLW 7000:7999 or EI 7000:7999 or FIN 7000:7999 or GSC 7000:7999 or ISM 7000:7999 or MGT 7000:7999 or *MKT 7000:7999* or SEM 7000:7999."

> **Exhibit 176**. (*Emphasis added*).

*432.* It is also important to **highlight** the **little added value** the M.B.A. Concentration holds being wholly absent from notation on **STUDENTS**' diplomas and being simply "minimized" to a one-line designation on the **STUDENTS**' transcript somewhere tucket away in a cabinet doing-*little*-good. *See*, **Exhibit 190**—*WSUMISB Website*.

*433.* **Also important** is that the M.B.A. Degree and M.B.A. Concentration are wholly separate commoditized goods.

*434.* This too allows applicability of the above to become easier to comprehend—this is further **distinguished** by the bolded-black line on *every* plan of work segregating the requirements for *each*. *See*, **Exhibit 177**; **Exhibit 180**; **Exhibit 182**; **Exhibit 187**.

*435.* Moreover, **STUDENTS** do not obtain a certificate like the <u>fraudulent</u> one issued by Dr. Low, Mrs. Habel, *and* Dr. Strauss for completion of the *several* conditions leveraged over **STUDENTS** in GSC 7260. *See again*, **Exhibit 93**—*Fraudulent WSUJONAH Certificate*.

*436.* ***Remembering too***, Dr. Low has confessed previously to having fraudulently tricked "**<u>well over</u> <u>250</u> <u>former</u>** [**STUDENTS**] of the course out there now, working in a variety of industries and locations around Southeast [sic] Michigan," by utilization of this certificate. *See again*, **Exhibit 141*; Exhibit 142**. (*Emphasis added*).

*437.* *Finally though*, and simply started, the Defendants' explanation *and* forms clash, where Degree Works *is* explicit the plan of work *is* silent—**Thus**, *reasonable interpretations arose*.

*438.* This previous point <u>*is*</u> important, because not only are the Defendants proactively steering **STUDENTS** towards the WSUMISB, **but also now** *even closer* to **the principal door** through a M.B.A. Concentration in <u>Healthcare Supply Chain</u> Management. *See*, **Exhibit 192**—*May 31, 2021, Crain's Business Article; see also,* **Exhibit 193**—*M.B.A. Concentration Requirements*.

*439.* **Now**, <u>*this*</u>—***ECHO***—*is designed to*—***SOUND THE ALARM***—for the surrounding business community—*everyone* outside those thirty (*30*) companies *and* private equity firms **NOT** contacted directly by ***The Barthwell Group*** to engage in "recorded telephone interviews," with "most Interviewees as heads of their organization," regarding the Defendants' "brand assessment."" **Exhibit 17***, at pp. 19; 27*.

**440.** The Defendants **have** and **will** continue to leverage the Global Pandemic into the future *focusing* on Global Healthcare Supply Chain and proactive *"whole person care"—just as* TOCICO, Ascension, and *all those knowledgeable* "*Change Agents*" of TOC around the *globe*, each "*exploiting*" their own constraints *in their own ways*.

**441.** **Here**, the Defendants have exploited its' constraints for nearly twenty years, and despite *this objective* fact:

> "**93%** of the Interviewees indicated that *they do not have a clear understanding* of the School's '*research' capabilities*, **20%** of those surveyed expressed an *interest in exploring research and development activities* with the School, provided the School had expertise in research that could *add-value* to their organizations."

> **Exhibit 17**, *at pp. 29-30*. (*Emphasis added*).

**442.** **Now**—*aside from the incompetent stooge*—**100%** now understand the '*research*' capabilities of the Defendants should they *fully* ingest *this* Complaint or *again* hear *this*—**ECHO**.

**443.** Is there a reason why that once the *93%* was fully abreast of the Defendants' "*capabilities*," **only** *20*% verbally acknowledged interest—*but only* if that 'research' "could *add-value* to their organizations," in true TOC "*win-win*" fashion? *Id.*

**444.** You can see in **Exhibit 193**, the Defendants keenly list the "*highly recommended*" at dispute GSC 7260, *not at the top*, but second, so *clearly evident* to *avoid* the obvious once you *see the full picture here*.

**445.** The Defendants tell us themselves explicitly and through the *effects* of their actions—*if you know you know*—and they are *fully entrenched* in the "Critical Chain Application" of TOC; "…because of COVID… It was ***too big to ignore***, and our administration was *able to move quickly* to add new classes and the MBA concentration." **Exhibit 192**. (*Emphasis added*). S*ee also*, Mr. Kevin Ketels, Lecturer of Global Supply Chain Management at WSUMISB:

> "*I* enjoy <u>connecting</u> <u>with</u> <u>industry</u> professionals and *bringing these perspectives to students* and alumni through courses and events at Wayne State University."

**Exhibit 192**, at p. 2. (Emphasis added).

***446.*** This logic of "*use these [**STUDENTS**] as bridges to companies,*" is the *focus* of the intent behind all of this conduct, bolstered even further by again Mr. John Taylor's resume:

> "- Co-developed with Tim Butler and Nitin Paranjpe the Southeast Michigan Purchasing Managers monthly (sic) survey and index and worked with marketing and PR departments to obtain monthly press coverage in Crains, Oakland Press, Detroit News, etc.
>
> - Developed placement strategy and engaged in various activities as follows to assure student placement for internships and full time positions nationwide and in Michigan. Efforts have led to internships at General Motors, Ford, Chrysler, Delphi, American Axle, Nexteer, Detroit Diesel, Denso, Faurecia Interiors, Preh Automotive, Prestolite Wire, TACOM, Textron, Yazaki, TRW, Phillips Automotive, Hino Motors, England Logistics, CSX Rail, CEVA Logistics, TPS Logistics, Kohl's HQ's, Best Buy HQ's, Cargill HQ's, Blue Cross Blue Shield, Enesco, Mossejaw, Jabil Circuits, Pool Corporation, and Coamau..."

**Exhibit 97**, *pp*. 21-23

***447.*** We know too, *objectively*, that Mrs. Deborah Habel <u>has</u> extensive experience in the healthcare industry in which she can ***conveniently leverage*** this common footing as a *psychological tool* like the CDC to diffuse resistance towards the intellectual probing *set to ensue* as the Defendants leverage the "[***VERY***] Ambitious Goal" 'curriculum' of TOCFE to "*use these [**STUDENTS**] as bridges to companies,*" by 'researching' industry through the manipulated **STUDENTS**' educational experience in GSC 7260 and GSC 5670. *See*, **Exhibit 42**—*<u>Critical Chain</u>*, *at pp. 9-10*; **Exhibit 43**—*Critical Chain Synopsis*, *at pp.* 4-5.

***448.*** Moreover, *is it not a conflict-of-interest* for someone to be pursuing a dissertation focused on TOC <u>and</u> be using and teaching an unsanctioned "[***VERY***] Ambitious Goal" course undercover having been "passed the torch" by Dr. Low to generate research for this very dissertation?

**449.** The Defendants, and those _other_ institutions engaging in this conduct too—_will continue_, until **this conduct is** fully adjudicated and declared unconstitutional and **void**.

## DEFENDANTS' DISCRIMINATION AND ONGOING RETALIATION AS AN EFFECT OF THE PLAINTIFFS' INTERNAL WHITLEBLOWING

**450.** At last, we leave WSUMED taking with us this expressly identified "_double counted_" interpretation in **Exhibit 172**, and now **directly link** the disparate and discriminatory **effects** attributable to rejection of **_my_** "**_Double Dip_**" interpretation by the Defendants.

**451.** Even after _this_, and the facts sparking _this_ Complaint, the Defendants continue to knowingly retaliate against the Plaintiffs' **right to redress** following Mr. Cochrane's February 5th, 2021, Complaint filed with the Wayne State University Office of Equal Opportunity.

**452.** Following the March 16th, 2021, closure letter by Defendant, Nikki Wright, the Defendants proceeded to let the system itself pressurize the Plaintiff, Attorney Cochrane, unjustly **in retaliation** of bringing to light this objective truth while also using the FOIA Process to offset these unenforceable debts by ghosting Attorney Cochrane post payment. _See again_, **Exhibit 57**; **Exhibit 61**; **Exhibit 64**.

**453.** Specifically, by participating in the Defendants' use of the "[**_VERY_**] Ambitious Goal" the Defendants obtained an absorbent amount of personal and proprietary information including intellectual property specifically related to the Plaintiffs' personal and financial positioning enough to recreate each Plaintiffs' alternative reality.

**454.** Now, even further, following the filing and service of Attorney Cochrane's argued as unnecessary Notice of Intent filed on May 5th, 2021—the Defendants have stalled and remained mute intentionally to defend this proposed lawsuit by leveraging the effect of this literal-compounding-nightmarish reality as I sought redress in the beginning of this journey to understand this then acute reality. **Exhibit 56**.

*455.* At the point the Defendants obtained this Notice of Intent, they had already received and responded to several FOIA Requests and made the erroneous decision to dismiss the Plaintiffs' February 5th, 2021, Office of Equal Opportunity Complaint, which *itself* was in violation of the United States Constitution, Michigan law, and other long-standing Wayne State University Policy and Procedure.

*456.* Simply, the Defendants used the information they wrongfully obtained and leveraged this usurped information offensively as a defensive shield—ingenious, but no one would have anticipated this recreation of the entire matrix to denounce this exact offensively-defensive move.

*457.* For the record, I identified to the Defendants at least seven (7) times in some way that I was "*trying not to take more classes than necessary.*" *See* **Exhibit 173**; **Exhibit 174**.

*458.* Explicitly, I identified the following characterizing my agonizing trek to the station in which I wearily stand consciously before you today:

*(1)* "I'm trying not to take more classes than necessary." **Exhibit 173**

*(2)* "I'm trying not to take more classes than necessary." **Exhibit 174**

*(3)* "I really need these classes scheduled, otherwise my entire graduation will be pushed back…" **Exhibit 175**

*(4)* "I will suffer irreparable harm should I be forced to commute to your campus and/or wait until the Spring/Summer 2020 term as you improperly suggest." **Exhibit 176**

*(5)* "I've had several students explain to me similar situations as they have taken more classes than necessary to graduate." **Exhibit 177**

*(6)* "I would no long wish to pursue a concentration and would like to graduate as fast as possible.

What classes would I need to take to do this, and what is the earliest possible graduation date?" **Exhibit 179**

*(7)* "I would like to obtain this degree as fast as possible, so electives with perquisites would obviously be avoided." **Exhibit 179**

**459.**     Remembering too, Mrs. Rupert-Jones' **failure** to follow through with the offer I accepted to advise the **Graduate Committee** of this "**Double Dip**" interpretation, and instead her *objective* silence:

> **Offer:** "I can bring your concerns in taking the course in the Winter 2020 term with our **Graduate Committee** for review and consideration at their next meeting on November 13, 2019, if you wish and let them review your request however in the interim, your request is respectively denied." **Exhibit 176**

> **Acceptance:** "Again, this is an easy situation to resolve and believe it should absolutely be brought to the attention of the **Graduate Committee** for review." *Id.*

**460.**     Clearly, I was attempting to graduate early to save "*time and money*" just as is the intent described by the Defendants in their marketing in Exhibit **172**. *See also*, **Exhibit 194**—*WSUMISB M.B.A. Brochure, at p. 3*: "This option (of taking courses in the fall and winter, *all year essentially*) allows [**STUDENTS**] to take more courses each term and *decreases* their *time* to graduation." (*Emphasis added*).

**461.**     This is what I did for three (*3*) years, *and still*, I was required to take fifty (*50*) credits.

**462.**     Ultimately, as an overbroad fact—*this* journey has <u>incalculably</u> altered my trajectory requiring only more "*time and money*" as I relentlessly advocate these ideas against all that is opposed to them.

**463.**     Candidly, the following list identifies the continuous flow of financial holds and releases during my enrollment at WSUMISB as I continued to *give everything* to pursue **and** defend *my* **American Dream**:

> (*1*) On February 5th, 2018, "A hold, Current Term Bal 577-2100, has been placed on your record;" *See* **Exhibit 195**.

> (*2*) On February 12[th], 2018, "The following hold has been released from your record: Current Term Bal 577-2100;" *See* **Exhibit 196**.

> (*3*) On June 3[rd], 2019, "A hold, Current Term Bal 577-2100, has been placed on your record;" *See* **Exhibit 197**.

(*4*) On July 17th, 2019, "The following hold has been released from your record: Current Term Bal 577-2100;" *See* **Exhibit 198**.

(*5*) On September 30th, 2019, "A hold, Current Term Bal 577-2100, has been placed on your record;" *See* **Exhibit 199**.

(*6*) On October 2nd, 2019, "The following hold has been released from your record: Current Term Bal 577-2100;" *See* **Exhibit 200**.

(7) On February 3rd, 2020, "A hold, Current Term Bal 577-2100, has been placed on your record;" *See* **Exhibit 201**.

(*8*) On February 3rd, 2020, "The following hold has been released from your record: Current Term Bal 577-2100;" *See* **Exhibit 202**.

(9) On July 8th, 2020, "A hold, Current Term Bal 577-3653, has been placed on your record;" *See* **Exhibit 203**.

(*10*) On July 8th, 2020, "A hold, Transcript & Grad 577-2100, has been placed on your record;" *See* **Exhibit 204**.

(*11*) On September 26th, 2020, "A hold, Prior Term Balance 577-3653, has been placed on your record;" *See* **Exhibit 205**.

(*12*) On January 26th, 2021, "The following hold has been released from your record: Transcript & Grad 577-2100;" *See* **Exhibit 206**.

(*13*) On January 26th, 2021, "The following hold has been released from your record: Current Term Bal 577-3653;" *See* **Exhibit 207**.

(*14*) On February 10th, 2021, "A hold, Pre-Collection 577-3653, has been placed on your record;" *See* **Exhibit 208**.

(*15*) On April 7th, 2021, Wayne State University Collections Specialist, Mrs. Tysh Hopkins, pre-collections email; *See* **Exhibit 209**.

(*16*) On May 18th, 2021, "The following hold has been released from your record: Pre-Collection 577-3653;" *See* **Exhibit 210**.

(*17*) On May 18th, 2021, "A hold, Pre-Collection 577-3653, has been placed on your record;" *See* **Exhibit 211**.

(*18*) On June 4th, 2021, "A hold, Transcript & Grad 577-3653, has been placed on your record;" *See* **Exhibit 212**.

**464.**    *In fact*, over the course of my enrollment at WSUMISB it is known *objectively* that I struggled to maintain funding for my education as I maxed out my financial aid and personal loans were not an option.

**465.**    Ironically, after the 2020 Spring/Summer expenses were *the last funds drawn attributable to Federal Student Loan Debt*, I planned to pay, *somehow*, out-of-pocket for the remaining expenses associated with my M.B.A. pursuit. *See*, **Exhibit 213**—*Financial Aid Email 5-2020*.

**466.**    Instead, *this* ensued, and I *obviously* wholly dispute these voidable debts given these corrupt and void actions…and if I am wrong, we all walk across the street for liquidation proceedings— regardless of the consequences—these questions must be answered.

**467.**    Again, *ironically*, the timing was just enough for me to take the final classes I needed to qualify for graduation under the Defendants' enriching terms; I hypothesize that had I needed more credits the Defendants would have prohibited my advance.

**468.**    *The timing* of the Defendants' choice to pursue collections *is curious* and from my perspective in ***retaliation*** to the Formal Complaint I filed with the Wayne State University Office of Equal Opportunity on February 5th, 2021, and this investigation that has followed in toe.

**469.**    And too as a **direct result** of my refusal to pay these claimed-outstanding debts following the completion of GSC 7260 on June 23, 2020, and following the holdover of these debts after my *final* and subsequent term in Fall 2020, *the Defendant sent me into collections after* my formal Office of Equal Opportunity Complaint was filed and dismissed summarily against protocol.

**470.**    The following list provides a continuation of the Defendants' pushy efforts to collect these *disputed* debts:

>    *(1) In addition to the above* Financial Hold & Release List; *see*, *#8* through *#18;*

>    (*2*) On January 26th, 2021, the Defendants mailed a Delinquent Account Invoice to me, Mr. Cochrane; **Exhibit 214**—*WSU Delinquent Account Invoice*.

(*3*) On February 5th, 2021, a Formal Complaint for Discrimination and Harassment was filed with the Wayne State University Office of Equal Opportunity;

(*4*) On February 10th, 2021, "A hold, Pre-Collection 577-3653, has been placed on your record;" *See* **Exhibit 208**.

(*5*) On February 25th, 2021, the Defendants emailed a notice that the "outstanding balance of $8,214.90 is eligible for a WSU internal collections payment plan;" **Exhibit 215**—*Internal Collections Payment Plan Notice.*

(*6*) On February 25th, 2021, the Defendants emailed another notice that the "outstanding balance of $8,214.90 is eligible for a payment plan;" **Exhibit 216—***WSU Payment Plan Notice.*

(*7*) On March 5th, 2021, Collections Specialist, Mrs. Tysh Hopkins, left me a voicemail regarding the disputed-outstanding debt; **Exhibit 217**—*March 5, 2021, Collections Voicemail.*

(*8*) On March 31st, 2021, Collections Specialist, Mrs. Tysh Hopkins, left me a voicemail regarding the disputed-outstanding debt; **Exhibit 218—***March 31, 2021, Collections Voicemail.*

> ***It is **important** to note that after Mrs. Hopkins first left me this voicemail, and I then spoke to her when she called back *immediately* after leaving this voicemail. During this telephone call that was under two (*2*) minutes, I expressly informed Mrs. Hopkins: (*1*) I expressly refused to pay *100%* of these disputed debts; *and* (*2*) to forward these disputed debts to **Mr. Louis Lessem**. *Instead*, Mrs. Hopkins expressed that she "did not have authority to do that," and so I *kindly* told her to figure it out and terminated the call. ***

(*9*) On April 7th, 2021, Wayne State University Collections Specialist, Mrs. Tysh Hopkins, sent me a pre-collections email; *See* **Exhibit 209**.

(*10*) On April 20th, 2021, Collections Specialist, Mrs. Tysh Hopkins, left me a voicemail regarding the disputed-outstanding debt; **Exhibit 219—***April 20th, 2021, Collections Voicemail.*

(*11*) On April 26th, 2021, the Defendants emailed another notice that the "outstanding balance of $8,214.90 is eligible for a payment plan;" **Exhibit 220**—*WSU Payment Plan Notice.*

(*12*) On or about May 22nd, 2021, National Credit Management sent (2) two Past Due Notices for: (*1*) Account # *2777954* (**Exhibit 221**), and (*2*) Account # *2777955* (**Exhibit 222**);

(*13*) On June 2nd, 2021, my wife, on her cellphone, received a collections telephone call from a "F.Nash" from the "National Credit Management" company from "P.O. Box 32900, St. Louis, MO (*sic*) 63132-8900," attempting to collect the debts associated with the Defendants' Account # 2777954, and Account # 2777955; *see also*, **Exhibit 223**; **Exhibit 224**.

(*14*) On June 3rd, 2021, I sent the following communication to National Credit Management in reply to its June 2nd, 2021, collection efforts regarding Account # 2777955; **Exhibit 223**.

(*15*) On June 7th, 2021, I sent the following communication to National Credit Management in reply to its June 2nd, 2021, collection efforts regarding Account # 2777954; **Exhibit 224**.

(*16*) On June 11th, 2021, National Credit Management, through Mrs. Theresa Schulte, acknowledged receipt of the above-mentioned documents and confirmation of my name, address, and amount with the Defendants. Curiously, notice the increase of outstanding-debt balance from $8,214.90, to now $10,268.62, that is an increase of $2,053.72, *respectfully*. **Exhibit 225**.

(*17*) On August 6th, 2022, *I,* Bradley E. Cochrane, received in the mail what is known as **Exhibit 226** from the **DEFENDANTS** as knowledge of their procedural-financial pursuit;

(*18*) Oddly enough, as I have to come back to this *idea* in my writing to identify that on or about June 13th, 2022, Collections Specialist, Mrs. Tysh Hopkins, contacted me directly to offer a promotion to settle or otherwise reduce the claimed outstanding balance. I recognized Mrs. Hopkins voice, and she acknowledged it was her after I asked; I ended the call politely and told her she was not allowed to call me and that she should speak to her general counsel;

(*19*) Again too, contemporaneous with August 23rd, 2022, in which my debt has now shifted to the out-of-state higher education collection firm— Williams & Fudge, Inc., of South Carolina. Both my wife and I were receiving for some time daily telephone calls from (313) 710-8688 and (313) 710-6646;

(20) Further as I finalize this Complaint, on December 2nd and 16th, 2022, I receive debt collection calls from Williams & Fudge, Inc., by a "Samantha Spear" who fails to identify the nature of the call other than a "business matter" and laughed when I asked if she was a debt collector making an attempt to collect a debt; these calls were from the same (313)710-6646 telephone number; *and*

(21) Again, on February 8th, 13th, & 20th, 2023, Plaintiff, Attorney Cochrane, received a telephone call from a blocked number and a "Beth" seeking

to discuss a "business matter on a recorded line" from Williams & Fudge, Inc., *respectfully*.

*471.* Attached *next* is a final list of the *combined* Financial Hold, Release, and Collection efforts associated with my enrollment at WSUMISB. **Exhibit 227—***Complete Timeline of Financial Holds & Collections.*

*472.* As of *this* Complaint, no additional actions have been taken by National Credit Management, Williams & Fudge, Inc., the Defendants, nor *Plaintiffs* in regard to these void debts.

*473.* Explicitly, I believe that any such negotiations on these disputed debts would trigger an accord and satisfaction defense for the Defendants **in retaliation**—*so I refused to negotiate.*

*474.* *Realistically*, had the Defendants litigated those issues immediately, I would not have had the time to truly understand and prepare the communication of the **objective** **truth** herein.

*475.* Additionally, these holds **prohibited** my actual **graduation** in 2020.

*476.* Additionally, these holds prohibited my career advancement having been unable to turn away from the impending damages resulting from the Defendants' incompetence.

*477.* And, as of this Complaint, my M.B.A. degree is being withheld as a result of these financial holds which to release my degree these disputes need remedying in full.

*478.* The Defendants have held virtual graduation ceremonies in lieu of traditional graduation and I was named as a graduate—but my M.B.A. Degree is absolutely tied up between these questions or satisfaction of these void debts; "we had to find a way to recognize the many [**STUDENTS**] like you who have *graciously waited for their moment*," the Defendants said in a graduation notice I received. **Exhibit 228—***Graduation Notice*. (*Emphasis added*).

*479.* *In closing of this section*, these *objective* facts demonstrate in large part the ***toxic*** ***stress*** I have developed and endured as I walk a *fine* line financially simply given the burden of *this* Complaint, and the *other* necessary conditions based on my relative trajectory through life.

*480.*     Meaning simply—*I am poor*, and *yes* COVID-19 and inflation has hurt my family significantly as supply chain incontinence permeates still three (*3*) years after the 2020 Global Pandemic emerged.

*481.*     The Defendants know I am *wholly insolvent* given that my financial disclosures communicated this as fact when complying with the Defendants' intake-form for its' "[**VERY**] Ambitious Goal" Application of TOC <u>used *for*</u> obtaining *background information* to reengineer the alternative reality of the identified problems' system. *See*, **Exhibit 229— "*[VERY] Ambitious Goal" Survey Questionnaire.*

*482.*     The emotions in **Exhibit 229** are still very much at play as all of *this* is thrust into *focus*.

*483.*     My admissions on my *early* May 27th, 2020, submissions make clear that *faithfully*, I am "<u>*all in*</u>" on—*my* **American Dream**. *Quite literally*, the Defendants have <u>**ceased**</u> <u>my</u> <u>momentum</u> both *personally* and *professionally*—and *I* am wholly stagnant as *I* defend against this omnibus injustice and tread water with each stroke of the *pen*dulum.

*484.*     Again, the Defendants have placed me at a moral and ethical crossroad—and given my attained knowledge and experiences—I have chosen to *move* this Honorable Court with *faith* still principally guiding me through the storm as my Compass rose. I have chosen to sacrifice everything *and more* to defend my **American Dream** *in lieu of* submission to the status quo and our new age nationalistic-debtors' prison—**yes**, <u>*student loan debt*</u>. *See*, **Exhibit 230**—*Stafford Loan Account Details*; **Exhibit 231**—*Graduate PLUS Account Details*. Also, look at these <u>*ridiculously*</u> unsustainable repayment plans. *See*, **Exhibit 232**; **Exhibit 233**.

*485.*     Also, *for the record*, the COVID-19 Pandemic relief associated with student loan debt is another fundamental cause of *this* Complaint. Meaning, as long as I pursued the Defendants, I could ignore the literal compounding-**toxic** *constraint* of that student loan debt given the forbearance by the United States Federal Government as a result of the Global Pandemic.

**486.**    The frustration intensifies as *you already know*, to forgo *this* fight would be *in kind* to that which I would be employed to pursue *in the alternative for someone else*.

*If I cannot do for myself—what can I do for others*?

## <u>WAYNE STATE UNIVERSITY, COVID-19'S PANDEMIC EFFECT, & THE PRINCIPAL DOOR</u>

**487.**    Finally, this last relevant-direct effect from the Defendants' *rejection* of my "***Double Dip***" interpretation will point our sails towards the *end* of these Background Factual Allegations.

**488.**    Simply, the Defendants required me to obtain a total of (*59*) accumulated credits to qualify for graduation.

**489.**    In doing so I selected the following Elective courses as *my* <u>first</u>-choice selections:

> (*1*) MKT 7450: Business Research and Methodology
> (*2*) MKT 7470: Consumer and Industrial Buying Behavior
> (*3*) MKT 7950: Business and Sustainability**\***

> **\****Cross-listed* as MGT 7950: Business and Sustainability

**490.**    Remember, the application and timing of <u>the</u> <u>Defendants</u>' <u>choice</u> in first applying my accumulated credits to satisfy the optional three (*3*) Concentration Elective requirements *before* that of the M.B.A. Elective requirements.

**491.**    Principally, my "***Double Dip***" interpretation arose from **Exhibit 186**, the *now **OLD*** version of Degree Works, a dynamic-user interface **STUDENTS** were then "*encouraged to use* this degree audit report as a *guide when planning* your *progress towards completion* of the *above requirements*." *Id*; **Exhibit 176**; *see also*, **Exhibit 184**, the *new* version of Degree Works.

**492.**    Thus, the effect of the Defendants' rejection of my "***Double Dip***" interpretation led to the following three (*3*) Elective Courses being applied to the M.B.A. Elective requirements as *my* <u>second</u>-choice selections:

> (*4*) ISM 7560: Information Systems Management
> (*5*) MKT 7430: Advertising Management
> (*6*) GSC 7960: Lean Six Sigma

*493.*    Now as an effect of the *then* acute Global Pandemic, on March 12th, 2020, the Defendants began the shutdown of all "face-to-face classes" to "allow instructors time to adapt their syllabi and delivery methods in transition to online and remote instruction methods," said WSUMISB Dean, **Mrs. Robert Forsythe**. *See*, **Exhibit 234—***WSU Gone Digital Email*.

*494.*    Next, on April 1st, 2020, WSUMISB Associate Professor, Mr. Timothy Butler, sent a Canvas Message to each registered STUDENT of GSC 7960 as seen in **Exhibit 235**—Timothy Butler Cancelation Notice.

*495.*    Continuing as the Global Pandemic *unfolded*, on April 7th, 2020, Mr. Butler provided further assurances of noncompliance with offering GSC 7960 in an update as seen in **Exhibit 236—***Mr. Butler's Cancelation Update*.

*496.*    Then, on April 14th, 2020, Mr. Butler formally communicates cancellation of GSC 7960: Lean Six Sigma for the Spring/Summer 2020 Term. **Exhibit 237—***Mr. Butler's Final Cancellation Notice***; *see also,* **Exhibit 238—***GSC 7960 Administrative Cancellation Notice*.

*497.*    Finally, on the same April 14th, 2020, at 2:51 P.M., **Mrs. Kiantee-Rupert Jones** <u>contacts me</u> and identifies:

> "The instructor of GSC 7960 is planning to cancel the course in the Spring/Summer 2020 term. You will receive official notification by email from the University Registrar's office once the cancellation is complete. *In the interim*, if you need assistance with choosing another course in the Spring/Summer 2020 term in place of GSC 7960s, *we can help*."

> **Exhibit 239**—*Mrs. Rupert-Jones' Cancellation Notice* (*Emphasis added*)

*498.*    Now, *you can* envision my dismay in this space and *time* as the Global Pandemic changed *everything*—you understand *even more now, because* <u>you</u> <u>lived</u> <u>it</u>; nine (*9*) minutes later—given Mrs. Rupert-Jones' otherwise *silence* on all *other* issues—I objectively sought *help* by replying:

> "I would like to find an *online course* that is *comparable to* the GSC
> 7960, or I would like to find an (*sic*) *online course* that will *fulfill
> my requirements* so I can *graduate* after the Fall 2020 term."

*Id*. (*Emphasis added*)

***499.*** The Defendants' answer to *this* desperate *call for help was* then **and** is *what* has become now for eternity—***The Principal Door***. *See*, **Exhibit 239**.

***500.*** Again, Mrs. Rupert-Jones *remains mute* with Assistant Director of Graduate Programs, Mrs. Veronica Seatts, replying—*objectively*—in her place:

> "*Are you looking for another Spring/Summer online GSC class*? *If so,* GSC 7260
> and GSC 7992 will both be held online during the Spring/Summer semester and are
> *currently open*. If these options do not interest you, please give our office a call to
> schedule a phone advising appointment to review other class options available to you."

*Id*. (*Emphasis added*)

***501.*** On April 16th, 2020, I replied to Mrs. Seatts' *objectively* explicit suggestion of the Defendants' "[***VERY***] Ambitious Goal Application" of TOCICO—the course commonly known as **GSC 7260**: Theory of Constraints: Breakthrough Solutions, taught by Dr. James T. Low. *Id*.

***502.*** It was during *this* period from April 14th, 2020, at 5:23 P.M. to April 16th, 2020, at 12:39 P.M., in which I reviewed the Defendants' marketing and *other* representations superficially relevant to the "currently open" classes to find a "fine replacement for GSC 7960" in the Spring/Summer 2020 Term. *Id*.

***503.*** I did *not* spend a lot of time on this project and plainly my decision was <u>*not*</u> *pragmatic*—I gave *deference* to Mrs. Seatts' suggestions and my *then* understanding of TOC *only in comparison to* Lean Six Sigma. I also highlighted to Mrs. Seatts that the other course she suggested (GSC 7992) contained math and/or statistical analysis. *Id*. I wanted *only* to graduate and slogging through the effects that statistical analysis and math in general would have on my OCD was something I wanted to avoid at all costs given *the time* involved. I also wanted to stay within the

marketing and supply chain **focus** given that Plaintiff, The Traveling Attorney, *P.C.*®, is structured as a vertically integrated firm strategically alignable by its' integrated marketing campaign—any knowledge and/or *hard skills* to advance that mission is what *I was **focused*** on obtaining during this space and time.

*504.*   Finally, on **May 5th, 2020**, I received an email with an updated class schedule reflecting *my* third-choice elective to replace the *cancelled* GSC 7960 as:

(*7*) GSC 7260: Theory of Constraints: Breakthrough Solutions

**Exhibit 240**—*Spring/Summer Updated Schedule*

*505.*   Well, here we are, we have arrived at ***The Principal Door*** using *exactly* what I learned inside *that door* from Dr. Low and Professor Habel by leveraging TOC's *proper* decision making and cause-effect logic *at* a structural depth. *For now*, we remain on the *outside* of ***The Principal Door*** to understand exactly the effects the Defendants' integrated marketing campaign ("IMC") has had in communicating its' *objective* objectives at *each vertex.*

## WAYNE STATE UNIVERSITY'S INTERGRATED MARKETING CAMPAIGN AS A DECISIVE COMPETITIVE EDGE LEVERAGED TO HARM PLAINTIFFS

*506.*   This Section is aimed at identifying what the Defendants have achieved and maintained in controllable form as a very-complex system focused on leveraging the "**Systems' Thinking Logic**" as a fundamental requirement of the Theory of Constraints.

*507.*   Plainly, the depth of the Defendants' implementation and use of the Theory of Constraints objectively draws together as a common enterprise the totality of the Defendants' communication omnichannel at macro and micro levels.

*508.*   Simply, *here*, the Defendants have created a 'Deceive Corporate Edge' in the controllable form of its' extremely complex Integrated Marketing Campaign ("IMC") and management structure as the principal engine for this pedagogical vessel.

*509.* Meaning, while we are not able to transparently see every action the Defendants have taken to achieve this accomplished objective, we definitively see through the authorized 'People(s), Process(es), and Product(s)' produced during this transformative stage that *beyond a reasonable doubt* the consequence thereof *is* what has sparked factually *this* very Complaint.

*510.* In general, when *I* begin to analyze a complex system or reality, *I* most often directly or unconsciously use what *I* call the **Marcus Lemonis Three (3) Ps** for redevelopment of the alternative reality being reviewed: (**1**) People; (**2**) Process; (**3**) Product.

*511.* Based on **Newton's First Law of Motion in Physics**, 'People' if left alone remain as clay afraid and confined to the shadows on the walls of the Great Cave doing as they have *experienced*:

> "A body at rest will remain at rest, and a body in motion will remain
> in motion unless it is acted upon by an external force."

> *Sir Isaac Newton's First Law of Motion in Physics*

*512.* Simply, we have no 'Product' without the 'Process' and no 'Process' without the 'People' and therefore we must understand *who* is producing and *what* it is they are producing as product.

*513.* Also considering **Newton's Third Law of Motion in Physics**, tracking effect-cause-effect relationships is habitually used to delve deeper into an alternative reality when you know necessary conditions-of-fact exist:

> *"*For every action, there is an equal and opposite reaction*."*

> *Sir Isaac Newton's Third Law of Motion in Physics*

*514.* *Here*, the People of the **Great State** of Michigan have through the "Michigan legislature established WSU as a "state institution of higher education," *in full*:

> "The Michigan legislature established WSU as a "state institution of higher
> education" that "shall be maintained by the state of Michigan" in *Mich. Comp.
> Laws § 390.641*. The Michigan Constitution provides that the "legislature shall
> appropriate monies to maintain . . . Wayne State University," Art. 8, § 4, and
> establishes that "the governors of Wayne State University and their successors in
> office shall constitute a body corporate known as the Board of Governors of

Wayne State University." *Mich. Const. Art. 8, § 5*. Appropriations to WSU are received from the state's general fund pursuant to *Mich. Comp."*

*Kreipke v. Wayne State Univ.*, 807 F.3d 768, 776-777 (6th Cir. 2015)

*515.*    The pinnacle realm of authority is the Board of Governors of Wayne State University who themselves are in general openly elected members of the public serving one eight (*8*) year term per-voting cycle.

*516.*    Next, the Wayne State University President is the second realm of authority, with authority cascading throughout the body corporate as one "*research enterprise*" thereafter *as designed*.

*517.*    The President is voted on and appointed by the Members of the Board of Governors and from there the President has operational oversight of the "state institution of higher education" where *in some instances* this authority is abused and usurped for individual enrichment *as* has been accomplished *here* "quite frankly;" specifically here, where the Defendants have "*used these [STUDENTS] as bridges to companies,*" by leveraging the Theory of Constraints in every capacity while broadcasting the same.

*518.*    *For me*, the main reasons why I was drawn to Wayne State University was (1) the branding associated with "Mike Ilitch" famously known as the Entrepreneurial Founder of Little Caesars Pizza, and (2) proximity of the 'Mike Ilitch School of Business' to the heart of Detroit, Michigan.

*519.*    Candidly, this 'strategic alliance' between Wayne State University School of Business and the Ilitch name was marketed as added value capable of being leveraged by the M.B.A. degree post-graduation…*so I bought in*; see too Mr. Townsend's biography indicating his work to conjoin the marketing of the two brands in perpetuity "contributed to *substantial* growth in M.B.A. enrollment." **Exhibit 128**.

*520.*    On or about September 12, 2018, President M. Roy Wilson issued a University Address and unequivocally identified that the 2016—2021 Strategic Plan's goal was to grow enrollment:

"Just last month we had the **ribbon cutting** for the **brand-new Mike Ilitch School of Business in downtown Detroit**. **This beautiful new learning facility has brought a surge in enrollment for the school**. **Since** we **announced** the $40 million Ilitch gift in October 2015, graduate **enrollment** in the Mike Ilitch School of Business **has increased by two-thirds** to more than 1,400 students this fall. **In that same time, total enrollment in the school has increased by one-third to more than 4,000 students today**."

**Exhibit 241**, *at p.* 2 *(Emphasis added)*

*521.*    We must remember this "research enterprise" is a business, and businesses have bottom lines, competitors, processes, and stakeholders. Yet Dr. Wilson continues with what <u>should</u> be most important—but has gone *overlooked* in our fact pattern *here*:

"We owe it to our [**STUDENTS**] to help them complete their degrees and <u>move</u> <u>on</u> <u>with</u> their <u>lives</u> as *quickly* as possible."

**Exhibit 241**, *at p.* 4

*522.*    **As fact**, the Defendants have spoken and told us themselves as seen building throughout each vertex of the Defendants' continuously improving IMC for at least the last twenty (20) years giving us their plans, motives, common schemes, knowledge, understanding, and intent to premeditatedly act in "win-win" fashion to use **STUDENTS** as human research subjects without obtaining proper informed consent.

*523.*    This is one of the most important foundations of this Complaint because we can see the Defendants collectively building structurally at macro levels through these communications with individual-micro-Defendant lateral support, all of this involving <u>and</u> occurring simultaneously with that of the Theory of Constraints as *it* "continuously improved" into a "cyclical process" of 'academic research.'

*524.*    You will see that when the Defendants are speaking *individually*—they always by title in some form express connectivity to reinforce the **ECHO** of Wayne State University's perceived-brand value and to gain the intended Receivers' trust that the IMC communication is valid.

*525.* Importantly, <u>each</u> individual Defendants' actions adds either positive or negative "**Throughput**" to the Defendants' IMC on a perpetual basis relative to <u>each</u> communication.

*526.* As the Theory of Constraints evolved, "**Throughput**" as an idea has taken on many forms and definitions, many of which are irrelevant for our purposes here.

*527.* To me, *the idea* of "**Throughput**" and definition thereof: is the relative measure of the reliability of a system variably computed by both macro and micro communications. Meaning, did the system deliver everything it said it would on *every* relative communication—did it achieve its purpose—and if so, does the effect add or subtract "**Throughput**" for *the whole*?

*528.* Simpler, "**Throughput**" as a function is analogous with the *House Points Counters* situated within the *Great Hall* at *Hogwarts*. The concept is simple, physical <u>and</u> invisible communication variably computed for when good and bad deeds are done by **STUDENTS**. *There*, a simple verbalized acknowledgement by educators— "*10 POINTS TO GRYFFINDOR*" —adds the variable value to the measure and is counted visually in the House Points Counters in the Great Hall; of the four (*4*) Houses, the most points at the end of the school year earns the *House Cup*.

*529.* This is much the same as the reality we share by analyzing the Defendants' IMC. But replace points with money or *invisible*-perceived brand value, *or* <u>even</u> with the variable of enrolled **STUDENTS**; <u>the</u> <u>intended</u> <u>effect</u> of the Defendants' IMC is to add positive "**Throughput**," or more precisely, add value to the <u>overarching</u> Wayne State University global brand queuing consumers to act on this perceived value of the relative or accumulative effect of the IMC.

*530.* Plainly, *here*, this is why this case is so difficult to understand in that the **sheer volume** of the Defendants' communication omnichannel **overloads** the Receivers' Communication Process, and they submit like the water they are to the least resistant path of acquiescence.

*531.* *Here*, almost all the Exhibits submitted have at least one element of the Defendants' IMC.

**532.**      Each element, each *vertex*, is a single point in space and time <u>*designed*</u> to correlate and ECHO support for the whole; these layers of communication are what consumers conceptualize as perceived value based on the decoding by the Receivers' *relative*-Communication Process. Meaning, the Receiver will individually decode the IMC's communication and derive at a relative alternative reality where an informed decision based on this complex analysis is generally made.



**533.**      Visually represented *above*, the Defendants have used the Theory of Constraints to 'build, capitalize, and sustain' what *is* the Wayne State University IMC *as* a "**Decisive Competitive Edge**" *by* maximizing control over each facet of this "*research enterprise*" or, more precisely, this "state institution of higher education."

**534.**      Following here <u>chronologically—*is*</u> in part **the** Defendants' **IMC**, beginning in 1992 with relevant vertices that build incrementally the objective basis for *this* Complaint:

# <u>WAYNE STATE UNIVERSITY IMC:</u> 1992

*535.* On or about September/October 1992, **Exhibit 242** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low.

*536.* Specifically, **Exhibit 242** is a snapshot of space and time that objectively identifies:

> "James. T. Low, Ph.D., CPIM. Certified Jonah. Avraham Y. Goldratt Institute, is a Professor in the Marketing Department at Wayne State University in Detroit."

> **Exhibit 242**, *at p.* 26.

*537.* Continuing, Dr. Low identifies early that the Theory of Constraints is a "means of managing [a] organization" and a "very important point is that [TOC] represents a shift in emphasis in the management of organizations." *Id*. at 27.

*538.* Specifically, Dr. Low exposes the 1992 version of what are known as the Theory of Constraints "**Five Focusing Steps**:"

> "The **focusing steps** of the theory of constraints, which enable the process of continuous improvement, are as follows:
>
> Step 1: *Identify* the system's constraints. This could be machines, **market demand**, **policies**, **procedures**, or **corporate thinking**.
>
> Step 2: Decide how to ***exploit*** the system's constraints. Squeeze the most possible from the limits of the current constraint.
>
> Step 3: *Subordinate* everything else to the decisions made in Step 2. Avoid keeping non-constraint resources busy doing unneeded work.
>
> Step 4: *Elevate* the system's constraints. If possible, reduce the effects of the constraint. Off-load some of its demand, or expand its capability, or change the way it is managed (especially with regard to batch sizes). Make sure that everyone in the firm knows what the constraint is and what the effects of the constraint are. Marketing, engineering, sales, and other functions should know (and make decisions based on) the effects of the constraint.
>
> Step 5: If the constraint is broken in Step 4, go back to Step 1. *Warning*: do not let inertia become a system constraint."

> **Exhibit 242**, at p. 27. (Emphasis added)

*539.* Importantly, Dr. Low continues with "[a] constraint is defined as anything that holds back a system from achieving a higher level of performance toward its goal. Of course, this assumes that an appropriate goal has been set for the organization in the first place."

*540.* Moreover, Dr. Low differentiates the importance between the **two types** of **constraints**:

"There are **two kinds of constraints**: Physical Constraints and Nonphysical Constraints. A **<u>Physical Constraint</u>** may be the capacity of a machine to produce parts, the width of a hallway, or the capacity of a vehicle. A **<u>Nonphysical Constraint</u>** could be market demand, a policy, a procedure, or even a manager's way of thinking. Usually, the Physical Constraints are much easier to identify and considerably easier to deal with than the Nonphysical Constraints. Identifying and dealing with Nonphysical Constraints can be enormously frustrating unless the process is approached through the methods of "effect-cause-effect" reasoning…"

*Id*. (Emphasis added)

*541.* Included within **Exhibit 242** is an enormously complex and irrelevant example that takes the reader to the "excess capacity" idea and recommendation of:

"Using throughput as a ***focus*** requires a realization that constraints are important because they limit the throughput of the entire system, and thus the achievement of the overall goal of the system. Considering throughput to be a **focus** of improvement leads to a question regarding the marketing strategy of the organization. **What is the organization really selling in the marketplace? Is it selling products J, K, and L? Or is it really selling its capability to produce? If so, why not use that capability** to product the products that will help the most to achieve the organizations' **goal of making more money**?"

**Exhibit 242**, *at p.* 35 (Emphasis added)

*542.* Here, the overall goal of each individual Defendants and the "research enterprise" from a holistic standpoint was at all relevant timeframes—**<u>Research</u>!**

*543.* Concluding coincidently, Dr. Low summarizes the effect of the Defendants' now at dispute use of this "excess capacity" idea *then* in 1992: "*We* reached the best decision by *exploiting the system*'s constraints, in order to squeeze the most we could out of it, and by subordinating everything else." *Id*. at p. 37.

# WAYNE STATE UNIVERSITY IMC: 1993

*544.*   On or about March 1993, **Exhibit 130** was added as a vertex to the Defendants' IMC with authority by Wayne State University Associate Professor, George C. Jackson, and Defendant, Dr. James T. Low.

*545.*   Specifically, **Exhibit 130** has the title "Constraint Management: A Description and Assessment," where "Theory of Constraints" is synonymous with "Constraint Management" as an early alias.

*546.*   This white paper updates our snapshot and adds substance to the Defendants' IMC:

> Dr. James T. Low is a Professor in the Marketing Department at Wayne State University in Detroit. He has an M.B.A. and a Ph.D. from the University of Michigan. He also holds a CPIM Certification in Production and Inventory Management from the American Production and Inventory Control Society (APICS). Dr. Low is a member of the Society of Manufacturing Engineers, APICS, the American Marketing Association, The Institute of Management Accountants, The Institute for Management Science, Decision Sciences Institute, and the Transportation Science Section of the Operations Research Society of America. He has published articles in the *Journal of Marketing Research*, the *Journal of the Society of Logistics Engineers*, the *International Journal of Physical Distribution and Logistics Management*, *Corporate Controller*, *APICS: The Performance Advantage*, and the *Journal of Marketing Education*, as well as the proceedings of a number of conferences.

**Exhibit 130**, at p. 48.

*547.*   Continuing, Dr. Low explains "Constraints Management" in *this* space and time as:

> "Constraints Management can best be understood as an application of the systems concept ["**Systems' Thinking Logic**"]. According to Shannon: The systems approach attempts to study total-system performance rather than to concentrate on the parts. It stems from the recognition that even if each element or sub-system is optimized from a design or operational viewpoint, the total-systems performance may be suboptimal owing to interactions between the parts…
>
> Constraint Management begins with the understanding that the overall system has a goal. For an organization, this goal has to do with the reason for its existence. The total system will move toward its goal until it is prevented from doing so by a constraint…

Constraint Management is an iterative process which seeks to continuously improve relative to the system's goal."

*Id*, at p. 41.

**548.** The pioneering Duo identifies in Figure 1 below "The Six Steps of The Theory of Constraints," which typically ***does not*** include number one (1) below; *see* **#480** above for comparison. *Id*. at p. 42.

**Figure 1**
**THE SIX STEPS OF THE THEORY OF CONSTRAINTS**

1. Identify the Overall Goal of the System.
2. Identify the Systems Constraint(s).
3. Decide How to Exploit (Squeeze) the System's Constraint(s).
4. Subordinate (coordinate) Everything Else to the Constraint.
5. Elevate the System's Constraint(s).
6. If a Constraint Has Been Broken, Go Back to Step One and Go Through All of the Steps Again Making Sure that None of the Policies Made in Previous Passes Through the Five Steps Remain Unchallenged.

Source: Adapted from Eliyahu M. Goldratt, *The Haystack Syndrome*, Croton-on-Hudson, N.Y.; North River Press, 1991, pp 53-58.

**549.** After identifying the Constraint, Dr. Low begins explaining that "the next step is to **squeeze** the **maximum out**," of the constraint by deciding how to "exploit" this resource.

**550.** Meaning, "[i]n other words, we need to schedule the constraint so it is always producing and we need to determine the mix of products which will maximize the profitability of this system." *Id*.

**551.** Explaining further, that "[p]roper scheduling of the constraint is only one way to squeeze out the maximum "**Throughput**"…[t]he key is to release material into the system in the precise amounts required by the constraint and on a schedule which will guarantee that the constraint is not starved or idle." *Id*. at p. 43.

*552.* Continuing, Dr. Low identifies four (4) ways to "elevate" or stated differently "reduce the effects of the constraint:" (1) "utilize the constraint on overtime;" (2) "off-load certain types of work from the constraint to non-constraints or to operators outside of the organization;" (3) "look for ways to speed the performance of the constraint;" *and* (4) "[m]arketing could try to shift demand." *Id*. at p. 44.

*553.* "In the process of elevating the constraint, it is possible that the constraint will be broken. That is, the original constraint would no longer be the resource preventing the organization from moving closer to its goal. A new constraint would become the system's limiting factor." *Id*.

*554.* "An example would be a situation in which capacity was elevated beyond market demand, in which case the market would become the constraint. If the constraint is broken, all of the steps in the process should be repeated. That is, the new constraint should be identified, then squeezed or exploited. The rest of the operation should be subordinated or coordinated with the constraint, and ways should be sought to elevate the constraint." *Id*.

*555.* "It is critical that policies developed to support the original constraint should not persist, so that these policies become constraints themselves." *Id*.

*556.* "Constraint Management advocates the use of strategically placed buffers in systems with dependent components and stochastic behavior." *Id*. at p. 45.

*557.* Dr. Low continues by introducing the "buffer" and "time buffer" ideas below:

> "A buffer is a means of absorbing fluctuations or disruptions in the operation of system resources. In CM, buffers are considered to represented time, even if they require the presence of pieces of physical inventory in order to keep a resource (usually the constraint) in operation, so that it will not starve for productive work it is scheduled to perform. Nonconstraints do not generally require buffers because their excess capacity provides some buffer in the form of available idle time. The constraint, however, has no excess capacity and the entire system suffers a loss of the entire contribution margin of each unit not produced if it should be starved or blocked. Therefore, time buffers are often employed in front of a constraint or assembly operation in a CM system, to guarantee minimum loss of throughput to the system. Time buffers

simply involve the release of material into the system a predetermined period of time ahead of schedule."

*Id*. at p. 45.

**558.** Further, Dr. Low in making an assessment of "Constraint Management:"

"Perhaps the most important contribution of CM is the focus it provides the entire organization. This focus provides the rationale for the production schedule, for quality and marketing initiatives and for the strategic use of buffers. Efforts to improves the system are directed to those components which can have the greatest impact on the system's overall productivity."

*Id*. at p. 46

**559.** Moreover, Dr. Low identifies "[a]nother advantage of CM is that it can be implemented with relative ease," and "does not require a complete reorganization of the [system]." *Id*.

**560.** The **most striking** and final advantage identified by Dr. Low involved **exploiting policy**:

"Finally, CM explicitly recognizes that nonphysical constraints such as outdated policies and strategies can keep us from realizing our goals and that we should take a proactive approach to correcting them whenever possible. It also provides the organization with a conceptual framework with which to identify and deal with such constraints. For example, if a policy can be shown to be keeping the organization from its goal, the first step is to exploit it."

*Id*. at pp. 46-47.

**561.** We see explicitly the developmental stage at which the Theory of Constraints, or here "Constraints Management" is at in this early spotlight—that "[m]ost of the initial applications of CM appear to be confined to manufacturing." *Id*. at 47.

**562.** Hypothesizing accurately, hindsight as we now know our current reality:

"Although it is true that all systems have constraints and dependent components and therefore **CM** should be applicable to **all** **systems**, it is more difficult to conceptualize the application of CM outside of manufacturing."

*Id*. (Emphasis added).

**563.** Finally, "the authors feel that CM provides some interesting and valuable insights into the management of systems that could be very useful, and found:

"**There is a need to integrate CM into the <u>strategic planning process</u>**. If the *focus* of the organization is on the constraint, it is critical that the policies developed **to support** the constraint be **consistent with** the mission and **strategic plan of the organization**. Also, since the **location of the constraint can be influenced by management**, and important strategic issue would be to decide *where it should be located* to best meet the goals of the organization."

*Id*. (Emphasis added).

**564.** On or about November 24, 1993, **Exhibit 243** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low; *see below*, **Exhibit 243**, *at p*. 3b.



# <u>WAYNE STATE UNIVERSITY IMC: 1994</u>

**565.** Sometime in or around December 1994, **Exhibit 129** was added as a vertex to the Defendants' IMC with authority by Mr. Jeffery Stoltman; Mrs. Audrey Taylor; and Mr. George C. Jackson.

**566.** Specifically, **Exhibit 129** objectively identifies that at this space and time:

"George C. Jackson is Associate Professor of Marketing, Jeffery J. Stoltman is Assistant Professor of Marketing and Audrey Taylor is Lecturer in Accounting, all at the **School of Business Administration**, **Wayne State University**, Detroit, Michigan, USA."

*Id*. at p. 10.

**567.** The trio begins this article by identifying: "[a]s logisticians…[w]e are trained to analyze (sic) the trade-offs and look for compromising solutions, yet we know of situations where seemingly conflicting objectives have been met…[**w]e know** the trade-offs yet we also know that sometimes **<u>it is possible</u>** to "**have our cake and eat it too**." *Id*. at p. 4. (Emphasis added).

**568.** Continuing, this article is a spotlight on a then relatively *new* Theory of Constraints tool known as **Evaporating Clouds** ("EC"). This Theory of Constraints tool was:

> "…first developed by Dr. Eliyahu Goldratt, an Israeli physicist [1, p. 37, **1991**]. He calls the technique "evaporating clouds" (EC) because the objective is to find a solution which causes the problem, analogous to a large black cloud, to evaporate or disappear as opposed to choosing between conflicting alternatives or seeking compromises among the alternatives…The Solution sought is one which eliminates the conflict between the alternatives thereby allowing the attainment of the positive results for both [win-win]." *Id.*

**569.** This early Theory of Constraints article does not mention TOC by name, nor identify other aspects of the theory such as the "**Five Focusing Steps**." Instead, this *early* spotlight is *focus*ed on the EC, where the steps to employ this logic tool are defined by the Defendants' educators:

> "The first step [is] to **assemble a team** to conduct the EC analysis….**a diverse team representing all major areas of the firm** especially logistics, [must be] assembled."

> *Id*. at p. 8. (Emphasis added).

**570.** The second step of the Evaporating Cloud analysis requires a "precise, uniquely structured definition of the problem [or objective]." *Id*. at p. 5.

**571.** Similarly, the authors here gave the same definition to "problem" or objective as that of "constraint", and in **1994**, the Defendants voice importance to align the objective and to avoid "misaligned objectives," continuing:

> "The problem can be defined a something that prevents us or limits us in achieving a desired objective. Therefore, in defining a problem we must identify the objective we are trying to achieve….It is very important to examine the objective carefully to be sure that it is consistent with the goals and objectives of the overall organization. It is possible that a misaligned objective is actually creating the problem…It should also be pointed out that the objective should not only be based on an overall goal of the organization, but it should also be fairly broad."

> *Id*. at p. 5.

**572.** The third step and final step described by the Defendants' trio is to "identify and attack the underlying assumptions of the logical links." *Id*. at p. 8.

**573.** Meaning that "the EC technique leads to an innovative solution to a complex problem:"

"The objective is to break or invalidate an underlying assumption that is sufficient to make the problem disappear. When an assumption which underlies or supports a logical link is broken, the problem collapses ending the conflict and solving the problem."

*Id*. at p. 5.

574. The Defendants' authors admit the continuous pressure the EC logic tool itself has as an effect on the user; let alone an environment **designed** to <u>add</u> pressure on the user of an EC:

"Evaporating clouds continually pressures the analyst to dig for underlying assumptions and ways to break them. A trade-off solution is not acceptable."

*Id*. at 6.

575. Summarizing, the Defendants' authors identify five (5) benefits of using the EC in the decision making and problem-solving context:

1. "First, EC requires the analyst to identify the core objective that the decision maker is trying to achieve. If the objective is not consistent with the firm's overall objectives and mission, there may not be a problem. The need to **specifically tie the analysis back to the organization's strategy** is sometimes overlooked in day-to-day problem solving."

*Id*. at p. 8. (Emphasis added).

2. "A second advantage is that there is no solution until the problem disappears…With EC the **analyst** is **not allowed to escape** from **the problem by** devising a **compromise**. The ability **to cause the problem** to cease to exist depends largely on **the imagination of the analyst** or **preferably a group of analysts** representing multiple functions and viewpoints of the problem."

*Id*. at pp. 8-9. (Emphasis added).

3. "A third advantage is that it <u>**forces**</u> the underlying assumptions of **a problem** out <u>**into the open to be fully analyzed**</u> (sic) and scrutinized…Alternatively, one might restrict the analysis in terms of a particular approach such as…a **differentiated** <u>**competitive**</u> advantage <u>**strategy**</u>…In other words, the analyst is **forced** to consider the problem in several different contexts."

*Id*. at p. 9. (Emphasis added).

Remembering too Mr. Stoltman's Chair position on **Exhibit 17**; **Exhibit 127**.

4. "Another benefit of EC is that it **stimulates creativity** by providing a structure and objective which directs and **focuses** the **imagination** rather than merely listing possible alternatives or brainstorming. It <u>**takes**</u> the **analyst's**

**knowledge** of the costs and **systems** involved and **pushes** the **analysis** [*and* analyst] **deeper**."

*Id.* at pp. 9-10. (Emphasis added).

5. Finally, the authors also explicitly identify that "[i]t is also **suggested that EC be used to help direct research efforts**."

*Id.* at. p. 10. (Emphasis added).

*576.* Lastly, the Defendants' trio leaves *you*, the Reader, with a bit of a warning from long ago:

"[T]he reader should be aware that learning to use this technique is **not easy** at first and **takes considerable practice**. It **requires** a completely different mental map and **more energy** than traditional approaches to problem solving."

*Id.* (Emphasis added).

## <u>WAYNE STATE UNIVERSITY IMC:</u> 1995

*577.* Sometime in 1995, **Exhibit 244** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs.

*578.* Specifically, **Exhibit 244** depicts an early Intermediate Objective Map (IO Map) that when you define the words "performance measures" with "academic research" *and* overlay the Defendants "system" and "org. culture" over this analysis—it becomes clear that: "[p]eople put their own personal gains ahead of the organization," and that even generically, "[p]erformance measurements are not appropriate." *Id.* at p. 4.

*579.* We see on Page four (4) the accumulation of the content on Pages one (1) to three (3); reading from bottom up, following along from the lowest number to the next highest. Specifically, *focus* on the value in numbers: 20; 70; 72; 77; 80; 90; 100; 110; 170; 180; 190; & 200. *Id.*

## <u>WAYNE STATE UNIVERSITY IMC:</u> 1998

*580.* Sometime in and around Fall of 1998, **Exhibit 245** was added as a vertex to the Defendants' IMC with authority most likely by the Defendants' then Interim Vice President for Marketing and Communications, *again*, Mr. Jeffery Stoltman.

*581.*   Specifically, **Exhibit 245** illustrates a snapshot in time of the Defendants' position one year after Dr. Eli Goldratt released the cryptic blueprints for pedagogical research in Critical Chain.

*582.*   This spotlight of Wayne State University captures the following highlights:

> "**Wayne State University** was created as a state institution by Act 183 of 1956, succeeding Wayne University formerly operated by the Detroit Board of Education. The university was given autonomous constitutional status by vote of the people of Michigan in the April 6, 1959, election…. As a states institution of higher education, Wayne State University, is less than 50 years old, but several of its colleges are of long standing. The College of Education traces its history from 1881 and the School of Medicine from 1868. As a university, Wayne came into being in 1933, when the Detroit Board of Education united the several institutions of higher learning under its jurisdiction….The university has 14 **schools and colleges** and enrolled more than 31,000 students in **Fall 1998**…. Wayne State University is one of only 125 of the nation's more than 2,100 four-year universities and colleges that have been designated by the Carnegie commission as research universities. Of these 125 institutions only 88, including Wayne State University, are classified as **"Research University 1" institutions**. To be included, a university must annually aware 50 or more doctoral degrees and receive at least $40 million in federal government support annually."

**Exhibit 245**, at p. 2.

*583.*   The Defendants total 'research' expenditures were approximately $256,349,427.00 for **1997—1998**; approximately $6,626,734.00 increase from 1996—1997. *Id*. at p. 3.

*584.*   Sometime during **1998**, **Exhibit 246** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low.

*585.*   First, we learn *extensively* about the author, Dr. James T. Low, "the first Marketing Ph.D. in the World to become a Certified Jonah of the Avraham Y. Goldratt Institute," clearly marketing his abilities to understand, create, *and* control **the complex**. **Exhibit 246**, at p. 261, *see* "About the Author."

*586.*   Specifically, **Exhibit 246** offers to the constructionist what is the "Drum-Rope-Buffer" tool, otherwise known as "Protective Capacity" or broadly as "Buffer Management," which is another early Theory of Constraint idea developed by Dr. Goldratt for the "*very unbalanced production systems,*" or a very complex system. *Id*. at p. 258.

*587.*   We learn from this still early Theory of Constraints article from Dr. Low:

> "The Theory of Constraints concepts, developed by Dr. Eli Goldratt (and popularized by his novel, *The Goal*) have *revolutionized* much of the *traditional thinking* about manufacturing *processes*. One of Goldratt's major contributions was the development of the Drum-Buffer-Rope approach to managing production, which has resulted in dramatic improvements in companies in a wide variety of industries."

> *Id*. at p. 455. (Emphasis added)

*588.*   The concept is simple, the constraint, **or** *focus*, is the **Drum**, the "release of material into the system," the **Rope**, is for "establishing buffers in front of the constraint and at other critical locations in the system (the **Buffer**)….This shifting of demand can be applied to a number of resources which would become temporarily overloaded according to an initial *plan of operation*. When this kind of planning is done before a final production schedule is determined, the result is effectively the application of Drum-Buffer-Rope on a dynamic basis, to deal with multiple constraints that can vary over time." *Id*.

*589.*   Candidly, **Exhibit 246** is one of the most complex examples of this concept possibly ever conceived by the *Homo Sapiens sapiens* Species, and *I* caution the reader who attempts to follow as such is necessary *here* for the totality, but unnecessary as content…*seriously*.

*590.*   Also, this document was presented to *at least* the 2020 GSC 7260 and GSC 5670 courses where **STUDENTS** were told to review this mind-bending example for '*help*' with classwork.

*591.*   Beginning, Dr. Low limits the reality of this "paper" by explaining the idea of "**Constraint Management**," or otherwise what was *then* the essence of Theory of Constraints:

> "The original definition of a Constraint, as proposed by Dr. Goldratt, was "anything that holds back a system from achieving a higher level of performance, relative to its goal." Obviously, this could be a physical constraint, such as a machine that has a limited production rate, the capacity of a vehicle, or the width of a hallway. **Less obviously**, a **constraint** that limits the performance of a system **could be an operating policy** that is no longer relevant, **or performance measurements that lead to incorrect behavior**, or other such nonphysical constraints.

*For the purpose of this paper*, the discussion will be confined to physical constraints in a production system."

*Id*. (Emphasis added).

592.   Clarifying further, Dr. Low identifies:

"It should be clear that measurements which call for maximum output from each person and each resource will inevitably lead to excess inventory in the system. Because the system can produce no more than its constraint will allow, anything produced beyond that limit will remain in the system as excess inventory….From an accounting standpoint, any express investment represents an opportunity to reduce costs, which is supposed to lead to increased profits."

*Id*. at p. 456.

593.   Even further, Dr. Low proclaims the following "**bold statement**:"

"Allow me to make a **bold statement** as a result of this kind of insight: **Every** production **system will** either **incorporate Protective Capacity as part of its design, or it will develop a form of Protective Capacity in order to survive**. The **only alternative** to this **would be** a **failure** to function, **leading to** the **demise** of the production system….This **Protective Capacity allows** the Non-Constraint **Resources to recover from** a certain amount of **disruption** in its own operations **without affecting** the rest of the **system**. As long as the disruption only uses up the available idle time on the resource, and does not eat into the time the resource must be busy, the rest of the system will not be affected….It should be clear that **we are** now **scheduling** the operation of the **system** to **produce as much as we can from** the Constraint [**STUDENTS**], and are subordinating the operation of all other resources to what can be accomplished by the Constraint."

*Id*. at p. 457. (*Emphasis added*).

594.   Taking into consideration that, "[o]bviously, the more complex the system being analyzed, the more comprehensive the planning tool would need to be to accommodate it." *Id*. p. 460.

595.   Using the Drum-Rope-Buffer **and**/or Protective Capacity and/**or** Buffer Management technique allows the designer of a system to protect resources and assets by placing buffers throughout the process to **shift the load** "to a point where capacity of specific resources would be available [**or…overloaded**]." *Id*. at 459.

596.   These buffers could be offensively placed by the systems' designers.

597.    A *fence* is the simplest form of a buffer placed primarily for defensive purposes, *though* offensive qualities are intrinsic an inherent effect of **this buffer chosen** *by* the authorized **decision maker**; is it a white-picket fence *or* thirty (*30*) feet tall wall reinforced with six (*6*) inch steel, concrete, rebar, razor wire, and the latest in security surveillance, telecommunications, and a militarized agency patrolling this monument every second of every day.

598.    Sometime in and around October 14-16, 1998, **Exhibit 247** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low, of "Wayne State University."

599.    Specifically, **Exhibit 247** is an early post-*Critical Chain* "**TECHNICAL PAPER**" with the curious title:

"*Using Theory of Constraints to Teach Supply Chain Management in the Manufacturing and Marketing Classroom*." *Id.*

600.    The abstract to this paper reads in pertinent part:

> "This paper will show how the Theory of Constraints approach can be used to teach Supply Chain Management concepts in manufacturing, as well as in business. The Theory of Constraints will be defined and the basic concepts will be presented. The manner in which manufacturing and marketing can both be more effective will be illustrated through a **hands-on-exercise**, which **has been used** with **repeated** success **in** both manufacturing and marketing **classrooms**, as well as **in industry**. The exercise proves a clear demonstration of the value of integrating manufacturing and marketing, as well as fostering an understanding of hose to accomplish that integration."

*Id.* at p. 3. (Emphasis added).

601.    Traditionally, given the complexity of manufacturing sets of separate disciplines, were divided "into a number of separate subjects," and "in most cases, were not considered to interact much with business." *Id.*

602.    "As with manufacturing, business subjects such as accounting, marketing, finance, management, and human resources were taught from the point of view that each areas could stand

relatively well on its own, and that integration [with business] could be accomplished

afterword's." *Id.*

**603.** Importantly, "[a]s education was translated into practice in both manufacturing and

business, this lack of integration led to the development of "functional silos" in operation.

**604.** This concept of "**functional silos**" is important to understand then and now which "…led

to circumstances where many companies became uncompetitive….because they did not recognize

the interdependent nature of their operation." *Id.*

**605.** As a proposed solution, this paper continues by identifying that:

> "Changes in education to integrate manufacturing and business subjects have been
> rather recent developments, and have in many cases followed, rather than led,
> developments in industry….Supply Chain Management and the Theory of
> Constraints can be combined to provide the integrating framework that has been
> missing from both manufacturing and business education."

> *Id.* at pp. 3-4.

**606.** Next, Dr. Low unloads and introduces the integration of the Theory of Constraints and

clearly identifies the cryptic "*closer look*" yields this analysis:

> "In the early 1980's, Dr. Eliyahu M. Goldratt developed an improvement approach
> that came to be known as the Theory of Constraints (TOC), popularized first in
> 1984 through Goldratt's best-selling novel, *The Goal*. Although the subject matter
> of *The Goal* is described in manufacturing terms, a **closer look reveals** that this is
> simply an application of system improvements that can be used in a **large context**.
> In the **last several years**, the Theory of Constraints knowledge base has **expanded
> dramatically** and TOC has become a **full-fledged strategic approach** to system
> improvement, which application **to systems in general**, *rather than just*
> manufacturing. **At the core of the Theory of Constraints** is a **powerful process
> of <u>using</u> cause-effect <u>logic</u> <u>for</u> problem solving**, <u>idea</u> <u>generation</u>, **and**
> implementation **planning**. The Theory of Constraints approach has been
> productively applied to manufacturing, accounting, marketing, human resource,
> performance measures, organizational change, project management, and even
> personal issues. Further discussion of the cause-effect logic aspects ["**Thinking
> Processes**"] is outside the scope of this paper.

> In a nutshell, the Theory of Constraints approach to system improvement focuses
> on achieving the **single strategic goal of the system**: to fulfill the purpose for
> which it was created [**Research**]. Other required or desirable aspects of the system
> are treated as necessary conditions, which must be satisfied at some threshold level

in order for the system to pursue its goal. In general, businesses were created to make money for their owners, so that the goal of a business would be to "make money, not and in the future." **Other threshold conditions** could include **paying employees enough** that they were willing to work, meeting safety and emission standards, and so forth. A constraint is "anything which limits a system from achieving a higher lever of performance, relative to its goal." The constraint may be physical, such as a machine that cannot produce any faster, or a vehicle with limited capacity. A constraint can also be **non-physical**, such as a **policy**, **procedure**, the market demand for an item, or a limited supply of a raw material. In general, physical constraints are much easier to identify and deal with than the non-physical.

*Id*. at p. 4.

**607.**     Next, Dr. Low continues by introducing the "Steps in the Theory of Constraints Improvement Process," identifying that "[w]hile non-physical constraints are best dealt with by using the ["**Thinking Processes**"] mentioned previously, physical constraints can be dealt with effectively by following the Theory of Constraints five-step improvement process:"

> Step 1: **IDENTIFY** the system's constraint(s).
> Step 2: Decide how to **EXPLOIT** the system's constraint(s).
> Step 3: **SUBORDINATE** everything else to the decisions made in Step 2.
> Step 4: **ELEVATE** the system's constraint(s).
> Step 5: If the constraint is broke in Step 4, go back to Step 1.
>
> Warning: Do not let **INERTIA** become a constraint.
>
> In **Step 1** of this process, the constraint that is identified could be a machine, market demand, a **policy**, a **procedure**, or **corporate thinking**. In **Step 2**, exploiting means to **squeeze** the most possible from the limits of the current constraint. In **Step 3**, an example of subordination could be to avoid keeping non-constraint resources busy doing unneeded work [or overloaded]. Note that this **calls for** a fundamental change in behavior and **thinking** on the part of **everyone**, **especially managers**, and **those in charge of performance measurements**.
>
> For **Step 4** elevation means, if possible, to reduce the effects of the constraint in limiting the system. This could mean to off-load some of its demand, or expand its capability. Continuous improvement efforts should be focused on the constraint. For **Step 5** the restart of the process completes the cycle of improvement, without allowing inertia or self-congratulation to halt the process. A caution is that the next constraint (that will then limit the system) should be anticipated before breaking the current constraint. This avoids being unready to deal with the next constraint."

*Id*. at p. 4.

*608.* This explanation is similar to that of the **Exhibit 242 "Five Focusing Steps"** and even has a reduced step in comparison to **Exhibit 130**.

*609.* The Theory of Constraints challenges many assumptions on which traditional practices are based, such as…productivity measures, and performance incentives." **Exhibit 247**, at p. 5.

*610.* Continuing, Dr. Low identifies a "*very important point*" in that follows:

> "A *very* important point is that the Theory of Constraints represents a shift in emphasis in the management of organizations. This shift is from a perception that minimizing costs is most important, to a realization that the *overall success* of the endeavor **is really most important**. It requires management to move from a **focus** on Cost, where everything is considered important, to a **focus** on **Throughput**, where constraints, **Protective Capacity**, and **Buffer Management** are the **focus** of efforts to *continuously improve* t**he** **overall system's** ability to reach its **goal** [**Research**].

> *Id.* (Emphasis added).

*611.* Most importantly, Dr. Low unequivocally identifies that the integration of the Theory of Constraints into Supply Chain Management (SCM) curriculum results from:

> "recognition that a chain of suppliers and their customers needed to have a much higher degree of integration and **cooperation** if they were to compete effectively with other supply chains to reach the same end users. In effect, Supply Chain Management calls for all of the **separate** business **entities** that compose a supply chain to **work together as if** they were a **single integrated enterprise**….In order to perform effectively, a Supply Chain Management organization **needs to be beneficial to all the partners involved**, and needs to be based on mutual trust between its partners. In addition, Supply Chain Management has not states this explicitly, operating as a market leader will require the non-constraint partners in a supply chain to subordinate their operations to the partner holding the constraints. This will be necessary in order to have maximum effectiveness for the overall supply chain, so that it can reach the position of market leader in competition with other supply chains. **Understanding this will require a significant educational effort on the part of all the top managers involved in a Supply Chain Management partnership**. They will need to learn why subordination to the constraint will be necessary, and they will need to be willing to work out **a winning arrangement for all** of **the partners**."

> *Id.* at pp. 5-6. (Emphasis added).

*612.* Next, Dr. Low identifies the reasoning behind his integrated version of the Theory of Constraints into the Defendants' curriculum in *this* space and time using a very-complex and

technical-business hypothetical similar to that which was used in class. "The relationships involved in the management of an integrated supply chain can be complex, and difficult to grasp on an overall level." *Id*. at 6.

*613.*   Importantly, Dr. James T. Low identifies unequivocally *then* in 1998:

> "**A** Supply Chain Management **analyst**, **especially** one **familiar** with the Theory of Constraints, **might** **look** **at** **the** **system** **itself** **for** **a** **more** **fundamental** **reason** *for the outcome*."

> *Id*. at p. 7. (Emphasis added).

*614.*   Attempting to justify further "[t]he reason for using a hands-on exercise is that it lets people learn through experience, and allows them to come to a fundamental understanding of the appropriate concepts, when they are presented in a realistic, but simplified context." *Id*. at p. 6.

*615.*   Skipping the hypothetical as irrelevant and straight to the lesson—*sync operations*:

> "This result leads to some interesting questions about what changed in order to achieve the better result…the company changed its mind. It adopted a production strategy that recognized the effects of the constraint on its system. **What could happen if it adopted a marketing strategy that recognized the effect of the system constraint**?"

> *Id*. at p. 8. (Emphasis added).

*616.*   This idea to integrate the marketing strategy with the production strategy synced to the same organizational goal is similar to aligning the strategic planning and organizational research of Mr. Stoltman in **Exhibit 129**.

*617.*   Interestingly here, Dr. Low is advocating to integrate the Theory of Constraints into his pedagogy through the example shown though there is no mention of the "[*VERY*] Ambitious Goal" or the "Thinking Processes" as was taught to Plaintiffs, closing instead:

> "The example shown here can be used in both the manufacturing and marketing classroom to convey an understanding of the real implications of Supply Chain management. Working through the problem in a hands-on manner makes the overall system analysis meaningful to the [**STUDENTS**]. The Theory of

Constraints provides a very effective means to analyze and implement Supply Chain Management, since each supply chain is ultimately dependent on the current constraint of the overall system."

*Id*. at p. 8

*618.*   Sometime in and around 1998, **Exhibit 248** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs.

*619.*   Specifically, **Exhibit 248** appears to be a PowerPoint of "Session 5: An Introduction to the Thinking Process; Giving Clear Instructions; Transition Trees" developed the Defendants for "[a]n Adapted Thinking and Communication Skills (TACS) Session." *Id*. at p. 1.

*620.*   Of relevance in this PowerPoint are three topics, the **<u>first</u>** that follows with four (4) slides is "Giving Clear Instructions," based on the fitting quote by Dr. Goldratt: *Id*.

"As long as we don't know how to verbalize our *<u>intuition</u>*, the only thing we can delegate is our own confusion."

**Dr. Eliyahu M. Goldratt**



*Id*. at pp. 3-4.

*621.*   The **<u>second</u>** relevant topic in **Exhibit 248** is next where Dr. Low identifies and explains what is known as an "Intermediate Objective Map" as part of the "**Thinking Processes**"—using "**<u>Audrey Taylor's Example</u>**: **<u>Ambitious Target</u>**—*I deliver an Excellent TOC class." *Id*. at pp. bottom of p. 4 through p. 8.

**622.**     Pausing here to identify that "obstacles" may be defined as "problems" arising from Mrs. Taylor's identified "TOC Class" she concedes *then* in 1998 is what we are *focusing* on now:

> 1. "I have titled this course, "TOC and Management Accounting" when the **bulk of the subject matter is <u>not</u> directly <u>linked</u> to accounting**;" *Id*. at p. 5.
>
> 2. "**No good book exists** on the methodology of Management Accounting and TOC. **Good TOC** and Accounting Methodology is communicated/**developed during the class**/semester;" *Id.*
>
> 3. "**Very few cases exist** on TOC;" *Id*. at p. 6.
>
> 4. "It is **difficult to grade students** on the Thinking Process without assigning homework;" *Id.*
>
> 5. "The students are so impressed with this course that **word of mouth spreads**. *Id.*

**623.**     Finally, the <u>**third**</u> relevant topic in **Exhibit 248** presented by Dr. Low identifies what is known as a "Transition Tree" and part of the "**Thinking Processes**"—<u>**again**</u>, by using "<u>**Audrey Taylor's Example**</u>: <u>**Ambitious Target**</u>—*I deliver an Excellent TOC class!" Id*. at p. 5.

**624.**     Candidly this 1998 Transition Tree Example is the most comprehensive outline of what was *then* "Ambitious Goal" Curriculum being used by the Defendants and thereafter continuously improved, or "adjust[ed]" for more derived excess gain relative to the performance measurements of this very complex system through the **STUDENTS'** pedagogical experience.

**625.**     Interestingly, Dr. Low <u>**through**</u> Mrs. Audrey Taylor creates the *most detailed snapshot* of the Defendants' *earliest form* of the Critical Chain Application of the Theory of Constraints known *then* as "Ambitious Goal" Curriculum legitimatized *Globally* by TOCFE:

> *1.*     "Action: I assign **each** [**STUDENT**] to complete their [**STUDENT**] book, *Production The TOC Way*, and to fully complete the comment pages documenting what each step has shown them, (the major learning point of each each (sic) simulation run.);" *Id*. at p. 7.
>
> *2.*     "Need: I need to give [**STUDENTS**] more direct interaction with TOC;" *Id.*

3.  "Result: I will have a clearer idea of what their needs are and will be able to adjust the course;" *Id*. (Emphasis added).

4.  "Result: **Valuable individual work** was assigned **for grades**. [**STUDENTS**] have a clear picture of the impact of TOC in the physical process of deliver products/services.;" *Id*. (Emphasis added).

5.  "Need: I need to ensure that [**STUDENTS**] thoroughly digested the book [Critical Chain];" *Id*. at p. 8.

6.  "

7.  "Result: I know how much [**STUDENTS**] understand. **I have individual grades. Synergy** is developed **via** the **conversation**. The [Thinking Process] is re-introduced in a clear presentation;" *Id*. at p. 8. (Emphasis added).

8.  "Need: I need to make sure that **each** [**STUDENT**] understands the **power** and applicability **of the tools** [Thinking Process];" *Id*. (Emphasis added).

9.  "Action: [**STUDENTS**] **are told** to document their application of **each tool** to a **problem** in **their area of influence**, (work **or** personal) which they greatly care about solving. **Their work will be graded for correctness on the method**. **Personal data** will be kept secret **if so desired**. **Those willing to share** their work will be asked to present it in front of the room;" *Id*. (Emphasis added).

10. "Result: [**STUDENTS**] understand how to use the [Thinking Process] tools and see how the [Thinking Process] can impact their area of influence. **Good TOC** and Accounting Methodology is communicated/**developed during the class**. Current class developed cases are sufficient for exploring the impact of TOC on different entities. Grading encourages time work;" *Id*. at p. 8. (Emphasis added).

11. "Need: [**STUDENTS**] need to know that companies they care about use TOC;" *Id*.

12. "Reason: "The **knowledge** that **TOC <u>is being used</u>** in nearby companies **makes TOC more real and valid**. Hearing speakers give [**STUDENTS**] the opportunity to have their questions asked and answered;" *Id*. (Emphasis added).

13. "Action: I share information about the use of TOC in regional firms, (**GM**, Ford, Federal Mogul…). I find speakers willing to discuss the impact of TOC on Business. (Rick, **<u>Jim</u>**, Caroline);" *Id*. (Emphasis added).

14. "Result: The credibility of TOC is growing. [**STUDENTS**] feel less fear and reluctance to use TOC at their workplace. [**STUDENTS**] are

aware of their impact of TOC in industry, health care, the military, and in education;" *Id*. (Emphasis added).

15. "Need: [**STUDENTS**] need to gain ideas on how to use TOC in various different business environments;" *Id*.

16. "Reason: Presentation demands understanding. **Applying** the [Thinking Process] to the **individual** [**STUDENTS**'] **company** enables the [**STUDENT**] to determine the **validity** and applicability of the [Thinking Process] to his or her own entity. Presenting also allows the [**STUDENT**] to **defend his or her ideas** in front of their peers. Such a **defense** will also **enable** the [**STUDENTS**] to **discover** and **correct weaknesses** in hir or her plan;" *Id*. (Emphasis added).

17. "Action: [**STUDENTS**] are **told to apply** the [Thinking Process] to a **problem** they care about in **their** own **business**. The **<u>final</u> <u>version</u>** of the application of the [Thinking Process] to their problem **is to be presented** to the entire class **<u>after</u>** the **<u>components</u>** have been **<u>scrutinized</u>** during the semester, (**<u>in private</u>** discussions and in front of the class during the TACs sessions);" *Id*. (Emphasis added).

18. "Need: [**STUDENTS**] need to present their work to their bosses;" *Id*.

19. "Action: The **final project** submission will be **down-graded if suggestions for improvement have not been made by** the [**STUDENT**]. The [**STUDENTS**] will be informed of this criteria. The [**STUDENTS**] are to **include** in the final submission the **actions** they have **taken** to implement their solution, **and** the **reactions** which occurred when they did. It will be **suggested** that they **share** their **ideas** with someone "**safe**" at work;" *Id*. (Emphasis added).

## <u>WAYNE STATE UNIVERSITY IMC: 1999</u>

626. Sometime in and around 1999, **Exhibit 249** was added as a vertex to the Defendants' IMC

with authority by Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs.

627. Specifically, **Exhibit 249** identifies both "James T. Low, Ph.D., CPIM" and "Wayne State

University" above the fold; the article goes on "[a]bout the Author:"

> "**Dr. James T. Low** has an **MBA** in **Marketing** and **Operations Research**, and **Ph.D.** in **Marketing** from the University of Michigan. Dr. Low holds the CPIM Certification in Production and Inventory Management from APICS, the American Production and Inventory Control Society. He is also the **first Marketing Ph.D. in the world** to become a **Certified Jonah** of the **Avraham Y. Goldratt Institute**. In the

**last 8 years**, Dr. Low has spoken on Theory of Constraints topics **at more than 60 meetings and conferences**, dealing with applications in manufacturing, marketing, accounting, **operations research**, and organizational change. He has also authored a number of articles on applications of Constraints Management in recognized journals.

Dr. Low has presented sessions on Constraint Management at the U.S. General Accounting Office (GAO) in Washington, D.C., at Federal Mogul Corporation in Southfield, Michigan, at Kelsey-Hayes Corporation in Livonia, Michigan, at Rockwell Automotive Corporation (now Meritor Automotive) in Troy, Michigan and Ford Motor Company in Dearborn, Michigan, at Georgia-Pacific Corporation in Atlanta and at i2 Technologies in Dallas."

*Id*. at p. 5. (Emphasis added).

*628.*   The abstract for **Exhibit 249** reads in part:

"Objective: To have participants learn better ways to use the Evaporating Cloud approach in an interactive, hands-on context, so that they can generate simple, creative, and powerful solutions to the problems they face, either one an everyday basis, **or** for those situations where **the** problem has seemed **unsolvable**….While the Evaporating Cloud approach was introduced some time ago, people have often encountered difficulty in applying it to solve problems on an everyday basis. In most cases, this is because **they have not developed a higher level of skill with the approach**, that would make it easier and **faster** to use, and which would increase their confidence in their ability to apply it. In addition, it is likely that **they have not learned some of the newer means that have been developed** to make this problem-solving approach easier to use."

*Id*. at p. 1. (Emphasis added).

*629.*   Importantly, this is not the only time Dr. Low identifies the disparity in User Level as he also differentiates these Users as having "less experience" and being "novices." *Id*. at p. 2.

*630.*   The bulk of **Exhibit 249** outlines how to construct an Evaporating Cloud a logic tool of the "**Thinking Processes**" that will be covered *later*:

"The primary reason for using the Evaporating Cloud diagram approach is to identify and examine the assumptions that underlie a specific problem. If even one of the underlying assumptions leading to a problem can be reversed or invalidated, **a potentially powerful solution** to the problem becomes available. **This approach** can be used to address everyday problem situations as well as those that have seemed **unsolvable**, sometimes for **decades**."

*Id*. at p. 4. (Emphasis added).

# <u>WAYNE STATE UNIVERSITY IMC:</u> 2001

**631.**   Sometime in and around 2001, **Exhibit 250** was added as a vertex to the Defendants' IMC

with authority by Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs.

**632.**   Carrying over from **Exhibit 249** "[a]bout the Author" and still representing boldly "Wayne

State University," the only changes to this section by *now* "James T. Low, Ph.D., CPIM, **Jonah's**

**Jonah**" is that he has spoken "at more than **70** meetings and conferences" in the "**last 8 years**,"

adding too "DaimlerChrysler" as additur.  *Id*. at p. 5; **Exhibit 250**, at pp. 34-35. (Emphasis added).

**633.**   Specifically, **Exhibit 250** gives us a deeper look at the applicability, logic, and versatility

behind the Defendants' use and development of "[**VERY**] Ambitious Goal" curriculum. Where in

this paper titled "*Using the Intermediate Objective Map to Foster Trust in the Supply Chain*," the

abstract reads in part as follows:

> "A major problem in achieving true supply chain management has been
> that **companies in general** have continued to **pursue their individual
> goals** rather than concentrating on ways to improve the functioning of
> the supply chain as an overall entity. The **traditional point of view** has
> always been that the management of a specific company should manage
> its affairs so that the company's profit is maximized. If this means the
> supplier or customer of that company is less well-off as a result, that is
> typically viewed as the suppliers or the customer's cost of doing business
> and is of little concern to the management that causes it. From this point
> of view the management of every company should look out for only its
> own interests, and should not concern itself with the health or well-being
> of a supplier company or a customer. Naturally this leads to situations in
> which companies view themselves as adversaries in their business
> dealings, with the idea that the situation should be viewed as a two-
> person, **zero-sum game**. In that situation the only way for someone to
> come out ahead is to **make their opponent lose**.
>
> **What is needed** is a means of **overcoming** the **isolationist viewpoint** of
> the companies involved in a supply chain. If those companies are to
> function effectively as an overall supply chain, it is essential that their
> **management should realize how dependent they actually are on
> other companies in their supply chain**. One of the prevailing attitudes
> seems to be that if suppliers are driven out of business, they will simply
> be replaced by other suppliers, and life goes on for the customer company
> that contributed to the suppliers' demise. This can be a self-limiting
> process if **enough damage** is done to the community of supplier

companies, since there may be too few qualified suppliers in that case. This presentation will outline how such situations could be changed for the better. The **Theory of Constraints** problem solving tool known as the Intermediate Objective Map can be **used to overcome** some of these **barriers to cooperation**. It can also be **used to foster trust** among the companies which have **usually tried to take advantage of each other**.

The presentation will **discuss how to conduct a group session with participants** from the companies in a supply chain, in which the **group builds** an I.O. Map with **an ambitious goal for the supply chain itself**. Participation in this kind of session fosters a realization that the companies in a **supply chain are interdependent**, **rather than stand-alone entities**. Participants may realize that overcoming obstacles to success of the supply chain can depend on the actions of other companies that affect them. The presentation will discuss **ground rules for this kind of session**, and procedures for conducting it effectively."

*Id*. at p. 26. (Emphasis added).

**634.**    For this paper, it is relevant and keen to identify that a replacement of the word "Supplier" with "the Defendants" and/or "Buyer" with "[**STUDENTS**]" moves us closer to this Complaint's analysis that the **educational system is a supply chain of minds**.

**635.**    Identifying the difficulties in "achieving real supply chain management," Dr. Low unequivocally foreshadows *the possibility* of the Defendants' conduct expressly <u>in</u> 2001:

"From this management point of view, **if** a **company maximizes** its own profits **at** the **expense** of a **supplier** or immediate customer, that other company should look at it as a **cost of doing business**. There is **little concern** on the part of most managers that they might **damage** a supplier to the point that the supplier goes out of business. **Suppliers are** usually viewed as **expendable**. **If** a supplier is **lost**, it is **expected** that **another will simply take its place**, and **life goes on**. Immediate customers are not necessarily viewed in any higher regard than the suppliers.

The prevailing view has been: "**Everyone for himself**."

**Buyers** have a **long history** of **playing suppliers** off against each other, in order to obtain the lowest possible price. <u>**More recently**</u>, **buyers have** <u>**demanded**</u> **proprietary** <u>**information**</u> from suppliers, **such as** costing <u>**information**</u>, manufacturing **processes**, **research results**, or **innovations**, regarding the products they intend to buy. **All too often**, a **supplier furnishes this information**, **only to discover that the buyer uses it against him**, in order to get a lower price. <u>**Worst of all**</u>, some **buyers have been guilty of** <u>**obtaining**</u> **trade** <u>**secret**</u> **information** from

**a supplier**, and then revealing it to that supplier's competitors, so the competitor can make the parts at a lower price. **Not surprisingly, a supplier who has been burned in this way** is unlikely to reveal that they even have any trade secrets, to this kind of buyer. In the long run, the **buyer who cannot be trusted is apt to lose access to innovative technology that suppliers offer** to his competitors (and conceal from him). It should also be **no** <u>surprise</u> **that suppliers** <u>eagerly</u> <u>await</u> **the** <u>opportunity</u> **to** <u>take</u> <u>advantage</u> **of this kind of buyer**. If a shortage occurs, suppliers will tend to favor the buyers that treat them well. The buyer with a **predatory history** will usually be **last in line**."

*Id*. at pp. 26-27. (Emphasis added).

636.    In **2001**, Dr. Low continues by identifying the "Theory of Constraints Problem Solving as an Answer" giving us a snapshot of the "evolution" of this still emerging-pedagogical idea:

"The **Theory of Constraints problem solving approach is an evolution from** the **original applications** of the Theory of Constraints to production scheduling. Dr. Eliyahu Goldratt first popularized this approach to manufacturing through his novel, The Goal, in 1984. The manufacturing approach focuses on the least capable part of the system, as the constraint which limits performance for the system as a whole. In **most** manufacturing **systems**, the physical resource with the least capacity appeared to be the constraint. It soon became apparent to Goldratt that the real underlying constraint in most systems was not physical. The **policies, procedures,** <u>and</u> **performance measures** in use at most companies were the real limitations that held those companies back from a higher level performance toward their goal. These nonphysical constraints were usually difficult to identify and often resulted in physical constraints that were more easily seen. The Theory of Constraints **Thinking Processes,** that were **developed to deal with these non-physical constraints, are based on cause and effect logic.** These <u>logic tools</u> include the following: **The** <u>Current Reality Tree</u> is used to diagnose the root cause of a problem situation from its symptoms. **The** <u>Evaporating Cloud</u> is used to develop simple and creative win-win solutions to conflict situations. **The** <u>Future Reality Tree</u> provides a means of exploring both the positive and negative effects of a potential solution. **The** <u>Intermediate Objective Map</u> (I.O. Map, also known as the **PreRequisite Tree**) is used to plan for the achievement of an ambitious target that otherwise might seem unreachable. **The** <u>Transition Tree</u> is a detailed cause and effect implementation plan for achieving the ambitious target.

The **advantage of** the Theory of Constraints problem solving approach is that it **takes** an <u>overall</u> <u>system</u> **point of view toward** <u>achieving</u> <u>results</u>. The <u>emphasis</u> **is** <u>on</u> <u>success</u> **for the** <u>overall</u> <u>system</u>, rather than optimizing each of the individual components for that system. The process tends to lead toward developing **win-win solutions** to conflicts, and

creative "outside the box" strategies for the overall system. Because the process concentrates on developing **system-wide solutions**, there is little emphasis on blame finding or turf protection. Instead, **<u>if the process is used correctly</u>**, it tends to **<u>foster trust</u>** among those people from different components of the system who are working together on the solution."

*Id*. at pp. 29-30. (Emphasis added).

*637.* Similarly, if you re-define "*Ambitious Target*" with "**<u>RESEARCH</u>**;" and "*positive incentives*" with the "WSU Jonah Certificate," and even further "*channel captain*" with "CDC; President, M. Roy Wilson; Implementation Team Member and Director of Marketing and Supply Chain Management Department; Defendant, Dr. John C. Taylor; or even more broadly as "Change Agent," the *focus* of *this* Complaint begins to objectively tighten upon the Defendants both holistically as a system of operatives <u>and</u> individually as each has the specific intent to act.

*638.* Objectively stated by Dr. Low outlines what is essentially a Strategic Alliance or often commonly known today as Affiliate Marketing agreements:

> "The **problems with self-centered companies** in a supply chain **can be overcome**, and the supply chain overall can be made much more successful, by using the Theory of Constraints Intermediate Objective Map **on a <u>group basis</u>**. If the **companies in a supply chain can agree on a target that will benefit all of them**, and <u>work together</u> to achieve it, the <u>cooperation</u> can make <u>all</u> of them <u>better off</u> than the would otherwise have been. The first step is to get agreement from representative companies to have their **key managers participate** in a group session that will **explore** how they might benefit from **working more closely together**. This may not be easy if previous experience has led companies to be wary of each other. However, it should work better if the session is **organized by the company with the most influence** in the supply chain. This company can **<u>use its position</u>** as the "**<u>channel captain</u>**" as a **means of <u>obtaining cooperation</u>** from other companies to at least attend the meeting with an **open mind**. **The organizers may find that <u>providing positive incentives</u> to other companies <u>can be a key</u> to <u>obtaining cooperation</u> in this regard**. It is important to note that participants in the problem solving session should be representative **opinion leaders and key managers** from each firm, and that these participants need to come with an open mind. They **should also have** the **authority to speak** for their firm and to **make commitments** that can be kept, once they are agreed upon. This will facilitate dealing with matters such as **trust**, pricing, technology sharing and other important issues in the supply chain."

*Id*. at p. 30. (Emphasis added).

639.     Group **or** individually driven, the "channel captain" drives the *focus* of the identification of the "problem" or—a "*ambitious target*" as defined in 2001 by Dr. Low:

> "The **definition** of an **ambitious target** *is that it is not easily achieved*, *and that it will most likely require the efforts of more than one person.* **If** the goal is **particularly ambitious**, *it is likely to involve more people and require more cooperation from them in order to achieve it.*
>
> If the target is related to the success of an overall supply chain, it is likely to get an indifferent reception from the management of a company that is mostly concerned with its own profitability, and does not care about the rest of the companies in its supply chain. Unless they develop a new idea for themselves, people are often suspicious of new ideas, and are likely to feel threatened by the changes it would bring about.
>
> If the management of each company in a supply chain is primarily concerned with their own profitability, they are likely to have the attitude that the other companies are expendable.
>
> The **highest resistance is likely for an idea that is counter to the conventional wisdom in a field**, since **conventional wisdom is based on traditional practice, and is a very powerful influence. Even if the conventional wisdom is mistaken, or is completely unenlightened, it can be a very stubborn obstacle to the adoption of new ideas**.
>
> **Sometimes a problem goes unrecognized by the people affected by it, _or_ it is thought of as a fact of life, that nothing can be done about. Even if people recognize a problem and someone develops a solution, others will raise obstacles to it. _Without_ a _process_ _to_ _take_ _advantage_ _of_ these _obstacles_, they are usually enough to thwart any progress toward a solution**. Each obstacle represents a reason why progress is not possible, and even one obstacle is usually deemed sufficient to derail an entire program. People see every obstacle as needing an answer. If any obstacles are not answered, they tend to be seen as valid (even if they are not), and are considered enough to block the program. **Dealing with all of the obstacles** that are **typically** raised when a new program is suggested, **will** tend to **drain energy** from **the program's champion. Often**, the **champion gives up, rather than deal with them all**."

> *Id*. at pp. 30-31. (Emphasis added).

640.     This same basic premise above explained earlier by Dr. Low in the same article:

> "The same is **true** of **most breakthrough innovations** which **require** a **complete rethinking of traditional practice**."

> *Id*. at p. 28. (Emphasis added).

*641.* Focusing on the structure of "Group Problem Solving to Get Consensus," Dr. Low provides an overview of the process and again differentiates User Level of participants:

> "A **very underlined productive way** to **resolve** a **problem**, **or** to put an action **program** into place is to have a **group** of appropriate **people involved collectively in** a **structured approach** that **leads to cooperation in dealing with the problem**. The Theory of Constraints (TOC) **Thinking Processes** can **provide this** kind of **structured approach**. W**hen the approach is used in a group context** as described below, **every person has an equal opportunity to contribute to the solution of the problem**. **This means that each person in the group can legitimately have ownership of the results**. People tend to avoid finger-pointing, ego display, and turf protection, since they realize that they are up **collectively against the problem**, **rather than against each other**. The **participants** in this kind of session **do not need to become experts in** using the **Theory of Constraints tools**, **but** the **facilitator** for the group **must certainly be** an **expert** with the Theory of Constraints Thinking Process tools, as well as very experienced in using them to conduct such sessions. Having an experienced, innovative, and knowledgeable facilitator is crucial to the success of such a session. **When this is done well, the process of dealing with the problem is energizing, and gets the participants enthusiastically involved**."

> *Id*. at p 31. (Emphasis added).

*642.* Now, when we replace "facilitator" as we did for "channel captain" using the Defendants holistically was the providing system, *or* Dr. Low and Mrs. Habel individually, and too "participants" with "[**STUDENTS**]," we again clearly see the structure of this pedagogical hydra take form in different yet congruent forms throughout time and space—only to be collectively continually improved and designed to capture more and more "trade secrets."

*643.* Interestingly, Dr. Low expressly outlines the "Ground Rules for Group Problem Solving:"

> "Using the **TOC Thinking Process tools with a group**, as outlined here, would **usually be reserved for strategically important problems**, rather than for day-to-day problems that do not need as much emphasis. The **TOC logic tools can be used very productively** for smaller problems **on a** small **group or individual** basis, without needing the involvement of a large group. For the kind of group problem solving session described here, it is important that each one of the participants be open-minded, interested, have a stake in the outcome, and have a background that enables them to contribute effectively to dealing with the current problem. **Participants should ideally be key opinion leaders** or high level management in their company. They should also be volunteers, and **no one should ever be "sent"** by a superior, as a hostile or unwilling participant, especially if the

person usually attempts to dominate discussions. **The degree of need to be explicit about the following ground rules will depend on the specific group involved in a problem solving session.** The **more open-minded** the participants and the **more cooperative** the atmosphere, the **less need** there is to explicitly state the following. There should be no negative comments about other persons, groups, or companies, and no negative comments about their actions or decisions. Constructive comments should be welcomed from everyone, regardless of their rank or position. The management of each company should be actively involved, and supportive of the process, rather than looking to assess responsibility for unpleasant things that have happened in the past. Note that there are simple ways to have comments and **suggestions made anonymously** to the facilitator if this is needed, so that the facilitator can screen out negative comments, and that **other comments** would **not** be **traceable** to their originator."

> *Id.* at pp. 31-32. (Emphasis added).

**644.** Again, experience a factor with a psychological and sociological twist derivative of Dr. Low's "specific procedure" where the "[r]ole of the Facilitator" is defined *then* as follows:

> "This kind of group problem solving session **needs** an **experienced facilitator**, who is **both** an **expert** in the **Theory of Constraints Thinking Process tools**, **and** is **experienced in using them with groups**. The facilitator **cannot display an ego in the process**, and if he or she is afflicted with a **sizeable ego**, it must be **parked outside**. The facilitator needs to be able to **innovate on the fly**, **letting the work actually be done by the participants**, and being able to **guide** the **process without taking it over or acting as a participant directly**. **Often**, the **facilitator will** need to **guide** a **participant's statements into a form that works best for the problem solving tool** being used. **Experience with conducting group problem solving sessions has led the author to develop a number of specific procedures that work best for these sessions**. **These procedures deal with such issues as room layout, location, messages, organization and introduction of the session by the sponsor, keeping the sponsor as an active participant, preserving anonymity for suggestions, and the best specific ways to use both computer projectors and overhead projectors for this kind of session.** However, a discussion of those procedures is *outside the scope of this paper*."

> *Id.* at p. 32. (Emphasis added).

## WAYNE STATE UNIVERSITY IMC: 2002

**645.** Around August 7th, 2002, **Exhibit 109** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low, and *then* agent, Mrs. Audrey Taylor. Remembering, Mrs. Taylor thanked Dr. Low for assistance in "*infecting*" Wayne State University:



"**Dr. James Low** for **introducing me** to The **Theory of Constraints** and for being **my mentor and partner in infecting** the Business School of **Wayne State University** with the theories of Eliyahu Goldratt."

*Id*. at p. iii. (Emphasis added).

*646.* Specifically, **Exhibit 109** is a seven (*7*) page preview of Mrs. Taylor's investigation into the attachment of the Theory of Constraints to education and the fundamental formation of the Theory of Constraints for Education ("TOCFE"):

"In this study, **the mechanisms** which promote the diffusion and dissemination of the TOC Thinking Process Tools in educational systems **will be investigated**. A **model** for fostering long term change in systems **was developed** and this model will be tested for validity."

*Id*. at p. 1. (Emphasis added).

*647.* This short segment of this investigation by Mrs. Taylor still paints a vivid window into the *still* early and evolving Theory of Constraints as a knowledge base now *shifting* into pedagogy:

"…Dr. Eli Goldratt. in a meeting held in Chicago in April of 2000, that is not the case. In a gathering **called by** Dr. Eli Goldratt, of the **top TOC experts in the United States**, of which I was an invited member"". **Dr. Goldratt stated** that **nine out often TOC applications eventually fail**, not because of an incorrect methodology, but **because** the **implementation is local** in nature. Dr. Goldratt emphasized during the discussion, that the implementations had all initially been successful, and yet the **implementers** had either **left** their company, **gone underground** with the use of TOC within their company **or** had **stopped** using **TOC entirely**. Why?"

The hypothesize reason for the **incredible failure rate** of a highly successful theory is locked in the way organizations react to change. The Theory

developed by Dr. Goldratt to explain the resistance to change experienced by TOC implementers is the following [in part]:

1. A local implementation takes place within a company. The **change agent is not the president of the company**, so the change is only implemented in one portion of the entity, section X.

2. When **successfully implemented**. TOC reveals <u>**untapped capacity**</u>, which **requires change** in other departments **if such capacity is to be used effectively**.

…

8. **Without** such **changes** in measurements and/or procedures, the success of the changes in **X** appears to be **either insignificant**, **or** even worse, **harmful**.

9. After multiple attempts, the leaders of the change in X **either give up**, **go underground**, or leave the company."

*Id*. at pp. 4-5. (Emphasis added).

**648.** In 1992, Mrs. Kathy Suerken discovered the Theory of Constraints *and*:

"…wrote to Dr. Eli Goldratt expressing her enthusiasm about the book and her vision for how the methodology used to improve businesses could also improve education. Dr Goldratt invited Kathy to attend the Jonah class being held in **Dayton. Ohio**, that summer. The class was for academics, and Kathy decided to attend. **It was at that Jonah class**, that **I first met the future president of The Theory of Constraints for Education**, TOCFE.

…The **first time Kathy met Eli** Goldratt was in Dearborn, Michigan <u>**at** t</u>he **1993 International Jonah Conference** <u>**sponsored by**</u> **Wayne State University**…

….Each time Kathy spoke, requests poured in for her to share her experiences with other school districts and with other children. The business people invited Kathy to visit their districts and share her knowledge of TOC with Education Professionals in their area. **Kathy did**. By 1995, Eli Goldratt asked Kathy Suerken to become the President of a new foundation, the Theory of Constraints of Education, TOCFE. **Kathy said yes**."

**Exhibit 109**, at pp. 23-24. (Emphasis added).

## <u>WAYNE STATE UNIVERSITY IMC: 2003</u>

**649.** Sometime in and around 2003, **Exhibit 251** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs.

*650.*     Specifically, **Exhibit 251** appears to be a PowerPoint designed as a ninety (93) slide catchall compilation of *then* Theory of Constraints concepts.

*651.*     Furthermore, **Exhibit 251** appears to have been used by Dr. Low and the Defendants as an <u>advertisement</u> for future <u>consultancy</u> for at least a "**two day session…like this one**" and "**three day planning sessions**" where "**<u>key</u>** management **people**" develop an:

> "**implementation plan** of <u>what</u> should <u>be done</u>, in <u>what</u> <u>sequence</u> and <u>by</u> <u>whom</u>."

> *Id*. at p. 89. (Emphasis added).

*652.*     The slides of relevancy within **Exhibit 251** begin by identifying the continued **evolution** of the "extraordinarily powerful" Theory of Constraints' "process" along with Dr. Low and the Defendants. Id, at pp. 1; 2; 4; 5; *& 7*.

*653.*     Defendant, Dr. Low provides a new yet similar definition of constraints:

 

> *Id*. at pp. 9; 12.

Next, Defendant, Dr. Low identifies and explains the idea of "**Throughput**" in a business context stating the difference between "Throughput-Management" and "Cost-Management" visually in Exhibit 251, at pp. pp. 13-16; 18.

*654.*     The premise of "**Throughput**" fundamentally is *again* simple: the aggregated positive and negative effects relative to the success measurements of the system. *Here*, Dr. Low has used this

concept in the business context focusing on the weakest link where positive "**Throughput**" would improve the link and/or alternatively the system through the "**Five Focusing Steps'**" exploitation and subordination to break the constraint. The same premise, positive and negative accumulation of points based on the conduct of the **STUDENTS** of Hogwarts determines the success of that relative systems' aggregated measurements at the end of each term. The *focused* importance on the overall systems' success as an overall measurement for success often breaks barriers of communication unlocking potential beyond departmental silos. This broadened and blending viewpoint enhances cooperation of the whole where the system and its individual suppliers are more apt to succeed through this focused coordination towards achieve the targeted objective. Again, this could also be identified as a **strategic alliance**, or too, affiliate marketing.

*655.* Again too, while it may seem irrelevant or maliciously repetitive to repeatedly identify some information here, we are watching the Defendants' pedagogy, the delivery process, and Theory of Constraints itself evolve while using these early offerings to "continuously improve."

*656.* For example, Dr. Low here in 2003 identifies "Steps in the Theory of Constraints" which is really a hierarchical list of what was the six (6) steps in **Exhibit 130**, then known as the "[Five] Focusing Steps" in **Exhibit 242**, with the most recent rendition to *this* as the "Theory of Constraints five-step improvement process" of **Exhibit 247** in pp. 21 through 25.

*657.* After these discussions, the PowerPoint becomes highly complex and mostly irrelevant.

*658.* Specifically, Dr. Low speaks on V, A, T processing-layout categories and discusses Buffer Management, Drum-Rope-Buffer, and Protective Capacity relative to each category of *flow*.

*659.* Of the remaining slides given to the Plaintiffs in 2020 to review were recycled from an earlier PowerPoint in part showing continuous improvement of Dr. Low's pedagogical delivery as time passed *and* his experience grew. *See* **Exhibit 246**, at p. 458; **Exhibit 251**, at p. 82.

660.    Finalizing and **pitching** the sale to those decision-making "Key People" reading this presentation—Dr. Low outlines for marketing purposes the advertisement identifying early forms of Theory of Constraints consultancy:



**Exhibit 251**, at pp. 85-90.

661.    Going even further, we learn from Dr. Low that at some time during 2003 the Defendants held "**monthly** meetings of the **Theory of Constraints Club of Detroit**:"

- ✓ Attend the monthly meetings
- ✓ of the Theory of Constraints Club of Detroit,
- ✓ held on the first or second Thursday of the month
- ✓ at the Wayne State University Oakland Center
- ✓ on 12 Mile Road.
- ✓ Spread the word.

Copyright 2000 James T. Low          page 92     1/12/07

**Exhibit 251**, at p. 92.

*662.*  Sometime in and around October 6-9, 2003, **Exhibit 252** and **Exhibit 253** were added as a vertices to the Defendants' IMC with authority by Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs.

*663.*  Specifically, **Exhibit 252** is a paper titled "*The Theory of Constraints Way to Overcome Resistance to Change*," and **Exhibit 253** is a PowerPoint titled the exact same.

*664.*  Beginning with **Exhibit 252** as largely repetitious of Dr. Low's previous works there are several key notations to draw from this evolutionary snapshot by identifying the basic *focus* first:

> "Improvement has long been sought after as a desirable outcome for both organizations and individuals. A notable factor regarding improvement is that it always involves change. There are internal forces for change within organizations if people feel that things could be better than they are…[and] external forces for change that come from outside the organization…In most cases, people recognize that the "status quo" will not result in improvement."

> *Id*. at p. 1.

*665.*  Principally, Dr. Low goes on to identify the Theory of Constraints' perspective on "**OBSTACLES TO CHANGE**" and "**RESISTANCE TO CHANGE**," explaining that:

"**OBSTACLES TO CHANGE**

> Most people operating without an organization have a clear view only of their immediate functional area [SILO], and do not have the opportunity to have an **overall system-wide view** of the organization. This leads to a lack of perspective on how to make things better for everyone….The problem is that most performance measurements in organizations are driven by a compartmentalization view [SILOS] of the organization, down to the individual department or functional area….Another significant obstacle to change, and thus improvement, is that no matter how bad the situation, people tend to adapt to it and find some **comfort** level in dealing with the situation. If a change is suggested, it tends to threaten this comfort level….There is an old saying that: "The devil you know is better than the devil you don't know."

**RESISTANCE TO CHANGE**

> Given these factors, it is no surprise that most resistance to change is based more on emotion than on logic….All to often, people who are afraid of change have a **legitimate basis for** this **fear**, since the change may indeed make them worse off, if the performance measures and **the surrounding culture** are not changed to support whatever new program is being implemented….The term "**malicious compliance**" appears to have originated in the auto industry. The term indicates that to survive such programs, people should **act as if** they are supporting the new program, and "check the box" on its implementation measures, while they **secretly carry out** their traditional **behavior** and ignore the program as much as possible…[*addressing the nine (9) layers of resistance of change identified by Dr. Goldratt*]…Using the Intermediate Objective Map in a group context, with an experienced Theory of Constraints facilitator, **can lead** to a **resolution** of these **issues** [Resistance to Change] **as** an **inherent part** of the process. The **structured nature** of [the "**Thinking Processes**"], **and** the involvement of the **group**, **focuses** the group's **energy** on addressing these questions in a way that **overcomes** the **usual resistance**."

> *Id*. at pp. 1-2. (Emphasis added).

**666.** Continuing, Dr. Low identifies keenly how to overcome resistance to change:

"**HOW REISTANCE TO CHANGE CAN BE OVERCOME**

The **person(s) who initiated** the **change**, **or** who **determined** what **form** the change would have, **are not resistant to the change**. Instead, **as the inventors** for the change, **they are the champions for bringing it about**. They **understand the change and what it has to offer**….The Theory of Constraints Thinking Process consists of **cause-effect logic** tools for **problem solving** that can be used for just such a purpose. These logic **tools can be used in a group** situation to provide a **structure** for **problem solving**, within guidelines, that will overcome most of the usual resistance to change. The nature of the process for using these tools gets the group members directed towards solving the problem together, so that the group, both collectively **and individually, can legitimately feel ownership of the solution they have constructed**. The nature of the process also tends to eliminate turf protection, finger-pointing, and ego display, because the group members understand that it is the group collectively against the problem, not individually against each other. The individual group members **do not need to be experts** in using the Theory of Constraints logic tools, but the **facilitator for the group must be** just such an **expert**. The **role of** the **facilitator is** to **assist the group in using** the appropriate **logic tools in reaching their own solution**, <u>rather</u> **than being an active participant in the solution process by guiding the group to any specific solution**. In order to have the **group legitimately** <u>feel</u> **ownership**, the **solution** to the problem **must be the work of the group, not the work of the facilitator**. The facilitator should not only be an expert in using the Theory of Constraints logic tools, he or she should be experienced in using them with a group. The facilitator cannot display an ego during the process, and if the facilitator is burdened with a sizable ego, it must be parked outside the door. The facilitator must also be able to innovate on the fly, as needed."

*Id*. at p. 2. (Emphasis added).

667.    Next, Dr. Low goes on to identify the five (5) Theory of Constraints Thinking Process Logic Tools, or collectively, the "**Thinking Processes**" in the following order:

(1) Current Reality Tree;
(2) Evaporating Cloud;
(3) Future Reality Tree;

(4) Intermediate Objective Map ["It is worth noting that earlier in the development of the Theory of Constraints Thinking Processes, this tool was labeled as the Prerequisite Tree, and the procedures for using it were somewhat different]; *and*

(5) Transition Tree."

*Id*. at pp. 2-4. (Emphasis added).

Page **170** of 779

668.     Again, the enigmatic evolution of the Theory of Constraints is openly established and we see Dr. Low explains that the "**Thinking Processes**" may be used together or individually:

> "Although the tools of the **Theory of Constraints Thinking Processes were originally envisioned to be used as a complete set for <u>every</u> <u>problem</u>, experience has shown** that this is not necessary except for the most complicated and involved problem situations. **In most situations**, the **tools can be used in standalone or in combination fashion** as the needs of the specific situation require. For the situation in which an improvement program or other significant change is under consideration, the Intermediate Objective Map can be used as a constructive framework to overcome the resistance to change that would typically occur."

> *Id*. at p. 4. (Emphasis added).

669.     Finally, **Exhibit 252** provides another yet similar perspective of this pedagogy in the form of "Setting up the Group," and the necessary "invited" participants to facilitate such properly:

> "In order to overcome resistance to change using the Intermediate Objective Map, an **appropriate group of** people need to be involved in using the tool to address the specific problem, guided by a **facilitator who is experienced** in using the Theory of Constraints Thinking Process in this context. The members of the group who are **invited** to **participate** should have some direct involvement in dealing with the problem, and should include a cross-section of the organization in terms of different functions and departments who are affected by the problem. It is recommended that the **group include not only the decisionmakers** for those functions and departments, **but also several levels of responsibility, right down to the worker level**. This is **because** the workers can provide a **<u>perspective</u>** that may be entirely lost to the management level. It is best if the group includes the opinion leaders from the various groups. It is **essential** that the **participants volunteer** to come and participate **with** an **open mind**, and that those who are hostile or do not have an open mind are kept away. **No** one, especially someone with a **closed m**ind, should ever be "sent" to participate in such a session."

> *Id*. at p. 4. (Emphasis added).

*670.*   Distinctively moving onto PowerPoint **Exhibit 253** though addressing the same fundamental content as **Exhibit 252** in a different medium, Dr. Low identifies on the first page:



**Exhibit 253**, at p. 1.

*671.*   Next, Dr. Low again superficially lists what are identified as the "Nine Layers of Resistance to Change," but then dismisses the lot immediately where "***experience has shown***" as these are simply statements made from Dr. Low's experience tailored to teaching courses. *Id.* at pp. 2-4.

*672.*   This presentation by Defendant, Dr. James T. Low, briefly outlines importantly the "Role of the Facilitator," although completely eliminating the "Ground Rules" section for conducting this type of identified-group *idea* session, *i.e.*, research. *See*, *Id.* at p. 4. (Emphasis added).

*673.*   Continuing, Dr. Low provides an overview of the Theory of Constraints "**Thinking Processes**" that are "based on cause-effect logic," and "**can be used either as <u>stand</u>-<u>alone</u> tools**…**or** in <u>combination</u> as needed." *Id.* at p. 4. (Emphasis added). Specifically, Dr. Low names and outlines all five (*5*) of the "**Thinking Processes**" and gives examples of each associative logic map for each thinking process.

*674.*    The Defendants "[*VERY*] Ambitious Goal" phraseology appears for the first time where Dr. Low opines that "when someone suggests a **very ambitious goal**, the obstacles raised seem insurmountable." *Id*. at p. 6. (Emphasis added).

*675.*    Again, favoring the Intermediate Objective Map, Dr. Low establishes that the "**more fundamental**" the logic "**the better**" the application. See, *Id*. at p. 8. (Emphasis added).

*676.*    One example used in this PowerPoint is a "Live Hands-on Example, where Dr. Low chose a **STUDENTS**' compelled educational speech gained from a "Breakthrough Solutions problem solving course **at Wayne State** University in Detroit:" *Id*. at p. 16.

# <u>WAYNE STATE UNIVERSITY IMC:</u> 2004

*677.*    Sometime in and around 2004, **Exhibit 254** was added as a vertex to the Defendants' IMC with authority by the Defendants' Human Resources Department recognizing the milestone accomplishment of Dr. Low's thirty (**30**) **years** of loyal dedication to the "research enterprise."

*678.*    Doing the math, Dr. Low began his work with the Defendants sometime in and around 1974 judging by this formal recognition of merit communicated by the Defendants' organization.

| 2004 | 30 | James Low | School of Business Admin | Marketing |
|------|----|-----------|-------------------------|-----------|

*679.*    Sometime in and around 2004, **Exhibit 255** and **Exhibit 256** were added as vertices to the Defendants' IMC with authority by Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs for review.

*680.*    Interestingly, a similar pattern arises out of the content and context of the communications contained in Dr. Low's 2003 APICS presentations in **Exhibit 250**, **Exhibit 252,** and **Exhibit 253**. Simply, in segments: (*1*) the introduction and headlining topic is discussed; (*2*) then a very complex example is provided; and (*3*) concluded by a sales pitch on the benefits of conducting— **group-problem-solving sessions—**guided only by an "**expert**" Theory of Constraints facilitator.

In a way, these two (2) APICS presentations are sales pitches for group consultancy contracts a potential effect of Dr. Low's presentation.

**681.** In 2003 Dr. Low was discussing overcoming resistance to change by using the Theory of Constraints, where in 2004 Dr. Low has now shifted to discussing "[u]sing Theory of Constraints Accounting in Plan Production and Marketing Strategies." **Exhibit 255**; **Exhibit 256**.

**682.** Looking at **Exhibit 255** first, this is the second and most in depth version of what Dr. Low calls "Theory of Constraints Accounting" and "Throughput Accounting" explaining:

> "Throughput Accounting uses the principles of the Theory of Constraints, developed by Dr. Eliyahu M. Goldratt, in order to account for **measuring the operations of an organization in a meaningful way**….**Only total variable expenses that vary directly with changes in production volume are subtracted from sales** revenue to calculate contribution margin…The **constraint** that holds back the system from achieving its goal to make more money is identified…The major difference is that Throughput Accounting **concentrates on the overall results for the organization** as **limited by its constraints**, while cost allocation methods such as conventional costing (Activity-Based Costing) concentrate on the measurement of individual operations and individual products, with the hope that the overall system will benefit."

> *Id*. at p. 2. (Emphasis added).

**683.** This echo of Dr. Goldratt's targeting of GAAP is an interpretation that in large part is irrelevant substantively for *this* Complaint. It is relevant and important to identify that substantively the Plaintiffs and other **STUDENTS** were taught "Throughput Accounting" by the Defendants potentially as noise and/or as Protective Capacity. Both **Exhibit 255** and **Exhibit 256** are good examples of the substantive accumulation of the various developed threads of the Theory of Constraints, like "Throughput Accounting" as time passes and individual experience grew.

**684.** The corresponding PowerPoint in **Exhibit 256** is no different and is laid out strategically to induce further inquiry into the Defendants' sales funnel of intellectual connectivity:

*Id*. at pp. 1; 10-11.

# WAYNE STATE UNIVERSITY IMC: 2005

**685.**  On or about October 24th, 2005, **Exhibit 257** was added as a vertex to the Defendants' IMC with authority by the Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs for review.

**686.**  From **Exhibit 257** we see Dr. Low *again* here phishing for the sale having connected earlier in the day with *then* **General Motors'** Vice Chairman of Global Product Development; Wayne State University Department of Marketing School of Business Administration letterhead to firmly establish the legitimacy of the pitch.

687.    This letterhead alone encapsulates much of the arguments presented here in *this* Complaint where the content confirms the evolutionary connectivity of the Theory of Constraints and the Defendants' manipulation thereof:

> "**Your interview was excellent**. **I mentioned** to you **afterwards** that **you certainly can communicate your intuition**, so that it will be understood and accepted, even by hard-headed analysts who typically don't pay attention to anything without numbers. **I teach the BA7260 Breakthrough Solutions course**, which **teaches people how to do exactly that**. One of the **cause-effect logic tools** is a diagram called a Negative Branch, which shows the effects of a strategy or decision in a way that the results are inescapable. To show you how this works, I have taken the example you mentioned in your session, regarding the unsuccessful introduction of the rear steering option. I built a Negative Branch analysis, which is the diagram attached."

> *Id*. at p. 1. (Emphasis added).

688.    Even Dr. Low seeks to mute the skepticism opposite this unprovoked explanation of the Theory of Constraints by identifying *then* what I *now* desperately plead to you now—**_focus_**:

> "<u>**Before you dismiss this analysis**</u> as just stating the obvious, or **as much too detailed**, let me tell you what **I have learned from experience** with doing this. **Unless someone else sees the world from your point of view, with your knowledge and experience, they are <u>unlikely</u> to include all of the factors that you do**, in making a case for something. **They will not even recognize some of the factors that you know are important**. <u>**Therefore**</u>, if you tell them that Situation A results in Outcome N, they are likely to disagree or dismiss it. However, **if you show them**, **through** a <u>**cause**-**effect** **logic**</u> diagram **that Situation A results in B and C**, **which in turn have results D and E**, **which result in F, G, and H**, **and that the progression of these results does lead**, **one cause effect relationship at a time**, **to Outcome N**, <u>**you have them**</u>. More importantly, you have gotten their agreement by being able to **communicate your intuition in a way they will understand**. This **kind of analysis isn't hard to do**, and **doesn't take long**. Although I think you would find it useful to know how to **do it yourself**, **you could easily have someone prepare this kind of analysis for you**, **as you would with writing a speech**. <u>**I have developed**</u> *a way* **to present** this kind of analysis that is easy to follow, doesn't necessarily use diagrams, and **is *crystal clear* to an audience**."

> *Id*. at pp. 1-2. (Emphasis added).

**689.**   At this point, if you have made it this far—*thank you*—but do press on to understand in totality the cause-and-effect relationship of this monstrosity…*your* current reality relies upon it:

> "What I have sent you is a **small example of what is possible in using the cause-effect logic** tools. The tool for conflict resolution allows you to readily resolve problems that have stymied other attempts, and in some cases, **may have persisted for years**. The tool for overcoming resistance to change may be even more useful, since it sets an **ambitious goal and uses all of the obstacles to construct a road map to achieving the goal**, instead of letting the obstacles derail the process."

> *Id*. at p. 2. (Emphasis added).

**690.**   Sometime in and around 2005, **Exhibit 146** was added as a vertex to the Defendants' IMC with authority by the Defendants and more specifically Adriana Murillo.

**691.**   Specifically, **Exhibit 146** is an important look behind the Defendants' veil having been devised in 2003 GSC 7260 Breakthrough Solutions course through Dr. Low's substantive manipulation, or '*guidance*.'

**692.**   Without being redundant (see *this* Complaint **#189** *to* **#221**), the "TOC Thinking Process facilitate communication, collaboration," and is a "flexible, process-oriented model [that is] applicable to any level of instruction across institutional contexts." *Id*. at p. 23.

**693.**   Who is suspected to be Dr. Low, continuing, the author continues by explaining:

> "TOC, *the precursor to* the TOC Thinking Process, resulted from Goldratt…by acknowledging the existence of cause-effect-relationships that help us gain the knowledge necessary to solve a particular problem. **TOC is a relatively new concept in the business environment**. Most of the organizations that use TOC concepts initiated this process as a result of *The Goal* (Goldratt and Cox 1992), a business novel that introduces and exemplifies **the utility** and processes of TOC. Because *The Goal* uses a manufacturing company as the setting for the application of TOC tools, the theory has been used repeatedly to generate improvements in similar business settings, and have become exceedingly popular for improvements dealing with physical production constraints. Yet because **TOC has a <u>much</u> <u>broader</u> scope than its perceived** limitation to manufacturing contexts, Goldratt and Cox (1992) developed a generic approach for diagnosing and solving problems called the **TOC Thinking Process** (see also Gardiner, Blackstone, and Gardiner 1994).

> Goldratt and Cox (1992) argue that **TOC Thinking Process tools <u>are</u> applicable to** almost **<u>any</u> problem** in a given organization (e.g., manufacturing companies, **<u>universities</u>**, **hospitals**, service providers, and **<u>government agencies</u>**)."

> *Id*. at pp. 22-23. (Emphasis added).

**694.** Continuing, in a business context the "**Thinking Processes**" "demonstrate the **flexibility** of this model **to** address **diverse organizational problems**," and also in "the **business education context**, the TOC Thinking Process **has been used** in the classroom as a model for **sharpening** the problem-solving and analytical **skills of** marketing [**STUDENTS**]." *Id*. at p. 24. (Emphasis added).

**695.** Candidly, the Defendants frame this inherent-academic research on **STUDENTS** in a way that identifies "[<u>t</u>]<u>he</u> **<u>tools</u> <u>allow</u>** participants to analyze the relationships **between information and ideas** and to identify objectives, problems, and solutions. *Id*. at pp. 24-25. (Emphasis added).

**696.** One such tool is known as the Current Reality Tree, typically the starting place to diagnosis a problem facing the used. Typically, the process of creating a Current Reality Tree begins with a list of symptoms:

> "The process of creating a CRT begins with a list of symptoms, or **Undesirable Effects** (UDEs), describing the initial situation. The list of UDEs is developed using **<u>collective</u> <u>intelligence</u>**—*in other words*, **the experience and intuition of the individuals involved**. The basic goal of generating and analyzing this list of UDEs is to find a pattern of symptoms with a single common cause…tied together using cause-and-effect logic. By systematically identifying these relationships among the UDEs, a formal cause-and-effect map, or CRT, can be assembled…Circles clustering two statements in the map indicate that both factors are required for the indicated outcome to occur; the presence of only one of these factors is not sufficient."

> *Id*. at p. 26. (Emphasis added).

**697.** The Defendants' CRT establishes the true priority of this "Research Enterprise:"

> "…Area 3 (**Reward System**; Figure 8) is set up **reveals** that **faculty** members **have little incentive** to devote their time to the task of articulating the Spanish program and **improving** its curriculum. In

general, **this system gives <u>more</u> <u>priority</u> <u>to</u> research** and scholarship,
**and <u>less</u> <u>priority</u> <u>to</u> <u>teaching</u>** and service."

*Id*. at p. 33. (Emphasis added).

**698.**    In closing, "[t]his is particularly important…case of the WSU Spanish program in which previous attempts to address the problem of curriculum articulation were **<u>unsynchronized</u>**, **<u>isolated</u>** actions that **lacked** a clear, **strategic goal for the overall program**." *Id*. at p. 41. (Emphasis added).

**699.**    The proposed resolution as we remember is the "administrative" "communication channel" known as "CDC:"

> "The **CDC serves as a <u>communication</u> <u>channel</u>** for all issues that arise as a result of attempts to implement curriculum enhancements solutions and thereby improve articulation. Having a new **communication channel** has the potential to improve the existing curricular issues among faculty members…The action to solve this **need is to create a CDC to <u>moderate</u> <u>discussion</u> in such a manner that ideas are communicated clearly and disciplinary knowledge is shared effectively**…The **injection proposed** to break this conflict **was the introduction of a CDC to coordinate and facilitate all aspects of curriculum** development at the undergraduate level, **thereby <u>complementing</u> the existing <u>administrative</u> <u>structure</u>** of *the department*."

*Id*. at pp. 37; 38; 39. (Emphasis added).

# <u>WAYNE STATE UNIVERSITY IMC: 2009</u>

**700.**    Sometime in and around 2009, **Exhibit 258** was added as a vertex to the Defendants' IMC with authority by the Defendants' Human Resources Department recognizing the milestone accomplishment of Dr. Low's **RETIREMENT** after thirty-four (**34**) **years** of loyal dedication to the "research enterprise."

| 2009 Service Recognition Award Recipients RETIREES | | | | |
| --- | --- | --- | --- | --- |
| Low | James | T. | School of Business Admin | Marketing |

*701.*   On or about July 1, 2009, **Exhibit 259** was added as a vertex to the Defendants' IMC with authority by Defendant, Dr. James T. Low, and thereafter disseminated in 2020 to Plaintiffs.

*702.*   Specifically, **Exhibit 259** begins by explaining a fundamental pillar of the Theory of Constraints without highlighting the importance of ***effect—cause—effect*** logic:






*Id*. at pp. 1; 3-5.

*703.*   The importance of "***effect—cause—effect***" <u>logic</u> *in the form of* the Theory of Constraints "**Thinking Processes**" cannot be dismissed <u>or</u> misunderstood and in part allows the User to recreate visually through creation of a **Current Reality Tree** the alternative reality in which the framed problem and/or objective is situated.

*704.*  The joining of the Theory of Constraints' **focus** on "**Systems' Thinking Logic**" and objective factual *"effect—cause—effect"* logic illuminates the Defendants' orchestrated-alternative reality.

*705.*  The sequencing in the below example is focused on *a system,* that being the car. This example used by Dr. Low assumes the reader *understands* the system where the problem has arisen. **But**, what if the individual who has encountered this problem does not have the experience and/or *knowledge of the good* to understand that the core problem is the alternator belt? The User must either forge their own path and make the conscious decisions to remedy their obstacle individually *or* choose a lifeline and find someone to assist. Simply meaning, there may be a *deeper analysis* or alternative reality for a User who may take their car (the system) to AutoZone or a Dealership *for diagnosis*—the same could occur as if you are seeking legal advice, medical attention, *or* education on a subject of pursuit. The **_superior_** Users with experience and/or knowledge of the system have influence, and in some instances, credible persuasion over the submitting inexperienced and/or unknowledgeable User if *they control the system* itself. Regardless of the entity conducting the conscious reasoning to determine the core problem and/or how to achieve a "[*VERY*] Ambitious Goal," the use of "*effect—cause—effect*" logic from a **systems**' thinking perspective is the foundation of the Theory of Constraints.



*Id*. at p. 13.

*706.*   Dr. Low continues by explaining the simple process of building a **Current Reality Tree**:



*Id*. at pp. 14; 17; 22.

*707.*   Taking these very concepts and continuing *onward*, the Defendants' unjust advantage in the

form of "[*VERY*] Ambitious Goal" curriculum is on full display as Dr. Low "facilitated" a

"**Critical Chain Full Cycle**" as demonstrable evidence <u>this</u> intellectual trap <u>works</u> *as designed*.

*708.*   The following vertices of the Defendants' IMC were generated from what is suspected in

Spring/Summer 2007 during the **<u>BA 7260</u>** Breakthrough Solutions course. Specifically, the

following announcement was in part disseminated in 2020 to Plaintiffs (**Exhibit 260**) with **Exhibit**

**261** and **Exhibit 262** attached; *again,* note the absolute file path in **Exhibit 260** below.

## Attachments

- MTU_TognumNewsletter.pdf (https://canvas.wayne.edu/courses/128516/files/6117822/preview)
- Klisch&Jain&Low_MTUDetroitDiesel.pdf (https://canvas.wayne.edu/courses/128516/files/6117818/preview)

**709.** First and foremost, **the goal** or objective of the "**Critical Chain Application**" of the Theory of Constraints is to "***use these [STUDENTS] as bridges to companies***." *See again*, **Exhibit 42** at pp. 9-10. (Emphasis added).

**710.** *What I,* Plaintiff Cochrane*, call* the "**Critical Chain Full Cycle**" is the most desirable outcome of sequential entanglement between the collective Defendants, Dr. Low, Deborah Habel, and **STUDENTS** as depicted in **Exhibit 261** and **Exhibit 262**.

**711.** Also, importantly, **Exhibit 261** and **Exhibit 262** depict through explicit identification the following **STUDENT**: **A.J.**; Spring/Summer 2007 (*suspected*). First as depicted in the 2020 course announcement:

> "Attached is a .pdf file of the paper presented at the TOCICO (Theory of Constraints International Certification Organization) conference in Tacoma, Washington on June 6-9, 2009 regarding the MTU Detroit Diesel project as presented in class on August 12, 2009. **The paper provides much more detail** regarding the project than the newsletter article regarding the MTU Detroit Diesel project. **Note** that because **the newsletter article was heavily edited** by Tognum Group, the parent company in Freidrichshaven, Germany, **all references to details of the project, or any role by Dr. James Low were removed**. Nevertheless, the full **use of** the **Intermediate Objective Map and Transition Tree were central aspects of the project, as facilitated by Dr. Low**. Note, however that the article includes *a very nice picture* of Dr. Eli Goldratt together with Joerg Klisch and [STUDENT J.A.] of MTU Detroit Diesel, and Dr. James Low, at the TOCICO Conference in June, 2009."

> **Exhibit 260**. (Emphasis added).

**712.** Next, **Exhibit 261** was generated for the June 6-9, 2009, TOCICO Conference in Tacoma, Washington, and identifies in depth the "Critical Chain Application" from <u>start</u> to <u>finish</u> demonstrating the "Full Cycle," beginning with Dr. Low's updated biography:

> "Dr. James T. Low is an **Emeritus Professor** in the Marketing Department of the School of Business Administration **at Wayne State University in Detroit**. For the **last several years, he has taught BA7260**, **Theory of Constraints Breakthrough Solutions**, as **a regular M.B.A. elective course, as a full**

**equivalent of the TOC Jonah Course**. He has an *M.B.A.* in Marketing and *Operations Research* from the University of Michigan. Dr. Low earned his *Ph.D. in Marketing* at the University of Michigan. Dr. Low holds Certification in Production and Inventory Management (CPIM) from APICS. He is also the **first Marketing Ph.D. in the world** to become a Certified Jonah and Jonah's Jonah of the Avraham Y. Goldratt Institute. In the **last 10 years**, Dr. Low has spoken on Theory of Constraints topics at **over 80** conferences, dealing with applications in manufacturing, accounting, <u>operations research</u>, <u>problem solving</u>, and <u>organizational change</u>.

*Id*. at p. 60. (Emphasis added.)

*713.*   Thinking through the following closed system logically, MTU Detroit Diesel likely would not have been introduced to the Theory of Constraints had it not been for **STUDENT J.A.** who himself would not have "gave copies of *The Goal* to every Operations manager had he not taken **BA7260** in 2008 with Dr. Low. Therefore, it is argued in *this* Complaint and the example *here*, that the constraints are the **STUDENTS** in this system, and the Users (the Defendants) are affirmatively seeking to "**exploit**" these individual constraints to "**squeeze**" the most from each while broadcasting their conduct.

*714.*   Initially, the problems preventing the system (MTU Detroit Diesel) from achieving its' objective outlines similarities in Dr. Low's previous work up to this point:

"(1) **Employees** working **in silos** and **not able to see** the **overall picture**; (2) Hard work not resulting into visible improvements; (3) Too much firefighting and very little continuous improvement; (4) Large number of engines coming off the line missing parts; (5) Little standardization of tasks; **Lack of** structured problem-solving approach; and (6) **Lack of** learning to get better."

**Exhibit 261**, at p. 9. (Emphasis added.)

*715.*   To resolve these issues, "Joerg Klish, Operations Director for MTU Detroit Diesel, saw a way to use TOC to reach the goal of implementing improvements." *Id*. at p. 11. The timeline that follows depicts the Defendants' pseudo consultation derived only through its' **STUDENT**.

*716.*   Sometime on or about **January 18th, 2008**:

"Initial meeting with Joerg Klish, **STUDENT J.A.**, and James Low **of** Wayne State University."

*Id*. at p. 12. (Emphasis added).

*717.*   Sometime on or about **January 25, 2008**:

"Meeting with **all** Operations area managers; watch *The Goal* movie; Presentation on TOC production applications, IO MAP, Transition Tree."

*Id*. (Emphasis added).

*718.*   Sometime on or about **February 1, 2008**:

"Meeting with **all** MTU Detroit Diesel **employees** in their auditorium; Introduction by Joerg Klish; Watch *The Goal* movie; Presentation on TOC production applications, IO Map, Transition Tree; Questions and Answers; **Identification of the Ambitious Goal by** Joerg Klisch; Request each person to identify 2 roadblocks (obstacles) to reaching that goal, on 3x5 cards; **Everyone was asked** to identify two most important roadblock which prevent them from reaching the goal."

*Id*. at pp. 12-13. (Emphasis added).

*719.*   Sometime on or about **February 15, 2008**:

"Joerg Klisch, **all** area **managers**, <u>and</u> James Low **met off-site** for a full day to develop the Intermediate Objectives and the structure of the IO Map; Overview of Intermediate Objective (IO) map and Transition Tree; **Review obstacles suggested by employees**; **Clarify** the **wording**, resolve **duplicates**, **remove** those **not applicable**; **Rank in terms of importance**; Used a spreadsheet projected on the wall for this; All area managers met off-site for a whole day to identify intermediate objectives and develop an intermediate objective map to reach the ambitious goal."

*Id*. at p. 17-18. (Emphasis added).

*720.*   The segmentation of the MTU employees and managers must be highlighted to understand that Mr. Klisch and "all area managers" represent the decision makers, or **Change Agents**, in *this* system; the system being discussed here was then a **Defense Contractor** with *nearly* **10%** of its' business being generated directly from the United States Government. *Id* at pp. 5-6.

*721.*   Sometime on or about **March 10, 2008**:

"**20** MTU Detroit Diesel **managers met off**-site for a half-day session on how to build steps in a Transition Tree; The **thrust of this meeting was to develop the managers as facilitators**, so that there would be a **cadre of experienced team leaders** in working with Transition

Trees; These **team leaders were preparing to each lead a team at a** following off-site **workshop** that would involve **all** MTU Detroit Diesel **employees**; The managers worked as an overall group on 3 specific Transition Tree modules, **facilitated by James Low**."

*Id*. at pp. 23-24. (Emphasis added).

*722.* Importantly, Dr. Low unequivocally identifies that "[t]he Transition Tree **turns** the IO Map **into an action plan with specific steps** to be carried out," which establishes further the "**Thinking Processes**'" cascading effect which allows the decision maker to make a more informed and thought-out decision. *Id*. at p. 23. (Emphasis added).

*723.* […] For Plaintiff, Attorney Cochrane, this journey emulates a personal *Via Dolorosa...*

"So **I exhort the elders** among you, **as a** fellow elder and a **witness of the sufferings** of Christ, **as well as a partaker in the glory that is going to be revealed**: <u>shepherd</u> **the** <u>flock</u> of God that is **among you, exercising oversight,**[a]nd not under compulsion, **but willingly**, as God would have you; [b]ut **not for** shameful **gain**, but eagerly; **not domineering over those in your charge, but being examples to the flock**. And **when the chief Shepherd appears, you will receive the unfading crown of glory**. Likewise, **you who are younger, be subject to the elders**. Clothe yourselves, all of you, with humility toward one another, for "God opposes the proud but gives grace to the humble."

**Humble yourselves**, therefore, under the mighty hand of God so that at the proper time he may exalt you, **casting all your anxieties on him**, because he cares for you. **Be sober** minded; **be watchful. Your adversary the devil prowls around like a roaring lion**, seeking someone to **devour**. <u>Resist</u> **him**, firm in your faith, **knowing that the** <u>same</u> <u>kinds</u> of <u>suffering</u> **are being experienced by your brotherhood** <u>throughout</u> **the** <u>world</u>. **And after you have suffered a little while**, the **God** of all grace, **who has called you to his eternal glory in Christ, will himself restore**, **confirm**, **strengthen**, <u>and</u> **establish you**. <u>To him</u> be the dominion **forever and ever**. <u>Amen</u>."

ESV, 1 Peter 5; 1-11. (Emphasis added).

*724.* Sometime on or about <u>April 11-12, 2008</u>:

"126 people from operations and other functional areas participated; 19 teams with 4-6 people per team worked on a total of 79 intermediate Objectives; the Transition Tree was developed for MTU to reach its ambitious goal."

*Id*. at p. 29.

*725.*    During this 2008 2-Day Workout, "[i]t became evident that there was a **need to coordinate the efforts** of the 79 teams: [1] to get them started; [2] to keep them moving; [3] to keep them motivated; [4] to avoid duplication of effort or working at cross-purposes; [5] to report on their progress for their task; [6] to find ways to reward them for their efforts." The injection, or the action chosen to resolve these issues above, revealed "**a coordinator for improvement efforts**" was necessary to assist in the facilitators of this "Full Cycle" "Critical Chain Application" of the Theory of Constraints. *Id*. at p. 29. (Emphasis added).

*726.*    Plainly, this "coordinator" plays a similar role to a CDC and Change Agent in that the initial role of Defendant, Mrs. Deborah Habel, during the 2020 Spring/Summer GSC 7260 and GSC 5670 Breakthrough Solutions courses. In addition, this "coordinator" position may also be considered a Drum-Rope-Buffer for improved-operational flow towards the common objective.

*727.*    In addition to learning the pitfalls of operation of a large group, again positive reinforcement was used to entice participation:

"The teams are presented an **appreciation** **award** **once** **they** **complete** their Transition Tree."



*Id*. at p. 34. (Emphasis added).

*728.*    The framework of the Theory of Constraints is supported greatly by "win-win solutions" for all stakeholders involved in an implementation. In MTU's case, there were several "lessons learned" and "accomplishments" discussed that likely have led to the Defendants' continuous improvement of these very techniques:

1. "Employees see the overall picture and how their work affects the GOAL;

2. Employee (sic) know their priorities;

3. Employees feel more valued as they are the ones who identified roadblocks, came up with solutions, and chose the transition tree they want to work on;

4. We tried to work on every roadblock all at once;

5. We did not evaluate the strategic importance of each roadblock;

6. We let people sign up for objectives they had little knowledge about; and

7. We did not have a good way to track the progress made as a whole."

*Id*. at pp. 41; 43.

***729.*** From an alternative perspective, MTU Detroit Diesel in **Exhibit 262** is seen marketing to highlight the recent innovation of their systems' upgrade by implementing the Theory of Constraints on a holistic scale; Dr. Low was not given direct credit as facilitator of this massive improvement effort. Instead, **STUDENT J.A.** received the bulk of the praise:

> "Since mid-2008, Jain has been committed – in cooperation with assembly operations manager Jörg Klisch – to the implementation of the principles pertaining to the Theory of Constraints…"

*Id*. at p. 1.

***730.*** Both "[**STUDENT J.A.**] and (sic) Klisch reported on their positive experiences gained within the implementation of the principles pertaining to the Theory of Constraints in the assembly line operations at a regional conference on this issue, hosted by the Theory of Constraints International Certification Organization [TOCICO] in Tacoma (Washington), an international audience of 150 participants representing 65 companies and ten nations." *Id*. at p. 2.

***731.*** The final linkage to the Defendants' overall IMC and simultaneously to Dr. Low's individual IMC—comes in the form of a photo taken some time in and around this early 2008 TOCICO Conference in Tacoma depicting who is **STUDENT J.A.**, Mr. Klisch, Dr. James T. Low, *and* Dr. Eliyahu M. Goldratt:



*Jörg Klisch and Anshum Jain at the conference with Dr. Eli Goldrat, who invented the theory of constraints and Dr. James Low (from left) from Wayne State University.*

*Id*. at p. 3. (Emphasis added).

*732.* Fundamentally, the effect of this stochastic-empirical research conducted by Dr. Low adds positive "**Throughput**" to these *ideas* and only through the connection with the Defendants' **STUDENTS** does **Exhibit 260**; **Exhibit 261**; and **Exhibit 262** arise therefrom **and** in the least unequivocally demonstrates:

(1) "the Model" and system of processes as deployed by the Defendants is an operational multi-tool with research capabilities designed to enrich the User;

(2) a definite and empirical process of research exists inherent within this "[*VERY*] Ambitious Goal" curriculum given that the "**Thinking Processes**" builds a cumulative analysis based upon the Users' knowledge and experience as *they* progress through each logic process using "**Effect-Cause-Effect Logic**;"

(3) "the Model" is designed to connect the educator with the **STUDENTS**' business, and the results are enhanced when the business seeks the consultancy of the educator and educational institution—this is a "**Full Cycle**" where the critical chain is developed as a future value stream of the intellectual-supply chain. This process was designed by the Defendants to achieve this exact objective

without truly marketing these capabilities to provide the proper informed consent for this forced merger;

(4) this PowerPoint is proof of the **ultimate success** the Defendants' process may achieve where the individuals involved all have an "open mind" and accept the consultancy of the relative educator who has "*used* [**STUDENTS**] *as bridges to companies.*" Here, Dr. Low was a Champion and instilled the value in this process delivering a successful result for largely everyone involved. This success was not accomplished through writing, but physically in reality, and therefore deserved proper praise as evident in the marketing of the successes at the TOCICO International Conference and through MTU's own affiliate marketing publication even despite the scraped explicit praise. **Importantly**, Dr. John Taylor has established similar "Full Cycle" Critical Chain connections with GM and other businesses, for example specifically staging International Competitions and conferences to build value for those brands involved. See, **Exhibit 97**, at p. 22.

*733.* We make two keen and relevant observations regarding the Defendants' "research enterprise" during 2009, the first is **Exhibit 263** involving an Associate Professor terminated for unauthorized use of a grant-procurement card in a matter before the Eastern District of Michigan. Specifically, in making initial attempts and offers like "pay[ing] whatever was necessary to resolve the situation" the **focus** to settle this issue was still on—*yup*—**research**:

"**E.    Walter J. Piszczatowski's Communication with Lessem and Dr. Oliver**

Dr. Zamorano's criminal defense attorney, Walter J. Piszczatowski, asked Lessem for a meeting in November 2004 to **discuss options other than prosecuting** Dr. Zamorano. During the meeting, Piszczatowksi **talked about** Dr. Zamorano's **credentials** and **her passion for research**. Piszczatowksi says he did not have an opportunity at the meeting to explain Dr. Zamorano's position on the charges.

Following Piszczatowski's meeting with Lessem, Dr. Zamorano attended a meeting with Piszczatowksi, Lessem, and Dr. Oliver. Based on Piszczatowksi's advice and Lessem's warning that her statements could be used against her in a criminal proceeding, Dr. Zamorano did not speak at

the meeting. **Lessem refused** Piszczatowksi's request for protection under **Michigan Rules of Evidence 408** which says: Evidence of:

(1) furnishing or offering or promising to furnish, or

(2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Piszczatowksi presented a chart of the charges he believed were grant related and told Lessem that Dr. Zamorano would pay whatever was necessary to resolve the situation. Dr. Zamorano says neither Lessem nor Dr. Oliver wanted to discuss the situation or listen to Piszczatowksi."

2:07-cv-12943-VAR-MJH  Doc# 115  Filed 01/30/09  Pg 5 of 29  Pg ID 4464 (Emphasis added)

*734.* Finally, on or about June 2, 2009, **Exhibit 264** was added as **negative "Throughput"** to the Defendants' IMC in the form of the Michigan Court of Appeals case known as ***Chen v. Wayne State University***, a consolidated appeal dismissed and affirmed with the background:

"This case has its origins in the **progression of** Chen's **career at the University over a period of more than 25 years**. Chen is a citizen of the United States, but was born in China and speaks English with a Chinese accent. The University hired Chen as an associate professor for its department of biological sciences in 1968. Chen's field of study is genetics. He became a tenured associate professor in 1971."

*Chen v. Wayne State Univ.*, 284 Mich App. 172, 175; 771 N.W.2d 820 (2009). (Emphasis added).
*735.* Specifically, this decision in *Chen* identifies crumbs of information relevant to our fact pattern and otherwise, based upon information and belief, involves explicitly the early career development of Defendant, Dr. John Taylor, and the historic bloodlust for research present:

"Chen apparently did not have any serious difficulties at the University until after Dr. Albert Siegel became the department's chairperson in 1972. **Dr. John Taylor**, who **joined the department's faculty in the same year as Chen** [1968], testified that Chen apparently did not like Siegel. Taylor said that Siegel treated Chen as though he were a "pseudo molecular biologist" and believed that Chen's courses were "out-of-date or just plain wrong." **Indeed**, **Taylor stated** that Siegel and some other faculty

members had their graduate students leave Chen's courses. **In a memo written** some years after Siegel's chairmanship, **Taylor stated** that Siegel tried to "**change** [**Chen**], then **isolated** him and then gave up." **Siegel testified that the problems he had with Chen were related to Chen's ability to get things done on his own**. Siegel explained that other **professors** who had inadequate space worked hard at improving their space, "**got their research programs well funded and started right in working and attracting graduate students and did the best they could under the circumstances**." Siegel stated that the problem with Chen was that he "**was not of that nature. He didn't try to help himself**."

Chen testified at his deposition that Taylor was apparently jealous of Chen's achievements and status and alleged that Taylor used his position to impede Chen's efforts at the University. Specifically, Chen noted that Taylor was apparently bothered by the fact that the University hired Chen as an associate professor whereas the University hired Taylor as an assistant professor. Although Chen started as an associate professor, **Taylor eventually surpassed Chen and became a full professor**. In addition, **in 1974, Taylor replaced Siegel as the department's chairperson**."

*Id*. at pp. 176-177. (Emphasis added.)

**736.**    Continuing, we learn from the prior testimony of the Defendants' past President, Dr. David

Adamany, further details regarding Defendant, Dr. John Taylor's, own thirst for research:

"**Dr. David Adamany**, who **was the University's president, testified that Taylor was a productive researcher and that he was appointed to chair the department in an effort to strengthen the department's research program**. Adamany stated that **faculty members who were not active researchers resisted Taylor's efforts. He stated that the relations between Taylor and those faculty members eventually deteriorated to the point that the department was no longer able to make progress on improving research**. Dr. Robert Arking testified that he was a full professor in the department and that he had served on various committees. He stated that Taylor had favorites on the faculty and that Chen was not one of them. **Arking said that the faculty committee eventually asked Taylor to step down as chairperson because of issues with** hiring, the budget, and **faculty relations**."

*Id*. at p. 178. (Emphasis added.)

**737.**    *Interestingly thirsty*, another prior agent of the Defendants puts it this way:

"**Dr. Stanley Gangwere** replaced Siegel as the department's **chairperson later in 1987**. **Gangwere testified that Taylor was a**

> **controversial chairperson** <u>and</u>, for that reason, **he tried to** "**separate**" himself "<u>from any association</u>" with <u>Taylor's policies</u>."

*Id*. at p. 179. (Emphasis added).

**738.** Despite other attributes, we have seen even up to this point *how* the Defendants treat underperforming or non-active researchers not "pulling [their] weight" and thus have been consistent and if not grown exponentially in the drive for productive research:

> "In **July 1994**, **Dr. Jack Lilien** replaced Smith **as the chairperson**… **Lilien testified** that when **he was hired** as chairperson of the department **he was told to refocus the mission of the department on research <u>and</u> the procurement of extramural funding**. To that end, Lilien stated that **he intended to eliminate the department lecturers to <u>free</u> positions <u>for</u> tenure-track <u>faculty</u> <u>who</u> <u>would</u> <u>perform</u> <u>research</u>**. <u>Lilien stated</u> that he <u>also</u> **evaluated the faculty and assessed whether each member was an <u>active</u> researcher**. Lilien stated that Chen appeared to have ceased being a productive researcher in 1980."

*Id*. at p. 182. (Emphasis added).

**739.** Finally, it is relevant and illuminating to identify the acquiescence and connectivity thereof to the "Chinese Mafia" as Defendant, Dr. John Taylor, testifies:

> "Chen also testified that Taylor was biased against him because of his Chinese national origin, which was shown by the fact that Taylor referred to him as being "Chinese Mafia." **Taylor admitted** that **he had used the phrase "Chinese Mafia**," but said that he did not direct it at Chen. **Taylor explained that Chen had asked him for assistance in a business matter involving his brother-in-law, who lived in Taiwan. Taylor stated** that **he referred Chen to a friend who was Chinese for help** with the business matter. **Taylor said that his friend called him and indicated that Taylor and Chen might want to avoid dealings with Chen's brother-in-law**. **After that**, Taylor stated that **he would use the phrase "Chinese Mafia" in connection with discussions concerning Chen's brother-in-law**."

*Id*. at p. 177. (Emphasis added).

**740.** Moreover, the testimony of a "staff person" raised more suspicion of tolerance and gives below an example of a form of *cover* through non-electronic communication. Furthermore, this communication would be on par with another example where a User gives the Login/Password to

a Dump-Email Account that is a receptacle for certain material of focus; i.e., homework, forwarded emails, and other intellectual property that travels through email correspondences:

> "In March 1996, Lilien sent out two memos notifying the faculty, staff, and graduate students that the second and third floors of the natural sciences building would soon be renovated. The notice indicated that all personal belongings had to be removed from these floors or they would be discarded. Chen indicated that he never received these memos. **Chen admitted that he does not like computers and that he does not use e-mail**. Chen also stated that he has had trouble receiving regular campus mail. **A staff person testified that, because Chen and one other professor refused to use e-mail, she made hard copies of all memos and placed the memos into the professors' mailboxes**."

> *Id*. at pp. 184-185. (Emphasis added).

# **WAYNE STATE UNIVERSITY IMC: 2010**

*741.*   Exactly on January 30th, 2010, at 11:44 AM, **Exhibit 265** was added as a vertex to the Defendants' IMC with authority by *then* President of Wayne State University, Jay Noren, M.D., as a pseudo state of the union and vocalization of the need to coordinate-open communication.

*742.*   Specifically, **Exhibit 265** gives an updated snapshot of the Defendants' **feeble position** from a systems standpoint in and around *this* time, economically, where we still as a Nation were recovering from the 2007—2009 Great Recession and the 2007—2008 Global Financial Crisis both sparked largely from predatory lending, bundling of subprime-mortgages, and the collapse and correction of the United States' housing market as a direct result of the root cause: *greed*.

*743.*   Simply, at this time in the United States, and particularly the individual States themselves did not apportion *as much* money to State educational institutions as they would in more prosperous times. Here, the Defendants, Wayne State University being a State Institutional of Higher Education, their annual budget is based largely in part upon the State's constitutionally required apportionments to fund the State's pedagogical mission. We see here in 2010, the Defendants' deep concerns:

> "We will be faced with **many difficult decisions** in the upcoming months as we learn more about the **state's budgeting outlook for 2011**. <u>We will be guided</u> in these decision <u>by the overarching principle of</u> preserving the core educational and <u>research</u> missions of the University that have been entrusted to us, and <u>which form the essential nature of Wayne State University</u>. Budgeting by definition is often an exercise in compromise, but we cannot compromise on this principle as <u>we are committed to maintaining our status</u> as a premier research university."

**Exhibit 265** (Emphasis added).

744.    Continuing, *then* President of Wayne State University reminds his Change Agents that *it is not the short-term mission <u>but for the long term</u> they <u>are</u> in* true <u>control</u> of:

> "At this time, we do not know the specific impact of the budget on *our* appropriations, but we feel we must <u>resist</u> the **temptation** to take **a short term view** of this situation and <u>instead focus</u> **on** a **longer term**, **strategic approach** that will allow us to both weather this economic storm <u>and</u> lay a foundation for a stable future. This will not be east, but most things worth doing are hard. **If we are to control our** *destiny*—and I am confident that we will—**we must <u>rise to this challenge</u> rather than shrink from it**."

**Exhibit 265** (Emphasis added).

745.    These words by *then* President of Wayne State University resonate as a battle cry galvanizing his troops for the long-term missions ahead as they weather an economic storm with a strategic *<u>focus</u> on* maintaining <u>status</u> but only for the root cause of—*research*.

746.    This positioning holistically by the Defendants' entity is much in the same as that which was staged in Dr. Eliyahu Goldratt's 1999 *demonstrative* novel, *Critical Chain*, involving an economically challenged business school *on the brink* of either success *or* failure, *destiny* it seems was in their hands too—the Theory of Constraints seems to help fictitiously *there* as it has materially *here*.

747.     Primarily, **Exhibit 265** identifies the in-depth manner in which the Defendants'

organization holistically "**continues to leverage** [their] existing **communications** forums," and

uses this system-thinking network of CDCs and Change Agents to make real-time decisions:

"Times of uncertainty, like those we face today, sometimes give rise to speculation that is based more on emotion than information. While this may be understandable, it is often counterproductive and sometimes harmful. **To ensure the most accurate and current information is shared among faculty**, staff and administration, **it is essential that we communicate openly and regularly. To facilitate this, we will continue** to leverage **our existing communications** forums, to which **we have added** a number of **additional opportunity for dialog and input**. **We also plan to** institute new opportunity to **share** information broadly and transparently. **I will continue to be personally involved** in many of the forums in order to assure that we receive input and feedback directly. **I strongly encourage all** participants **to engage openly and provide** the **frank and thoughtful** input **necessary to not only** address **current challenges but** to help **decide our future strategy**. Among **the communications forums designed** to encourage dialog among faculty, staff and administration **are**:

- Monthly Academic Senate meetings, co-chaired by the president of the Academic Senate and the provost: The Academic Senate provides **a regular pipeline of information** and advice. I will continue to be present for an open dialog session for the first 15 minutes of each meeting (or longer if requested);

- **Monthly meetings** of the **Policy Committee** of the Academic Senate, where I will also attend for the first 15 minutes of open dialog;

- Attendance at all Academic Senate Policy Committee meetings by the budget work group of the Cabinet (Provost, Vice President for Research, Vice President for Finance and Facilities, and Associate Vice President for Budget);

- **Monthly attendance** at regular meeting of the President's Cabinet by the President and Vice President of the Academic Senate;

- Newly formed **junior and senior faculty committees** to advise the president and supplement the Faculty Senate committees;

- **Weekly Council of Deans** meetings, chaired by the provost, with **presidential attendance periodically**;

- **Ongoing Strategic Directions** campus open forums: **Several of these forums** were held prior to the holiday break. Based on the input received, the content of the initial considerations is currently being revised. Each forum began with a presidential overview, and open input is encouraged both in the forums and on the Strategic Directions Web site (also being updated);

- **Budget meetings**: In preparation for the FY 2010 budget, regular and open budget meetings were convened to solicit broad input on budget formulation. This process will be implemented for FY11 and future budget planning, with participation from the Board of Governors, the president, students, faculty and staff;

- Faculty forums: **Open discussions** between the president and the faculty of each school and college;

- **Ongoing dialog** with WSU's Student Council: These meetings have been very useful in helping us understand student issues and concerns, and we plan to increase their regularity and frequency;

- University task force committees to analyze and provide recommendations on key strategic issues: Committee membership is variable depending on the topic, but includes representatives from students, faculty, staff and administration. In most cases, the president of the Faculty Senate is asked to provide recommendations for faculty representation. Among the task forces are:
  - Student Success Task Force
  - Code of Ethics Committee
  - Task Force on Online Instruction
  - Research Incentive Task Force
  - LEADS Task Force
  - Strategic Planning Budget Committee
  - Strategic Directions Task Forces:
    - Teaching and Learning
    - Research
    - Campus Life
    - Urban Engagement
    - Resources
    - Enrollment
    - Infrastructure

- Presidential communication: In addition to the formal scheduled communications forums and e-mail updates as appropriate, I will be increasing the content of the presidential Web site and hosting

a presidential blog – http://president.wayne.edu/blog - to provide updates on current issues and feedback on input received. The blog will launch the first week of February 2010.

**Open and ongoing communication will be a critical component in helping us meet our current challenges and map our future**, and we are fully committed to making campus leadership available to engage in thoughtful and productive dialog. Considering the array of issues, challenges and opportunities, I fully expect this dialog to be deep and passionate. **I encourage you to avail yourselves of the many communications opportunities so you may take an active role in shaping our future direction**. Please feel free as well to contact me at pres...@wayne.edu, members of the Cabinet (listed below), or members of the Faculty Senate/ Policy Committee of the Academic Senate at http://sun.science.wayne.edu/~senate/.

**Thank you for _your_ participation**."

**Exhibit 265** (Emphasis added).

**_748._**   At _any_ of these meetings…was the Theory of Constraints discussed? Were the Plaintiffs' as former **STUDENTS'** educational records discussed as **void** "academic **research**" and/or used for strategic benefit to any of the Defendants individually and institution holistically? Those truly are the questions I seek to answer _at this stage_ in space and time as I finalize _this_ Complaint **now** on February 14th, 2023; otherwise, this **unjust** _loophole_ **continues**.

**_749._**   Next, sometime in and around the Summer of 2010, **Exhibit 143** was added as a vertex to the Defendants' IMC with authority by three (3) actors including principally Defendant, Dr. James T. Low, and the former and _then_ staffer of Western Washington University, Mrs. Audrey Taylor— including too most importantly again former **STUDENT R.S.**

**_750._**   Importantly, **Exhibit 143** is not being presented for unnecessary accumulation, instead _here_ to expound on the historic-chronological-continuous improvement by the Defendants, individually and holistically, and too the Theory of Constraints as time continues _into infinity_ with the _enticing_ forward:

"**One idea had the potential** to significantly and positively affect the profitability, and even the well-being, of a major automaker. **That opportunity was not taken**, however, and competitors made the most of the situation instead. **Most organizations do not have an effective channel to evaluate** and **make use of opportunities that are developed from within** on an unprompted basis. **The authors suggest a framework that would enable organizations to take advantage of such situations rather than missing opportunities in the future.** Although this case study deals with the auto industry, **the implications** should be **applicable to** a great **many** for-profit and nonprofit **organizations across a wide variety of industries**."

**Exhibit 143**, p. 10. (Emphasis added).

*751.*     *Here*, relative to **Exhibit 143** we review **two**-distinguishable **topics** that set the stage for *(1)* further improvement of the Defendants' "model" and "system" to generate value from available capacity in the form of intellectual property as a result of this holistically-designed process, and *(2)* respectfully, we witness through the evidence presented a former **STUDENT R.S.**, used by the Defendants as a **human-research subject** establishing the Defendants' early on **failed** Critical Chain Full Cycle that took over ten *(10)* years to fully materialize.

*752.*     To begin, **Exhibit 143** presents the important and relevant overlay-of-reality in which the actors involved *were then* operating, explaining in full:

"**Recent events** in the automotive industry have overturned what had seemed to be a relatively predictable set of circumstances. The original U.S. "**Big Three**" automakers General Motors, Ford, and Chrysler—had a **combined market share** of **90.6%** of the **U.S. automobile market** in **1965**. After that, there was an up-and-down decline in their market share to only **70%** of the **U.S. market** by **1997**. From **1997 to 2009**, the **Big Three** have had a steady and relatively steep loss in their combined **market share** to **only 43.7%** (see Figure 1).[1]

**During this entire time**, **Chrysler was always in third place** among what has **now** become **known as** the "**Detroit Three**," although it had experienced previous triumphs with some unique product offerings such as the Caravan, the Viper, the Prowler, and the Jeep lines. The **economic recession in 2008 and 2009 caused** a **steep drop in auto sales** for nearly **all automakers**, with the result that **both GM and Chrysler** were forced to **declare bankruptcy in 2009**. Chrysler appeared to have suffered the most from these circumstances, and on January 5, 2010, The Wall Street Journal e-mail update reported that, "Chrysler posted a 3.7% decline and said its full-year sales were the worst the automaker had seen in 47 years."

**In 2001**, DaimlerChrysler (DMC) **faced some difficult choices**. Its Jeep Grand Cherokee had sold very well in the late 1990s but had started to lose market share to new competitor versions of the rugged all-terrain vehicle. Production had reached a crescendo in 1999 and then started a steady and steep decline through the time period from 2000 to 2010.[3] **In late 2001, Dieter Zetsche**, **the president of DMC**, was **interviewed by Ward's AutoWorld about his projections for the future of the company**. **He stated that DMC was searching for synergies for future product development to counteract the $70 billion drop in its worth after the merger between Daimler Benz and Chrysler**.[4]

**It was in this environment <u>in 2001</u> that** one coauthor [**STUDENT R.S.**] **<u>proposed</u> the** following **<u>project</u>** that could utilize existing unused capacity within DaimlerChrysler to produce a highly profitable new vehicle and to open a new international market for the company. **This is the story of an opportunity lost**."

753.  *At this time*, again, the authors individually were positioned as follows:

"*James T. Low, Ph.D., is emeritus professor at Wayne State University in Detroit. He can be reached at: James_Low@wayne.edu.*

*Audrey Taylor, Ph.D., is an associate professor of accounting at Western Washington University and an IMA Member-at-Large. She can be reached at Audrey.Taylor@wwu.edu.*

[**STUDENT R.S.**] *is the head of business development and solution deployment with...*

**<u>Two</u>** of the **<u>authors</u>** were **<u>personally</u> <u>instructed</u>** in the Theory of Constraints Thinking Process Tools **by Dr. Eliyahu Goldratt** at the Jonah Course offered to academics. **<u>James</u> <u>Low</u> <u>attended</u>** the Jonah Course **with** the **<u>first</u> <u>group</u> <u>of</u> <u>six</u> <u>academics</u> <u>in</u> 1989**. **Audrey Taylor attended** the **first Jonah Course <u>dedicated</u> <u>to</u> academics in 1991**."

**Exhibit 143**, at p 28. (Emphasis added).

754.  Relevant for the record too since having come down *this* road, the Plaintiff, Bradley E. Cochrane, <u>as a child would fear</u> his father would lose his job having begun working at Chrysler in 1994. *I* know about **Cobra** and *who* **Marvin** is—Chrysler's Michigan Sterling Heights Stamping Plant Assembly Lines are truly in part why *this* Complaint is before your eyes and are *respectfully* due notice. For, <u>had it not been for</u> those blue-collar floors and the nearly thirty-years (*30*), my father, Scott Edward Cochrane, has now walked the same routine passing his opportunity unto his children furthering the opportunities they have—*this* Complaint **<u>would not be</u>**. And too,

another **STUDENT** you will meet later, **STUDENT D.B.**, he too has blue-collar roots tied to *now* Stellantis' Sterling Heights Stamping Plant.

***755.***     In totality, **Exhibit 143** is largely the story of then DiamlerChrysler rejecting a thoroughly planned opportunity for a Global investment in the face of Bankruptcy ***that in the end*** becomes the story of **STUDENT R.S.**'s Theory of Constraints' journey presented here through the Defendants' marketing and corroborating evidence such as the LinkedIn Profile Data below.

***756.***     *Simply*, it appears from the evidence provided that **STUDENT R.S.** attended Wayne State University sometimes in and around 1996 to 2000, and more specifically was Dr. Low's **STUDENT** in which he was elevated through instruction to the intellectual level of **Wayne State University Jonah** and thereafter received a certificate for successful completion of the Defendants' Theory of Constraints course.

 

***757.***     Moreover, the routine Spring/Summer placement of the Defendants' Theory of Constraints courses suggests the work for this project by **STUDENT R.S.** began in early 2000 at the time he was a **STUDENT** close to graduation at Wayne State University while working at *then* DiamlerChrysler as an engineer and manager. **Exhibit 143**, at p. 10. The trio identifies the framing of *the need*:

> "In **2001**, [**STUDENT R.S.**], an **engineer and** a **manager at DaimlerChrysler**, **noted** the burgeoning **market in India for** family **cars**. At that time, although Mercedes-Benz had product offerings and a dealer network in India, **DaimlerChrysler had almost no presence in that market**. <u>**Because of his background, his position, and his experience**</u>, [**STUDENT R.S.**] <u>**saw an opportunity in <i>this</i>**</u>. A native of India, he had the advantage of living there up

through his undergraduate college years and then working for Chrysler in its extensive road testing of new vehicles throughout India and several other countries prior to working as an engineer for Chrysler in the United States. **On his own initiative and during his own personal time**, [**STUDENT R.S.**] **developed** a **production**, **marketing**, **financial**, **and distribution strategy for a new vehicle that could be produced by DaimlerChrysler to meet the needs of the market in India**…. Because of [**STUDENT R.S.**] **extensive knowledge** of the market in India, he knew that an adaptation of DaimlerChrysler's popular Jeep could serve this market well… **Once the plan was developed, all that would be needed was a plant in which to build the car**, **some minor changes in the design**, and, **most importantly**, **approval from the upper management at DMC to move ahead**."

*Id*. at pp. 12; 14. (Emphasis added).

**758.** The parallel you must take away from this highlight of hindsight is "most importantly" the "approval from…management…to move ahead," with implementation of ***ideas***—*here*, the Authors promote fluidity and continuity of ***ideas*** that allows the CDC's "[d]ata gathering" skills to prosper ***up*** through the chain-of-command for the benefit of the system holistically.

**759.** Next, in a section called "**DATA GATHERING**" the trio of authors identifies that the information used to develop the project was extracted by leveraging "background, training, and experience **together with his position in DaimlerChrysler**," *continuing in full*:

"**Because of his background, training**, and **experience, together with his position in** DaimlerChrysler **that allowed him to obtain data from** contacts **within the company**, [**STUDENT R.S.**] realized that a very suitable vehicle could be assembled from already-existing **components** that **were available** then **in DaimlerChrysler facilities throughout the world**…. **Marketing studies** to choose a name and marketing strategy for the vehicle **would not be needed because of the knowledge already available regarding the market** in India. The **name of the vehicle would be "Chanakya" after a hero in India's history**…. The **R&D needed to design the engine modifications** had an estimated cost of only $50,000 since **adaptation studies already existed**…. it could be made from selected components that were already being produced in DaimlerChrysler facilities…. stretched version of the Jeep Cherokee **body was readily available from facilities in China**. Turbo diesel engines were available as surplus from Brazil, and they easily could be adapted for use. Suspension components were available from the United States…. It is worth noting that the cost of tooling was considered negligible because

there was excess capacity at existing Chrysler plants…. The **surplus and already-paid-for engines could be shipped to China or India from the Detroit Diesel Plant in Brazil**. The **cost of the body produced in China was estimated to be an amazingly low $500 per vehicle**. The **steel** was **produced** in **China** at a **lower-than-market cost**. In addition, the **labor cost to assemble the final vehicle was estimated at $0 because of excessive idle time for labor at the facility in China**….[*the hypothesis was*]… A successful launch of this vehicle would be an extraordinarily profitable venture and would provide Daimler-Chrysler with an ongoing entry into the previously untapped market in India."

**Exhibit 143**, at pp. 14-16. (Emphasis added).

*760.* Important here are the elements and tactics leveraged by [**STUDENT R.S.**] to "obtain data" from "within the company," which is the crux of *this* Complaint against the Defendants.

*761.* One could also say that the techniques used by [**STUDENT R.S.**] were in the same manner a CDC "collect[s] information essential for departmental articulation efforts," or otherwise candidly is easily defined as **corporate espionage**.

*762.* Further, what is suspected as [**STUDENT R.S.**] "[*VERY*] Ambitious Goal" for "[t]he proposal for the Jeep Chanakya was presented to DaimlerChrysler management **about four times**, and **management expressed reservations each time** that details were missing or that an important consideration had not been addressed." *Id*. at p. 17.

*763.* Aside from (1) missing details, and (2) important considerations not addressed, the trio of Authors expressly added as the reasons for rejection:

> (3) cost concerns given that "DaimlerChrysler had just shifted to activity-based costing (ABC) in all of its plants;"

> (4) "[a]nother possible reason for management neglecting to implement this project might have been chaos. It is easy to ignore a new idea in the middle of a busy day;

> (5) Admittedly, [**STUDENT R.S.**] "did not push the idea vigorously;"

> (6) Admittedly, [**STUDENT R.S.**] "never asked why the idea had not been implemented;"

(7) At the time it was "alleged by Bill Vlasic and Bradley A. Stertz" that "former Chrysler President Robert Lutz (who left Chrysler in 1998 and is now at General Motors)" had an "aversion to investing in India;" *and*

(8) Admittedly, [**STUDENT R.S.**] "just took his ideas and his innovative spirit and started his own company," or another way left his company and "**went underground**" to use the Theory of Constraints as Dr. Goldratt has previously observed identified in **Exhibit 109**, at p. 5.

**Exhibit 143**, at p. 17.

*764.* The trio hypothesizes as we do here "[**w**]**ith perfect hindsight**:"

"**With perfect hindsight**, the impact of the market increase in vehicle sales in India from 2001 to 2007 can give us an idea of the lost profit. In 2001, the total number of cars sold in India was 601,132. By 2006, car sales had increased to 1,201,178 vehicles. That is an increase of 100%. Given the initial sales estimate of 10,000 vehicles for the proposed Jeep Chanakya, sales in 2006 would have increased to 20,000 units. If the sales price remained at $25,000, the revenue from the projected sales would have increased from $250 million in 2001 to about $500 million in 2006.10 Note that the projected revenue does not take into account the opportunity cost. The weakening economy and U.S. dollar in 2009 and 2010 make international sales much more attractive now than in 2001.

If the margins for the Jeep Chanakya stayed close to the projected 81%, then the sales in India could have added as much as $405 million contribution margin per year to Chrysler's coffers in 2006. The maximum potential cash flow if Chanakya sales of 10,000 vehicles in 2001 had increased in a steady progression to 20,000 vehicles in 2006, with the selling price maintained at $25,000 each, at a contribution margin of 81%, **the potential total contribution margin earned by Chrysler from the Chanakya project from 2001 to 2006 could have totaled $1.8225 billion dollars** (see Table 4), If sales leveled off, the cash flow would have continued, potentially **keeping Chrysler out of bankruptcy court**."

**Exhibit 143**, at pp. 17-18 (Emphasis added).

*765.* Instead of this alternative reality coming to fruition *then*, (1) [**STUDENT R.S.**] "resigned from DaimlerChrysler shortly after this project was rejected," *and* (2) on April 30, 2009, Chrysler and twenty-four (24) affiliated subsidiaries filed Chapter 11 Bankruptcy alongside GM seeking a **$25 Billion Dollar** bailout from Congress historically arriving individually by private jet.

*766.* The timeline suggests resignation from DiamlerChrysler occurred sometime after the 2005 Realization Customer Conference where **STUDENT R.S.**as representative of DaimlerChrysler recognized as "Implementation Lead" did give a sixteen (*16*) minute speech on the Theory of Constraints discussing this study.

*767.* And, *in the end*, **STUDENT J.A.**, *now* has a position for the vary company sparking so much thought in that being DaimlerChrysler working in the country of **STUDENT R.S.**'s idea.

*768.* Next, we move quickly into the second topic known commonly as "the model" or "system" as described by Defendant, Dr. James T. Low, and collectively the trio here dictate as follows:

> "In many businesses, **great ideas are developed**, sometimes from unexpected sources within the company. **Some of these ideas are propelled to the market with stories of profit and great success. Others disappear into the swamp of inattention that kills off innovation, not through malice but through neglect.** This represents one such great idea that ended up on the refuse heap. **Naturally the question** that must be addressed is **"Why?"** It **becomes clear** that **we need a mechanism** or **a process that lifts good ideas to the surface** rather than allowing them to sink to the bottom, never to be seen again. **We** will **propose a mechanism to make good ideas more accessible and** to **gain** the **attention of** the **decision makers** who are able **to implement** and fund **them**."

> **Exhibit 143**, at p. 11. (Emphasis added).

*769.* The mechanism the trio speaks of must be distinguished from **STUDENT R.S.** example where there physical material was piecemealed together to form a subsidiary dice-roll. Now conversely, Dr. Low suggests that **ideas alone**—the intellectual sparks of ingenuity and progression of Man—would be funneled through a process of sorting subjectively the 'good' and 'bad' and elevating those worthy **up** to the Decision Makers or "*higher*-level innovators." Identifying further the typical barriers of implementation of new ideas:

> "When brainstorming about the reason(s) for **management's reluctance** to take on this **new** and probably highly profitable **project**, several ideas emerged:

**1.** Lack of knowledge about where to submit the idea so that the <u>**higher**</u>-<u>**level**</u> <u>**innovators**</u> see the idea.

**2.** The innovator's fear of retribution by his or her immediate boss.

**3.** The <u>lack</u> <u>of</u> a <u>mechanism</u> <u>for</u> <u>gathering</u> <u>and</u> <u>reacting</u> <u>to</u> good <u>ideas</u> in a timely fashion.

**4.** The lack of respect for ideas that are proposed by lower-level employees.

**5.** Corporate <u>inability</u> <u>to</u> <u>see</u> <u>things</u> <u>from</u> <u>a</u> <u>holistic</u> <u>point</u> <u>of</u> <u>view</u>."

**Exhibit 143**, at p. 18. (Emphasis added).

*770.* **Focus**—analyze <u>your</u> perspective of these facts based on the subjective point of view you have at *this* moment—the depth at which this is necessary to see every vertex in the Defendants' web of injustice stated conversely themselves in 2010:

"<u>**Everybody**</u> <u>**has**</u> **a paradigm** (<u>**point**</u> <u>**of**</u> <u>**view**</u>) <u>**through**</u> <u>**which**</u> <u>**he**</u> **or** <u>**she**</u> <u>**sees**</u> <u>**the**</u> World (sic), <u>**and**</u> <u>**a**</u> <u>**factor**</u> **that is** <u>**outside**</u> <u>**the**</u> <u>**paradigm**</u> <u>**of**</u> <u>**the**</u> <u>**decision**</u> <u>maker</u> <u>**is**</u> almost always either <u>**not**</u> <u>**noticed**</u> or rated as unimportant."

**Exhibit 143**, at pp. 18-19. (Emphasis added).

*771.* **Perspective** is derived from the individual's **perception** of the subjective reality analyzed.

*772.* *Here*, Dr. Low and the intellectually subordinate duo propose that "[o]ur "**Big Hairy Audacious Goal**" (BHAG) is: **Good ideas are fairly evaluated and implemented in a timely manner giving the innovator full credit and reasonable reward**." *Id*. at p. 19. (Emphasis added).

*773.* Continuing, "[i]n order to create a plan to reach the target," the "team agrees to a Big Hairy Audacious Goal." *Id*.

*774.* It is here that "team" is undefined and thus may simply be identified as any group of two or more individuals working together—though again this works for individuals too. From here, the trio introduces a "Target Map" which is a compilation of the Thinking Process results after

formation of a Current Reality Tree, Intermediate Objective Map, and Future Reality Tree relative to your objective or framed here "Big Hairy Audacious Goal." *Id.*

775.    Continuing further, "while innovators are **pushing** good ideas **up** **the** **chain** **of** **command**, those good ideas will not be implemented," where the "**higher-level** innovators" are not encouraged to holistically engage, *although*:

> "At this point, *however*, **the need** for some metrics and/or action steps **may be questioned**. If those **actions and**/or **metrics do not flow from the cause-and-effect logic** in the [Future Reality Tree], they **should be removed**. It is **better to have a few metrics at the beginning of an implementation and only add additional metrics if the behaviors desired are not emerging**."

> *Id.* at p. 21. (Emphasis added).

776.    This is the perception of the subjective perspective to which this Complaint hinges in that "metrics" defined as terminology may be used to represent a form of analysis described here to bring about specifically **desired behavior** forcefully through corrective and coercive tactics. Or, put another way the **three-tiered grading** scheme used by the Defendants to establish compliance and then probe the alternative realities presented for relevant data.

777.    The primary *focus* of the chain-of-command is to derive gain and the Defendants' "*model*" presents next the socialistic dissection of a submitted ideas' ownership:

> "**By creating a system where ideas can be entered anonymously** but ownership is maintained through an electronic tag, innovators will be more likely to submit their ideas, and managers will be more **likely to evaluate the ideas** without prejudice. **If management rewards innovators through a portion of the profit earned or cost reduced**, then the submission of innovative ideas should increase. To ensure that the managers in the chain of command review and promote good ideas, **those analysts and managers encouraging good ideas also should get a portion of the profit produced or cost reduced**. **In order to calculate** the change in profit and/or cost, however, certain **new information is needed in the system**…"

> *Id.* at pp. 21-24. (Emphasis added).

778.    The Defendants' utopic usurping of intellectual property is expounded further *in full*:

"**The <u>end</u> <u>result</u>** of any improvement should be an increase in profit or a reduction in cost, so the **incremental effects of** each **project must be tracked**. Those with **positive results should yield <u>bonuses</u> to the innovators <u>and</u> <u>to</u> the analysts and managers promoting innovators <u>in</u> <u>their</u> <u>ranks</u>. <u>It</u> <u>is</u> <u>hoped</u> <u>that</u> <u>this</u> <u>bonus</u> <u>will</u> <u>motivate</u> <u>managers</u> <u>to</u> <u>encourage</u> <u>innovators</u>** in their midst, **<u>doing</u> <u>what</u> <u>needs</u> <u>to</u> <u>be</u> <u>done</u> <u>to</u> <u>push</u> <u>their</u> <u>ideas</u> <u>through</u> <u>the</u> <u>system</u>**. Simultaneously, analysts will be more likely to take the time to separate high-profit potential projects from others if they get a portion of the net benefit to the company. **By <u>tracking</u> the amount of current resource <u>information</u> <u>that</u> <u>is</u> <u>missing</u> <u>from</u> <u>the</u> <u>system</u> <u>and</u> <u>tracking</u> <u>that</u> <u>missing</u> <u>information</u> <u>to</u> <u>the</u> <u>person</u> <u>responsible</u>, such information should be made available in a timelier manner**. The accuracy of this information is safeguarded using the following steps:

1.  The **<u>innovator</u>** enters the costs and profits initially. **The innovator has more information about** local costs **and** a **greater understanding of the resources needed for** his or her **project**.

2.  The **<u>manager</u>** for the innovator **<u>reviews</u> the <u>initial</u> <u>submission</u> and <u>can</u> <u>identify</u> <u>false</u> <u>assumptions</u>** and numbers quickly, **based on familiarity with processes** in his or her area of control. Even though the submissions will be anonymous, the **initial review should be <u>sent</u> <u>to</u> the <u>decision</u>-<u>making</u> <u>manager</u> closest to the innovator**. The only exception to this rule is if the innovation requires **reviewer expertise that is not present in the innovator's immediate chain of command. In that instance, the reviewing manager should be one selected by the innovator**. The manager should have the resident skills to evaluate the proposal in the view of the innovator.

3.  Next, the cost analyst massages the numbers, testing them for completeness and accuracy. **As <u>all</u> <u>three</u> <u>persons</u> <u>in</u> <u>the</u> <u>information</u> <u>chain</u> <u>are</u> <u>vested</u> <u>in</u> the <u>success</u> of projects they review**, and since time is still limited, **unprofitable projects** would be **more likely to exit the system before too much time is spent evaluating them**. **<u>As</u> <u>soon</u> <u>as</u> the <u>project</u> is <u>deemed</u> to be <u>unprofitable</u>, <u>that</u> <u>message</u> would be <u>sent</u> <u>back</u> <u>to</u> the <u>innovator</u> with the cost analysis. <u>If</u> the <u>innovator</u> <u>disagrees</u>, he** or **she** <u>can</u> <u>do</u> the <u>groundwork</u> <u>to</u> <u>strengthen</u> the <u>argument</u> <u>and</u> <u>resubmit</u> <u>the</u> <u>idea</u>."

**Exhibit 143**, at pp. 24-26. (Emphasis added).

779.    This is by form and substance "[**VERY**] Ambitious Goal" curriculum as seen here in the vaguely proposed utopic system or "model" of centralized elevation of the **socialism of ideas**.

780.    In the end, the trio concludes as we must distinctively identify the parallel of <u>STUDENTS</u> <u>as</u> <u>resources</u> paying tuition for their course <u>having</u> <u>excess</u>-<u>available</u> <u>capacity</u> *if* you *design* the *process* of *extraction* correctly:

> "**These <u>resources</u> that are <u>already</u> <u>paid</u> for <u>should</u> <u>be</u> <u>examined</u>** *to see* **if they can be turned into <span style="color:gold">*gold*</span>.**"

**Exhibit 143**, at p. 28. (Emphasis added).

781.    Merging these two-distinctive concepts into one form Defendant, Dr. James T. Low, on multiple occasions has <u>used</u> this former **STUDENTS', STUDENT R.S.**' Theory of Constraints journey to **maintain and increase status**, both as representatives of Wayne State University.



From: James Low [mailto:james_low@wayne.edu]
Sent: Sunday, May 25, 2014 8:29 PM
To: James Cox
Cc: Bahadir Inozu; alan@goldratt.co.za; Patti, Anthony L.; Archie Lockamy; Boaz Ronen; Carl Betterton; Carol Ptak; Budd, Charlene S.; Craig Knight; drg16@psu.edu; Ed Walker; Frances su; Groop Johan; James R Holt; Janice F Cerveny; Jeet Gupta; john H blackstone; Atwater, Joseph Brian; Kevin Watson; Lisa Ferguson; Dr Lisa Lang; Lynn H Boyd; Cooper, Marjorie; Umble, Michael; 'Mike Spencer'; 'Lillrank Paul'; ppittman@ius.edu; Dmoore@prochain.com; Rik Berry; Rob Newbold; 'Rocco Surace'; rkli@cc.nctu.edu.tw; Stratton, Roy; smehra; Seonmin Kim; 'Steve Holt'; Ted Hutchin; Tim Sullivan; Vicky Mabin; 'Mahesh C Gupta'; Srinivasan, Mandyam M; John Davies; Marcia Hutchinson; Fry, Timothy; Tom Gattiker; Tony Inman; Tony Polito; Wayne Patterson; Eli Schragenheim
Subject: Re: 2014 Revised TOC Book List

Hi Jim,
Nice to hear from you again.  Hello to all of my friends on this TOC list!  You might know that I wouldn't give up easily on TOC.  Even though I retired from full time teaching in May, 2008, I have continued to teach the GSC 7260 Theory of Constraints Breakthrough Solutions course in the School of Business Administration at Wayne State University in Detroit, each Spring Semester in May and June ever since (for the last six years).  Before retiring, I had taught the course as a regular MBA program elective course since about 2000. To my knowledge, no Big Ten university has an equivalent course.  I am currently teaching the course right now during this Spring Semester 2014, and we are about a third of the way through the course at this point.  It is the full equivalent of the Jonah Course, and I have been issuing a certificate to students who complete the course, declaring each to be a Wayne State University Jonah.  There are well over 250 former students of the course out there now, working in a variety of industries and locations around SouthEast Michigan.  The reason I haven't made it to the TOCICO conferences for the last few years is that the timing of the conference has been in direct conflict with my teaching the course in the Spring, just about every year.  After I retired, I still kept active in writing articles and presenting papers on TOC, and I have attached a list below. You should note the article that shows how Chrysler could probably have avoided going bankrupt.  If you have any interest in any of the articles or papers, just let me know and I'll send you a

**782.**   **First**, *on the preceding page*, on May 25th, 2014, Defendant, Dr. James T. Low, in an email that follows below addressed to a variety of Theory of Constraints stakeholders; most are academics, others are consultants. **Exhibit 141**, pp. 3-4.

**783.**   **Second**, on June 3rd, 2014, in an email:



*Id*. at p. 2.

**784.**   At the same time Dr. Low is <u>conducting</u> <u>active</u> research on **STUDENTS** as human research subjects absent informed consent, the Defendants on March 24, 2010, revised the long-established Wayne State University Non-Discrimination & Affirmative Action Policy enshrining the equal rights and expressly <u>protecting</u> <u>all</u> **STUDENTS** "***regardless of***" <u>classification</u>. **Exhibit 266**— *Revised WSU Non-Discrimination & Affirmative Action Policy*.

**785.**   *Regardless* of the way this is interpreted— "<u>regardless</u>" *is* the all-encompassing adverb that <u>creates</u> the <u>class</u> of **STUDENTS** the Plaintiff, Attorney Cochrane, has sought protection for, initially seeking protection through the Wayne State University Office of Equal Opportunity.

**786.** But, *instead*, was again victimized as a **STUDENT** in furtherance of the concrete crimes identified in *this* Complaint—sparking Substantive and Procedural Due Process claims in violation of these <u>fundamental</u> <u>civil</u> <u>rights</u> by summarily dismissing such in violation of the Wayne State University Non-Discrimination/Affirmative Action Policy and the Elliot Larsen Civil Rights Act ("ELCRA").

**787.** *Again*, the language sought to be declared valid here in *this* Complaint is as follows:

<u>**A Fundamental Right to a Public Education** *Free Of* **Discrimination, Harassment, Threats, and Coercion For** *All* **Students** *Regardless* **of Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth—***EXISTS* **in the United States—***unequivocally***!**</u>

## <u>WAYNE STATE UNIVERSITY IMC: 2011</u>

**788.** Sometime in and around February 6, 2011, **Exhibit 267** was revised and added as a vertex to the Defendants' IMC with authority by Peter Chhim and Dr. Ratna Babu Chinnam, objectively identifying that the Theory of Constraints <u>is</u> present and prominent among the faculty of Wayne State University **infused** **within** the educational complex as a pedagogical focus of the Defendants' 'curriculum' *leveraged* against **STUDENTS**. See **Exhibit 267**, at p. 3.

**789.** Specifically, this hypothetical case was "prepared under the supervision of Dr. Ratna Babu Chinnam for the Global Executive PhD Track in Industrial Engineering at Wayne State University." *Id*. at p. 1.

**790.** Candidly, Dr. Ratna Babu Chinnam is an "expert in AI, Big Data & Business Analytics and is a Professor and Chair of the Industrial & Systems Engineering Department at Wayne State University;" much like Defendant, Dr. John Taylor, the Defendants' advertising boasts heavily on Dr. Chinnam's achievements. See **Exhibit 268**.

*791.* Moreover, what is pictorially depicted below that best represents Deep Learning or Machine Learning for Artificial Intelligence—where, *simply*, this identifies just one large communication cycle based upon aggregated datasets *where* the Theory of Constraints "**Thinking Processes**" would be best used to plot the **Effect-Cause-Effect** variables for each objective sought; <u>meaning</u>, each circle has <u>at</u> <u>least</u> <u>one</u> objective *or* programable function.



*792.* Next, and more importantly, on June 11, 2011, a key article from Wayne State's own *The South End* titled: "WSU Marketing VP Michael Wright Named chief of staff." See **Exhibit 269**.

*793.* By "reinventing the [Chief of Staff] position," the Defendants were able to leverage Mr. Wright's then "27 years of experience in marketing and advertising" to "facilitate the president...to take this university in the most positive and constructive direction" towards "fortifying the university's reputation as a "major metropolitan <u>*research*</u> university."" *Id.*

*794.* Another key figure behind the veil—Mr. Michael Wright too has deep connections to General Motors as does Dr. Taylor and Dr. Goldratt, and highlights opaquely Theory of Constraints concepts on subordination focus ("It's about understanding how to *focus* on the appropriate issues...") and collective collaboration to achieve the "shared objectives," to *use these*

*[STUDENTS] as bridges to companies,*" when identifying: "People are always looking for a gap between academia and the private sector, but it's all pretty similar." *Id.*

## WAYNE STATE UNIVERSITY IMC: 2012

**795.**    The Defendants' focus on research continues to escalate as another IMC vertex is added to the Defendants' IMC on June 11, 2012, by Wayne State University Institutional Review Board Division of Research Communications, Director, Julie O' Connor, titled: "Wayne State University received "*gold* seal" for research protection." See **Exhibit 270**.

**796.**    Specifically, *and prior to* the full throttle towards research in 2013 by Defendant, Dr. Wilson, "[f]ollowing a rigorous evaluation process, Wayne State University's research program involving human participants *has been renewed for full accreditation* by the Association for the Accreditation of Human Research Protection Programs Inc. (AAHRPP)." *Id.*

**797.**    Importantly, "AAHRPP is a nonprofit organization dedicated to the protection of the rights and welfare of research participants and the promotion of scientifically meritorious and ethically sound research. AAHRPP accreditation is the "*gold* seal" for human participant research, requiring its member institutions to reach performance stands that surpass the threshold of state and federal requirements." *Id.*

**798.**    The process of seeking AAHRPP accreditation is "voluntary," and "[b]y maintaining full accreditation, the university has demonstrated the highest ethical standards in protecting human research participants," said Hilary Ratner, Ph.D., WSU's vice president for research." *Id.*

**799.**    Continuing, the Defendants' *focus*ing objectives of the then ongoing development of the 2013—2018 Wayne State University School of Business Strategic Plan are framed as:

> "*Wayne State University is one of the nation's pre-eminent public <u>research</u> institutions in an urban setting. Through its multidisciplinary approach to research and education, and its <u>ongoing</u> <u>collaboration</u> <u>with</u> government, <u>industry</u> <u>and</u> <u>other</u> <u>institutions</u>, the university seeks to enhance economic*

*growth and improve the quality of life in the city of Detroit,*
*state of Michigan and throughout the world.*"

*Id.* (Emphasis added)

**800.** Moreover, this article was also published by 62 CBS Detroit, a community stakeholder, where this **ECHO** reverberates the Defendants' IMC representations of: "Wayne's <u>commitment to</u> the <u>most comprehensive protection</u> for <u>human research participants and</u> to the <u>highest quality research</u>." *Id*; *see also* **Exhibit 271**.

**801.** Finally, sometime in and around 2012, Defendant, Dr. Taylor, took the helm as "Wayne State University—Chair, Department of Marketing and Supply Chain Management (2012—[2021]." See **Exhibit 97**, at p. 1.

# <u>WAYNE STATE UNIVERSITY IMC:</u> 2013

**802.** On **August 1, 2013**, Defendant, Dr. M. Roy Wilson, began his tenure as WSU President.

**803.** Even before Dr. Wilson's researching fury became his own objective, the Defendants' institutional objectives were enshrined within the 2013—2018 Wayne State University School of Business Strategic Plan; the importance of *this* strategic plan cannot be underestimated as such is the culmination of <u>years</u> of preparation. *See again*, **Exhibit 17**.

**804.** Positively, we know the "[2013—2018 Wayne State University School of Business Strategic Plan] builds on a number of successes and accomplishments since the 2007—2012 plan was developed." See in full **Appendix 4**, of **Exhibit 17**, at pp. 21-24.

**805.** As of March 1st, 2013, we see the "highlighted progress" towards implementation of the Critical Chain focus begin to emerge as the Defendants "[d]evelop a strategic communications program <u>targeting</u> internal and external <u>audiences</u>," where explicitly "[s]upport <u>and</u> <u>reward</u> faculty interaction with the business community." *Id*. at 21. (Emphasis added).

806.    Continuing with the mission of "the School" to "[e]xploit opportunities to introduce other graduate programs [and] enhancements" that are "[c]onsistent with the vision and mission of the School, support, recognize, and reward the following intellectual contributions of faculty:

> 3.  Encourage, support, recognize, and reward faculty for those efforts that are consistent with the vision and mission **of the School**:"

*Id*. at 22-23. (Emphasis added).

807.    As you will see with Plaintiffs' own case—refusing Dr. Low's own attempt to personally connect Attorney Cochrane with his Attorney son-in-law, Attorney David Orlandoni—and too the connection with Audrey Taylor, the Defendants use their authority throughout to "[r]ecruit [**STUDENTS**] demonstrating high academic achievement and/or potential;" this too seen explicitly in Dr. Taylor's own resume ironically at page 22 too. *Id*. at 22; **Exhibit 97**, at p. 22.

808.    Consistent with the facts sparking this Complaint and the known courses containing the Defendants' Theory of Constraints—"[a] **formal** mentoring **program** that **pairs** junior **faculty** members [Professor Habel] with more senior members [Dr. Low] of the faculty who can provide advise and direction was implemented in 2011—2012." **Exhibit 17**, at 24. (Emphasis added).

809.    More interesting is the fact that the Defendants through Dr. Taylor, Dr. Low, and Mrs. Habel have used the Theory of Constraints in true win-win fashion enhancing the Defendants' revenue by infusing their research into and as the course itself—requiring **STUDENTS** to pay for and subscribe unknowingly to this latent-unconstitutional takings.

810.    Often, both undergraduate and graduate **STUDENTS** paid for this course out-of-pocket and/or sought **FEDERAL STUDENT LOANS** to advance this invalid research as unknowing human-research subjects.

811.    This notion was likely thought of as a systems wide win-win and explicitly as "a *focus* of the school's new [2013—2018 Wayne State University School of Business Strategic Plan]," where overall, the mission was to exploit:

"**Prioritize** those **initiatives that** will **enhance revenue**. **Revenue enhancement** efforts **should** not only **be self-supporting**, but should **also** be **expected to** provide **support** for other initiatives within **the School**."

*Id*. at p. 24. (Emphasis added).

*812.*    Further, "the school invest in a variety of databases to support faculty research," recalling the over Six (6) million files the Defendants have retained as a direct result of this self-supporting revenue enhancement. *Id*., *see also*, **Exhibit 145**.

*813.*    Further, recall **Exhibit 27** as the 2013—2018 Wayne State University School of Business Strategic Plan embodies the formal structure towards implementation of the Critical Chain Application of the Theory of Constraints—here <u>exploiting</u> Detroit, Michigan—where the "[m]embers of our Board of Visitors (BOV; see Appendix 2), **stressed** that the plan be characterized by "**focus**" and that it include metrics to determine whether or not goals have been accomplished." **Exhibit 17**, at p. 2. (Emphasis added).

*814.*    Continuing, "[a]ccordingly, a strategic implementation team (see Appendix 3) met during the summer and fall of 2013, to identify requirements for effective implementation. These efforts are ongoing." *Id*.

*815.*    We see from these identified dates that this process of industry connectivity and Critical Chain implementation was "unanimously" voted favoring developing even prior to Dr. Wilson's control of authority on August 1st, 2013, and thereafter continues intensely towards achieving these objectives even to *this* day—the day you're reading this Complaint, *respectfully*.

*816.*    Recall **Exhibit 124**, the Wayne State University College of Engineering Syllabus generated for FIN 6240, Section 17861-901, in the Fall of 2013, wherein Dr. Low likely tested the implementation of the Defendants' continually improving Critical Chain Application of the Theory of Constraints, as well as the [*VERY*] Ambitious Goal Curriculum in some capacity.

**817.**   Every line of the Defendants' 2013—2018 Wayne State University School of Business Strategic Plan can be used to demonstrate the effects this Honorable Court now sits to adjudge.

# WAYNE STATE UNIVERSITY IMC: 2014

**818.**   Next, the Defendants' 2014—2015 Fact Book communicates in-depth the institutional structure and operational objectives at the point-in-time where the greenlight was lit on research; this 2014-2015 Fact Book is omitted as an exhibit given the size exceeds the filing parameters of this Honorable Court, and otherwise the relevant parts are submitted here to demonstrate the amplification of the Defendants' objectives through this *billowing* IMC.

**819.**   For example, this 2014—2015 Fact Book largely ECHOs the objectives of the 2013—2018 Wayne State University School of Business Strategic Plan, where "Wayne State University has pledged to: [a] anticipate, understand and prepare for the future of higher education; [b] promote student success through the university; [c] strengthen the research enterprise; [d] develop a sustainable revenue model to allow continued growth and improvement; and [e] improve community engagement," all of which "support our purpose to maintain Wayne State's stature as one of the nation's most respected public research universities." *See* later, WSU's 2014—2015 Fact Book, at p. 1.

**820.**   Notably, the Defendants leverage too their connection with two other major intellectual infrastructures, *first*, being Macomb Community College, *second*, the University Research Corridor ("URC") comprised of (*a*) University of Michigan, and (*b*) Michigan State University.

**821.**   Each of these enterprises is itself a system of people and policies, and together combine to form a vertically integrated intellectual resource distinct by their own operation, but leverageable enough for the procurement of the multiple objectives in each system. *Id*. at pp. 6-8.

*822.* Continuing, "[t]his year, Wayne State partnered with two local community colleges to expand its offerings to [**STUDENTS**]," where it is explicitly clear that each "will also serve as a site for Wayne State and Macomb faculty to research..." *Id*. at p. 6.

*823.* Candidly, the URC "helps Michigan thrive" and by "advancing research, moving new technologies to the marketplace, helping create new jobs and giving a boost to the state's economy," the "URC contributed $16.6 billion to the state's economy—a 30 percent increase from the first assessment in 2007." *Id*. at p. 7.

*824.* As is relates to integrating business and education to "*use these [**STUDENTS**] as bridges to companies*," this same report identified that "the URC has generated more than 66,000 direct and indirect jobs across the state, and $6 billion in wages of staff and alumni, which contributed an added $449 million to state tax revenue." *Id*. (Emphasis added).

*825.* And, as systems of people, processes, and policies, each with the same objectives the "URC ranked second when compared with the seven other **major** university **research clusters** it measures itself against, such as North Carolina's Research Triangle Park, California's Innovation Hubs, and Massachusetts' Route 128 Corridor." *Id*. (Emphasis added).

*826.* Plainly, as described at p. 49-50 in the Defendants' 2014—2015 Fact Book:

> "Wayne State University faculty members engage in groundbreaking research and innovative community projects. They are committed to the highest standards, ethics and quality of treatment and care for humans and animals in investigational research. A notable indicator of the research program's success is its ranking as Research University (Very High Research Activity) by the Carnegie Foundation for the Advancement of Teaching. Wayne State is also ranked among the top public institutions for annual research expenditure by the National Science Foundation."

*827.* Simply, this is the educational landscape the Defendants are operating in at this point in time and space, where one objective above all others exists, where— '**RESEARCH**'—is sought overall as the primary objective of each person and each entity involved.

*828.*      Recall from June 6th, 2014, what is **Exhibit 105** in which the then newly appointed Dean of Wayne State University's School of Business Administration—the location of the Principal Door—was characterized as: "Dr. Forsythe will be an excellent addition to the academic leadership of the university...[h]e understands the interrelation of an institution such as Wayne State with the city and region in which it is located, and is eager to work with others on enhancing these connections."

*829.*      Interestingly, Dr. Forsythe "succeeds Margaret L. Williams who served as the school's interim dean during the national search," and who also "initiated" the 2013—2018 Wayne State University School of Business Strategic Plan ("The current strategic plan was the result of a planning process initiated by Interim Dean Margaret Williams and conducted by the Strategic Planning Committee (SPC; see Appendix 1"). *Id*; see also, **Exhibit 17**, at p. 2.

*830.*      Recall another important IMC vertex from October 6-7, 2014, that ECHOs again **RESEARCH** from the very top as Emeritus Vice President & General Counsel Of Wayne State University, Attorney Louis Lessem, gives a seminar on "How to Create Internal Policies" involving "Human Subject Research Requirements:"

> "Complying with Domestic and International Human Subject Research Requirements: How to Create Internal Policies that Account for Intellectual Property, Research Grants, and Sponsors."

*831.*      Now, recall what is likely the most important email chain embedded within this Complaint contained in **Exhibit 141** and **Exhibit 142**, where on March 4th, 2014, University of Georgia Emeritus Professor, Jim Cox, seeking assistance in maintaining the TOCICO's growing-digital databases maintained by "TOCICO's web genius, Jessica Banks, where a response from james_low@wayne.edu," also known as Defendant and Wayne State University Emeritus Professor, Dr. James T. Low, was retained on May 25th, 2014, *respectfully*.

**832.** Specifically, Jim Cox was replying to Bahadir ("Baha") Inozu, a former *Ph.D*. student from the University of Michigan and co-founder of a TOC Think Tank, *Novaces*—itself amplifying the Theory of Constraints mantra of "*Focus*. Accelerate. Achieve," as its tagline. *Id*, at **Exhibit 141**.

**833.** Continuing, Jim Cox's email acts as an ECHO mirroring Baha's inquiry ("Are you aware of any TOC centers in academia besides the Masters Program in Healthcare in the UK?"), where Dr. Cox  outlines his vast perception of the "network of academics in TOCICO" and calls for "anyone on this email [who] knows of other academic programs [to] please provide this information to those copied on the email." *Id*.

**834.** And, *again*, on May 25th, 2014, Dr. James T. Low, speaking with authority and on behalf of Wayne State University identifies the unconstitutional research clearly snowballing from at least by this confession from 2000:

> "Nice to hear from you again. Hello to all of my friends on this TOC list! You might know that I wouldn't give up easily on TOC. Even though I retired from full time teaching in May, 2008, I have continued to teach the GSC 7260 Theory of Constraints Breakthrough Solutions course in the School of Business Administration at Wayne State University in Detroit, each Spring semester in May and June ever since (for the last six years). Before retiring, I had taught the course as a regular MBA program elective course since about 2000. To my knowledge, no Big Ten university has an equivalent course. I am currently teaching the course right now during this Spring Semester 2014, and we are about a third of the way through the course at this point. It is the full equivalent of the Jonah Course, and I have been issuing a certificate to students who complete the course, declaring each to be a Wayne State University Jonah. There are well over 250 former [**STUDENTS**] of the course out there now, working in a variety of industries and locations around South East (sic) Michigan. The reason I haven't made it to the TOCICO conferences for the last few years is that the timing of the conference has been in direct conflict with my teaching the course in the Spring, just about every year. After I retired, I still kept active in writing articles and presenting papers on TOC, and I have attached a list below. You should note the article that shows how Chrysler could probably have avoided going bankrupt. If you have any interest in any of the articles or papers, just let me know and I'll send

you a copy. While many of them are available online, that probably isn't the case with all of them. I have also attached a flyer that I distribute about the course, and a summary of some [**STUDENTS**'] results from the course, taken verbatim from their individual project final reports. Best regards, Jim Low."

*Id*. (Emphasis added).

835.   Continuing, and after the University of Baylor Emeritus Professor, Charlene Spoede Budd, offered Dr. Low with what could be categorized as a bribe to be picked up from the Atlanta airport to visit Mrs. Budd's former "retirement retreat" in Butts County [199 Air Strip Road, Jackson, GA 30233] for what would be likely an opportunity to discuss in more depth the Dr. Low's <u>marketing</u> of his "busy" work. *Id*.

836.   Explicitly, <u>we</u> see from another follow up from June 3, 2014, that Dr. Low's subjective selection of possessive pronouns is consistent with dominion and control over this "busy" work:

"It just occurred to be that you might like to see **<u>our</u>** MAQ article on how Chrysler ignored a chance to enter a new market with a vehicle assembled from parts they already made and had excess capacity for, with almost no tooling required, and about an 80 percent contribution margin and most of that being net profit. If **<u>we</u>** are correct, the contribution margin would have been about 1.8 BILLION dollars, and they could probably have saved themselves from bankruptcy, but ignored the project because **it was an <u>unprompted</u> suggestion <u>from within</u> the company, by <u>one</u> of <u>our</u> <u>Wayne</u> <u>State</u> <u>University</u> <u>Jonahs</u>**. I'd be interested in your reaction. Best regards, Jim Low."

*Id*. (Emphasis added).

837.   Finally—*respectfully*, **Exhibit 142** speaks for itself and is an early byproduct of the significant and unconstitutional intrusion the Defendants have enhanced as a "self-supporting" "revenue enhancement" from as early as 2000, of which was <u>continually</u> improved "to provide support for other initiatives within the School." *Id*; also, **Exhibit 17**, at p. 24.

838.   Candidly, just as "[**STUDENTS**] projects used Theory of Constraints (TOC) [**Effect-Cause-Effect**] logic problem solving tool to deal with **<u>major</u> <u>unresolved</u> <u>problems</u>**"—*I* too, *here*, used the Theory of Constraints effect-cause-effect tools to derive this exhaustive analysis for proper decision making. *Id*. (Emphasis added).

839.   Finally—*remember*, these are marketing communications by a Marketing Ph.D. in that Dr. Low was **ECHO**ing the mission of **RESEARCH** on behalf of himself and the Defendants with authority as the effect of the Critical Chain Application and [***VERY***] Ambitious Goal Curriculum—**and**"[n]ote that **there** **are** **a** **lot** **of** **other** **equally** **impressive** **results** **that** **have** **not** **been** **included** **here**." *Id*. (Emphasis added).

# **WAYNE STATE UNIVERSITY IMC: 2015**

840.   First, on February 20, 2015, we see the spotlight drawn on the Defendants' IMC within the Wayne State University Mike Ilitch School of Business *focus* on Assistant Professor, Tinting Yan, for her "national attention in the field of global supply chain management," who at this time is "enjoying a rapid career trajectory." See **Exhibit 272**—*Faculty Spotlight: Tingting Yan*.

841.   Specifically, Defendant, Dr. John Taylor, identifies in this vertex of the Defendants' IMC that: "Tingting has been a tremendous addition to our department...[t]he scope, depth and quality of her research in the field of supply chain management is generally associated with an academic far more established." *Id*.

842.   Explicitly, Assistant Professor Yan identifies the primary *focus* of her individual purpose for embarking on her chosen profession:

> "I was attracted to **this career** by the **unlimited opportunities to** **create** **and** **distribute** **knowledge** **that** **helps** **companies** better compete in a globalized economy by developing world-class supply chains...[m]y ***focus*** over the next three to five years is how supply networks drive innovation firms could better innovate by better utilizing resources in their customer and supplier networks. It's from the perspective of the buying firm a focal firm, which could be either an auto OEM or a tier-3 supplier and how they can **stimulate** better **innovation within** the manager supplier **network**."

> *Id*. (Emphasis added).

843.   Plainly, this article reinforces the Defendants' *focus* and strategic plan on again not on the success of her **STUDENTS**—but instead the "unlimited opportunities to create and distribute knowledge that helps companies." *Id*.

*844.*    Further, this faculty spotlight, like other vertices within the Defendants' IMC, boasts the interconnectivity of individual-scholar growth and business connectivity, or plainly—the Critical Chain Application of the Theory of Constraints—ultimately <u>leveraging</u> the **STUDENTS** who are captives in this lopsided- 'educational' process.

*845.*    On April 17, 2015, the Defendants' IMC amplifies not only the Theory of Constraints, but too the personal achievements of Defendant, Dr. James T. Low, in what is another form of 'faculty spotlight' hailed as the "First-ever TEDxWayneStateU" with a "distinct School of Business flavor." *See*, **Exhibit 273**—TEDxWayneStateU.

*846.*    Explicitly, only three speakers are listed in this marketing communication, two of which were **STUDENTS** or recent graduates—the only remaining speaker identified was Defendant, Dr. James T. Low—with the rewarding biography as follows:

> "**James T. Low**
>
> Dr. James T. Low is an **emeritus faculty** member in the marketing program at the School of Business. Low has an **M.B.A. in marketing and operations research** from the University of Michigan and earned his **Ph.D. in marketing** at the University of Michigan. Over the **last 10 years**, Low has **spoken on Theory of Constraints topics at over 80 conferences**, dealing with **applications** in manufacturing, accounting, **operations research**, **problem solving**, and **organizational change**. Low has published a number of articles in well-recognized professional journals and has worked with a number of companies on **Theory of Constraints** issues, including Ford Motor Company, Chrysler, and MTU Detroit Diesel."

*Id*. (Emphasis added).

*847.*    This vertex of the Defendants' IMC explicitly **ECHO**ing the value of the Theory of Constraints **and** individual successes of Defendant, Dr. James T. Low, further demonstrates as an application in this time and space of the transfer of authority and connectivity of the Defendants' 2013—2018 Wayne State University School of Business Strategic Plan.

*848.*    This authorized amplification of the Theory of Constraints and of Dr. James T. Low is also evident in and around February 19 to June 11, 2015, and September 10 to December 10, 2015, in

what is a "Wayne State University School of Business Administration" marketing packet for the "2nd Annual Auto Industry Certificate in Purchasing and Supply Chain Management" "non-degree certificate program." *See* **Exhibit 274**—*WSU & AIAG Certificate Advertisement.*

*849.* Specifically, this vertex of the Defendants' IMC boasts the offering "in cooperation with [Automotive Industry Action Group] AIAG" the "second annual non-degree certificate program designed to provide participants with an in-depth understanding of supply chain topics and issues in the context of the global auto industry." *Id.* at p. 1.

*850.* This Wayne State University designed offers participants the opportunity to "learn about a broad range of vehicle industry-oriented supply chain topics including SCM strategy...quality management processes and Six Sigma." Where, plainly, "quality management processes" is arguably the Theory of Constraints. *Id.* at p. 2.

*851.* Moreover, "[t]he program faculty will consist of a combination of supply chain academics and industry supply chain professionals." *Id.*

*852.* Were, of these "supply chain academics," this IMC vertex identifies first Defendant, Dr. John Taylor, as "Chairman of the Department of Marketing and Supply Chain Management in the School of Business at Wayne State University," and second Defendant, Dr. James T. Low, *respectfully* connecting Wayne State University, Dr. Low, **and** Dr. Goldratt in this biography:

> "**James Low**
>
> Dr. Low is **Professor Emeritus** of SCM **at Wayne State University**. He is an **expert** **in** **Theory of Constraints**, **a discipline related to problem solving in various settings** including manufacturing. In addition to teaching Theory of Constraints at Wayne State, he has worked extensively in IT consulting, most recently at JDA Software. He holds a **Ph.D.** in **Marketing** and **Operations Research** from the University of Michigan, **and** was **certified as** a "**Jonah**" **by** the **Avraham Goldratt Institute**."
>
> *Id.* at p. 4. (Emphasis added).

853. Finally, we recall **Exhibit 18** published on October 30th, 2015, marketing the pivotal driver behind the Defendants' Critical Chain Application of the Theory of Constraints in the connectivity to the rebranding of the "Wayne State University School of Business" to the "Wayne State University Mike Ilitch School of Business." *See again*, **Exhibit 18**.

854. Specifically, it is this connection to the entrepreneurial heritage of Detroit that helped the Defendants **leverage** and "**_use_** *these [***STUDENTS***] **_as_** **_bridges_** to companies,*" between academia and industry when Detroit entrepreneurs Mike and Marian Ilitch gifted $40 Million plus use of land to Wayne State University to build a new business school in Detroit. *Id.*; *recall also*, **Exhibit 42**, at pp. 9-10. (Emphasis added).

855. Specifically, a direct effect of this substantial gift provides "new flexible teaching, **research**, office and community spaces **for** [STUDENTS] and **faculty** **bringing** WSU's outstanding **business** **programs** **closer** **to** **the** **market**." *Id*. (Emphasis added).

856. Concluding with, Defendant, Dr. Robert Forsythe opining strategically:

> "Our new home in the heart of The District Detroit **will** **provide** an **educational** **anchor** **institution** **that** **can** **merge** **programs** **and** [STUDENTS] **with** the **dynamic** economic **growth** currently underway...We are grateful for this lead gift and investment by Mr. and Mrs. Ilitch and the tremendous impact it will have on the educational experience of our [STUDENTS], **as well as** **opportunities** **for** our **faculty** **to** **engage** **with** the southeast Michigan **business** **community**."

> *Id*. (Emphasis added).

## **WAYNE STATE UNIVERSITY IMC: 2016**

857. First, we see again on January 12, 2016, "[f]olloing a **rigorous** **evaluation** **process**, Wayne State University's **research** program **involving** **human** **participants** has been **renewed** **for** full accreditation for **five years** by [AAHRPP]." *See*, **Exhibit 275**. (Emphasis added).

858. Interestingly, this article is a near **verbatim** ECHO of the Defendants' 2012 AAHRPP advertisement of their "*gold* seal" achievement. *See again*, **Exhibit 270**; **Exhibit 271**.

859.   Continuing, on January 14th, 2016, we see an additional vertex of the Defendants' IMC again ECHO this "*gold* seal" achievement identifying that "[f]olloing a **rigorous evaluation process**, Wayne State University's **research** program **involving human participants** has been **renewed for** full accreditation for **five years** by [AAHRPP]." See, **Exhibit 276**. (Emphasis added).

860.   Taking for a moment this "**rigorous evaluation process**" into consideration—this voluntary accreditation program is extremely through and the self-Evaluation Instrument for Accreditation PDF for institutions to review is 175 pages and omitted from *this* Complaint as an exhibit at this time but is available to be downloaded on AAHRPP's website.

861.   Instead, to achieve accreditation, an organization must meet all the accreditation standards and elements as required by this "**rigorous evaluation process**," of which is in general comprised of five sections of elements and standards.

862.   Further, of these five sections number three reviews "Required Written Materials" an organization must have to meet the element:

> "AAHRPP uses the generic term "policies and procedures" to refer to all types of written materials. Policies and procedures include any written materials that the organization uses to define and communicate its practices, such as standard operating procedures, policy statements, procedure descriptions, checklists, guidelines, educational materials, job descriptions, memoranda, forms, templates, strategic plans, Web sites, charters, by-laws, mission statements, or other forms, that are used to administer the Human Research Protection Program. Policies and procedures are not limited to IRB or EC policies and procedures; other organizational procedures are likely to be relevant, such as some policies related to human resources, budgeting, pharmacy, contracting, student orientation, corporate compliance, or corporate ethics.
>
> A policy is generally defined as a strategy, goal, or objective. It defines an expectation regarding a behavior or course of action. A procedure is a method by which a policy can be accomplished. Procedures should describe the operational steps that are followed to meet regulatory requirements. A restatement of the regulations or guidance is generally insufficient to provide the necessary specificity. Procedures should include:

1. An explanation of how key regulatory terms are interpreted,
2. The actions that are taken,
3. The title of the person, office, or entity responsible for taking the action, and
4. The timing of actions.

No single format is required for policies and procedures, and no specific wording is required to be used in policies and procedures. Organizations have used a range of models for writing policies and procedures. Procedures should provide enough detail to be understandable to individuals within the organization who use them. Procedures should reflect actual practice within the organization.

AAHRPP has provided a description of the content for many policies and procedures. U.S. regulatory requirements, such as the criteria for approval of research, elements of disclosure for the consent process, or types of disclosure for financial interests, are not listed. The organization must use the federal regulations to obtain these requirements."

*863.*  Plainly, the AAHRPP gives deference to the organization's "policies and procedures" and thereby defines two important variables to consider in this Complaint. **First**, defined above, "policy" as a strategy, goal, or objective, *and* **second** "procedure" as the method by which a "policy" can be accomplished.

*864.*  Firmly— "procedures" should provide **enough detail** to be understandable to the individual within the organization who use them— "procedures" should **reflect actual practice** within **the organization**.

*865.*  Now—*this* Complaint was sparked by the Defendants' **unconstitutional research** on the Plaintiffs but for principally the extortive "policy" or objectives as defined by the 2013—2018 Wayne State University School of Business Strategic Plan—and, **we know for a fact** that the Defendants **did not** follow the "policy" nor "procedures" in place to protect these Plaintiffs from such inhumane, uncivil, *and* unethically research practices.

*866.*  In fact, skipping ahead in this timeline to demonstrate this point—on July 21, 2021, the Wayne State University FOIA Coordinator, at the time under the direct supervision of Defendant, Attorney Mr. Louis Lessem, confirms receipt of the second batch of thirty-three (*33*) FOIA

Requests, *I*, Attorney Cochrane submitted to mitigate my damages while desperately trying to objectively understand this fact pattern as the effects continued in real time. *See*, **Exhibit 277**.

867.    Of those thirty-three requests, two requests were approved, and the remaining requests were denied for the reason that "**the requested <u>records</u> <u>do</u> <u>not</u> <u>exist</u>.**" *Id*. (Emphasis added).

868.    Importantly, for the purpose of tying together the AAHRPP "*gold* seal" accreditation repeatedly **ECHO**ed and leveraged above by the Defendants' IMC—the records requested **<u>should</u> <u>exist</u>** as would be required to legitimately achieve the Defendants' policy "objectives" by employing the proper "procedures" when conducting **RESEARCH** on **STUDENTS** as human research subjects. *Id*.; *see also*, **Exhibit 278**.

869.    Specifically, this evidence demonstrates firmly the Defendants' failure to follow proper research protocol before and after President Wilson's tenure at Wayne State University enmeshes these facts to the institution as a whole—President Wilson knowingly added the fuel to push the Defendants further towards achieving these institutional objectives.

870.    Furthermore, this connectivity of the Critical Chain Application of the Theory of Constraints demonstrates the control, specific intent, motive, and common plan of the Defendants as this exact connectivity was being developed at Wayne State University wholistically by the entire system where the [***VERY***] Ambitious Goal Curriculum was thereafter embedded within Defendant, Dr. John Taylor's, Marketing and Global Supply Chain Department to achieve the Defendants' objectives of **RESEARCH** by "*use[ing] these* [**STUDENTS**] *as bridges to companies*" See, **Exhibit 42**, *at pp. 9-10*. (Emphasis added).

871.    Next, sometime in and around 2016 the Wayne State University Computing & Information Technology 2016—2021 Strategic Plan was adopted and aligned with the institutional wide strategic plan:

> "Computing & Information Technology (C&IT) is Wayne State University's
> central IT organization, which reports to the Provost as a unit within the Division

of Academic Affairs. As a key academic and administrative support unit, C&IT is **tightly integrated** with the university's strategic directions.

Wayne State recently released an updated **university-wide** strategic **plan**, Distinctively Wayne State [*see*, **Exhibit 19**], and C&IT has aligned itself with the plan's core values and strategic *focus* areas:



**Exhibit 279**, at p. 2. (Emphasis added).

*872.* Continuing, four-strategic points are relevant to highlight from this C&IT Strategic Plan:

(1) work together to continuously improve WSU;

(2) Support a collaborative, innovative and creative work culture;

(3) Robust cyber infrastructure and research support services; *and*

(4) **University leaders expect** and require that **data** be **available in real time**, using state-of-the-art analytical tools that are easy to learn and flexible.

*Id*. at p. 3. (Emphasis added).

*873.* Recall **Exhibit 19**—the 2016—2021 "Distinctively Wayne State University" Strategic Plan of which embodies globally throughout the entire educational institution the implementation of the Critical Chain Application of the Theory of Constraints developed in furtherance of the 2013—2018 Wayne State University School of Business Strategic Plan. *Id*.

*874.* Specifically, in 2016 the Strategic Planning Process was outlined as follows:

"**For approximately one year**, **we engaged in a strategic planning process that involved hundreds of stakeholders**. We launched the

process with a thought-provoking presentation on the future of higher education, facilitated by our consultants, **the Barthwell Group.** Our Strategic Planning Committee — comprised of faculty, administrators, and a student representative, and **co-chaired by the president's chief of staff**, the provost, the vice president for finance and business operations, and the **vice president for research** — **met monthly to develop the basic goals, objectives**, and metrics for each of the Strategic **Focus** Areas. Subgroups of the Strategic Planning Committee, augmented by **additional faculty and staff participants**, **also met intermittently to continue analyzing each of the Strategic Focus Areas.** Throughout our process, five focus groups representing our alumni, administrators, faculty, staff, and students met periodically to provide feedback. In addition, meetings were held with the **President's Community Advisory Group**, <u>**key members of**</u> the university and **the community**, and <u>**a group of external stakeholders**</u> (**corporate executives, policy makers, retired faculty, and administrators**) to <u>**obtain**</u> <u>**their**</u> <u>**ideas**</u> about the Strategic Plan. <u>**Special retreats**</u> and briefings were held <u>**by the president**</u> <u>**with the Board of Governors**</u>. In the **final stages** of the Strategic Planning Process, meetings were held with the **President's Cabinet** and **the Council of Deans**. During a Town Hall meeting led by the president, the university community was updated regarding the Strategic Plan. **Throughout the strategic planning process**, the **provost** and the **president of the Academic Senate gave briefings on the Strategic Plan to every school and college.**"

*Id*. at p. 6. (Emphasis added).

**875.** Continuing, the Defendants' innovative spirit is captured in this explanation: "We are <u>**unafraid**</u> to **try new things**, to test, and <u>**to learn**</u> <u>**by**</u> both <u>**failure**</u> **and success**. We are relentlessly curious about the evolving world and how we can do things better." *Id*. at p. 8. (Emphasis added).

**876.** Further—the Defendants' Research preamble explains this innovative drive to **RESEARCH** *even further* by "engaging [**STUDENTS**] at all levels:" *Id*. at p. 16.



*877.*   We see on or around August 15th, 2016, recalling a similar **Exhibit 149**, where here the Defendants through The Detroit News **ECHO** their vigorous mission to **RESEARCH** opined by, Mr. Jack Sobel, former Dean of the Wayne State University Medical School. See, **Exhibit 280**.

*878.*   Specifically, Mr. Sobel explicitly opines, potentially as a stakeholder in the same strategic planning process, and in relation to the thirty-seven (37) faculty "cut" from the Wayne State University's School of Medicine:

> "...a small minority of **faculty** members [were] **viewed as underproductive** or **unproductive**...it was a critical and **necessary step forward** allowing **our many productive faculty** members **to thrive**, and will **result in <u>our</u> emerging stronger** as one of the nation's most robust urban medical colleges and <u>**centers**</u> **of research**."

> *Id*. (Emphasis added).

*879.*   Recall too the explicit connection to and leverage of The Barthwell Group for development of the Defendants' continuously improving IMC as analyzed here following the solicitation of "key" stakeholders; *specifically*, **Exhibit 24**; **Exhibit 27**;

---

**The Barthwell Group**

The Barthwell Group is the Detroit-based strategic management consultant for Wayne State University's Strategic Planning Process. A Certified Women-Owned MBE, The Barthwell Group has advised higher education institutions, *Fortune 500* corporations, and the military throughout the United States.

---

**Exhibit 24**.

*880.*   Furthermore, do recall The Barthwell Group's own IMC under "Case Studies" (or **RESEARCH**) explicitly identifying the specific intent of the "new president of a state university" (President Wilson of Wayne State University) who "wanted to develop a dynamic planning process which would guide the institution's transformation towards **more** emphasis on **research**..." See again, **Exhibit 40**, at p. 5.



**Exhibit 40**, at p. 5. (Emphasis added).

*881.*   This "dynamic planning process" can only be the Defendants' 2013—2018 Wayne State University School of Business Strategic Plan which has led to every other strategic plan from inception—just as did the 2013—2018 Strategic Plan was "[built] on a number of successes and accomplishments since the 2007—2012 plan was developed (see Appendix 4)." See again, **Exhibit 17**, at p. 2. (Emphasis added); recall too, **Exhibit 19**; **Exhibit 20**; **Exhibit 21**; **Exhibit 22**; **Exhibit 23**; and **Exhibit 279**.

*882.*   Next, the connectivity to and leverage of the automotive industry in Michigan and throughout the World is concrete as : (*1*) the facts herein *this* Complaint originated within the Defendants' Marketing and Global Supply Chain Management Department, (*2*) the Chairperson overseeing this department, Defendant Dr. Taylor, was also on the implementation team of the 2013—2018 Wayne State University's School of Business Strategic Plan, and (*3*) the Theory of

Constraints was developed principally by Dr. Goldratt for the Global Automotive Industry where General Motors itself is a long time client of Dr. Goldratt's network of intellectual suppliers.

**883.** Moreover—another significant and relevant connection to each of these three vertices is the American multinational automotive manufacturing company headquartered in Detroit Michigan—formally the General Motors Company, now known as General Motors ("GM").

**884.** Simply, we see through the veil as another IMC vertex from the 'competing' Supply Chain Management Department of Michigan State University the marketing by GM explicitly committing to the purchase of **STUDENTS** from our new age nationalistic-intellectual supply chain. See **Exhibit 281**—*MSU Alumni, Mr. Todd Scott, Spotlight.*

**885.** Specifically, sometime in and around October 10th, 2016, "Michigan State supply chain management alumni [Mr.] Todd Scott, Executive Director of Global Purchasing Supply Chain and Logistics at General Motors" publicly commits projects GM's five (5) year plan for regrowth.

**886.** Interestingly, just as we will see herein *this* Complaint, respectfully and proffered as civilly as possibly—Mr. Scott too has direct connections to China having:

> "spent 32 years at General Motors in roles ranging from logistics, supply chain operations, manufacturing, and sales/marketing. He has also had the opportunity to work globally in Brazil and **China** for [GM]."

> *Id.* (Emphasis added).

**887.** Further, it is the content of this Alumni's Spotlight that with the individual positioning of Mr. Scott that makes this point relevant to the Defendants—specifically, "[w]hen asked about why it was important to have the [educational] faculty visit General Motors Scott said:"

> "We currently have 400 supply chain graduates working at General Motors. Half of our supply chain employees will be eligible to retire over the next five years, because of this, **we are looking to hire at least 50 full-time employees** (sic) **each year** and hope **to hire 25% from Michigan State**. **Because of this growth**, it is **important to us to have a strong relationship with faculty**."

> *Id.* at p. 1. (Emphasis added).

*888.* Now, translating this word problem to numeric values—**5** years x **50** full-time employees, gives us **250 full-time employees** over that 5-year period.

*889.* Of those prospective **250** full-time employees, **25%** will be **hired from Michigan State University**, *or* **63 STUDENTS** out of the total 250 prospective **STUDENTS**.

*890.* The reaming **187 STUDENTS** or Supply Chain Management Professionals will be obtained through *other sources*—for example, *other institutions*, and as we will see *herein*—the Defendants have aligned with GM in the heart of Detroit to likely fill the majority of this void by engaging jointly in the Critical Chain Application of the Theory of Constraints.

*891.* We see explicitly from **Exhibit 97** that Defendant, Dr. Taylor, in his implementation of the Defendants' *focus* on researching [**STUDENTS**], aligns himself with GM in several ways notably to further the Defendants' globalized-strategic objectives <u>throughout the institution</u>, and <u>not just</u> within the Marketing and Supply Chain Management Department of the Wayne State University Mike Ilitch School of Business.

*892.* And finally, we see from an email sent by Mrs. Audrey Taylor on November 30th, 2016, with the subject line: "FW: accounting jobs at Big 3 Auto Companies," reaching out to Dr. Low for "links" in the "auto companies" regarding this exact form of connectivity:

> "Hello! I have a [**STUDENT**] desirous of working with one of (sic) the auto companies...Do **you** have any **links still**?"

> **Exhibit 282**—*Automotive Job Links Email*. (Emphasis added).

*893.* Responding to this email on December 9th, 2016, Dr. Low **unequivocally confirms** what was just laid out above and what we will see *expanded* as we continue:

> "Audrey and Savya,
>
> Apologies for the slow reply. I also don't have ties into industry like I used to, but **I** would **suggest contacting <u>John Taylor</u> in Marketing <u>and</u> Myles Stern in Accounting at <u>Wayne State</u>** because **I am sure that <u>John has good ties</u> to the <u>auto companies</u>, and Myles would have good insights into Accounting there**. Hope things are going well for you. I am doing ok,

although it has now been nearly a year without Louise at this point. The kids and friends have been a big help. I'll try calling you on the phone in addition to sending this. Best regards,
Jim Low

Sent from my iPhone"

**Exhibit 282** (Emphasis added)."

894.    Finally—as **ECHO**ed in the footing of Mrs. Taylor's email in response to Dr. Low's directions, and is relevant with the **history and tradition** later argued *herein* to bolster the claims against the Defendants' ongoing and unconstitutional RESEARCH on STUDENTS:

> ""*They who can give up essential liberty to obtain a little temporary safety*, *deserve neither liberty no safety*." **Benjamin Franklin**"

*Id*. (Emphasis added).

895.    Ironically too, recalling **Exhibit 142**—*every* business <u>named</u> <u>is</u> <u>redacted</u>—**except GM**.

# <u>WAYNE STATE UNIVERSITY IMC: 2017</u>

896.    Next, continuing the line of connectivity to GM and Wayne State University, specifically here to Defendant, Dr. John Taylor, and GM Executive Global Supply Chain Director, Mr. Todd Scott, we again <u>pair</u> <u>the</u> <u>two</u> while reviewing the Defendants' IMC on May 12th, 2017, in an article called— "*Education and training: The hard line on soft skills*." **Exhibit 283**—*Automotive Logistics Magazine Article*.

897.    We see the spotlight draw on "General Motors' executive director for global supply chain, Todd Scott, meets frequently with the faculties of several universities."

898.    Plainly, this article summarized the goal behind the Critical Chain Application of the Theory of Constraints:

> "...the demand for highly skilled, high-caliber employees has never been greater, especially for management positions. Talk to any group of automotive logistics executives, and a frequently-heard refrain is that they've never been hungrier for logistics and supply chain talent."
>
> *Id*.

**899.** Plainly, GM Executive, Todd Scott, explains his ideal candidate as follows:

> "We want [**STUDENTS**] who are collaborative in nature, but who can demonstrate leadership in cross-functional groups: collaboration is very important in the supply chain, because the function is very often operating in the middle – between manufacturing and sales, for instance, or manufacturing and suppliers," he notes. "It's also important for people to be able to deal comfortably with extreme levers of ambiguity and change, because both are a strong feature of supply chain management. People who want certainty don't tend to do well in our kind of environment....we want [**STUDENTS**] who can learn and adapt throughout their professional careers: **being one-dimensional will no longer suffice**."

> *Id*. at pp. 2-3. (Emphasis added).

**900.** Similarly, "**GM isn't alone** in talking with universities to shape logistics and supply chain education to the automotive industry's requirements. Ryder System's Jeff Kosloski, for instance, points to the advantages that such collaboration can offer, both to the universities and the firms that engage with them." *Id*. at p. 3. (Emphasis added).

**901.** Continuing, Mr. Kosloski explains his perspective of the Critical Chain Application of the Theory of Constraints, *maybe without even knowing it*:

> "We've created a **formal university relationship** programme and **appointed ambassadors** for **key universities**, which has **contributed to the success** we've had in hiring and developing some of **our key talent**. As part of this programme, we not only offer internships and management trainee programmes, but **we're trying to find other ways to give back to these universities and contribute to their curriculums**, **so we can help groom** [**STUDENTS**] to come out as prepared as possible, with as many tools as possible."

> *Id*. (Emphasis added).

**902.** Connecting this logic to Wayne State University, and more specifically Defendant, Dr. John Taylor:

> "At one of these establishments, **Wayne State University**, **John Taylor**, chair of the department of supply chain management within the Mike Ilitch School of Business, points to how such interactions have shaped his own school's offering. As opposed to many other university logistics and supply chain management programmes that are heavily focused on industries such as consumer packaged goods, **he observes**, **Wayne State's focus is much**

more on <u>complex</u> **manufacturing** – and **specifically the automotive industry**."

*Id*. (Emphasis added).

**903.**   Finally, Defendant, Dr. John Taylor, identifies himself this conclusion in "*The hard line on soft skills*:"

"A **number of our industrial contacts** have been saying that crisis management was an important skill set and we identified that we had specific expertise in the area. Among other resources, we use a case study of how Toyota responded to the 2011 Japanese earthquake and tsunami."

*Id*. at p. 4. (Emphasis added).

**904.**   Next, the Defendants pivot towards a full embrace of the Critical Chain Application of the Theory of Constraints while embedding the [*VERY*] Ambitious Goal Curriculum as fuel.

**905.**   Specifically, see **Exhibit 284**, an advertisement "flyer" sent by Defendant, Dr. James T. Low, (as early as 2014 recalling **Exhibit 141)** to solicit prospective **STUDENTS** to enroll in GSC 7260/GSC 5670: Break Through Solutions.

**906.**   Advertised as "a 3 credit hour M.B.A. program or undergraduate elective course," that was "formerly listed as BA7260: Theory of Constraints Approach to Management Accounting." **Exhibit 284**. (Emphasis added).

**907.**   Interestingly, recalling **Exhibits 270**; **Exhibit 271**; **Exhibit 275**; **Exhibit 276**, regarding the Defendants' "*gold* seal" relative to the "rigorous evaluation process to conform to the required laws governing <u>Human</u> <u>Research</u> Projects—*this* "name change" and placement of the [*VERY*] Ambitious Goal Curriculum in Defendant, Dr. John Taylor's, Marketing and Supply Chain Management Department <u>is</u> <u>suspect</u> as to avoid this "rigorous evaluation" and formal requirements of the Wayne State University Institutional Review Board and other explicitly applicable "Policies" and "Procedures" designed to protect **STUDENTS**.

**908.** Next, this vertex of the Defendants' IMC identifies a <u>falsity</u> relative to the cost of attendance of which further demonstrates the, recalling **Exhibit 17** at p. 24, the "**enhanced revue**" of this "**self-supporting**" course that which was designed as a win-win that "**supports [the overall] initiatives within the school**:"

> "Note that **this course would cost $10,000 if taught outside of the university curriculum**, and that it is currently scheduled to be offered in the Spring 2017 Semester."

> **Exhibit 284**. (Emphasis added).

**909.** Plainly, **<u>this is false</u>**, and when obtaining this "curriculum" from outside of the Defendants' control—even from Avraham Goldratt Institute ("AGI—Goldratt Institute), the primary source of these concepts—a 10 day/50 hours course through the Jonah Program $^©$ costs the attendee **$4,000 per seat**, *respectfully*. See, **Exhibit 285**—*AGI Jonah Program Advertisement*.

**910.** Recall also on April 18th, 2017, **Exhibit 123**, the, Defendants' IMC continues to "strongly recommend" this "popular course" that was given a "new name and a new department" as expressed in this Exhibit, corresponding to and enmeshing Defendant, Dr. John Taylor's, own marketing intent described in his **Exhibit 97** resume at *page 23*.

**911.** Again, in **Exhibit 123**—Defendant, Dr. James T. Low, individually is celebratorily advertised and this vertex boasts further that this course "enable[s] [**STUDENTS**] to develop solutions to problems that even experts have considered unworkable." *Id*.

**912.** Specifically, the Defendants advertise this "Breakthrough Solutions course" as follows:

> "Through **hands-on** projects using [**Effect-Cause-Effect Logic**] logic, [**STUDENTS**] will learn to develop **creative <u>win-win</u> solutions** to conflicts that have stymied others. [**STUDENTS**] will learn how to achieve an ambitious goal by using the obstacles that normally detail any progress to achieving the goal. Instead, [**STUDENTS**] will learn how to build a roadmap to achieving the goal by using the obstacles as a constructive means to get there. [**STUDENTS**] will also learn how to diagnose the root cause of problems so that they can avoid wasting time and energy on mere

symptoms, as well as how to plan for implementation of solutions in ways that make sure they will really work."

*Id*. (Emphasis added).

**913.** Continuing with the Defendants' Marketing and Supply Chain Management Department, we see that on December 15th, 2017, the "Wayne State University Mike Ilitch School of Business [**was**] **proud to announce** a $123,000 contract with the Automotive Industry Action Group ["AIAG"] to **determine whether <u>regulatory</u> <u>burdens</u> spur or stall innovation in the auto industry**." **Exhibit 286**. (Emphasis added).

**914.** Simply, this "proud" vertex of the Defendants' IMC is <u>now</u> <u>non-existent</u> on both AIAG's website and the Defendants, and that is believed to be based on the connectivity to the individual researchers identified and the specific research that was to be conducted, where:

"Through this major grant, Ilitch School **researchers will construct** a **database of corporate responsibility practice** types, along with an analysis of their costs and benefits. The **research will aim to identify** current and future industry **best practices**, **costs of compliance and non-compliance**, and possible benefits that result from sustainability practices."

*Id*. (Emphasis added).

**915.** Further, "[i]n addition to [**Sachin**] **Modi**, researchers on the project include global supply chain management faculty members **John Taylor**; Bertie Greer; and **Tim Butler**." *Id*. (Emphasis added).

**916.** Specifically, we know that Defendant, Dr. John Taylor hired Mr. Modi (recalling **Exhibit 97**, at pp. 21-22), and even then, Mr. Modi opined the following rather alarming notation that which seems at odds with **STUDENTS**' rights:

"Managers are often tasked with maximizing shareholder value and delivering innovative products. It is debatable whether corporate responsibility helps or harms their efforts to meet these objectives," said Sachin Modi, principal investigator and professor of global supply chain management. "As such, academic research that provides a trust picture of the automotive industry's best practices, as well as reliable evidence of costs and

benefits of corporate responsibility initiatives, is critical for managerial decision making."

**Exhibit 286**. (Emphasis added).

*917.*    From AIAG's perspective, this *arguably* paid-for research, as identified by "Joel Karczewski, vice president, [of] commercial services at AIAG:"

> "We're **proud to sponsor** this project as part of the AIAG/WSU GAPSCN program, which **focus**es on **developing talent and innovation** in global purchasing and supply chain, and **includes research on critical global automotive issues** like these...in this case, **AIAG <u>anticipates</u> <u>results</u> that reflect our belief** in the numerous benefits of corporate responsibility and sustainability initiatives. When organizations take action in way that are socially responsible, <u>ethical</u>, and environmentally friendly, they're doing more and just 'the right thing' – they're adding value to their bottom line."

*Id*. (Emphasis added).

*918.*    Finally, we see again the **ECHO** of the Defendants' IMC reverberate the Critical Chain Application of the Theory of Constraints as described by Defendant, Dr. John Taylor, as the Defendants, in this space and time, continue to perfect this process to "*use these [**STUDENTS**] as bridges to companies,*" (recalling **Exhibit 42**, at pp. 9-10):

> "The **research project** also **strengthens** the **connections between** the Ilitch **School and** the **automotive industry**. "**As we deepen our industry relationships**, it **leads to research** relevant **to both automotive companies and our faculty**. It **also increases opportunities for** [**STUDENT**] internship placement **and other collaborative projects**," Taylor said."

**Exhibit 286**. (Emphasis added).

*919.*    This logic of research and "create[ing]...knowledge" is **ECHO**ed again outside the control of the Defendants' Marketing and Supply Chain Management Department where too in September 2017 we see an important vertex of the Defendant's IMC resonate the Wayne State University Office of Equal Opportunity Register Vol. 1, Issue #10, under the direct supervision of Defendant, Attorney Louis Lessem; recall **Exhibit 79**— "**How will you live our mission**?"

*920.*    Finally, on March 29, 2017, we recall again **Exhibit 147**, another of the Defendants' IMC vertices that identifies clearly the level of infusion of the Defendants' "research" mission and the

unprecedently move to remove tenure from five (5) professors by Defendant, M. Roy Wilson, demonstrating the powerful and focus toward achieving the global objectives of "research."

*921.* Specifically, we can identify from **Exhibit 147**, that Defendant, M. Roy Wilson's, reasoning behind make this superfluous move was to **shock the system** towards achieving the global objective but for the "grossly underperforming" tenured professors who were "not doing anything...making it difficult to move the university towards its mission as a premier urban research institution." *Id*.

# **WAYNE STATE UNIVERSITY IMC: 2018**

*922.* *Now*, to pause here in this space and time, we begin to see through the Defendants' IMC the effect-cause-effect results of the Defendants' infusion of the Critical Chain Application of the Theory of Constraints while building on this inextricable infusion **socialism of ideas** by leveraging too the intrinsic-research characteristics of the [*VERY*] Ambitious Goal Curriculum on **STUDENTS**.

*923.* First, reviewing the "Management's Discussion and Analysis" portion of the 2018 Wayne State University Financial Report—*we again* recognize the "research" shadow cast by the Defendants; an overview of what has been laid out here by reconstruction of this IMC:

> "Wayne State University is a nationally recognized **public research university** with **urban roots** and a **global reputation**. The main campus, located in Detroit's University Cultural Center, includes more than 350 undergraduate, graduate, doctoral, certificate, and professional programs offered through the University's schools and colleges. With fall 2017 enrollment of approximately **27,100 students**, the University **ranks among** the **top public universities in the nation** and has the most diverse student body of any university in Michigan. As the **7th largest employer in the city of Detroit**, as ranked by the 2018 Crain's Business Survey of Detroit's Largest Employers, **the University has a significant impact on the local economy and contributes to the state and nation as well through its research and public service programs**.
>
> **Excellence in research is essential to the University's mission.** Based on the 2017 National Science Foundation Research and Development Expenditures Survey, the University **ranked 99th among all universities and 69th among**

**public universities in research** and development expenditures. A **substantial portion of the University's research is conducted at the School of Medicine**, the **nation's largest single campus medical school**. The 2017 National Science Foundation Research and Development Expenditures Survey ranked the University 53rd in the health sciences category. Based on the 2018 Carnegie classification of higher education, Wayne State University ranked within the **top 2.7 percent of the nation's universities and colleges with the Carnegie classification of R1 (very high research activity)**. **Wayne State University, Michigan State University, and the University of Michigan, the state's three largest research universities, are partners in the University Research Corridor (URC)**. The URC is an alliance among these three universities to **spark regional economic development** <u>through</u> invention, innovation, and technology transfer, **by educating a work force prepared for the "knowledge economy,"** and **by attracting smart and talented people to Michigan.**"

**Exhibit 287**, at p. 5. (Emphasis added).

**924.** Next, we see an optimistic overview of the "Higher Education <u>Industry</u>" expressed *then* as:

"The United States higher education industry remains stable as demand continues to be strong and enrollment is steady. The long-term outlook for higher education is favorable as the **number of careers requiring degrees** and **advanced degrees continues to grow**. The lifetime earnings disparity between degreed and non-degreed individuals strongly supports the value of higher education. Despite the strong demand, t**he sector continues to face a multi-faceted set of challenges**. There are **continuous pressures on institutions regarding affordability,** <u>accountability</u>**, and** <u>competition</u>. Also, there is uncertainty surrounding the federal policy for higher education and concern regarding the growth in unfunded pension liabilities. Research funding is expected to have moderate increases from both federally funded and non-federally funded agencies, with **funding likely to shift to comprehensive universities that offer** <u>cross</u>**-**<u>discipline</u> <u>collaboration</u>."

*Id*. at p. 18. (Emphasis added).

**925.** Finally, the "Management's Discussion and Analysis" section identifies the "short term" goals of the Defendants' institution, and the "seven pillars of **focus**" established by the Defendants' "strategic plan, Distinctively Wayne State University:"

"In the short-term, institutions of higher education are experiencing **very modest increases in tuition revenue**. State support across the country has varied significantly from state-to-state over the last 5 years with some states still below pre-recession funding levels. <u>Constrained</u> **revenue sources require institutions to** <u>continuously</u> **manage operating costs while balancing the competitive recruitment and retention of its faculty and staff**. Universities

continue to utilize debt financing and philanthropy to provide the necessary investments in campus infrastructure....

The **University is <u>positioning</u> <u>itself</u>** to address the challenges and opportunities guided by its strategic plan, Distinctively Wayne State University. The strategic plan sets forth **seven pillars of <u>focus</u>**:

- **<u>Student success</u>** – **[STUDENTS]** remain the University's **top priority**, and it will provide [**STUDENTS**] with the tools and experience that they need to learn and succeed. Academic excellence, **<u>innovative</u> <u>pedagogies</u>**, **<u>collaborative</u> and interdisciplinary <u>research</u>**, career preparation, global experiences, and **<u>deep</u> <u>engagement</u>** in cultural diversity within a dynamic urban environment all create a "Distinctively Wayne State" [**STUDENT**] experience.

- **<u>Teaching excellence</u>** – The University will **use both proven and thoughtfully innovative**, **evidence based**, **<u>high</u>-<u>impact</u> practices**, and culturally responsive and reflective pedagogies to increase the levels of [**STUDENT**] **engagement** and learning outcomes, as well as **promote greater academic performance** and achievement.

- **<u>Research</u>** – The University **will increase strategic integrative research and nurture the <u>broad</u> <u>ecosystem</u> for scholarly inquiry**, **discovery**, **creativity**, and urban location. **The University believes the <u>research</u> <u>ecosystem</u> <u>is</u> a <u>key</u> <u>driver</u> <u>for</u> <u>economic</u> <u>growth</u>**, for revitalization in Detroit, and for addressing real-world challenges in a rapidly evolving urban environment. **<u>By</u> <u>engaging</u> [STUDENTS] <u>at</u> <u>all</u> <u>levels</u> <u>enhances</u> <u>the</u> <u>research</u> <u>mission</u> <u>as</u> <u>well</u> <u>as</u> <u>their</u> <u>participation</u> with the University and preparation for careers**.

- **<u>Diversity and inclusion</u>** – The University **strives to have an inclusive environment** where diversity is valued broadly **and appreciate the <u>ability</u> of <u>every</u> <u>person</u> <u>to</u> <u>contribute</u> <u>to</u> over diversity <u>of</u> <u>thought</u>**. The University's rich multicultural experiences enable us to develop exportable programs and curricula, which provide leadership in a multicultural society.

- **<u>Entrepreneurship</u>** – The University strives to become **a bustling <u>hub</u> of innovation**, where **new ideas are constantly developed** into new ventures; students and faculty collaborate through TechTown Detroit to mentor community, urban, and minority entrepreneurs; and industry leaders and startup CEOs seek innovative resources. **The lively <u>exchange</u> <u>of</u> <u>new</u> <u>ideas</u> <u>and</u> the <u>innovative</u> <u>collaboration</u> both on and off campus <u>will</u> <u>allow</u> the translation of <u>research</u> and development into entrepreneurship**, which will

permeate the campus culture and increase the growth and vitality of the University, the city, and region.

- **Community engagement** – The University **encourages** **every** **faculty** **member**, **administrator**, and **[STUDENTS]** **to** **participate** in **meaningful**, **sustainable**, **and** **mutually** **beneficial** **relationships** **with** **the** **community**. The **experiential** **learning** and community service **are** **vital** to the **academic** **mission**.

- **Financial and operational** – The **University is** **committed** **to** **grow** **revenue** and **increase** the **efficiency** and **effectiveness** of **business** **processes** in order **to** **provide** **adequate** **resources** **to** **support** **the** **University's** **mission** while maintaining a value-based tuition **structure**."

*Id*. at pp. 19-20. (Emphasis added).

*926.* Simply, this snapshot again **ECHO**s the Defendants' **RESEARCH** mission from the top down and infuses the authority throughout the body corporate of Wayne State University.

*927.* Recall the emanating effect-cause-effect of the full implementation of the Critical Chain Application of the Theory of Constraints and global authority as depicted in **Exhibit 241**, added to the Defendants' IMC on September 12, 2018, identifying at the "mid-point of the [2016—2021 Distinctively Wayne State University Strategic Plan]" that when "classes [begun] Aug. 29, there were 2,955 full-time freshman. That's an **increase** **of** **15** **percent** **over** **last** **year**'s incoming freshman class." **Exhibit 241**, at p. 1. (Emphasis added).

*928.* Specifically, *then* President and Defendant, Dr. M. Roy Wilson, identifies explicitly that "[s]ome of our enrollment seems to be related to new campus development[:]"

> "Just **last month** we had the **ribbon cutting for** the brand-new **Mike Ilitch School of Business** in downtown Detroit. This beautiful new learning facility **has brought a** **surge** **in** **enrollment** **for** **the** **school**. Since we announced the $40 million Ilitch gift in October 2015, **graduate enrollment in** **the Mike Ilitch School of Business has** **increased** by **two-** **thirds** **to** **more** **than** **1,400** [STUDENTS] this fall. In that **same** **time**, total **enrollment** in the school has **increased** by **one-third** **to** **more** **than** **4,000** [STUDENTS] today."

*Id*. at p. 2. (Emphasis added).

929.    Continuing, Dr. Wilson identifies further that an "**important objective** in our Strategic Plan **was to restructure** the general **education** program **to ensure** [STUDENTS] learning outcomes and **success**." *Id*. at p. 4. (Emphasis added).

930.    Plainly, Defendant, Dr. Wilson explains explicitly the effect of the infusion of the Theory of Constraints to Wayne State University:

> "**We successfully modified** our general **education program for the first time in 30 years**, laying the **basis for a true 21st century learner**. A byproduct of the new gen ed curriculum is greater flexibility for the [STUDENTS], which should help them in achieving a successful educational outcome."

> *Id*. (Emphasis added).

931.    Continuing, this IMC vertex explains further the <u>authority</u> and <u>dominion</u> over the "[**RESEARCH**] [E]nterprise" that is Wayne State University:

> "**Our** stated **goals for our** [**RESEARCH**] **enterprise** are <u>ambitious</u>. **Among them are** increasing research expenditures, **expanding the** [**RESEARCH**] **enterprise**, and establishing an Office of Research Development."

> *Id*. (Emphasis added).

932.    Continuing even further, Dr. Wilson explains and differentiates Wayne State University from *other* institutions identifying intrinsically the "**Decisive Competitive Edge**" that is being laid before you: "[u]niversities sometimes have the reputation of being **complex organizations** that **move slowly** and are **so risk averse that they cannot** <u>capitalize</u> **on** <u>opportunities</u> **to** <u>collaborate</u> **with** <u>businesses</u>." *Id*. at p. 6. (Emphasis added).

933.    This **ECHO**s the intent that which Wayne State University is operating under and instead, this statement is the antithesis of the Defendants' Strategic Plan designed to capitalize on the intersecting foci—**socialism of ideas**, an old concept in new form disguised "for a true 21st century learner." *Id*. at p. 5.

***934.*** Finally, expressing the institutional synergy as being "proud to be apart of **this team**," Dr. Wilson explicitly identifies the *progress yet to be made* by intrinsically confessing the Defendants' specific intent to "game the system:"

> "**These** sorts of **activities will pay off over time to raise our public statute and reputation**, but our reputation also depends on how well we serve our core mission. I continue to have mixed feelings about the U.S. News and World Report ranking, because **the rankings can be manipulated**, and **I have no intention of trying to game the system, although all too many do.**"

*Id*. at p. 8; 11. (Emphasis added).

***935.*** In the same breath of this disturbing confession as to the **ability to manipulate**, we see exactly how "**the rankings can be manipulated**" to "**game the system,**" where on June 18th, 2018, the effect-cause-effect of the Defendants' implantation of the Critical Chain Application of the Theory of Constraints by using the [*VERY*] Ambitious Goal Curriculum in Defendant, Dr. John Taylor's, Marketing and Supple Chain Management Department "*pay*[*s*] *off over time*" and leads explicitly to **ranking manipulation** where "Wayne State's supply chain program [becomes] ranked among top 25 [#17] in the country." **Exhibit 288**—*2018 Mike Ilitch Supply Chain Program Top 25 Article*.

***936.*** Specifically, Defendant, Dr. John Taylor, identifies that, "[t]his is a **great milestone** for **our program**...[i]t shows that Wayne State is **instrumental** to closing the skills gap in supply chain. **Our graduates** are well trained and talented, with the **right combination of skills** and experience to support **new capabilities** and **drive change in the industry**." *Id*. (Emphasis added).

***937.*** Continuing **explicitly**, **courses** "**include** logistics and transportation, purchasing, risk management, manufacturing processes for buyers, production planning and control, **theory of constraints**, quality management, lean management, and more." *Id*. (Emphasis added).

***938.*** **Then again**, on June 29th, 2018, essentially the same article as **Exhibit 288**, an additional vertex of the Defendants' IMC **ECHO**s this same content in the DBusiness Magazine and adds a

digital layer for search engine optimization ("SEO") purposes to amplify the brand value attributable to such 'success.' **Exhibit 289**—*DBusiness Magazine June 2018 Top 25 Article.*

*939.* **Then** **again**, on June 24th, 2018, AIAG, the Defendants' "partner" and **RESEARCH** grant principal, **ECHO**s this underline{exact} "*milestone*" written by "Wayne State University, Mike Ilitch School of Business" to add another digital-IMC layer for SEO purposes disseminating further this perceived-brand value; including too the explicit mention of General Motors **and** the "***theory of constraints***" as an available course. **Exhibit 290**—*AIAG Top 25 Article.*

*940.* **Then** **again**, on September 14th, 2018, DBusiness Magazine **ECHO**s further this "milestone," by expressly identifying "***the theory of constraints***," and Defendant, Dr. John Taylor's, **extreme happiness** about "**our program**:"

> "**I am thrilled** for **our program**...**We offer** a comprehensive course offering our [**STUDENTS**], **and it's great that** the **growth** of **our program** and the **relationships** **we have built within the industry are being acknowledged**."

> **Exhibit 291**—*DBusiness Magazine September 2018 Top 25 Article.*

*941.* *For*, without the Critical Chain Application of the Theory of Constraints **and** the [***VERY***] Ambitious Goal curriculum of TOCFE **generating the knowledge** behind this **RESEARCH Enterprises**' intellectual-upward trajectory—Wayne State University, and the Defendants collectively and individually, underline{would} underline{not} have underline{legitimately} reached the plateau we rest upon now.

*942.* Plainly, the Defendants have "**manipulated**" the **rankings** by "**gam[ing] the system**," *respectfully*.

*943.* Continuing, on October 18th, 2018, the Defendants IMC identifies an important "policy" **ECHO** identifying the "major changes to federal regulations ["procedures"] that protect the rights and welfare of human participants (subject) research which [went] into effect on January 21, 2019." **Exhibit 292**—*WSU HRPP Sweeping Changes 2018 Article.*

944. *Simply*—"[h]oused within the Division of Research, the Wayne State University [Human Research Protection Program] HRRP is responsible for the Institutional Review Board (IRB) review and approval of [**RESEARCH**] involving Human Subjects [**STUDENTS**], ensuring that all human subject research at Wayne State be conducted in accordance with **all** Federal, institutional **and** ethical guidelines." *Id*. (Emphasis added).

945. Encouraging all stakeholders of the Wayne State University "**research <u>community</u>**" to gain information and specific guidance "to become familiar with the new regulations, and how they may impact your future research." *Id*.

946. Specifically, this vertex of the Defendants' IMC identifies explicitly that "**<u>all</u> <u>studies</u>**" will be affected by the "major changes to federal regulations" regarding the "revised Common Rule:"

> "The **revised Common Rule** will be in **effect for <u>all</u> <u>studies</u> that have been APPROVED on or after January 21, 2019**. The IRB administration office will post our **modified consent templates** on our website in **December 2018 to allow researchers to begin preparing the <u>consent</u> <u>form</u>** prior to any January 21, 2019, submissions. **All** of the **updated policies, applications, templates <u>and</u> guidance documents will be <u>posted</u> <u>to</u> the WSU <u>IRB</u> <u>website</u> on the eve of January 21, 2019**."

> *Id*. (Emphasis added).

947. Continuing, by acknowledging the impact this expansion of Rights has on the Defendants' institution:

> "this may create new challenges for those of you who are planning to submit your study for review during January 2019. **<u>We</u> <u>are</u> <u>doing</u> <u>everything</u> <u>possible</u> <u>to</u> <u>prepare</u> <u>our</u> <u>research</u> <u>community</u>**, IRB Members, **<u>and</u> staff for these changes**. We ask for your patience as we transition to the updated regulations, and *<u>learn from</u> <u>one</u> <u>another</u> along the way*."

> *Id*. (Emphasis added).

948. Recall again **Exhibit 277**, and explicitly **Exhibit 278**—<u>clearly</u> <u>establishing</u> that the Defendants bypassed this federally <u>required</u> "policy" and <u>failed</u> to follow the "guidance" of the

Wayne State University IRB and HRPP, and instead dug deeper to continue their unsanctioned **Human Research on STUDENTS** in the form of [**VERY**] Ambitious Goal Curriculum of TOCFE—furthering the application of the globally entwined Critical Chain Application of the Theory of Constraints.

*949.* We see this **failure** to follow proper "policy" and "procedure" continues to build hastily in 2018—*even with* the knowledge of Defendant, Dr. John Taylor—where on March 30th, 2018, an identified **STUDENT** registered for GSC 7260 and sparked an email chain that **pinpoints the progression** of the Defendants' use of [**VERY**] Ambitious Goal Curriculum **before and after** the Revised Common Rule. *See*, **Exhibit 293**—*GSC 7260 Syllabus Request*.

*950.* Specifically, in responding to this inquiring **STUDENT**, Defendant, Dr. James T. Low, forwards not only the most recent syllabus used for the 2018 GSC 7260 Spring Semester, but also what is *herein* known as the confessing-repetitive advertisement as **Exhibit 284** and those **STUDENTS**' educational records compiling the illegal and unethical effects of the Defendants' ongoing **RESEARCH** on **STUDENTS** *herein* as **Exhibit 142**. See, **Exhibit 294**—*2018 GSC 7260 Syllabus*.

*951.* Continuing, it is the language of Defendant, Dr. James T. Low's, response on April 2nd, 2018, to an identified **STUDENT** that further **ECHO**s the objective of *this* Complaint and bolsters these arguments with Dr. James T. Low's own words:

> "The **course is intended to** provide [**STUDENTS**] with
> a lifetime career advantage, because they learn to readily
> **solve problems others** would **consider impossible**."
>
> **Exhibit 293**, at p. 1. (Emphasis added).

*952.* Continuing even further, this email chain was used by Defendant, Dr. James T. Low, on March 15th, 2019, *after* the Revised Common Rule went into effect on January 21st, 2019, sent to Wayne State University **Director** of **Instructional Design** and Part-Time Faculty of Information

1   Systems Management, Mrs. Nicole Winkler, **and also** Chair of the Marketing and Supply Chain

2   Management Department, Defendant, Dr. John Taylor, and too Mrs. Audrey Taylor to whom this

3   email was ultimately retained through a FOIA request. **Exhibit 293**, at p. 1. (Emphasis added).

4   *953.*    To *emphasis* this evidence *further*— "...*it* (*the 2019 GSC 7260 syllabus*) **would** **be** **the** **same**

5   **except** for **adjusted** **dates** **for** **the** **year**. I hope that *gives you enough to work with*. I haven't tried

6   to publicize the course yet, but **I see that there are 15** [**STUDENTS**] **registered** **already**, the last

7   time I looked. **Would it be useful if I came in to help you**?" *Id*. (Emphasis added).

8   *954.*    Finally, I find a directive and/or requirement of this 2018 GSC 7260 syllabus highly

9   suspicious under these circumstances in that Defendant, Dr. James T. Low, bifurcated the

10   **STUDENTS'** submissions for "correspondence" and "**homework and course submissions**,"

11   using two-separate emails directing the value derived from **STUDENTS'** academic records to

12   Google serves *instead* of Wayne State University's servers. **Exhibit 294**, at p. 1.

13
14

GSC 7260, Section 33229
Theory of Constraints: Breakthrough Solutions
Monday, Wednesday, 6:30-9:00 PM
321 Jeffress Center Building, Schoolcraft College
Seven Mile at Haggerty Road, Livonia

15
16   Spring Semester, 2018
Instructor: Dr. James T. Low
Office:    300 Prentis Bldg., Wayne State Univ., Detroit, MI 48202
Phone:    (734) 429-3381 (Home), (734) 944-0543 (home fax), (734) 646-0295 (cell)
Office Hours: Monday, Wednesday 6:00-6:30 PM, 9:00-9:30 PM , and by appt.
E-mail:  james_low@wayne.edu for correspondence
17
             jamestlow@gmail.com for homework and course submissions

18   *955.*    **Rhetorically speaking**, in the most respectful and civil way possible—**who** **else** has access

19   to these emails containing *not only* the **STUDENTS'** educational records, *but too*, as an intrinsic

20   result of the **RESEARCH** conducted by the Defendants and Dr. James Low, the **business records**

21   containing the intellectual property and trade secrets of those **STUDENTS'** employers.

22

# <u>WAYNE STATE UNIVERSITY IMC:</u> 2019

*956.*   First, while pondering this question above, recall **Exhibit 279**, and the fact that the construction of the Defendants' "new data center" was completed as a state-of-the-art that brought "Wayne State into the future:"

> "The **new data center** is an **investment** by the university **to <u>elevate</u>** our existing **infrastructure** to **current best practice standards** of an energy-efficient, high-performance and **secure computing environment**," said Daren Hubbard, chief information officer and associate vice president, C&IT. "**Our goal with this new facility is <u>to ensure</u>** that Wayne State is able to support the teaching, learning and **research <u>computing</u> <u>needs</u> <u>of</u> <u>today</u> <u>and</u> <u>tomorrow</u>**. Our current facility has served the campus well and we look forward to the new facility doing the same.
>
> The **new construction <u>houses</u> <u>all</u> of Wayne State's computing facilities**, and includes an energy-efficient cooling system as well as **state-<u>of</u>-<u>the</u>-<u>art</u> <u>security</u>**, fire protection, and power back-up. A **substation was built** on the property to provide **redundant electrical feeds from Detroit Edison**, giving our facilities truly reliable electrical power for the first time. This **new building brings Wayne State into the future**, and **will help further support the success of** students, **<u>faculty</u>**, **<u>staff</u>**, and **<u>researchers</u>**."
>
> **Exhibit 295**—*C&IT State-of-the-Art Article*. (Emphasis added).

*957.*   By elevating this constraint (the constraint being the 'out-of-date' information-technology infrastructure) the Defendants continue their advance towards **RESEARCH** on a macro scale.

*958.*   At the same time this is occurring, we see *at the top* a definitive-power struggle emerges and a misaligned Wayne State University Board of Governors attempts a coup to vote out Defendant, Dr. M. Roy Wilson; recall, **Exhibit 5**.

*959.*   This gridlock attributable to many variables, potentially in large part the breakdown and separation from DMC while Defendants were "taking advantage of [that] opportunity" (recalling **Exhibit 160**)—*however this is viewed though*, on September 6th, 2019, the Office of the Vice President and General Counsel, then under the control of Defendant, Mr. Louis Lessem, publicly released **Exhibit 296** in connection with an inquiry from the Higher Learning Commission.

**960.** Specifically, "the Higher Learning Commission had received a number of complaints that WSU's Board of Governors may have acted in violation of Core Criterion II.C(4); that 'the Governing Board delegates day-to-day management of the institution...'" *Id.*

**961.** Simply, following the Higher Learning Commission's request to respond to these allegations from Defendant, M. Roy Wilson, as then President of Wayne State University—the following processes were triggered by and in Defendant, Mr. Louis Lessem's, own words:

> President Wilson consulted with our Board of Governors, which determined that it was not reasonably possible for the Board to investigate itself regarding such allegations, or for the President to do so, and so elected to proceed as follows:
>
> - the investigation and response was delegated to the President, with the instruction that the President was to delegate it to me;
> - there was to be a firewall between myself and the President and Board as to the conduct of the investigation;
> - I was to retain outside counsel to conduct the actual inquiry;
> - the outside counsel was to be an individual familiar with higher education but not having represented Wayne State University, its Board, individual Board members, or anyone who would be interviewed.

**Exhibit 296**, at p. 1.

**962.** Candidly, this exact process would have taken place had *I* presented this unrefined evidence to the Defendants as *I* laid the thread mentally to couch exactly how **this is reality**—which bolsters too the subjective-chill argument *herein* and the overall decision to mitigate *my* damages to pursue *this* Complaint in lieu of proceeding internally; *though*, *I* suspect and have good reason to believe that this process has in part *already occurred* given that Defendants still have paid-in-full FOIA requests held in outstanding retaliation of breathing life into this gigantic fraud, *respectfully*.

**963.** Continuing, the **first** of two **complaints** made to the Higher Learning Commission in part identifies:

> "...**This concern has since grown into a far worse situation** – a **dysfunctional Board** where certain **members** attempt to **engage in operations**, and a president who is hampered in his ability to lead the institution. One particular governor, **Sandra O' Brien**, **consistently and**

openly **questions** **the** **competence of the president, most of his Cabinet members and a number of lower lever employees**...She has demanded that the Board approve interim dean appointments, which is not within BOG purview. She **inserted herself into an issue with a faculty visa issue** and then asked that the organizational structure be changed, and the director of the Office of International Students and Services be fired. This member has **created a block of four governors** (herself included) **that has stalled** (and perhaps permanently damaged) **the** **president's** **primary** **strategic** **program concerning WSU health sciences**...[t]his program, the president feels strongly, is necessary for the health and future of the School of Medicine and the university. The four board members wish instead to purchase the Detroit Medical Center at an approximate cost of $2-3 billion (which we do not have) from a for-profit company (**Tenant Healthcare** – **with whom we have a** **highly** **adversarial** relationship and who has no clear intention of selling). **These board members have begun** **a** **war** in the press **that has attempted to hurt the president's reputation and is definitely hurting the university's reputation**."

*Id*. at pp. 10-11. (Emphasis added).

964. Further, the **second complaint** made to the Higher Learning Commission in part identifies:

"...the Wayne State University Board of Governors **is not** "consistently delegate(ing) the day-to-day management of WSU to the administration." I can attest that such delegation is not occurring. Certain **Board members** that **I will characterize as rogue actors** have **second-guessed management decisions**, **intervened with staff**, and **threatened**, **cajoled**, and **intimated employees** **below** the level of the President, Vice Presidents, and **Deans** (e.g., **associated vice presidents and chairs**). In my 30+ years...never have I witnessed **rogue board members acting with personal agendas and vendettas** to **reach around** leadership, **consistently** and **maliciously** **violating** the University's **chain** of **command** and its own approved code of board conduct. It is **my observation** that **many of their actions** **are** **undermining** university leadership's ability to lead and compromising **the best interests of the University** [and **STUDENTS**]...All in all, these **overreaches** by certain board members **have had a profound impact** on the President who has shared (sic) with me and his cabinet that the Board's actions have undermined his ability to lead and may lead to his resignation. **This outcome would be a tragedy** for **this** **University** which **has suffered** **through 20+ of blurred governance** - - and this is the first president with the temerity and integrity to intervene."

*Id*. at pp. 12-13. (Emphasis added).

965. Specifically, this independent investigation set in motion by the Higher Learning Commission was conducted by Attorney, Ms. Emily Pontius, of the law firm of Fredrikson &

1    Byron located in Des Moines, <u>Iowa</u>, which found albeit tied to one member, five (*5*) instances of

2    Board member conduct that violated Core Criterion II.C(4). *Id*. at p. 8.

*966.*    Namely, we learn through this investigation that *even* WSU Board of Governors have

4    "*friend[s] and contacts*" within the body corporate that is Wayne State University and likely have

5    considerable leverage over *the system* when *this position,* or indivi1dual, seeks to obtain an

6    intended effect. *Id*. at p. 5. (Emphasis added).

*967.*    In fact, the Defendants continually add individuals to their roster of faculty and

8    administration for various purposes, two of which were cast as IMC vertices in spotlights during

9    this period that include: (*a*) Mary Zatina; and (*b*) Defendant, Professor Deborah Habel.

*968.*    First, *respectfully* to demonstrate the "*deep connections*" involved and control of the

11   Defendants, on December 18th, 2019, the Defendants' WDET radio station broadcast a relevant

12   vertex of this ongoing IMC identifying, Mrs. Mary Zatina, as the new general manager:

> "We are delighted that Mary is joining us at WDET. Her wealth of leadership experience and her **deep connections in the greater Detroit community are a perfect fit** for the station," **said Michael Wright**, WSU vice president of Marketing and Communications and Chief of Staff. "I have no doubt WDET will thrive under her leadership."

**Exhibit 297**—*WDET December Spotlight Article*. (Emphasis added).

*969.*    Second, an important vertex in the Defendants' IMC casts a spotlight on principal

22   Defendant, Professor Mrs. Deborah Habel, on November 22nd, 2019, *herein* as **Exhibit 298**.

*970.*    Explicitly, this **ECHO**ed spotlight on Defendant, Mrs. Deborah Habel, confirms her **deep**

24   **involvement** in the Defendants' strategic plan of **RESEARCH** and further demonstrates the

25   infusion of these claims to the Defendants' global IMC.

*971.*    Plainly, this vertex <u>is</u> <u>actually</u> an advertisement <u>soliciting</u> <u>donations</u> in comparison to Mrs.

27   Habel's arguably "self-supporting" pay-to-play endowments (**$50,000**) while 'obtaining' her Ph.

28   D at Wayne State University as a 'lecturer' at the Mike Ilitch School of Business. *Id*.

**972.** Interestingly—Defendant, Mrs. Deborah Habel, and her husband have **donated heavily** to five (5) sections of Wayne State University: (*a*) Wayne State University College of Engineering; (*b*) Wayne State University School of Nursing; (*c*) WDET; (*d*) Wayne State University Mike Ilitch School of Business; *and* (*e*) National Association of Black Accountants, "via their on-campus high school summer program." *Id*.

**973.** **We know** "[h]igher education is an advantage," and that Defendant, Mrs. Deborah Habel, "joined the Mike Ilitch School of Business faculty in 2014," after beginning teaching in 2009 at Mott Community College in Flint. *Id*.

**974.** Explicitly, "*Deborah says*, "...the rug can be pulled out from under you at any time, and **I wished I was in a position to help**. **Now I am**." *Id*. (Emphasis added).

**975.** *Yet*, as *this* record entails explicitly regarding this *Change Agent*—Defendant, Mrs. Deborah Habel, **was able and instead acquiesced** to the Defendants' "self-supporting" "revenue enhancement" where despite her ability to rebuke this conduct as a Philosopher King for what it is—unethical and illegal—**she did nothing** but joined the fray pursuing *her own* Ph.D. becoming instead, *respectfully*, a true Sophist. *Id*. (Emphasis added).

**976.** *Finally*, recall **Exhibit 20**, the Defendants' 2019—2022 Wayne State University Mike Ilitch School of Business Strategic Plan—*Charting the Course*—approved by the Wayne State University Mike Ilitch School of Business Academic Assembly on September 20th, 2019.

**977.** First, then Dean of the Mike Ilitch School of Business, Dr. Robert Forsythe, opens by identifying "another year of accomplishments," while "capping a half-decade of transformative achievements unrivaled in the school's 73-year history," by mentioning the relevant notes:

> " ▪ **Enrollment** in both undergraduate and graduate programs **soared 43% during the last five years**;
>
> ▪ **We launched** the **Executive Master of Science in Automotive Supply Chain Management**, the Master of Science in Data Science and Business Analytics, a Sport and Entertainment Management and Human

Resource Management **concentration in the MBA**, Undergraduate and Graduate Certificates in Entrepreneurship and Innovation, and the Detroit Police Department Leadership Academy Certificate;

- **Our global supply chain program and** the annual General **Motors/Wayne State University Mike Ilitch School of Business Supply Chain Case Competition** have **achieved international recognition** with participation from 24 schools from all over the world. *Additionally*, **both** our **undergraduate and graduate** global **supply chain programs are ranked in the top 25 of Gartner rankings; and**

- **We** have achieved **more than** a **50%** increase in published**, scholarly research** by our faculty over the past five years.**"**

**Exhibit 20**, at pp. 1-2. (Emphasis added).

*978.*    In closing this opening, Dr. Forsythe continues with the following:

> "**I am excited** for the **years ahead** and **delighted** that the MISB's 2019—20133 strategic plan **is an outcome of engagement from all** our key stakeholders. **Together we will** move forward and **collectively accomplish the strategic goals we have established**. **We will continue** to invest in **our dedicated faculty** and staff **which will result in impactful research and student learning outcomes**. **We will continue to work diligently** to ensure that our students are career-ready and able to compete in the constantly changing, global marketplace. **And jointly**, **we will create** a work culture **focused** on student success and **engagement**. **We** cannot reach our goals without financial support. **We will continue to work** on **obtaining funding** sources **to support strategic initiatives** such as scholarships and study abroad. **All these goals will enhance our reputation** and make the Mike Ilitch School of Business one in which you can be proud."

*Id*. at p. 2. (Emphasis added).

*979.*    Continuing, the "*Executive* Summary" of the 2019—2022 Strategic Plan for the Mike Ilitch School of Business is explicitly as follows:

> "It is a **revision of** the **2013-2018 plan and continues to build on existing success** factors, the many accomplishments and the new building in its new District of Detroit location. **In order to align MISB's strategic planning cycle with Wayne State University's cycle**, this plan is for three years. **In 2022, MISB will commence a new strategic planning process** according to the new Wayne State University's strategic vision. **This plan is**

the **outcome** of a **strategic** **process** **with** **key** **stakeholders** who reviewed and revised existing 2013-2018 strategic goals."

*Id*. at p. 3. (Emphasis added).

**980.**    Next, the "*Introduction*" identifies the following relevant additions to the Defendants' IMC **focus**ed again on "collaborative alignment opportunities developed with local businesses," of which could include similarly the Critical Chain Full Cycle **STUDENTS R.S.** (recall **Exhibit 143**) and **STUDENT J.A.** (recall **Exhibit 260**; **Exhibit 261**; & **Exhibit 262**):

"Metrics to monitor business engagement success are the number of executive education programs offered and the associated net revenue generated, and the number of feasible, collaborative alignment opportunities developed with local businesses."

**Exhibit 20**, at p. 5. (Emphasis added).

**981.**    Continuing with a recap during the 2013—2018 "time period," approximately "90% of the [Mike Ilitch School of Business] stated strategic goals were achieved, propelling the Defendants towards **Exhibit 20** and future "*win-win*" engagements, where "key areas of **focus**" included:

"Key areas of **focus** for 2019—2022 will be **engagement** **with** the **business** **community** and [STUDENT] success. **Building** **mutually** **beneficial** **collaborations** will permit the MISB to be **more** entrepreneurial and **revenue** **driving**. **Additionally**, **we will** be able to build relationships that will **enhance** the quality of **our** **instruction**, faculty **research**, and [STUDENT] opportunity."

*Id*. (Emphasis added).

**982.**    Moreover, to demonstrate the synergy and connectivity of authority, the "MISB's strategic planning cycle was misaligned with that of the University, the School was in the undesirable position of having to create a new 5-year strategic plan in 2019 and then again in 2022 in order to articulate and **align with the University's new strategic vision**." *Id*. at p. 6. (Emphasis added).

**983.**    To solve this planning misalignment to **bridge together** this strategic **focus**, "Dean Forsythe and his leadership team discussed three strategic planning options;" the following option was chosen by "consensus" to sync these plans, reducing the term of the "MISB" strategic plan:

" 3) Adopt a strategic planning cycle that lags one year behind the
University's (sic) 2019-2022."

*Id*. at p. 6.

**984.**    Specifically, the Strategic Planning Process used by the Defendants to generate **Exhibit 20**'s Strategic Plan **is itself in form** [*VERY*] Ambitious Goal Curriculum; a form of strategic planning using stakeholder input aimed at obtaining maximum input from the "self-supporting" Change Agents implementing the focused mission on the daily.

**985.**    Following along, **this** strategic **process** is interchangeable with the [*VERY*] Ambitious Goal Curriculum in a pedagogical environment **and** the process used at MTU Detroit Diesel (recall **Exhibit 261**) each exploited by the Defendants—where *here*, the elected 2018—2019 Faculty Strategic Planning Committee in six (*6*) Phases continuously improved their Critical Chain Application of the Theory of Constraints. **Exhibit 20***, at pp. 7-8; 28.

**986.**    Explicitly, the **FIRST PHASE** of the Defendants' continually improving Strategic Planning Process began in Fall 2018 and lasted approximately until March 2019:



*Phase 1*

- Associate Dean Greer reviewed the current strategic plan. After reviewing, she sent out a request for information and updates to all parties who were identified as being responsible for strategic goals and/or objectives in the current 2013-2018 plan.  (9/2018)

- A request was made to the faculty senate to start the process to form the MISB strategic planning committee (9/2018). Following senate rules, a committee was formed. (2/2019)

- Dean Forsythe and his leadership team met to discuss the current mission and vision statements and determine if the current mission is still suitable for the strategic direction of the School. After much discussion, it was agreed that the current mission is still relevant and capable of directing the School until 2022.

- Dean Forsythe and his leadership team met and agreed on the process for the strategic plan review.

**Exhibit 20**, at p. 7.

**987.**    Next, the **SECOND PHASE** of the Defendants' continually improving Strategic Planning Process took place during April to June of 2019:

> **Phase 2**
>
> All key stakeholders were engaged to determine the situational analysis for the MISB (see Appendix for details). The key stakeholders were divided into groups and input was sought from all levels.
> - Engagement with Dean Forsythe's executive team by strategic focus group (February 2019)
> - Engagement with MISB Strategic Planning Committee by strategic focus group (April 2019)
> - Engagement with MISB BOV executive committee by survey (June 2019)
> - Engagement with MISB Student Ambassadors by survey (June 2019)
> - Engagement with MISB Staff Council Members by survey (June 2019)

*Id.*

**988.** Next, generating this extensive review of the process and updated input from the knowledgeable stakeholder(s) to recreate each facet of the Defendants' system for continual improvement, the Defendants digested this "<u>solicited</u>" feedback <u>data</u> from all key stakeholders just as Defendants, Dr. Low and Professor Habel had demanded, and prepared a draft as the **THIRD PHASE** sometime in and around July 2019:

> **Phase 3**
>
> All information received from the strategic focus groups and surveys were content analyzed to determine a summary analysis and an overall situational analysis for MISB. This information provided the basis for the revisions and creation of new MISB strategic goals. A draft plan was developed and shared with the Dean's executive team and the MISB Strategic Planning Committee to obtain feedback. This resulted in a revised plan (July 2019).

*Id.* at p. 7.

**989.** Next, the **FOURTH PHASE** is designed as a feedback look, exactly as the three-tier grading structure of the Defendants [VERY] Ambitious Goal Curriculum of TOCFE, simply taking the inputs generated from the solicited-*key* stakeholders (top managers with authority), and making a '*first revision*' of the draft for improvement of the Defendants' strategic plans to date:

> **Phase 4**
>
> Revise Draft MISB 2019-2022 Strategic Plan (August 2019)

*Id.*

**990.** Next, this feedback look continues in the **FIFTH PHASE** where the 'first revision' was "share[d] and discuss[ed]....with faculty at [the] faculty retreat sometime in and around July and August 2019 where the Defendants "receivie[d] feedback and [**made**] **changes** similar to again the three-tiered grading structure of the Defendants' application of [*VERY*] Ambitious Goal Curriculum:

> **Phase 5**
>
> Share and discuss the draft plan with faculty at faculty retreat
> Receive feedback and make changes (August 2019)

*Id.*

**991.** Next, and finally, the **SIXTH PHASE** of this feedback loop is the final grade, where on September 20th, 2019, the Academic Assembly voted and approved this improving plan:

> **Phase 6**
>
> Vote and Approve MISB 2019-2022 Strategic Plan: Charting the Course 2022 (September 2019)

*Id.* at p. 8.

**992.** Specifically, the Strategic Planning Timeline used by the Defendants to replicate the current reality effecting Wayne State University using SWOT (Strength; Weakness; Opportunity; *and* Threat) analysis is outlined by the Defendants in detail leading up to this Complaint. *Id.*

**993.** The byproduct of this strategic-**communication cycle** resulted in several relevant variables, the first of which is a revised Mission Statement that emboldened the Defendants' push forward:

> "*Our mission is to prepare our students for challenging and rewarding careers, advance the boundaries of scholarly and practitioner knowledge, and enhance the economic vitality of the city of Detroit, the state of Michigan and beyond through our programs, research, and community engagement.*
>
> *Innovate, Impact & Inspire*"

*Id.* at p. 9. (Emphasis added).

**994.** Specifically, the Defendants reveal the "Strategic Emphasis" on the integration of this deliberate-synergic **focus** for continuous improvement to "exploit" and "advance the boundaries" forward as the cause of *this* Complaint—*plainly*:

> "The **MISB** **strives** **to** incorporate and **exploit** **interactions** that occur **between** **[STUDENT] Success**, **Engagement** **with** **the** **Business & Community,** **and** **Basic** **and** **Applied** **Research**. The **integration** and synergies created through these interactions are further improved by increased funding for **research**, teaching, and **engagement** initiatives as well as an **increase** in program **ranking**."

*Id*. (Emphasis added).

**995.** The best way to **enhance** external **reputation** is through "**collaborative** **effort** with **all** **stakeholders** and a **continuous** **improvement** **process**," as has been developed by this reflection of the Defendants' swelling IMC. *Id*. at p. 26. (Emphasis added).

**996.** To do this properly, the stakeholders must identify through a "Situational Analysis" the current footing and direction of the entity at which is being directed in order to understand the variables of interaction capable of being exploited—the Defendants framed their continuous improvement process as follows:

> "**To determine the** **current** **state** **of** the MISB's **operating** **environment**, we conducted strategic **focus** groups and **surveys** to **gain feedback and insight** on MISB's SWOT **from** **key** **stakeholders**. We sought input from leadership, BOV, faculty, [**STUDENTS**], and staff (See Figures 3-7)."

*Id*. at p. 10. (Emphasis added).

**997.** For example, a "key strength" was identified as the "MISB **faculty** and staff, who are the **heart** and **soul** of the School and **crucial** to its operation." *Id*. (Emphasis added).

**998.** Namely though, the "stakeholders agreed that the new MISB building and its new location is a strength that will add **significant value to** its **strategic direction**;" to which Plaintiff, Attorney

Cochrane, concedes that this building and the Ilitch-name brand was what that pulled me in as a prospective **STUDENT** sometime in and around October 2018. *Id*. (Emphasis added).

**999.** Specifically, regarding rebranding of the Wayne State University School of Business while utilizing the Ilitch branding and location within Detroit:

> "This places the MISB in a **unique strategic position to <u>take</u> <u>advantage</u> <u>of</u> the <u>many</u> <u>businesses</u>** (profit and non-profit), <u>**industries**</u> (sports and entertainment, healthcare, automotive) **<u>and</u> <u>community</u> <u>initiatives</u>**. The MISB location gives it a competitive advantage and will permit it to contribute to the success of the Detroit region and its myriad industries. This desirable location will also make it more convenient for the MISB faculty and staff to work directly with local businesses and provide them with high-quality talent prepared with the requisite knowledge, skills, and abilities to support regional growth. **Moreover**, the new location will <u>**increase**</u> partnerships for the MISB **<u>faculty</u>** to generate more high quality, basic, and applied **<u>research</u>** to assist with regional business sustainability and overall success..."

> *Id*. at pp. 10. (Emphasis added).

**1000.** More specifically, the Defendants' boast explicitly about this disguised Critical Chain Application of the Theory of Constraints by proclaiming their Decisive Corporate Edge:

> "<u>**MISB**</u> also **has a strength <u>in</u> <u>engagement</u>**. The <u>**increase**</u> in [**STUDENT**] <u>**engagement**</u>, and the growing partnerships and relationships with local businesses, such as the creation of newly formed and energetic department **<u>advisory</u> <u>boards</u>** in **<u>Global</u> <u>Supply</u> <u>Chain</u>**, Accounting, Marketing and Information systems, and the **<u>continued growth</u>** and **supportive <u>involvement</u>** **the MISB <u>board</u> <u>of</u>** visitors, **<u>are</u>** all **<u>strengths</u>** that will **<u>give</u> <u>MISB</u>** an **<u>unparalleled</u> <u>competitive</u> <u>advantage</u>**."

> *Id*. at p. 11. (Emphasis added).

**1001.** Principally, the Defendants' zealous drive towards reputation enhancement and to box out the City of Detroit is described as the following "<u>**vital**</u>" threat:

> "One <u>**vital**</u> <u>**threat**</u> is the growing **number of competitors** that want **to take advantage of the resurgence of Detroit**. Universities such as University of Michigan, Michigan State, Lawrence Tech, and Davenport have **all secured buildings to expand their educational offerings** in midtown and downtown locations."

> *Id*. at p. 12. (Emphasis added).

1002.    Continuing further as explicitly identified by the Defendants' of which totally entwines the Critical Chain Application of the Theory of Constraints and the [**VERY**] Ambitious Goal Curriculum of TOCFE:

> "[t]he **results of** the **process provided the information to create** the **strategic goals** proposed. **The strategic goals identified** in this plan **will guide**, direct, and **advance** the MISB for the next three years. **These goals build on current successes** and the many achievements of MISB during the 2013-2018 strategic planning years." *Id*. (Emphasis added).

1003.    One question asked of the key stakeholders resonates deep within this Complaint as the Defendants have continuously leveraged the pedagogical structure of this educational institution— "*What should we stop doing*?" *Id*.

1004.    Instead, <u>as designed</u> the Defendants, individually and collectively as a whole, continue towards the **FIRST** of the "Strategic Goals" **focus**ing on reputation enhancement and increased profits by "exploiting" **STUDENTS** and the pedagogical mission the Wayne State University:

" **I. [STUDENT] Success**

[...]

**Objectives**:

**1C**.  Enhance the School's **focus** on [**STUDENT**] experiences, competencies, and overall success...

**Objective 1C**

[...]

1C.6 Conduct an **extensive review** of MBA **curriculum**..."

*Id*. at pp. 14-15. (Emphasis added).

1005.    Specifically, to accomplish **Objective 1C.6**, no fiscal resources were necessary, and instead this 'policy' objective had a desirous outcome of not what **STUDENTS** need—*but instead*, the

MBA Curriculum was 'extensively' "[r]evised...**based** **on** **key** **stakeholder**[**s'**] **needs**." *Id.* at p. 17. (Emphasis added).

*1006.* Continuing, the Defendants' **SECOND** "Strategic Goal" is what has propelled this hivemind towards development of the Decisive Corporate Edge that is **Exhibit 20**, and in part this **ECHO** of the Defendants' IMC:

> "**II. Engagement with Business and Community**
>
> > **Goal 2**: Engage with the surrounding business community to enable the MISB to become a partner of choice in a multi-pronged relationship focused on collaborative research, executive education, research and development contracts, and workforce preparation. **This goal aligns with University strategic initiatives that address** student success, **research**, entrepreneurship, community engagement, financial sustainability, **and Distinctively Wayne State key priorities** [**Exhibit 19**].
>
> > Objectives:
>
> > **2A**   Formalize the engagement process
> > **2B**   Engage the business community via executive education and management development programs
>
> > **Strategies to achieve goal 2:**
>
> > **Objective 2A**
>
> > > [...]
>
> > > **2A.3**   **Develop a process to share the results of engagement** meetings and activities with faculty and staff to ensure awareness.
>
> > **Objective 2B**
>
> > > **2B.1**   Work to establish research centers in select industry specific areas (supply chain management, entrepreneurship, and leadership)
>
> > > **2B.2**   Conduct feasibility studies to identify Business and Community opportunities in which MISB can support and work collaboratively to enhance local business and region objectives
>
> > > **2B.3**   Work to increase executive education/management development programs..."
>
> > > > > **Exhibit 20**, at p. 18. (Emphasis added).

*1007.*   As identified explicitly by the exhaustive process used by the Defendants for continuous improvement of this Critical Chain Application of the Theory of Constraints, relatively small fiscal resources were needed ($10,000.00) for those responsible parties to:

> "Identify **vetted**/**feasible** **opportunities** that **mutually** **benefit** **MISB** and business and/or community by benchmarking and working directly with organizations."

> *Id*. at p. 19. (Emphasis added).

*1008.*   Further, the Defendants' **THIRD** "Strategic Goal" is identified to "[s]trengthen the infrastructure and school culture to support, encourage, and reward basic and applied scholarship," simply, *for example*, the "Emeritus" positions used Defendants as designations of affiliation act as conduits "incentives for faculty to [continuously] engage" as **brand ambassadors**:

> "**III. Basic and Applied Research**

> **Goal 3:** **Encourage** and **enhance** basic and applied **research** **activities** that result in high-impact scholarly and applied publications, funded research grants and contracts, **and enhancement of the** **academic** **curriculum**. **This goal** **aligns** **with** **University** **strategic** **initiatives** **that address** student success, **research**, entrepreneurship, community engagement, financial sustainability, **and** **Distinctively Wayne State key priorities** [**Exhibit 19**].

> **Objective 3A**:

>> **3A**.  **Support** basic **research by** **strengthening** the **School's** **research** **infrastructure** *and* identifying **additional** sources of **revenue** **in support** of basic **research**.

> **Strategies to achieve goal 3**:

>> **3A.1**   **Strengthen** the infrastructure and **school** **culture** to **support**, **encourage**, **and reward** basic and applied **scholarship**."

> **Exhibit 20**, at p. 20. (Emphasis added).

*1009.*   Continuing, the Defendants' **FOURTH** "Strategic Goal" again is **focus**ed on "engagement" and increasing revenue sources, where "Goal 4" specifically identifies:

> "**IV. Increase Funding Sources for Research, Teaching and Engagement**

**Goal 4**: **Identify** **multiple** **sources** of **funding** to **support** the **School's** ongoing **research**, **teaching**, and engagement missions and to ensure our ability to implement high-priority, continuous improvement initiatives. **This goal aligns with University** strategic initiatives addressing financial sustainability.

**Strategies to achieve goal 4**:

**Objective 4B**:

**4B.1** **Leverage the School's strategic emphasis on engagement with the business community to actively pursue funded research opportunities for collaboration and to grow revenues**...

**Objective 4C**

**4C.1** Hire an executive education director who can work with local communities to **create courses** or programs in professional/management development **as a new source of revenue**."

**Exhibit 20**, at p. 22. (Emphasis added).

*1010.* And finally, the Defendants' **FIFTH** "Strategic Goal" is central to this IMC in that each vertex **ECHO**s this **focus** towards "enhance [the Mike Ilitch School of Business] external reputation" to achieve each of the objectives *herein*—**and just as** Defendant, Dr. M. Roy Wilson, identified in **Exhibit 241**, at p. 8, that **manipulation** of the "*Communication Process*" **is possible**:

"**V. Enhance MISB External Reputation**

**Goal 5**: **Elevate** the **U.S. News** & **World Report rankings** of the WSU Mike Ilitch School's Part-time **MBA program** to the top 100 and **undergraduate Business programs** to the top 150 by 2022. **This Goal Aligns with MISB** aspiration and **vision**, **University's core values** on Excellence, **University's strategic initiatives on teaching** excellence, **research**, communication, and expanding awareness. [Remember to "*elevate*" the constraint].

**Objectives**:

**5A**. **Target communications** to key stakeholders, including peer deans who influence rankings.

[...]

**Strategies to achieve goal 5**:

    **Objective 5A**

        **5A.1**  <u>Research</u> <u>communications</u> <u>processes</u> to determine the most cost-effective manner **to** <u>increase</u> <u>communications</u> **to** <u>ranking</u> <u>organizations</u> **and** <u>their</u> <u>influencers</u> **[aka manipulation]**

        **5A.2**  **Create strategies to** <u>increase</u> <u>influence</u> <u>on</u> the <u>ranking</u> organizations' <u>decision</u> <u>makers</u>

    **Objective 5B**

        **5B.1**  <u>Align</u> recruitment, programs, and <u>**curriculum**</u> **with** the MSB **brand**: Innovate. Impact. Inspire.

        **5B.2**  **Pilot with** Accounting, **Supply Chain**, Entrepreneurship & Innovation, Sports & Entertainment Management Programs **to determine best practices**;

        [...]

    <u>**Objective 5C**</u>

        **5C.1**  **Meet with** Dean, Associate Deans, and Budget Officer to determine the BOV role;

        **5C.2**  **Meet with** Directors and Department Chairs to determine strategic needs;

        **5C.3**  <u>**Work with**</u> Budget Officer and Marketing Communications' director to formulate Resource Campaign Plan;

        **5C.4**  **Meet with** WSU Provost to discuss BOV support for MISB;

        **5C.5**  **Meet with** WSU CFO to discuss budget challenges and MISB Needs;

        **5C.6**  **Work with** WSU Fulbright office to discuss opportunities and process.

                              **Exhibit 20**, at p. 24. (Emphasis added).

*1011.*  Simply, the Defendants' "self-supporting" application of the [***VERY***] Ambitious Goal

Curriculum of TOCFE itself checks each of these boxes in true 'win-win' fashion as designed by

Dr. Goldratt arguably with the assistance of the Defendants overtime as their brand of the Critical Chain Application of the Theory of Constraints.

*1012.* Plainly, the Defendants identify themselves through this ongoing and extensive "collaborative effort" how the express-actual authority necessary to operate the [**VERY**] Ambitious Goal Curriculum of TOCFE is infused within ever aspect of Wayne State University's Critical Chain Application of the Theory of Constraints:

> "**Conclusion**
>
> The following **plan is a revised version of the 2013-2018 strategic plan**. This **plan will provide strategic direction for the MISB during 2019-2022**. This **revised plan is <u>driven by</u> the <u>same mission</u> as the 2013-2018 strategic plan but has updated** goals and performance **targets**. The **implementation** of the strategic goals identified **will require a <u>collaborative effort</u> with all stakeholders <u>and</u> a <u>continuous improvement process</u>**. Consequently, all action plans for stated goals will require a semester review by the MISB strategic planning & budget committee in order to monitor and discern progress."

*Id*. at p. 26. (Emphasis added).

# <u>WAYNE STATE UNIVERSITY IMC:</u> 2020

*1013.* First, continuing with the recreation of the Defendants' IMC for encapsulation of the truth *herein*, and to demonstrate the scope and connectivity of the authority that made the Defendants' illegally unauthorized **RESEARCH** on **STUDENTS** possible; we see another layer materialize when on February 18th, 2020, the "members of the Wayne State University Press Editorial Board" revolt against authoritative changes made by the President, Defendant, Dr. M. Roy Wilson's, outreach of power. **Exhibit 299**—*WSU Press Release*.

*1014.* Further, we see from this Press release that positioning of a potential standoff as the Wayne State University Press Editorial Board bands together to explicitly identify in form a Theory of Constraints "**MAFIA OFFER**" identifying:

> "**<u>We</u>** appreciate President Wilson's support of **<u>the Press</u>** and **<u>his decision</u> to place it in the Office of the President <u>under</u> the <u>supervision</u> of Michael Wright**. Michael has assured us that he is working to restore trust. To that

end, we welcome Kathryn Wildfong back as Interim Director and look forward to the hiring of a permanent Director. We are hopeful about the future of the Press. **Members of the Board will remain vigilant as we advocate for authors**, **staff**, and **the <u>community</u> <u>served</u> <u>by</u> the <u>Press</u>**."

*Id*. (Emphasis added).

*1015.*   Plainly, the decision to "place [the Press] in the Office of the President under the supervision of Michael Wright," identifies further the Defendants' specific intent to control the narrative and reputation of Wayne State University at very vertex.

*1016.*   Recall, on May 8th, 2020, the Defendants used their "**<u>monopoly</u>**" arm, 101.1 WDET, to intentionally leverage the dissolving relationship between Wayne State University and the DMC by verbal "**MAFIA OFFER**" to "**<u>take</u> <u>advantage</u> <u>of</u> this <u>opportunity</u>**, **quite frankly**, **to reboot**" and position their brand in a more controllable form. **Exhibit 160**; **Exhibit 164**; **Exhibit 165**; **Exhibit 166**; **Exhibit 167**. (Emphasis added).

*1017.*   Further, 2020 presented the Defendants with many challenges as COVID-19 forced the World to learn on the fly, where on June 4th, 2020, Associate Deans of the Graduate School emailed the STUDENTS' master list and identified explicitly: "Wayne State University is taking deliberate steps to restart research activities on campus." **Exhibit 300**—*Graduate School Email*.

*1018.*   Further, this email dials in the authority of research where "[s]pecfici details regarding these processes differ among different schools and colleges," identifying also that the process would be initiated "incrementally," because as **STUDENTS**— "**<u>You</u> <u>are</u> <u>a</u> <u>key</u> <u>component</u> <u>to</u> <u>the</u> <u>research</u> <u>activities</u> <u>occurring</u> <u>at</u> <u>our</u> <u>institution</u>**, and we want to assure you that your success and safety are of utmost concern to **<u>us</u>**." *Id*. (Emphasis added).

*1019.*   Concluding, this email identifies the institutional hierarchy embedded throughout the Wayne State University brand: "If you have concerns about restarting research **<u>that</u> <u>cannot</u> <u>be</u> <u>resolved</u> <u>at</u> the <u>program</u> <u>level</u>**, don't hesitate to reach out to us." *Id*. (Emphasis added).

*1020.*   Next, on or about September 21st, 2020, we add another vertex to the Defendants' pedagogical fraud, recalling other known research misconduct in **Exhibit 263** and too specifically *CHEN* in **Exhibit 264** at pp. 184-185; identifying here the "reckless research practices" identified only after a federal probe was triggered by Wayne State University's own substantiated-internal investigation:

> "A former **Wayne State University** and Karmanos Cander Institute **scientist falsified data** in nine federally funded cancer research projects, **14 published papers** and **his own Ph.D. thesis**, a federal oversights agency has determined....The federal Office of Research Integrity found that Zhiwei Wang, a postdoctoral fellow at the WSU Department of Pathology and Karmanos Cancer Institute in Detroit, **falsified or fabricated dozens of images used to show results of his research** on breast, prostate and pancreatic cancer...According to the federal agency, **Wang agreed to a 10-year banishment** from any federally funded research. **Wang appears to be working at Soochow University in China and could not be reached for comment**."

> **Exhibit 301**—*WSU Misconduct Case Detroit News Article. (*Emphasis added*).*

*1021.*   Interestingly, the "Wang investigation came in the aftermath of a separate Wayne State probe, concluded in 2015, into **263 individual allegations of research misconduct** made against former Department of Pathology Professor Fazlul H. **Sarkar**, who **ran the lab where Wang worked**." *Id*. (Emphasis added).

*1022.*   Firmly, Wayne State University "**investigators substantiated 204 of the allegations made** against Sarkar, all of which involved images that were manipulated, re-ordered, re-used or otherwise falsified." *Id*. (Emphasis added).

*1023.*   The Wayne State University Investigation Committee concluded that "Sarkar's laboratory focused on high productivity in publishing and grant applications while disregarding checks on record keeping and data integrity," identifying explicitly:

> "Dr. Sarkar **demonstrated his reckless research practices by so pervasive a pattern of falsification** and fabrication and plagiarism **among so many people over an extended period** of time that the Investigation Committee determined **that it is highly unlikely** that Dr. Sarkar **would not have known**

**about** the **repeated** copying, **re-use**, **manipulation** and relabeling of images and figures," the report concluded."

*Id*. (Emphasis added).

*1024.* Candidly—the same findings should be **ECHO**ed *here* as the totality of *this* Complaint demonstrates the systematic acquiesce of each authority branch to openly exploit and "*use* [**STUDENTS**] *as bridges to companies*" furthering the Defendants' "win-win" in the form of Critical Chain Application of the Theory of Constraints by obtaining troves of intellectual property disguised as '**RESEARCH**' perverting the pedagogical through use of the [**VERY**] Ambitious Goal Curriculum as confessed by Defendant, Dr. James T. Low, himself.

*1025.* Furthermore, the value of the intellectual property and proprietary data obtained by the Defendants over the term of their use of [**VERY**] Ambitious Goal Curriculum is estimated to be in excess of at least one (*1*) billion USD, *respectfully*.

*1026.* As any entity under the heightened scrutiny of such a case as Wang and Sarkar—"**Wayne State University would not comment**," and identified instead that "the university **thoroughly investigated** these issues several years ago **and initiated the appropriate actions** then...[t]he researcher (Wang) is **no longer affiliated** with the university and has not been for some time;" **unlike** *this* Complaint supporting the totality view of infusion throughout the university as these IMC vertices are still supporting the Defendants' **RESEARCH** mission. *Id*. (Emphasis added).

*1027.* Next, connecting the Wayne State University Board of Governors, *and everyone else present at this meeting*, to the 2019—2022 Wayne State University Mike Ilitch School of Business Strategic Plan, on September 25th, 2020, the Academic Affairs Committee Meeting Minutes identifies in connection with **Objective 1C.6** (Conduct an extensive review of the MBA curriculum) Governor Thompson's open inquiry into the status of this strategic goal of eliminating outdated curriculum:

"**Governor** Thompson **asked** about the **status** of the **university's** **review** **of all** **programs, to** **make** **sure** **that** **those** that are **outdated** **were** **eliminated**," which had been started under former Provost Whitfield. **Provost Clabo** **noted** that **review** **is ongoing**. Associate Provost Ellis is now in charge of that process and noted that they are working on a revamped degree productivity reporting tool. Information on that tool will be provided to the deans in the next month. **Governor Thompson** **asked** about the **timeline** for further **discontinuances**. Associate Provost Ellis noted it **is an ongoing process of monitoring** and adjustment and includes looking for areas where resources are being used effectively and where they might be reallocated. Provost Clabo added that the process that Provost Whitfield initiated will allow the University another data point to look at the production of graduates in those certificate programs and a closer look at the process."

**Exhibit 302**, at pp. 1; 3—*Academic Affairs Committee Meeting Minutes*. (Emphasis added).

*1028.* Next, once again on July 9th, 2020, the Defendants add another layer-of-manipulation to this IMC as "Wayne State University's graduate program**s** in global supply chain management are once again among the nation's top 25, according to Gartner, a leading industry research company that releases rankings every other year." **Exhibit 303**—*2020 Mike Ilitch Supply Chain Program Top 25 Article*

*1029.* Fundamentally, recall **Exhibit 288** and the ECHOs in support (**Exhibit 20**, at pp. 1-2; Exhibit 289; Exhibit 290; and Exhibit 291), this 2020 version is in large part the same substantive makeup and mostly a copy of the 2018 spotlight.

*1030.* Specifically, we see that Defendant, Dr. John Taylor, is still "*thrilled for our program*," recycling the exact same quote from 2018's version easily found in **Exhibit 291**, again **ECHO**ing to a belief "it's great that the growth of **our** program and the relationships **we** have built within the industry are being acknowledged." *Id*. (Emphasis added).

*1031.* Interestingly, the 2020 version identifies explicitly the M.B.A. concertation course by identifying again "the theory of constraints," but too, again, **ECHO**s in this same 2020 article "constraints management" which is synonymous terminology for "the theory of constraints:"

"The executive master's program provides [**STUDENTS**] in **automotive** and related industries with the **theoretical** understanding and applied practical knowledge and skills to be well-informed, creative professionals who have

> **leading-edge knowledge** in managing **complex** manufacturing supply chains. The **curriculum is designed** to **address** the **specific needs** of auto industry, **covering** finance, information systems, purchasing, production control, lean management, **constraints management**, sustainability, risk management, logistics, and quality control."

**Exhibit 303**. (Emphasis added).

*1032.*   At the same time the Defendants celebrate, on October 12th, 2020, Defendant and Assistant Dean of Graduate Programs at the Mike Ilitch School of Business, Mrs. Kiantee Rupert-Jones, candidly opines in a rare negative branch of the Defendants' IMC that "the **MBA degree faces** a new **question of relevance**," as [b]usiness schools in Michigan are **struggling to sell the master's programs** as they face staggering budget cuts and **enrollment declines**." **Exhibit 304**—*Crain's Detroit Business Recruitment Report*. (Emphasis added).

*1033.*   From this IMC snapshot in 2020, we see that "there [was] 223 new MBA [**STUDENTS**] at the school [in 2020], compared to 270 last year." *Id*.

*1034.*   Further, Defendant, Mrs. Rupert-Jones, explains in detail the type of **STUDENTS** that primarily attend Wayne State University to identify the frame-of-mind each of these likely overworked **STUDENTS** supporting the inability to fully comprehend the true effect of the Defendants' use of [*VERY*] Ambitious Goal Curriculum:

> "Wayne State's **niche** of **part-time**, **mainly online classes** would seem better protected from the pandemic than its competitors' models, but "virtually" attracting new [**STUDENTS**] has been a headache," Jones said. The **work and learn-from-home** age caused a **disconnect between** the **school and companies** such as Lear Corp., DTE Energy Co., **and the automakers**, **which provides [Wayne State University's] main pipeline of [STUDENTS]**."

*Id*. (Emphasis added).

*1035.*   Plainly, this reasoning by Mrs. Jones further demonstrates the Defendants' exploitation of **STUDENTS** and companies to further the Critical Chain Application of the Theory of Constraints, identifying further:

"We **used to get flooded** with applications," Jones said. "**We didn't really have to put forth a great effort**. **We were invited to corporations**. We were setting up tables. <u>**We**</u> <u>**had**</u> <u>**a**</u> <u>**really good**</u> <u>**connection**</u> <u>**with**</u> the <u>**employees**</u> at these **corporations**. It was just easier." Jones said...she believes the **challenges posed by** the **coronavirus are long-term**..."

*Id*. (Emphasis added).

*1036.*  Even with the acute struggles the pandemic posed on the Defendants' pedagogical infrastructure, Defendant, Dr. James T. Low, continues his "self-supporting" by re-pitching to nineteen (*19*) Wayne State University Academics the "HUGE discount" for the 2020 virtual TOCICO Conference. **Exhibit 305**—*2020 TOCICO Advertisement to WSU Staff.*

*1037.*  Specifically, this carefree solicitation to notify these nineteen (*19*) Wayne State affiliates further establishes the depth of authority of this mission and the knowledge of the Defendants' ongoing use of the [***VERY***] Ambitious Goal Curriculum, with notable individuals identified as:

- Defendant, **Dr. John Taylor**, as Director/Chair of the Marketing and Supply Chain Management Department;

- Defendant, **Dr. Robert Forsythe**, *Former* Dean of the Mike Ilitch School of Business;

- Defendant, **Mrs. Deborah L. Habel**, as Associate Professor;

- **Dr. Bertie Greer**, Associate Dean for Strategy and Planning, and Associate Professor of Global Supply Chain Management;

- **Mr. Steven Townsend**, Director of Marketing and Communications;

- **Mrs. Linda Zaddach**, Assistant Dean of Student Services and Part-Time Faculty of Foundations;

- **Dr. Timothy Butler**, Associate Professor of Supply Chain Management;

- **Dr. Tinigting Yan**, Professor in MISB Marketing and Supply Chain Management Department;

- **Dr. Sachin Modi**, *then* Professor of Global Supply Chain Management;

- **Dr. Hakan Yaldiz**, Associate Professor of Global Supply Chain Management;

- **Dr. Hugo DeCampos**, Assistant Professor of Supply Chain Management;
- **Kevin Ketels**, Assistant Professor of Global Supply Chain Management;

- **Michael Silvio**, Part-Time Faculty of Global Supply Chain Management;

- **Mr. John Boulahanis**, Part-Time Faculty of Global Supply Chain Management;

- **Mr. Richard Lerman**, then Associate Director of Information Technology;

- **Mr. Raymond Caladiao**, Systems Administrator of Computing Services;

- **Mr. Edward Riordan**, Professor Emeritus of Marketing;

- **Dr. Hugh Cannon**, Emeritus Professor of Marketing; *and*

- **Dr. George C. Jackson**, Associate Professor of Marketing and Supply Chain Management.

*Id*. (Emphasis added).

*1038.*   Continuing, this email solicitation by Defendant, Dr. James T. Low, was also sent to the former exploited **STUDENT** known *herein* as, **STUDENT R.S.**, and Mrs. Audrey Taylor too, the source of this email chain via the FOIA process, *respectfully*. *Id*.

*1039.*   Further, we see again a glimpse of the reality brewing behind the veil as Dr. James T. Low entices those recipients with the same message I **ECHO** as you read to comprehend this totality of which is *your* reality— "***You just have to be interested enough*** to register for the conference...I believe that ***this is an extraordinary opportunity***..." *Id*. at p. 2. (Emphasis added).

*1040.*   Even further, <u>we</u> <u>know</u> definitively from University of Georgia Emeritus Professor, Dr. James Cox III, that "**<u>TOC</u> <u>tools</u> <u>are</u> <u>universal</u>** and **<u>apply</u> <u>to</u> <u>any</u> <u>environment</u>**," confessing that he has "been **<u>applying</u>** them **<u>in</u> <u>healthcare</u> <u>for</u> <u>almost</u> <u>a</u> <u>decade</u>**." *Id*. at p. 3. (Emphasis added).

*1041.*   At the same time Defendant, Dr. James T. Low, is selling the 2020 TOCICO Conference to the Defendants' Marketing and Global Supply Chain Management Department and other high-ranking Academics—on **June 12th, 2020**, **STUDENTS** in GSC 7260/5670 were induced by the

exact recruitment tool three (*3*) days before the deadline. **Exhibit 306**—*2020 TOCICO Advertisement to STUDENTS.*

*1042.* Now, the Defendants' IMC manipulation takes another form where in 2020 Defendants, Dr. James T. Low and Mrs. Deborah Habel, repeatedly leveraged the artifice known as the "**Wayne State University Jonah Certificate**," a standalone certificate offered to complying **STUDENTS** who complete condition precedents while attended the GSC 7260/5670 Theory of Constraints course, acting to **ECHO** the **RESEARCH** mission of Wayne State University as a "self-supporting" marketing vertex for **each** additional **recipient**; *recall*, **Exhibit 93**.

*1043.* Simply, the "Wayne State University Jonah Certificate" is a concrete-unauthorized fraud leveraged against **STUDENTS** in the Defendants' favor for more than a decade.

*1044.* First, recall **Exhibit 141**, where on May 25, **2014**, Dr. James T. Low, unequivocally confesses to using the Wayne State University Jonah Certificate on *more than* **250 STUDENTS**:

> "...Even though I retired from full time teaching in May, 2008, **I have continued to teach the GSC 7260 Theory of Constraints Breakthrough Solutions course in the School of Business administration at Wayne State University in Detroit, each Spring Semester in May and June ever since (for the last six years [(2014 - 6 years) = 2008]).** Before retiring, I had taught the course as a regular MBA program elective course since about 2000. To my knowledge no Big Ten university has an equivalent course. **I am currently teaching the course right now during** this Spring Semester **2014**, and we are about a third of the way through the course at this point. **It is the full equivalent of the Jonah Course, and I have been issuing a certificate to [STUDENTS] who complete the course, declaring each to be a Wayne State University Jonah.** There are **well over 250 former** [**STUDENTS**] of the course **out there now**, working in a variety of industries and locations around South East (sic) Michigan."

**Exhibit 141**, at p. 3. (Emphasis added).

*1045.* To start, the Wayne State University Jonah Certificate was offered principally to the Plaintiffs via digital solicitation and is wholly absent from the GSC 7260/GSC 5670 course syllabus issued to **STUDENTS**. **Exhibit 307**—*Wayne State Jonah Certificate Offering.*

*1046.* Candidly, every **STUDENT** who has taken the GSC 7260/GSC 5670 course will attest that the Wayne State University Jonah Certificate was repeatedly **ECHO**ed by Defendants, Dr. Low and/or Professor Habel as: (*a*) increased value, and (*b*) largely became itself a requirement of the course through repeated reminders to fulfill the condition precedents to obtain this certificate.

*1047.* Next, on **June 17th, 2020**, Defendant, Mrs. Deborah L. Habel, unequivocally proclaims in relation to obtaining outstanding certificate conditions from **STUDENTS** of the 2020 Spring GSC 7260/5670 course— "*I am going to print them and mail them from home. I have envelopes and stuff <u>here</u>*;" this redacted video was obtained from the Defendants via the FOIA process and is available as an Exhibit, but too large for submission as a standalone exhibit though incorporated by reference *herein*.

*1048.* Previously, on **June 15th, 2020**, Plaintiff, Attorney Cochrane, submitted jointly with three (*3*) other **STUDENTS** a Final Group Report in partial satisfaction of the Defendants' Wayne State University Jonah Certificate condition precedents. **Exhibit 308**—*Jonah Group Submission*.

*1049.* Next, on **June 18th, 2020**, Plaintiff, Attorney Cochrane, submitted individually a Group Evaluation of the three (*3*) other **STUDENTS** that formed 'Group 5' in partial satisfaction of the Defendants' Wayne State University Jonah Certificate condition precedents. **Exhibit 309**—*Jonah Group Individual Evaluation Submission*.

*1050.* Then, on **June 22nd, 2020**, following my final presentation on June 17, *I*, Plaintiff, Attorney Cochrane, did submit the Final Project Individual Case Analysis in full satisfaction of the Defendants' Wayne State University Jonah Certificate condition precedents. **Exhibit 310**—*Jonah Individual Project Submission*.

*1051.* Continuing, after receiving an arbitrary grade unsupported by the breakdown of points on Canvas, *I*, Attorney Cochrane, on **September 1st, 2020**, sought the assistance of the Mike Ilitch School of Business **STUDENT** email in general—this email generated a response from Melissa

Sweda to speak with the culpable-individual professors. **Exhibit 311**—*September 1st, 2020, Email Request for Assistance*.

*1052.*  As a result of the Defendants' silence, on **September 14th, 2020**, *I*, Attorney Cochrane, escalated my objection and made a second attempt to remedy the issues then sparked by Defendants', Dr. James T. Low and Mrs. Deborah L. Habel, unconstitutional **RESEARCH** on **STUDENTS**. **Exhibit 312**—*September 14th, 2020, Email Request for Assistance*.

*1053.*  Continuing the Wayne State University Jonah Certificate **fraud** regarding the "certificates [**STUDENTS**] <u>have</u> <u>earned</u>," on **September 14th, 2020**, Defendant, Mrs. Deborah L. Habel, <u>falsely</u> identifies her "trouble getting certificates generated and shipped" entirely contrary to her declaration on June 17th, 2020. **Exhibit 313**—*September 14th, 2020, Habel Certificate Email*.

*1054.*  Then, on **September 18th, 2020**, Defendant, Mrs. Deborah L. Habel, continues by responding to Attorney Cochrane's escalated objection found in **Exhibit 312**, confirming in this reply nearly everything, and importantly was still speaking as Dr. James T. Low's proxy <u>after</u> coordination with Dr. Low and Defendant, Dr. David J. Strauss. **Exhibit 314**—*September 18th, 2020, Habel Reply Email*.

*1055.*  Continuing, on **September 23rd, 2020**, *respectfully*, *I*, Attorney Cochrane, responded to Defendant, Mrs. Deborah L. Habel's, coordinated reply to my request for assistance and continued my open objection to the Defendants' **RESEARCH** <u>on</u> **STUDENTS**. **Exhibit 315**—*September 23rd, 2020, Objection Email*.

*1056.*  Continuing further, recall on **September 24th, 2020**, Defendant, Dr. David J. Strauss, interjects and ceased communication with all subordinate parties ensnaring himself in the Defendants' ongoing and illegal fraud by this display of authority. **Exhibit 92**—*September 24th, 2020, Interjection Email*.

*1057.* Finally, on **September 27th, 2020**, Plaintiff, Attorney Cochrane, received through the United State Postal Service from the Dean of Students Office at the direction of presumably Defendant, Dr. David J. Strauss, the **backdated** artifice Wayne State University Jonah Certificate "*attested to*" on June 22nd, 2020, by Defendant, Dr. James T. Low, *respectfully*. **Exhibit 93**.

*1058.* Explicitly, we know with **concrete** **certainty** that the Wayne State University Jonah Certificate is a fraudulent certificate used by the Defendants to manipulate **STUDENTS** towards disclosure of intellectual property from two (*2*) FOIA communications with the first on (*a*) March 31st, 2021, and second on (*b*) April 30th, 2021, *respectfully*. **Exhibit 317**—*March 31st, 2021, FOIA Email*; **Exhibit 318**—*April 30th, 2021, FOIA Email*.

*1059.* Specifically, on **March 31st, 2021**, Defendant, Linda Lowe, while under the direct supervisory authority control of Defendant, Attorney Louis Lessem, identified explicitly:

> "You have requested a copy of "**any and all records related to the Board of Governors of Wayne State University approval and authorization to offer the "WSU Jonah Certificate"** awarded for successfully completion of the Global Supply Chain7260 and/or 5670 courses offered at Wayne State University Mike Ilitch School of Business". **After a reasonable search by Wayne State University, we have determined that the requested records do not exist and for that reason this request is denied.**"

> **Exhibit 317**. (Emphasis added).

*1060.* Finally, on **April 30th, 2021**, the Defendants **again** declare this falsity by identifying:

> "***Please be advised that the University does not offer a certificate program titled "WSU Jonah Certificate***.""

> **Exhibit 318**— (*No* emphasis added).

## **WAYNE STATE UNIVERSITY IMC: 2021**

*1061.* Importantly for the development of *this* Complaint relative to the Defendants' IMC, know that on **March 16th, 2021**, the Defendants summarily dismissed Plaintiff, Attorney Cochrane's, Office of Equal Opportunity Complaint for Discrimination in violation of Wayne State University

Policy 2005-03, known commonly as the Discrimination and Harassment Complaint Process, as _retaliation of the truth_ of the matters asserted where *I* did continue *this* pursuit of justice by exercising *my rights* through the FOIA process where _further retaliation_ did so occur _simultaneously with this_ ongoing portion of the Defendants' IMC in real time.

*1062.*   Continuing with the direct development of the Defendants' IMC by utilization of the Critical Chain Application of the Theory of Constraints and [*VERY*] Ambitious Goal Curriculum of TOCFE, on February 17th, 2021, "[t]he **global supply chain management program** at Wayne State University's Mike Ilitch School of Business **continues** its **upward trend** with an improved standing...[putting] **the program in the top 12 percent worldwide**." **Exhibit 319**—*Top 12% Worldwide Article*. (Emphasis added).

*1063.*   Continuing further, the Defendants themselves identify objectively the "**upward trend**" _begins in **2015**_ as then "**ranked 229** out of 414 programs," moving up "**to 53 out of 452** among empirical SCM programs in the most recent rankings." *Id*. (Emphasis added).

*1064.*   Explicitly—Defendant, Dr. John C. Taylor, opines the following for *his* Department:

> "**Our program** ranking in the **top 12 percent globally** is a **great achievement for us** and **a credit to our outstanding research faculty**," said John C. Taylor, chair of the Ilitch School's Department of Marketing and Global Supply Chain Management. "**We** are competing with some of the best universities in the world, and **this ranking demonstrates our strong credibility in empirical SCM research** and the **value we bring** to companies and [**STUDENTS**] alike."

> *Id*. (Emphasis added).

*1065.*   Simply—the Defendants *at this point* in space and time have continuously improved the people, process, and products to facilitate this IMC and to facilitate the 'achievements' *herein*.

*1066.*   Next, on **August 16th, 2021**, Crain's Detroit Business published an article "Sponsored by Wayne State University," that truly solidifies the arguments *herein* as _actual reality_. **Exhibit 320**—*August 16th, 2021, Crain's Detroit Article*.

*1067.* First, referencing the "**growing** executive master's degree program at Wayne State University," the article explicitly identifies that the **program** "**is** also **designed as** a **pipeline** of **talent** [**STUDENTS**] for Detroit-area supply chain businesses." *Id*. (Emphasis added).

*1068.* Next, Defendant, Dr. John C. Taylor, when asked "[h]ow is this program different from other supply chain management programs at peer universities," Dr. Taylor's response unequivocally identifies that available "[e]lectives includes **courses** in **theory** of **constraints**..." as found within *his* Global Supply Chain Management Department. *Id*. at p. 2. (Emphasis added).

*1069.* Moreover, continuing with Wayne State University Mike Ilitch School of Business Supply Chain Career Coach and Supply Chain **STUDENT** Organization Advisor, Mrs. Lori Sisk, the Defendants know exactly the profile of **STUDENT** that which they are exploiting:

> "**Most** of the [**STUDENTS**] in the program **are full-time employees** in the auto industry and are working in SCM roles, **often with some of their own staffs they are managing**. Some [**STUDENTS**] have engineering undergraduate backgrounds...Given this [**STUDENT**] **profile**, **the program is very cognizant** of [**STUDENTS**'] **conflicting demands** and works to maximize learning in a flexible way. Most required courses are offered in multiple semesters, with **a number of offerings** also **in the Spring/Summer semester** [GSC 7260]."

> *Id*. at pp. 3-4. (Emphasis added).

*1070.* As a result of the 2020 Global Pandemic, ultimately resulting in the initial conduct sparking *this* Complaint, sometime in and around **March 1st, 2021**, the Defendants' IMC highlighted its status as "a participating member of NC-SARA [National Council for State Authorization Reciprocity Agreement]." **Exhibit 321**—*WSU Office of Online Programs Bulletin*; **Exhibit 322**—*WSU Educational Outreach Department NC-SARA Notice*.

*1071.* Specifically, as a "NC-SARA/ participating Member since February 1st, 2016," sometime in and around 2021, the Wayne State University Office of Oline Programs revised and endorsed the "quality standards for online instruction" identifying the following:

"**To ensure Wayne State University's commitment to the highest standards of quality for its online programs**, it endorses core values and best practices that are widely accepted as institutional benchmarks for quality online course design, instruction, and support. The core values that guide online instructional programs at WSU are based on the academic research literature and are informed by guidelines established by regional accrediting agencies and national educational policy organizations. Together these authoritative sources constitute a converging set of widely accepted evidence-based best practices that provide reliable criteria for assessing the quality and effectiveness of WSU's online programs and for guiding its online practices and policies."

**Exhibit 321**. (Emphasis added).

*1072.* By endorsing the "core values and best practices that guide online development, implementation, and support at WSU," the following "core values" of "best practices" are relevant as disregarded by the Defendants in the development of GSC 7260/5670, respectfully:

- "All online courses should be centered on [**STUDENT**] learning.

- Faculty interactivity and prompt feedback on assignments are key to [**STUDENT**] engagement and success.

- Institutional standards for ensuring quality should be embedded in a formal process of peer-review and program evaluation.

- A quality assurance process for developing and teaching online courses should be established as part of a formal continuing education program for faculty.

- Compliance with online best practices should be regularly monitored and reviewed in a comprehensive and systematic way.

- Uniform standards for planning and authorizing online programs should be established along with appropriate oversight in monitoring compliance with standards of best practice.

- An efficient process of conducting online course evaluations should be implemented in conjunction with a process that ensures that standards of course quality are being met in a way that promotes continual course/program improvement."

*Id*.

*1073.* In combination with **Exhibit 321**, "[a]s a participating member of NC-SARA, Wayne State University is **authorized to offer online distance education courses to** persons [**STUDENTS**]

residing **in member states** in accordance with NC-SARA established policies and standards effective **as of** February 1st, 2016." **Exhibit 322**, at p. 1. (Emphasis added).

*1074.*   Meaning plainly, the GSC 7260/5670 course sparking *this* Complaint was an online course the Defendants operated from the sanctity of their own homes as the 2020 Global Pandemic ensued, demonstrating the versatility and capability of this illegal process, but too, taking this a step further for analysis purposes, the Defendants' participation as a NC-SARA Member would allow **STUDENTS** and businesses in *states other than Michigan* to be probed in the same manner as the Plaintiffs were demonstrating the endless possibilities of implementation.

*1075.*   Next, on **August 20th, 2021**, *former* Dean of the Mike Ilitch School of Business and Defendant, Dr. Robert Forsythe, publishes a smokescreen email welcoming **STUDENTS**, faculty, and staff back for in-person activities for the 2021—2022 academic year. **Exhibit 323**—*Dean Forsythe August 2021 Email*.

*1076.*   Continuing, this broad email expounds on the Defendants' intentional acts by identifying explicitly the follow directive to staff:

> "**All faculty** members **who need assistance navigating** Ilitch School or WSU **policies and procedures should contact one of the helpful and knowledgeable members of our administrative team**. They are located on the third floor across from the department chair offices and are available Monday-Friday 8:30 a.m. – 5 p.m. or via email at ilitchadmin@wayne.edu."

**Exhibit 323**. (Emphasis added).

*1077.*   At the same time Defendant, Dr. Robert Forsythe, was marketing adherence to the "policies and procedures" within the Mike Ilitch School of Business, on **July 26th, 2021**, Wayne State University added a vertex to this IMC proclaiming to the world that "Sachin Modi to lead marketing and global supply chain management programs," effective **August 18th, 2021**. **Exhibit 324**—*Sachin Modi July 2021 Appointment Spotlight*.

*1078.*   This *post* Office of Equal Opportunity Objection by Plaintiff, Attorney Cochrane, further exclaims the connectivity to the Theory of Constraints and dedication to the research mission.

*1079.*   Specifically, "Modi's research **focus**es on the financial impact of operations resources/capabilities, sustainable operations, supply management and healthcare operations," having his research published in numerous journals and being "involved in supply chain **consulting** engagements with multiple organizations such as **General Motors**..." *Id*. (Emphasis added).

*1080.*   In drawing the spotlight on Dr. Sachin Modi, Defendant, Dr. Robert Forsythe explains:

> "**We** are **very pleased** that **Sachin** has **agreed to step into this leadership role**," said Ilitch School Dean Robert Forsythe. "In addition to **his outstanding research record**, he is an excellent teacher and mentor who is committed to the success of his [**STUDENTS**] and colleagues."
>
> *Id*. (Emphasis added).

*1081.*   Interestingly, little is mentioned of prominent Defendant, Dr. John C. Taylor, and instead the article continues the Defendant's ongoing market manipulation by highlighting the exponential growth of the Global Supply Chain Management Program, while also telegraphing the want for "**maintaining** and **building upon** the **relationships** [**Dr. Taylor**] has **established within** the **industry** and the many wonderful opportunities he has created for our [**STUDENTS**]," *reading in full*:

> "**Modi succeeds John Taylor, who is stepping down after nearly a decade as department chair**. **Both** the **marketing** and **supply chain management programs** saw their enrollments grow under Taylor's leadership. The **supply chain management program in particular has grown exponentially from around 75 majors in 2011 to nearly 600 today**. The **program also ranks among the best in the nation** according to Gartner, a leading industry research company that releases program rankings every other year."
>
> *Id*. (Emphasis added).

*1082.*   Next, at the same time the Defendants are shuffling faculty behind-the-veil in arguably one of the most successful and important programs at Wayne State University, on **April 26th, 2021**, Defendant, Mrs. Kiantee Rupert-Jones, acts explicitly to induce **STUDENTS** to "[l]earn how to solve problems that baffle everyone else," and register for the "career advantage" Spring/Summer 2021 GSC 7260/5670 Theory of Constraints: Breakthrough Solutions course taught exclusively by Defendant, Mrs. Deborah L. Habel. **Exhibit 325**—*2021 Theory of Constraints Advertisement*.

*1083.*   Recall that this regurgitated vertex of the Defendants' IMC is used repeatedly to fraudulently induce **overburdened** and **vulnerable STUDENTS** in substantively the identical form, aside from term and faculty designation, for *more than* a decade. **Exhibit 141**, at p. 3; **Exhibit 284**.

*1084.*   Moreover, recall the effect of this vertex's **ECHO** where we know from **Exhibit 116** and **Exhibit 117**, that only six (*6*) **STUDENTS** registered for GSC 7260/5670 in 2021; recall too that we know from **Exhibit 111**; **Exhibit 112**; *and* **Exhibit 114**, that fifteen (*15*) **STUDENTS** registered for GSC 7260/5670 in 2022, the last year Defendants have openly offered this course.

*1085.*   Interestingly, obtained through the FOIA process *prior to* the Defendants' retaliation of my mitigation to understand the injustices *herein*, **Exhibit 115** identifies changes to the 2021 joint-syllabus for GSC 7260/5670 in comparison to the 2020 **Exhibit 118** joint syllabus, identifying the feasibility of precautionary measures to protect **STUDENTS** from illegal **RESEARCH**.

*1086.*   At the same time Defendant, Mrs. Deborah L. Habel, prepares to intellectual invade **STUDENTS** in 2021, and in addition to the **$50,000** of endowment scholarships pledged and accepted by the Wayne State University Board of Governors established by Defendant, Mrs. Deborah Habel, in 2019, on **April 8th, 2021**, the Wayne State University College of Engineering accepted an "**undisclosed**" donation from Mrs. Habel. **Exhibit 326**—*Lewakowski Endowed Scholarship BOG Acceptance*; **Exhibit 327**—*Habel 2021 Undisclosed Donation Notice*.

*1087.*   Finally, while at the same time the Defendants were accepting "**undisclosed**" gifts despite the valid outcry by the summarily dismissed Plaintiff, Attorney Cochrane, on **March 24th, 2021**, we learn unequivocally Defendant, Mrs. Deborah L. Habel, was using the GSC 7260/5670 courses for her own **RESEARCH** to obtain a Ph.D. as Mrs. Habel identified herself multiple times during the 2020 course, she <u>was</u> pursuing this effort. **Exhibit 328**—*2021 UGA Habel Outreach Email Chain, at pp. 35-37*. (Emphasis added).

*1088.*   Specifically, this email chain is generated by long-time Theory of Constraints consultant, Mr. Rocco Surace, to whom Defendant, Mrs. Debroah L. Habel, had contacted seeking help where pieces of this email chain identify an **ECHO** of the evidence *herein*:

> "I was **contacted by** a new TOCICO member **Deborah Habel** a **professor a**t **Wayne State University** in Detroit. <u>**She**</u> saw my webinar on a Building a Bridge and **wanted to talk to me about ideas on the direction of her upcoming PhD effort**...Her <u>**mentor**</u> is <u>**Jim Low**</u>...I do not know Jim but Deborah did say **he is a <u>Jonah</u>**...I do not know any details but <u>**Jim**</u> **has** <u>**passed**</u> **the** <u>**TOC**</u> **torch** <u>**to**</u> <u>**Deborah**</u> **to** <u>**continue**</u> **including** <u>**TOC**</u> <u>**in**</u> **the** <u>**courses**</u> <u>**she**</u> <u>**teaches**</u>**. She** <u>**wants**</u> **a** <u>**TOC**</u> <u>**focus**</u> <u>**for**</u> <u>**her**</u> <u>**PhD**</u> **effort**.... She does teach within the School of Engineering...."

> *Id*. (Emphasis added).

*1089.*   Finally, we again see from *this* email chain by Mr. James F. Cox, III, Emeritus Professor from the University of Georgia Terry College of Business, that the Theory of Constraints is not only deeply embedding at Wayne State University, but to likely *the entire* Educational Ecosystem:

> "**I know Jim Low <u>very</u> <u>well</u>. <u>He</u> <u>is</u> an <u>early</u> <u>pioneer</u> <u>in</u> <u>TOC</u>**. I don't recall if I taught him in any Jonah course but **<u>he</u> <u>far</u> <u>exceeds</u> <u>my</u> <u>capabilities</u>. <u>He</u> <u>retired</u> years ago at Wayne State <u>but</u> <u>still</u> <u>teaches</u> a <u>TOC</u> course <u>there</u> <u>each</u> <u>year</u> <u>for</u> [STUDENTS] <u>and</u> some <u>faculty</u> <u>like</u> <u>Deborah</u>. He is a real ball of fire!** TOCICO should find a way to get both Jim and Debra involved in TOCIOC! I have copied Jim on this email as he deserved all the praise! Debra might look at taking the on-line TOC Fundamentals exam and proceeding through certification.
>
> **If you know any consultants in the vicinity of Wayne State and they still teach a Jonah workshop that might be an excellent place to hold an academic Jonah Course for faculty**. Johnny Blackstone and **I did that for a number of years at UGA**; Boaz Ronan, Mahesh

Gupta, Wayne Patterson, and **about <u>50</u> other <u>academics</u> were graduates of those summer academic workshops** (I think Lisa Scheinkopf was also a graduate of one academic workshop.).

On the personal involvement suggestion, I am happy to try to help her. I still meet weekly with Gustavo Bacelar with working on his dissertation. With Gustavo his dissertation is going on a couple year effort with the COVID19 pandemic killing his TOC implementation in a large hospital in Portugal. I am trying to help him salvage some type of dissertation out of his hard work. I have chaired or co-chaired about 15 PhD dissertations and been on over 30 dissertation committees. **It <u>is</u> a <u>marathon</u> <u>journey</u> <u>for</u> <u>the</u>** [**STUDENT**]."

*Id.* (Emphasis added).

# <u>WAYNE STATE UNIVERSITY IMC:</u> 2022

*1090.*   The **ECHO** of the Defendants' continuously improving IMC and overall use of the Theory of Constraints throughout the body corporate of Wayne State University continues into 2022 even as the Defendants openly retaliate against Plaintiff, Attorney Cochrane.

*1091.*   First, under the supervision of Dr. Sachin Modi as Chair of the Mike Ilitch School of Business Marketing and Global Supply Chain Management Department, Defendant, Mrs. Deborah L. Habel, continued offering the Theory of Constraints: Breakthrough Solutions to **STUDENTS** in GSC 7260/5670 in an <u>online</u> setting. **Exhibit 111**; **Exhibit 112**; *and* **Exhibit 114**.

*1092.*   Continuing, it can be presumed that even following Plaintiff, Attorney Cochrane', objection to the **RESEARCH** use of the Theory of Constraint on <u>unknowing</u> **STUDENTS** and "companies," that Defendant, Mrs. Deborah L. Habel, received a **promotion** from "Lecturer" to "Associate Professor" as "the **TOC torch was passed** to Deborah **to <u>continue</u>** including **<u>TOC</u> in** the <u>courses</u> <u>she</u> <u>teaches</u>," <u>because</u> "[s]he <u>wants</u> a <u>TOC</u> <u>focus</u> <u>for</u> <u>her</u> <u>PhD</u> effort," *respectfully*. **Exhibit 103**; **Exhibit 111**; **Exhibit 112**; **Exhibit 114**; **Exhibit 115**; **Exhibit 118**; *and* **Exhibit 328**, at pp. 35-37. (Emphasis added).

*1093.*   Interestingly, the Defendants allow Defendant, Mrs. Deborah L. Habel, **to <u>go</u> <u>even</u> <u>further</u>** with her **RESEARCH** by permitting the next dismal vertex of this mirrored IMC called "Venture

for America Ideation Session," held on **March 24ᵗʰ, 2022**. **Exhibit 329**—*Venture for America Ideation Session*.

*1094.* Plainly—the <u>group</u> concept that is known as an "Ideation Session" is synonymous with and has the same principal effect as the Defendants' implementation of the [**VERY**] Ambitious Goal Curriculum of TOCFE, *respectfully*.

*1095.* Even more forward—[**VERY**] Ambitious Goal Curriculum and "Ideation Sessions" are unequivocally "socialism of ideas," where collective brainstorming generating the information and knowledge could be seen as resources (or, "*excess capacity*" as Dr. Low identified in **Exhibit 130**, at p. 45) that are collectively owned and managed by <u>cognizant</u> individuals of the group; recall E**xhibit 250** *in full* were Defendant, Dr. James T. Low, at p. 31, proclaims explicitly:

> "A **very <u>productive</u> <u>way</u>** to **resolve** a **problem**, **or** to put an action **program** into place is to have a **group** of appropriate **people involved collectively in** a **structured approach** that **leads to cooperation in dealing with the problem**. The Theory of Constraints (TOC) **Thinking Processes** can **provide this** kind of **structured approach**. W**hen <u>the</u> <u>approach</u> <u>is</u> <u>used</u> in a group context** as described below, **every person has an equal opportunity to contribute to the solution of the problem**. **This means that each person in the <u>group</u> can <u>legitimately</u> have <u>ownership</u> <u>of</u> <u>the</u> <u>results</u>**. People tend to avoid finger-pointing, ego display, and turf protection, since they realize that they are up **collectively against the problem, rather than against each other**. The **<u>participants</u>** in this kind of session **<u>do</u> <u>not</u> need to become experts in** using the **Theory of Constraints tools, but** the **<u>facilitator</u>** for the group **must <u>certainly</u> be** an **<u>expert</u>** with the Theory of Constraints Thinking Process tools, as well as very experienced in using them to conduct such sessions. Having an experienced, innovative, and knowledgeable facilitator is crucial to the success of such a session. **When this is done well, <u>the</u> <u>process</u> of dealing with the problem is energizing, and <u>gets</u> the <u>participants</u> <u>enthusiastically</u> <u>involved</u>**."

**Exhibit 250**, at p 31. (Emphasis added).

*1096.* Now again, "Ideation Sessions" use what are "collaborative problem-solving workshops rooted in *design thinking*," where the term "design thinking" is too synonymous with the Theory of Constraints' system-thinking approach to complex-problem solving; this also can said of "*The Method of Multiple Working Hypotheses*," introduced in an *1890* paper by the American geologist

and paleontologist, Thomas C. Chamberlin. **Exhibit 329**; *see also*, **Exhibit 252**; **Exhibit 253**; **Exhibit 255**; *and* **Exhibit 256**.

*1097.* Further, the incoming company, **Venture for America**, identifies their "ideation framework helps participants deepen their problem-solving skills to evaluate real-world problems and **foster an entrepreneurial <u>community</u>**." **Exhibit 329**. (Emphasis added).

*1098.* Another advertisement for **Venture for America** identifies the framework involved:

> "Ideation sessions **teach** a problem solving **framework** that **prioritizes** a **deep understanding** of the issue before thinking of solutions, ultimately leading to human-centered and impactful solutions. At the official Ideation Session, **our experienced facilitator**, John Harris Alexander, **will lead participants through this brainstorm**. <u>**All**</u> <u>**you**</u> <u>**need**</u> <u>**is**</u> <u>**an idea**</u> that you want to test out during this exercise!"

**Exhibit 330**—*Venture for America Tour Advertisement.*

*1099.* Candidly, *I*, Attorney Cochrane, genuinely believe <u>**both**</u> models of "self-sustaining" "knowledge generation" <u>**are**</u> <u>**predatory**</u> and do not give the individual generating and disseminating the ideas adequate informed consent, authority, protection, nor value in consideration of those conveyed ideas in certain settings.

*1100.* Next, "*once again*," on <u>**June 13th, 2022**</u>, the Defendants' IMC touts another vertex directly related to the use of the Theory of Constraints where this **ECHO** reads: "*Wayne State's global supply chain program once again ranked among top 25 in the country*." **Exhibit 331**—*2022 Mike Ilitch Supply Chain Program Top 25 Article.*

*1101.* Explicitly, the Defendants' unjust **RESEARCH** <u>on</u> **STUDENTS** has led to "<u>**Top 25**</u>" standings in the country (*recalling*, **Exhibit 288**; **Exhibit 289; Exhibit 290**; *and* **Exhibit 291**), and "<u>**Top 12%**</u>" standings in the World (*recalling*, **Exhibit 219**) **ECHO**ed by the ongoing and continuously improving manipulation of this IMC and implementation of [***VERY***] Ambitious Goal Curriculum <u>by</u> <u>every</u> <u>vein</u> <u>of</u> <u>authority</u> throughout Wayne State University, *respectfully*.

*1102.* Explicitly, we learn from the Defendants' 2022 Gartner that rankings are generated from "data gathered from *supply chain contacts at universities* across the U.S. and Canada," where "the Ilitch School program came in at number 21 for 2020, its highest ranking ever." **Exhibit 331**.

*1103.* Further, taking the place of Defendant, Dr. John C. Taylor, in this again largely regurgitated marketing vertex in comparison to past-IMC vertices, Dr. Sachin Modi proclaims:

> "**Our faculty** members have **worked hard to make sure we** are [**STUDENT**]-centered and **deliver excellent curriculum**," said Sachin Modi, professor and chair of the Ilitch School's Department of Marketing and Department of Supply Chain Management. "**Our full-and part-time faculty** represent tremendous industry experience and **have helped shape our program**. The **supply chain management advisory board's effort** and dedication to [**STUDENT**] placement, experiential learning and **program promotion cannot be understated**."

> **Exhibit 331**. (Emphasis added).

*1104.* Further, the 2022 IMC **ECHO** identifies explicitly by <u>dual</u> <u>recognition</u> that the M.B.A. concentration courses cover "**the theory of constraints**;" *in full as follows*:

> "**Courses include** logistics and transportation, purchasing, risk management, manufacturing processes for buyers, production planning and control, **theory of constraints**, quality management, lean management and more. The job placement rate for alumni within six months of graduation is over 85%, with most of those entering automotive careers.
>
> [...]
>
> The **M.B.A. concentration covers** subjects such as strategic procurement, enterprise resource planning systems and quality management. Courses include ERP systems and business integration, **the theory of constraints**, supply chain decision tools, quality management, manufacturing planning and control, managing risks in automotive supply chains and more."

> *Id*. (Emphasis added).

*1105.* Next, as the Defendants continue to advertise the Theory of Constraints under Dr. Sachin Modi and Defendant, Dr. Robert Forsythe, it is also clear the gears behind the veil continued to turn where on **May 23rd, 2022**, we learn that Dr. Virginia Franke Kleist "has been selected to serve as the next dean of the Wayne State University Mike Ilitch School of Business, ending a

**seven**-**month** national **search**...She will begin at Wayne State on July 11th, 2022." **Exhibit 332**— *May 23, 2022, Dean Kleist Spotlight Article*.

*1106.* Continuing, this article to **ECHO** the 'achievements' attained by the exiting Defendant, Dr. Robert Forsythe, by expressing that:

> "Kleist succeeds **Robert Forsythe**, who has **served as dean since 2014**. **Under Forsythe's leadership**, the school was renamed in 2015 in recognition of an historic $40 million gift from the Ilitch family, which allowed the school to build its state-of-the-art new home in The District Detroit. **Forsythe's tenure** also **included the development of several new academic programs**, including those in entrepreneurship and innovation and sport and entertainment management, and [**STUDENT**] success and mentoring initiatives. **Forsythe will remain as dean until Kleist's arrival**."

> *Id*. (Emphasis added).

*1107.* Even further, at the same time the Defendants changeover the Dean at the Mike Ilitch School of Business where the location of the Defendants' illegitimate **RESEARCH** on **STUDENTS** is then still occurring—also, Defendant and then President of Wayne State University, Dr. M. Roy Wilson, the pivotal influence behind the ongoing zeal for **RESEARCH**, also communicates openly he would step down as President in 2024. **Exhibit 333**—*August 1st, 2022, President Stepping Down Article*.

*1108.* Specifically, we see from Defendant and Board of Governor, Mr. Mark Gaffney, that "the impact of President Wilson's transformative leadership **will be felt for years to come**." *Id*.

*1109.* Finally, this **ECHO** of "transformative leadership **will be felt for years to come**," as the Defendants **continue** to implement the enmeshed Critical Chain Application of the Theory of Constraints and [**VERY**] Ambitious Goal Curriculum of TOCFE as Wayne State University continuously improves and evolves into the synchronized 2022—2027 "*Our Moment in Time*" Wayne State University Strategic Plan; *recalling*, **Exhibit 20**; **Exhibit 21**; **Exhibit 22**; *and* **Exhibit 23**.

*1110.*  Explicitly, *this* reality **continues to** "**build upon**" the previous work of those **STUDENTS** involved, and explicitly: "...Wayne State University **will build upon** its 2016—21 Strategic Plan and redouble its commitment to being a world-renowned research institution dedicated to [**STUDENT**] success, furthering knowledge, and contributing to our community." **Exhibit 21**, at p. 2. (Emphasis added).

*1111.*  Continuing, we confirm from the Office of the President, that the Defendants' Strategic Plans have cascaded to "build upon" the Defendants' illegitimate success given the "*research activities [that] continued to expand*," during the 2020 Global Pandemic:

> "In **2016**, Wayne State launched its five-year strategic plan, "**Distinctively Wayne State**," a **product of participation** and input **from across** the campus and **community**, and **a plan that still resonates**."

**Exhibit 334**—*Office of the President 2022—2027 Strategic Plan Overview*. (Emphasis added).,

*1112.*  Continuing even further, the Office of the President describes the process of "build[ing] upon" the Defendants' previous successes:

> "**Building upon the success** and **strong foundation of our "Distinctively Wayne State" plan**, we began the process of creating our next strategic plan in early 2021 with our **Board of Governors**, who **affirmed our mission**, **broadened our vision** and emphasized in our values the importance of Wayne State's leadership in Detroit's resurgence. Led by a steering committee representing diverse backgrounds, perspectives, positions and experiences, **we** invited participation from across the campus and community, **collecting input and insights that form the basis of a new roadmap to our future**: our 2022-27 strategic plan entitled "**Our Moment in Time**.""

> *Id*. at p. 2. (Emphasis added).

*1113.*  In another website overview from the Office of the President, the 2022-2027 Strategic Planning Process is described in even greater detail, again bridging the vein-of-authority to the **top** through acceptance of the strategic plan initiated in part by Defendant, Dr. John C. Taylor, as each plan thereafter has built upon the successes of the previous:

> "The **Steering Committee** was co-chaired by **Dean of the College of Nursing Laurie Lauzon Clabo** and **Provost Mark Kornbluh**, upon his arrival; **Vice**

**President for Research Steve Lanier**; and **Vice President for Communications/Chief of Staff Michael Wright**. **WSU Board of Governors Chair Marilyn Kelly represented the board**. The **committee was also supported by MGT Consulting**, a consultancy with expertise in higher education strategic planning."

**Exhibit 335**—*2022-2027 Strategic Plan President Overview*. (Emphasis added).

*1114.* Continuing by expressly connecting the strategic **focus** of "the last five years," the Office of the President identifies further:

"**In 2016**, **Wayne State launched** its five-year strategic plan, entitled "**Distinctively Wayne State.**" **This plan was molded throughout 2015 with participation from the Board of Governors, all levels of campus, alumni and members of the community at large**. It **was shared with the entire organization through a series of training and cascading communication activities** that solidified the mission, vision and values of Wayne State, and **identified the individual and unit roles in achieving the** goals and **objectives** of the plan....The past several years have also seen challenges and setbacks, all of which will feed into the creation of the next strategic plan. Among these are...

[...]

Business engagement: Although **sporadic progress has been made with select outside organizations, the launch of an integrated WSU system/organization to create and capitalize on business and scientific engagements was slow to materialize**. The recent **launch of WSU's Office of Business Innovation** (OBI), however, **will help the university capitalize on this opportunity.**"

*Id*. at p. 2. (Emphasis added).

*1115.* Finally, following the Defendant, Wayne State University Board of Governors', "two half-day [retreat] sessions on March 5 and 6 [2021] to discuss the 2022-27 strategic plan," three key strategic issues generated input "for consideration by the Steering Committee," the last of which is a key driver behind this Complaint:

"[1] **Continue to solidify** our **relationship with Detroit** and **Lansing governments to further the understanding of** the **importance of** WSU and its **mission**;

[2] **Research is a competitive advantage** and **needs to play a key part in our innovation** and **entrepreneurship efforts**; *and*

[3] **Social justice continues** to grow **in importance**, and the **Social Justice Action Committee initiatives need to be folded into the strategic planning efforts**."

*Id*. (Emphasis added).

*1116.* In closing, the Office of the President identifies the "Planning Process" that looks very similar to an "Ideation Sessions" on much larger scale, again leveraging "the process that yielded the 2016-21 strategic plan:"

"**Based on the success of the process that yielded the 2016-21 strategic plan**, the board considered and approved a general process for development of the new plan, with the understanding that the Steering Committee will manage and adjust the process as appropriate. General timing of the phases of development are:

**Phase 1: Input and analysis (April June)**

**Phase 2: Plan development (July September)**

**Phase 3: Drafting and refinement (October December)**

**Phase 4: Adoption and implementation (January 2022 December 2027)**"

*Id*. (Emphasis added).

# <u>WAYNE STATE UNIVERSITY IMC:</u> 2023

*1117.* Further *now* into 2023—the Defendants' IMC continues to evolve as for the first time in over a decade GSC 7260/5670 Breakthrough Solutions—is not scheduled for the Spring/Summer Semester—despite the reverberations of the Defendants' **ECHO**s and being "highly recommended" as a course for those **STUDENTS** at the Mike Ilitch School of Business.

*1118.* Instead, those involved head "underground" (*recall*, **Exhibit 109**, at p. 5) to redevelop and implement the [*VERY*] Ambitious Goal Curriculum of TOCFE in new forms undiscovered by *this* Complaint for continuous improvement of the Defendants' Critical Chain Application of the

Theory of Constraints—avoiding inertia and subordinating individually for the success of the overall system itself: *Wayne State University*.

*1119.* We see exactly how the Defendants sought to continue leveraging the byproduct of the illegitimate gains usurped from **STUDENTS** in the Wayne State University Mike Ilitch School of Business Marketing and Global Supply Chain Management Department with the appointment of Dr. Sachin Modi, respectfully; *recall* **Exhibit 324**.

*1120.* Following the 2021 and 2022 Spring/Summer semester—where the Defendants **continued** probing **STUDENTS** in an illegal and unethical manner **despite** Plaintiff, Attorney Cochrane's, candid and legitimate-open objections—on April 14th, 2023, we learn of Dr. Hakan Yildiz, and his "*recently selected* Chair of the WSU Mike Ilitch School of Business Global Supply Chain Management Department" position. **Exhibit 336**—*Dr. Yaldiz Spotlight Article*.

*1121.* In fact, *after a thorough review*, this is the only notation representing the shift from Dr. Sachin Modi to Dr. Hakan Yildiz as Chair of the Global Supply Chain Management Department at the Mike Ilitch School of Business, *respectfully*.

*1122.* Although, when comparing individual marketing vertices of the Defendants' IMC bolstering both Dr. Yildiz and Dr. Modi, each has been represented in nearly identical fashion; compare—**Exhibit 337** and **Exhibit 338**, *respectfully*.

*1123.* Specifically, the Defendants take it even further and explicitly identify the impact Dr. Modi's appointment "as sustainability department editor for [the] Journal of Operations Management" would have on the entire Wayne State system bolstering this *herein* argument:

> "**Modi's role as** sustainability department **editor gives Wayne State**, the Ilitch School **and the global** supply chain **management program great worldwide visibility and stature**."

> **Exhibit 339**—*Dr. Modi's Appointment Spotlight.* (Emphasis added).

*1124.* Continuing even further, on **July 14ᵗʰ, 2023**, the Carl H. Lindner College of Business at the University of Cincinnati announced the "appoint[ment] [of] Sachin Modi, Ph.D., as the new head of its department of operations, business analytics, and information systems (OBAIS)." **Exhibit 340**—*Dr. Modi's University of Cincinnati Spotlight*.

*1125.* Interestingly—Dr. Sachin Modi's connection to Wayne State University Mike Ilitch School of Business—is <u>entirely</u> <u>omitted</u> from this incoming spotlight. *Id.*

*1126.* Instead, this spotlight on Dr. Modi as "a self-described "multidisciplinary business researcher,"" also takes advantage of his role as editor of the Journal of Operations Management and International Journal of Operations and Production Management. *Id.*

*1127.* Even more strange is the description of Dr. Modi's past work:

> "**Sachin puts his research into practice**. For example, **he worked closely with representatives of the automotive industry** to improve their operations **through a partnership he developed in one of his previous appointments**," said Andrew Harrison, PhD, OBAIS associate professor, outgoing interim department head and incoming assistant department head. "The **application of research into practice is something we covet at UC**. I am **looking forward to seeing how his leadership can strengthen our impact in our community and business partnerships**."

> *Id.* at p. 2. (Emphasis added).

*1128.* Candidly, Dr. Andrew Harrison opined there that the University of Cincinnati would like Dr. Sachin Modi to improve their own Critical Chain Application of the Theory of Constraints; the University of Cincinnati requires two (*2*) of Dr. Goldratt's books in a similarly designed course known as "Spring 2018 OM 7083," respectfully. **Exhibit 341**—*Spring 2018 OM 7083 Syllabus*.

*1129.* Now, ***more importantly***, the Defendants seek to squeeze the pedagogical competition from leveraging the same **great** City of Detroit as the resurgence **boom** continues further into this new post-pandemic decade.

*1130.*  In doing this—the Defendants set out to start anew following Defendant, Dr. M. Roy Wilson, stepping down as President—where, Defendant, Dr. Kimberly Andrews Espy, was unanimously elected by the Wayne State University Board of Governors "to maintain the momentum of Wayne State into the next decade of growth and beyond." **Exhibit 342**—*Dr. Kimberly Espy Election Spotlight Article.*

*1131.*  Explicitly, Defendant and Chair of the Board of Governors, Mr. Mark Gaffney, explains it this way:

> "**Wayne State is a uniquely positioned** R1, urban, public university that is nationally recognized and respected **for** its scholarship, student success and **engagement with a resurgent Detroit**. When the Presidential Search Committee launched a national search, **there was a great deal of interest from a wide range of strong candidates across the country**."

*Id*. (Emphasis added).

*1132.*  Coincidentally, the newly minted President of Wayne State University and Defendant, Dr. Kimberly Espy, syncs in tune with the Defendants' positioning extremely well.

*1133.*  First, "as provost and senior vice president for academic affairs at the University of Texas at San Antonio (UTSA), position [Dr. Espy] has held since 2018. With more than 25 years of experience in higher education, [Dr. Espy] has consistently championed social and economic opportunity by promoting affordable access to a top-quality R1 university education." *Id.*

*1134.*  Specifically, during her tenure at UTSA, Defendant, Dr. Espy, "**played an important role in making UTSA one of only five research** universities nationwide to receive a $40 million gift from Mackenzie Scott in 2022 to advance student success to those underserved by higher education." *Id.* (Emphasis added).

*1135.*  Although not directly correlated to *this* Complaint, the number chosen ($40 million) by both the Ilitch Gift (**Exhibit 241**, at p. 2) and the philanthropic-mega doner, Mrs. Mackenzie Scott, is

the same; this is *only* relevant to identify the capabilities that which Mrs. Espy possesses and the similarities between the approaches taken to achieve the pedagogical mission of each institution.

*1136.*   Instead, the University of Texas at San Antonio itself offers the **Theory of Constraints** in **MS 5393**—**Advanced Production and Operations Management**, known there too as "**constraints management**," explicitly marketing this curriculum as an "effective **competitive weapon** to **penetrate** into markets...**designed to address** the key operations issues in manufacturing and service organizations that have **strategic as well as tactical implications**...**required for design**, **operation**, **and improvements** of *the* systems that create products or services." **Exhibit 343**—*UTSA Course MS 5393*. (Emphasis added); *also recall,* "constraints management" in **Exhibit 130**, at p. 41; **Exhibit 249**, at p. 5; *and* **Exhibit 303**.

*1137.*   Continuing even further, the similarities grow stronger given that "[Dr. Espy] also played a key role in UTSA's contributions to San Antonio's economic development," *in full reading*:

> "[Dr. Espy] also played a **key role** in UTSA's **contributions to** San Antonio **economic development**. The **San Pedro 1 Building**, the new home for UTSA's School for Data Science, opened in 2022 and is the university's **latest investment in the city's downtown**. For her commitment to the community and her work as an **agent of change**..."

**Exhibit 342**, at p. 2. (Emphasis added).

*1138.*   Recall too the Defendants' definition of "**agent of change**," on a local level (**Exhibit 109**, at p. 6), *where now* in 2023—the Defendant and Chair of the Board of Governors explicitly admits, that the President and Defendant *herein*, Dr. Kimberly Espy, is the chosen "**change agent**" to "**continue the momentum**" as Wayne State University "**builds upon**" the success as mirrored in this IMC as the ongoing strategic plan to "use [**STUDENTS**] as bridges to companies."

*1139.*   Rhetorically speaking—is this not the same sound-and-tune sung by the Mike Ilitch School of Business and Wayne State University as a whole?

*1140.*   In fact, based upon information and belief—Defendant Espy's most recent position held with the University of Texas at San Antonio is currently implementing its own model of the Critical Chain Application of the Theory of Constraints focused on "[d]riving local growth," bridging the connectivity of public educational success by more likely than not leveraging the **STUDENTS**' pedagogical experience to "use [**STUDENTS**] as bridges to companies."



*1141.*   Based upon information and belief, Defendant, Dr. Espy, even served as "**senior vice president for research** at the **University of Arizona**, where **she <u>increased</u> <u>research</u>** and development **<u>to</u> <u>record</u> <u>levels</u>**. [Dr. Espy] also served as **vice president for research and innovation** and dean of the graduate school at the **University of Oregon**, where **she helped secure funding from the Oregon state legislature to advance <u>economic</u> <u>development</u>** and value to the state." *Id*. at p. 2. (Emphasis added).

*1142.*   We know too that Defendant, Dr. Kimberly Espy, "started her academic career at Southern Illinois University School of Medicine, a rural, community-oriented medical school where **she taught** first-year medical students neuroscience using **the then-<u>pioneering</u> <u>problem</u>-<u>based</u> <u>learning</u> <u>curriculum</u>**, <u>which has been widely adopted across the United States</u>. *Id*. at p. 2. (Emphasis added).

*1143.* Interestingly enough, based upon information and belief—the Southern Illinois University, formed employer of Defendant Espy also offers courses commonly known as "MGMT 483 – Advanced Production-Operations Management;" "470A-3 Six Sigma Green Belt;" and "IMAE 470A Six Sigma Green Belt I," that explicitly involve the **Theory of Constraints**.

**IMAE470A - Six Sigma Green Belt I** Study the knowledge areas of Six Sigma Green Belt. Topics include six sigma goals, lean principles, theory of constraints, design for six sigma, quality function deployment, failure mode and effects analysis, process management, team dynamics, project management basics, data and process analysis, probability and statistics, measurement system analysis, and process capability. Restricted to Junior/Senior standing. Restricted to College of Engineering, Computing, Technology, and Mathematics students or departmental approval required. Credit Hours: 3

*1144.* Furthermore, it **must** be highlighted for *this* record, that the "**then-<u>pioneering</u> <u>problem-based</u> <u>learning</u> <u>curriculum</u>**," sounds similar to that of the Defendants' current [*VERY*] Ambitious Goal Curriculum, where the [*VERY*] Ambitious Goal **is the problem** posed to **STUDENTS**, *respectfully*. **Exhibit 344**—*Hun School of Princeton Problem-Based Learning*.

# <u>WAYNE STATE UNIVERSITY IMC:</u> CONCLUSION

*1145.* Understand, this is just a snapshot of the Defendants' enormous IMC and does not include all relevant vertices of marketing used to advance the Critical Chain Application of the Theory of Constraints and the [*VERY*] Ambitious Goal Curriculum of TOCFE leveraged to support the **RESEARCH** mission of Wayne State University.

*1146.* What this information provided establishes by clear and convincing evidence is the connectivity of authority to the heart of the Defendants' operation from the inception of the Theory of Constraints, tied to supporting Dr. Goldratt himself, and to the global system of continuously improving operation being questioned by *this* Complaint.

*1147.* Simply, the **Marcus Lemonis Three (3) Ps** (People, Process, and Product) have been used *herein* to reengineer the Defendants' IMC where these reverberations of relevant vertices develops the individual and global system of processes that generate the Defendants' byproduct.

*1148.*   Again, *even more simply*, without the **PEOPLE**, we do not have the **PROCESS**, and without *that* we do not have the **PRODUCT**—every line of authority is supporting the other and connected with direct—express authority for the specific intent to "use [**STUDENTS**] as bridges to companies," for **RESEARCH**—thus placing us on *this* plateau in *American History*.

*1149.*   The Defendants, **Wayne State University Board of Governors**, had the specific intent to engage in **RESEARCH** in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this vein of authority for *research.*

*1150.*   The Defendant, *former* President, **Dr. M. Roy Wilson**, had the specific intent to engage in **RESEARCH** in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research*.

*1151.*   The Defendant, Vice President & General Counsel Emeritus, **Mr. Louis Lessem**, had the specific intent to engage in **RESEARCH** in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research*. See, **Exhibit 345**—*Mr. Lessem's Presidential Recommendation Request*.

*1152.*   The Defendant, *former* Assistant Vice President of the Wayne State University Office of Equal Opportunity, **Ms. Nikki Wright**, had the specific intent to engage in **RESEARCH** in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research*.

*1153.*   The Defendant, Wayne State University Mike Ilitch School of Business Dean of Students, **Dr. David J. Strauss**, had the specific intent to engage in **RESEARCH** in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research*.

*1154.*   The Defendant, *former* Dean of Wayne State University Mike Ilitch School of Business, **Dr. Robert Forsythe**, had the specific intent to engage in **RESEARCH** in furtherance of every-

strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research*.

*1155.* The Defendant, *former* Wayne State University Mike Ilitch School of Business Marketing and Supply Chain Management Director, **Dr. John C. Taylor**, had the specific intent to engage in **RESEARCH** in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research*.

*1156.* The Defendant, *former* Wayne State University Mike Ilitch School of Business Marketing and Supply Chain Management Emeritus Professor, **Dr. James T. Low**, had the specific intent to engage in **RESEARCH** in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research.*

*1157.* The Defendant, Wayne State University Mike Ilitch School of Business Marketing and Supply Chain Management Associate Professor, **Mrs. Deborah Habel**, had the specific intent to engage in **RESEARCH** in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research*.

*1158.* The Defendant, Assistant Dean of Graduate Programs at Wayne State University Mike Ilitch School of Business, **Mrs. Kiantee-Rupert Jones**, had the specific intent to engage in **RESEARCH** by acting in furtherance of every-strategic plan following the 2013—2018 Wayne State University School of Business Strategic Plan that ignited this express authority of *research*.

*1159.* Plainly, the Defendants have developed a "**Decisive Competitive Edge**" in both their IMC and corporate design of Wayne State University with a common: control; plan; motive; design; and specific intent to support the pedagogical mission of "self-supporting" **RESEARCH** as a "**national model" that is obsessively focus**ed on community engagement to "use [**STUDENTS**] as bridges to companies," as designed by the Defendants.

*1160.*   *Here*, the Defendants, collectively, both individually and as a system, have premeditatedly evolved as individuals, *yet too as a system* by continuously improving the processes to which they generated the product that **we** see as **Wayne State University** *today*.

## BACKGROUND FACTUAL ALLEGATIONS CONCLUSION

*1161.*   **In sum**, *again*, it is Plaintiff, Attorney Cochrane's, chilled-subjective belief that the conduct of Dr. James T. Low and Mrs. Deborah Habel is imputed to *the entire* Wayne State University Organization given the common-traceable plan and intentional transfer-of-authority from the People to *these* collective-Governmental Actors—**even** prior to and **without** the **additional** violations of *his* clearly established Constitutional Rights by in part unequivocally disregarding Wayne State University's Discrimination and Harassment Policy **and** the *ongoing* retaliation that has occurred thereafter as a direct result of bringing these injustices into the light.

*1162.*   *In the least*, it should be clear now that:

> (*1*) individually Wayne State University as an Organization has a direct connection with Dr. Goldratt and the Theory of Constraints even prior to the Defendants' implementation of: **(a)** Critical Chain Application of the Theory of Constraints; *and* (**b**) [*VERY*] Ambitious Goal Curriculum of TOCFE;

> (**2**) Dr. James T. Low has a direct connection with Dr. Goldratt and the Theory of Constraints as an early figure within the Theory of Constraints community as the first global Marketing Jonah; *and*

> (*3*) Dr. John Taylor, given his authority and as **(a)** member of the Implementation Team for the 2013—2018 WSU MISB Strategic Plan; **(b)** the Marketing and Global Supply Chain Management Department Chair; *and* **(c)** knowledge of Theory of Constraints, TOCICO, *and* TOCFE—Dr. John Taylor has fused the conduct of Dr. James T. Low and Mrs. Deborah Habel's continuously improving <u>illegal</u> research to the Defendants' continuously improving Strategic Plans.

*1163.*   And, **even if** this conduct is not found to leech onto the Defendants as a *whole*, the individual conduct of Dr. James T. Low and Mrs. Deborah Habel are invalid as unjust and unconstitutional

**regardless**—where the Defendants collectively thereafter on March 16th, 2021, summarily dismissed the valid Office of Equal Opportunity Complaint filed by Plaintiff, Attorney Cochrane, acting to further the originating conduct by retaliation to the known and concrete truth perpetuating the violations of the Plaintiffs' Constitutional Rights still ongoing *today*—thus subjectively chilling Attorney Cochrane by silencing the ongoing pursuit to remedy these issues within the Institution after being redirected to the *involved* Defendant, Dr. Strauss, *respectfully*.

*1164.*   Thus, subjectively, as *I*, Plaintiff, Attorney Cochrane, *see it*, the Defendants and *I* are at an intellectual, moral, and ethical stalemate given this irrefutable-objective reality—thus leaving me with **eight** (*8*) **avenues of action**, making inner-agency remedial exhaustion, where it be argued in defense by the Defendants, *impossible*, and which ultimately led me subjectively *here* to *your* prefrontal cortex for contemplation in a *future* space and *time*:

### PLAINTIFF—ATTORNEY COCHRANE'S EIGHT AVENUES OF ACTION

*1165.*   The **FIRST avenue of action** is defined as follows: *Quit*, run away, give up on the American Dream *I* have set out to achieve for my family and move on with life *submitting* to the System with a false sense of security as a cog in the machine reliving this *truly* agonizing-*toxic* nightmare like a cross between *Murry* in Groundhogs' Day and Beckett's *Waiting for Godot* as time passes and *I* slowly submit to the lessening of my ethics to accept this invalid reality as my own valid reality—which *I* expressly and unequivocally will not.

*1166.*   Plainly, while using the Theory of Constraints, part of the *fun* is seeing the dots connect in objective form as your *future* reality takes shape based upon your valid-*past* decision making.

*1167.*   **However**, when the problem you are solving is your life's mission—connecting all of the dots that are your past decisions, good and bad, made to reach this *future* space and time can (*and has here*) quite literally induced an **ECHO** chamber of **toxic** reminiscence as this first avenue of action was contemplated heavily as *I* would have had so easily accepted in the *past*.

*1168.* Candidly, *this* Complaint as an unequivocal objection is a piece of me, Attorney Cochrane, and without me—it certainly would not be—and therefore, to explain to you every variable vertex *is* possible, but here the psychological weight *I* carry can be seen building throughout my journey to **the Principal Door**.

*1169.* I believe the following is *highly* relevant and prudent for *this* record to, "quite frankly," know exactly how we have arrived *here* in this space and time, and therefore the following ensues, *respectfully*, to lay the foundation for the moral crossroad *I* lay and ponder.

*1170.* Again, the record should reflect the whole truth, and that is unfortunate for the Defendants in which that encompasses the breadth of my curiosity seen by my educational trek through life.

*1171.* *I* have amassed in total **272 Credits** from the following five (*5*) educational institutions from the time I graduated in *2007* from—**WARREN MOTT HIGH SCHOOL**:

> (*1*) **International Academy of Design and Technology**;
>
> (*2*) **Macomb Community College**;
>
> (*3*) **Madonna University** with a certificate of Terrorism and Homeland Security;
>
> (4) **Western Michigan University—Thomas M. Cooley Law School** with a concentration in Business Transactions; *and*
>
> (5) **Wayne State University: Mike Ilitch School of Business** with a concentration in Marketing.

> > *See*, **Exhibit 346**—*Attorney Cochrane's 2020 Resume;* **Exhibit 347**—*Attorney Cochrane's Undergraduate Transcript;* **Exhibit 348**—*Attorney Cochrane's Law School Transcript;* **Exhibit 349**—*Attorney Cochrane's Business School Course Overview.*

*1172.* Even before graduating from high school to pursue this intellectual journey, *I*, Attorney Cochrane, was always drawn towards an intellectual pursuit. For example, *on the subsequent page*, in Elementary school at **PEARL LEAN ELEMENTARY SCHOOL**, *I* was a member of the Science Olympiad and regularly participated in extracurricular STEM activities.



*1173.*   In fact, until *I* reached the 7th grade at **BEER MIDDLE SCHOOL** my intellectual pursuit took precedent, ultimately yielding to the backseat as sports consumed my **focus** as a young-malleable adolescence guided principally by my size and athleticism.

*1174.*   While in the 7th grade, my fellow classmates and *I* democratically chose an animal that would represent our class, and we elected—**the Stingray**—as our 7A mascot. Now, this form, the character and natured temperament of this creature is the ideal example of faithfully floating through life, recalibrating with your current reality, only to be aggressive when threatened or provoked. These characteristics are the perfect overlay for *this* Complaint, and for my life up to this point as *I* have continued to learn my place and the parameters of *this game.*

*1175.*   For example, continuing in the 7th grade with extremely-poor grammar and with this provocation idea, a friend would intentionally wear the same graphic t-shirts as *I* would on a routine basis, often on the same days—*so*, being the creative thinker *I* was even *then*, one day *I* wrote out a non-compete agreement on a sticky note, sparked by a Mr. Kool-Aid t-shirt, and this friend signed this arguable-valid contract freely restricting the attire *he* could wear in *my* presence.



**1176.** Continuing, High School was no different. *I* **focus**ed more on sports than academics, simply not putting in the time to deliberately think-in-layers *as I do now*. I was present and understood what was being taught, but *I* did not excel nor conform to the permissive structure of academic rigor and simply just did *enough* to make my overseers content to obtain what *I* wanted in that space and time as *I* learned *a lot* the hard way by making mistakes while learning *by experience*.

**1177.** Candidly, my 'status' as a Freshman/Sophomore Varsity Basketball player, often starting based on my defensive determinism, propelled this insolence further as time progressed and my

audience grew larger—*I* had no direction nor drive to achieve anything other than what was in front of me; not even the desire to play sports at a collegiate level—*I* did not know or understand how these processes worked, how life works, and *I* simply embraced the lessons learned from the comradery of those *games—no one explicitly held my hand and showed me the way*, although some did try and those lessons *I* often competently recall to carry with me in each day.

*1178.*   You will see as my journey continues to unfold and as *I* stepped further into this World *we* share, *I* had to learn life the hard way, by doing and failing, and it was this <u>experience</u> by failure, and the guilt attributable to those failures that *I* let compound and shape <u>our *current*</u> reality.

*1179.*   Sometime in and around *2008*, the **INTERNATIONAL ACADEMY OF DESIGN AND TECHNOLOGY** was experiencing accreditation woes and as a result *I*, Attorney Cochrane, ceased attendance and dropped out after my second semester where thereafter *I* took a course on career exploration at **MACOMB COMMUNITY COLLEGE** to determine *at that point* in space and time, what *my then* path through life <u>*could*</u> be.

*1180.*   What *I* learned about myself in that career exploration class was: (*a*) that *I* liked to solve problems, *and* (*b*) *I* have a natural tendency to sacrifice and put others before myself no matter the cost—*so*, as my professor *then* identified, a career in *Law Enforcement* would suit me well. Even *then*, *I* still was not awake to *my then* current reality, *I* still did not understand life as a process, and *I* did not have a purpose in *my* direction which was no fault but *my* own.

*1181.*   *I* pivoted towards obtaining an associate degree in criminal justice at **MACOMB COMMUNITY COLLEGE**. Likening this experience to sports, the familial dynamic of the vocation that is law enforcement is one aspect that *I* enjoyed most; several of these individuals *I* still have connections with today, *candidly*, one of whom that is relevant for *this* Complaint is currently a Staff Member for the **Honorable Judge Matthew F. Leitman**, *respectfully*.

*1182.* Even while pursuing *my* associate degree in criminal justice, *I* did not have moon-shot aspirations. Instead, *I* embarked on a journey to acquire knowledge of the good and to find my place in society as a young man. Specifically, my aspirations grew with the more <u>experiences</u> *I* had, understanding with each what *I* was individually capable of. Interestingly, one of these experiences was on **April 6th, 2010**, where a behind-the-veil tour of the United States District Court for the Eastern District of Michigan led at the direction of and meeting intimately the **Honorable Judge Bernard Friedman**, *respectfully*. This guided tour was made possible through the long-time connection Judge Friedman shared with my then Professor and Michigan Attorney, Mrs. Donna Sherwood, where this tour was slow and we took our time in Judge Friedman's chambers, his courtroom, witnessing a brief hearing, the Million Dollar Courtroom, and too *other* off-path sections of the agencies of the United States Department of Justice stationed out of the Eastern District Courthouse, workout rooms, and even watching the CCTVs over the shoulders of the on-duty United States Marshals. Frankly, it was *this* tour that sparked something inside that *made me look up*, towards the moon, a goal, an aspiration of *then* momentary want—so, *I* continued on *my* journey for the requisite knowledge of the good, still not knowing *how* to achieve such elevated footing.

*1183.* *I* pressed on towards obtaining my bachelor's degree and graduated from **MADONNA UNIVERSITY** in 2012, although *that* is when the uncertainty about my "place in society" compelled me ultimately towards the LSAT and law school in the first place.

*1184.* This uncertainty was sparked by not one, but several effects that ultimately pushed me to choose the path <u>*I*</u> <u>am</u> <u>still</u> <u>on</u> <u>today</u>. Primarily, the reverberating effects of the 2009 Great Recession effected every law enforcement agency nationwide and was itself a significant contributor of my decision to attend a law school in Michigan, with **WESTERN MICHIGAN**

**UNIVERSITY—THOMAS M. COOLEY LAW SCHOOL** making the only offer of acceptance between the trio of Wayne State University and the University of Detroit Mercy.

*1185.*   Moreover though, it was the effect of obtaining several misdemeanor citations in 2011 while pursuing my bachelor's degree in criminal justice of all things that ultimately led me and my misunderstood shameful guilt to **the Principal Door**, *respectfully*.

*1186.*   See, my journey to law school is not ordinary, *in the least*, but candidly it is an *effect* of the *root cause* of this entire stream of reality. Plainly, the root cause is my unchecked *subjective belief* of simply, "*being uncertain of your place in society*," and *that idea* of **debilitating** guilt is what led me to law school in the first place, *then onto* business school *too*—and now *here*, where *I* have now laid *these ideas* for your conscious to deliberate having learned through experience to dauntlessly pursue my rebuke of the Defendants' illegal conduct sacrificing myself for *those other* **STUDENTS** who were wronged and those for who will be wronged if this goes unchecked.

*1187.*   Simply, after graduating with my bachelor's degree in criminal justice, *I* entered a crowed pool of applicants fighting for a law enforcement position while being a 'criminal' applicant. Most of the applicants *I* was up against as a prospective law enforcement officer were older and more experienced; laid-off law enforcement; retired-military veterans; and other younger applicants with **clear records**. Candidly, *I* allowed this subjective perception to override my decision to continue forward with applying to any local agency, and instead *I ran* and sought alternative paths to find my place in society.

*1188.*   Moreover, on **June 13th, 2012**, *I* stepped out into the World and took the Civil Service Entry-level Law Enforcement Examination to prospectively become a Michigan State Trooper. The required combined score to pass the exam was 197—my score was 229, *however*, *I* failed this exam by receiving a "3" where a "4" was required on the writing portion. Candidly, *I* should have studied harder in English class during High School, a class my Senior year *I* was often led to an

adjacent room by my teacher openly to sleep under a computer table after playing Halo 2 tirelessly the night before.

*1189.*   The effect of failing this non-appealable Civil Service Aptitude test was: (*a*) two (2) of my friends, even though *I* scored significantly higher than each, began this journey together leaving me behind with each still excelling exceptionally as Michigan State Troopers in their own way today, and (*b*) my <u>guilt</u> by being a **FAILURE** was again compounded, with a retake available at least six (*6*) months after my exam date taking life *then* into 2013.

*1190.*   It was during *this* period of time and space that *I* sat back and pondered *my* possibilities as a young man still naive to the "*how*" to achieve anything material where *I* chose two-principal paths towards *this* current reality. **First**, *I* took and passed the Civil Service Examination and was conditionally selected for an entry-level law enforcement position with the United States Customs and Border Protection (CBP) Agency. **Second**, *I* bought a Princeton Review Law School Admissions Test (LSAT) preparation book at Barnes & Noble for *under* $30, considering Law School through a quick jaunt on Google and a shrug, *literally*.

*1191.*   As it grew closer to the time to complete my application for CBP, *I* allowed the guilt of my criminal record to compound further ultimately straying my decision, and instead *I* took the LSAT not understanding the process *I* had chosen *even in the slightest*. Frankly, *I* took one or two practice tests in my LSAT book, again not taking the time to dissect the process of the exam.

*1192.*   On **October 6th, 2012**, *I*, Attorney Cochrane, took the LSAT and receive a below par 141 having not put in really any effort towards the exam; moreover, despite adequate time, *I* did not even attempt the writing portion as a result of seeing the size of the fact pattern and my **focus** was on attending that night the Detroit Tigers' Game One (1) of the American League Division Series.

*1193.*   Still—*I* pressed on **blind**ly and used this LSAT score to apply in non-pragmatic form to the trio of in-state law schools mentioned above, forgoing a path to the CBP formal-training academy

in Arizona. Solidifying my decision to law school, **my guilt** catapulted me towards *this* current reality. On **December 12th, 2012**, *my* decision to attend law school was somewhat reinforced when *I* was selected to serve as a Juror for a three-day trial in the Macomb County 16th Judicial Circuit Court before the visiting judge, **Honorable Judge Antonia A. Viviano**, *respectfully*.

*1194.*   In **May of 2013**, *I*, Attorney Cochrane, began my 1L law school journey taking <u>five</u> (*5*) <u>courses</u> and still working <u>full</u> <u>time</u>; looking back, *I* should have taken less classes and adjusted my work schedule to compensate for the academic rigor necessary *for success*. Instead, *I* continued with this overload into my second term as a 1L and failed my <u>first</u> <u>ever</u> academic course. Candidly, *my being* was shocked to the core as a result of *this* failure, and *I* adjusted my employment after being placed on 1st Term academic Probation.

*1195.*   **Now**, *using hindsight*, *I* can <u>definitively</u> tell you that **January of 2014** <u>is</u> <u>where</u> *I* turned my brain **on**to *this* stream of consciousness towards the unwavering accumulation of knowledge of the good as a direct result of *my* ongoing failures. Further for this complete record, *I* will lay for time the name—**NEIL DEGRASSE TYSON**—as the inspirational Sender, where on **June 8th, 2014**, as Receiver of the following energizing communication that ousted *my* withdrawn and dormant intellectual spirt at a same time *I* faced *my* greatest fork in *my* road giving me the **focus** *I* needed in *that* <u>**moment**</u> <u>**in**</u> <u>**time**</u>:

> "Only a few centuries ago, a mere second in cosmic time, we knew nothing of where or when we were. Oblivious to the rest of the cosmos, we inhabited a kind of prison, a tiny universe bounded by a nutshell.
>
> #### How did we escape from the prison?
>
> It was the **work of generations of searchers who took five simple rules to heart**:
>
> *1.* <u>**Question**</u> <u>**authority**</u>. No idea is true just because someone says so, **including me**.
>
> *2.* <u>**Think for yourself**</u>. Question yourself. Don't believe anything just because you want to. Believing something doesn't make it so.

*3*. **Test ideas by the evidence gained from observation and experiment**. If a favorite idea fails a well-designed test, it's wrong. **Get over it**.

*4*. **Follow the evidence wherever it leads**. If you have no evidence, reserve judgment.

And perhaps **the most important rule of all**...

*5*. **Remember: you could be wrong**. Even the best scientists have been wrong about some things. Newton, Einstein, and every other great scientist in history -- **they all made mistakes**. Of course they did. **They were human**.

Science is a way to keep from fooling ourselves, and each other. **Have scientists known sin? Of course**. **We have misused science** just as we have every other tool at our disposal and **that is why we cannot afford to leave it in the hands of a powerful few**. **The more science belongs to all of us, the less likely it is to be misused**. These values undermine the appeals of fanaticism and ignorance, and, after all, the universe is mostly dark, dotted by islands of light. Learning the age of the Earth or the distance to the stars or how life evolves—**what difference does that make**? Well, part of it depends on how big a universe you're willing to live in. **Some of us like it small**. That's fine. Understandable. **But I like it big**. **And when I take all of this into my heart and my mind**, I'm uplifted by it. **And when I have that feeling, I want to know that it's real, that it's not just something happening inside my own head, because it matters what's true, and our imagination is nothing compared with Nature's awesome reality**. I want to know what's in those dark places, and what happened before the Big Bang. I want to know what lies beyond the cosmic horizon, and how life began. Are there other places in the cosmos where matter and energy have become alive...and aware? **I want to know my ancestors—all of them. I want to be a good, strong link in the chain of generations. I want to protect my children, and the children of ages to come. We**, who **embody the local eyes and ears and thoughts and feelings of the cosmos, we've begun to learn the story of our origins**—star stuff contemplating the evolution of matter, tracing that long path by which it arrived at consciousness. **We and the other living things on this planet carry a legacy of cosmic evolution spanning billions of years. If we take that knowledge to heart, if we come to know and love nature as it really is, then we will surely be remembered by our descendants as good, strong links in the chain of life**. **And our children will continue this sacred searching, seeing for us as we have seen for those who came before**, discovering wonders yet undreamt of...*in the cosmos*."

Cosmos: *A Spacetime Odyssey*, *Unafraid of the Dark*, June 8th, 2014.

**1196.**   Specifically, *I* was on academic probation for only one term, and thereafter *my* life changed as *I* grew further into the man before you today—finding solace in *my* academic pursuit, achieving my first A- in Constitutional Law the following term of **May 2014**, *respectfully*.

**1197.**   Again, *I* must lay for *this* foundation every relevant variable, where on **November 12ᵗʰ, 2014**, *I* had my first real conversation with this new frame-of-thought while planning *my* tentative and future-course *plan*. Specifically, after sitting down to plot out my 2L and 3L courses, *I* met with **WESTERN MICHIGAN UNIVERSITY—THOMAS M. COOLEY LAW SCHOOL** *then* Assistant Dean and Professor—**FRANK AIELLO**—where this open conversation peered into the *prospective* future, towards graduation, *and beyond*.

**1198.**   Frankly, it was *this* conversation that sparked my moon-shot mentality, and more specifically, on this *very day* after leaving his office to return to my study bunker—*the idea* that is **The Traveling Attorney, *P.C.*®** was born.

**1199.**   *I* sat in my typical chair, glued to my notes, contemplating not what was written, but what was discussed in this meeting— "*How are you going to achieve your goals, Bradley*?" This question evoked *so many more* as *I* contemplated *my* prospective *future*; *my* goals; *my* then current *reality*. The "*how*" was something that has stayed with me to *this* day; where even in that very moment, a classmate and mentor of mine poked in and was brought up to speed on this meeting's effect—himself immediately brushing off *the idea* that today *I have* implemented successfully.

**1200.**   Continuing on, my brainstorming was <u>endless</u> as *I* cultivated the entrepreneurial spirt always present though never fully invoked, <u>giving</u> <u>everything</u> *I* had to secure the academic footing towards achieve those necessary conditions required to '*hang your own shingle*'—candidly, "*big law*" was never an option in my head as *I* understood my place was subpar to all those other students, even at my school, who understood this process in far greater detail than *I* did then.

**1201.**   After finalizing my legal studies at Western Michigan Thomas M. Cooley Law School, I was conferred my Juris Doctor on **May 22ⁿᵈ, 2016**, and formally graduated even within the top 100 of my class despite my overburdened-rocky start.

*1202.*   Simultaneously with graduation and preparing for the July 2016 Michigan Bard Exam, *I* had several-confidential correspondences with the State Bar of Michigan regarding concerns related to my Michigan Bar Application.

*1203.*   Specifically, the State Bar of Michigan was *then* concerned as to whether *I*, Attorney Cochrane, held the requisite character to practice law in the State of Michigan.

*1204.*   More specifically, in general this concern objectively arose from the 'criminal' record *I* had generated in 2011 and had run from since as an effect of the **overwhelming guilt** attributable to my two misdemeanor citations for (*a*) consuming alcohol in a public place, and (*b*) suppling/furnishing alcohol to minors.

*1205.*   Candidly, even after preparing for the **July 26-27th, 2016**, Michigan Bar Exam and **passing** this debilitating exam **on the first attempt** sitting in seat number **#00103**—*I* was sidelined by the State Bar of Michigan but for my duty to present by clear and convincing evidence that *I* as an applicant held the requisite character to practice law in the State of Michigan.

*1206.*   For nearly two (*2*) years—*I*, Attorney Cochrane, wadded through the Character and Fitness Process to demonstrate that *I* did then have this requisite character. Primarily, the issue was related to the self-serving description of the events generating this 'criminal' record and my inability to verbalize through my guilt reddened conscious of the sober truth of this event.

*1207.*   Plainly, again looking back at the October 30th, 2001, journal entry *herein*—my ability to write was not honed until after *I* entered law school—and *I* did not seek assistance with (*a*) my law school application, nor (*b*) my bar application. Instead, *I* carried over my law school application's erroneous seven-paragraph disclosure, inclusive of the police report, that contained what *I* thought then was my per se advocacy of vagueness though objectively was instead an incomplete account of the true events triggering the citations which *I* had over those five years accepted as an unchecked-false reality and submerged *deep* in my soul—again, **ultimately an**

**effect of running from the truth**—or, *realistically*, **running from my failure** despite the lessons *I* had accepted and learned thereafter. So, plainly—after running into law school to escape my '**criminal**' record—*I* was confronted by the <u>**very**</u> <u>**failure**</u> *I* had ran from.

***1208.*** Due to this route in the licensing process, you would not know that *I* passed the July 2016 Bar Exam if you review the official notice, *my name was omitted,* and *I* was otherwise minimized to be only known by the forgotten seat number ***#00103***.

***1209.*** Simply, *I* can write this for you today so openly and with little care in the World because this has become my story—and details matter, **truth matters**, and that was what *I* learned the hard way. <u>**Now**</u>, *I* am thankful to have taken these detours in my journey as the effect has allowed me to perfect my spirit having gone through many hours of counseling as a conditional requirement of my pending admission to the State Bar of Michigan giving me the voice to speak.

***1210.*** *I*, Plaintiff and Attorney, Bradley Edward Cochrane, was sworn in as an Attorney on **June 25th, 2018**, in the County of Oakland, Michigan, before the **Honorable Daniel Patrick O' Brien**, of the Oakland County Sixth Judicial Circuit Court. **Exhibit 2—***Order of Admission to the Bar*.

***1211.*** During this time on the sideline, *I* studied legal ethics which has allowed me to understand in more depth the nature of our Legal Industry and the dark forces that are now relentlessly attacking its foundation.

***1212.*** As the product of running from my failure in the same way I ran into law school—I ran into business school while waiting; there were no guarantees, my resume needed added value and thought an M.B.A. would differentiate my skills as *then* as a young *potential* Attorney.

***1213.*** This is a relatively great development—<u>**however**</u>, this time in space is where <u>our</u> <u>story</u> with the Defendants began. It was during this extended wait on the sidelines that *I* nearly pivoted and walked away from the practice of law, even with the mountain of debt in **Exhibit 110** and **Exhibit 111**. Candidly, *I* understood the need to differentiate myself; The Traveling Attorney, P.C.® as an

*idea* continuously pressed on my conscious as a viable reality, and *I* knew *it* was possible. But even as an Attorney, *I* had to <u>on paper</u> have the credentials as evidence to demonstrate the reasoning *I* knew to be objective reality—so, to differentiate my resume and educational footing, *I* was drawn to the *newly emerging* Wayne State University Mike Ilitch School of Business in Detroit, Michigan during the <u>same time</u> the Defendants *herein* were on <u>full</u>-<u>throttle</u> <u>execution</u> of their continuously improving Strategic Plans leveraging their pedagogical mission unlawfully to "use [**STUDENTS**] as bridges to companies," *respectfully*.

***1214.***   Respectfully, *I* have literally been in school nearly my entire life, learning who *I* am and my place in society—and then *this* occurs—so, *I* had a choice: Do *I* make the same mistake and **run from** the **failure** of falling for the Defendants' intellectual trap, **run from** my education and the **knowledge of the good** that *I* have acquired during that arduous journey despite the unequivocal-objective evidence opposing this supposed valid reality?

***1215.***   Simply, *I*, as an <u>individual</u>, must be as an individual free of manipulation and free to choose the depth, breath, and delivery of <u>my</u> free speech—and <u>not</u> the State—<u>not</u> the Defendants. It is *this* idea that is the paramount question that *I* have given so much thought to answering.

***1216.***   Frankly, *this* question, and the many others *I* have written *within*, cannot be answered by me, nor could they be answered by any counselor, psychiatrist, nor therapist should *I* run into the future and pass by these valid questions to regret such stupidity later when the bell tolls—***the time is now***. For, I would be doing this for anyone else, advocating for justice, <u>*reform*</u>, unpleasantly stuck—so, if I could not weather this **toxic**ity now, how could *I* ever for someone else? And, the Defendants again in the most perfect way possible, <u>literally</u>, explain it themselves:

> ""<u>We</u> <u>believe</u> that being <u>minimized</u>, being <u>disrespected</u>, <u>being</u> <u>uncertain</u> <u>of your</u> <u>place</u> in society <u>induces</u> <u>toxic</u> <u>stress</u>."

**Exhibit 38**. (*Emphasis added*).

*1217.*   Now, my son—**CONNER DAVID COCHRANE**—has begun <u>his</u> own individual-intellectual journey in Preschool—*rhetorically*, how can I teach him the lessons *I* have learned if *I* do not follow the lessons *I* have learned and continue to run to escape this fate?

So, *to Mordor the ring began*…what are the counter-effec<u>ts</u> if *I* run, *again*?

*1218.*   *Respectfully*, as an Attorney investigating and pursuing on my own behalf the claims against the Defendants, even at the early stages of these claims when the totality was unknown, the Michigan Rules of Professional Conduct were present and attach to the decisions *I* choose to make. Thus, the following analysis attributable to Dr. David Strauss is too relevant for each of those alternative avenues relatable to individual Defendants, or their positions, as nearly each actor has vacated their post silently following my objective objection and valid pursuit of the truth *herein*, *respectfully*.

*1219.*   The **<u>SECOND avenue of action</u>** is defined as follows: Contact Dr. Strauss as the supposed "*proper forum*" to denounce the conduct within my Office of Equal Opportunity Complaint, <u>*with*</u> the Defendants' General Counsel's written consent. *Recall*, **Exhibit 94**.

*1220.*   Herein, a decision to contact Dr. Strauss would invoke the Michigan Rules of Professional Conduct Rules **1.13**; **MRPC 3.4**; **MRPC 4.2**; *&* **MRPC 8.4**, specifically based upon several factors: **<u>(a)</u>** Plaintiff and Attorney Cochrane's prior relationship with Dr. Strauss in regard to being a member of the Wayne State University **STUDENT** Publication Board (*recall*, **Exhibit 85 to Exhibit 91**); but more specifically, **<u>(b)</u>** Dr. Strauss' <u>direct</u> involvement in ceasing communication with Dr. Low and Mrs. Habel following my initial-email objections in **Exhibit 92**, **<u>and</u>** the direct fulfillment of the fraudulently unauthorized WSU Jonah Certificate as **Exhibit 93**; *and* **<u>(c)</u>** in which as a result of the Defendants' conscious decision making, and despite the fact that the dismissed Office of Equal Opportunity Complaint was confirmed to be <u>against</u> Dr. Strauss in-part by Mr. Tommy Martin, the Defendants, through the direction of Defendants, Attorneys Mr. Louis

Lessem and Mrs. Nikki Wright, entrapped *I*, Attorney Cochrane, in an **ethical dilemma** where Dr. Strauss was identified as the "proper forum" to continue my internal objection **erroneously** and thus as a result my clearly established Constitutional Due Process Rights were quashed as this pseudo entrapment ensued ultimately subjectively chilling my internal pursuit.

*1221.*   The **THIRD avenue of action** is defined as follows: Contact the former and/or sitting President and/or Board of Governors, *with* the Defendants' counsel's written consent, which candidly, this would be futile and have little effect other than to again oust for the Defendants my subjectively chilled position on this ongoing matter;

*1222.*   The **FOURTH avenue of action** is defined as follows: Contact the former and/or sitting dean of Wayne State University Mike Ilitch School of Business, *with* the Defendants' counsel's written consent, which candidly, this would be futile and have little effect other than to again oust for the Defendants my subjectively chilled position on this ongoing matter;

*1223.*   The **FIFTH avenue of action** is defined as follows: Contact in writing the former and/or sitting Counsel for the Defendants' Organization to confirm proper counsel for each party involved, and reaction to whatever effect a reply was secured, though too ousting Plaintiff Cochrane's subjectively chilled position. Moreover, it is the direct conduct of Defendants' Counsel who has ceased communication and defensively retaliated against Plaintiff, Attorney Cochrane, in an <u>ongoing</u> effort to minimize the effect of the objectively known truth by in the least:

**(a)** violating Plaintiff Cochrane's clearly established Constitutional Rights by filing a formal complaint with the Wayne State University Office of Equal Opportunity and the effect thereafter by violating Wayne State University Due Process Policy, *and*

**(b)** violating Plaintiff Cochrane's clearly established Constitutional Rights by fraudulently inducing in consideration of the facts *herein* the payment of identified

and responsive records and by thereafter failing to facilitate in defensive retaliation those paid-for records while underline(continuing) collections efforts on the indigent Plaintiff, Attorney Cochrane, *respectfully*.

*1224.* The **SIXTH avenue of action** is defined as follows: *As authorized by the law*, file a Research Misconduct Pre-Inquiry Request and/or Complaint with the Wayne State University Institutional Review Board.

*1225.* The internal agencies known as an "Institutional Review Board" ("IRB") are vital components of the ethical framework that governs research involving human participants in every institution of higher education, not just here in the United States, but throughout the World.

*1226.* The primary purpose of an IRB is to protect the rights, safety, and well-being of individuals who participate in research studies, while also ensuring that the research is conducted in an ethically responsible manner.

*1227.* Principally, IRBs have a direct historical connection to **the Nuremberg Code**, a set of ethical principles and guidelines for human experimentation that was developed as a result of the Nuremberg Trials following Nazi treatment of POWS/Holocaust Victims during World War II.

*1228.* Explicitly, these historic trials prosecuted Nazi war criminals, including doctors and scientists who conducted unethical and inhumane experiments on prisoners without their consent during the Holocaust, often leading to the grotesque and painful death of the research subjects.

*1229.* **The Nuremberg Code**, established in 1947, outlined ten principles to guide the conduct of human research from this objective inception and that which flows directly to today, thus invalidating the Defendants' conduct as described *herein*: [*The Nuremberg Code as follows*]

> "**The great weight** of the evidence before us to effect that certain types of medical experiments on human beings, when kept within reasonably well-defined bounds, conform to the ethics of the medical profession generally. The protagonists of the practice of human experimentation justify their views on the basis that such experiments yield results for the good of society that are unprocurable by other

methods or means of study.  All agree, however, that certain basic principles must be observed in order to satisfy moral, ethical and legal concepts:

1. The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision. This latter element requires that before the acceptance of an affirmative decision by the experimental subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person which may possibly come from his participation in the experiment.

   The duty and responsibility for ascertaining the quality of the consent rests upon each individual who initiates, directs, or engages in the experiment. It is a personal duty and responsibility which may not be delegated to another with impunity.

2. The experiment should be such as to yield fruitful results for the good of society, unprocurable by other methods or means of study, and not random and unnecessary in nature.

3. The experiment should be so designed and based on the results of animal experimentation and a knowledge of the natural history of the disease or other problem under study that the anticipated results justify the performance of the experiment.

4. The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury.

5. No experiment should be conducted where there is an a priori reason to believe that death or disabling injury will occur; except, perhaps, in those experiments where the experimental physicians also serve as subjects.

6. The degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem to be solved by the experiment.

7. Proper preparations should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability or death.

8. The experiment should be conducted only by scientifically qualified persons. The highest degree of skill and care should be required through all stages of the experiment of those who conduct or engage in the experiment.

**9**. During the course of the experiment the human subject should be at liberty to bring the experiment to an end if he has reached the physical or mental state where continuation of the experiment seems to him to be impossible.

**10**. During the course of the experiment the scientist in charge must be prepared to terminate the experiment at any stage, if he has probable cause to believe, in the exercise of the good faith, superior skill and careful judgment required of him, that a continuation of the experiment is likely to result in injury, disability, or death to the experimental subject."

Trials of War Criminals before the Nuremberg Military Tribunal under Control Council Law No. 10

**Exhibit 351**—*The Nuremberg Code*

*1230.*   Building on these fundamentals of **the Nuremberg Code**, first adopted by the World Medical Association in 1964, **The Helsinki Declaration** can be seen as an evolutionary expansion of the ethical principles for research involving human subjects.

*1231.*   Specifically, **The Helsinki Declaration** built upon and refined the evolving-ethical consideration involving human-research subjects, applying principally to clinical and medical research, outlining principles for informed consent, risk-benefit assessment, and the important of ethical review committees, such as those IRBs discussed *herein*. **Exhibit 352**—*Declaration of Helsinki*.

*1232.*   Continuing, **the National Research Act of 1974** was a landmark piece of Federal legislation in the United States that made a profound impact on the ethical conduct of research involving human subjects. The **National Research Act** led to the establishment of the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research ("National Commission"), having far-reaching consequences for the regulation of research ethics involving human subjects.

*1233.*   Explicitly, **the National Research Act of 1974** itself was an effective response to public concerns and ethical controversies surrounding research involving human subjects, particularly

in the wake of revelations about unethical and deceptive research practices such as the Tuskegee Syphilis Study of Macon County, Alabama, from 1932 to 1972.

*1234.*   As part of its work, the National Commission produced **The Belmont Report**, a seminal document in the field of bioethics and research ethics for the Protection of Human Subjects of Biomedical and Behavioral Research in 1979 serving as a foundational framework for ethical principles and guidelines in human research subjects that has led directly to the establishment of educational IRBs, *respectfully*.

*1235.*   Principally, **The Belmont Report** outline three (*3*) fundamental ethical principles that <u>must</u> guide research involving human subjects and discusses the application of these principles to research design, informed consent processes, and the roll of IRBs in overseeing and approving research protocols. Specifically, IRBs are the Gatekeepers and play a critical role in ensuring that research adheres to the ethical standards outlined in **The Belmont Report**:

(*see*, **Exhibit 353**—*The Belmont Report*)

1. <u>**Respect for Persons**</u>: This principle emphasized the importance of individual autonomy and the need to treat individuals with respect. Central to this principle is the concept of informed consent, which means that the individuals should be fully informed about the nature of the research, its risks and benefits, and they must voluntarily agree to participate *without* coercion:

    "Respect for persons incorporates at least two ethical convictions: <u>**first**</u>, that individuals should be treated as autonomous agents, and <u>**second**</u>, that persons with diminished autonomy are entitled to protection. The principle of respect for persons thus divides into two separate moral requirements: the requirement to acknowledge autonomy and the requirement to protect those with diminished autonomy.

    An **autonomous person** <u>is an individual capable of deliberation about personal goals and of acting under the direction of such deliberation. To respect autonomy is to give weight to autonomous persons' considered opinions and choices while refraining from obstructing their actions unless they are clearly detrimental to others. To show **lack of respect** for an autonomous agent **is to repudiate that person's considered judgments, to deny an individual the freedom to act on those considered judgments, or to withhold information necessary to make a considered judgment**, when there are **no** compelling **reasons** to do so.</u>

However, **not every human being is capable of self-determination**. **The capacity for self-determination matures during an individual's life**, and **some individuals lose this capacity wholly or in part because of** illness, mental disability, or **circumstances that <u>severely restrict liberty</u>**. **Respect for** the immature and **the incapacitated may require protecting them** as they mature or while they are incapacitated.

**Some persons are in need of extensive protection**, even to the point of excluding them from activities which may harm them; other persons require little protection beyond making sure they undertake activities **freely and with awareness of possible adverse consequence**. **The extent of protection afforded should depend upon the risk of harm and the likelihood of benefit**. **The judgment that any individual lacks autonomy should be periodically reevaluated and will vary in different situations**.

In most cases of research involving human subjects, **respect for persons demands that subjects enter into the research voluntarily and with adequate information**. In some situations, however, application of the principle is not obvious. The involvement of prisoners as subjects of research provides an instructive example. On the one hand, it would seem that the principle of respect for persons requires that prisoners not be deprived of the opportunity to volunteer for research. On the other hand, under prison conditions they may be subtly coerced or unduly influenced to engage in research activities for which they would not otherwise volunteer. Respect for persons would then dictate that prisoners be protected. Whether to allow prisoners to "volunteer" or to "protect" them presents a dilemma. **Respecting persons, in most hard cases, is often a matter of balancing competing claims urged by the principle of respect itself**."

**Exhibit 353**, at pp. 4-5. (Emphasis added).

2. <u>**Beneficence**</u>: This principle obligates researchers to maximize benefits and minimize harm to human-research subjects establishing the duty to ensure that the potential benefits of the research outweighs any potential risks. This principle highlights the importance of conducting research that has a positive impact on not only the participants, *but society as a whole*:

"<u>Persons are treated in an ethical manner not only by respecting their decisions and protecting them from harm, but also by making efforts to secure their well-being</u>. Such treatment falls under the principle of beneficence. The term "beneficence" is often understood to cover acts of kindness or charity that go beyond strict obligation. In this document, beneficence is understood in a stronger sense, as an obligation. Two general rules have been formulated as complementary expressions of beneficent actions in this sense: **(1)** do not harm and **(2)** maximize possible benefits and minimize possible harms.

The Hippocratic maxim "do no harm" has long been a fundamental principle of medical ethics. <u>Claude Bernard extended it to the realm of research, saying that</u> **<u>one should not injure one person regardless of the benefits that might come</u>**

**to others**. However, even avoiding harm requires learning what is harmful; and, in the process of obtaining this information, persons may be exposed to risk of harm. Further, the Hippocratic Oath requires physicians to benefit their patients "according to their best judgment." Learning what will in fact benefit may require exposing persons to risk. The problem posed by these imperatives is to decide when it is justifiable to seek certain benefits despite the risks involved, and when the benefits should be foregone because of the risks.

The obligations of beneficence affect both individual investigators **and** society at large, because they extend both to particular research projects and to the **entire enterprise of research**. In the case of particular projects, investigators and members of their institutions are obliged to give forethought to the maximization of benefits and the reduction of risk that might occur from the research investigation. In the case of scientific research in general, members of the larger society are obliged to recognize the longer term benefits and risks that may result from the improvement of knowledge and from the development of novel medical, psychotherapeutic, and social procedures.

The principle of beneficence often occupies a well-defined justifying role in many areas of research involving human subjects. An example is found in research involving children. Effective ways of treating childhood diseases and fostering healthy development are benefits that serve to justify research involving children -- even when individual research subjects are not direct beneficiaries. Research also makes it possible to avoid the harm that may result from the application of previously accepted routine practices that on closer investigation turn out to be dangerous. But the role of the principle of beneficence is not always so unambiguous. A difficult ethical problem remains, for example, about research that presents more than minimal risk without immediate prospect of direct benefit to the children involved. Some have argued that such research is inadmissible, while others have pointed out that this limit would rule out much research promising great benefit to children in the future. Here again, as with all hard cases, the different claims covered by the principle of beneficence may come into conflict and force difficult choices."

*Id*. at p. 5. (Emphasis added).

**3**. **Justice**: This principle underscores the importance of fairness and equitable treatment in research requiring fair selection of research subjects and the equitable distribution of the benefits and burdens of the conducted research. Specifically, researchers should **avoid exploiting** vulnerable populations—*such as* **STUDENTS**—and strive for fairness in the selection of participants:

"**Who** ought **to receive** the **benefits** of research **and bear** its **burdens**? **This is a question of justice**, in the sense of "fairness in distribution" or "**what is deserved**." **An injustice occurs when** some **benefit** to which **a person is entitled is denied without** good reason **or when** some **burden is imposed unduly**. Another way of conceiving the principle of justice is that **equals ought to be treated equally. However, this statement requires**

**explication. Who is equal and who is unequal? What considerations justify departure from equal distribution?** Almost all commentators allow that distinctions based on experience, age, deprivation, competence, merit and position do sometimes constitute criteria justifying differential treatment for certain purposes. It is necessary, then, to explain in what respects people should be treated equally. There are several widely accepted formulations of just ways to distribute burdens and benefits. Each formulation mentions some relevant property on the basis of which burdens and benefits should be distributed. These formulations are **(1)** to each person an equal share, **(2)** to each person according to individual need, **(3)** to each person according to individual effort, **(4)** to each person according to societal contribution, and **(5)** to each person according to merit.

Questions of justice have long been associated with social practices such as punishment, taxation and political representation. Until recently these questions have not generally been associated with scientific research. However, they are foreshadowed even in the earliest reflections on the ethics of research involving human subjects. For example, during the 19th and early 20th centuries the burdens of serving as research subjects fell largely upon poor ward patients, while the benefits of improved medical care flowed primarily to private patients. Subsequently, the exploitation of unwilling prisoners as research subjects in **Nazi concentration camps** was condemned as a particularly flagrant injustice. In this country, in the 1940's, the **Tuskegee syphilis study** used disadvantaged, rural black men to study the untreated course of a disease that is by no means confined to that population. These subjects were deprived of demonstrably effective treatment in order not to interrupt the project, long after such treatment became generally available.

Against this historical background, it can be seen how conceptions of justice are relevant to research involving human subjects. For example, the selection of research subjects **needs to be scrutinized** in order to determine whether **some classes** (e.g., welfare patients, particular racial and ethnic minorities, or persons confined to institutions [**such as STUDENTS**]) **are being systematically selected** simply **because of their easy availability**, **their compromised position**, or **their manipulability, rather than for reasons directly related to the problem being studied.** Finally, whenever research supported by public funds leads to the development of therapeutic devices and procedures, justice demands both that these not provide advantages only to those who can afford them and that such research should not unduly involve persons from groups unlikely to be among the beneficiaries of subsequent applications of the research."

*Id*. at pp. 5-6. (Emphasis added).

*1236.* Plainly—the Defendants' conduct *herein* violates all three basic-ethical principles of **The Belmont Report**, *respectfully.*

*1237.* Furthermore, the National Commission also established within **The Belmont Report** the procedural applications enforcing these principles and the conduct of research that leads to the consideration of the following requirements:

"**1. Informed Consent**—Respect for persons requires that subjects, to the degree that they are capable, be given the opportunity to choose what shall or shall not happen to them. This opportunity is provided when adequate standards for informed consent are satisfied.

While the importance of informed consent is unquestioned, controversy prevails over the nature and possibility of an informed consent. Nonetheless, there is widespread agreement that the consent process can be analyzed as containing three elements: **information**, **comprehension** *and* **voluntariness**.

**Information.** Most codes of research establish specific items for disclosure intended to assure that subjects are given sufficient information. These items generally include: the research procedure, their purposes, risks and anticipated benefits, alternative procedures (where therapy is involved), and a statement offering the subject the opportunity to ask questions and to withdraw at **any** time from the research. Additional items have been proposed, including how subjects are selected, the person responsible for the research, etc.

However, a simple listing of items does not answer the question of what the standard should be for judging how much and what sort of information should be provided. One standard frequently invoked in medical practice, namely the information commonly provided by practitioners in the field or in the locale, is inadequate since research takes place precisely when a common understanding does not exist. Another standard, currently popular in malpractice law, requires the practitioner to reveal the information that reasonable persons would wish to know in order to make a decision regarding their care. This, too, seems insufficient since the research subject, being in essence a volunteer, may wish to know considerably more about risks gratuitously undertaken than do patients who deliver themselves into the hand of a clinician for needed care. It may be that a standard of "**the reasonable volunteer**" should be proposed: the extent and nature of information should be such that persons, knowing that the procedure is neither necessary for their care nor perhaps fully understood, can decide whether they wish to participate in the furthering of knowledge. Even when some direct benefit to them is anticipated, the subjects should understand clearly the range of risk and the voluntary nature of participation.

A special problem of consent arises where informing subjects of some pertinent aspect of the research is likely to impair the validity of the research. In many cases, it is sufficient to indicate to subjects that they are being invited to participate in research of which some features will not be revealed until the research is concluded. In all cases of research involving incomplete disclosure, such research is justified only if it is clear that **(1)** incomplete disclosure is truly necessary to

accomplish the goals of the research, **(2)** there are no undisclosed risks to subjects that are more than minimal, and **(3)** there is an adequate plan for debriefing subjects, when appropriate, and for dissemination of research results to them. Information about risks should never be withheld for the purpose of eliciting the cooperation of subjects, and truthful answers should always be given to direct questions about the research. Care should be taken to distinguish cases in which disclosure would destroy or invalidate the research from cases in which disclosure would simply inconvenience the investigator.

**Comprehension.** The manner and context in which information is conveyed is as important as the information itself. For example, presenting information in a disorganized and rapid fashion, allowing too little time for consideration or curtailing opportunities for questioning, all may adversely affect a subject's ability to make an informed choice.

Because the subject's ability to understand is a function of intelligence, rationality, maturity and language, it is necessary to adapt the presentation of the information to the subject's capacities. Investigators are responsible for ascertaining that the subject has comprehended the information. While there is always an obligation to ascertain that the information about risk to subjects is complete and adequately comprehended, when the risks are more serious, that obligation increases. On occasion, it may be suitable to give some oral or written tests of comprehension.

Special provision may need to be made when comprehension is severely limited -- for example, by conditions of immaturity or mental disability. Each class of subjects that one might consider as incompetent (e.g., infants and young children, mentally disable patients, the terminally ill and the comatose) should be considered on its own terms. Even for these persons, however, respect requires giving them the opportunity to choose to the extent they are able, whether or not to participate in research. The objections of these subjects to involvement should be honored, unless the research entails providing them a therapy unavailable elsewhere. Respect for persons also requires seeking the permission of other parties in order to protect the subjects from harm. Such persons are thus respected both by acknowledging their own wishes and by the use of third parties to protect them from harm.

The third parties chosen should be those who are most likely to understand the incompetent subject's situation and to act in that person's best interest. The person authorized to act on behalf of the subject should be given an opportunity to observe the research as it proceeds in order to be able to withdraw the subject from the research, if such action appears in the subject's best interest.

**Voluntariness.** An agreement to participate in research constitutes a valid consent only if voluntarily given. This element of informed consent requires conditions free of coercion and undue influence. Coercion occurs when an overt threat of harm is intentionally presented by one person to another in order to obtain compliance. Undue influence, by contrast, occurs through an offer of an excessive, unwarranted, inappropriate or improper reward or other overture in order to obtain

compliance. Also, <u>inducements that would ordinarily be acceptable may become undue influences if the subject is especially vulnerable.</u>

<u>Unjustifiable pressures usually occur when persons in positions of authority or commanding influence -- especially where possible sanctions are involved -- urge a course of action for a subject.</u> **<u>A continuum of such influencing factors exists,</u>** <u>however, and it is impossible to state precisely where justifiable persuasion ends and undue influence begins.</u> <u>But undue influence would include actions such as manipulating a person's choice through the controlling influence</u> of a close relative and <u>threatening to withdraw</u> health <u>services</u> to which <u>an individual would otherwise be entitled.</u>"

<em>Id</em>. at pp. 6-8. (Emphasis added).

"**<u>2. Assessment of Risks and Benefits</u>**—The <u>assessment of risks and benefits requires careful array of relevant data, including, in some cases, alternative ways of obtaining the benefits sought in the research. Thus, the assessment presents both an opportunity and a responsibility to gather systematic and comprehensive information about proposed research. For the investigator, it is a means to examine whether the proposed research is properly designed. For a review committee, it is a method for determining whether the risks that will be presented to subjects are justified.</u> <u>For prospective subjects, the assessment will assist the determination whether or not to participate.</u>

**<u>The Nature and Scope of Risks and Benefits.</u>** The requirement that research be justified on the basis of a favorable risk/benefit assessment bears a close relation to the principle of beneficence, just as the moral requirement that informed consent be obtained is derived primarily from the principle of respect for persons. <u>The term</u> "**<u>risk</u>**" <u>refers to a possibility that harm may occur</u>. However, when expressions such as "small risk" or "high risk" are used, they usually refer (often ambiguously) both to the chance (probability) of experiencing a harm and the severity (magnitude) of the envisioned harm.

The <u>term</u> "**<u>benefit</u>**" <u>is used in the research context to refer to something of positive value related to health or welfare. Unlike,</u> "**<u>risk</u>**," "**<u>benefit</u>**" <u>is not a term that expresses probabilities. Risk is properly contrasted to probability of benefits, and benefits are properly contrasted with harms rather than risks of harm.</u> Accordingly, so-called risk/benefit assessments are concerned with the probabilities and magnitudes of possible harm and anticipated benefits. <u>Many kinds of possible harms and benefits need to be taken into account. There are, for example, risks of psychological harm, physical harm, legal harm, social harm and economic harm and the corresponding benefits. While the most likely types of harms to research subjects are those of psychological or physical pain or injury, other possible kinds should not be overlooked.</u>

<u>Risks and benefits of research may affect the individual subjects, the families of the individual subjects, and society at large</u> (or special groups of subjects in society). <u>Previous codes and Federal regulations have required that risks to subjects be outweighed by the sum of both the anticipated benefit to the subject, if</u>

any, and the anticipated benefit to society in the form of knowledge to be gained from the research. In balancing these different elements, the risks and benefits affecting the immediate research subject will normally carry special weight. On the other hand, interests other than those of the subject may on some occasions be sufficient by themselves to justify the risks involved in the research, so long as the subjects' rights have been protected. Beneficence thus requires that we protect against risk of harm to subjects and also that we be concerned about the loss of the substantial benefits that might be gained from research.

**The Systematic Assessment of Risks and Benefits.** It is commonly said that benefits and risks must be "balanced" and shown to be "in a favorable ratio." The metaphorical character of these terms draws attention to the difficulty of making precise judgments. Only on rare occasions will quantitative techniques be available for the scrutiny of research protocols. However, the idea of systematic, nonarbitrary analysis of risks and benefits should be emulated insofar as possible. This ideal requires those making decisions about the justifiability of research to be thorough in the accumulation and assessment of information about all aspects of the research, and to consider alternatives systematically. This procedure renders the assessment of research more rigorous and precise, while making communication between review board members and investigators less subject to misinterpretation, misinformation and conflicting judgments. Thus, there should first be a determination of the validity of the presuppositions of the research; then the nature, probability and magnitude of risk should be distinguished with as much clarity as possible. The method of ascertaining risks should be explicit, especially where there is no alternative to the use of such vague categories as small or slight risk. It should also be determined whether an investigator's estimates of the probability of harm or benefits are reasonable, as judged by known facts or other available studies.

Finally, assessment of the justifiability of research should reflect at least the following considerations: **(i)** Brutal or inhumane treatment of human subjects is never morally justified. **(ii)** Risks should be reduced to those necessary to achieve the research objective. It should be determined whether it is in fact necessary to use human subjects at all. Risk can perhaps never be entirely eliminated, but it can often be reduced by careful attention to alternative procedures. **(iii)** When research involves significant risk of serious impairment, review committees should be extraordinarily insistent on the justification of the risk (looking usually to the likelihood of benefit to the subject -- or, in some rare cases, to the manifest voluntariness of the participation). **(iv) When vulnerable populations are involved in research**, the **appropriateness of involving them should itself be demonstrated**. A number of variables go into such judgments, including the nature and degree of risk, the condition of the particular population involved, and the nature and level of the anticipated benefits. **(v) Relevant risks and benefits must be thoroughly arrayed in documents and procedures used in the informed consent process**."

*Id*. at pp. 8-9. (Emphasis added).

"**3. Selections of Subjects**—Just as the principle of respect for persons finds expression in the requirements for consent, and the principle of beneficence in risk/benefit assessment, the principle of justice gives rise to moral requirements that there be fair procedures and outcomes in the selection of research subjects.

Justice is relevant to the selection of subjects of research at two levels: **the social and the individual**. **Individual justice** in the selection of subjects would require that researchers exhibit fairness: thus, they should not offer potentially beneficial research only to some patients who are in their favor or select only "undesirable" persons for risky research. **Social justice requires** that distinction be drawn between classes of subjects that ought, and ought not, to participate in any particular kind of research, based on the ability of members of that class to bear burdens and on the appropriateness of placing further burdens on already burdened persons. Thus, it can be considered a matter of social justice that there is an order of preference in the selection of classes of subjects (e.g., adults before children) and that some classes of potential subjects (e.g., the institutionalized mentally infirm or prisoners [or **STUDENTS**]) may be involved as research subjects, if at all, only on certain conditions.

**Injustice** may appear in the selection of subjects, even if individual subjects are selected fairly by investigators and treated fairly in the course of research. Thus injustice arises from social, racial, sexual and cultural biases institutionalized in society. Thus, **even if** individual researchers are treating their research subjects fairly, and even if IRBs are taking care to assure that subjects are selected fairly within a particular institution, **unjust social patterns may nevertheless appear in the overall distribution of the burdens and benefits of research**. Although individual institutions or investigators may not be able to resolve a problem that is pervasive in their social setting, they can consider distributive justice in selecting research subjects.

Some populations, especially institutionalized ones, are already burdened in many ways by their infirmities and environments. When research is proposed that involves risks and does not include a therapeutic component, other less burdened classes of persons should be called upon first to accept these risks of research, except where the research is directly related to the specific conditions of the class involved. Also, **even though** public funds for research may often flow in the same directions as public funds for health care, it seems unfair that populations dependent on public health care constitute a pool of preferred research subjects if more advantaged populations are likely to be the recipients of the benefits.

**One special instance of injustice results from the involvement of vulnerable subjects**. **Certain groups**, such as [**STUDENTS**, *or*] racial minorities, the **economically disadvantaged**, the very sick, and the institutionalized may continually be sought as research subjects, owing to their ready availability in settings where research is conducted. **Given**

their **dependent status** and their **frequently compromised capacity for free consent, they should be protected against the danger of being involved in research solely for administrative convenience, or because they are easy to manipulate** as a result of their illness **or socioeconomic condition**."

*Id*. at p. 9. (Emphasis added).

*1238.* Plainly—the Defendants' conduct *herein* violates all three basic-ethical principal applications required by **The Belmont Report**, *respectfully*.

*1239.* Chronologically, **The Belmont Report** was the precursor to **The Common Rule** first introduced in 1991 as a set of codified regulations in the United States that governs the ethical conduct of research involving human participants. Principally, **The Common Rule** is designed to protect the rights, safety, and the well-being of research participants while facilitating valuable scientific investigations that contribute to the advancement of knowledge.

*1240.* Applicable to our facts *herein*, **The Common Rule** applies to research conducted or supported by Federal Agencies that have adopted the regulations, such as, the Department of Education. This includes a wide range of research, such as medical studies, social science research, psychological experiments, *and more*.

*1241.* Specifically, one of the central features of **The Common Rule** is the requirement for institutions to establish and maintain Institutional Review Boards (IRBs), where these IRBs are responsible for reviewing and approving research protocols to ensure that they meet ethical standards and that the rights and welfare of participants are properly protected.

*1242.* Fundamentally, **The Common Rule** places a strong emphasis on obtaining informed and voluntary consent from human-research subjects in accordance with **The Belmont Report's** principles and applications. Overall, institutions and researchers are responsible for monitoring the progress of research and reporting any adverse events or unanticipated problems that may

affect the safety and well-being of participants; IRBs play a critical role in the oversight of these requirements at institutional levels.

*1243.* In 2017, **The Common Rule** underwent significant revisions, which **The Revised Common Rule** went into effect on January 21st, 2019, updating requirements for informed consent, the introduction of new categories of research that are exempt from full-IRB review, and made changes to the way research is conducted in our digital age.

*1244.* Principally, **The Revised Comon Rule** introduced changes to the informed consent process, <u>requiring</u> researcher to provide a concise and **focus**ed summary of key information at the beginning of the <u>informed</u> <u>consent</u> <u>document</u>; this "*key information*" section aims to enhance participants' understanding of the research being conducted and how they will be as **<u>used</u>** as research subjects.

## <u>WAYNE STATE UNIVERSITY'S</u>
## <u>INSITUTIONAL REVIEW BOARD (WSU IRB) OVERVIEW</u>

*1245.* The policy and procedures approved by the Defendants to comply with **The Common Rule** and more recently **The Revised Common Rule** is thoroughly discussed *herein* this section using the Wayne State University Institutional Review Board's (WSU IRB's) documents generated for system-wide compliance.

*1246.* Moreover, each of the documents *herein* are available on the WSU IRB's website and all Wayne State University researchers have access to these documents, in addition to a myriad of support and training for assistance in complying with Federal Law regarding <u>research</u> <u>on</u> <u>human</u> <u>subjects</u>, or as framed *herein*—**STUDENTS**.

*1247.* First, an Introduction to **The Revised Common Rule** 45 CFR 46 outlines the comparison between **The Common Rule** and **Revised Common Rule** outlining also the "three ethical

principles of **The Belmont Report**: Beneficence, Justice, and Respect for Persons." **Exhibit 354**—*Introduction to the Revised Common Rule*.

*1248.*   Furthermore, this introductive outline highlights what is the "Wayne State Human Research Protection Program" housed within the Division of Research, where the WSU IRB was "gearing up for major changes to federal regulations that protect the rights and welfare of human participant (subject) research." **Exhibit 355**—*WSU IRB Sweeping Changes Article*.

*1249.*   Specifically, the WSU IRB posted "modified consent templates on [their] website in December 2018 to allow researchers *to* begin preparing the consent form prior to any January 21, 2019 submissions. **All** of the **updated policies**, **applications**, **templates** and **guidance** documents **will** be **posted to** the WSU IRB **website** on the eve of January 21, **2019**." *Id*. (Emphasis added).

*1250.*   "Currently, there are 19 agencies that are signatories to **The Common Rule**. Research that is funded or supported by agencies that [*such as* **the Department of Education**] have signed on to **the Common Rule** are governed by **The Common Rule** and its subparts [and also **The Revised Common Rule**]." **Exhibit 356**—*Common Rule Agencies & Departments*.

*1251.*   *Historically*— **The Revised Common Rule** went into effect on **January 21st, 2019**, thus enhancing the protection of human-research subjects around the World.

*1252.*   On December 2nd, 2019, Wayne State University Vice President for Research, Dr. Stephen M. Lanier, issued a written declaration identifying that "... (WSU) operates under a Federal Wide Assurance (FWA), #00002460, with the United States Department of Health and Human Services, Office for Human Research Protection, in compliance with 45 CFR Part 46." **Exhibit 357**—*Notice of Compliance Federal Wide Assurance Letter*.

*1253.*   This guided transition from The Common Rule to The Revised Common Rule was designed by the Defendants to be seamless and included a "grandfather" clause to streamline the WSU IRB

approval process under The Revised Common Rule. **Exhibit 358**—*Transition to Review Common Rule 45 CFR 46 Temporary Policy*; **Exhibit 359**—*Transition to Revised Common Rule Appendix*.

*1254.* Under this transitioning policy, the WSU IRB "may transition **qualifying research** protocols to The Revised Common Rule (Criteria for qualifying research is described on page 2 of this policy). **Exhibit 358**. (Emphasis added).

*1255.* Specifically, **only** "[r]esearch protocols approved before January 21, 2019 may be transitioned to the Revised Common Rule regulations if the following criteria are met," as outlined in both **Exhibit 358**, and more explicitly in **Exhibit 359**, *respectfully*.

*1256.* Next, where research activity does not meet the criteria under The Reviewed Common Rule to be grandfathered under WSU IRB's policy and procedures, the Defendants explicitly identify—"All research that involves human participants must be reviewed and approved by the Wayne State University (WSU Institutional Review Board (IRB) prior to the implementation of research in accordance with the Department of Health and Human Services (DHHS) regulations at 45 CFR 46.108(b)..." **Exhibit 360**—*Initial Protocol Submission Requirements (Policy 04-02)*.

*1257.* Specifically, "[t]his Policy/Procedure applies to all behavioral or biomedical human subject research activities by WSU employees, faculty, and students or by individual who are members of WSU affiliate institutions." *Id*. at p. 1.

*1258.* Clearly— "**Human Participant (subject)**...[is] a living individual about whom an investigator conducting research obtains (1) data through intervention or interaction with the individual; or (2) identifiable private information." *Id*. at p. 2.

*1259.* Continuing, "**Intervention** includes both physical procedures by which data are gathered (e.g. venipuncture) and **manipulations of** the **participant** or their environment that are performed for research purposes." *Id*. (Emphasis added).

*1260.* Continuing further, "**Interaction** includes communication or interpersonal contact between investigator and participant/subject." *Id.*

*1261.* Even further—"**Private information** includes information about behavior that occurs in a context in which an individual can reasonably expect that no observation or recording is taking place, and information which has been provided for specific purposes by an individual and which the individual can reasonably expect will not be made public (for example, a medical record). Private information must be individually identifiable (i.e., the identity of the participant is or may readily be ascertained by the investigator or associated with the information) in order for obtaining the information to constitute research involving human participants." *Id.*

*1262.* Fundamentally— "[i]f the research activity does not qualify under any of the above circumstances [see below], then the activity would not need to be submitted and reviewed by the IRB:"

> 1. Under DHHS regulations, "**research**" **means a systematic investigation, including development, testing and evaluation, designed to develop or contribute to generalizable knowledge.**
> 2. Under FDA regulations research means any experiment that involves a test article and one or more human subjects, and that either must meet the requirements for prior submission to the FDA under section 505(i) or 520(g) of the Food, Drugs, and Cosmetics Act, or need not meet the requirements for prior submission to the FDA under these sections of the Food, Drug, and Cosmetics Act, but the results of which are intended to be later submitted to, or held for inspection by, the FDA as part of an application for a research or marketing permit. For research involving drugs, an experiment is any use of a drug, except for the use of a marketed drug in the course of medical practice, and is defined as a systematic investigation designed to develop or contribute to generalizable knowledge.

> > *Id*. at pp. 2-3. (Emphasis added).

*1263.* Plainly— "**Systematic investigation** - A systematic investigation may include research development, testing and evaluation, designed to develop or contribute to generalizable knowledge. Activities which meet this definition constitute research for purposes of this policy, whether or not they are conducted or supported under a program which is considered research for

other purposes. For example, some demonstration and service programs may include research activities." *Id*. at p. 3. (Emphasis added).

*1264.*   Where—"**Generalizable knowledge** - Determination as to whether the activity will contribute to "generalizable knowledge" **is** often **based on whether** the **data will be disseminated by** means of **publication or presentation**. This **should not be the sole factor** used to make a determination, however. In general, **OHRP gives guidance** that if the data will **be used to draw conclusions related to a larger entity**, **then the activity is considered** "**research.**"" *Id*. at p. 1. (Emphasis added).

*1265.*   In general, IRB approval is an ongoing process, and the "**IRB must** review research at intervals appropriate to the degree of risk, **but not less than once per year**. **Upon careful review of the submitted material**, the IRB Committee will determine if the research project requires review mor often than annually..." *Id*. at p. 6. (Emphasis added).

*1266.*   Where, "[b]efore approving research that involves [**HUMAN PARTICIPANTS**], the IRB must determine that the following criteria are met:

- **Risks** to participants are **minimized**.

- **Risks** to participants **are reasonable** in relation to anticipated benefits.

- **Selection of participants** is equitable or justified for the center aims.

- **Informed consen**t will be **sought from each** prospective **subject** or the subject's legally authorized representative.

- **Informed consent** will be **appropriately documented**.

- **When appropriate**, there are **adequate provisions to protect the privacy interests of participants** (an individual's interests in being left alone and free of physical or psychological intrusions or intrusions on information).

- **When appropriate**, there are adequate provisions to protect and maintain the confidentiality or participant data.

*Id*. at pp. 6-7. (Emphasis added).

*1267.* Again, as defined *therein*— "**_Risk_** – the probability of harm, injury, or loss (e.g. physical, psychological, social, or economic) occurring as a result of participation in a research study. Both the **probability** and **magnitude of** possible **harm** may **vary from minimal** *to* **significant**. Risks can be classified in one of the following categories:

- **Physical** – risks that may arise from the use of test agents such as chemicals or therapeutic drugs, devices, physical agents (including radiation), and clinical procedures;

- **Psychological** – risks that may arise from the utilization of behavioral questionnaires or surveys, interview interactions, the collection of sensitive data, or the emotional stress of study participation;

- **Social** – risks that may arise from actual or potential breaches of confidentiality or anonymity such as harm to interpersonal relationships, damage to reputation or social standing, or exposure to legal sanctions;

- **Legal** – risks that may lead to legal action against the participant such as investigation or arrest; [**or**]

- **Economic** – risks that may affect an individual's financial status, employment status or employability, or insurability.

*Id*. at p. 3. (Emphasis added).

*1268.* The effect of following proper WSU/IRB Policy/Procedure by submission of the research protocol involving human participant research, and "[a]fter an indepth review of the range of the research study, possible actions by the Institutional Review Board include:

- Approved
- Specific minor reviews required
- Tabled, and
- Disapproved."

*Id*. at p. 5.

*1269.* Moreover, even "[b]efore the IRB can review a protocol involving the use of human participants in research, the protocol **must be reviewed** for **scientific merit** by the Principal Investigator's (PI) department," with "any comments or feedback related to this certification" accompanying the research proposal submission **in writing**. *Id*. at p. 5. (Emphasis added).

*1270.* Specifically, **this <u>scientific review must</u> address** the following:

> (1) appropriate support will be provided for the research project including adequate facilities and staff;
>
> (2) appropriate scientific and ethical oversight has been and will be provided;
>
> (3) the research uses procedures consistent with sound research design; *and*
>
> (4) the research design is sound enough to yield the expected knowledge.
>
> *Id*. at p. 5. (Emphasis added).

*1271.* Expounding on this condition-precedent of the "**scientific merit**" requirement:

> "Various **departments conduct this scientific review in different ways** and the **IRB will accept any of these methods as long as <u>the</u> <u>Chair</u> and/or his/her designee <u>certifies</u> by <u>affixing</u> his/her <u>signature</u> <u>on</u> the <u>Protocol</u> <u>Summary</u> <u>Form</u> <u>that</u> the <u>scientific review</u> has been <u>completed</u> <u>and</u> that the <u>research</u> <u>has</u> <u>scientific</u> <u>merit</u> <u>and</u> <u>ensures</u> that <u>appropriate</u> <u>support</u> and <u>resources</u> <u>will</u> <u>be</u> <u>provided</u> to <u>conduct</u> the <u>study</u>. Research initiated by an investigator without a designated department <u>must</u> obtain certification from a department with the expertise to determine the scientific merit of the study** (see IRB Policy/Procedure "Investigator Initiated Research")."
>
> *Id*. at p. 5. (Emphasis added).

*1272.* Remembering the regulatory requirements for IRB review—"[o]nly research meeting the definition of "research" [*see above*]...requires IRB review and IRB oversight;" where "intent to publish is an insufficient criterion for determining whether a project involves activity that requires IRB review." **Exhibit 361**—*Activities That Are <u>Not</u> Human Participant Research*.

*1273.* Specifically, there are according to WSU IRB documents nine (*9*) activities that "are <u>NOT</u> Human Participant Research," identified as follows: (*see* **Exhibit 361** *in full*)

> a) **"<u>Case Report</u>**— The project consists of a case report or series (up to three cases) which describe an interesting treatment, presentation, or outcome. A critical component is that nothing was done to the patient(s) with prior "research" intent;"
>
> b) **"<u>Course-Related Activities</u>**— The project is limited to course-related activities designed specifically for educational or teaching purposes where

data are collected from and about students as part of a routine class exercise or assignment and is not intended for use outside of the classroom. NOTE: IRB approval is required if a student is involved in an activity designed to teach research methodologies and the instructor or student wishes to conduct further investigation and analyses in order to contribute to scholarly knowledge;"

c) "**Decedents**—The project involves research that is limited to death records, autopsy materials, or cadaver specimens. If the project involves the use and/or collection of Protected Health Information (PHI), HIPAA regulations apply to decedent research. As the Privacy Board, the IRB Office requires that you confirm the following conditions as set forth in the Privacy Rule at 45 CFR 164.512(i)(ii)(iii), have been met...."

d) "**Journalism/Documentary Activities**—The activities are limited to investigations and interviews that focus on specific events, views, etc., and that lead to publication in any medium (including electronic), documentary production, or are part of training that is explicitly linked to journalism. There is no intent to test a hypothesis. NOTE: IRB approval may be required when journalists conduct activities normally considered scientific research intended to produce generalizable knowledge (e.g., systematic research, surveys, and/or interviews that are intended to test theories or develop models);"

e) "**Oral History**—The project is limited to oral history activities, such as open-ended interviews, that only document a specific historical event or the experiences of individuals without the intent to draw conclusions or generalize findings. NOTE: IRB approval is required when the oral history activities are intended to produce generalizable conclusions (e.g., that serve as data collection intended to test economic, sociological, or anthropological models/theories);"

f) "**Program evaluation/Quality Improvement/Quality Assurance Activities**—The project is limited to program evaluation, quality improvement or quality assurance activities designed specifically to assess or improve performance within the department, hospital or classroom setting. The intention of the project is not to generate conclusions that can be applied universally, outside of the immediate environment where the project occurred. NOTE: Investigators, who plan to conduct a QI/QA project, should ensure that they have received approval from any applicable committees within their department or the site in which the activity will occur. NOTE: Activities that involve the implementation or evaluation of a new, modified, or previously untested intervention, service, or program to determine whether it is effective and to exclude the systematic comparison of interventions in an experimental-type design are considered human participant research, and require IRB review. In these cases, the knowledge gained may be applicable beyond the individual, specific program (unless the results are dependent on a set of unique characteristics);"

g) "**Public Use Datasets**—The project is limited to analyzing de-identified data contained within a publicly available dataset. The research will NOT involve merging any of the data sets or comparing/combining the data set with other data sources in such a way that individuals might be identified, and the researcher will NOT enhance the public data set with identifiable or potentially identifiable data; [and]

h) "**Coded\* or De-Identified Private Information or Human Biological Specimens**—The project is limited to the use of existing and/or prospectively collected de-identified private information and/or human biological specimens (hereafter referred to as "specimens"). IRB Approval is not required if you can confirm all of the following [six (6) elements]:

   1) The private information or specimens were/are not collected specifically for the currently proposed research project through an interaction or intervention with living individuals;

   2) 2. The investigator can confirm that the use of the private information or specimens is not in violation of the terms of use under which the information or specimens were/will be collected;"

**Exhibit 361** at pp. 1-3.

*1274.* **To be clear**—the Defendants' conduct **IS** activity that requires WSU IRB authorization.

*1275.* **To be *even more* concise**—the Defendants' conduct **IS NOT** activity/ research that avoids the regulatory requirements under **The Common Rule** or **The Revised Common Rule**.

*1276.* "There are several types of Institutional Review Board (IRB) reviews based on the type of [research] protocol submitted. The following is intended to assist the investigator in directing their protocol to receive the appropriate type of review. Ultimately, the [IRB] will decided the type of review a protocol will require. The **types of reviews** are:

    A. Exempted Reviews
    B. Expedited Reviews
    C. Full Board Reviews
    D. Single Use of a Test Article Review"

**Exhibit 362**—*Types of IRB Reviews Policy 04-01*

*1277.* First, "Exempted Reviews" includes "involvement of human participants...in one or more of the exemption categories found in the IRB policy—04-04 Exempt Review..." where "if an

investigator believes that his/her project qualifies for exemption, this **form** should be **completed**

and **submitted with** the original **complete protocol**. A designated member of the IRB **must**

"*concur*" that the project qualifies for exemption." *Id*. at p. 1. (Emphasis added).

*1278.*   Explicitly identified in WSU IRB Policy 04-04 for Exempt Review:

> "Wayne State University **does not allow** investigators to exempt his/her research project from IRB review and concurrence. **Instead**, the Wayne State University (WSU) IRB chairperson or his/her designee **must determine** that a **project** is **eligible** for exemption. For VA research, the IRB chair or IRB members designated by the chair must make exemption determinations. **Any study** that the **IRB** chairperson or his/her designee **believes is not exempt must be reviewed by either an expedited or full board review process**. A **research project meeting the criteria for exemption cannot start until after the IRB** chairperson or his/her designee **has given concurrence of exemption. Retroactive concurrence or review cannot occur**."

> **Exhibit 363**—*Exempt Review Policy 04-04 (Emphasis added).*

*1279.*   Within the Exempt Review Policy, the following definitions are relevant for the *herein*

analysis for **all** Human Participation **Research**:

> a) "**Minimal Risk**: The probability and magnitude of harm or discomfort anticipated in the research are **not greater** in and of themselves **than those ordinarily encountered in daily life** or during the performance of routine physical or psychological examinations or tests;"
>
> b) "**Deception**: A research technique that involves deceiving the participants about the nature or purposes of the research. Deception in exempt research can be done only with adult participants with a prospective agreement that informs the participant that he/she will be unaware of or misled regarding the nature or purposes of the research;"
>
> c) "**Exempt research**: Human participant research where the entire research project falls within one or more of the six specific regulatory categories (see below) and satisfies all institutional policies and procedures;"
>
> d) "**Limited IRB Review**: A limited IRB Review is required for studies in which provisions are needed to protect the privacy of participants and maintain the confidentiality of the data;" [and]
>
> e) "**Consent Process**: The process by which a human participant is informed (understands) what a study entails before voluntarily agreeing

(consenting) to participate. The informed consent process typically begins with recruitment and obtaining a signature on an informed consent document and continues through and beyond the completion of the study."

*Id*. at p. 3. (Emphasis added).

1280.   Next, "[u]nder federal regulations (45 CFR 46.101), research activities in which the only involvement of human participant[s] will be in one or more of the following categories **are eligible for exemption by** the WSU Institutional Review Boards:"

*(1)* Research conducted in established or commonly accepted educational settings that specifically involve normal educational practices that are not likely to adversely impact students' opportunity to learn required educational content or the assessment of educators who provide instruction. This includes:

    i.   Research on regular and special education instructional strategies, *and*

    ii.  Research on the effectiveness of, or the comparison among, instructional techniques, curricula, or classroom management methods;"

*(2)* Research that only includes interactions involving the use of educational tests (cognitive, diagnostic, aptitude, achievement), survey procedures, interview procedures, or observation of public behavior (Including visual or auditory recording) if at least one of the following criteria is met:

    i.   Information obtained is recorded by the investigator in such a manner that identity of the participants cannot be readily ascertained, directly or through identifiers linked to the participants;

    ii.  Any disclosure of the human participants' responses outside the research would not reasonably place the participants at risk of criminal or civil liability or be damaging to the participants' financial standing, employability, educational advancement, reputation. This provision also applies to VA regulated research;

           [*or*]

    iii.  The information obtained is recorded by the investigator in such a manner that the identity of the human participants can readily be ascertained, directly or through identifiers linked to the participants, and an IRB conducts a limited IRB review to examine the provisions to protect the privacy of subjects and to maintain the confidentiality of data.

*(3)* Research involving benign behavioral interventions in conjunction with the collection of information from an adult participant through verbal or written responses (including data entry) or audiovisual recording if the participant prospectively agrees to the intervention and information collection and at least one of the following criteria is met: [**SAME** three *(3)* criteria as found in (b)]

*(4)* Secondary research for which consent is not required: Secondary research uses of identifiable private information or identifiable biospecimens, if at least one of the following criteria is met:
  i.    The identifiable private information or identifiable biospecimens are publicly available;

  ii.   Information, which may include information about biospecimens, is recorded by the investigator in such a manner that the identity of the participants cannot readily be ascertained directly or through identifiers linked to the participants, the investigator does not contact the participants, and the investigator will not re-identify the participants."

        [...]

*(5)* Research and demonstration projects that are conducted or supported by a federal department or agency, or otherwise subject to the approval of Department or Agency heads (or the approval of the heads of bureaus or other subordinate agencies that have been delegated authority to conduct research and demonstration projects), and that are designed to study, evaluate, improve, or otherwise examine public benefit or service programs, including:
a. Procedures for obtaining benefits or services under those programs,
b. Possible changes in, or alternatives to, those programs or procedures, or
c. Possible changes in methods or levels of payment for benefits or services under those programs.

    Such projects include, but are not limited to internal studies by federal employees, and studies under contracts or consulting arrangements, cooperative agreements, or grants. Exempt Projects also include waivers of otherwise mandatory requirements using authorities such as sections 1115 and 1115A of the Social Security Act as amended;" [and]

*(6)* Taste and food quality evaluation and consumer acceptance studies if: [...]"

*Id*. at pp. 6-8. (Emphasis added); *summarized too* in
**Exhibit 364**—*Exempt Review of Research Overview.*

*1281.*  **Even if** a research project is "**exempt**" **under** categories **2 and 3**, "Limited IRB Review **is required**," when:

> *(a)* The information obtained is recorded by the investigator in such a manner that the **identity of the participants** **can** readily **be ascertained**, directly or through identifiers linked to the participants; **AND**

> *(b)* **Any disclosure of participants' responses** outside the research would reasonably **place the participants at risk** of **criminal** or **civil liability** or be **damaging to the participants**' **financial standing**, **employability**, **educational advancement, or reputation**."

**Exhibit 363**, at p. 3. (Emphasis added).

*1282.*  Where both of these elements are met, again— "Limited IRB **Review is required**," consisting of *at least* the following:

> "Limited IRB Review **consists of an evaluation** of the extent to which identifiable information is or has been de-identified **and the risk** that such de-identified **information can be re-identified, the use of the information,** the **extent to which the information will be shared or transferred to a third party or otherwise disclosed or released,** the **likely retention period or life of the information,** the **security controls in place to protect the confidentiality and integrity of the information,** and **the potential risk of harm to participants should the information be lost, stolen, compromised or otherwise used in a way contrary to the specifications of the research under the exemption.**"

*Id*. at p. 4. (Emphasis added).

*1283.*  Continuing with the types of WSU IRB reviews as outlined in **Exhibit 362**—*interestingly*, "beginning March 15, 2016," the WSU IRB "limited the scope of its Federalwide Assurance (FWA) to federally funded research." **Exhibit 365**—*Flexible Review and Oversight of Research Not Covered by Federalwide Assurance.*

*1284.*  Specifically, this limiting of "the scope of the FWA allows for an appropriate lever of flexibility for review and oversight of research projects without compromising protection of human participants." *Id*. at p. 1.

*1285.*  Meaning—the WSU IRB allows for "Flexible Review and Oversight" of "Research Not Covered by Federalwide Assurance," but availability is only for those "research **projects** that

**present no more than minimal risk** to human participants **are eligible for flexible review** and oversight." *Id*. at p. 1. (Emphasis added).

*1286.* Explicitly— "All human participant research projects conducted or supported at Wayne State University and/or affiliated institutions remain subject to WSU IRB policies and review, whether they qualify for [Flexible Review] or not. Eligibility of any research project for flexible review and oversight is at the discretion of the Wayne State University Office of Research Integrity." *Id*. at p. 2.

*1287.* Moreover, "a project may be approved by non-exempt flexible review unless the following criteria are met:

- Risks to participants are no more than minimal;

- Risks to participants are minimized;

- Risks to participants are reasonable in relation to anticipated benefits;

- Selection of participants is equitable;

- Research plan makes adequate provision for monitoring;

- Research plan makes adequate provisions for protecting the privacy of subjects and to maintain the confidentiality of data; [*and*]

- When some or all of the participants are likely to be vulnerable to coercion or undue influence, additional safeguards have been included in the study to protect the rights of vulnerable participants."

*Id*. at p. 2 (Emphasis added).

*1288.* **To be clear**—the Defendants' conduct *herein* **DOES NOT** meet this criterion, *respectfully*, and therefore Flexible Review by WSU IRB is inapplicable.

*1289.* Finally, and on an ongoing basis— "Research projects approved using a flexible review process will be **audited periodically** to **confirm** that the project is still **eligible** for flexible review and oversight." *Id*. at p. 4. (Emphasis added).

*1290.*   All research "for Flexible Review under this policy will be reviewed by the WSU IRB using **expedited review procedures** unless the IRB reviewer determines that review by the convened board is warranted [**Full Board** Reviews]." *Id.* at p. 2; **Exhibit 362**.

*1291.*   Ultimately—compliance rests in the hands of the principal investigator (PI) **and** the department chair in which the research involving human participation is taking place, and too the WSU IRB in general—**Exhibit 366** outlines for the PI a general overview as to how Human Participant Research is defined, whether WSU IRB oversight is appliable, and guides the PI towards completion of the formal Human Participant Research Determination Tool Form (**Exhibit 367**) required to be submitted with each research protocol.

*1292.*   Very clearly—these two documents are used to determine if the activity under question **is** "Human Participant" (subject) research" in which "a research proposal **must** be submitted to the IRB for review." **Exhibit 366**, at p. 1; 2.

*1293.*   Specifically, the WSU IRB has outlined these determinative variables below:

| | | Is this research? The decision process: |
|---|---|---|
| | 1 | The first question a principal investigator (PI) must ask is whether or not a "research activity" is being proposed.  Contact the IRB Education Office should assistance be required in making this determination. (Note: An investigator cannot exempt his/her research project from IRB review and concurrence. Instead, the HIC chairperson or his/her designee must determine that a project is eligible for exemption. (See IRB Policy/Procedure "Exempt Procedures"). |
| | 2 | The second question is whether or not the "research activity" involves interacting or intervening with living individuals or their identifiable private information (see Part A #3 below). |
| | 3 | If the activity involves the FDA, Part B (below) provides the appropriate definition. |
| | 4 | If the activity involves the Department of Defense (DoD) or one of its components, the definition of "Experimental Subject" should be used in determining if the research meets the criteria for human subject research. |
| | 5 | When the questions in Part A or Part B (below) can be answered "yes," a research proposal must be submitted to the IRB for review. |

**Exhibit 366**, at p. 1.

*1294.*   This determination follows to "Part A" wherein the following variables are considered:

| A. | The activity is "Human Participant" (subject) research according to the Department of Health and Human Services (DHHS) regulations when either 1 and 2 below are true Or 1 & 3 below are true. |
|---|---|

*Id*.

**1295.**   Explicitly, review by the WSU IRB is triggered when the following are identified:

| 1. | The activity is a systematic investigation including research development, testing and evaluation and is designed **OR** contributes to generalizable knowledge<br><br>**AND** |
|---|---|
| 2. | The data the PI is planning to obtain are about living individuals obtained through any or all of the following means:<br>o   Physical procedures performed on individuals<br>o   Manipulation of individuals<br>o   Manipulation of individuals' environments<br>o   Communication with individuals, **OR**<br>o   Interpersonal contact with individuals<br><br>**OR** |

| 3. | The data is individually identifiable because:<br>o   The identity of the participant is or may readily be ascertained by the PI **OR**<br>o   The identity of the participant is or may readily be associated with the information<br><br>**And**  the data is private because:<br>o   It is about behavior that occurs in a context in which the individual can reasonably expect that no observation or recording is taking place **OR**<br>o   The individual has provided information for specific purposes and can reasonably expect that the information will not be made public (i.e., medical record). |
|---|---|

*Id*. (Emphasis added).

**1296.**   *Herein*—the Defendants' conduct **meets all three** (*3*) variables and thus **is** "**research**" on human participants (**STUDENTS**), *respectfully*, and thus **requires** WSU IRB review & approval **before** operation of this research.

**1297.**   Moreover, the WSU IRB has developed an "Investigator Self-Pre Review Tool" that is for "guidance only" in which this tool identifies clearly that "[**a**]ll investigators **must** complete CITI training **prior to** submitting any study to the IRB." **Exhibit 368**—*Investigator Self Pre-Review Tool*. (Emphasis added).

*1298.* This **required** **training** is known as "Collaborative Institutional Training Initiative (CITI)," consisting of "three sets of modules for Principal Investigator & all key personnel" that "must be renewed every three years." **Exhibit 369**—*CITI Training: WSU Required Modules.*

*1299.* Comprehensively—the WSU IRB derives authority from the "university-wide [Human Research Protections Program] that ensures the safe and ethical conduct of human participant research by all faculty, staff, and students of Wayne State University and its affiliates." **Exhibit 370**—*Human Research Protections Program Policy Broad Overview.*

*1300.* This institutional-authority structure further commingles the arguments *herein* as:

> "In order to adequately protect the rights of human participants in research an effective Human Research Protection program **requires** an **institutional** **organizational** structure in **which authority** and responsibilities are **clearly** **defined**. The **President of Wayne State University** (WSU) has **given the Vice President for Research the authority to designate the Associate/Assistant Vice President for Research** (AVPR) as the University's chief regulatory compliance officer for research. The **AVPR** also **oversees inquiries** and **investigations of alleged violations** of University policies and state and federal regulations related to human subject's protections. **Wayne State University's commitment** to the highest standards in human participant research also **requires** the **cooperation** and **commitment** of **all components** of the University that **are** **involved** with the **conduct** or oversight of human research protection..."

> **Exhibit 371**, at p. 1. (Emphasis added).

*1301.* Moreover, this commingling of executive authority persists as, "[a] representative from the Office of General Counsel (**OGC**) **holds** a position as a **voting** member of an IRB committee and **provides** legal **expertise** to the IRB as necessary." *Id*. at p. 6. (Emphasis added).

*1302.* The objective-core reasoning behind **The Nuremburg Code**, **The Helsinki Declaration**, **National Research Act of 1974**, **The Belmont Report**, **The Common Rule**, *and* **The Revised Common Rule**—is for the specific purpose to **protect** those **vulnerable** and susceptible as clay

who cannot *or* may not understand the given effect of the **designed-systematic research** implemented by a Principal Investigator's research as a **HUMAN** participant.

*1303.* Explicitly, the WSU IRB explains the policy gap at issue---identifying there is no specific "federal regulations that specifically address the inclusion of [**STUDENTS**]/trainees/employees in research protocols." **Exhibit 372**—*Vulnerable Participants Policy*. (Emphasis added).

*1304.* Moreover, the Defendants explicitly agree with the core beliefs of the arguments *herein* when identifying in reference to **STUDENTS**/trainees/employees— "these **classes of subjects are vulnerable** in that **they may be** unduly **influenced by** the expectation that **participation or nonparticipation in a research protocol** [may] [sic] **affect their academic** or employment status." *Id*. (Emphasis added).

*1305.* Simply— "[**STUDENTS**]/trainees/employees **have the same rights as any other** potential **subjects** to participate **in an IRB approved research project**, **irrespective** of the degree **of risk** provided all of the following conditions are met:

1. All [**STUDENTS**]/trainees/employees must be offered the same inducement as other participants in the research project.

2. **Research must not offer** [**STUDENTS**]/trainees/employees any **competitive academic** or occupational advantage **over others who do not volunteer nor impose any academic** or occupational **penalty on those who do not volunteer**. If only one protocol is available, the [**STUDENTS**] should be allowed to participate and receive credit **after** the study has received full board review and **approval**. If credit is offered to [**STUDENTS**] for research participation, alternative methods of gaining credit that require an equal time commitment must be offered to non-participating [**STUDENTS**]. The a**lternative method(s) of obtaining credit must be disclosed to the IRB. [WSU JONAH CERTIFICATE]**

3. [**STUDENTS**]/trainees/employees must not be systematically treated differently from non-institutional participants as a result of their participation in a research study. **Extra precautions must be taken** to ensure the confidentiality of data files for [**STUDENTS**]/trainees/employees. If data to be collected are of a sensitive nature, **someone other than the investigator**(s) **must manage subject**

**recruitment and data collection** (interviews et. al.). **The protocol <u>form</u> <u>must</u> specify how the confidentiality of the data will be ensured**."

*Id*. at p. 2. (Emphasis added).

*1306.* Fundamentally as proclaimed in **The Belmont Report—<u>informed</u> <u>consent</u>** is the "primary ethical requirements" protecting the <u>established</u> <u>rights</u> of the participating **HUMAN RESEARCH SUBJECTS**, *including explicitly* **STUDENTS**, and is **<u>required</u> <u>before</u>** WSU IRB will authorize any research protocol. **Exhibit 373**—*Informed Consent Process*.

*1307.* The requirements to obtain informed consent is found—"[a]ccording to the federal regulations (45 CFR 46.116, 38 CFR 16.116, and 21 CFR 50.20), **<u>no</u> investigator <u>may</u> involve a human being [including STUDENTS] as a participant in research <u>unless</u> the investigator <u>has</u> obtained the legally effective informed consent of the individual** or the individual's legally authorized representative (LAR). An investigator **<u>shall</u> obtain consent <u>only</u> under** circumstances that provide the prospective participant or his/her LAR with sufficient opportunity to consider whether or not to participate and **<u>has</u>** minimized the possibility of **<u>coercion</u>** or **<u>undue influence</u>**. The information that is given to the participant or the LAR shall be in language understandable to the participant or the LAR." *Id*. at p. 1. (Emphasis added).

*1308.* Fundamentally— "[i]nformed consent is **a <u>process</u>** that **goes <u>far</u> <u>beyond</u> asking** for the participant's signature on an informed consent document. **It is an ongoing**, **interactive exchange of information** that begins with recruitment of the participant **and <u>continues</u> <u>through</u>** the **<u>completion</u> of the study**." *Id*. (Emphasis added).

*1309.* The WSU IRB policy and procedure regarding informed consent "applies to all personnel who will be obtaining informed consent for research studies approved by the IRB, although the ultimate responsibility lies with the Principal Investigator (PI)...co-investigator(s), and any key personnel that the principal investigator has delegated authority to obtain informed consent." *Id*.

*1310.*   Continuing—the eight-step **process to obtain** proper-**informed consent** is laid out where

"**the following must occur**:"

> "1. Details are presented by study personnel who are knowledgeable about both the study and the IRB requirements of informed consent process.
>
> 2. Adequate information is given concerning the research via the IRB approved informed consent document in a language that is as non-technical as possible.
>
> 3. Ample time and opportunity are provided for the potential participant or his/her LAR to inquire about the details of the research project and to decide whether or not to participate in the research, as well as to consider other available options, if applicable.
>
> 4. Potential participants or his/her LAR have asked questions and received answers to their satisfaction.
>
> 5. It is ensured, to the degree possible, that the potential participant has comprehended the information provided about the research.
>
> 6. The potential participant or his/her LAR **voluntary consent** is obtained by way of a signature on the **informed consent document** or as otherwise authorized.
>
> 7. Documentation is provided about the research that the participant can refer to later. This includes a signed copy of the informed consent document, calendars, instructions, etc. Note that **all materials** provided to participants **require IRB approval**.
>
> 8. Documenting that the informed consent process has occurred. This may be done in the research record, a narrative note in the medical record, or an entry onto a research worksheet kept in each participant's research file.
>
> [...]
>
> The principal investigator and all research personnel **are responsible** for **continuing** the informed consent **process throughout** the individual's **participation** in the study, **providing ongoing opportunities to reaffirm** participation through the study, reminding the participant about important information and data collection points, and providing new information as it becomes available. **All interactions** with the participant[s] **are to be documented as appropriate**.
>
> **At each study visit, participants are encouraged to ask questions about** the study and **their participation, and to raise all concerns**. Thus, **informed consent becomes an ongoing, interactive process, rather than a one-time information session.**"

**Exhibit 373**, at p. 2. (Emphasis added).

*1311.* Overall, "[i]nformed consent as a whole <u>must</u> present information in sufficient detail relating to the research and must be organized and presented in a way that does not merely provide lists of isolated facts, but rather facilitates the prospective participant's understanding of the reasons why one might or might not want to participate." **Exhibit 374**—*Requirements of Informed Consent*, at p. 3.

*1312.* Explicitly, "[t]here are 5 factors that are suggested to be included in the presentation of key information;" otherwise, "[t]he elements of informed consent are mandated in 45 CFR 46.116, 38 CFR 16.116, 21 CFR 50.25 and **<u>must</u>** include the following:"

1. A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the participant's participation, a description of the procedures to be followed and identification of any procedures which are experimental;

2. A description of any reasonably foreseeable risks or discomforts to the participant;

3. A description of any benefits to the participant or to others which may reasonably be expected from the research;

4. A disclosure of appropriate alternative procedures or courses of treatment, if any, that might be advantageous to the participant;

5. A statement describing the extent, if any, to which confidentiality of records identifying the participant will be maintained;

6. For research involving more than minimal risk, an explanation as to whether any medical treatments or compensation are available if injury occurs and, if so, what they consist of or where further information may be obtained;

7. An explanation of whom to contact for answers to pertinent questions about the research and research participants' rights, and whom to contact in the event of a research-related injury to the participant; and

8. A statement that participation is voluntary and refusal to participate will not involve a penalty or loss of benefits to which the participant is otherwise entitled, that the participant may discontinue participation at any time without penalty or loss of benefits to which he/she is otherwise

entitled and that the participant will receive a copy of the signed informed consent.

9. When appropriate, one or more of the following elements of information shall also be provided to each participant:

    a. A statement that the particular treatment or procedure may involve risks to the participant (or to the embryo or fetus, if the participant is or may become pregnant) which are currently unforeseeable;

    b. Anticipated circumstances under which the individual's participation may be terminated by the investigator without regard to the participant's consent;

    c. Any additional costs to the individual that may result from participation in the research;

    d. The consequences of a participant's decision to withdraw from the research and procedures for early and orderly termination of the participant's participation;

    e. A statement that significant new findings developed during the course of the research which may relate to the participant's willingness to continue participation will be provided to the participant; and

    f. The approximate number of participants involved in the study.

        [...];

    g. A statement regarding whether clinically relevant research results, including individual research results, will be disclosed to participants, and if so, under what conditions; and

    h. For research involving biospecimens, whether the research will (if known) or might include whole genome sequencing (i.e., sequencing of a human germline or somatic specimen with the intent to generate the genome or exome sequence of that specimen)."

**Exhibit 374**, at pp. 3-4; *see also*, **Exhibit 375**—*Required Elements of Informed Consent Overview*; **Exhibit 376**—*Key Information for Consent*; *and* **Exhibit 377**—*Informed Consent Overview Diagram*.

*1313.* Moreover, the prospective human-research subjects must be provided with "information about "any additional costs to the subject that may result from participation in the research...[and this] must be provided to each participant (subject) [45 CFR 46.116]." **Exhibit 378**—*Costs Associated with Research Participation*; *see also* reference alternatively the potential compensation due or available to human-research subjects for participation as outlined in **Exhibit 379**—*Compensation for Research Participation.*

*1314.* In some instances, **after** submitting the appropriate-protocol forms to the WSU IRB—the "**IRB** may waive or alter some or all of the informed consent requirements **under certain conditions**." **Exhibit 380**—*Waiver and Alternation of Informed Consent.* (Emphasis added).

*1315.* Generally straight forward, "in order for the [WSU] **IRB** to **waive or alter** consent **the** [WSU] **IRB must find and document** the following:"

> "1. The research involves no more than minimal risk to the participants;
>
> 2. The research could not practicably be carried out without the requested waiver or alteration;
>
> 3. If the research involves using identifiable private information or identifiable bio-specimens, the research could not practicably be carried out without using such information or bio-specimens in an identifiable format;
>
> 4. The waiver or alteration will not adversely affect the rights and welfare of the participants; *and*
>
> 5. Whenever appropriate, the participants or Legally Authorized Representative will be provided with additional pertinent information after participation."
>
> *Id*. (Emphasis added).

*1316.* Also, two other forms of waiver are relevant for identification (Information Sheets and Oral Consent) but are not applicable given the in-depth design of the Defendants' human research on **STUDENTS** as such research far exceeds minimal risk and instead qualifies as criminal

espionage in the least with an extremely high risk or unavoidable liability for participating **STUDENTS**; those two forms being: (*a*) **Information Sheets** for passive consent by which proceeding with the minimal risk task may aver consent; *and* (*b*) **Oral consent** used in minimal risk research where use of an information sheet is not possible. *Id*. at p. 2.

*1317.* In the context of oral consent, "a consent script **must** be submitted **and approved** by the [WSU] IRB," and "[i]f the potential participant declines to participate, the researcher **must** thank the participant for their time, and **promptly end** the conversation." *Id*. (Emphasis added).

*1318.* The WSU IRB even provides researchers with SAMPLE documents for guidance on how to draft research-specific forms to achieve the condition precedents for WSU IRB review and approval:

> (a) Behavioral Informed Consent **SAMPLE—Exhibit 381**;

> (b) Informed Consent Short Form **SAMPLE—Exhibit 382**; *and*

> (c) Confidentiality and Non-Disclosure Agreement **SAMPLE—Exhibit 383**.

*1319.* In fact, Plaintiff, Attorney Cochrane, had gone through an extensive informed consent process with the Defendants in 2018 in reference to a Cognitive Brain Study which never materialized to full participation unfortunately—otherwise, *ironically*, the Defendants would likely have an MRI photo of my brain for review. **Exhibit 384**—*Brain Study Email Chain*.

*1320.* Again, compliance with IRB policy and procedure rests with the Principal Investigator <u>and</u> the Department Chair permitting such research on human subjects for a legitimate-scientific benefit, both of which "**must** have the experience, expertise, professional qualifications and the research facilities and resources necessary to **ensure** that **the rights and welfare** of the human participants <u>are protected</u>." **Exhibit 385—***Principal Investigator Roles and Responsibilities*.

*1321.* Specifically, "Principal Investigator" is defined as "the scientist or scholar with primary responsibility for the design and conduct of a research project." *Id*. at p. 1.

*1322.*   Next, the core responsibility of the Principal Investigator includes the "Study Design" requiring explicitly under WSU IRB policy the following:

> "1. **Develop a research plan that** is: **(a)** scientifically valid, **(b)** consistent with sound research design, **(c)** minimizes risks to human participants, **and (d)** includes a data safety monitoring board when required by the National Institutes of Health, FDA, or IRB.
>
> 2. **Ensure** that **all** facilities and **resources necessary to protect participants are present before conducting** the research study.
>
> 3. **Maintain oversight** of the research protocols and research staff. The PI's **signature on forms** submitted to the IRB **certifies** that he/she has reviewed all of the submitted information and affirms that it is accurate to the best of his/her knowledge."

*Id*. at p. 2. (Emphasis added).

*1323.*   Moreover, the Principal Investigator **must** conduct the study in accordance with law, regulations, ethical standards, **and** internal policies as generally outlined as:

> "**Conduct the study in accordance with**: **(a)** The protocol as approved by the WSU IRB, **(b)** Ethical standards (e.g., **the Belmont Report**, the **Declaration of Helsinki**), **(c)** Applicable federal regulations (45 CFR 46.160 and 164, 38 CFR 16, 21 CFR 50 and 56), **(d)** Applicable state and local laws (45 CFR 46.102 and 116, 38 CFR 46.118, 38 CFR 16.402, 28 CFR 50 and 56), **(e)** Good Clinical Practice guidelines, **(f)** The signed agreement/contract between the study sponsor and the PI, **and (g)** All WSU internal IRB policies, standard operating procedures and any conditions of approval imposed by the IRB."

*Id*. (Emphasis added).

*1324.*   Also, as a condition precedent prior to submission of prospective research protocols—the Principal Investigator **and all** other Co-Principal Investigators **must** successfully complete the WSU IRB's on-line training program in human research protection, health information privacy, and responsible conduct in research known as the Collaborative Instructional Training Initiative ("CITI"). *Id*. at p. 3. (Emphasis added), *recalling specifically* **Exhibit 369**.

*1325.*   **After** WSU IRB **authorization** of the scientifically valid research study involving human participants, the Principal Investigator will conduct the study in accord with a broad range of

affirmative actions, e.g., conduct of study **#1** to **#15**, **Exhibit 385**, at pp. 3 to 4, including reporting responsibilities "**not less than once per year**."

*1326.*   The Office of the Vice President for Research offers at Wayne State University a "**FREE research/academic career-development seminar series for WSU faculty, chairs and directors, postdoctoral trainees and graduate [STUDENTS], and administrators**" what is known as the Research Development Seminar Series. **Exhibit 386**—*Research Development Seminar Series*.

*1327.*   These FREE research training seminars are not mandatory although they offer a broad variety of training and informative seminars to bring invaluable depth to Wayne State University researchers and their affiliates and have been offered continuously by the Wayne State University Division of Research from at least 2007—2008 to the present.

*1328.*   In addition to these rigorous requirements by the WSU IRB for research approval—the Principal Investigator and Key Personnel must avoid direct and/or indirect conflict of interests that compromise the objectivity in the conduct of research that involved human participants. **Exhibit 387**—*WSU IRB Conflict of Interest Policy: Principal Investigator & Key Personnel*.

*1329.*   Specifically, the "WSU IRB is committed to the promotion of the highest level of integrity and ethics in all research endeavors, and "[a] conflict of interest is a situation, and not a behavior," *for example*:

> "*Principal Investigator/Key Personnel Conflict of Interest* – refers to situations in which the employee **and or** his/her **immediate family** has **financial** or **personal interests** that may **compromise** *or* have the **appearance of compromising**, the employee's **professional judgment** in conducting or reporting research."

> **Exhibit 387**, at p. 3. (Emphasis added).

*1330.*   As it relates to oversight at Wayne State University, "[t]he Institutional Review Board (IRB) Policy and Standard Operating Procedure compliments the Research Policy and specifically

addresses communication between the University's Conflict of Interest Committee and the [IRBs], the role of the IRB plays in providing additional oversight in conflict of interest issues, as well as when the IRB may want to inform the research participant about a real or perceived conflict of interest." *Id.* at p. 1; *see also*, **Exhibit 388**—*Individual and Institutional Financial Conflict of Interest and Commitment Policy*.

*1331.* Moreover, IRB Administration and Office Staff in certain situations <u>must</u> avoid actual or perceived conflicts of interest outlined by the WSU IRB, and even "[i]ndividuals <u>responsible</u> <u>for</u> **Business Development**: [b]ecause of the unique responsibilities of these individuals[,] they are **prohibited** **from** **serving** as members or ex-officio members on the IRB's **and** from carrying out day-to-day **operations of the <u>review</u> process**." **Exhibit 389**—*IRB Administration and Other Staff Conflict Policy*. at p. 1. (Emphasis added).

*1332.* Continuing explicitly— "[t]his policy applies to <u>all</u> <u>types</u> <u>of</u> IRB <u>review</u>, including" (***a***) "Review by a convened IRB;" (***b***) "Review of unanticipated problems involving risks to participants or others, and (***c***) "review of non-compliance with the regulations or the requirements of the IRB." *Id.* at p. 2.

*1333.* Even further—this conflict-of-interest policy defines explicitly an "**Institutional** **Conflict** **of Interest**" that fit seamlessly into our Theory of Constraints' system focus and further supports Plaintiff, Attorney Cochrane's, subjective-chill argument in that this definition is strictly applicable here to these ongoing facts given that the Vice President of Research, Mr. Stephen Lanier, is Co-Chair of the 2022—2027 Strategic Plan Steering Committee (*recall*, **Exhibit 22**, at p. 21 (Emphasis added)**):**

> "**Institutional** **Conflict** **of Interest**—Institutional Conflict of Interest consist of two major types: (***1***) Conflict of Interest involving University equity holdings or a royalty arrangement related to sponsored programs, **and** (**2**) **Conflict of Interest involving University officials who make <u>decisions</u> <u>with</u> <u>institutional</u>-<u>wide</u>**

**implications**, which can include department heads and center and institute directors, in addition to senior management."

**Exhibit 389**, at p. 3. (Emphasis added).

*1334.* It is the duty of the Principal Investigator to "self-report" and disclose potential conflicts to the IRB for authorization to conduct research in the *disclosed*-conflict position.

*1335.* Fortunately, the Wayne State University IRB has a "representative from the Office of General Counsel (OGC) [that] **holds a position as a voting member** of an IRB committee **and provides legal expertise** to the IRBs and IRB Administration as necessary." **Exhibit 390**—*WSU IRB General Counsel's Roles and Responsibilities*.

*1336.* *Respectfully*, an Institutional Conflict of Interest is present when the institution itself is being investigated for research misconduct on a global scale—solidifying Plaintiff, Attorney Cochrane's, subjective-chill argument with actual damages to result further from open disclosure to these unbiased and institutionally conflicted individuals at each vein of authority.

*1337.* Specifically, being available for "consultation" by the Office of General Counsel with their voting authority provides a conflicted structure of protection in favor of the institution and not **STUDENTS**—*much like* the Wayne State University Office of Equal Opportunity—stating more specifically, "the Office of General Counsel is available for consultation on issues of **non-compliance**, **scientific misconduct**, and export **control**." *Id.* at p. 2.

*1338.* In some instances, the research to be conducted and subject to WSU IRB authorization may involve **other** collaborative **institutions** of higher education where, "each institution involved is responsible for safeguarding the rights and welfare of human participants (subjects) and for complying with the [WSU IRB] policy. **Exhibit 391**—*WSU IRB Collaborative Research Policy*.

*1339.* Primarily, Collaborative Research under **The Revised Common Rule** was codified into 45 CFR 46.114, in that— "[t]he WSU Principal Investigator (PI) **and** the [WSU IRB] are responsible for assuring that human research participants are protected, *and* federal guidelines are followed

during collaboration with other entities," often syncing research activities to include "**Reliance Agreements**" *or* "Authorization to Use Another IRB form[s]." *Id*. at p. 4. (Emphasis added); see also, **Exhibit 392**—*Cooperative Research Provision of The Revised Common Rule*; **Exhibit 393**—*WSU IRB as Primary IRB Approval Agreement*; and **Exhibit 394**—*WSU IRB as Secondary IRB Approval Agreement*.

*1340.* Even more— "[t]he IRB reviews, as part of this process [of review], the methods that investigators propose to use to recruit participants," meaning the Principal Investigator's **advertising must be reviewed** in relation to approval of the **human**-research protocol:

> "**One method of recruiting participants is through advertisements**. Direct **advertising** for research participants is not in and of itself an objectionable recruitment practice but **is seen as part of the informed consent** and **participant selection process**. **IRB review is necessary to ensure that information is not misleading to participants**. This is **especially critical when a study may involve vulnerable participants [such as STUDENTS]** such as those with acute or severe physical or mental illness **or persons who are educationally or economically disadvantaged [again, overburdened STUDENTS]**."

> **Exhibit 395**—*WSU IRB Advertising for Research Participants. (*Emphasis added*)*.

*1341.* For example, recall *e.g*., **_(a)_** the advertisement used by the Defendants as **Exhibit 141**, at p. 3; **Exhibit 284**; *and* **Exhibit 325**; **_(b)_** the direct headhunting Defendant, Dr. John Taylor, has admitted to in his resume at **Exhibit 97**, at pp. 22; 25; *or* **_(c)_** recall in comparison the Brain Study Plaintiff, Attorney Cochrane, engaged in where that process ensured that information was not misleading of the objectives involved.

*1342.* Further, the WSU IRB advertisement approval policy explicitly reads: "All advertisements for research protocol must be submitted to the IRB for review and approval ***prior*** to their use." **Exhibit 395**, at p. 2. (*No* Emphasis added).

*1343.* Moreover, the criterion for WSU IRB approval of research-protocol advertisements includes, among other things: **_(a)_** "Advertisements **may not** imply a certainty of favorable

outcome or benefits beyond what is outline in the informed consent; and _**(b)**_ Advertisements should state that it is for a research study." _Id_. (Emphasis added).

_**1344.**_ **Now**, assuming all of these required policies are followed by the Principal Investigator, Program Director, the Office of General Counsel, <u>and</u> the WSU IRB—the process of oversight does not cease upon approval and instead the WSU IRB still interactively monitors the human-research protocol as the research is conducted, _e.g._, should any unanticipated problems and other reportable events occur—there is protocol that **<u>must</u>** be **<u>promptly</u> <u>reported</u>**. **Exhibit 396**—_WSU IRB 13-1 Unanticipated Problems and Other Reportable Events Policy_; **Exhibit 397**—_IRB Reporting Unanticipated Problems Serious & Continuing Non-Compliance_.

_**1345.**_ Meaning— "Investigators are required to promptly report unanticipated problems involving risks to participants and others to the [WSU IRB]," and the WSU IRB "is required to promptly report unanticipated problems involving risks to participants and others, to the IRB, appropriate institutional officials, and departmental or agency heads." **Exhibit 396**, at p. 1.

_**1346.**_ In the event of an unanticipated problem, "the **Institutional Official** has **delegated authority** to the **Assistant/Associate Vice President of Research** (AVPR) for reporting these situations to supporting agencies and appropriate regulatory authorities. When following DHHS regulations, the report of an unanticipated problem involving risks to participants or others will be sent to OHRP." _Id_. (Emphasis added).

_**1347.**_ The WSU IRB Unanticipated Problems Policy identifies several relevant definitions that follow for consideration with the facts herein:

> "**<u>Adverse Event</u>**: For the purposes of these policies and procedures, an adverse event (AE) **is any undesirable and unintended** (although not necessarily Unanticipated) **occurrence in a human subject**, including any abnormal sign (for example, abnormal physical exam or laboratory finding), symptom, or disease, temporally associated with the subject's participation in the research, whether or not considered related to participation in the research. **Adverse events encompass** both physical and **psychological harms**. **They occur** most commonly in the context of

biomedical research, although on occasion, they can occur **in the context of social and behavioral research**.

**Non—Compliance**: Failure (**intentional or unintentional**) **to comply** with applicable Federal regulations, state or local laws, the requirements or determinations of the IRB, or WSU policy regarding research involving human participants. **Non-compliance can result from action or omission**. Non-compliance may be non-serious (minor), or **serious**, and **may also be continuing**.

**Continuing Non—Compliance**: **Non-compliance** (serious or non-serious) that has been previously reported, **or a pattern of ongoing activities that indicate a lack of understanding of human participation protection requirements that may affect research participants or the validity of the research and suggest a potential for future non-compliance for future non-compliance without intervention**. Examples of continuing non-compliance may include but are not limited to the following: repeated failures to provide continuation reports resulting in lapses of IRB approval, **inadequate oversight of ongoing research**, or failure to respond to or resolve previous allegations or findings of non-compliance.

**Unanticipated**: **Any incident**, **experience or outcome** that is not expected (in terms of nature, severity, or frequency) given the research procedures that are described in the study-related documents, such as the IRB-approved research protocol/research plan, any applicable investigator brochure, and informed consent documents; **and the characteristics of the subject population being studied**."

**Exhibit 396**, at pp. 1-2. (Emphasis added).

*1348.* Should an unanticipated event occur— "Principal Investigators must report all unanticipated problems [as described in **Exhibit 396** and **Exhibit 397**] **as soon as possible**, **but in all cases within 5 business days** after the [I]nvestigator first learns of the even using the Unanticipated Problem and Events Reporting Form." *Id*. at p. 5; *see also*, **Exhibit 398**—*Unanticipated Problems Reporting Form*. (Emphasis added).

*1349.* Furthermore, for *whatever* reason the Principal Investigator is replaced the WSU IRB has developed a Change in Principal Investigator Form necessary to satisfy every policy relative to

compliance for continuance of approved human-research protocols. **Exhibit 399**—*Change In Principal Investigator Form*.

*1350.* Specifically—the incoming Principal Investigator **must** have completed their **CITI Training** prior to submission of the Change Form (*recall* **Exhibit 369**), and the Department Chair, Dean, or Authorized Signatory Official **must certify** *again* that "the research uses procedures consistent with sound research design," in which "the research design is sound enough to yield the expected knowledge." **Exhibit 398**. at p. 4. (Emphasis added).

*1351.* One instance a Principal Investigator may be replaced is perhaps when the WSU IRB conducts a **for-cause audit** of the Human Research Study "when there are concerns about whether or not the rights and welfare of participants enrolled in a particular research protocol are being adequately protected." **Exhibit 400**—*WSU IRB For-Cause Audits Policy*.

*1352.* For example, in situations such as Wayne States' own Zamorano (Case No. 07—12943; **Exhibit 263**), the non-digitized and 'connected' *Chen* (**Exhibit 264**, at pp. 184—185), and the 263 individual allegations of "reckless research practice[s]" by both Zhiewei Wang and Fazlul H. Sarkar (**Exhibit 301**)—*respectfully*—the WSU IRB for-cause audit policy would be appropriate.

*1353.* In **all** **instances** of approved research involving human participants at Wayne State University—the **WSU IRB** "**shall have authority to suspend or terminate approval of research** that is not being conducted in accordance with the IRB's requirements or that have been associated with Unanticipated serious harm to subjects." **Exhibit 401**—*Suspension and Termination of Research Protocol*. (Emphasis added).

*1354.* Further, "WSU has granted the IRB the authority to approve, require modifications (to secure approval), disapprove, and suspend or terminate approval of research activities not being conducted in accordance with IRB requirements; and to observe or have a third party observe the

informed consent process and the conduct of the research." **Exhibit 402**—*WSU IRB Policy on Non-Compliance in Human Research.*

*1355.* Even further— "Investigators, research team members, the Institutional Review Board (IRB) members and/or Wayne State University (WSU) administrative staff are required to conduct research ethically and in accordance with federal regulations and WSU and/or IRB policies. Non-compliance occurs when research involving human participants is conducted in a manner that disregards or violates federal regulations, ethical standards, and WSU and/or IRB policies and procedures governing research and human research protection." *Id.*

*1356.* In the event of a breach of the WSU IRB protocol, or as it relates to research involving human participants—**research misconduct**—the WSU IRB has oversight authority by and through **University Policy 2010—01**, established by Wayne State University Office of the President, Jay Noren, enacted with reciprocally-radiant authority when signed as policy on July 13th, 2010. **Exhibit 403**—*Wayne State University Policy and Procedure Regarding Research Misconduct*; **Exhibit 404**—*Text Searchable WSU Research Misconduct Policy PDF.*

*1357.* Specifically, ***Section 1.1*** outlines the "Purpose and Scope" of the WSU Research Misconduct Policy, with the <u>scope</u> outlined as— "The federal requirement for this policy accords with the University's commitment to an institutional culture that values integrity in the conduct of research and scholarship. **This policy applies to all research regardless** of the source of funding or other support." *Id.* at p. 1. (Emphasis added).

*1358.* Continuing in this same section we see understand the <u>purpose</u> for enactment next:

> "Wayne State University therefore adopts this policy and these procedures on research misconduct. The policy and procedures have the **purposes of <u>1)</u>** ensuring that the University remains in compliance with the law, **<u>2)</u>** establishing uniform and well understood procedures for addressing allegations of research misconduct, **<u>3)</u>** protecting those who in good faith bring allegations of misconduct from the possibility of retaliation, **and**

**4)** ensuring that unfounded allegations of research misconduct do not work to the detriment of researchers at the University."

**Exhibit 403**, at p. 1. (Emphasis added).

*1359.* In ***Section 1.2***, we learn that "[t]his policy applies to allegations of research misconduct (fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results) involving:

"Any person who, at the time of the alleged research misconduct, was employed by, was an agent of, or was affiliated by contract, agreement, or other arrangement with Wayne State University (**this includes all** faculty, primary investigators, other staff, students, research assistants, research associates, graduate assistants, postdoctoral fellows, visiting and adjunct faculty, and any other **person conducting research at**, **sponsored by**, **or under the auspices of Wayne State University**). These provisions apply **even if** the respondent is **no longer employed** by or otherwise associated with the University; and

Any of the following:

Applications or proposals for PHS or other support for biomedical or **behavioral research**, research training or **activities related to that research or research training**; or

**Research records produced in the course of research**, research training, or activities related to that research or research training.

**This policy includes any research** proposed, performed, reviewed, or reported, **or any research record generated from that research**, **regardless of whether** or not the research is funded by a grant, contract, cooperative agreement, or other form of support.

This policy and the associated procedures **do not apply** to authorship or collaboration disputes and **apply only to allegations of research misconduct that occurred within six years of the date the institution** or HHS received the allegation, subject to the subsequent use, health or safety of the public, and grandfather exceptions authorized by the Code of Federal Regulations. Research **misconduct does not include honest error or differences of opinion**."

**Exhibit 403**, at pp. 1-2. (Emphasis added).

*1360.* What the Defendants will potentially argue as an "honest error" or "differences of opinion exist"—would be nothing less than a frivolous defense and false misrepresentation of the known

truth tied to the continuously improving specific intent in the form of the Theory of Constraints Critical Chain Application by using the [*VERY*] Ambitious Goal Curriculum to "use [**STUDENTS**] as bridges to companies," *respectfully*.

*1361.*   Next, relevant Definitions are found in ***Section 2.0***, and are as follows:

> "**2.1** *Allegation* means a disclosure of possible research misconduct by written, electronic, or oral statement to the Vice President for Research or his/her designee. An allegation must be more than a conclusory statement and should contain sufficient specificity to allow the Vice President for Research or his/her designee to determine whether, if true, the allegation sets forth a possible basis for a conclusion of scientific misconduct.
>
> [...]
>
> **2.4** ***Conflict of Interest*** means any commitment or affiliation held by a member of an Inquiry or Investigation committee, or by his/her immediate family member(s), that could potentially or actually affect the member's ability to render an unbiased opinion about an allegation. Examples include significant personal, professional, or financial relationships with the complainant or respondent, or with the Department in which the complainant or respondent has appointments or employment. For the Vice President for Research, the Provost, the President, or other high ranking official of the University, "conflict of interest" means to be a respondent, within the meaning of section 2.22, or to have a commitment of affiliation that could potentially or actually affect significantly the individual's ability to perform a duty under the policy and procedure in an unbiased fashion.
>
> [...]
>
> **2.6** ***Evidence*** means any document, tangible item, or testimony offered or obtained during a research misconduct proceeding that tends to prove or disprove the existence of an alleged fact.
>
> **2.7** ***Good faith*** as applied to a complainant, means having a reasonable basis for a suspicion that the alleged misconduct had occurred based on the information known to the complainant at the time. As applied to a witness (including a complainant giving testimony as a witness), "good faith" means having a reasonable belief in the truth of one's testimony based on the information known at the time of the testimony. An allegation or testimony in a research misconduct proceeding is not in good faith if it is made with knowing or reckless disregard for information that would negate the allegation or testimony. "Good faith",

as applied to a committee member, means cooperating with the other members of the committee to achieve the purpose of helping an institution meet its responsibilities. A committee member does not act in good faith if his/her acts or omissions on the committee are dishonest or influenced by personal, professional, or financial conflicts of interest with those involved in the research misconduct proceeding.

[...]

**2.9 Inquiry** means preliminary information-gathering and preliminary fact-finding.

[...]

**2.13 Pre-Inquiry** means an initial assessment to determine whether an allegation has been made in good faith, whether it meets the definition of research misconduct provided in this Policy, and whether the support documentation is sufficiently credible to warrant an inquiry.

**2.14 Preponderance of the Evidence** means proof by information that, compared with that opposing it, leads to the conclusion that the fact at issue is more probably true than not.

[...]

**2.17 Records of research misconduct proceedings** means: (1) the research records and evidence secured for the research misconduct proceeding pursuant to this policy, except to the extent the Research Integrity Officer determines and documents that those records are not relevant to the proceeding or that the records duplicate other records that have been retained; (2) the documentation of the determination of irrelevant or duplicate records; (3) the inquiry report and final documents (not drafts) produced in the course of preparing that report, including the documentation of any decision not to investigate; (4) the investigation report and all records (other than drafts of the report) in support of the report, including the recordings or transcripts of each interview conducted; and (5) the complete record of any appeal within the institution from the findings of research misconduct.

**2.18 Research Integrity Officer (RIO)** means the Associate Vice President for Research or designated substitute who is responsible for: (1) performing the initial assessment of allegations of research misconduct to determine if they fall within the definition of research misconduct, are covered by 42 CFR Part 93, and warrant an inquiry on the basis that the allegation and available supporting documentation is sufficiently credible and specific so that potential evidence of research misconduct may be identified; (2) overseeing inquiries and investigations; and (3) the other responsibilities described in this policy. The Vice President for

Research or designee may designate a temporary RIO if the permanent position is vacant, or if the RIO is otherwise unable to conduct the responsibilities designated to him/her in this policy and procedure.

**2.19 Research misconduct** means fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.

**Fabrication** is making up data or results and recording or reporting them.

**Falsification** is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.

**Plagiarism** is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit. Plagiarism includes both the theft or misappropriation of intellectual property and the substantial unattributed textual copying of another's work. The theft or misappropriation of intellectual property includes the unauthorized use of ideas or unique methods obtained by a privileged communication, such as a grant or manuscript review, or a patent application. Substantial unattributed textual copying of another's work means the unattributed verbatim or nearly verbatim copying of sentences and paragraphs which materially mislead the ordinary reader regarding the contributions of the author.

[...]

**2.23  Retaliation** means an adverse action taken against a complainant, witness, or committee member by this institution or one of its employees or students in response to (1) a good faith allegation of research misconduct; or (2) a good faith cooperation with a research misconduct proceeding.

**2.24 Undue influence** means the exertion of persuasion that is strong enough to prevent a complainant, witness, or committee member from fulfilling objectively and voluntarily his or her responsibilities under the policy and procedure. [Interestingly, this definition is cited in **Exhibit 403**, but that content cited on the Defendants' website which is **Exhibit 404** does expressly omit this definition erroneously.]"

**Exhibit 403**, pp. 2-5. (Emphasis added).

*1362.*   It is, found in **Section 3.2.1**, the Complainant has the affirmative responsibility to "making allegations in good faith, maintaining confidentiality, and cooperating with the inquiry and investigation. **Exhibit 303**, at p. 6.

*1363.* Formally, in **Section 3.3.1**, the Respondent, beginning at the time of or before beginning an inquiry, is entitled to: (**a**) written notice; (**b**) the right to request to be interviewed during the investigation and to call any witness; *and* (**c**) the right to request an institutional appeal outlined in **Section 8.4**, respectfully. **Exhibit 403**, at pp. 6-7.

*1364.* Importantly—where the authority complex is conflicted, for example where the Vice President of Research is the Respondent, **Section 3.3.2**, outlines the procedure of appointing a Research Integrity Officer (RIO):

> "**If the respondent** in an allegation **is also the VPR**, **then a different University official who does not report to the VPR will be appointed by the President to serve as the RIO** with respect to that specific case. **If the respondent is also the AVPR**, or Research Integrity Officer, **then the VPR in consultation with the Provost will designate a different University Official to act as the RIO** in that specific case. In addition, **if the VPR or the Provost cannot fulfill the duties assigned to them** under this policy and procedure **because of a conflict of interest, as defined in section 2.4, or for any other reason, the President shall appoint a member of the University community to serve in place of the VPR or Provost. If the President is unable to fulfill his or her obligations** under this policy and procedure, **the Board of Governors shall appoint some member or group of members of the University community** to serve as a substitute for the President."

> **Exhibit 403**, at p. 7. (Emphasis added).

*1365. The issue is*—of which firmly establishes the genuine and objective reasoning Plaintiff, Attorney Cochrane, has avoided this biased process as has been subjectively chilled is that the **entire Institution** of **Wayne State University is conflicted** as has been outlined exhaustively to dispel every dispute otherwise. Candidly—there is **no** other **individuals** to which would be capable of avoiding the inherent **Institutional Conflict of Interest**, and as career educators the under influence present in this constrained process would cause actual damages to Plaintiff,

Attorney Cochrane, in objective form as this pre-inquiry process is designed to capture data similarly to the Office of Equal Opportunity to which would oust these arguments for the lurking Office of General Counsel to continue the uncivilly pseudo defense to these good-faith claims in further retaliation of the known and objective truth.

*1366.*   *For example*, the conflicted Office of General Counsel through the acting RIO could claim the **same argument** through advising pursuant to ***Section 4.1.1***. and the vaguely overbroad language of ***Section 4.1.2***., where after capturing the good-faith evidence to remedy the research misconduct— "If the circumstances described by the individual do not meet the definition of research misconduct, **the RIO will refer the individual** or allegations **to other offices or officials with responsibility** for resolving the problem." **Exhibit 403**, at p. 8. (Emphasis added).

*1367.*   Interestingly, nowhere in this policy does the Complainant expressly have the right to "consult with legal counsel or a non-lawyer personal adviser...to seek advice," where instead in ***Section 4.5.2***, the Respondent "may bring the counsel or personal advisor to interviews or meetings on the case. [Where the] role of the Attorney or advisor shall be limited to counseling and assisting the respondent." *Id*. at p. 9.

*1368.*   The time limitations on "allegation[s] of research misconduct must be made by a complainant within six (*6*) years of the occurrence of the alleged misconduct," as identified in ***Section 4.7.1***., where two exceptions are outlined in ***Section 4.7.2***., that extend this time: (***a***) **subsequent use** by the respondent, and (***b***) where the alleged misconduct, if it occurs again, would "possibly have **a substantial adverse effect on the health or safety of the public**." *Id*. at p. 10.

*1369.*   Initially, the Complainant's allegations of research misconduct is **assessed by** the RIO under ***Section 5.1.1***., where "**the supporting documentation** [is used] **to determine** whether [the complaint is] **sufficiently credible** and specific **so that potential evidence of research misconduct may be identified**." *Id*. (Emphasis added).

*1370.*  Furthermore, under *Section 5.1.2.*— "a **Complainant may request**, or the RIO may decide, that the University will conduct **a pre-inquiry review of the research misconduct**." *Id*.

*1371.*  During this "*pre-inquiry*" state, under *Section 5.1.4*., "the **RIO need not interview** the complainant, respondent, or other witnesses, **or gather data beyond any that may have been submitted** with the allegation, <u>**except as necessary**</u> to determine whether the allegation is sufficiently credible **and specific so that potential evidence of research misconduct may be identified.**" *Id*. at p. 11. (Emphasis added).

*1372.*  Interestingly, this allows the RIO to under *Section 5.3.1*., "[a]t the **time of or before beginning an inquiry** [meaning, at the pre-inquiry stage], the **RIO must make a good faith effort to notify the respondent in writing**.... [taking] all reasonable and practical steps to obtain custody of all research records and evidence needed to conduct the research misconduct proceeding." *Id*. (Emphasis added).

*1373.*  This pre-inquiry notice requirements presents again an inherent leverage point of an institutional conflict of interest capable of ousting the good faith arguments of the Complainant, with the process designed to protect the respondent with also the support of the Wayne State University Office of General Counsel.

*1374.*  Explicitly—this policy structure provides <u>**no protection**</u> to the Complainant and instead commingles the authority structure tied directly to the defensive-voting member of the Office of General Counsel and the subordinate constrained positions of the Vice President for Research as Co-Chair of the 2022—2027 Wayne State University Strategic Plan Steering Committee—*again*, subjectively chilling Plaintiff, Attorney Cochrane, from incurring actual damages filing with the institutionally conflicted Wayne State University Institutional Review Board a pre-inquiry complaint to dispute the full-scale implementations of the Critical Chain Application and [*VERY*]

Ambitious Goal Curriculum of the Theory of Constraints tied to each level of authority throughout the body corporate of Wayne State University.

*1375.* Moreover, in **Section 9.1**, even after this policy is fully invoked and "a finding of research misconduct has been made and the appeals process is completed, the Vice President for Research in consultation with the Provost will decide on the appropriate actions to be taken." *Id*. at pp. 20.

*1376.* Again, where a human participant is explicitly used unlawfully as a human-research subject—this policy presents truly **nothing advocating** for the Complainant except the vague and overbroad description of "other action appropriate to the misconduct."

*1377.* Here, *even more*, this language expresses how little authority exists to cure the damaged Complainant, *herein* the Plaintiffs by and through inclusively, Attorney Cochrane, and again further establishes concrete damages to subjectively chill pursuit of this lopsided policy designed in favor of the Defendants for instead this forum for full redress and authority under the United States Constitution.

*1378.* Importantly—the "termination of the respondent's institutional employment, by resignation or otherwise, before or after an allegation of possible research misconduct has been reported, will not preclude or terminate the research misconduct proceeding or otherwise limit any of the institution's responsibilities under 42 CFR Part 93." Where, *more importantly*, "[i]f the respondent refuses to participate in the process after termination or resignation, the RIO and any Inquiry or Investigation Committee will note in the report the respondent's failure to cooperate in its effect on the evidence." *Id*. at p. 22. (Emphasis added).

*1379.* Remember that the Defendants *herein* are nearly all former leaders and staff members at Wayne State University with the following individuals vacating their post suspiciously after Attorney Cochrane's complaint was summarily dismissed by the Wayne State University Office of General Counsel and Office of Equal Opportunity: (**_a_**) President, Dr. M. Roy Wilson; (**_b_**) Vice

President of General Counsel, Attorney, Louis Lessem; (*c*) Dean of the Mike Ilitch School of Business, Dr. Robert Forsythe; (*d*) Wayne State University Office of Equal Opportunity Director, Attorney, Nikki Wright, (*e*) Wayne State University Mike Ilitch School of Business Marketing and Global Supply Chain Management, Dr. John C. Taylor; (*f*) Emeritus Professor, Dr. James T. Low; *and* (**g**) Associate Professor, Deborah Habel.

*1380.*   And finally—where no research misconduct occurs and approved research using human-research participants concludes as planned there is a required formal closure process overseen by the WSU IRB. **Exhibit 405**—*Closure of a Research Protocol Policy*; **Exhibit 406**—*Research Closure Protocol Form*.

*1381.*   **NOW**—Fortunately for us—*and candidly*, unfortunately for the Defendants—**all** of these prerequisite **records** "**do not exist**" and we know this **definitively** because the Wayne State University Freedom of Information Act Coordinator, overseen and operated by the Wayne State University Office of General Counsel, and specifically at the time Defendant, Emeritus Vice President of General Counsel, Attorney, Mr. Louis Lessem, identified this as **objective fact** by responding to Plaintiff, Attorney Cochrane's, lawful and reasonable request for these public records—recalling **Exhibit 277** *&* **Exhibit 278**—and so plainly the **Defendants failed** to satisfy these requirements **completely** and in doing so **have systematically conducted unethical** research **using human-research subjects** in violation of the United States Constitution and Federal law—here, on ***STUDENTS***—by using the [***VERY***] Ambitious Goal Curriculum to "use these [***STUDENTS***] as bridges to companies" to directly support the Critical Chain Application of The Theory of Constraints establishing the global Institutional conflict of interest which is the Defendants' ongoing-continuously improving Strategic Plans in all forms inclusive the ongoing integrated marketing campaign intentionally leveraged to **ECHO** the illegitimate results thereof.

*1382.*   In contrast—*before I understood this reality in totality*—*I*, Plaintiff, Attorney Cochrane, spoke to the *now retired* Senior Associate Dean at the College of Business at University of Louisville, Dr. Lynn Boyd, who informed me that each participating **STUDENT** learning the Theory of Constraints at the University of Louisville was required to engage formally in a non-disclosure agreement and this included informed consent. Frankly, *I* made several requests through the Kentucky Open Records Act to disassociate the University of Louisville curriculum with this herein theory but was denied under Louisville State Law as the reason was *I*, Attorney Cochrane, was a non-resident and surprisingly not entitled to inspect the requested records interestingly. **Exhibit 407**—*University of Louisville Rejection Email.*

*1383.*   Furthermore, and candidly, *I*, Attorney Cochrane, had a single deceptively vague and in-depth conversation with Dr. Boyd giving no specific detail of <u>*my*</u> position other than that *I* was investigating potential misconduct for a potential client and had found his information on the internet relative to the Theory of Constraints in so much as *I* was curious having some questions on the topic; Dr. Boyd was just as curious to talk to me as *I* was to talk to him. This conversation was roughly an hour long and *I* learned much more detail about the string that *I* was then tugging on...*this* Complaint...and ultimately it was Dr. Boyd who steered me to Dr. James Cox at the University of Georgia Terry College of Business, *respectfully,* unveiling Defendant, Dr. James T. Low's confession found in **Exhibits 141** *and* **Exhibit 142** through Audrey Taylor.

*1384.*   The <u>**SEVENTH avenue of action**</u> is defined as follows: *As authorized by the law*, exercise *my rights* in petitioning *my government* through lawful mitigation of damages to support and/or dispel these arguments *herein* utilizing the Freedom of Information Act ("FOIA") process.

*1385.*   To summarize, *I*, Plaintiff, Attorney Cochrane, have utilized the FOIA Process also known as the Open Records Act ("ORA") in a total of four (*4*) states to gather as an attempt to mitigate

the Plaintiffs' ongoing damages as a result of the Defendants' collective retaliatory specific intent and to dispel this *herein* reality with objective truth.

*1386.*   Explicitly, *I*, Plaintiff, Attorney Cochrane, have sought public records under FOIA/ORA laws in the following states: (*1*) Michigan; (*2*) Kentucky; (*3*) Washington State; *and* (*4*) Georgia.

*1387.*   As noted above, on or about October 14th, 2021, *I*, Plaintiff, Attorney Cochrane, did send reasonable public records requests to the **University of Louisville** as a state institution subject to public records requests under KORA ("Kentucky Open Records Act") as codified in the State of Kentucky, which **Exhibit 408** encompasses the summarized attempt to retain these reasonably requested public records.

*1388.*   Plainly, it is noteworthy to identify explicitly that the **University of Louisville** estopped Plaintiff, Attorney Cochrane, from obtaining public records as a result of his lack of citizenship of the Commonwealth of Kentucky.

*1389.*   Continuing, on or about October 14th, 2021, *I*, Plaintiff, Attorney Cochrane, did send reasonable public records requests to **Western Washington University** as a state institution subject to public records requests under FOIA as codified in the State of Washington, which **Exhibit 419** encompasses the summarized attempt to retain these reasonably requested public records.

*1390.*   Continuing further, on or about October 14th, 2021, *I*, Plaintiff, Attorney Cochrane, did send reasonable public records requests to the **University of Georgia: Terry College of Business** as a state institution subject to public records requests under ORA as codified in the State of Georgia, which **Exhibit 431** encompasses the summarized attempt to retain these reasonably requested public records.

*1391.*   Frankly—by triangulating the public records requested at Western Washington University, University of Georgia, *and* Wayne State University—we <u>know</u> <u>definitively</u> that the University of

Georgia unjustly withheld public records responsive to the request criteria, *e.g.*, **Exhibit 141**; **Exhibit 142**; *and* **Exhibit 429**, *respectfully*.

*1392.*   Lastly—as has been discussed periodically within *this* Complaint, *I*, Plaintiff, Attorney Cochrane, have in accord with my duty to mitigate my losses and right to redress of my government sought public records from the Defendants, Wayne State University, that the existence of would either prove or diminish objectively the arguments *herein*.

*1393.*   Candidly, as you will learn—*I* did not want *this* to be my reality, meaning *this* was not something *I* sought out or "ambulance chased" and instead my attempts to procure these public records was only to quell my subjective suspicion and toxic discomfort with what <u>has</u> objectively occurred. But, unfortunately, the more *I* researched—the more objectivity *I* found to support my subjective hypothesis, and so—*here we are*.

*1394.*   Simply, *I* made several successful attempts to obtain public records from Wayne State University using the FOIA process of which **Exhibit 466** encompasses the summarized attempts to retain these reasonably requested public records.

*1395.*   In fact—in making these public records requests, Defendant, Attorney Louis Lessem, as Vice President and General Counsel for Wayne State University did so as pseudo FOIA Coordinator violate the Plaintiffs' rights in retaliation of this truth *herein* by using the combined knowledge of his Institutional Conflict of Interest and authority position as a pseudo-common defense by failing to perform on these valid requests <u>even</u> <u>after</u> payment-in-full was requested and furnished for identified-responsive records.

*1396.*   As of this Complaint—in addition to retaliatorily placing Plaintiff, Attorney Cochrane, in collections for the disputed outstanding balance owed for courses taken at Wayne State University and while also withholding his Masters of Business Administration (*M.B.A.*) degree by conditional satisfaction of debts as a result of the facts *herein*—the Defendants, Wayne State

University, has further retaliated against Plaintiff, Attorney Cochrane, by failing to deliver identified-responsive records being unjustly enriched but for Attorney Cochrane's payment of $631.18 was made in full on November 30th, 2021, *respectfully*. Recall, **Exhibit 59**; **Exhibit 60**; **Exhibit 61**; **Exhibit 62**; and **Exhibit 63**.

*1397.* Explicitly—as *I*, Plaintiff, Attorney Cochrane, could have pursued legal action on this failure to comply alone, drawing out the Defendants and these questions preemptively—at the time this occurred the totality of this understanding *herein* was not known and was still being pieced together in real time—so, *I*, Attorney Cochrane <u>continued</u> to wait as this matrix was formed into *this* Complaint instead of bringing what could have been categorized then as potentially a frivolous or incomplete action-of-redress endangering my future, *respectfully*.

*1398.* The **<u>EIGHTH avenue of action</u>** is defined as follows: File a lawsuit and other relevant filings to zealously advocate for the protection of the clearly established rights and liberties at stake in *this* Complaint and to denounce the Defendants' collective-retaliatory conduct as **<u>VOID</u>** advocating for the **<u>expansion</u>** of those well-established rights, effectively seeking this Honorable Court's **ECHO** that:

> **<u>A Fundamental Right to a Public Education *Free Of* Discrimination, Harassment, Threats, and Coercion For *All* Students *Regardless* of Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth—*EXISTS* in the United States—*unequivocally*!</u>**

*1399.* Frankly, *this* Complaint and the information contained within would have reached you sooner if it had not been for the necessary subordination (a Theory of Constraints "Thinking Process" concept) directly related to the ongoing **31st Circuit Court Case #22—001403—CZ** of

which could likely be plead with *this* Complaint as intervening facts exacerbating the Plaintiffs', Attorney Cochrane's, toxic damages as these realities **bind together** through time and space.

*1400.*  Candidly, as evident *herein—I*, Plaintiff, Attorney Cochrane, will not accept a false reality as objective truth where objective evidence exists to the contrary and that is the root cause of what is the foundational argument of **Case #22—001403—CZ**. Whereas therein as Defendants/Counter Plaintiffs/Cross Plaintiffs, Attorney Cochrane and his wife, Lauren Michelle Lossing (now known as Lauren Michelle Cochrane) were maliciously targeted and categorically defamed by the opposing party, **Daniel Scott Teetor, *Jr.***, and **Lauren Austin Teetor**, individually and by and through their *supposed* **third** Attorney, **Charles M. Penzien**, of **Penzien & McBride, *P.L.L.C.***, also represented as d/b/a/ **Penzien Legal Group, *P.L.L.C.***, *respectfully*.

*1401.*  It is only as a result of **standing firm on my ethics** to forgo illegal conduct and the appearance of impropriety in all forms did we, my wife and *I*, succumb to the rip current that is **Case #22—001403—CZ** where as a result of this valid decision making, the **Honorable Judge Cynthia A. Lane** has with actual bias and prejudicial predisposition unethically aligned with the Plaintiffs to form a voidable **Common Defense Star Chamber** in violation of the First Amendment, Fifth Amendment, and Fourteenth Amendment severely violating *Caperton v. Massey*, 556 U.S. 868; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), *respectfully*.

*1402.*  Explicitly—the cause of action that is **Case #22—001403—CZ** originates from a property line dispute involving the owners of 7307 Shanna Ln., Ira Township, MI 48023, and in part the *herein* Plaintiff, Attorney Cochrane.

*1403.*  Plainly, in 2014 Plaintiff, Attorney Cochrane and his wife purchased 7303 Shanna Ln., Ira Township, MI 48023, and thereafter from the date of purchase used this property as it was openly presented thus treating a tree line as the general property line for use and maintenance. As time progressed, this open use gradually continued as the owners' families met each other and grew

closer, where Plaintiff, Attorney Cochrane and his family, made improvements within this now disputed area by planting trees and ultimately erecting the disputed garden.

*1404.*   Candidly, sometime in and around July 2020, Plaintiff, Attorney Cochrane, obtained verbal authority from the prior owners of 7307 Shanna to situate two raised garden beds along this tree line in what is referenced as the "lost corner" on the West line of these adjacent properties in a fixed corner of these lots along a St. Clair County Drain, itself running through these properties as a right-of-way known commonly as the St. Mary's Drain, *respectfully*.



*1405.*   In late 2021, the owners of 7307 Shanna, at no fault of the *herein* Plaintiffs but likely based on opportunities presented as a result of the 2020 Pandemic, decided to sell their long-term primary residence and move to the other side of the State of Michigan. Frankly, this was devastating for Attorney Cochrane and his family, as our young boys were growing very close and the bonds we were building as friends were sparking on real levels as we wandered through life searching for the knowledge of the good. Unfortunately, we are called to do what we are when

we are and so our reality is what we choose it to be—*meaning*, they were called, and so they answered...just as I have done *here*.

*1406.*   So—in July of 2021, **Lauren Austin Teetor** purchases 7307 Shanna Ln., with no mortgage and gave her predecessors until August 2021 to reside at their long-term home. Prior to this sale, as admitted by **Lauren Austin Teetor** to the Clay Township Police Department on May 12th, 2022, as prospective purchaser she was expressly informed by the prior owners that Attorney Cochrane and his family were given permission to situate the now disputed garden beds and use the land. In fact, prior to the purchase as observed by Attorney Cochrane working in his backyard at the time, **Lauren Austin Teetor**, **Daniel Scott Teetor**, *Jr*., and who is believed to by **Daniel Scott Teetor**, *Sr*., did so in fact walk the St. Mary's Drain and around Attorney Cochrane's garden—no survey was conducted, and no communication was made to Attorney Cochrane nor his wife regarding the historic accord nor acquiesced use by the predecessors *or* the purchasers.

*1407.*   After the prior owners moved out sometime in and around August 2021—7307 Shanna was conveyed via Quit Claim Deed two times, first from **Lauren Austin Teetor** to **Lauren Austin Teetor** and **Daniel Scott Teetor**, *Jr*., as husband and wife, then subsequently through a Lady Bird Deed with a remainder to the Teetor's Trust.

*1408.*   Candidly, no one moved into 7307 Shanna following the previous owner's vacancy—**even to this day** this house has stood vacant—where **Lauren Austin Teetor** and **Daniel Scott Teetor**, *Jr*., **have not** formally treated this property as a primary residence nor slept one night in this home despite the property being designated as the Teetor's 100% Primary residence. In fact, also on May 12th, 2022, **Lauren Austin Teetor** confessed to the Clay Township Police Department that they have "*another house*" as a "*part-time residence*" at 7360 Flamingo Street, Clay Township, MI 48001, on the canal; suspiciously, **Daniel Scott Teetor**, *Jr*., owns a marina with its' principal place of business in Ira Township known as, **Teetor Marine, *L.L.C.***, *respectfully*.

*1409.*  After the predecessors' vacancy, on **October 4ᵗʰ, 2021**, again with no communication being made to the *herein* Plaintiffs, **Daniel Scott Teetor**, *Jr.*, and **Daniel Scott Teetor**, *Sr.*, did so begin to remove at least ten long-standing pine trees situated on the West line of 7307 Shanna along the St. Mary's Drain including those along the tree line creating the lost corner.

*1410.*  On **November 8ᵗʰ, 2021**, this removal work continued as **Daniel Scott Teetor**, *Jr.*, and **Daniel Scott Teetor**, *Sr.*, did bring in a Blue Ford Tractor on a flatbed trailer utilizing a GMC Sierra 2500 Pickup Truck owned and operated by Teetor Marine, *L.L.C.*, *respectfully*. As the duo worked to remove these trees and stumps, they took their time, and this Blue Ford Tractor was left on the scene parked on the rear patio of 7307 Shanna for nearly a month.

*1411.*  On **November 19ᵗʰ, 2021**, *I*, Attorney Cochrane, was lying on my basement floor having my first battle with COVID-19 wheezing for air in a semi state of delirium having refused to go to the hospital fearful *I* would not return nor having the financial ability to pay for the anticipatory level-of-care—when my wife was frantically calling for me to come upstairs: "*Brad, he is in the drain with the tractor*!" Somehow, *I* managed to breach the basement to find a seat outside, the fresh air was helpful, but the sight of **Daniel Scott Teetor**, *Jr.*, repeatedly using the Blue Ford Tractor to fill in and damage the St. Mary's Drain—that **was** itself **nauseating**. Candidly, *I* watched for approximately fifteen minutes, took some photos and videos, and then receded into my makeshift containment ward to burn off what *I* was fighting within.

*1412.*  On **December 11ᵗʰ, 2021**, the St. Mary's Drain flooded in a highly unusual manner and then again more significantly on **February 17ᵗʰ, 2022**, flooding 7303 Shanna and approximately four (4) other properties. Again, at the time this flooding occurred no one resided at 7307 Shanna as a primary residence to communicate an objection nor to visualize the acute issue.

*1413.*  On **March 8ᵗʰ, 2022**, **Daniel Scott Teetor**, *Jr.*, approached Attorney Cochrane to forward a piece of mail to the previous owners—up until this time there was no express objections to the

previous owners' authorization and acquiescence to the use of the Cochrane's garden beds in any form. During this brief meeting, *I*, Attorney Cochrane did plainly identify the damage to the St. Mary's drain and communicated my objective dissent to this likely unauthorized conduct where **Daniel Scott Teetor**, *Jr.*, identified it would be remedied in the Spring. Candidly, after this communication I sought public records, *e.g.*, permits, authorizing **Daniel Scott Teeter**, *Jr.*, to conduct this work in the St. Mary's Drain—where *I* was ignored by the St. Clair County FOIA Coordinator and left to continue the ongoing-blind defense. Later, after naming the St. Clair County FOIA Coordinator as a defendant and securing a Default against this official capacity position for failure to respond, **Attorney T. Allen Franics** of Fletcher, Fealko, Shoudy, & Francis, *P.C.*, did confirm that these records **do not exists** in exchange for the obliged removal of Default and dismissing claims against the FOIA Coordinator.

*1414.*   On **May 9th, 2022**, a boundary line survey was conducted on 7307 Shanna, Ln., and the already present irons in the ground were marked with wooden stakes. Continuing, on **May 12th, 2022**, both **Daniel Scott Teetor, *Jr.*,** and **Lauren Austin Teetor** began to flag the line adjacent 7307 Shanna and 7303 Shanna were *I*, Attorney Cochrane, proceeded to exit my residence calmly and engaged the duo; this communication was recorded. As a result, **Daniel Scott Teetor**, *Jr.*, identified that they had <u>not</u> spoken to an Attorney, where *I* advised they should and terminated this <u>*very*</u> brief communication after four (4) sentences. As a result of this communication, **Lauren Austin Teetor** called Clay Township Police Department and twenty (20) minutes later Officer Burley responded and generated over twenty-six (26) minutes of body camera video—nearly all of which is of the duo admitting to their conduct, and frankly lying to sell their story. It was during this conversation that **Lauren Austin Teetor** confessed to the fact she obtained knowledge of the authorization prior to purchasing 7307 Shanna, and that in fact they "**were <u>already talking</u> about it <u>with the Attorney, and he said</u>**..." interestingly.

*1415.*   Next, on **May 14th, 2022**, *I*, Attorney Cochrane received two (2) missed telephone calls from Attorney Paul Cassidy, my landlord, a long-time family friend, and my Attorney who has advised me on *this* case *herein* and assisted with *other* matters in the past as *I* grew as a young solo Attorney. Candidly, *I* expressly reserve this Attorney Client Privilege and otherwise have summarized this communication in four (4) statements identifying here that Attorney Cassidy had not represented **Daniel Scott Teetor**, *Jr.*, prior to his call for supposed representation:

> (*1*) **Attorney Cassidy** called me to inquiry as to the issue regarding the garden beds identifying that **Daniel Scott Teetor**, *Jr.*, had called his office for representation on this matter to which the supposed settlement of our dispute and may be in a position financially to settle this issue—throwing out a hipshot **$25,000.00** settlement number;

> (*2*) *I*, **Attorney Cochrane**, acknowledged that this was an issue and that *this dynamic* was <u>exactly</u> what *I* was seeking to avoid explaining the methodical facts as chronologically identified *herein* while otherwise remaining mute;

> (*3*) Where, *immediately*, **Attorney Cassidy** agreed with my thorough logic, and he said "Ok. I will tell them I have nothing for them and cannot help them then;" *and*

> (*4*) Both **Attorney Cassidy** and **Attorney Cochrane** terminated this telephone call with the understanding we sought to avoid blackmail/extortion of **Daniel Scott Teetor**, *Jr.*, and **Lauren Austin Teetor**.

*1416.*   Frankly—*I* did not have the body camera video at the time of this call, and we know now with hindsight that **Daniel Scott Teetor**, *Jr.*, was represented by counsel at this time of this communication on May 12th prior to contacting Attorney Cassidy to settle this materializing dispute. Instead, *I* obtained the body camera video through FOIA and found the facts that indefinitely establish that **Daniel Scott Teetor**, *Jr.*, was sent to Attorney Cassidy to attempt settlement and/or to conflict the forty (40) years of experience Attorney Cassidy would have used to defend Attorney Cochrane and his wife if a formal dispute arose.

*1417.*   On **May 16th, 2022**, shortly after *I* returned home—**Daniel Scott Teetor**, *Jr.*, <u>entered my garage</u> and threatened me maliciously identifying intrinsically that if *I* did not settle our disputes out of court: "*This is your chance. If we go to court, you are paying for all of it.*" In fact—this

entire encounter was videotaped too, where after refusal to negotiate, **Daniel Scott Teetor**, *Jr*., did so then call the Clay Township Police Department and filed formal criminal-trespass charges against Attorney Cochrane for the previously acquiesced garden beds.

*1418.* On **June 6ᵗʰ, 2022**, *I*, Attorney Cochrane received and disregarded an unsigned demand letter, written in the form of a *herein* "**MAFIA OFFER,**" delivered by Attorney **Charles M. Penzien** of Penzien & McBride, *P.L.L.C.*, *respectfully*. This unsigned demand letter unreasonably demanded the removal of these disputed garden beds within ten (10) days contrary to law and had no mention to the St. Mary's Drain despite admissions to Officer Burley on **May 12ᵗʰ, 2022**, where **Daniel Scott Teetor**, *Jr*., and **Lauren Austin Teetor** admit to having knowledge of Attorney Cochrane's express objections to their destruction of the St. Mary' Drain.

*1419.* Furthermore, identified to and disregarded by the **Honorable Judge Cynthia A. Lane** and to the involved parties, Attorney Cochrane and his wife have a direct connection with Attorney Penzien's now-supposed former partner, Attorney McBride, where Lauren M. Cochrane did have a former-business relationship with the McBride family, inclusive Attorney McBride's wife and two children for many years on a direct and deep-familial type level (*e.g.*, dance teacher). In fact, sometime in and around July 2018, Attorney Cochrane visited Attorney McBride at his office introducing himself and met Attorney Penzien during this brief-introductory meeting. At the mention of this information by Attorney Cochrane in his Counter/Cross Complaint, Attorney Penzien denied by certification that this relationship existed—later perjuring himself by admitting the existence of the relationship, denying though a conflict-of-interest was presented imputed through MRPC 1.10, *respectfully*.

*1420.* On **June 17ᵗʰ, 2022**, while cutting the lawn as with historic accord—**Daniel Scott Teetor**, *Jr*., did arrive rapidly at 7307 Shanna and proceed to watch Attorney Cochrane cut his lawn where, towards the end of this maintenance, Mr. Teetor did turn on his sprinklers intentionally

and struck Attorney Cochrane with water. It was following this malicious aggression by **Daniel Scott Teetor**, *Jr.*, that he again called Clay Township Police Department and Officer Burley responded prompting *another separate* complaint for criminal trespass that was filed and forwarded to the Township Prosecutor.

*1421.*   On **July 18ᵗʰ, 2022**, *I*, Attorney Cochrane, accepted service of the initial complaint for what is **Case #22—001403—CZ**, immediately subordinating *this* Complaint as **Murphy's Law** consumed my time as the constraint, impacting my critical path for this *herein* mental pilgrimage.

*1422.*   Continuing now into civil litigation, the **Honorable Judge Cynthia A. Lane,** exhibiting actual bias and prejudicial predisposition through repeated violations of the Michigan Rules of Professional Conduct and Judicial Cannon, has openly defended by aiding and abetting Plaintiffs' and Plaintiffs' Counsel's ongoing invalid and illegal conduct by adopting a false reality not supported by objective evidence and has instead conditioned Attorney Cochrane's arguments with a **$50,000** Security Bond. Specifically, the **Honorable Judge Cynthia A. Lane** has routinely violated her judicative duty and oath by overseeing this crooked litigation process with specific intent to forgo all valid and objective truth provided competently under oath by Attorney Cochrane but for his failure to furnish the Ordered **$50,000** of pecuniary security. In fact, the **Honorable Judge Cynthia A. Lane** has with individual actual malice from the bench openly defamed Plaintiff, Attorney Cochrane, while leveraging her authority to maliciously threaten the In Pro Per Attorney Cochrane's ongoing-objective opposition to comply with Court Order pecuniarily securing the Plaintiffs and their counsel against his ability and will to furnish this invalid and illegal **$50,000** Security Bond filed under **MCR 2.109**, *respectfully*.

*1423.*   Suspiciously, this **$50,000** illegal and extortive Motion for Security for 'Costs' was filed only as a direct effect of Attorney Cochrane's zealously filed initial Answer by Motion for Summary Disposition and Counter/Cross Complaint filed on **August 9ᵗʰ, 2022**, which included

claims against **Daniel Scott Teetor**, *Sr*., the **St. Clair County Freedom of Information Act Coordinator**, and the **St. Clair County Drain Commissioner**.

*1424.*   Frankly, this **September 2nd, 2022**, pay to play **$50,000** Motion for Security for 'Cost' was in fact conjured by Attorney Penzien <u>after</u> a Common Defense Telephone Conference on **August 29th, 2022**, with the **Honorable Judge Cynthia A. Lane's** *official capacity* Attorney known as, T. Allen Francis, of Fletcher, Fealko, Shoudy, and Francis, *P.C.*, conflicted as being imputed through **MRPC 1.10** and acting under cover <u>before</u> the **Honorable Judge Cynthia A. Lane** in **Case #22—001403—CZ** through express deception representing *therein* a Common Defense of the **St. Clair County** Defendants, while also simultaneously representing through a Common Defense strategy "clients" as "all [St. Clair County] defendants" <u>including</u> the **Honorable Judge Cynthia A. Lane** in then pending *Kevin Linke v. Hon. Cynthia A. Lane, et al*., 4:19—CV—11905, (E.D. Mich.), *respectfully*.

*1425.*   Despite objective and admitted truth, the **Honorable Judge Cynthia A. Lane** <u>from the beginning</u> opined that "*Mr. Teetor did not deserves this*," has routinely ruled opposite Attorney Cochrane's valid evidence exclaiming on multiple occasions— "*I do not care*," and has continuously abused her judicative duty by leveraging the civil-litigation process to <u>silence</u> Attorney Cochrane's In Pro Per advocacy and the advocacy in favor of his spouse as client furthering the **<u>Common Defense Star Chamber</u>** in violation of the First, Fifth, and Fourteenth Amendment in an unprecedented manner.

*1426.*   In fact, we know definitively that the **Honorable Judge Cynthia A. Lane** has not reviewed the **May 12th, 2022**, body camera video inclusive the parties' admissions <u>nor</u> the photographic evidence identifying **Daniel Scott Teetor**, *Jr*., destroying the St. Mary's Drain—this evidence was returned to Attorney Cochrane by the Judge's Administrative Clerk, Mrs. Kathrynn Miles,

in the same <u>sealed</u> envelope it was filed in and was effectively scrubbed from the 31st Circuit Court records as *I* received the filed Judge's Copy <u>and</u> Clerk Copy.

*1427.*   The Michigan Attorney General *should* have actual knowledge of **Case #22—001403—CZ** as a result of Attorney Cochrane's ongoing zealous advocacy to diminish the fraudulent reality adopted by the **Honorable Judge Cynthia A. Lane's** ongoing extortion of Attorney Cochrane.

*1428.*   Plainly—I have spent *hundreds* of hours defending the legal profession, my professional reputation, my individual character, my wife, our family, and our property against a maliciously frivolous complaint materially advanced by the **Honorable Judge Cynthia A. Lane** as *I* will not cease until the objective truth is recognized.

*1429.*   Candidly, the same logic *herein* applies there—*if she can do this to me*, *then no one is protected*—**ECHO**ing the notion that only those individuals directly affected by any sort of injustice can protest it, as *I* am the objective reminder that we—*the People*—all have a responsibility—a duty as Americans—to take a stand when we witness injustice.


### "...**Injustice *anywhere* is a threat to justice *everywhere*....**"

### **Martin Luther King**, *Jr.*


*1430.*   *Here*, in this matter, my squelched speech was more than subjectively chilled given the complexity of this case and the actual damages that would have objectively ensued had *I* not thought thoroughly enough to carefully lay out these arguments *herein* for this Honorable Court to adjudicate.

*1431.*   This case would be confusing enough if a lay **STUDENT** sparked *this* Complaint, but the added fact that *I* am an Attorney respectfully triggers the deeper analysis as *I* believe the MRPC supports my arguments firmly ultimately creating the chilled-stalemate position.

### DR. ELIYAHU M. GOLDRATT'S
### THEORY OF CONSTRAINTS

*1432.* Now, <u>you</u> <u>must</u> <u>learn</u>, *or* at least *understand the fundamentals*, of what the Theory of Constraints '*is*' before you completely grasp the nature of *this* Complaint. <u>This can be done</u>. This can be done *quickly*, and <u>this</u> is <u>necessary</u> to properly lay the foundation for the claims of *this* Complaint. Plainly, this case <u>is</u> about *<u>knowledge</u>*, knowledge transfer, *abstract* thought, creativity, and **<u>speaking</u> out** as the **Heretic Creative Martyr**. Specifically, *here*, Defendant, Dr. James T. Low, *<u>one</u>* of the Wayne State University Mike Ilitch School of Business Marketing and Supply Chain Management Professors who gave me the *glimpse* of the Theory of Constraints that *I* needed to understand what *truly* lay behind the veil—Dr. Low *repeatedly* chanted—*<u>do</u> <u>not</u> <u>be</u> <u>the</u> <u>Martyr</u>*. This here, *my conduct*, will either be *valid* or *invalid*, and the tactics of the Theory of Constraints will aid in the analysis of the applicable factors concerning the merits *herein*.

"***The powerful solutions of yesterday might become the disaster of today!***"
Dr. Eliyahu M. Goldratt, *The Haystack Syndrome*, 1990

*1433.* The death of knowledge, just as individuals succumbing to the sands of time—ideas and knowledge too have a lifecycle, *a process*, and *we* are no different in that all will cease at some point in time. In fact, our collective-objective reality is a testament to this constraint as we now freely with ease lay down a recorded record, yet most of those before us found little solace recording *ideas* as time passed and survival took precedence opposite now our less barbaric current reality. Take for example, Lucretius' *On the Nature of Things*, written around 50 B.C.E. and adopted more than *1500* years later by the *so-called* Heretic, Giordano Bruno. Adoption of these *ideas* in Bruno's space and time led directly to eight (*8*) years of confinement by the Roman Catholic Inquisition, to the destruction of *his* written records (*e.g.*, *ideas*), and ultimately his public execution in the Campo de' Fiori by being strung inversely nude burned alive at the stake on

February 17th, 1600 A.D.—to be thereafter <u>proven</u> <u>correct</u> by Galileo Galilei—himself on June 22nd, 1633 A.D., deemed heretical by the Catholic Church for his *ideas*. Frankly—no amount of technology or depth of curiosity can bring back *what is forever lost to the sands of time*. This premise is *further* demonstrated where knowledge is intentionally lost—through conceptual evolution, censorship, *destruction*, and ignorance; *taking for example*, those common lessons learned from *The House of Wisdom*; the *Library of Alexandria*; *Library of Pantainos*; the *Imperial Library of Constantinople*—and *many others* lost to the *fires* of the invading hordes.

*1434.*   As relevant to the Theory of Constraints, and with the death of Dr. Eliyahu M. Goldratt on June 11th, 2011—the knowledge that is the Theory of Constraints now lay without their master's active **ECHO**—themselves subject to time as their lifecycle continues naturally into the future open to whomever finds and breathes life into them, *should they ever* **ECHO** the same again.

*1435.*   Undoubtedly, you have gleaned from *these pages* already a good grasp of what is Dr. Goldratt's Theory of Constraints— "*What is T-O-C?*"—Dr. Goldratt asked this *exact* question sometime in and around 2009 at a Theory of Constraints International Certification Organization ("TOCICO") conference synthesizing his struggle then to define TOC. Even thirty-one (*31*) years after the spark of ingenuity that first stirred the idea of what is TOC—<u>its</u> <u>creator</u> <u>struggled</u> to adequately define the evolved parameters of his *idea*.

*1436.*   This account by Dr. Goldratt is <u>extraordinarily</u> important for our analysis *herein*—as such definition narrows the scope onto the Defendants with impressive specificity—**<u>FOCUS</u>**—read the first-hand account *here* in Dr. Goldratt's <u>broken</u> <u>English</u> explaining this defining process of TOC:

> "**What is TOC**? Can anyone tell me what it is? You know, **there was a time when it was so easy to define, then it grew and mushroomed, and mushroomed**, and now—**what the hell is it**? About a year ago, I was forced to really give some serious thinking to define it. What happened is, that one of our crazy friends, **Professor Jim (James) Cox**, has decided that TOC now is so big that it is about time to write the handbook of TOC. So, he went out and marked about forty (*40*) TOC World Experts and approached each one of them and convinced each one to write a chapter for the handbook giving him a title. **And then, he said, okay you can write**

**introduction to the handbook from the perspective of the Founder; now how can you say no now? So, I said fine. But then, what do you write?** What am I going to write? What, how do you put an introduction to all of TOC without being totally stupid? So, this took a lot of time thinking. I think that what helped me was a very famous story in the Jewish tradition, this is a true story; it's about around 30 A.D., which means almost 2000 years old and the story is about a gentile and non-jew that came to the two great rabbis of his times and ask each will you please teach me all of Judaism at the time that I can still balance on one leg. So, one of them chased him out of the house very brutally, but the other one have answered and the answer is become very famous and after that there was so much studying to study the answer. **The answer was—don't do unto others what you don't want others to do to you**—this is all of Judaism, everything else is direct derivatives go and study. What a fantastic answer; by the way it took hundreds of years decipher it in order to prove that really all of Judaism can be deduced directly one-to-one from one single sentence. And this gives a new meaning to what is TOC, in other words, **can you come up with one sentence that encompasses all of TOC as it is now and as it will be in the future**, and you can (sic) **you have to prove that all what we see under the** (sic) **this umbrella of TOC can be derived directly from that sentence**. **Quite a big challenge**.

**I started to work on it and then I found to my amazement that's probably it is possible to condense all of TOC not to one sentence, <u>but to one word</u>**. Of course, after they took me months that, yes from this word directly every (sic) all of TOC is coming out, but the things that was amazing to me as well, not that only all of the TOC is coming out, but what came for the first time so clear in my mind is that all the evolution of TOC came out one-to-one. **In other words, the evolution of TOC is not done by fluke, there is only one way it can evolve and that's how it evolved and it's all coming from the base of TOC which is only one word**. <u>Can anybody guess the word?</u> When I've asked the same question in Latin America just a month ago, Alejandro, one of the World's real TOC Experts, have answered he knows, and the answer is—*oh shit*! But this is two words, not one. I think that the World that encompass all of TOC is that you can derive, and that's what I will try to do in the next three hours, that **you can derive all of TOC from <u>it is the word that will not come as any surprise to you—the word</u>**, **FOCUS**—and *everything comes from that*...so *let us go about it systematically*...."

YouTube Video: <u>https://www.youtube.com/watch?v=W18n8m97uuk</u>
TOCICO: <u>https://www.tocico.org/page/EliyahuGoldrattWhatisTOC</u>

***This video is available at these webpages and is when recorded in the short version about five (5) minutes, or 335MB in size, outside the size limit for attachment *herein* to this case electronically but is otherwise available to this Honorable Court for consideration. ***

*1437.* <u>**Focus**</u>—*this is <u>not</u> my word*; this single word is what Dr. Goldratt as the Founder and Creator

of the Theory of Constraints conjured in 2009 to succinctly define what he saw as then and in the

future as the precise definition of TOC. But too, **remember**—the Defendants' 2013—2018 Wayne State University School of Business Administration Strategic Plan as the foundational dissemination of their ongoing plan to leech onto industry through their **STUDENTS** was itself conjured and infused with input from "Members of our Board of Visitors (BOV; see Appendix 2) [that] **stressed** that **the plan be characterized by "focus"** and that it include metrics to determine whether or not goals have been accomplished." **Exhibit 17**, at p. 2. (Emphasis added).

1438.   *Now*—the reason for *this* section is to demonstrate the fundamental-core elements of what is the Theory of Constraints as to depart from the noise generated because of time, *confusion*, and the very evolution of this growing-monumental *idea*. Simply, this section reveals for you now the beginning, the evolution, the current state-of-being, and importantly *my* interpretation of *what is actually* the Theory of Constraints as to allow others to cut through this noise and utilize the value of this knowledge of the good for time to dispense *as it will*.

1439.   In the beginning—*there was nothing*—or, for our purpose here there was Dr. Eliyahu Moshe Goldratt, and a chicken coop. In fact, it appears from a triangulation of the records that *the cause* of all of *this* was a chicken coop, and as *the effect* a genuine desire to solve a problem systemically was itself the scientific breakthrough that ensued as a primordial Theory of Constraints; *recall*, Audrey Taylor's highlight relative to the Chicken Coop in **Exhibit 109**, at p. 18.

1440.   Let us begin by standing on the shoulders of *the* man who lit this flame in *1984*, chasing its' shadows until his final breath: Dr. Eliyahu Moshe Goldratt, *Ph.D.*, *respectfully*.  Dr. Goldratt was born into a rabbinic family in Vienna, Austria, on March *31*st, *1947*, *ironically* five (*5*) months prior and only *313* miles from the *very* location of the monumental verdict known *herein* and internationally as: *The Nuremburg Code*. **Exhibit 1.**

1441.   Though Dr. Goldratt's youth is largely absent from his many biographies, it is his foundational work as a college **STUDENT** that gives rise to *his* destiny.

*1442.*   Upon information and belief, Dr. Goldratt was pushed intellectually by his father, Avraham-Yehuda Goldrat, a member of the *1*st Knesset which established the sovereign state of Israel in *1949*; the Israeli Knesset is the unicameral legislative authority in Israel that was founded on February *14*th, *1949*. **Exhibit 503**—*Avraham-Yehuda Goldrat's Curriculum Vitae*. You can see that Mr. Goldrat was involved in at least four (*4*) different committees during his three-year tenure with the Knesset, and he continued serving the public *all his life*, writing publications until his death on June *17*, *1973*, *respectfully*.

*1443.*   We know that sometime in and around **1978**, a young Dr. Goldratt at the age of thirty-one (*31*) left academia not knowing he would one day return to sell the Global Educational Industry a 'solution' to its' *future* woes. Armed with a Bachelor of Science in <u>Physics</u> from Tel Aviv University, Israel, and a Master of Science and Doctorate in <u>Philosophy</u> from Bar-Ilan University, Isreal, Dr. Goldratt used his doctoral precepts to effectuate a worldwide management paradigm shift over the course of his professional career. **Exhibit 1**. Interestingly, it was Dr. Goldratt's unique combination of his physics background, having developed a deep understanding of the *<u>flow</u>* of fluids, and his later merger of managing systems in the business environment that led to the notion that <u>universally</u> "*managing systems means managing flows*." **Exhibit 504**—*Oded Cohen Dr. Goldratt Tribue Biography*.

*1444.*   Plainly, there are **four (4) epochs** of Dr. Goldratt's professional journey that follow his academic exit, each compounding the latter, ultimately continuing as we read *this* Complaint as we have entered the fourth (4th) and final legacy epoch.

*1445.*   Initially, in Israel sometime in and around **1978**, Dr. Goldratt as CEO along with some partners including his brother, Issachar Dov Pazgal (commonly known as "Izzy"), formed a company known as "**OPT Israel**" using the "Optimized Production Technology" algorithm he developed for his *Ph.D.* thesis. The process known as "OPT" is based on the principle that

reducing bottlenecks in a system while optimizing and scheduling non-bottlenecks maximizes the "**Throughput**" of a system which in turn increases profits. Simply, what Dr. Goldratt did as CEO of "OPT Israel" was develop the "first software to provide finite capacity scheduling for production environments," used for production management and manufacturing of <u>all</u> types of <u>goods</u>. **Exhibit 505**—*Theory of Constraints Institute Biography*.

*1446.*   It was this early stratum that allowed "OPT Israel" to implement the OPT software "in some very large Israeli companies such as Israeli Aircraft Industry (IAI), Elsint, Soltam, and Israeli Defense Industry. Recall, **Exhibit 504**: "The software was powerful and very quickly brought to improve the on-time delivery and the reduction of production lead time." *Id*.

*1447.*   As "OPT Isreal" grew with its successes, sometime in and around **1979** the company incorporated within the United States forming the equivalent subsidiary known as— "**Creative Output, Inc**.," where OPT was improved further and utilized by large-manufacturing corporations "such as Westinghouse, **General Motors**, Ford, General Electric, Howmet Turbines, *and others*." *Id*. (Emphasis added).

*1448.*   During this early growth, Dr. Goldratt learned through the "experience of working with established American companies [that] presented more challenges to the ability of the software package to bring the desired improvement to the performance." *Id*. Plainly, it was this concept of <u>software</u> ineffectiveness that drove Dr. Goldratt to begin to reshape the *ideas* that were behind the OPT ideology. It was sometime in and around **1980** that Dr. Goldratt wrote his first article— "*The Unbalanced Plant*," identifying management should not strive to balance the manufacturing capacity but should balance the manufacturing flow instead. *Id*.

*1449.*   Again, as "OPT Isreal" and "Creative Output, *Inc*." continued to grow steadily, sometime in and around **1982** a United Kingdom subsidiary, "**Creative Output UK**" was established increasing the number of businesses utilizing the OPT technology Worldwide. *Id*. In fact, it was

at or around this time that Dr. Goldratt began to have concerns about two major reoccurring *effects* organizations were realizing while utilizing OPT:

> "(*1*) the *dependency of* the companies implementing OPT on the external team *in achieving and sustaining the results*, and
>
> (*2*) the *challenges in selling* the software and *persuading managements to take* on board the *necessary changes to their <u>decision-making processes</u>*."

*Id*. (Emphasis added).

*1450.*   Plainly, Dr. Goldratt "realized that certain habits and assumptions [known as paradigms of employees and managers] held back the software from achieving its full potential [negatively influencing results after implementation]." **Exhibit 1; Exhibit 505.**

*1451.*   To combat these *negative effects*, two solutions [injections] were generated, the *first* was relative to the dependency of companies and the inability to sustain results following implementation of OPT:

> "The answer to the *first effect* was training.
>
> In **1983**, ...Creative Output **introduced management training alongside the software implementation**. [Dr. Goldratt] recorded 16 programs of the "OPT Executive Video Course" in which he presented the basic principles as well as the **practical application for the software and for decision making**. In the autumn on that year, in the International Conference of APICS-the American Production and Inventory Control Society – **Dr. Goldratt presented his famous speech**: "Cost Accounting – Public enemy number one of productivity". A year later he was invited to re-address the same topic in the National Conference of the Association of Management Accountants."

**Exhibit 504**. (Emphasis added).

*1452.*   Simultaneously, the "answer to the selling difficulty [ as the *second* reoccurring *effect*] was to **<u>write a book <em>as</em> a marketing brochure</u>**." *Id*. (Emphasis added).

*1453.*   Plainly, this journey took Dr. Goldratt thirteen (*13*) months to complete, and the final product was not received well by "OPT Israel" and Creative Output staff, nor by large publishers. **Exhibit 1**. In fact, "with the help of Larry Gadd, the Owner of North River Press, Dr. Goldratt's **first book**—*The Goal*—become published sometime in and around **1984**. *Id*.

*1454.* At "OPT Israel" and Creative Output, the direct effect of *The Goal* was not the solution Dr. Goldratt anticipated. "After a while, [Dr. Goldratt] noticed that many implementations conducted [by clients] were conducted using the [*The Goal*] but not [OPT] software." *Id*. As the success of *The Goal* continued, Dr. Goldratt "lost the heart to sell his software and attempted to reposition Creative Output, *Inc*., as a consulting firm, [but] (sic) declining revenues and Goldratt's radical shift of **focus** caught shareholders off guard." **Exhibit 505**. (Emphasis added).

*1455.* Persistent, Dr. Goldratt continued his attempt to reposition Creative Output, *Inc*., into early **1985** when he wrote his **second book** introducing a manufacturing scheduling concept known as **Drum-Buffer-Rope** in *The Race*. **Exhibit 1**. In general, Drum-Buffer-Rope as a concept <u>is</u> <u>universal</u> to <u>all</u> systems, though it is best used in manufacturing procedures using buffer management (controlled release) within the system(s) (rope) while utilizing the system's bottleneck (or constraint) to schedule a series of actions in the applicable system to achieve the desired objective (drum). *Id*.

*1456.* Unfortunately, Dr. Goldratt's vision for Creative Output was not flourishing as anticipated and the repeated push towards the path of "consulting" ultimately reshaped his future:

> "Goldratt tried to move the company down the path of "**consulting**," <u>**trying to help people rethink the way**</u> <u>**they did things**</u>, but Creative Output's declining revenues and Goldratt's *involvement with things other than* the sales of OPT software [is what] convinced the shareholders to fire Goldratt (and afterward his closer collaborators)."

**Exhibit 1**. (Emphasis added).

*1457.* Fortunately for Dr. Goldratt at this time—*The Goal* was a best seller, translated *now* into twenty-seven (*27*) languages, and has sold over a million copies Globally—in <u>2011</u>, *Time Magazine* listed the book as one of "*the 25 most influential business management books*." **Exhibit 504**. Importantly, it should be noted for *this* record that the business textbook known as *The Goal*

was derived from Dr. Goldratt's underlying <u>intent</u> to draft a <u>cryptic</u> message as a marketing *pitch* with "**romantic overtones**," **just like** his 1997 book, *Critical Chain*. **Exhibit 506**—*Dr. Goldratt's APICS Cost Accounting Article, at p. 92*; **Exhibit 42**; **Exhibit 43**. (Emphasis added).

*1458.*   In late **1986**, Dr. Goldratt embarks on his second (2nd) post-pedagogical epoch by founding the **Avraham Y. Goldratt Institute** (hereinafter "**AGI**"), named after his late father, wherein this self-funded consultancy firm gave Dr. Goldratt the creative breathing room for what was thereafter developed known now principally as Theory of Constraints. *Id*.

*1459.*   At first the goal of AGI was to "[g]enerate and disseminate knowledge," and Dr. Goldratt's "approach was given a new name – TOC – the Theory of Constraints," where sometime in and around **1987** the Theory of Constraints "**Thinking Processes**" did evolve through extensive refinement and were revealed publicly <u>as the **core value** to what is TOC</u>. **Exhibit 504**, at p. 2.

*1460.*   It was "[t]o achieve [this] purpose [that] it was needed to develop the tools and ability to construct and communicate common sense solutions – that will be understood and accepted by all parties involved in the improvement." *Id*.

*1461.*   It was this shift in ***focus*** "toward training and education" that led to the development of the "**Thinking Processes**" and their dissemination through the AGI "**Jonah Program**" as in part the foundation for the effect of *this* Complaint. *Id*.

*1462.*   It appears again from triangulation of the records that this entity, AGI, was the vehicle used for the diffusion of Dr. Goldratt's core idea, a process on ongoing improvement <u>used for proper decision making</u> known now as the "**Thinking Processes**," in which through specifically the "**Jonah Program**" we know this knowledge was transferred to several key individuals *herein*.

*1463.*   Specifically, we learn from several of Dr. Goldratt's early AGI consultancy partners causal links in this ongoing evolutionary timeline. *First*, from a 2017 Tribute to Dr. Goldratt by John Covington of Chesapeake Consulting, who first in **1987** implemented this *early form* of TOC and

had excellent results as then the "Plant Manager of the World's Largest Manufacturing Facility owned by Sherwin-Williams." **Exhibit 507**—*2017 Dr. Goldratt Tribute Entries*.

*1464.*   Continuing, we learn further from Mr. Covington that sometime in and around the "**Summer of '88** [he] attended a Jonah class taught by [Dr. Goldratt] and Dale Houle. Also in that class were **Jim Cox**, Mark Woepple, Kevin Fox, Harvey Oppos, Chris Wysong..." where after completing "the Jonah course [Mr. Covington] became an associate of the Goldratt Institute and handled most of the south." *Id*. at p. 2. (Emphasis added). Moreover, we know that "AGI, the associate network and the clients were a tight knit family in the late 1980's early 1990's." *Id*.

*1465.*   We know definitively during this time that "[Defendant, Dr. James T. Low, and Mrs. Audrey Taylor] were personally instructed in the Theory of Constraints Thinking Process Tools by [Dr. Goldratt]" where Defendant, Dr. James T. Low, "attended the Jonah Course with the **first group of six academics in 1989**," and Mrs. Taylor "attended the first Jonah Course dedicated to **academics in 1991**." **Exhibit 143**, at p. 28. (Emphasis added).

*1466.*   In fact, these admissions are corroborated by Mrs. Lisa Scheinkopf—truly a very important TOC figure Globally—that in the same 2017 tribute continues the evolution of AGI and the TOC "**Thinking Processes**":

> "It was **1991**, and we were the very first "Jonah's Jonahs." (And oh my, how young!) **We were the first of two groups of AGI Associates that Eli selected for the purpose of helping him to design the "new Jonah Course" which would move the program from teaching how to teach TOC/DBR with the simulator to teaching "how to think like a Jonah".** Around the table, staring from the left: Otto who was with Phillips NV, Mark, Eli, me, Harvey Opps, Warren Foster, Wendy, Kevin Fox, and Dick Moore who was still teaching at Air Force Academy at the time.
>
> **We would meet** at that beautiful former church that was AGI's building for a few days each month **and dive into the different thinking processes** – **what they were, what was the purpose for each, how to do them, how they fit together, etc**. It was during the first Gulf War and Iraq was

throwing scud missiles at Israel. In between Eli's calls home to make sure family was safe. He (sic) guided our learning process with lessons in Talmud, chaos theory and Mandelbrot fractals, and challenged our thinking incredibly. And yes, it took a while for us all to realize that when Eli said "cows" he really meant "chaos".

**Our group would be followed by a second**, and then the first part of the process was a **gathering of the 2 groups plus several of Eli's partners in The Netherlands to finalize the program**. One of the most powerful personal growth times of my life."

**Exhibit 507**, at p. 4. (Emphasis added).

*1467.*  We know further from this same **2017** Tribue to Dr. Goldratt that Kathryn Leishman contributed to this phase of evolution of the Theory of Constraints ""**Thinking Processes**"" sometime in and around **1989** to **1991**:

"I first read The Goal in 1987 when I joined Ashridge Management College to teach and consult in operations management. The subject was based around TOC. I met Eli Goldratt for the first time about a year later. **I was a privilege to be part of the development team**, including Alex Knight and Oded Cohen, **altering the Jonah Program from a production focused course into initially one suitable for service operations. Over the course of two to three years the major evolution was into a program teaching the use of the Thinking Processes to initiate significant change in an organization**. <u>1992 saw me move to Hong Kong and light the spark which my colleague William Law has developed into TOC in China</u>. Next stop New Zealand and Australia where I was living when I was asked "we've had some interest from India, you are closest, can you follow up". Just a few weeks later Ravi Gilani had met my challenge of organizing a seminar and the big adventure in India started. Eli made his first trip to India to speak at a conference organized (sic) by the Confederation of Indian Industry in 1999. We built up a great network of local consultants. Weh the Viable Vision initiative for enterprise-wide improvement took off, India was a significant success with a number of large respected companies signing on. Eli became a frequent visitor to clients in India. Which his PhD and practical outlook, he fit right in which the senior management and owners there..."

*Id*. at p. 7. (Emphasis added).

*1468.*  It is this note by Kathryn Leishman that illuminates too the direct connection Dr. Goldratt has with China and specifically Mr. William Law, himself pinning a note openly on this **2017** Tribute website:

"Eli, thank you for bringing TOC to the world, *to China*, and to me.
You will live in my heart forever."

*Id*. at p. 10.

**1469.**   In fact, having come down this road *I* find it disturbingly prudent to identify in *this* record the presentation compiled by Mr. Law in which demonstrates chronologically the extensive relations Dr. Goldratt had with China. In which, specifically on page twelve (12) sometime in and around December **2005**, during a presentation in Shanghai where the United States Marine Corp. Matcom (Material Command) insignia is displayed on the screen behind Dr. Goldratt in relation to likely the United State Military application of TOC. **Exhibit 508**—*China's 2017 Goldratt Tribute; see also, Professor Jim Cox' concern for Chinese translations in* **Exhibit 456**, at p. 14.

**1470.**   Chronologically this takes us to sometime in and around **1990** where we know that Dr. Goldratt's Theory of Constraints was being refined internally within AGI whereas a result of this **shifted *focus* toward teaching the World <u>how</u> to think**—Dr. Goldratt continued to publish books while consulting Globally as well as teaching what was then the Theory of Constraints through this revamped AGI Jonah Program. **Exhibit 1**.

**1471.**   Specifically, we know that during this time Dr. Goldratt published four (4) other seminal books demonstrating the ongoing evolution of this knowledge base along with several of the applications that have been generated from use of the Theory of Constraints **Thinking Processes**:

- **First Book**—1989, *The Goal*;
- **Second Book**—*1986, The* Race;
- **Third Book**—1990, *What is this Thing Called Theory of Constraints*;
- **Fourth Book**—1991, *The Haystack Syndrome*;
- **Fifth Book**—1994, *It's Not Luck*; and
- **Sixth Book**—1997, *Critical Chain*.

**Exhibit 1**, at p. 2.

*1472.* It was in Dr. Goldratt's **Third Book** in **1990**, *What is this Thing Called Theory of Constraints*, that first explicitly gave the World the combination of the Theory of Constraints "**Five Focusing Steps**" of ongoing improvement and the fundamentals of the Theory of Constraints "**Thinking Processes**."

*1473.* Previously in *The Goal* and later in *Critical Chain*, Dr. Goldratt's explanation and use of these tools are muddled and not explicitly identified, leaving the reader to read between the lines miscommunicating the value that is this knowledge. *Id.*

*1474.* In fact, the Theory of Constraints "**Five Focusing Steps**" is a process of ongoing improvement that was first identified in *The Goal* and was used *then* primarily for physical constraints in a manufacturing context and thereafter has evolved with the "**Thinking Processes**" simultaneously.

*1475.* In fact, from a **2009 AGI White Paper** called "*The Theory of Constraints and its Thinking Processes*," AGI explains this convolution involving *The Goal's* original "**Five Focusing Steps**" as a Theory of Constraints tool that <u>can</u> <u>be</u> used with the "**Thinking Processes**" for "combined, overall performance" improvements. **Exhibit 509**—*AGI 2009 White Paper, at pp. 9-10.*

*1476.* Importantly, in **1991** Dr. Goldratt wrote his **fourth book**, *The Haystack Syndrome*, which is an integral point of evolution in the development of the Theory of Constraints.

*1477.* Specifically, it is the "**Systems' Thinking Logic**" of the Theory of Constraints that widens the decision-making horizon for the User and with that comes more deliberation, or simply more data to leverage for the decision-making process.

*1478.* More specifically—The "**Thinking Processes**" is a <u>high</u>-<u>level</u> decision-making process used for continuous improvement utilizing whole-*system* thinking. I explicitly say "*system*" in that the "**Thinking Processes**" has *<u>many</u>* small mechanisms, or 'thinking processes', that when used in totality with one another they form a "*system*" of *analytics*, or more concisely, a <u>mechanism</u>

for **proper** _decision-making_. I explicitly say "_analytics_" meaning that TOC as a _whole_ system has a distinct-analytical effect on the root objective of the _User_; similar to white hat/black hat hacking. I explicitly say "_User_" to note that TOC may be used, for example, by a single individual, _or by_ a system of Users, _e.g._, for example, the World collectively as a _group_, there are no limits or restrictions against aggregation of _data_ in our digital age. As relative to Dr. Goldratt's book, _The Haystack Syndrome_, I explicitly say "_data_" as the opposite of "_information_" in that "_data_" is _information_ that is raw and cataloged, where "_information_" is that "_data_" that is being used analytically for <u>decision making</u> by the _User_. _This is the way_, the basic-underlying analytical movement that gives life to the intent behind the ideology of continuous improvement using the Theory of Constraints for _systematic-decision making_ by its User; in contrast, the "**Five Focusing Steps**" are more action steps then reflective-logic tools.

_1479._  Most importantly to _this_ Complaint, sometime in and around **1995** Dr. Goldratt with the help of Ms. Kathy Suerken as President founded and launched The Theory of Constraints For Education (as known _herein_ as TOCFE) the Global 501c3 non-profit organization with the purpose of diffusion of the Theory of Constraints "**Thinking Processes**" throughout the pedagogical ecosystem. **Exhibit 510**—_Kathy Suerken TOCFE Biography_; recall, **Exhibit 1**; and Mrs. Taylor's dissertation at **Exhibit 109**, pp. 23-24, explicitly identifying therein the "<u>first time</u> Kathy met Eli Goldratt was in Dearborn, Michigan at the **1993 International Jonah Conference sponsored by <u>Wayne State University</u>**." (Emphasis added).

Plainly—as the pedagogical trojan horse—TOCFE was developed to foster mutually beneficial win-win solutions for **STUDENTS** _and_ educators to achieve desired objectives through implementation of the "Ambitious Target" Curriculum, as _herein_ amplified by the Defendants' **ECHO**ed use of "[_VERY_] Ambitious Goal Curriculum" of TOCFE.  **Exhibit 511**—_TOCFE 2010 Thinking for a CHANGE Presentation, p. 41._ (Highly Emphasized)

Concisely, it is the use of the pedagogical <u>Communication</u> <u>Process</u> that is education and the pedagogical purpose to teach **STUDENTS** that fostered the ability to manipulate this process through combination of the Theory of Constraints "**Thinking Processes**" and "[*VERY*] Ambitious Goal" Curriculum on "all levels" allowing this infusion to be "[u]sed by educational staff to achieve management goals;" *e.g.*, the Wayne State University School of Business for 2013—2018 Strategic Plan *and* <u>*all*</u> <u>*others*</u> that have followed as a <u>direct</u> result of this *focus*. *Id*.

*1480.*   At the time TOCFE was founded sometime in and around **1995** until the development of **Exhibit 511** sometime in and around **2010**, well "over 200,000 education stakeholders" were "trained through TOCfE seminars and workshops..." having a direct impact on "more than 8 million children in 21 Countries on 5 continents." *Id*. at pp. 3-4.



**Exhibit 511**, at p. 4.

*1481.*   Interestingly, in Singapore "TOC is being taught to prison inmates," while in the United States, <u>especially</u> Michigan, TOCFE was used to "bridge the gap between having 'good' ideas and effectively making the improvements we envision." *Id*. at pp. 5-6.

*1482.* In general, the TOCFE business model leverages the Theory of Constraints "**Thinking Processes**" which as logic tools have the intent to provide a <u>systematic</u> approach to enable the User to create and implement the kinds of change that can also be considered improvements based on the objectives of the User; importantly—*remember*, not all changes are improvements, and this is a natural result of the decision-making process.

*1483.* Specifically, the Theory of Constraints "Thinking Processes" were designed to answer three questions <u>systematically</u> as the User progressively worked towards crafting *a <u>future reality</u>*:

What to Change?

What to Change to?

How to Cause the Change?

**Exhibit 511**, at p. 10.

*1484.* Continuing, these questions themselves *and* the TOCFE sales pitch lead the User naturally into the second question where *the future reality* is shaped opposite the first question (the User's current reality) where the User is free to brainstorm ways 'the how' *and* 'what' to reach for as their "Ambitious Target" which becomes the overall objective of this <u>systematic</u> process.

*1485.* Specifically, in **2010** the following pitch introduces the "Thinking Tools" applicable for "[**STUDENTS**] at <u>**all levels**</u>" to achieve the objective of TOCFE in upgrading **STUDENTS**' decision-making capabilities—see Exhibit 511, at p. 18-20. (Highly Emphasized).

*1486.* Simply—these three (*3*) "Thinking Tools" are an abbreviated form of the Theory of Constraints "**Thinking Processes**" and in general are used to allow the User to learn the effect-cause-effect relationship of action and achieving objectives. The TOCFE presentation continues the sales pitch of this trojan horse idea identifying <u>six</u> (*6*) <u>key</u> <u>facets</u> of the Theory of Constraints "**Thinking Processes**" each applicable to the facts sparking *this* Complaint:

**Criteria of the TOC methodology**

- **Simple**….breaks seemingly complex problems down into simple, clear and focused analysis

- **Graphically structured**  … provides visual framework to enhance understanding and memory

- **Practica**l….enables the underlying theory to yield practical outcomes

- **Activates prior knowledge**…enables learner to scaffold prior knowledge and experience to new knowledge

- **Socratic**…provides questions that  enables the learner to discover and take ownership of answers

- **Non exclusive**….works with all ages, cultures and political systems

© TOC for Education, Inc. 2010   All rights reserved     21

**Exhibit 511**, at p. 21. (Emphasis added).

*1487.*  Explicitly—the use of the Theory of Constraints "**Thinking Processes**" in conjunction with the Defendants' "[*VERY*] Ambitious Goal" Curriculum is the issue *here* but for the very placement of the questions poised of professional **STUDENTS** unknowingly participating in the Defendants' ongoing systematic research. Candidly, it is these logic tools and the six (*6*) facets above that has allowed the Defendants to enter the current realities of the Plaintiffs through the **STUDENTS'** pedagogical **FREE SPEECH** and systematically use these **STUDENTS** as "bridges to industry" by exploiting this Communication Process where this compelled excess capacity has materialized into value as Defendant, Dr. James T. Low, has openly confessed.

*1488.*  Specifically, the TOCFE "Cloud" is what is known as the Theory of Constraints "**Thinking Processes**" "**Evaporating Clouds**" which is a logic tool used primarily to identifying and resolve conflicts between two non-mutually exclusive alternatives.

*1489.*  Candidly, as a **STUDENT** myself, *I*, Plaintiff, Attorney Cochrane, participated at Warren Mott High School in Warren, Michigan, sometime in and around **2004-2005** as a Peer Mediator

where *I* do not recall the name or description of the paper before me *then*—*but*, *I* do recall now vividly the general and nearly unmistakable design of the "Cloud" and/or "**Evaporating Cloud**" that was used by my group of Peer Mediators to resolve a conflict we were presented.

*1490.* Next, continuing with the next "Thinking Tool" of TOCFE called "Branch" and/or "Logic Branch" itself is not a logic tool explicitly used in the Theory of Constraints "**Thinking Processes**" and *is* instead a logic tool used to teach "**Effect-Cause-Effect Logic**" in general.

*1491.* Simply, this <u>systematic</u> logic is a skill developed through constant internalized questioning, some are born with *and* other must develop, and in a Theory of Constraints context this logic process of continuous deducing is known as sufficient "**Effect-Cause-Effect Logic**."

*1492.* In more fundamental terms—Sir Issac Newton's Third Law of Motion in Physics presents us with an incomplete definition of Motion in that "*For every action, there is an equal and opposite reaction*," failing to contemplate the *reaction* of the initiating action—more precisely, the initial effect is the start of the analysis, not the resulting cause as the action—logically this presents an incomplete equation by removal of a requisite variable.

*1493.* The use of sufficient "**Effect-Cause-Effect Logic**" allows the User and educator(s) the ability to view the problem in a <u>systematic</u> manner *even if* the **STUDENTS** fail to correctly redesign <u>their</u> problem adequately *in their* description of What to Change, *e.g.*, the **STUDENTS**' current reality and/or "[*VERY*] Ambitious Goal."

*1494.* Plainly, as *seen later* through use of the formal "**Thinking Processes**," "**Effect-Cause-Effect Logic**" is "used to **<u>understand</u>** cause-effect **<u>links</u>** between actions and consequences, **<u>make predictions</u>**, and **<u>create</u>** new and better ***<u>solutions</u>***." *Id*. at p. 36. (Emphasis added).

*1495.* Finally, the last "Thinking Tool" as *herein* identified as the "Ambitious Target Tree" and is *not* a logic tool explicitly used in the Theory of Constraints "**Thinking Processes**" and is itself inherent graphical speech as a tool used to compel speech while asking the User a question:

What is the Users' Ambitious Target?

*Id.*

*1496.*   Again, this logic tool is graphically structured so that speech itself is not a constraint to knowledge dissemination and generation as this question itself is "used by teachers and [**STUDENTS**] to achieve **mutual goals**;" also "[u]sed by [**STUDENTS**] to achieve **personal goals**;" and more importantly for those who <u>control</u> <u>this</u> <u>Communication</u> <u>Process</u>— "[u]sed by **educational staff** to achieve **management goals**." **Exhibit 511**, at p. 41. (Emphasis added).

*1497.*   For example, and conversely opposite the Defendants' implementation of their <u>placement</u> of this "[*VERY*] Ambitious Goal" Curriculum by using the Theory of Constraints "**Thinking Processes**" to <u>systematically</u> compel **STUDENTS** absent informed consent to develop the valuable-excess-capacity <u>research</u> by answering the "[*VERY*] Ambitious Goal" question for the required-personal project leveraged intentionally by the Defendants in a mutually beneficial way—*see below*, the "Ambitious Target" is to "Raise Reading Test Scores:"



**The Ambitious Target Tree**

Target:   **Raise Reading Test Scores**

| OBSTACLES | OBJECTIVES | PLAN |

**Exhibit 511**, at p. 42. (Emphasis added).

*1498.*   Candidly—this **higher-order thinking** is derivative of the Theory of Constraints "**Thinking Processes**" and the logic tools attributable to the systematic and graphical thinking used by this Communication Process—and *even by* employing the watered-down version of the TOCFE, the **STUDENTS**' pedagogical speech—*their* **FREE SPEECH**—is subverted because of this compelled-enhanced adaptation of thought using this evolved knowledge of the good placed in the pedagogical environment where questions are leveraged to elicit knowledge.

**Exhibit 511**, at p. 43. (Emphasis added).

*1499.*   Next—sometime in and around **1997**—Dr. Goldratt **formally retired from AGI** as that was "his plan to retire from the Institute prior to his 50th, birthday." **Exhibit 1**.

*1500.*   It was then too sometime in and around **September 4th, 1997**, that Dr. Goldratt released his **sixth book**—*Critical Chain*—as *herein* being the **<u>cipher</u>** at issue. *Recall*, **Exhibit 43**.

*1501.*   The phrase—*if you know, you know*—is a concise phrase, where the context of the matter does not need to be explained and is understood or known only by a *select group* of people.

*1502.*   Plainly—just as *The Goal* **<u>was written as a cipher</u>** to sell OPT in 1984, *Critical Chain* is too a **<u>cipher</u>** used to demonstrate the Theory of Constraints from a pedagogical perspective <u>eerily similar</u> to that of which Wayne State University was in prior to the Defendants' full throttle pursuit of academic research to exploit **STUDENTS'** excess capacity by leveraging the pedagogical Communication Process illegally by compelling their **STUDENTS' FREE SPEECH** as research for mutually-beneficial results without adequate informed consent. *Id*. (Emphasis added).

*1503.*  Interestingly, the term "Critical Chain" and "Critical Path" are concepts under the Theory of Constraints umbrella, although they are not directly related to the "**Thinking Processes**" nor the "**Five Focusing Steps**" they and are instead more akin to "Drum-Buffer-Rope" as a standalone application of proper-decision making used in a process/objective driven management context.

*1504.*  Simply, "Critical Chain" is a project management methodology that allows a User to create, monitor, and manage resources of a project by prioritizing dependent tasks within a project's system(s) of process(es). This methodology leverages inherently "Drum-Buffer-Rope" logic and allows the process (chain of dependent tasks, *e.g.*, system(s)) to be designed in the most effective way to accomplish the Users' objective in the most efficient manner possible.

*1505.*  Further, *though outside the scope of this explanation*, a User may also infuse other methodologies such as Six Sigma; Lean; IS0—9000; ISO-9001—*and too* the Theory of Constraints "**Thinking Processes**" and "**Five Focusing Steps**" to develop the most effective and efficient "Critical Chain" to achieve an objective, *e.g.*, "[*VERY*] Ambitious Goal."

*1506.*  Moreover, the "Critical Path" is inherent within a "Critical Chain" and is itself the longest path of completion in the schedule of processes (*e.g.*, system) taking into consideration all interdependent activities within the process(es) while also accounting for the systems' constraints. Plainly, "CCPM" (Critical Chain Project Management) manages closely the schedule of the systems' process(es) and determines which activities that from start to finish, if delayed, will extend the objectives' completion date. *For example*, take *this* Complaint, the 31st Circuit Court **Case #22-001403—CZ**, and The Traveling Attorney, *P.C.*®, in that *I*, Attorney Cochrane, *can only do so much* with my limited resources (*time and money where time is money*) and therefore without the ability to leverage the time of another Attorney to facilitate either *this* Complaint or defend my family pro bono—my personal "Critical Path" in this "Critical Chain" to effectuate the

objectives sought—social reform, justice, and acceptance of the objective truth—*was undoubtedly delayed* unlawfully as a direct result of these compounding constraints *herein*.

*1507.*   Explicitly—Education is a process, a system of processes, a "*Critical Chain*" as you will, and **STUDENTS** are inherently the inventory of these *timeless* processes individually moving permissively on their own "Critical Path;" and simply, the right inventory is valuable and always has been as time has demonstrated. Plainly, the pedagogical objective of Education has in part and always will be: (***a***) to capture the best inventory and develop those **STUDENTS** in a way that instills the knowledge of the good relative to the Senders' objectives; and in conjunction with this first point, (***b***) in part as the relative social contract, effectuate the permissive cultivation necessary to generate nationalistic value through this this generational natural-selection process for the continual advancement of the Senders' society now and *into the future*.

*1508.*   *Here*, the Senders are in part the State of Michigan as ordained by *the People* and shrouded by the confines of our Great Republic's Constitutional framework—the Senders' objectives are <u>explicitly</u> clear as identified exhaustively *herein*, and it is that *focus* which is being questioned as to determine the validity of this conduct relative to the well-established rights and liberties guaranteed to *the People* by and through this perpetually attacked framework in consideration of the nationalistic pedagogical intent leveraged to compel mutually beneficial 'research' exploiting this Communication Process of which is the **STUDENTS' FREE SPEECH**, *respectfully*.

*1509.*   Demonstrable, as identified by the Defendants' explicitly, the following key passage from *Critical Chain* outlines the intent for placement of this "[***VERY***] Ambitious Goal" Curriculum as an intellectual dragnet of which should provoke *this* Honorable Court—and *all other* courts of competent jurisdiction—to protect <u>all</u> **STUDENTS** by rebuking this premeditated conduct:

> "You can't compare teaching an Executive MBA course with teaching (sic) a regular MBA course. In the Executive MBA program, the students are not full-time students. Actually, they are full-time managers spending one Saturday in class

every two weeks…Teaching managers, that will be a new experience for me. They're not going to accept everything I say just because I'm quoting from a textbook. They will force me to deal with real life (sic) situations they face. **This may actually be a good thing. *It might give me some new ideas for research…and articles. Ideas are not enough. I can't do research in a vacuum***, at least not the type I'm willing to do. But maybe, *<u>if I play my cards right I can use these students</u> <u>as bridges to companies</u>. <u>It's possible</u>*."

> **Exhibit 43**, at p. 4 (at pp. 9-10 within *Critical Chain*). (Emphasis added).

*1510.*  Continuing—after Dr. Goldratt **retired** from **AGI** sometime in and around **1997**, his time was spent writing and "further developing the ability to market and implement the Theory of Constraints," where sometime in and around **November 2001** at the first TOCICO conference Dr. Goldratt was recognized as a founding member of the Theory of Constraints International Certification Organization (herein known as "**TOCICO**"). **Exhibit 504**; **Exhibit 512**—*TOCICO 2001 Founding Member*.

*1511.*  Moreover, likely in conjunction with TOCICO, Dr. Goldratt sometime in and around **2002** founded a flurry of entities to effectuate his dissemination of the Theory of Constraints on a Global scale while making a valiant effort to control the continuously growing use of his *evolving* ideas.

*1512.*  Principally, we know that sometime in and around **2002** *and thereafter* Dr. Goldratt founded: (*a*) Goldratt Consulting; (*b*) Goldratt Schools; (*c*) Goldratt Marketing, under the umbrella corporation (*d*) the Goldratt Group, and too (*e*) Viable Visions; (*f*) Odyssey Institute (**2005**); (*g*) Goldratt Research Labs (**2008**); (*h*) TOC in Healthcare; *and* (*i*) TOC for the Individual. *Recall in part*, **Exhibit 1**; **Exhibit 504**; **Exhibit 505**; and **Exhibit 513**—*Viable Vision Letter*; **Exhibit 514**—*Odyssey Institute Overview*; *website depicted below, with a PowerPoint slide in the background identifying an underlying notion of this Complaint*: "***How to Make Better Faster Decisions in a complex World***."



*1513.* It seems again from the triangulation of the records that TOCICO was in fact the main vessel used by Dr. Goldratt to <u>control</u> and disseminate the Theory of Constraints Globally (***a***) requiring an annual membership, **marking** the members as TOCICO Certified Members, and too (***b***) bringing together annually these Certified Members like that of the *World Economic Forum* to various venues all throughout the Globe.

*1514.* Even with the death of Dr. Goldratt on June 11th, 2011, TOCICO like many other of Dr. Goldratt's institutions have continued to function offering legacy programs and slowly evolving through Dr. Goldratt's legacy epoch.

*1515. For example*, Defendant, Dr. James T. Low, is a member of TOCICO.

*1516. For example*, Defendant, Deborah L. Habel, is a member of TOCICO.

*1517.* In fact, sometime in and around **June 2020** Dr. Low offered to Plaintiffs' class and the entire Wayne State University faculty **discount tickets** via Dr. Jim Cox's personal discount. **Exhibit 515**—*TOCICO 2020 Discount*.; this is essentially the same email received as **Exhibit 305** through Mrs. Audrey Taylor's FOIA Request.

*1518.* Moreover, we know that sometime in and around March 30th, 2021, TOCICO published a newsletter identifying the "Board of Directors Update" outlining several relevant parts for this Complaint:

> (*a*) "TOCICO will continue to be the catalyst for spreading and growing TOC worldwide;" *and*

> (*b*) "Aggressive revenue goals and initiatives have been set for 2021 through 2023 which will be **focusing on** Conferences & Events.... [*and*] **building a Bridge to Academia**...We are **seeking** member support and looking for committee **volunteers to accomplish these goals**."

> **Exhibit 516**—*TOCICO March 2021 Update*. (Emphasis added).

*1519.* Continuing with TOCICO in **2010** we see familiar concepts as identified *herein* and a familiar face, one we will return to again *herein* shortly, Mrs. Lisa J. Scheinkopf, with a TOCICO Presentation Title: "**The Strategics & Tactics for Selling a Decisive Competitive Edge**." **Exhibit 517**—*TOCICO 2010 Scheinkopf Presentation*.

*1520.* Inclusive this **2010 TOCICO Presentation** overview, Mrs. Scheinkopf outlines several key questions for our analysis *herein*; the actual presentation *could not* be located on the internet:

> • "What is the difference between a Competitive Advantage and Decisive Competitive Edge?"

> • "How are a Standard Offer, a Mafia Offer, and an offer based on a Decisive Competitive Edge different from each other?"

> • "What are the paradigm shifts that salespeople must make in order to be effective in selling an offer based on a Decisive competitive Edge?"

> *Id*. (Emphasis added).

*1521.* We see the ongoing improvement of the Theory of Constraints evolve further posthumously when sometime in and around **2013** a **TOCICO Presentation** titled "***What is TOC? A Basics Workshop***," was produced and presented in English by "Dr. James F. Cox, TOCICO Certified, Jonah's Jonah, Professor Emeritus, Management Dept. Terry College, University of Georgia,"

giving us a detailed time-capsule overview of what was then in part the umbrella that is the Theory of Constraints. **Exhibit 518**—*TOCICO 2013 Basics PowerPoint*.

*1522.*   Moreover, sometime in and around **2016** a **TOCICO Presentation** titled "***Theory of Constraints: An Introduction***" by TOCICO Board of Directors Member, Kathy Austin, mirrors the 2013 version with some minor upgrades to the style of this revised presentation, but nearly all substantive overviews remain the same. **Exhibit 519**—*TOCICO 2016 Introduction PowerPoint*.

*1523.*   In general, both presentations fail to encapsulate in totality the Theory of Constraints and instead trend along the presentation line of TOCFE in a rather broad and confusing manner, and in fact omit in full the "**Thinking Processes**" of the Theory of Constraints.

*1524.*   Instead, these so-called introductions broadly outline seven (*7*) reoccurring ideas under the Theory of Constraints umbrella relevant *herein* as discussed above and are otherwise *lacking*.

*1525.*   <u>**First**</u>, collectively these presentations identify a key fundamental concept necessary for proper decision making in that every decision must be made from a "**Systems' Thinking Logic**" perspective considering the effect-cause-effect implications on the system *as a whole*.



**Exhibit 519**, at p. 5; *see also*, **Exhibit 518**, at p. 14.

*1526.*  Specifically, we recall **Exhibit 130**, at p. 41, where Defendant, Dr. James T. Low, identifies explicitly the "Systems Concept" of the Theory of Constraints known *herein* as "**Systems' Thinking Logic**" necessary to effectuate the intended effect-cause-effect reaction to achieve the respective systems' objectives. *See further*, **Exhibit 519**, at p. 9. (Emphasis added).

*1527.*  The **second** collective and fundamental concept of the Theory of Constraints identified by these presentations is the single-word definition of the Theory of Constraints— "TOC in One Word, **FOCUS**—*Doing what should be done*, [and] *Not doing what should not be done*." **Exhibit 518**, at p. 9; **Exhibit 519**, at p. 10. (Emphasis added).

*1528.*  The **third** collective and fundamental concept addressed under the Theory of Constraints umbrella is identified *herein* as a process of ongoing improvement known principally as the Theory of Constraints "**Five Focusing Steps**." **Exhibit 518**, at p. 22; **Exhibit 519**, at p. 11.

*1529.*  Specifically, this is the same process of ongoing improvement conjured by Dr. Goldratt in The Goal, and thereafter has largely become a standalone application used in conjunction with the Theory of Constraints "**Thinking Processes**" themselves absent from these collective presentations. *Recall*, Defendant, Dr. James T. Low, in **Exhibit 130**, at p. 2 (p.42); **Exhibit 242**, at p. 27; **Exhibit 247**, at p. 4; **Exhibit 251**, at pp. 21-25; *and* AGI at **Exhibit 509**, at pp. 9-10.

*1530.*  In general, the Theory of Constraints "**Five Focusing Steps**" is a process of logic deduction that is used after a system has been designed and implemented where the Users' objective(s) are to maximize the systems' output relative to the current constraints' impact based on a "**Systems' Thinking Logic**," *e.g.*, generally identified as the systems' *strategic planning process*. See, Exhibit 519, at p. 11. (Emphasis added).

*1531.*  The **fourth** collective and fundamental concept addressed under the Theory of Constraints umbrella identified by these presentations is an application of the Theory of Constraints known as a "**MAFIA OFFER**" also known as an Unrefusable Offer ("URO").

1532.   Simple, *as* discussed briefly *above*, a Theory of Constraints "**MAFIA OFFER**" or URO "*is like something out of a movie*, an offer that the Receiver <u>cannot</u> refuse, *easily*. A "**MAFIA OFFER**" is not easily conveyed, the Sender must be *uniquely positioned* to properly leverage their "**Decisive Competitive Edge.**" Even more simply, a "**MAFIA OFFER**" is an offer that is not easily turned down and also offers your competition cannot or would not consider offering.

1533.   In fact, a Theory of Constraints "**MAFIA OFFER**" requires in part the application of "**Systems' Thinking Logic**" in that the Senders' offer is a combination of principally marketing, sales, strategic variables leveraged by management while utilizing all aspects of the systems' "**Decisive Competitive Edge**" to push and pull the Receiver(s) into accepting the offer.



**Exhibit 519**, at p. 37. (Emphasis added).

1534.   In tandem with and most often as a condition precedent to a plausible Theory of Constraints "**MAFIA OFFER**" the Senders must have known as the **<u>fifth</u>** collective and fundamental concept

under the Theory of Constraints umbrella a **"Decisive Competitive Edge,"** capable of being leveraged to create a "win-win solution" that advances the Senders' position where the **"Systems' Thinking Logic"** of the Theory of Constraints binds the silos of the system strategically to achieve the global [*VERY*] Ambitious Goal/objective. Recall, **Exhibit 519**, at p. 44. (Emphasis added).

*1535.* This presentation slide *will be used later* and itself captures in essence the Theory of Constraints umbrella quite perfectly as each of these variable designations represents in part a facet of this cumulative knowledge of the good as also represented by this icon used by TOCICO:



*1536.* The **sixth** fundamental concept under the Theory of Constraints umbrella in these collective TOCICO presentations is known as "**Throughput,**" as documented extensively *herein.*

*1537.* Simply, "**Throughput**" is principally a counter using "**Systems' Thinking Logic**" to determine the effect micro causes (actions) have on the macro level of the system, *financial or otherwise*; *recall* Defendant, Dr. James T. Low, at **Exhibit 130**, at p. 45; **Exhibit 242**, at p. 35; **Exhibit 247**, at p. 5; **Exhibit 251**, at pp. 13-16; 18; *and* **Exhibit 255**, at, p. 2.

*1538.* The **seventh** and final fundamental concept under the Theory of Constraints umbrella in these collective TOCICO presentations is that which was derived by Dr. Goldratt sometime in and

around **2008** as noted in his **seventh book**—*The Choice*—which outlines six (*6*) **core beliefs** that seek to overcome four (*4*) **core obstacles** that <u>prevent</u> people from <u>thinking clearly</u>.

*1539.*   Specifically—Dr. Goldratt identified that typically there are only four (*4*) obstacles that prevent individuals from using proper decision making and/or thinking clearly:

>>>(*1*) The perception of reality as complex;
>>>(*2*) Blaming others;
>>>(*3*) Accepting conflicts as given; *and*
>>>(*4*) Thinking that you know.

**Exhibit 520**—*International Journal of Current Research, Vol. 10, Issue 4, p. 68449*.

*1540.*   Ironically, to identify and combat these obstacles Dr. Goldratt infused this philosophical cipher into *The Choice* and explained neatly the paradigm shifts necessary to live ***the good life***:



**Exhibit 519**, at p. 38. (Emphasis added).

*1541.*   It seems from a triangulation of the records that in large part this is what is the fundamental makeup of what The Theory of Constraints has evolved into over the last forty (*40*) years.

*1542.*   In fact, in the end, *I*, Attorney Cochrane, believe that Dr. Goldratt came to the same understanding as the argument *I* have embedded for time *herein* stating that the knowledge he had created was in fact a way for individuals themselves to obtain a "*full life*" through proper decision making as will be explained in more detail *later*—as ***Aristotle*** states—***The Good Life***.

*1543.*  <u>Finally</u>—on **June 11th, 2011**, at or around noon—Dr. Goldratt passed with his family by his side at his home in Israel leaving behind the Theory of Constraints for the World; the philosophical underpinnings of Dr. Goldratt's work blanketing his remains. **Exhibit 1**.



*1544.*  Plainly—*see*, what Dr. Goldratt did was *more profound* than most people understand. Simply, in his quest to better the success of Taiichi Ohno of Toyota and Henry Ford's Assembly Line, Dr. Goldratt continually improved *his* idea, developing along the way with the aid of his Jonah's Jonahs the umbrella of what is the Theory of Constraints. As Dr. Goldratt expressed in **2009** — "...the evolution of TOC is not done by fluke, **there is only one way it can evolve and that's how it evolved and it's all coming *from the base* of TOC**..." Frankly, it is that "base" that which has made *this* Complaint a reality—the "**Thinking Processes**" are that "base"—<u>all other</u>

applications under the Theory of Constraints' umbrella are a derivative of these logic tools themselves having evolved specifically for proper decision making.

*1545.* It is therefore important to note that the Theory of Constraints' umbrella **is not fixed** within the manufacturing realm and this knowledge of the good **must** be applied to *every* intellectual *silo*, such as, academia; legal; governmental management; personal management; business; marketing; healthcare; science; finance; technology—and *literally* the list is *endless*.

*1546.* Simply, the Theory of Constraints "**Thinking Processes**" are designed to facilitate proper decision making between the ears of the User relative to the Users' space and time subject to the constraints of the Users' current reality, *e.g.*, their objective placement in space and time.

*1547.* *Here*, as a broad stroke across the canvas, the Defendants as Pedagogical Overlords have used multiple applications of the Theory of Constraints with express premeditation to leverage this historical pedagogical Communication Process for **STUDENTS**, being simultaneously designed *against* these **STUDENTS**, while also repetitiously improving this win-win Philosopher King like ecosystem to unconditionally usurp the intrinsic value of *this sacred form*.

*1548.* Plainly—the Defendant's conduct has irreparably damaged the fabric of the American Educational Ecosystem as a *whole*.

*1549.* Continuing, through this necessary labyrinth of evidence depicting clearly for *this* record what lay beyond the veil, my objective is to objectively demonstrate beyond a reasonable doubt that the Defendants have quite literally designed the pedagogical experience at Wayne State University to "*exploit*" and "*squeeze*" their **STUDENTS**, to "*generate knowledge*," and to create a "**Decisive Competitive Edge**" in the form of an unconstitutional-added value system in favor of the Defendants as a whole, and *individually*.

*1550.* Up to this point, *I*, Attorney Cochrane, have used the Defendants' work and objective knowledge derived from my extensive research to generate *this* Complaint and the parameters of

the Theory of Constraints' umbrella. Now, using this knowledge of the good, ***my interpretation*** seeks to integrate these ideas where my understanding of the Theory of Constraints has been galvanized from a primeval source of **pure survival**. For, without decoding this epic web of truth and seeking the good within this field of knowledge—*I* would not be fit to survive in it. Yet, *still*, here *I* stand completely aware of the reality consuming *the People*, they themselves incapable of identifying the connectivity of this truth *without this* experience and *the others* that *I*, Attorney Cochrane, have individually weathered; immense energy was expended to properly digest and align *this* Complaint in a manner that achieves its objectives. Respectfully, *I* cannot underestimate the importance of grasping this knowledge of the good for yourself so that *in the future* you may employ these logic tools as *herein* given freely to belong to all for the greatest good of *the whole*.

*1551.* In the end, what *I*, Plaintiff, Attorney Cochrane, respectfully call "**Cochrane's Theory of Constraints' Full Flex**" is a compilation of each piece of this continuously improving logic *and other* closely related scientific ideas generating a framework of elevated-proper decision making.

*1552.* Specifically, *I* will recall the Theory of Constraints Expert, Mrs. Lisa J. Scheinkopf, intrinsically in the form of her **1999** book, *Thinking for a Change: Putting the TOC Thinking Processes to Use*, incorporating by express reference the <u>entirety</u> of this invaluable learned treatise; this book is 255 pages, available online in full, and will otherwise be synthesized *herein*.

*1553.* *Thinking for a Change: Putting the TOC Thinking Processes to Use* by Mrs. Lisa J. Scheinkopf is shelfed in the Library of Congress at **HD69.T36S33**, *respectfully*.

*1554.* Explicitly, *Thinking for a Change: Putting the TOC Thinking Processes to Use* by Mrs. Lisa J. Scheinkopf was a required text for Defendants' courses of GSC 7260 & GSC 5670 in **2020**, **2021**, and **2022**. *Recall*, **Exhibit 115**; **Exhibit 118**; and **Exhibit 121**.

*1555.* Unfortunately, as the **2020** Global Pandemic began to wreak havoc on our supply chains, and we learned the extent of *our* vulnerability to fear—the United States Postal Service prioritized

shipments of essential goods—where media mail was not of that classification. So, as GSC 7260 & GSC 5670 commenced and the Defendants "*squeezed*" **STUDENTS** to "*generate knowledge*" as valuable-excess capacity—some **STUDENTS**, *like me*, Attorney Cochrane, were left unable to digest Mrs. Scheinkopf's refined teachings to glean the value of that knowledge.

## "Cochrane's Theory of Constraints' Full Flex"

*1556.*   The Defendants' conduct has *irreparably harmed* the fabric of the American Educational System as a *whole*. **Here**, *through a labyrinth of evidence*, *I* have shown you that the Defendants have quite literally designed the educational experience at Wayne State University to "*exploit*" and "*squeeze*" their students, to *generate knowledge*, and create a "**Decisive Competitive Edge**" in the form of an *unconstitutional*-added value system in favor of the Defendants as a whole, *and individually*. *But*, in order to fully digest the objective evidence submitted before you, *you* must understand what lies behind the veil *too—enter*: **Cochrane's Theory of Constraints' Full Flex**.

*1557.*   To start, intrinsically this is a "**Full Flex**" of the *human brain* where this philosophically based logic map uses Inductive and Deductive reasoning simultaneously to develop proper decision making thoroughly deep solutions taking into consideration the current and potential future problems as the objectives like, *e.g.*, [***VERY***] Ambitious Goals. In general, the more repetitious the Theory of Constraints is used, be it a "**Full Flex**" or a traditional "**Thinking Processes**" application, the User gains muscle memory from these experiences and over time is cognitively elevated developing simultaneously an individual decision-making framework, equation, or formula if you will, to consistently solve problems in a more thorough manner.

*1558.* *First*, we must preemptively understand the parameters of our equation to make valid decisions modeled objectively after knowledge of the good—here, *I*, Attorney Cochrane, do first recall "**Dr. Goldratt's Six Pillars of Proper Decision Making**" as a precursor that will guide our

journey towards valid solutions. It is said that Dr. Goldratt in *The Choice* derived the following six (*6*) philosophical pillars used to <u>fundamentally frame the approach for *every* problem</u>:

*1.* People are good;
*2.* Every conflict can be removed, *or stated differently*, every problem can be solved;
*3.* Every situation no matter how complex it initially looks, is exceedingly simple;
*4.* Every situation can be substantially improved; even the sky is not the limit;
*5.* Every person can reach a full life; *and*
*6.* There is always a win-win solution.

**Exhibit 1**.

*1559.* **__Second__** and continuing with this starting-line logic, the idea of thinking thoughts itself is rather curious, but to do so intentionally and in a way that turns your thoughts onto themselves is conscious self-reflecting; this frame of thought is often the design state—*abstract thought*, figuring out what works, what does not—*being creative*.

*1560.* Plainly—this is *raw* decision making—developing the hypothesis, creating an artificial reality that is home to a future reality based upon the User's perspective, *e.g.*, subjective feedback relative to the User's Communication Process. As children, we are often taught to *think before we speak*, less often to *think before we do*.

*1561.* Fundamentally, these lessons are tailoring our early Communication Process to design *the effect*, or that action which we seek to evoke from a Sender in response to our chosen form of communication. Often, now more than ever, our Communication Process is multilayered; and plainly, *I* would venture to say most of the population throughout the World fails to understand the mechanism that is *our present* Communication Process.

*1562.* Frankly, much like the issues presented *here* where the Defendants have leveraged their multi-layered pedagogical objectives to exploit **STUDENTS'** pedagogical Free Speech, this intrinsically unconstitutional overreach collapses and is traceable still through speech alone to *the base* objective—**STUDENTS**. Meaning the Defendants' design does not achieve its objectives

without the fundamental aspect, a lynchpin per se, that which is explicitly the **STUDENTS'**

**PEDAGOGICAL FREE SPEECH**—*period*.

*1563.* Take for example the framework of *this* Complaint in layers relative to the Communication Process, each layer of speech compounding the next contingent on the same variable: (***a***) Wayne State University itself is a form of speech, a product of *the People's* objective and collective decision making, leveraging the Constitution of the great State of Michigan; (***b***) by and through the election process *the People* elect a Board of Governors who then in turn elect a President formalizing the civil body politic that is Wayne State University as an entity communicated into being; (***c***) the objectives that Wayne State University objectively communicates are further examples of this compounding Communication Process—inclusive the 2013—2018 Wayne State University School of Business Strategic Plan, strategic partnerships, marketing, faculty selections, academic offerings—again *each* a form of decision making using the Communication Process as feedback fundamentally as in a form of speech; (***d***) trickling down *even further* next into the individual faculty members who use this same Communication Process to tailor course offerings and lectures, forms of speech within this hierarchy of speech—and typically that is where the analysis would end—however, *here*, the Defendants have with specific intent pierced through the veil and have silently placed this heavy process on the **STUDENTS'** conscious by adding an additional weighted layer *to support the whole*; (***e***) the innate and valuable **STUDENTS'** pedagogical Free Speech is used by designing the course to **extract** and **refine** this Free Speech by manipulation, fraud, duress, and where these spoils as excess capacity of what would otherwise be protected and unspoken become an invalid 'research' byproduct *or* fodder for the faculty's next research paper and/or presentation to advance *their* individual objectives and those of the institution as a *whole*; simply, without the **STUDENT**, this entire Communication Process collapses at every level like a house of cards.

*1564.*   Firmly, relative to **Cochrane's** "**Theory of Constraints' Full Flex**" this idea of multiple working levels is in part derived from the Theory of Constraints "**Systems' Thinking Logic**," but was diagnosed using ideas from two (*2*) social scientists with philosophical and fundamental *focus* relative to decision making using knowledge of the good established *before* Dr. Goldratt synthesized his ideas: (*a*) T. C. Chamberlin (**1890**), and (*b*) Herbert A. Simon (**1988**).

*1565.*   Specifically, first published sometime in and around **1890** was T.C. Chamberlin's: *The Method of Multiple Working Hypotheses,* offering us a perspective of decision making relative to the investigator's selection of theories and choice of logic, identifying the important historical and fundamental classes of thought: (*1*) Deductive Reasoning, and (*2*) Inductive Reasoning:

> "There are two fundamental classes of study. The one [**Deductive Reasoning**] consists in attempting to follow by close imitation the processes of previous thinkers, or to acquire by memorizing the results of their investigations....
>
> The other class [**Inductive Reasoning**] is primary or creative study. In it the effort is to think independently, or at least individually, in the endeavor to discover new truth, or to make new combinations of truth, or at least to develop an individualize aggregation of truth. The endeavor is to think for one's self, whether the thinking lies wholly in the fields of previous thought or not. It is not necessary to this habit of study that the subject-material should be new; but the process of thought and its results must be individual and independent, not the mere following of previous lines of thought ending in predetermined results."

**Exhibit 521**—*Chamberlin's: Method of Multiple Working Hypotheses*, at p. 754.

*1566.*   Continuing with this logic of the Thinker's starting position—Chamberlin identifies that "[i]ntellectual methods have taken three phases in the history of progress thus far," each relevant here to describe the transformation of thought as to identify the valuable upgrade to a multi-variable decision making process in (*a*) the Method of Multiple Working Hypothesis, has over (*b*) the Ruling Theory, a more ridged and historically prominent theorizing application for problem solving, and the singular (*c*) Working Hypothesis. *Id.*

*1567.* Establishing the principal difference between the Ruling Theory and the Working Hypothesis, Chamberlin explains his objection:

> "...improvement was sought in the method of the working hypothesis. This is affirmed to be *the* scientific method of the day, *but to this I take exception*. The working hypothesis differs from the ruling theory in that it is used as a means of determining facts, and have for its chief function the suggestion of lines of inquiry; the inquiry being made, not for the sake of the hypothesis, but for the sake of the facts. Under the method of the ruling theory, the stimulus was directed to the finding of facts for the support of the theory. Under the working hypothesis, the facts are sought for the purpose of ultimate induction and demonstration, **the hypothesis being but a means for the more ready development of facts and of their relations, and the arrangement and preservation of material for the final induction**."

> *Id*. at 755. (Emphasis added).

*1568.* Chamberlin continues by explaining that even though the Working Hypothesis had improved on the traditional Ruling Theory model of scientific investigation, he urged that the Working Hypothesis was still defective, *e.g.*, especially in analysis with which the hypothesis becomes a controlling idea. Instead, Chamberlin offers the Method of *Multiple* Working Hypotheses as the safeguard, explaining the value of this promoted thought process:

> "The effort is to bring up into view *every* rational explanation of new phenomena, and to develop *every* tenable hypothesis respecting their causes and history. The investigator thus becomes the parent of a family of hypotheses: and, by his parental relation to all, he is forbidden to fasten his affections unduly upon any one...the danger that springs from affection is counteracted, and therein is a radical difference between this method and the two proceeding...

> The investigator...proceeds with a certain natural and enforced erectness of mental attitude to the investigations, knowing well that some of his intellectual children will die before maturity, yet feeling that several of them may survive the results of final investigation, since it is often the outcome inquiry that *several causes* are found to be involved *instead of a single one*.

> *Id*. at. p. 756. (Emphasis added).

**1569.**   In more detail Chamberlin outlines the limitations of the Working Hypothesis' explanation that intrinsically involves multiple causes, or multiple hypotheses, using the origin of our beloved Great Lakes basins as an example of this premise:

> "In following a *single* hypothesis, the mind is presumably led to a *single* explanatory conception. But an adequate explanation often involves the co-ordination of several agencies, which enter into a combined result in varying proportions. **The true explanation is therefore necessarily complex. Such complex explanations of phenomena are specially encouraged by the method of multiple hypotheses, and constitute one of its chief merits**. We are so prone to attribute a phenomenon to a single cause, that, when we find an agency present, we are liable to rest satisfied therewith, and *fail to recognize that it is but one factor*, and *perchance a minor factor*, *in the accomplishment of a total result*.

> *Take for illustration* the mooted question of the origin of the Great Lake basins. We have this, that, and the other hypothesis urged by different students as the cause of these great excavations; and all of these are urged with force and fact, urged justly to a certain degree. It is practically demonstrable that these basins were river-valleys antecedent to the glacial incursion, and that they owe their origin in part to the pre-existence of those valleys and to the blocking-up of their outlets. And so this view of their origin is urged with a certain truthfulness. So, again, it is demonstrable that they were occupied by great lobes of ice, which excavated them to a marked degree, and therefore the theory of glacial excavation finds support in fact. I think it is furthermore demonstrable that the earth's crust beneath these basins was flexed downward, and that they owe a part of their origin to crust deformation. But to my judgment neither the one nor the other, nor the third, constitutes an adequate explanation of the phenomena. **All these must be taken together, and possibly they must be supplemented by other agencies. The problem, therefore, is the determination not only of the participation, but of the measure and the extent, of each of these agencies in the production of the complex result**. This is not likely to be accomplished by one whose working hypothesis is pre-glacial erosion, *or* glacial erosion, *or* crust deformation, but by one whose staff of working hypotheses *embraces all* of these and any other agency which can be rationally conceived to have taken part in the phenomena. A special merit of the method [of multiple working hypotheses] is, that by its very nature it promotes **thoroughness**. The value of a working hypothesis lies largely in its suggestiveness of lines of inquiry that might otherwise be overlooked. Facts that are trivial in themselves are brought into significance by their bearings upon the hypothesis, and by their casual indications.... But if all rational hypotheses relating to a subject are worked co-equally, thoroughness is the presumptive result in the very nature of the case.

In the use of the multiple method, the re-action of one hypothesis upon another *tends to amplify the recognized scope* of each, and their mutual conflicts whet the discriminative edge of each. The analytic process, the development and demonstration of criteria, and the sharpening of discrimination, receive powerful impulse from the co-ordinate working of several hypotheses. Fertility in processes is also the natural outcome of the method. Each hypothesis suggests its own criteria, its own means of proof, its own methods of developing the truth; and **if a group of hypotheses encompasses the subject on all sides, the total outcome of means and of methods is full and rich**."

*Id*. at. p. 756 (Emphasis added).

*1570.*   While this may seem *today* as elementary, this layering of deliberate-mental patchwork was at the time of Chamberlin in **1890** a revelation written while he was actively serving as President of the University of Wisconsin. *Id*. at p. 754.

*1571.*   Principally, using Chamberlin's multiple working hypotheses as a baseline of thought improved the User's cognitive conditioning through repetition while also noticeably having a valuable effect in an educational setting:

"The use of the method [of multiple working hypotheses] <u>leads to certain peculiar habits of mind which deserve passing notice</u>, since as a factor of education its disciplinary value is one of importance. When <u>faithfully pursued for a period of years</u>, <u>it develops a habit of thought analogous to the method itself</u>, <u>which may be designated a habit of parallel or complex thought</u>. Instead of a simple succession of thoughts in linear order, <u>the procedure is complex</u>, <u>and the mind appears to become possessed of the power of simultaneous vision from different standpoints</u>. Phenomena appear to become capable of being viewed analytically and synthetically at once."

*Id*. at. p. 756 (Emphasis added).

*1572.*   As more data floods the analysis and becomes information necessary to render a proper explanation for the given objective or phenomena, Chamberlin keenly identified avoidable drawbacks of the method of multiple working hypotheses:

"The method [of multiple working hypotheses] has, however, its disadvantages. No good thing is without its drawbacks; and **this very habit of mind, while an**

**invaluable acquisition for purposes of investigation introduces difficulties in expression**. *It is obvious, upon consideration, that this method of thought is impossible of verbal expression*. We cannot put into words more than a single line of thought at the same time; and even in that the order of expression must be conformed to the idiosyncrasies of the language, and the rate must be relatively slow...

Furthermore, the impossibility of expressing the mental operation in words leads to their disuse in the silent process of thought, and hence words and thoughts lose that close association which they are accustomed to maintain with those whose silent as well as spoken thoughts run in linear verbal courses. There is therefore a certain predisposition on the part of the practitioner of this method to *taciturnity* [a state or quality of being reserved in conversation.].

We encounter an analogous difficulty in the use of the method with young students. It is far easier, and I think in general more interesting, for them to argue a theory or accept a simple interpretation than to recognize and evaluate the several factors which the elucidation may require...**The complex and the quantitative do not fascinate the young student as they do the veteran investigator**."

*Id*. at. p. 757 (Emphasis added).

*1573*.  Like Dr. Goldratt's Theory of Constraints, the evolution of this deliberate thinking is appliable in **every field** of decision making and not just manufacturing or investigative science as Chamberlin opines that the value is far greater when **applied to** the "practical affairs" of **life**:

"It has not been our custom to think of the method of working hypotheses as applicable to instruction or to the practical affairs of life. We have usually regarded it as but a method of science. **But I believe its application to practical affairs has a value coordinate with the importance of the affairs themselves**. I refer especially to those inquiries and inspections that precede the coming-out of an enterprise rather than to its actual execution. The methods that are superior in scientific investigation should likewise be superior in those investigations **that are the necessary antecedents to an intelligent conduct of affairs**. But I can dwell only briefly on this phase of the subject."

*Id*. at. p. 757 (Emphasis added).

*1574.*  Taking this even further as applicable *here* with the context of pedagogical delivery and multiple hypotheses, Chamberlin frames the practical use of the methods of multiple working hypotheses as beneficial for practical decision making *throughout* life:

> "In education, as in investigation, it has been much the practice to work a theory. The search for instructional methods has often proceeded on the presumption that there is a definite patent process through which all students might be put and come out with results of maximum excellence; and hence pedagogical inquiry in the past has very largely concerned itself with the inquiry, "What is the best method?" rather than with the inquiry, "What are the special values of different methods, and what are their several advantageous applicabilities in the varied work of instruction? The past doctrine has been largely the doctrine of pedagogical uniformitarianism. But the faculties and functions of the mind are almost, if not quite, as varied as the properties and functions of matter: and it is perhaps not less absurd to assume that any specific method of instructional procedure is more effective than all others, under any and all circumstances, than to assume that one principle of interpretation is equally applicable to all the phenomena of nature.
>
> As there is an endless variety of mental processes and combinations and an indefinite number of orders of procedure, the advantage of different methods under different combinations is almost axiomatic. This being granted, there is presented to the teacher the problem of selection and of adaptation to meet the needs of any specific issue that may present itself. It is important, therefore, that the teacher shall have in mind a full array of possible conditions and states of mind which may be presented in order that, when any one of those shall become an actual case, he may recognize it and be ready for the emergency.
>
> Just as the investigator armed with many working hypotheses is more likely to see the true nature and significance of phenomena when they present themselves, so the instructor equipped with a full panoply of hypotheses ready for application more readily recognizes the actuality of the situation, more accurately measures its significance, and more appropriately applies the methods which the case calls for."

> *Id*. at. pp. 757—758. (Emphasis added).

*1575.*  Moreover, Chamberlin builds further that the multiple working hypotheses prepares the User to avoid misinterpretation of true facts and instead prepares through preconceived contingencies various alternatives that may be narrowed as the hypotheses unfolds:

"*The application of the method of multiple hypotheses to the varied affairs of life is almost as protean as the phases of that life itself*, but certain general aspects may be taken as typical of the whole. What I have just said **respecting the application** of **the method to instruction may apply**, **with a simple change of terms**, <u>**to almost any other endeavor which we are called upon to undertake**</u>. We enter upon an enterprise in most cases without full knowledge of all the factors that will enter into it, or all of the possible phases which it may develop. **It is therefore of the utmost importance to be prepared to rightly comprehend the nature, bearings, and influence of such unforeseen elements when they shall definitely present themselves as actualities**. If our vision is narrowed by a preconceived theory as to what will happen, we are almost certain to misinterpret the facts and to misjudge the issue.

If, <u>**on the other hand**</u>, *we have in mind hypothetical forecasts of the various contingencies that may arise, we shall be the more likely to recognize the true facts when they do present themselves*. Instead of being biased by the anticipation of a given phase, the mind is rendered **open and alert by the anticipation of any one of many phases**, and is free not only, **but is predisposed to recognize correctly** the one which does appear. <u>**The method has a further good effect**</u>. The mind, having anticipated the possible phases which may arise, <u>**has prepared itself for action**</u> under any one that may come up, and <u>**it is therefore ready-armed**</u>, <u>**and is predisposed to act in the line appropriate to the event**</u>. It has not set itself rigidly in a fixed purpose, which it is predisposed to follow without regard to contingencies. It has not nailed down the helm and predetermined to run a specific course, whether rocks lie in the path or not; but, with the helm in hand, it is ready to veer the ship according as danger or advantage discovers itself."

*Id*. at. p. 758. (Emphasis added).

***1576.*** For Chamberlin, the second drawback of the multiple working hypotheses was the threat of vacillation, or simple the inability to decide between different opinions or actions—*indecision*:

"The tendency of the mind, accustomed to work through multiple hypotheses, is to sway to one line...or another, according as the balance of evidence shall incline. This is the soul and essence of the method. It is in general the true method. Nevertheless, **there is a danger that this yielding to evidence may degenerate onto unwarranted vacillation**. It is not always possible for the mind to

balance evidence with exact equipoise, and to determine, in the midst of the execution of the enterprise, what is the measure of probability on the one side or the other: and as difficulties present themselves, there is a danger of being biased by them and of swerving from the course that was really the true one. Certain limitations are therefore to be placed upon the application of the method, *for it must be remembered that a poorer line of policy consistently adhered to may bring better results than a vacillation between better policies*....It may be better, in the gross affairs of life, to be less precises and more prompt. Quick decisions, though they may contain a grain of error, are oftentimes better than precise decisions at the expenses of time."

*Id*. at. p. 758. (Emphasis added).

*1577.*   The inherent imperfections of our knowledge base as survived through time and space, *even less* in Chamberlin's time, is improved through the valuable use of the method of multiple working hypotheses as Chamberlin closes with this prediction:

"There is a third [positive] result of great importance [by using the method of multiple working hypotheses]. The imperfections of our knowledge are more likely to be detected, for there will be less confidence in its completeness in proportion as there is a broad comprehension of the possibilities of varied action, under similar circumstances and with similar appearances. So, also, the imperfections of evidence as to the motives and purposes inspiring the action will become more discernible in proportion to the fulness of our conception of what the evidence should be to distinguish between action from the one or the other of possible motives...

I am confident, therefore, that the general application of this method [of multiple working hypotheses] to the affairs of social and civic life *would go far to remove those misunderstandings*, *misjudgments*, and *misrepresentations which constitute so pervasive an evil in our social and our political atmospheres*, *the source of immeasurable suffering to the best and most sensitive souls [e.g.,* **STUDENTS***]*. The misobservations, the misstatements, the misinterpretations, of life may cause less gross suffering than some other evils; but they, being more universal and more subtle, *pain*. The *remedy lies*, indeed, *partly in charity*, but more **largely in correct intellectual habits**, in a predominant, **ever-present** *disposition to see things as they are*, and *to judge them in the full light of an unbiased weighing of evidence applied to all possible constructions*, accompanied *by a withholding of judgment when the evidence is insufficient to justify conclusions*.

**I believe** that *one of the greatest moral reforms that lies immediately before us consists in the general introduction into social and civic life of*

*that habit of mental procedure* which is known in investigation as the method of multiple working hypotheses."

*Id*. at. p. 759. (Emphasis added).

*1578.*   *Third*, by compounding "**Dr. Goldratt's Six Pillars of Proper Decision Making**" into Chamberlin's *Method of Multiple Hypotheses* sets the stage for our next facet of this elevated thought process where we add *abstract thinking* as a necessary element to *think beyond the box*, *The Science of Design: Creating the Artificial*, written in **1988** by Herbert A. Simon is added for a function of pure creation. **Exhibit 522**—Herbert's *Science of Design*: *Creating the Artificial*.

*1579.*   Rhetorically, how does an Investigator design their hypotheses reaching facts to support their end conclusions; this universal process of investigation **requires** creativity—**abstract thought**—simply by creating an artificial set of "*possible worlds*" the Designer creates multiple working hypotheses used collectively to elevate their decision making and therefore reach a more precise result of the solution posed or the objective sought to achieve.

*1580.*   Initially, Simon addresses the failed organizational design of the modern University having over the last century "driven the sciences of the artificial from professional school curricula," even though these concepts are the core of **all** professional training, and truly life itself:

> "Historically and traditionally, it has been the task of the science disciplines to teach about natural things: how they are and how they work. It has been the task of engineering schools to teach about artificial things: how to make *artifacts* that have desired properties and how to design. Engineers are not the only professional designers. *Everyone designs who devises courses of action aimed at changing existing situations into preferred ones*.
>
> [...]
>
> Design, so construed, is the core of *all* professional training: it is the principal mark that distinguishes the professions from the sciences. Schools of engineering, as well as schools of architecture, business, education, *law*, and medicine, are all centrally concerned with the process of design. In view of the key role of design in professional activity, it is ironic that in this century the natural sciences have almost driven the sciences of the artificial from professional school curricula.

[...]

The movement toward natural science and away from the sciences of the artificial has proceeded further and faster in engineering, business, and medicine than in the other professional fields I have mentioned, though it has *by no means been absent from schools of law*, journalism, and library science. The stronger universities are more deeply affected than the weaker, and the graduate programs more than the undergraduate. Few doctoral dissertations in first-rate professional schools today deal with genuine design problems, as distinguished from problems in solid-state physics or stochastic processes."

*Id*. at pp. 67-68. (Emphasis added).

*1581.*   Those "*artifacts*" as observations in a scientific investigation or experiment are by definition not naturally present and are otherwise the result of the Designer's preparative or investigative procedure—simply, this is the *new knowledge* generated from the creative Inductive Reasoning process derived from man's ability to think in the abstract and generate a relative artificial-possible worlds from these reflections, *e.g.*, those *ideas*. Even more precise Simon explains:

"The *artificial world is centered precisely on this interface between the inner and outer environments*; *it is concerned with attaining goals by adapting the former to the latter*. The proper study of those who are concerned with the artificial is *the way in which that adaptation of means to environments is brought about*—and central to that is the process of design itself."

*Id*. at p. 68. (Emphasis added).

*1582.*   As was the case with Chamberlin's **STUDENTS** who disfavored deep analysis, the same is present in our modern organizational design of the University where **STUDENTS** are now more often spoon fed their curriculum; Simon identified the reluctance of those **STUDENTS** to participate in Design Science curriculum was often the result of **University culture**, prevailing norms, and the informal "cook-booky" courses that which drove Design Science *into the shadows*:

"Such a universal phenomenon must have a basic cause. *It does have a very obvious one*. As professional schools, including the independent engineering schools, are more and more absorbed into the general culture of the university, they hanker after academic respectability. In terms of

the prevailing norms, academic respectability calls for subject matter that is intellectually tough, analytic, formalizable, and teachable. In the past much, if not most, of what we know about design and about the artificial sciences was intellectually soft, intuitive, informal, and cook-booky. Why would anyone in a university stoop to teach or learn about designing machines or planning market strategies when he could concern himself with solid-state physics? The answer has been clear: *he usually wouldn't*."

*Id*. at p. 68. (Emphasis added).

**1583.** Continuing, Simon explains further about the *remerging* state of Design Science:

"It is the thesis of this chapter that such a ***science of design not only is possible but is actually emerging at the present time***. It has already begun to penetrate the engineering schools, *particularly through programs in computer science and "systems engineering," and business schools through management science*. Perhaps it also has beach-heads in other professional curricula, but these are the two with which I am most familiar. We can already see enough of its shape to predict some of the important ways in which engineering schools tomorrow will differ from departments of physics, and business schools from departments of economics and psychology. *Let me now turn from questions of university organization to the substance of the matter*."

*Id*. at p. 69. (Emphasis added).

**1584.** Drifting from the organizational design of our American universities and into Design Science, in general Simon explains:

"The natural sciences are concerned with how things are. Ordinary systems of logic—the standard propositional and predicate calculi, say—serve these sciences well. Since the concern of standard logic is with declarative statements, it is well suited for assertions about the world and for inferences from those assertions.

Design, on the other hand, is concerned with **how things ought to be**, **with devising artifacts to attain goals**. We might *question whether the forms of reasoning that are appropriate to natural science are suitable also for design*.

[...]

The easiest way to discover what kinds of logic are needed for design is to examine what kinds of logic Designers use when they are bring careful about their reasoning. Now there would be no point in doing

this if Designers were always sloppy fellows who reasoned loosely, vaguely, and intuitively. Then we might say that whatever logic they used was not the logic they should use.

However, there exists a considerable areas of design practice where standards of rigor in inference are as high as one could wish. I refer to the domain of so-called "optimization methods," most highly developed in statistical decision theory and management science but acquiring growing importance also in engineering design theory."

*Id*. at pp. 69-70. (Emphasis added).

**1585.**  Simplistically, using the applicable terminology for *this* Complaint in that specifically the equation by Simon that follows uses the same combined logic of the Theory of Constraints' "**Effect-Cause-Effect Logic**" and "**Systems' Thinking Logic**," while also infusing Chamberlin's theory of *multiple* working hypotheses, to identify the necessary logic for what Simon identifies as the "optimization method," a method of Design Science problem solving:

"The logic of optimization methods can be sketched as follows:

The "**inner environment**" of the design problem is represented by a set of given alternatives of action. The alternatives may be given in extenso [in full or at length]: more commonly they are specified in terms of command variables that have defined domains.

The "**outer environment**" is represented by a set of parameters, which may be known with certainty or only in terms of a probability distribution. **The goals for adaption of inner to outer environment are defined by a utility function**—a function, usually scalar [quantity], of the command variables and environmental parameters—**perhaps supplemented by a number of constraints** (inequalities, say, between functions of the command variables and environmental parameters). **The optimization problem is to find an admissible set of values of the command variables, compatible with the constraints, that maximize the utility function for the given values of the environmental parameters**.

[...]

Since the optimization problem, once formalized, is a standard mathematical problem—to maximize a function subject to constraints—it is evidence that the logic used to deduce the answer is the standard logic of the predicate calculus on which

mathematics rests. How does the formalism avoid making use of a special logic of imperatives? It does so by dealing with sets of *possible worlds*: Frist **consider all the possible worlds** that meet the constraints of the outer environment; then **find the particular world in the set that meets the remaining constraints of the goal and maximizes the utility function**. The logic is exactly the same as if we were to adjoin the goal constraints and the maximization requirement, as new "natural laws," to the existing natural laws embodied in the environmental conditions. **We simply ask what values the command variables *would* have in a world meeting all these conditions and conclude that these are the values the command variables *should* have**."

*Id*. at pp. 70-71. (Emphasis added.)

*1586.* The explanation Simon uses to demonstrate this Design Science logic is what *I*, Plaintiff,

Attorney Cochrane, call the "**10ᵗʰ Dimension Chess Example**," or simply "**10D Chess**" for short:

"Only in trivial cases is the computation of the optimum alternative an easy matter. If utility theory is to have application to real-life design problems, it must be accompanied by tools for actually making the computations. The **dilemma of the rational chest player is familiar to all**. The optimal strategy in chess is easily demonstrated: simply assign [to each move] a value of +1 to a win, 0 to a draw, and -1 to a loss; consider all possible courses of play; minimax [the lowest of a set of maximum values] backward from the outcome of each, assuming each player will take the most favorable move at any given point. This procedure will determine what move to make *now*. The only trouble is that the computations required astronomical (the number $10^{120}$ **is often mentioned** in this context) and hence cannot be carried out—not by humans, not be existing computers, not by prospective computers.

*A theory of design as applied to the game of chest would encompass not only the utopian minimax principle but also some practicable procedures for finding good moves in actual board positions in real time, within the computational capacities of real human beings or real computers*. No exceptionally good procedures of this kind exist today, other than those stored in the memories of grandmasters, but there is at least one computer program that plays at the level of an expert or weak master—that is, better than all save a few hundred human players."

*Id*. at p. 72. (Emphasis added.)

*1587.* The value of this optimization method, and in general the logic of Design Science—is

finding the alternatives, or as Simon identifies the "**possible worlds**" that which meet all the

necessary conditions to support the Designer's/Investigator's reasoning. In essence, Simon's "**possible worlds**" can be simplified and defined as for example: ideas; hypotheses; problems; goals; [*VERY*] Ambitious Goals; *all* future realities; and *effects* as results of *all* decision making, inclusive those that the Designer specifically designates in a current reality that which facilitate into future reality. As Simon explains further:

> "In the case of optimization we asked: "*Of all possible worlds* (those attainable for some admissible values of the action variables), *which is the best* (yields the highest value of the criterion function)?" As we saw, this is a purely empirical question, calling only for facts and ordinary declarative reasoning to answer it.
>
> In this case, where we are seeking a satisfactory alternative, *once we have found a candidate we can ask*: "Does this alternative satisfy all the design criteria? Clearly this is also a factual question and raises no new issues of logic. *But how about the process of searching for [alternative] candidates*? What kind of logic is needed for the search?"

> *Id*. at pp. 72-72. (Emphasis added).

**1588.**   Continuing, and in contrast to the more stringent Theory of Constraints logic demonstrated later, Simon explains that "Design solutions are sequences of actions that lead to *possible worlds* satisfying specified constraints," whereby aligning these sequences of actions "the sought-for possible worlds are *seldom unique*; the search is for *sufficient*, *not necessary*, actions for attaining goals." *Id*. at p. 74. (Emphasis added).

**1589.**   It is this generalized brainstorming to develop a set of potential-alternative worlds that is the value of the Science of Design being that the exploitation of parallel, or near-parallel, alternative-possible worlds creates the set of solutions which allows the Designers thereafter to *focus* and narrow this set at later stages of this problem-solving technique to reach a conclusion.

**1590.**   A good example of this open logic is the legal doctrine of Stare Decisis where binding precedent that *is* workable and properly reasoned is used by an adjudicating court to determine

the merits of a case; *to stand by things decided*, is to take the facts of the matter and apply it to previous precedents to determine which vertical vein of Stare Decisis applies relative to the facts.

**1591.**   Moreover, Simon explains that actions have "*side consequences*" that create "*new differences*" that which furthers our Stare Decisis example, but also bolster Chamberlin's theory of *multiple* working hypotheses in that these differences often give breath to *new knowledge* used by the Designer/Investigator to communicate the solution more thoroughly from *all angles*:

> "Now the real worlds to which problem solvers and designers address themselves are seldom completely additive in this sense. Actions have *side consequences* ([that] may create new differences) and sometimes can only be taken when certain side conditions are satisfied ([*e.g.*, they may] call for removal of other differences before they become applicable). Under these circumstances one can never be certain that a partial sequence of actions that accomplishes certain goals can be augmented to provide a solution that satisfied *all* the conditions and attains *all* the goals (even though they be satisficing goals) of the problem.
>
> For this reason problem-solving systems and design procedures in the real world *do not merely assemble* problem *solutions* from components [*e.g.*, prior solutions] *but must <u>search</u> for appropriate assemblies*. In carrying out such a search, it is often efficient to divide one's eggs among a number of baskets—that is, not to follow out one line until it succeeds completely or fails definitely but to **begin to explore several tentative paths** [*as Chamberlin's theory reinforced*], continuing to pursue a few that look most promising at a given moment. If one of the active paths begins to look less promising, it may be replaced by another that had previously been assigned a lower priority."

*Id*. at p. 74. (Emphasis added.)

**1592.**   This **multiverse logic** is inherent within our human genome, *conscious thought*, and frankly, is intrinsic within the universe itself *even absent* conscious decision—*but for* **Newton's First Law of Motion in Physics**, a body at rest will remain at rest, and a body in motion will remain in motion unless acted upon by an external force—such "*external force*" being "*every action*" in

**Newton's Third Law of Motion in Physics** stating "for every action, there is an equal and opposite reaction;" simply *herein*, "**Effect-Cause-Effect Logic**" of the Theory of Constraints.

*1593.*   Now, *put differently*, the value of this "**Full Flex**" logic is the additive of conscious-individual thought, for a rock cannot form individual ideas, nor has any inherent goals, and otherwise it cannot be taught to tie its shoe enabling it to run faster and farther away from its gravitational condemnation—*instead*, it is the ability to consciously think independently that which separates our *potential force* from the rock.

*1594.*   Again, this multiverse logic is inherent within the human genome and has over millions of years evolved simultaneously with the Hominin form relatively constrained throughout this time subject to the compounding ***afferent*** and ***efferent*** variables to derive *this* stage that we as *Homo Sapiens sapiens now* stand—*collectively*, still evolving but for *one* single variable we have shared throughout that time—**life** *as subjective survival.*

*1595.*   This conscious prerequisite to subjectively survive life is inherently coded within our *Homo Sapiens sapiens*' goal-seeking system and is the fundamental core of our purpose—explained by Simon in two (*2*) examples, this built-in focus is centered on the ability to search for alternative possible worlds that achieve our objectives accumulating knowledge of the good along the way:

> "The condition of ***any*** goal-seeking system is that it is connected to the outside environment through two kinds of channels: the ***afferent***, or **<u>sensory</u>**, channels ***through which it received information about the environment*** and the ***efferent***, or **<u>motor</u>**, channels ***through which it acts on the environment***. The system must have some means of storing in its memory information about states of the world—afferent, or sensory, information—and information about actions—efferent, or motor, information. *Ability to attain goals depends on building up associations*, which may be simple or *very complex*, between particular changes in states of the world and particular actions that will (reliably or not) bring these changes about...
> [***Example 1***: **Infants**] Except for a few built-in reflexes, an infant has no basis for correlating his sensory

information with his actions. A very important part of his early learning is that particular actions or sequences of actions will bring about particular changes in the state of the world as he senses it. *Until he builds up this knowledge*, *the world of sense and the motor world are two entirely separate*, *entirely unrelated worlds*. *Only as he begins to acquire experience* as to how elements of the one relate to elements of the other *can he act purposefully on the world*.

[*Example 2*: **GPS**] The computer problem-solving program called GPS, designed to model some of the main features of human problem solving, exhibits in stark form how goal-directed action depends on building this kind of bridge between the afferent and the efferent worlds. One the afferent, or sensory, side, GPS must be able to represent desired situations or desired objects as well as the present situation. It must be able to represent differences between the desired and the present. On the efferent side, GPS must be able to represent actions that change objects or situations. To behave purposefully, GPS must be able to select from time to time those particular actions that are likely to remove the particular differences between desired and present states that the system detects. In the machinery of GPS, this selection is achieved through a *table of connections*, which associates with each kind of detectable difference those actions that are relevant to reducing that difference. These are its associations, in the form of productions, which relate the afferent to the efferent world. Since *reaching a goal generally requires a sequence of actions*, and since some attempts may be ineffective, GPS must also *have means for detecting the progress it is making* (the changes in the differences between the actual and the desired) and for *trying alternate paths*."

*Id*. at pp. 73-74. (Emphasis added).

*1596.*   Continuing, Simon identifies the importance of the *shape of the design* and the *hierarchy of the depth* that which a Designer will apply the alternative so as to be thorough enough to reach a valid conclusion while exposing all subfunctions and to avoid indecision in the process:

"...I gave some reasons why *complex systems might be expected to be constructed in a hierarchy of levels*, or in a *boxes-within-boxes form*. **The basic idea is that the several components in**

**any complex system will perform particular subfunctions that contribute to the over-all function**. Just as the "inner environment" of the whole system may be defined by describing its functions, without detailed specification of its mechanisms, so the "inner environment" of each of the subsystems may be defined by describing the functions of that subsystem, without detailing specification of *its* sub-mechanisms.

To design such a complex structure, one powerful technique is to discover viable ways of decomposing it into semi-independent components corresponding to its many functional parts. The design of each component can then be carried out with some degree of independence of the design of others, since ***each will affect the others largely through its function and independently*** of the details of the mechanisms that accomplish the function.

There is no reason to expect that the decomposition of the complete design into functional components will be unique. In important instances there may exist alternative feasible decompositions of radically different kinds. This possibility is well known to Designers of administrative organizations, where work can be divided up by subfunctions, by subprocesses, by subareas, and in other ways. Much of classical organization theory in fact was concerned precisely with this issue of alternative decompositions of a collection of interrelated tasks."

*Id*. at p. 75. (Emphasis added).

**1597.**   Furthermore, to ***test the depth of the alternative***, Simon explains the necessary process to generate a complete decomposition of the alternative-possible world ***cannot be ignored***:

"One way of considering the decomposition, but acknowledging that the **interrelation among the components cannot be ignored completely**, is to think of the design process as involving, first, the *generation of alternatives* and, then, the *testing of these alternatives against a whole array of requirements and constraints*. There need not be merely a single generate-test cycle, ***but there can be a whole nested series of such cycles***. ***The generators implicitly define the decomposition of the design problem***, and ***the tests guarantee that the important direct consequences will be noticed and weighed***. Alternative decompositions correspond to different ways of dividing the responsibilities for the final design between generators and tests.

To take a greatly oversimplified example, a series of generators may generate one or more possible outlines and schemes of fenestration for a building, while tests may be applied to determine whether needs for particular kinds of rooms can be met within the outlines generated. Alternatively the generators may be used to evolve the structure of the rooms, while tests are applied to see whether they are consistent with an acceptable over-all shape and design. ***The house can be designed from the outside in or from the inside out***.

Alternatives are also open, ***in organizing the design process, as to how far the development of possible subsystems will be carried before the over-all coordinating design is developed in detail***, or vice-versa, how far the over-all design should be carried before various components, or possible components, are developed. These alternatives of design are familiar to architects. They are familiar also to composers, who must decide how far the architectonics of a musical structure will be evolved before some of the component musical themes and other elements have been invented. Computer programmers face the same choices, between working downward from executive routines to subroutines or upward from component subroutines to a coordinating executive.

A theory of design will include principles—***most of which do not yet exist***—for deciding such questions of precedence and sequence in the design process."

*Id*. at pp. 75-76. (Emphasis added).

**1598.** ***Not all Designers are made the same***—the inherent value is the Designer themselves and the Inductive and Deductive Reasoning that comes as a "***style***" of the design that is the underlying value of the **artifact** of new knowledge generated from the Design Process. Simply, Simon explains this differentiating factor as follows:

"When we recall that the process will generally be concerned with finding a satisfactory design, rather than an optimum design, we see that sequence and the division of labor between generators and tests can affect not only the efficiency with which resources for designing are used but also the nature of the final design

as well. What we ordinarily call "***style***" may stem just as much from these decisions about the design process as from alternative emphases on the goals to be realized through the final design. An architect who designs building from the outside in will arrive at quite different buildings from one who designs from the inside out, even though both of them might agree on the characteristics that a satisfactory building should possess.

[...]

***Variety***, ***within the limits of satisfactory constraints***, ***may be a desirable end in itself***, ***among other reasons***, **because it permits us to attach value to the search as well as its outcome—to regard the design process as itself a valued activity for those who participate in it**.

[...]

However that may be, I hope I have illustrated sufficiently that both the shape of the design and the shape and organization of the design process are essential components of a theory of design."

*Id*. at pp. 76-77. (Emphasis added).

**1599.**   Similar to Chamberlin's diagnosis of the drawbacks of the method of multiple working hypotheses, Simon explained that *representation of the Design* was "viewed simply as change in representation, making evident what was *previously true but obscure*," continuing further:

"This view can be extended to **all of problem solving—solving a problem simply means representing it so as to make the solution transparent**. If the problem solving could actually be organized in these terms, the issue of representation would indeed become central [or clear]. But even if it cannot—if this is too exaggerated a view—**a deeper understanding of how representations are created and how they contribute to the solution of problems will become an essential component** in the future theory of design."

*Id*. at p. 78. (Emphasis added).

**1600.**   Simon explained even further that representation of a problem set can be incomplete and still a taxonomy will yield a starting point to build a theory using the possible worlds. *Id*. at 79.

***1601.***   Importantly, Simon explains that his goal was to demonstrate the value of the Science of Design and to bring this knowledge of the good *back into the light* to illuminate the complex:

> "My main goal in this chapter has been to show that ***there already exist today*** a number of components of a theory of design and a substantial body of knowledge, theoretical and empirical, relating to each. As we draw up our curriculum in design—in the ***science of the artificial***—to take its place by the side of natural science in whole...
>
> [...]
>
> There is no question, ***since these programs exist***, of ***the design process hiding behind the cloak of*** "***judgment***" or "experience." ***Whatever judgment*** or experience was used in creating the programs **must now be incorporated in them and hence be observable**. **The programs are the tangible record of the variety of schemes that man has devised to explore his complex out environment and to discover in that environment the paths to his goals**."
>
> *Id*. at pp. 79-80. (Emphasis added).

***1602.***   In closing—just as Chamberlin explained the personal application of the theory of *multiple working hypotheses* to everyday life—Simon explains too that Science of Design has a **profound impact** on "man's relation to the complex outer environment in which **he seeks to survive and achieve**," opining in full:

> "I have called my topic "the theory of design" and my curriculum a "program in design." I have emphasized its role as complement to the natural science curriculum in the total training of a professional engineer—**or of any professional whose task is to solve problems, to choose, to synthesize, to decide**.
>
> But there is another way in which the theory of design my be viewed in relation to other knowledge...The present chapter may also be construed as a chapter on psychology: **on man's relation to the complex outer environment in which he seeks to survive and achieve**.
>
> All three chapters, so construed, have import that goes beyond the professional work of the man we have called the "designer." Many of us have been unhappy about the fragmentation of our society into two cultures. Some of us even think there are not

just two cultures but a large number of cultures. **If we regret that fragmentation, then we must look for a common core of knowledge that can be shared by the members of all cultures—a core that includes more significant topics than the weather, sports, automobiles, the care and feeding of children, or perhaps even politics. A common understanding of our relation to the inner and outer environments that define the space in which we live and choose can provide at least part of that significant core**.

[...]

**Undoubtedly there are tone-deaf engineers**, just as there are mathematically ignorant composers. Few engineers and composers, whether deaf, ignorant, or not, can carry on a mutually rewarding conversation about the content of each other's professional work. **What I am suggesting is** that they *can* carry on such a conversation about design, can begin to perceive the common creative activity in which they are both engaged, can begin to share their experiences of the creative professional design process.

Those of us who have lived close to the development of the modern computer through gestation and infancy have been drawn from a wide variety of professional fields....We have noticed the growing communication among intellectual disciplines that takes place around the computer. We have welcomed it, because it has brought us into contact with new worlds of knowledge—has helped us combat our own multiple-cultures isolation [*e.g.*, **knowledge silos**].

[...]

**The ability to communicate across fields—the common ground**—comes from the fact that **all who use computers in complex ways are using computers to design or to participate in the process of design**. Consequently <u>we are designers</u>, or as <u>designers of design processes</u>, have had to be explicitly as never before about what is involved in creating a design and what takes place while the creation is going on.

**The real subjects of the new intellectual free trade among the many cultures are our own thought processes, our processes of judging, deciding, choosing, and creating**. We are 6importing and exporting from one intellectual discipline to another ideas about how a serially organized information-processing system life a human being—or a computer, or a complex of men and women and computers in organized

corporation—**solves problems and achieves goals in outer environments of great complexity**.

**The proper study of mankind has been said to be man**. But I have argued that man—or at least the intellective component of man—may be relatively simple, that **most of the complexity of his behavior may be drawn from man's environment, for man's search for good designs**. If I have made my care, then we can conclude that, in large part, the proper study of mankind is the **science of design, not only as the professional component of a technical education but as a core discipline for every liberally educated person**."

*Id*. at p. 81-82. (Emphasis added).

**1603.**   Now, briefly before we move into the *fourth* overlay of our "**Full Flex**," we must remember that *each* of these layers *compounds the other* <u>working</u> <u>together</u> *as a system of thought*. Remember as the general baseline for <u>all</u> problem solving "**Dr. Goldratt's Six Pillars of Proper Decision Making,**" followed thereafter by Chamberlin's theory of *multiple* working hypotheses demonstrating the **multiplicity** of our **alternative-possible worlds** working together towards our solution, and thereafter Simon's explanation of the **depth** that which these **alternative-possible worlds** may exist *in the future* given the Designer's individual **style** and **representation**.

**1604.**   <u>**Fourth**</u>, we must merge this aforementioned knowledge with the historically militarily based tactical-thought process predicated upon <u>**quick**</u>, effective, and <u>**proactive**</u> decision-making, developed in and around the **mid-1950's** by *Retired Lieutenant Colonel of the United States Air Force*, John Richard Boyd, and known principally as an "**OODA Loop**." **Exhibit 523**—*John Boyd's Wikipedia*.

**1605.**   In part, John Boyd was a United States Air Force Fighter Pilot and military strategist who developed the OODA Loop as a concept of situational awareness <u>***and***</u> of **man's survival** in war.

**1606.**   Specifically, the addition of Boyd's OODA Loop to this aforementioned group enhances the logic of the "**Full Flex**" and embeds the *necessity* of <u>**speed**</u> from *observation to action* on part

of the Receiver/Investigator/Designer to achieve **through survival** a relative "*victory*" by "*defeating*" an enemy *or* opposing force. **Exhibit 524**—*The OODA Loop by Mark Kelly.*

*1607.*   Simply, for Boyd, the contextual definition of "*victory*" militarily was to **survive** the battle and "*defeat*" your enemy *or* opposing force. And while the OODA Loop has its origins in "strategic military operations, the concept *has been applied with great success* in the realms of business, ***litigation***, intelligence and information gathering, law-enforcement and even advanced medical treatment." *Id.* at p. 1056. (Emphasis added).

*1608.*   In fact, the OODA Loop was developed by Boyd's research during the **Korean War**:

> "During the Korean War, Boyd was assigned to observe and assess the reasons for the rate of success of US pilots flying the F-86 Saber to **engage and defeat** the *arguably superior* MiG-15. F-86 piolets were credited with shooting down 792 MiGs for a loss of only 78 Sabers, a **victory** rate of 10:1. It was **Boyd's conclusions** that this was **not a result of** superior **aircraft design** but a result of the **ability for American piolets** to **quickly O**bserve, **O**rient, **D**ecide and **A**ct **on their own without being slowed by the need to be oriented by command elements far removed from the scene**. This observation resulted in Boyd's creation of the OODA Loop concept, wherein *those that are most able to* **quickly** orient to their environment, *make a decision and act upon it* **can overcome superior elements** through **rapid reaction**."

> *Id.* at p. 1056. (Emphasis added).

*1609.*   Accordingly, "the key to victory is the ability to *create situations* [alternative-possible worlds] in which one can make appropriate decisions **more quickly** than one's opponent," as the OODA Loop was explained similarly by Harry Hilaker as chief designer of the F-16 Fighter Jet:

> "**Time is the dominant parameter**. The pilot who goes through the OODA cycle [Loop] in the *shortest time* **prevails** because his opponent *is caught* **responding to situations that have already changed**."

> **Exhibit 523**, at p. 2. (Emphasis added).

*1610.* The fundamental character of Boyd's OODA Loop was **survival**— "Boyd hypothesized that **<u>all</u> intelligent organisms** *and organizations* undergo a **continuous cycle of interaction** with their environment." In part, Boyd depicted this <u>continuous cycle of interaction</u> into "four interrelated and overlapping processes" through which an <u>individual</u> **cycles continuously**:

> "**<u>Observation</u>**: the collection of data by means of the senses;
> **<u>Orientation</u>**: the analysis and synthesis of data to form one's current mental perspective;
> **<u>Decision</u>**: the determination of a course of action based on one's current mental perspective;
> **<u>Action</u>**: the physical playing-out of decisions."



*Id*. at p. 5. (Emphasis added).

*1611.* Similar to the difference in superiority of Fighter Jets, "Boyd emphasized that the [OODA Loop] is the central mechanism *enabling* <u>adaptation</u>, *apart from* natural selection, and is therefore **<u>critical to survival</u>**." In full, Boyd theorized from a military perspective though applicable *here*:

> "Boyd theorized that **large organizations such as** corporations**, governments**, or militaries **possessed a hierarchy of OODA loops at tactical**, **grand-tactical** (operational art), and **strategic levels**. In addition, [Boyd] stated that most effective organizations have a **highly decentralized chain of command** that uses **objective-driven orders**, or **directive control**, rather than method-driven orders, **to harness the mental capacity and creative abilities of individual commanders at each level**...Boyd argued that **such a**

**structure creates a flexible "organic whole" that is quicker to adapt to rapidly-changing situations.** Boyd noted, however, that any such **highly decentralized-organization would necessitate a high degree of mutual trust and common outlook that came from prior shared experiences.** The **headquarters needs** *to know that the troops are perfectly capable of forming a good plan for taking a specific objective*, and the **troops need** *to know that the headquarters does not direct them to achieve certain objectives without good reason*."

*Id*. at p. 2. (Emphasis added).

1612.   Continuing, sometime in and around **1986/87 to 1992** Boyd wrote nearly four hundred (*400*) pages of material compiled thereafter and titled "*A Discourse of Winning and Losing*," outlining his various military strategies, in large part encompassing his then *widely* adopted OODA Loop.

1613.   Within Boyd's discourse and written sometime in and around **May 1987** was a thirty-eight (*38*) page section titled "*Organic Design for Command and Control*," and within this section Boyd identifies that the "*schwerpunkt*" or *main emphasis* of his OODA Loop is—**O**rientation. **Exhibit 525**—*Organic Design for Command and Control*, *in part,* at p. 16.

1614.   In this presentation, Body defined "**O**rientation" as the *main emphasis* of the OODA Loop strategy explaining that "**O**rientation, [is] *seen as a result*, [and] *represents* images, views, or **impressions of the world shaped by** genetic heritage, cultural tradition, previous **experiences**, and **unfolding circumstances**." *Id*. at p. 13. (Emphasis added).

1615.   Intuitively, these **sense impressions** are created by the Receiver/Designer, just as Simon alluded to the infant having to build a *table of connections* or experiences; Boyd explained further:

"**O**rientation is an **interactive process** of many-sided implicit cross-referencing projections, empathies, correlations, and rejections **that is shaped by and shapes the interplay of** genetic heritage, cultural tradition, **previous experiences**, and **unfolding circumstances**."

*Id*. at p. 15. (Emphasis added).

*1616.* Continuing, Boyd explains further that individual "**O**rientation" "shapes the way we interact with the environment—hence **O**rientation *shapes the way we **o**bserve*, the *way we **d**ecide*, the *way we **a**ct*." *Id* at. p. 16. (Emphasis added).

*1617.* An *example* of **O**rientation in a military context is Warden's 5 Rings on grand-tactical scale.

*1618.* It is this **sense impression** that Boyd found to be **most valuable** that correlates directly with the **speed** in which one reacts to unfolding circumstances relative to the situation. Moreover, Boyd reasoned that the ***continuous internal process*** of **o**bservation-**o**rientation-**d**ecision-**a**ction "represents what takes place during the command-and-control process—which means that the OODA Loop can be thought of as being the C&C Loop." *Id*. at p. 26.

*1619.* For Boyd militarily, the "***command-and-control process***" is the system of *decision-making apparatus of a group*, organization, *or* government, or more precisely, individuals working together **to survive** or achieve a specific objective. In full, Boyd explains this combined logic of the OODA Loop and **O**rientation to a command-and-control hierarchy as follows:

> "Expose individuals, with different skills and abilities, against a variety of situations—whereby each individual can <u>observe</u> and <u>orient</u> himself simultaneously to the others and to the variety of changing situations.
>
> ### ? – WHY - ?
>
> In such an environment, a harmony, or ***focus*** and direction, in operations is created by the bonds of **implicit communications** and **trust** that evolve[s] as a consequence of the similar mental images or ***impressions*** each individual creates and commits to memory by <u>repeatedly</u> sharing the **same** variety of <u>experiences</u> in the **same** way.
>
> ### BENEFICIAL PAYOFF
>
> A **command-and-control system**, whose **secret lies in what's unstated or not communicated** to one another (in an explicit sense) –**in order to exploit lower-level initiative yet realize higher-level intent**, thereby **diminish friction and compress time**, hence **gain both <u>quickness</u> and security**."
>
> *Id*. at p. 18. (Emphasis added).

*1620.* *Recall briefly* as an example of Boyd's command-and-control system the Theory of Constraints' "**Decisive Competitive Edge**" from **Exhibit 519**, at p. 44, in that this **grand tactical Communication Process** creates the "*organic whole*" centered on mutual objectives used to exploit lower-level initiatives to realize higher-level intent.

*1621.* Furthermore, sometime in and around **June 28th, 1995**, Boyd synthesized his discourse in a short PowerPoint identifying the key attributes of this inherent and reoccurring impression logic:

> "**Without our genetic heritage, cultural traditions, and previous experiences**, we do not possess an **implicit** repertoire of psychophysical skills shaped by environments and changes that have been **previously experienced**.
>
> **Without analyses and synthesis**, across a variety of domains or across a variety of competing/independent channels of information, **we cannot evolve new repertoires to deal with unfamiliar phenomena or unforeseen change**.
>
> **Without a many-sided implicit cross-referencing process of projection, empathy, correlation**, and **rejection** (across these many different domains or channels of information), **we cannot** even do **analyses** and **synthesis**.
>
> **Without OODA loops**, we **can neither** sense, **hence** observe, thereby collect a variety of information for the above processes, **nor** decide as well as implement actions in accord with those processes.
>
> **Or put another way**
>
> **Without OODA loops** embracing all of the above and **without the ability to get inside other OODA loops** (or other environments), we will find it **impossible to comprehend**, shape, adapt to, **and in turn be shaped by an unfolding**, **evolving reality** that is uncertain, everchanging, [and] unpredictable [*while becoming the sheep*]."

> **Exhibit 526**—*Essence of Winning & Losing.*

*1622.* Now, fundamentally we must draw back and view this "**Full Flex**" from a vantage point of *40,000* ft to *understand the flow* of our enhanced decision making. Specifically, in fact we must understand that Boyd's OODA Loop is *inherent within* the Communication Process itself and is sparked principally in the Receiver's Decoding *and* Response positions *seen below*:



**Exhibit 527**—*The Communication Process*.

*1623.*  Fundamentally—this Communication Process is used by **all** intelligent organisms to communicate, *e.g.*, interact with their environment, each interacting at different levels based on experience subject to noise, corruption, abandonment, and decay.

*1624.*  To add a box and place Boyd's OODA Loop on this diagram would be to place the box relative to the Receiver's Decoding of the Encoded Message from the Sender who as a Receiver communicates Feedback as a Response to the Sender's *initiating* Encoded communication.

*1625.*  Intuitively, this Communication Process *once sparked* is a mirror of itself in that a Sender becomes the Receiver through Feedback and the Receiver becomes the Sender by Encoding the Response as Feedback simply by being the target of the Sender's *initiating* Encoded Message.

*1626.*  This process *is* often *instant*—a simple wave walking down the street sparks this interaction, where *even if* the Receiver does not wave or otherwise engage the Sender, the Communication Process ensues until the Communication is severed by noise, corruption, abandonment, *or* decay.

*1627.*  This process can also take *time* to develop, require physical objects as props, leverage multiple Senders, and encompasses **every level** of communication for **all** intelligent organisms.

*1628.*   For our purpose relative to the "**Full Flex**" the **Communication Process is** also inherently **man's decision-making process for survival** in that a Response is **O**riented from the Receiver's position subjectively relative to genetic heritage, cultural tradition, previous **experiences**, and tailored to the **unfolding circumstances**.

*1629.*   Therefore, in our "**Full Flex**" process of proper decision making, we must place within the Communication Process that of Boyd's OODA Loop located as dictated above, and then within Boyd's OODA Loop itself specifically between the **O**rientation and **D**ecide stage, that baseline knowledge generated from "**Dr. Goldratt's Six Pillars of Proper Decision Making**," Chamberlin's Theory of *Multiple* Working Hypotheses, and Simon's Science of Design of those **artificial-possible worlds**. From this hierarchy of thought, the value of the Theory of Constraints begins to take form as we ***zoom into*** our solution, *or* **A**ction, from this *40,000* ft. purview.

*1630.*   *Beginning our descent*, the Introduction of *Thinking for a Change: Putting the TOC Thinking Processes to Use* by Lisa Scheinkopf reinforces our understanding of the Theory of Constraints' past, present, *and* future, and furthermore bolsters the arguments *herein*:

> "**In the beginning...**
>
> The Thinking Processes were originated by Dr. Eliyahu Goldratt to address the unique and complex issue of firms that were implementing his Theory of Constraints (TOC) in their production environments. Once their manufacturing operations were "fixed," these firms needed more than the techniques described in his landmark text, *The Goal*.
>
> When an organization's physical constraint is a resource in the manufacturing plant, it is in what we consider to be a **manageable environment**. We're typically dealing with products and machines, and with material that flows within the firm, identifiable, presumably controllable boundaries. The data are available, the statistical fluctuations are measurable, the product is touchable, and it's easy to translate the specific steps of the TOC into measures of dollars and time.

When the physical constraint moves outside the physical arena of the plant, it moves into areas that are less controllable, **less manageable**. Engineering, sales, and marketing issues are unique, a function of the broader mission, culture, strategies, markets, and information systems of an individual organization. Once the material flow is managed correctly, the organization must address *deeper* issues if it wants to continue to improve.

Just as manufacturing's problems tend to be masked by inventory, the *deeper* policy and paradigm constraints are hidden by what we tend to call "problems." Just as we look under the piles of inventory to identify physical constraints that may exist in production, we must look under the "***piles of problems***" we are confronted with every day to identify the underlying policy and paradigm constraints of the organization—especially when the physical constraint has moved outside the comfort zone of manufacturing. Finding the specific policies and paradigms that inhibit an organization's performance is more difficult than figuring out why a bottleneck is utilized inefficiently.

The simple message of *The Goal* was: clarify the organization's purpose, determine measures that are aligned with that purpose, and improve by managing those few things that limit the organization's higher performance relative to that purpose.

**People outside the manufacturing arena also started reading** *The Goal* and its message resonated with many of them, too. While the message was clear, **the "how to" wasn't** always evident. Even the basic question, "What is the purpose, or goal, of your organization," is often not easy to answer.

Goldratt's Institute [AGI] was faced with more and more requests from a broader and broader audience. The common theme of the requests was this: *How, specifically, can I apply* The Goal's *ideas to my organization*? *What, specifically, do I do next*? *And after that*? The requests came from large organizations such as the **Department of Defense** and **General Motors** to organizations as small as Hannah's Donut Shop in Phoenix, Arizona. People from **insurance companies**, **churches**, **schools**, and **families** were applying lessons from *The Goal* and were seeking the next step in their **journey of ongoing improvement**.

Goldratt's challenge was then to avoid becoming the constraint, and he was faced with an *interesting dilemma*. **<u>For people and organizations to truly be successful in their efforts to improve over the short and long term</u>**, **<u>they must discover and make their own improvements</u>**. If this is the case, then the right thing for Goldratt to do would have been to send them on their way, as Jonah had done to Alex in The Goal, to **figure it all out for themselves**. **At the same time, <u>in so many cases</u>, <u>it was Goldratt's own ideas that had enabled real turnaround</u>**.

In the vast majority of cases, one of the effects of implementing the Theory of Constraints in a manufacturing environment is the exposure of **<u>excess capacity</u>**—often to the turn of 30 to 50%! Rather than finding ways to seize the opportunity to grow their markets and their businesses, the short term and shallow thinking that permeates our culture instead laid off hordes of people. If Goldratt turned people away for the sake of finding their own solutions, and if they didn't then find their solutions, would he be responsible for their companies' inevitable failures? And if he chose to start to solve specific organizational problems, which of those should he choose? Which should he not choose? How would he decide?

The path he chose was neither—or both, depending on how you look at it. **Goldratt's solution was to verbalize the processes by which anybody would be able to improve their lot, regardless of the constraints**.

Goldratt started to document the ["Thinking Processes"] around **1990**. He quickly wrote, *What is This Thing Called The Theory of Constraints*, which *conveyed the concept* of the thinking processes and the *<u>early versions</u>* of the application tools. While it was a great beginning, they were still *<u>not easily verbalized</u>* and were *<u>quite difficult to learn or teach</u>*. In **early 1991**, Goldratt convened several of his partners and associates to tackle this issue. **I was honored** to **be one** of **the members** of this team. Our task was to discover the answer to these questions:

1. If you are "Jonah" (the character from *The Goal*), how do you think?

2. What is the process that you use to really identify constraints, even the invisible constraints, and develop the means to improve any situation, given the existing constraints?

3. How do you teach this process to others?

The team was split into **two groups** that met over the course of eight months of hard work, sleepless nights, and much discussion, debate, and discovery. In **August 1991**, the **two groups came together** in Rotterdam, The Netherlands, to finalize their work. If *What Is This Thing Called The Theory of Constraints* represented the conception of the Thinking Processes then it is safe to say that in The Netherlands, ***they were born***.

## Improvement, or Only Change?

Every improvement is a change. But every change is not an improvement. The **intent of the Thinking Processes was to provide a systemic approach to enable people to create and implement the kinds of change that can also be considered improvement**. As such, **they were designed to answer these three questions**:

## What to Change?

As we know from the physical world, and the proven effectiveness of the Theory of Constraints (TOC) as illustrated in Goldratt's *The Goal*, dramatic overall system improvement occurs when we **focus** out attention on the activities of the system's physical constraint. **Does the same hold true in the non-physical world of policies and paradigms**?

Think of it this way, How many stupid policies exist in your company? If I asked you to list them, I imagine that your list would be quite long. How do you identify which policies to change? Do you select the easiest policies to target? The policies that are the subject of the majority of complaints? Those that will cost the least amount of money to change? Are you inclined to wipe the slate clean and reengineer the whole shebang?

Goldratt was unable to locate any process in existence that looked for the non-physical invisible weak links—the policy and paradigm constraints. **These are the rules and beliefs that if you change just one or two, you would move your system to a much higher level of performance**.

There are of course, an abundance of techniques that identify root causes, analyze cause-effect relationships, and apply weighting factors to causes in order to prioritize them for improvement projects. **These techniques utilize either "hard" data and logic or "soft" feelings and intuition**. We needed processes that utilize the strengths of both—the processes that enable us to **verbalize our intuition and emotions**, and as we do so, rigorously test our assumptions surrounding what we've verbalized. With such tools, **we can better understand the patterns of our current reality and select the <u>leverage points</u> that will enable us to inject changes in our systems that will lead those systems to continual improvement relative to their purposes**.

## <u>To What</u> to Change?

Assume that you have found a key policy that is a real constraint to making your organization better than it is today. Now what? Now it's time to figure out what to replace it with. It's also time to consider what you want the new and improved system to look, feel, and act like once its replacement has been implemented. If your current reality is a set of patterns, what would you like the new patterns to be?

Have you ever seen or experienced a solution that didn't work? How about a solution that was just looking for a problem? Or a solution that fixed the problem it was intended to fix, but also caused others? Goldratt sought a process that would enable us to show clearly how a selected solution to a core problem would, in fact, lead to the elimination of that core problem. In addition, he sought a process that would be robust enough to enable us to identify potential, unintended consequences of a solution, and proactively block them. **The Thinking Processes were developed in order to have a systematic way to paint a picture of a <u>desired future</u>, in a way that we can determine what we want, why we want it *and* avoid unintended, undesired consequences that might result**.

## <u>How to Cause</u> the Change?

Answering the *What to Change* questions involves understanding the **<u>current state</u>** of the system. Answering the *To What to Change* question involves deciding what we intend the system to be in the **<u>future</u>**. <u>Now it is time to determine **how** to go about closing the gap</u>. One of the strengths of America as a society is our *focus* on **<u>action</u>**. We are a nation of doers. My colleagues at Chesapeake have a nickname for this—we are a nation of *gunslingers*. One of our weaknesses, though, is that we are not in

the habit of **purposeful action**. All too often, we don't consider what we're trying to accomplish with our actions [*Thinking before we act*]. We typically don't put much time into considering why we think a specific action will lead to a specific result. We don't ask ourselves often enough if we even need to take an action in order to achieve a specific objective. The result is that we spend a lot of time doing; we get frustrated because we're working so hard, *doing* so much, and improvement just isn't happening commensurate with the rate of our busy-ness. **The Thinking Processes were developed to provide a systematic way to determine what obstacles lie between our current and desired realities, to explain why those obstacles exist, to define the steps that will overcome the obstacles, to define the order in which those steps should be taken, and to recognize when the plan should be altered**.

## Two Thinking Processes and Five Application Tools

There are *really only two* TOC Thinking Processes: Sufficient Cause and Necessary Conditions. As of this writing [*in 1999*], there are five applications of these <u>two thinking processes</u>:

| The Sufficient Cause Application Tools | The Necessary Condition Application Tools |
|---|---|
| • Current Reality Tree | • Evaporating Cloud |
| • Future Reality Tree | • Prerequisite Tree |
| • Transition Tree | |

If you read nothing else, read and do the exercises in the chapters on Sufficient Cause ["**Effect—Cause—Effect Logic**;" Chapter 3], the Categories of Legitimate Reservation [Chapter 4], and Necessary Conditions [Chapter 5]. You will then be in a position to **quickly** learn, use, <u>adapt</u>, and modify the five tools—maybe even develop a few yourself!

The Five Thinking Process application tools provide for a systematic approach to answering the three questions for system improvement. The *Current Reality Tree* answers the "What to Change" question. The *Future Reality Tree* answers the "To What to Change." The *Evaporating Cloud* is used as a paradigm shifting transition tool between the *Current* and *Future Reality Trees*. The *Transition Tree* answers, "How to Cause the Change," with the *Prerequisite Tree* serving as the bridge between the *Future Reality* and *Transition Trees*.

As with many inventions, uses for the **Thinking Processes have <u>evolved into</u> much more than their original intent**. These additional uses include:

- Communicating
- **Decision Making**
- Resolving Conflicts
- **Learning**
- **Developing** and **Implementing Policies**
- **Planning**
- **Leading** and **Following**

As with many things in life, discovered get made. **Original intentions aren't always the lasting intentions of many inventions. This, I believe, may very well be the case with the TOC Thinking Processes.** As I have used, taught, played with, challenged, and experienced these tools over the years, **I have begun to conclude that their <u>original intent may not be their legacy</u>. These tools provide us with an aid to better and clearer communication with each other as well as <u>better communication between our ears</u> (*thinking*). In an age where agility has quickly become the key to competitiveness, the ability to learn—<u>to generate knowledge</u>—is a <u>true competitive edge</u>**. The Thinking Processes provide a systematic approach to increasing our capacity to learn *faster* and *deeper* than ever before. The Thinking Processes will prove to be fundamental learning tool in the Age of Agility.

The five application tools *may not look the same* years from now as they do today. **They certainly don't look exactly as they did in 1991**. The group that Eli Goldratt brought together in **1991** is today largely dispersed around the world. Many of us have refined and expanded the tools, as have many of our students. I do believe that **the <u>principles and the basic thinking patterns</u> on which the five application tools and their variations are based <u>are timeless</u>**. Thus, much of this book will be devoted to the principles and basic thinking patterns. Once you've mastered these basics, two things will happen. The *first* is that the five application tools and variations you might encounter will be very easy to learn and master. The ***second* is that you won't really need to learn or master the five application tools, because they will simply be a <u>natural application</u> of the principles and basic thinking patterns**. **You will likely develop variations of your own**.

My <u>**cognizant involvement**</u> with and use of the Theory of Constraints **began in 1987**, when I read *The Goal*. The journey has been and continues to be one of nonstop learning and growth. *<u>Welcome to the journey</u>*."

**Exhibit 528**—*Thinking for a Change, in part, pp. 1-8*. (Emphasis added).

*1631.* *Now*, as we **continue to zoom in** while digesting this important Introduction by Mrs. Scheinkopf—for **every cycle** of the Communication Process that evokes Boyd's OODA Loop we *focus* on these three (*3*) questions inherent within our **O**rientation of our *continuous* observations: (*a*) <u>What</u> to Change; (*b*) <u>To What</u> to Change; and (*c*) <u>How to Cause</u> the Change.

*1632.* As we *focus* on these core questions relative to our *unfolding environment*, we must understand our position within the Matrix, **system**, *and environment* that which is the surrounding medium that we **o**rient, **d**ecide, *and* **a**ct within. We do this by using the Theory of Constraints' "**Systems' Thinking Logic**," to *think beyond the box*—to think in more abstract terms and reduce the friction or limitations of our problem-solving capabilities.

*1633.* Simply, if you are thinking within the box—*you will be confined within the box*.

*1634.* Again, recalling *in part* Chapter One of *Thinking for a Change* we see this "**Systems' Thinking Logic**" is necessary to escape traditional diagnosis of our problems relative to **Operational Silos** and view problems from a "*whole systems perspective*" instead:

> ## "Resizing the Box— [*Thinking Beyond the Box*]
>
> Imagine that I am a new employee in your organization, and it's your job to take me on a tour in order to familiarize me with the company's operations. What would you show me, and what would I see? Perhaps a scenario like this:
>
> First, we enter The Lobby and meet The Receptionist. Next, we walk through the Sale Department, followed by Customer Service, Accounting, Engineering, and Human Resources. Then, you lead me through Purchasing and Production Control, followed by Safety, Quality, Legal, and don't forget the Executive Offices. You save the best for last, and we go on a lengthy tour of Manufacturing. You point out the Press Area, the Machine Shop, the Lathes, the Robots, the Plating Line and Assembly Area, the Rework Area, and the Shipping and Receiving Docks.
>
> Do you notice the *functional* orientation of the tour [Operations Silos]? I've been led on well over a thousand imaginary and real tours. They are almost always functionally oriented.
>
> Imagine now that we have an opportunity to converse with the people who work in each of these functional areas as we visit them. Let's ask them

about the problems the organization is facing. Let's ask them about the "constraints." **All will talk about the difficulties they face in their own function and will extrapolate the problem of the company from that functional perspective**.

[...]

What's wrong with this picture? Nothing and everything. **Nothing** in that I'm certain that these good people are truly experiencing what they say they're experiencing. **Everything**, in **that it's difficult to see the forest when you're stuck out on a limb of one of its trees**.

My dear friend and colleague John Covington was once asked how he approached complex problems. His reply was, "***Make the box bigger***!" **This is exactly what the TOC paradigm asks us to do. There is a time for looking at a system from the functional perspective, and there is a time for looking at a bigger box**—from the "**whole system**" perspective ["**Systems' Thinking Logic**"]. **When we want to understand what is constraining an organization from achieving its purpose, we should enlarge our perspective of the box from the Function Box to the Value Chain Box**.

Let's take a look at the Value Chain Box. Pretend we have removed the roof from our organization and, for six months, we hover over it at an altitude of **40,000 feet**. As we observe, our perspective of the organization is forced to change. **We are viewing a pattern**. The pattern is *flow*. You may even describe this flow as process flow. Whether your organization produces a single product [*e.g.*, a **STUDENT**] or *thousands* [*e.g.,* **STUDENTS**], the flow looks the *same over space and time*, as shown in **Figure 1.1**. The inside of the "*box*" represents your organization. The inputs to your organization's process are the raw materials, or whatever your organization acquires from outside itself. Your organization takes these inputs and transforms them into the products or services that it provides to its customers [*e.g.*, Nationalistic Society/Industry]. These products or services are the outputs of the process[es]. **Whatever the output of your organization's process might be, it is the means by which your organization accomplishes its purpose**. The *rate* [speed] at which that output is generated is the *rate* [speed] at which your organization is accomplishing **its purpose**. **Every organization, including yours, wants to improve**. The (sic) **key to improving is that rate of output, in terms of purpose** (a.k.a. *the goal*).

**Actually**, **we can use this box to describe any "system" we choose**. For instance, look again at Figure 1.1. Now, let's say that the inside of the box represents your department. Your department receives inputs from something outside of it, and it transforms those inputs into its outputs. **We can also say that the box is you and identify your inputs and outputs**.

By the same token, try placing your customers and/or your vendors inside the box—**your industry**, **your community**, **your country**."

**Exhibit 528**—*Thinking for a Change, in part, pp. 11-14.* (Emphasis added).

*1635.* After orienting your decision making relative to the Theory of Constraints' "**Systems' Thinking Logic**" it is necessary to **simultaneously determine** the Systems' **Measurement of Success**, or purpose (a.k.a. *the goal*), and how that purpose is achieved opposite the constraints or opposing force(*s*) acting on the process of achievement.

*1636.* For **all** intelligent organisms, **survival**, *fundamentally*, is the core **Measurement of Success** and when we **zoom out** from this, we begin to view each of the variables that contribute to achieving this requirement; continuing with elaboration from Mrs. Scheinkopf:

> "More often than not, the answer is not obvious at all. Consider the case of a multibillion-dollar, multistate chemical company. Once of our projects was to help it improve one of its distribution systems. Before we began to talk about the constraints of their system, we asked the team to develop a common understanding of the role of the distribution system as it relates to the larger system of which it is a part. They considered the **40,000' view** of **the corporation** **as a whole** and **engaged in a dialogue on what the purpose of the** distribution **system is** in that "**bigger box**." As a result, the team was about to focus on improving the distribution system, not as an entity in and of itself, but as an enabler of **throughput** generation for the corporation.
>
> [...]
>
> *Determine the system's fundamental **measurements***: What does improvement mean for the system? What are its global measures of success? Of failure? How does the system know whether or not it's performing well?

**Exhibit 528**—*Thinking for a Change, in part, p. 24.* (Emphasis added).

*1637.* Often the "**Systems' Thinking Focus**" logic of the Theory of Constraints allows the individual(s) or organization to reframe the scope of *not only* the purpose of their actions, but also the **Measurements of Success** which sheds light on overlap and gaps in this success that which

allow for <u>improvements</u> towards achieving that underlying purpose. Continuing further, Mrs. Scheinkopf explains:

> "In his book, *The Goal*, Dr. Goldratt emphasizes that we need to look at what the organization is trying to accomplish, and make sure that we measure this process and **all of our activities in a way that <u>connects</u> to that goal**. For instance, when the organization's goal is to make more money now as well as in the future, our **40,000' view** of the organization can be translated as in Figure 1.2.
>
> We buy the inputs to the process from our vendors. We put this money into the manufacturing system (which we pay for on an ongoing basis) in order to convert that money into *more* money. It is actually converted into more money when a customer buys the transformed inputs from us at a price that's higher than what we've paid for them. The term "value added" can be defined, then, as the different between the money our customers pay us for the outputs of our system, and the money we've paid vendors for the inputs. We make a profit when we've generated more "value added" than we need to pay for the ongoing operation of our system. Note that it's quite easy for us to talk about for-profit companies because the measure of value added—money—is tangible in our eyes, and it comes in clear and precise units of measure. Money is an accepted and common means to measure value.
>
> [...]
>
> When the goal of the organization is to continually increase its profitability, improvement is measured as "**<u>throughput</u>**" (the rate of money generation) increases.
>
> Believe it or not, **not all organizations are built for the purpose of making money**. Government agencies, religious organizations, <u>**public educational organizations**</u>, and the like **are in business for reasons other than making money**. Although none of these entities can afford to neglect the necessity of funds to fuel their survival and growth, **their success is not (<u>or at least should not be</u>) measured in dollars**."

**Exhibit 528**—*Thinking for a Change, in part, pp. 14-15*. (Emphasis added).

1638.   Quickly, *for our purposes here*—the Defendants' **added value system** of fraud compels **STUDENTS** to use their Pedagogical Free Speech by discrimination, harassment, threat, and coercion to unconstitutionally contribute to the invalid purpose of this pedagogical *focus* related

to the Defendants' Global Research Mission and *specifically* that of [**VERY**] Ambitious Goal Curriculum resulting in the illegal and unconstitutional taking of the Plaintiffs' property in violation of clearly established Substantive and Procedural Due Process rights, as well as Equal Protection rights under the law.

*1639.* Also, *again*, at this point the simple concept of "**Throughput**" has been exhaustively explained in *this* Complaint and with that explanation comes *here* a reminder as this placement in "**Cochrane's Theory of Constraints' Full Flex**" necessitates such declaration as this concept is a fundamental **Measurement of Success**, or <u>purpose</u> of an organization.

*1640.* Simply, "**Throughput**" is the aggregated positive and negative effects relative to the measurements of success of the system. These measures of success are positive and negative, tangible, and intangible, and register on micro and macro levels—**<u>each</u>** communication registers as a measure of "**Throughput**" and **<u>each</u>** is limited relative to the systems' constraint(s).

*1641.* "A **<u>constraint is defined as</u>** *anything* that limits a system's higher performance relative to its purpose," and when "viewing an organization from the *functional perspective*, our list of constraints is *usually quite long*." **Exhibit 528**, at p. 15. (Emphasis added).

*1642.* In general, there are two (*2*) types of Constraints that limit "**Throughput**" and/or achieving the purpose of a System: (***a***) Physical, and (***b***) Non-Physical, each of which exists in **<u>every</u>** system **<u>all</u>** the time—*nothing is perfect*, and most often "[p]aradigm constraints cause policy constraints, and policy constraints result in mismanaged or misplaced physical constraints." *Id*. at p. 16.

*1643.* More specifically, "**<u>Physical Constraints</u>**" are limiting variables that "are physically limiting the system from increasing throughput," where this barrier "**can be <u>internal</u> or <u>external</u>** to the organization." *Id*. (Emphasis added).

*1644.* In more detail, Mrs. Scheinkopf explains the differentiation between internal and external physical constraints:

"An **external physical constraint might also be** at the output boundary of the system: **the market**. If you have plenty of capacity, access to plenty of materials, but not enough sales to consume them, a physical constraint of your organization is located in your market. **Most organizations today have market constraints**.

**Internal physical constraints** occur when the limiting resource [constraint] is a shortage of capacity or capability inside the boundaries of the organization. Although it is easy for us to relate to machines as constraints**, today's internal physical constraints are most often not machines**, **but the availability of people or specific sets of skills needed by the organization** to turn inventory into throughput.

Every organization is a system of interdependent resources that together perform the processes needed to accomplish the organization's purpose. **Every organization has at least one**, but very few, **physical constraints**. The key to continuous improvement, then, lies in what the organization is doing with those few constraints."

**Exhibit 528**—*Thinking for a Change, in part, pp. 16.* (Emphasis added).

*1645.* Just like physical constraints, **Nonphysical Constraints** are internal and external, and are defined as **policy** and **paradigm constraints**; *again*, Mrs. Scheinkopf explains in detail:

"**Policies** are the rules and measures that govern the way organizations go about their business. **Policies determine** the location of the physical constraints, and the way in which they are or are not managed. **Policies define** the markets your organization serves; they govern how you purchase products from vendors; and they are the work rules in your factory. **Policy constraints** are those rules and measures that inhibit the system's ability to continue to improve, such as through the **Five Focusing Steps**. **Policies** (**both written and unwritten**) **are developed and followed because people, through their belief systems, develop and follow them**. In spite of the fact that our organizations are riddled with stupid policies, I don't think that any manager ever woke up in the morning and said, "I think I'll design and enforce a stupid policy in my organization today." **We institute rules and measures because we believe that with them, the people in our organizations will make decisions and take actions that will yield good results for the organization**.

**Paradigm constraints** are those beliefs or assumptions that **cause us to** develop, embrace, or follow policy constraints."

**Exhibit 528**—*Thinking for a Change, in part, p. 18.* (Emphasis added).

*1646.*   To go about maximizing the Systems' constraint(s) which in turn reduces the limiting of net "**Throughput**" an individual and/or organization may incorporate the Theory of Constraints "**Five Focusing Steps**" to aid in the problem-solving/decision-making process.

*1647.*   Moreover, as explained before within *this* Complaint, the use of the Theory of Constraints "**Five Focusing Steps**" can be in used simultaneously with the Theory of Constraints "**Thinking Processes**" *as seen with* "**Cochrane's Theory of Constraints' Full Flex**," *respectfully*.

*1648.*   <u>*Before we continue this dissent*</u> through this elevated-problem solving/decision-making process, <u>**we must**</u> first <u>**turbo**</u> <u>**charge**</u> our logic—this is done by using the Theory of Constraints "**Effect-Cause-Effect Logic**," inclusive the **Categories of Limited Reservation**, and **Necessary Conditions** used to shape the way we <u>o</u>bserve, <u>o</u>rient, <u>d</u>ecide, and <u>a</u>ct on our "**Full Flex**" decision.

*1649.*   Again, "**Effect-Cause-Effect Logic**" has been exhaustively explained in *this* Complaint and with that explanation comes *here* a reminder as this placement in "**Cochrane's Theory of Constraints' Full Flex**" necessitates such declaration as this concept is the keystone of <u>**all**</u> decision making—<u>**asking**</u> the <u>**why**</u>—determining the source of the problem <u>**and**</u> solution.

*1650.*   This logic is easily explained by Mrs. Scheinkopf using a hypothetical that Defendants, Dr. James T. Low and Deborah Habel, also used in GSC 7260/5670 as depicted below:

> "**Sufficient Cause** ["**Effect-Cause-Effect Logic**"]
>
> **Sufficient cause is the thought pattern of effect–cause–effect**. **When we assume that something, simply because it exists, causes something else to exist, we are using sufficient cause thinking**. **Another way** of saying this is that we are using sufficient cause thinking **when we assume that something is the inevitable result of the mere existence of something else**. Here is an example of sufficient cause thinking:
>
> You live in Chicago, and it is a cold, winter day. You have just gone outside to start your car. You turn your key in the ignition, and nothing happens. If you're like me, you turn the key again, a little bit harder. Then again, harder still, and one more time, just in case you didn't turn it hard enough already. Guess what? You have just used what I call "passive" sufficient cause thinking. In a flash of a moment, you

hypothesized that the reason your car hasn't started is the lack of pressure on the key. This can be diagrammed as in Figure 3.1. Note the arrow points from your speculated cause (putting less than the required amount of pressure on the key) to its resulting effect (the car doesn't start). When the only result of your attempted solution is pain in your hand, you realize that the car is not going to start through brute force. You begin to think about what the problem might be, and you move into more "active" sufficient cause thinking. You might guess that the battery is dead, and you begin to check whether or not this hypothesis is correct. You do so by checking for additional effects. Inevitable results of a dead battery would be lights and a radio that don't work, as diagrammed in **Figure 3.2**.

Notice that you have gone through a pattern of speculating a cause for an effect, and then proceeded to check whether or not you were correct. **You checked the validity of your speculated cause by looking for additional, inevitable effects of that speculated cause**. When you are speculating causes for effects, or effects of causes, you are actively using sufficient cause thinking. **The TOC Thinking Processes add a twist, <u>by challenging us to ask why</u>**. Why do we believe that something causes something else? **Why do we believe that an effect is caused by that which we believe causes it**?



Figure 3.2

**Exhibit 528**—*Thinking for a Change, in part, pp. 31-33*. (Emphasis added).

*1651.* To adequately diagnose the *multiple* working hypotheses contributing to a problem (*cause*) it is best to take an approach of the pessimist, *the Attorney*, to attempt to prove your own hypothesis of the cause wrong and work backwards through the system instead of working from the hypothesized cause towards the effect. Simply, it is best to expose the hidden assumptions as alternative-possible worlds as effects that have resulted in the problem being solved *as* the cause.

The valuable byproduct of this **reverse engineering** is you are **simultaneously learning** how the system works and will but for this **gained experience** be positioned to solve future problems **faster** as a direct result of this mental-muscle memory.

*1652.* To aid and add value to your analysis, <u>when practical</u> relative to the decision-making process, the assistance of **visual diagrams** aids significantly to the complete analysis and are used to "pinpoint the space that might hold hidden, and potentially invalid, assumptions." *Id.* at pp. 34.

*1653.* In general, there are thousands of visual diagrams used to aid in all types of professional functions—for our purposes *here*, the visual diagrams used by the Theory of Constraints "**Thinking Processes**" use five (*5*) symbols or parts throughout each diagram to represent a function of the logic represented as the diagram (system) itself. These symbols as functions are elementary facets of the **o**rientation and explained by Mrs. Scheinkopf as follows:

> "Sufficient cause diagrams have specific characteristics and terminology. There are [five] unique parts to a ["**Effect-Cause-Effect Logic**"] diagram[s]:

> *1*. Entity (Figure 3.6)
> *2*. Arrow (Figure 3.7)
> *3*. Cause (Figure 3.8)
> *4*. And-Connector (Figure 3.9)
> *5*. Effect (Figure 3.10)

> <u>**Entity**</u>
> An entity is a single element of the system. [Each element] is expressed as a complete statement. For instance, the phrase, "the battery" is not considered to be an entity. However, "the battery is dead" is considered to be an entity. An entity can be a cause (see Figure 3.8) and/or an effect (see Figure 3.10).



Figure 3.6

### Arrow

An arrow is an indicator of a relationship between two entities. The entity at the base of the arrow is the cause (see Figure 3.8). The entity at the point or tip of the arrow is the effect (see Figure 3.10) An is where assumptions reside.



Figure 3.7

### Cause

An entity, or group of entities bound by an 'and-connector (see Figure 3.9), that, given its existence, will cause another entity to exist.



Figure 3.9

### And-Connector

The and-connector is an ellipse that groups entities to represent [a] "logical and." Each entity at the base of an arrow that is captured by an and-connector must exist in the system in order for the entity at the point [top] of those arrows to exist as an effect (see Figure 3.10) of them.

**Effect**
An effect is an entity that exists as an inevitable result of a cause [*or multiple* causes] It is also referred to as a consequence.



Exhibit **528**, at pp. 36-38.

*1654.* For every diagram you draw, whether that be of the Theory of Constraints "**Thinking Processes**," a chicken-scratch sketch, or a purely mental diagram—using these symbols to visual represent "**Effect-Cause-Effect Logic**" will aid significantly in understanding the problem **and** solution of any decision making.

*1655.* Next, the next layer of "**Effect-Cause-Effect Logic**" is to "stop [*when practical*] and check whether or not a claim of cause-effect is valid," and this is done through two primary methods of logic: (*a*) the **Categories of Legitimate Reservation**; and (*b*) **Necessary Conditions**. *Id*. at p. 41.

*1656.* Determining the validity of your logic is good practice, and as Mrs. Scheinkopf explains:

> "The **greater the risk**, the **greater the need to check**, as illustrated in Figure 4.1. I'm talking about the risk of impact on any of the system's stakeholders, not just financial risk. The **greater the degree to which the results of your hypothesis might be changing someone's life, the stronger is the need to check**."
>
> *Id*. at p. 43. (Emphasis added.)

*1657.* Frankly—*and in the more respectful way possible*—this determination rings true *here* and is why *this* Complaint is written to this degree of detail...without this detail, this argument would

fail to convey the totality of the circumstances and would unjustly jeopardize the Plaintiff. And

with this information, as outlined by Mrs. Scheinkopf these assumptions will be validated:

> "...gather a diverse group of stakeholders—individuals who represent different elements of your system, at least some of whom don't think like you. These are the people who have the best chance of helping you uncover those assumptions that hide in the space occupied by the arrows! **Any claim of cause-effect should be able to pass three tests**:
>
> *1*. Verification that what we say exists does exist.
> *2*. Validation of the relationships between causes and their effects.
> *3*. Agreement that what we say reflects what we mean to the person we are attempting to communicate with, including ourselves."

> *Id*. at p. 44. (Emphasis added).

*1658.*   Specifically, the **Categories of Legitimate Reservation** "blend basic scientific method with the **powerful intuition** we gain **through our life experiences** to provide an easier, yet systematic approach to uncover, verbalize, challenge, and replace our assumptions" while using the Theory of Constraints "**Effect-Cause-Effect Logic**."  *Id*. at 45. (Emphasis added).

*1659.*   Thinking of the placement of the Categories of Legitimate Reservation in "**Cochrane's Theory of Constraints' Full Flex**," this logic is leverages while using the Theory of Constraints "**Thinking Processes**," with specifically:

> "The current reality [(**O**bserve & **O**rientation)], future reality [(**D**ecide the alternative-possible worlds)], and transition trees [(**A**ct as Feedback)] depend on your rigorous use of these **Categories of Legitimate Reservation**. **Master them**, and several things will happen:
>
> - The quality of your thinking will improve;
> - The quality of your listening and communication will improve;
> - You will have established the foundation to master the sufficient cause application tools quickly and use them very effectively."

> *Id*. at p. 45. (Emphasis added).

*1660.*   In total there are **six** (*6*) **Categories of Legitimate Reservation** that allow for different ways to challenge or check the "**Effect-Cause-Effect Logic**" being analyzed:

> "*1*. **Entity Existence** asks us to verify that what we say exists does exist.

*2*. **Causality Existence** asks us to validate relationships between causes and their effects.

*3*. **Clarity** asks us to make sure that what we say reflects what we mean to the people we are attempting to communicate with, including ourselves.

*4*. **Additional Cause(s)** asks us to further examine **Causality Existence** by looking for additional independent causes for the given effect.

*5*. **Insufficient Cause(s)** also further examines **Causality Existence** by looking for missing dependent elements of the cause.

*6*. **Predicted Effect(s)** is used to examine either **Causality Existence** or **Entity Existence** by utilizing the scientific method of effect-cause-effect."

*Id*. at pp. 48; 53. (Emphasis added).

*1661.*   The **first** way to check your "**Effect-Cause-Effect Logic**" is through the **Category of Legitimate Reservation** known as:

"**Entity Existence**

"Then *entity existence* reservation is used to verify whether or not an entity does, in fact, exist in the system that is being examined. **Is it *really there***?

[...]

The entity existence reservation reminds us that we should check to make sure (verify) a problem exists before we spend time figuring out what's causing it or how to solve it. As illustrated in the car battery example of the previous chapter, it also reminds us that when we have speculated a cause for something, we should make sure (verify) that those (cause) entities also exist as entities in the reality we're trying to understand. (Sure, a dead battery can be a cause for a car failing to start, but is it so in this case? Use the entity existence reservation, and check first to see if the battery is dead!)

*Warning*: **Don't make this more difficult than it is**. The entity existence reservation is used merely to remind you to ask yourself a simple question: Does this really exist? If the answer is yes, fine. If the answer is no, excellent! You've saved yourself some work in the long run, because you won't be solving nonexistent problems. If the answer is "I don't know," move on to the predicted effect reservation later in this chapter. Its purpose is to help you systematically check those entities in particular."



*Id*. at pp. 46; 48-49. (Emphasis added).

*1662.* The **second** way to check your "**Effect-Cause-Effect Logic**" is through the **Category of Legitimate Reservation** known as:

"**Causality Existence**

"The causality existence reservation is used when you are questioning the cause–effect relationship itself. In terms of the sufficient cause diagram, the causality existence reservation points directly to the assumptions that occupy the space underneath the arrow, arrows, or and-connector. It does not question the existence of any of the entities, but rather the cause–effect relationship that is hypothesized to exist between them. The causality existence reservation says, OK, **I believe the entities exist**, <u>but</u> does the (speculated) cause really cause the effect? Does the effect really exist simply because the (speculated) cause does?

The causality reservation gives us an opportunity to test our assumptions against the reality of the validity of a cause–effect relationship—a relationship that we are claiming, as well as one that we are reading or hearing.

*Warning*: Don't make this more difficult than it is. The causality existence reservation is used to remind you to ask yourself a simple question: Does this cause–effect relationship really exist? If the answer is yes, fine. If the answer is no, excellent! You've saved yourself some work in the long run, because you won't be solving the wrong problem. If the answer is "I don't know," move on to the Additional Cause and/or Cause Insufficiency reservations later in this chapter."

*Id*. at pp. 46; 50; 52. (Emphasis added).

*1663.* The **third** way to check your "**Effect-Cause-Effect Logic**" is through the **Category of Legitimate Reservation** known as:

"**Clarity Reservation**

"There are three scenarios in which the clarity reservation is appropriate, and all three of these scenarios occur more often than you think:

*1*. You are not understood by someone you are trying to communicate with.
*2*. You do not understand what someone else is trying to communicate to you.
*3*. You have not articulated your own thinking clearly enough to yourself.

When an entity is not written as a complete statement, automatically raise a clarity reservation!

When you are writing the entity, be sure to write it as a complete statement. It will be there as your own reminder of what you mean. When you leave a diagram and come back to it sometime later, you will not have to second guess yourself as to what you meant. If the entity is one that is being verbalized by someone else, know that the only way you make sense of it is by completing a sentence in your mind...You will find that as you open yourself up to this practice, you will have fewer arguments and better relations.



*Id*. at pp. 46; 52-53. (Emphasis added).

**1664.** The **fourth** way to check your "**Effect-Cause-Effect Logic**" is through the **Category of Legitimate Reservation** known as:

"**Additional Cause[s]**

"The additional cause reservation is used when you suspect that the hypothesized cause is not the only cause for the resulting effect. A good test for additional cause is to ask, "If we removed the originally speculated cause, would the effect still exist?" If the answer is yes, there is a good chance that an additional cause exists.

The question that you are attempting to answer with the additional cause reservation is, Is there something else, independent of the cause(s) already speculated or validated, that is causing the effect? One way to get there, as Johnny's mother did, is to ask two questions:

*1*. Is there something else that might cause the effect?
*2*. Does that something else exist in the reality of the situation or system that I'm examining?

**It's easy to overdo this reservation**, by adding *so many minor causes* that the diagram becomes

meaningless. For each cause, ask If we eliminated this entity from existence, to what degree would its effect still exist? Take a look at **Figure 4.15**, which is what I refer to as a **pincushion**. Let's say entity **C** provides for **50%** of **Z**'s existence, entities **D** and **A** each provide for **20%**, and entities **B** and **E** each provide for **5%**. If entity **Z** were something that you wanted to change or improve, working to eliminate **B** and **E** will not have much of an impact. In a case such as this, my suggestion is to **remove** entities **B** and **E** from the diagram.



*Id*. at pp. 47; 54-55. (Emphasis added).

**1665.** The **fifth** way to check your "**Effect-Cause-Effect Logic**" is through the **Category of Legitimate Reservation** known as:

### "**Insufficient Cause[s]**

"The insufficient cause reservation questions causality by identifying one or more entities that must exist along with the speculated cause entity or entities in order for the cause to be valid. The [two] questions that we're asking with this reservation are:

> *1*. Is there something else that must exist in conjunction with the speculated cause, in order for the effect to exist as a result?

*2.* Does that something exist in the reality of the system or situation that I'm examining?

Like a chemical reaction, in reality it takes a combination of conditions to cause another condition to exist. Understanding the elements of those combinations can be quite important as we endeavor to make improvements in our organizations and our lives.

- We gain an understanding of the circumstances in which the cause is or is not a cause, and thus a better understanding of the circumstances in which a given solution will or will not lead to the desired outcome.

- We uncover more avenues and choices for solutions. Quite often, the newly discovered avenues are much more within our own realm of control or influence than previously believed.

**After several rounds of clarity**, additional cause, and insufficient cause reservations, our manufacturer's analysis of material shortages looked like Figure 4.19. Please note that **Figure 4.19** is **not** a "**pincushion.**" It contains three distinct and major causes for the effect.

Be careful to keep the sufficient cause diagram practical. If you find, for instance, that as a result of using the insufficient cause reservation you have more than four entities bound by an and-connector, one of two conditions exists:

- You have several layers of causality embedded in the diagram, in which case you should apply the causality reservation to clarify the cause–effect relationships.

- Your diagram is overloaded with entities that are trivial — so obvious that their only purpose seems t-o be to clutter up the tree.

When I say **keep it practical**, I mean keep it meaningful for the people who need to be involved in using (creating, reading, communicating) the diagram. If you are trying to obtain clarity of understanding, contributions to an analysis or solution, or consensus on a given subject, don't remove an entity just because it's "[clutter]" to you. Doing so will send the message to your colleagues that their understanding is inferior to yours. This is not the message you want to send if you're looking for collaboration. Only remove an entity if all concerned agree that it's "[clutter]."



*Id*. at pp. 47; 58-59. (Emphasis added).

**1666.** The **sixth** way to check your "**Effect-Cause-Effect Logic**" is through the **Category of Legitimate Reservation** known as:

### "**Predicted Effect[s]**

"The thinking processes were founded on the predicted effect reservation. The rest of the reservations were discovered later, as we gained better understanding of what the predicted effect reservation was actually accomplishing. Predicted effect is nothing more than the scientific method. For a given effect, speculate its cause. Try to invalidate your hypothesis by predicting another effect that must result from the cause, and check for the

existence of that effect. If the predicted effect does exist in the reality of the system or situation you are examining, then your hypothesis has passed a test of validity. If the predicted effect doesn't exist in that system or situation, then you have in some way invalidated your original hypothesis. This is why the thinking processes are often called "effect–cause–effect" thinking. The predicted effect reservation is used to check for entity existence, especially when the entity is something intangible and difficult to verify physically. It is also used to validate cause–effect relationships.

The common practice would have us go about looking for all the evidence we can find to substantiate the claim that the price increase is the culprit. The predicted effect reservation takes a different approach. It asks:

   • What entity, if we found it in reality, would prove our hypothesis wrong?

[...]

Using the [Predicted Effect reservation helps] to uncover additional, important aspects of the cause-effect relationship that were not evident before."



*Id*. at pp. 47; 59-61. (Emphasis added).

*1667.*   Summarizing the **Categories of Legitimate Reservation**, Mrs. Scheinkopf reminds us:

   "**When you are on the receiving end of communication**, **use the clarity reservation first**. It shows that before you assume the other person is incorrect, you first assume that you might not fully understand what he or she is trying to communicate.

   When you are creating sufficient cause diagrams, don't worry about using the clarity reservation first, but remember that you are not ready to show your diagram to anybody else until you have applied the clarity reservation to it. **When you are ready to share a diagram with others, add whatever is necessary to make it clear**. Don't leave entities off because you consider them to be "[clutter]" if someone

involved in the diagram believes the entity to be more relevant than that. **<u>Don't forget to put on your learning hat and remember that you are trying to prove yourself wrong every step of the way</u>**. This is an about face from our common practice of "being right" and trying to substantiate our claims every step of the way.

I hope that you have seen a glimpse of the benefits of this type of outlook — **you <u>empower yourself to learn</u> and to recognize opportunities that <u>you were previously blind</u> to**."

<em>Id</em>. at pp. 62-63. (Emphasis added).

*1668.*   The ability to use these **Categories of Legitimate Reservation** to scrutinize your own work **is powerful**—but to use these tools to scrutinize **someone else's work** is **even more powerful** as such is the case *herein* as demonstrated by the Defendants' positioning of the [*VERY*] Ambitious Goal Curriculum. **<u>Here</u>**, the **STUDENTS' pedagogical free speech** was deceptively compelled in the form of the "**Thinking Processes**" logic maps and submitted to Defendants, Dr. James T. Low and Deborah Habel, where this unconstitutional taking thereafter prompted the use of these **Categories of Legitimate Reservation** by the Defendants, leveraged by the **three-tiered grading scheme** providing *additional* opportunity to *clarify* and refine the **STUDENTS**' submissions, where this gave the Defendants the ability to **zoom into** the Plaintiffs' reality and question logic **that prompted <u>further</u> compelled speech**. See **Exhibit 528**, at pp. 64—67. (Emphasis added).

*1669.*   The final aspect of "**Effect-Cause-Effect Logic**" is "**Necessary Condition Thinking**" which as it sounds provides the limitations or boundaries of the current reality **<u>and/or</u>** future reality being designed by the decision-making process.

*1670.*   Quickly, three (*3*) examples of **Necessary Condition Thinking** relative to *this* Complaint encompass—Wayne State University Academic Nondiscrimination and Harassment/Affirmative Action Policy; Wayne State University IRB compliance, itself subject to a laundry list of necessary conditions, and including principally—ongoing-informed consent, *respectfully*.

*1671.* Specifically, as it relates to **Necessary Condition Thinking** of the Theory of Constraints "**Effect-Cause-Effect Logic**," Mrs. Schienkopf explains in detail:

> "**Necessary Condition[s]** is the thought pattern we use when we are thinking in terms of **requirements**. When we think that something must exist before we are able to achieve something else, we are using necessary condition thinking. Terms such as **must**, **must not**, **cannot**, **need**, and **have** are indicators of necessary condition thinking.
>
> **Necessary conditions are <u>rules</u>, <u>policies</u>, or <u>laws</u>,** that <u>provide the limitations,</u> or <u>boundaries within which</u> we believe <u>we are allowed to pursue goals and objectives</u>. Conformance with a necessary condition does not guarantee that a goal will be achieved, but we usually believe that if we don't have the perceived necessary condition in place, we will certainly be unable to attain that goal.
>
> **Our interpretations of necessary condition relationships shape our perceptions** of what we are and are not able to do. Often, we limit our opportunities by believing strongly in necessary conditions that aren't, or don't need to be. As a result, we block ourselves from seeing and acting upon many simple, practical, creative, and speedy ways to achieve our objectives. [...]
>
> <u>**Necessary Condition[s]**</u>
> "An entity is a necessary condition when it is considered to be **required** in order for another entity (*the objective*) to exist or to be allowed to exist. The necessary condition is located at the based of an arrow (see Figure 5.4)."



*Id.* at p. 69-70; 72. (Emphasis added).

*1672.* The general concept of "**Effect-Cause-Effect Logic**" is inherent within our DNA as intelligent organisms and has evolved like the *Homo Sapiens Sapiens* through our experiences and inductive reasoning by sparking the creation of new knowledge to **survive** relative to this continuous decision-making process; summarizing this logic, Mrs. Scheinkopf explains:

> "I want to encourage you to **be bold and creative** as you use this approach. My experience is that **out of bold, creative ideas, come quite practical and usable ideas**. Just as professional photographers often shoot many rolls of firm in order to get just a few great shots, **it is helpful for us to generate lots and lots of ideas, in order to find the one or the few that we actually want**

to implement. **Have fun with it**! **Allow yourself to go on the <u>thinking journey to generate as many ideas as you possibly can</u>**. Don't block yourself from writing down an idea just because it seems impractical. Writing it down frees you to generate and write down the next one, and the one after that, and the one after that."

*Id*. at p. 79. (Emphasis added).

*1673.* Once "**Effect-Cause-Effect Logic**" is understood you can **zoom in further** into the *40,000* ft. view to **d**ecide how to react to the unfolding environment by using the Theory of Constraints "**Five Focusing Steps**" to generate the **d**ecided solution as an **a**ction in response the **o**bservation and **o**rientation of a current reality as necessary for proper-decision making.

*1674.* Traditionally, the Theory of Constraints "**Five Focusing Steps**" have been used in the context of physical constraints—*but*, this logic can be used in **all** decision making **scenarios**, involving both physical and Nonphysical constraints as the following identifies:

> "**<u>The Five Focusing Steps</u>**
>
> > **<u>Step 1</u>**. Identify the system's constraint(s). What, if only the system had more of it, would enable it to increase its rate of goal attainment (e.g., throughput)? What is the physical entity that is limiting the system's ability to improve relative to its purpose? **Where is the weak link** in the chain? Please note that the word **identify** has **proactive** as well as **reactive** implications. To identify the system's constraint also means to **decide where to place it**. Thus, an important strategic question that your organization should answer is, where should the system's constraint be located?
> >
> > **<u>Step 2</u>**. Decide how to exploit the system's constraint(s). What do you want the constraint resource(**s**) to be doing, to ensure that **the system achieves as much of its goal (e.g.**, generates as much throughput) as it possibly can, given the current state of its resources? **How do we get the most with what we've got**?
> >
> > **<u>Step 3</u>**. Subordinate everything else to the decisions made in steps one and two. **Make sure the rest of the organization is aligned with the exploitation decisions**. The **job of every person in the organization is to enable the organization to accomplish all that its physical**

constraint is capable of. **This is often the most difficult step to implement**.

**Step 4**. Elevate the system's constraint(s). **Increase the capacity** of the constrained resource, **enabling** the **system to attain even more** of its goal (**e.g.**, generate even more throughput) than its current optimal capabilities. Think of the organization as a funnel with a one-inch-diameter neck. In the exploit step, you are doing everything you can to make sure as much fluid as possible flows through that one inch. **In the elevate step**, you are **enlarging the diameter** of the neck itself, thus enabling even more fluid to **flow** through it **faster**.

**Step 5**. Don't allow inertia to be the system's constraint. When a constraint has been broken, go back to step one. This **involves aligning policies and paradigms with the exploitation** and subordination decisions. If the physical constraint changes **without changes to the policies and paradigms** that govern its management, the system will not achieve as much of its goal (e.g., generate the throughput) that it is now capable of."

*Id*. at pp. 17-18. (Emphasis added).

*1675.*   This explanation by Mrs. Scheinkopf is similar to that of Defendants, Dr. James T. Low and Deborah Habel, and also that of TOCICO. *Recall*, **Exhibit 129**, at p. 8; **Exhibit 130**, at p. 42; **Exhibit 242**, at p. 27; **Exhibit 247**, at p. 4; **Exhibit 518**, at p. 22; *and* **Exhibit 519**, at p. 11.

*1676.*   There are **two** (*2*) **adaptations** that differentiates the traditional implementation of the "**Five Focusing Steps**" from "**Cochrane's Theory of Constraints' Full Flex**," both of which reside in **Step 2** and are the result of the **erroneous** *traditional verbiage* leveraged by all users of TOC:

> The *traditional verbiage* of **Step 2** of the "**Five Focusing Steps**" reads as follows "Decide how to **exploit** the Systems' Constraint." The definition of "**exploit**" is to **use** a *situation* or *person* in an **unfair** or **selfish** way; **benefit unfairly** from the work of *someone*, typically by overworking or underpaying them.

*1677.*   First, the alternative design of **Step 2** frames the decision-making process differently by adding an **ETHICAL** overlay prompting deliberate consideration of these conditions:

(*a*) an ethical overlay consistent with "**Dr. Goldratt's Six Pillars of Proper Decision Making**;" *and*

(*b*) adds the **relative Systems' ethics** to the decision-making process as necessary conditions, *e.g*., the Michigan Rules of Professional Conduct; Judicial Cannon; Geneva Convention; National Research Act; Institutional Review Board Policy and Procedure; Constitutional Safeguards; *etc*.

*1678.*   Using this ethical adaptation shifts the perspective of the decision-making process entirely and allows the User of **Step 2** of **Cochrane's Theory of Constraints' Full Flex** to determine:

(*a*) **D**ecide how to "**use**" the Systems' constraint(s) to maximize purpose/**Throughput**;

*and/or*

(*b*) **D**ecide how to reach your [**VERY**] Ambitious Goal.

*1679.*   Simply, the word "**d**ecide" evokes **all** aforementioned logic and requires a compounded analysis relevant to the **o**bservation, **o**rientation, and the **d**ecision of the *future* **a**ction—the Theory of Constraints "**Thinking Processes**" aid in this deliberate determination *of the future*.

*1680.*   Importantly, the "**Thinking Processes**" were deliberately **designed to compound** the thought processes of the User in a way that the logic transfers through a **Current Reality Tree** to the **Transition Tree** using experience and reasoning in a systematic fashion—*for example*, the sequence of this flow is: **Current Reality Tree**; **Evaporating Cloud**; **Prerequisite Tree**; **Future Reality Tree**; and **Transition Tree**. See, **Exhibit 528**, at pp. 232-233. (Emphasis added).

*1681.*   Specifically, *I*, Plaintiff Cochrane, have found from reviewing this exhaustive record that the flow-of-thought relative to the sequence of the "**Thinking Processes**" syncs with Boyd's OODA Loop, the Communication Process, *and* also maximize the use of Inductive and Deductive Reasoning as the **historically debated** lines-of-thinking. *For example*, bringing all this logic together visually for the *first time* as **Cochrane's Theory of Constraints' Full Flex**, the following

table *is inclusive* of this *knowledge of the good* attached as **Exhibit 529** and further demonstrates the overlapping functions of this intentional-thought process:



**Exhibit 529**—*Cochrane's Theory of Constraints' Full Flex Diagram*

*1682.*   This compounding logic may have been derived by fluke, but regardless Mrs. Scheinkopf identifies the origin of the "**Thinking Processes**" and provides a *message of clarity* for their use:

> "This is the **order** in which the **thinking processes were taught** when they were **first introduced**. A downside to **the teaching approach** was that many students of the thinking processes developed a paradigm that said, "Thou must always use these thinking processes, beginning with the current reality tree and continuing on through completion of the transition tree." This led to the belief that using the thinking processes is always a long, laborious task. As you have seen throughout this book, **that is not the case**.
>
> **It is worth repeating one of my main messages here**—**use the tools to answer questions that you have yet to answer**. If you are convinced that you know the problem, if you are convinced that you know the solution, if you are convinced

that you know exactly what to do, **don't go for the full analysis**. **Use the tools you need to answer the questions you need to answer**. As with picking up any of the single application tools, **when you embark on a full TP** [Thinking Processes] **analysis**, **make sure you are willing to learn**. **Make sure you are willing to recognize, verbalize, challenge, and change your assumptions**."

**Exhibit 528**, at p. 223. (Emphasis added).

*1683.* To summarize this message by Mrs. Scheinkopf—do not always go for the full analysis on paper mapping each entity and visually drawing out these logic maps, *most of the time you will not be able to do this anyways*—**these concepts will come mentally with practice**, allowing you to implement the logic of each tool *herein* intellectually where applicable and with *speed* throughout your engagement in the *continuous* Communication Process—*of life*.

*1684.* Specifically, just as the "**Thinking Processes**" have at times been infused within *this* Complaint embedded and discussed *therein* for demonstrative purposes, *e.g.*, the **Current Reality Tree** has been discussed in **Exhibit 146**, at p. 26, and **Exhibit 259**, at pp. 1; 3-5; 13-14; 17; and 22—where too, Defendant, Dr. James T. Low, has **ECHO**ed this *same message* identifying that originally the "**Thinking Processes**" were developed to be used as a group, but over time that necessity has faded through practice and the User is directed to **use individual tools** in their toolbelt *as needed*. **Exhibit 252**, at p. 4.

*1685.* Thus, to elaborate *now* briefly on the "**Thinking Processes**" is important given the placement of these logic tools to **d**ecide the reactive *effect* as the responsive **a**ction as feedback to the originating *cause* sparking the decoding within the Communication Process.

*1686.* **Beginning first** with what is a "**Current Reality Tree**," this logic tool uses "**Effect-Cause-Effect Logic**" to determine the **root cause of the problem** and/or outlines the Systems' constraint(s) on achieving its purpose (increasing **Throughput**)—essentially, the **core effect** will be identified through the process of determining the relationships between the variables involved.

*1687.*   Specifically, to begin constructing a **Current Reality Tree**, in general there are two (*2*) steps, the **first** is to "list between five (*5*) to ten (*10*) pertinent entities that exist in the system, relative to the scope of the analysis," to determine the core problem. **Exhibit 528**, at p. 147.

*1688.*   The 'pertinent entities' in a **Current Reality Tree** are called Undesirable Effects ("UDEs") and are observed in the environment of the system by answering the following three (*3*) questions:

"*a*. What evidence indicates that **the system** is misaligned with its purpose?
*b*. In what ways is **the system** achieving fewer of its goals than it desires to achieve?
*c*. What exists in **the system** that is preventing it from achieving more of its goals?"

**Exhibit 528**, at p. 147; **Exhibit 259**, at pp. 2-3. (Emphasis added).

*1689.*   The UDEs "should be *statements of facts*, without drawing conclusions in the statement," and will be constructed using "**Effect-Cause-Effect Logic**" utilizing the **IF/THEN** statements:



Steps in Constructing a Current Reality Tree: Step 2

✓ Look at the list of UnDesirable Effects
✓ Find two of the effects on the list for which you can state (out loud):  "IF I have __first effect__, THEN I have __second effect__ as a result."
✓ Another way to state this (out loud) is: "I have __second effect__, because of __first effect__."

Copyright 2009 James T. Low          page 17     7/8/2009

**Exhibit 259**, at p. 3; and **Exhibit 528**, at p. 153.

*1690.*   Once the UDEs are identified, it is important to use the "**Effect-Cause-Effect Logic**" tools known as the **Categories of Legitimate Reservation** *and* **Necessary Conditions** to test the assumptions for invalid and missing logic that contributes to the core problem.

*1691.*   From Defendant, Dr. James T. Low, the following is an "example of a **Current Reality Tree underlined developed by a previous class** to diagnose the core problem for Apple Computer:"



Figure 5
Current Reality Tree for Apple Computer

**Exhibit 259**, at p. 6.(Emphasis added).

*1692.*   Plainly, the **Current Reality Tree** should look slightly chaotic being that it represents the **reverse engineered current reality** *from the negative perspective* of the relative System—stated simply, the **Current Reality Tree** "is a tool that allows us to see **order even in the midst of chaos**." **Exhibit 528**, at p. 144. (Emphasis added).

*1693.*   Next, the **second logic map** of the "**Thinking Processes**" is known as an "**Evaporating Cloud**," used primarily to resolve conflicts between assumptions and generalizations made with "**Effect-Cause-Effect Logic**" by brainstorming an **injection** (*solution*) to resolve logic conflicts.

**1694.**   At times the "**Evaporating Cloud**" was also known as "Dilemma Tree" as Mrs. Scheinkopf explains a *behind-the-veil example* of Dr. Goldratt's **angered protection** of the Theory of Constraints during his controlling rein of Earth:

> "Imagine a problem as a giant storm cloud. Now, imagine that you can evaporate that problem into thin air simply by thinking about it. As a physicist, Dr. Goldratt believes there is no such thing as conflict in nature, so any conflict we experience is our own doing. His teaching acknowledges that **every problem is a conflict**, and that **conflicts arise because we create them by believing at least one erroneous assumption**. Thus, **simply by thinking about the assumptions that enforce the existence of a conflict, we should be able to resolve any conflict by evaporating it with the power of our thinking**. Goldratt decided to name the conflict resolution tool Evaporating Cloud in honor of Richard Bach.
>
> **Many consultants and academics who are teaching and using the thinking processes have changed the name of this tool** from evaporating cloud to things like conflict resolution diagram, conflict diagram, and dilemma tree. **Their reasons for doing this seem sound enough: evaporating cloud isn't really a professional or scientific sounding name**; it doesn't describe its function as well as the names of the other thinking process tools, such as current reality tree or future reality tree. This is a serious tool, and the name evaporating cloud is, well, too "fluffy" to be taken seriously; especially by executives ! Until last spring, I was in this camp and was referring to the tool as the dilemma tree.
>
> Dr. Goldratt was a keynote speaker at a conference I had helped to organize. One evening during the conference, he joined the conference committee for dinner. The subject of the evaporating cloud became the topic of conversation. **<u>Dr. Goldratt was clearly angry and offended about the variety of names that have surfaced for this tool</u>**. I chalked up his anger to ego and joined several people around the table who attempted to reason with him about the merits of the other names. Dr. Goldratt then reiterated the history of the name. **He went on to explain that in his culture, when something is named in honor**

**or in memory of a person, the only person in the world with the right to change that name is the person in whose honor the thing was named**. Thus, even if he agreed with the rationale for the name change, Dr. Goldratt himself doesn't have the right to change the name of the evaporating cloud. From his perspective, the only person with that right is Richard Bach, and anybody who calls it anything other than evaporating cloud is committing an act of disrespect to both Dr. Goldratt and Mr. Bach."

**Exhibit 528**, at p. 178. (Emphasis added).

1695.   Similarly, Mrs. Sheinkopf in the following sheds even more light on TOCFE's impact on the Global Educational Ecosystem *and* Peer Mediation using Evaporating Clouds as highlighted previously in *this* Complaint:

"**I then remembered Kathy Suerken**. Kathy is the president of the nonprofit organization, **TOC For Education**, Inc. The mission of Kathy's company is to help educational systems improve through using TOC, and her **intent is to spread the TOC principles and tools far and wide throughout educational systems all over the world**. In just a few short years, Kathy has proven that she's got a very good chance at success. **Many school districts in** and outside of **the States are using the thinking processes to reengineer their administrations**, and **teachers are using them to design their curricula**. **One of the thinking process** application tools — **yes, the evaporating cloud — is spreading like wildfire and is rapidly becoming the tool of choice for many <u>peer-mediation</u> programs**. These are <u>**programs in which students help each other resolve their conflicts**</u>. The kids call it "clouding." Just maybe, the parents of one or more of these kids will read this book. It would be nice if they both had the same name for the same tool. I certainly don't want to give any teenagers reason to argue with their parents over something like the name of the tool they're using to resolve arguments!"

*Id*. at p. 183; *see again*, **Exhibit 511**, at p. 20. (Emphasis added).

1696.   Typically, the **Evaporating Cloud** is used in scenarios with mutually exclusive alternatives, where the proposed **injection** (*solution*) to the conflict would result in a **win-win solution**.

*1697.*   Furthermore, the **injection** as the "**win-win solution**" should be sufficient to resolve the conflict completely, *again as identified previously* by Defendant, Dr. James T. Low:

> "...the **EC technique leads to** an **innovative solution** [*the injection*] to a complex problem: The **objective is to** break **or invalidate an underlying assumption that is sufficient to make the problem disappear**. **When** an assumption which underlies or supports a **logical link is broken**, the **problem collapses ending the conflict and solving the problem**."

**Exhibit 129**, at p. 5. (Emphasis added).

*1698.*   The win-win solution(s) used *as* the breakthrough solution(s) (**injection**) can then be analyzed and expanded further in the **third logic map** of the "**Thinking Processes**" known as the "**Prerequisite Tree**;" *remember*, the larger your **Current Reality Tree**, or the scope of your problem, the more injections you may have to determine feasible by using the **Prerequisite Tree**.

*1699.*   Recall the **nesting-doll design** of the "**Thinking Processes**," and while it may not seem determinative, Mrs. Scheinkopf's "Full Analysis" sequence of the "**Thinking Processes**" *does not* yield proper flow-of-thought and instead Defendant, Dr. James T. Low's, sequence as taught in GSC 7260/5670 is adopted. Specifically, the *Thinking for a Change* sequence of the "**Thinking Processes**" is expressed in the following *order* where this rendition fails to adequately sync this compounding logic: **Current Reality Tree**; **Evaporating Cloud**; **Future Reality Tree**; **Prerequisite Tree**; and **Transition Tree**.

*1700.*   Explicitly, the difference *here* between these two sequences is the rearrangement of the **Future Reality Tree** and the **Prerequisite Tree**—with the **Prerequisite Tree** _preceding_ the **Future Reality Tree** for the simple reason that the **Prerequisite Tree** establishes the necessary conditions that the User must achieve and incorporate into their **Future Reality Tree** analysis.

*1701.*   It seems <u>illogical</u> for someone to brainstorm a **Future Reality Tree** without knowing first the <u>necessary</u> components involved—the **Prerequisite Tree** sets the stage for these requirements.

*1702.*   Turning to Defendant, Dr. James T. Low, we must acknowledge that like the **Evaporating Cloud**, the **Prerequisite Tree** was given a pseudonym and was aptly called the **Intermediate Objective Map**; see again, **Exhibit 250**:

> "The Intermediate Objective Map (I.O. Map, also known as the PreRequisite Tree) is used to plan for the achievement of an ambitious target that otherwise might seem unreachable."

> **Exhibit 250**, at p. 4.

*1703.*   The notion of the unreachable is something that must be discarded if you seek to accomplish the objective you have chosen, Mrs. Scheinkopf explains the placement of the **Prerequisite Tree**:

> "While most of us won't be tasked with figuring out how to make the next greatest leap in science or technology, we are often assigned projects or dream of accomplishing things that seem far out of reach or just too difficult to achieve. In these circumstances, *most of us do one of three things*:
>
> 1. We lessen the goal to something that seems more within our grasp, compromising what we really want,
>
> 2. We decide to "forget about it," and keep it in our pile of never-to-be-achieved dreams, *or*
>
> 3. We continue on as we always have, under the delusion that somehow, someway, if it is meant to be, it will happen. "Someday, my dream will come true."
>
> **There are a few determined people in the world who actually don't compromise**. They set their goals, determine what milestones they need to accomplish along the way, and make them happen. Every once in a while, they regroup, reassess where they are relative to achieving their lofty goal, adjust the milestones, and leap forward once again. **The goal is always in mind**.
>
> The prerequisite tree **is a tool that can make that <u>elite circle of people much larger</u>**. The process of the prerequisite tree leads us to define what's in our way—*obstacles*—and what we need to make happen so nothing keeps us from achieving our goals. *Some* applications of the prerequisite tree include:

- Project planning
- Implementation planning
- Personal development plans
- Business process development and definition
- Marketing strategies
- Organizational strategies

**Exhibit 528**, at pp. 193-194. (Emphasis added).

*1704.* Simply, the **Prerequisite Tree/Intermediate Objective Map** begins shifting the **o**rientation of our problem solving by using the chosen breakthrough injection(*s*) developed towards *actually* **d**eciding how to achieve the relative Systems' defined purpose.

*1705.* Constructing the **Prerequisite Tree** is relatively simple and primarily *focus*es on leveraging Necessary Conditions "**Effect-Cause-Effect Logic**" to develop each rung-in-the-ladder <u>required</u> to achieve the Systems' objective by implementing the chosen injection(s). Specifically, this logic is outlined by Mrs. Scheinkopf as follows:

> "A simple prerequisite tree is illustrated in **Figure 10.1**.
>
> The prerequisite tree is a **diagram that describes the necessary condition relationships that are involved in achieving objectives** (see Chapter 5). When you create a prerequisite tree, **you will utilize necessary condition thinking to describe the path or paths that must be taken in order to accomplish those defined objectives**, or goals. The entities in the diagram all fall under the rules for necessary conditions, and are referred to as:
>
> **Objective**. The objectives are entities that describe the goals of the prerequisite tree. These are what the system is going to accomplish as a result of **attaining all the entities in the tree**.
>
> **Intermediate Objective**. The intermediate objectives are **entities that describe milestones that must be accomplished in order for the objectives to be accomplished. Each intermediate objective is created in order to overcome an obstacle that stands in the way of achieving the objective/s**, thus becoming a necessary condition to achieving another intermediate objective or objective.
>
> **Obstacle**. Each arrow identifies a necessary condition relationship between an intermediate objective and objectives, or between an objective and another objective. This indicates that the objective or

intermediate objective at the base of an arrow must be in existence before the objective or intermediate objective at the point of the arrow will be allowed to exist. **The assumption behind the dependency is the obstacle**, which is stated right on the arrow. **Unless the obstacle is overcome somehow, the system will be unable to achieve the stated objective/s. Obstacles are stated as entities that exist in the current reality**."



**Exhibit 528**, at pp. 194-195. (Emphasis added).

*1706.*   The four (*4*) major steps in developing a **Prerequisite Tree** are as follows:

"**1**. Define the purpose for the Prerequisite Tree.

**2**. List the obstacles to achieving each of the objectives, and the intermediate objectives that will overcome them.

**3**. Map the implementation order of the intermediate objectives.

**4**. Implement!"

*Id*. at p. 196.

**1707.**  Using the **Prerequisite Tree** requires both the objective and intermediate objective to be scrutinized "using necessary condition thinking, so that you can surface the obstacle/s the intermediate objective is meant to overcome," in addition to the **Categories of Legitimate Reservation** to display any invalid assumptions relative to an intermediate objectives' necessity.

**1708.**  Other important Theory of Constraints' topics previously covered to consider during creation of the ***ordered sequence*** in which the **Prerequisite Tree** would **a**ct out in the implementation stage are—Critical Chain *v.* Critical Path; *and* Drum-Rope-Buffer/Protective Capacity/Buffer Management.

**1709.**  Next, the **fourth logic map** of the "**Thinking Processes**" is known as an "**Future Reality Tree**," used primarily to—*frankly*—predict the future, *sort of* as framed by Mrs. Scheinkopf:

> "**Every single decision** we make, **every single action** we take, **will change** something in **the future**. It doesn't matter whether that future is just a moment away or whether that future is years from now. **The change might be** small enough that it's barely noticeable, or **so large that an entire civilization is affected**.
>
> As its name suggests, the **future reality tree is a tool for visualizing and predicting the future**. But, *you may say*, the future is unpredictable! **True**. A butterfly flapping its wings in China may cause entire weather patterns to change in North America six months from now.
>
> Yet don't **we** attempt to **predict the future with some degree of accuracy every day**? **You set your alarm** clock before you go to bed at night, predicting that it will ring at the appointed time and predicting that as a result, you will wake up in time to do whatever it is you will do that day. **You decide** to hire a particular job candidate because you predict that she will fit into the company culture and perform the tasks of the job with a high degree of proficiency. **You decide not** to hire a particular job candidate because you believe that bringing that person up to speed on your technology will take an inordinate amount of time. **Your company develops** a new marketing strategy, predicting that as the strategy is implemented, market share will increase, along with profitability. **You bring a gift** home for your spouse, predicting that he or she will be happy as a result. **You put** your young child in "time out" for 10 minutes, predicting that as a result, she'll stop the inappropriate behavior. Professors predict that students will learn as a result of implementing their lesson plans. Sales professionals predict they will "close" business when they deploy their sales skills and plans. A manager is afraid to

enforce a required new behavior in his plant, because he fears the workers will retaliate. A child is afraid to raise her hand in class because she thinks she'll look stupid and her friends will make fun of her.

**Yes, we are predicting the future all the time**. Sometimes, we do so quite inaccurately. Always we do so quite incompletely. All too often, **if we'd have just thought about it a little bit**, **we could have predicted better** — **more accurately and more completely**. The future reality tree is a tool that helps us do so, **and has the important added benefit of helping us learn more about our changing systems as we go**."

**Exhibit 528**, at pp. 109-110. (Emphasis added).

*1710.* The **value** of the **Future Reality Tree** is the framing from which it is built becoming essentially the *opposite* of the **Current Reality Tree**, while including the breakthrough **injections** from the **Evaporating Cloud** with knowledge of *all necessary intermediate objectives* as defined by the **Prerequisite Tree—**compounding all of this analysis, while taking into consideration the **positive** *and* **negative** effects for each action using "**Effect-Cause-Effect Logic**"—this is truly the elevation of the decision making process needed to reach the *next-intellectual level*.

*1711.* Further, Mrs. Scheinkopf explains the design and content of the **Future Reality Tree**:

"Future reality trees are sufficient cause diagrams that contain four distinctive parts, which are labeled in **Figure 7.1**.

*A*. Injections are always entry points to the tree (see Chapter 4). Injections are entities that do not exist in the system's current reality, and are distinguished from other entities by their squared corners. Why the term injection? Think of getting a shot in the arm. The idea is that once you've received that injection, the illness will be cured, and the ugly symptoms will disappear. Once an injection (idea) is implemented in reality, the effects predicted should emerge as a result.

*B*. Entities that do currently exist in the system's reality. In a future reality tree, this type of entity will usually be entry points and is typically not found in the body of the tree.

*C*. Entities that do not yet exist in the system. When entities that currently exist (B) are combined with injections (A), the (C) entities will (at least they're predicted to) exist in the future.

***D***. Reinforcing loops are often placed in future reality trees, as a means to create patterns of sustained and continuous improvement.

- **The key to** creating **the** desired **future** reality **is implementing** the **injections**.



**Exhibit 528**, at pp. 110-111. (Emphasis added).

*1712.* *Again*, recalling Defendant, Dr. James T. Low's, words it is important in this phase to plan for the inevitable negative consequences of the injection and for the effects of the intermediate objectives necessary to reach the Systems' primary objective.

*1713.* Finally, the **fifth and final logic map** of the "**Thinking Processes**" is known as an "**Transition Tree**," used primarily to create a **detailed action plan** for implementation of the compounded logic and analysis derived from the "**Thinking Processes**" decision making.

*1714.* Quickly, continuing with Mrs. Scheinkopf:

> "**We forget that for every action there's at least one reaction**. We forget that, when we have a plan that contains steps that must be performed in a specific sequence, <u>there are reasons for sequencing the steps</u>. In other words, **each step is** (or at least should be) **an action that is <u>meant</u> to create a reaction —<u>a new condition</u>**."

> **Exhibit 528**, at p. 84. (Emphasis added).

*1715.* Echoed again here is the compounded value that the "**Thinking Processes**" culminating in the form of the formalization of the **<u>a</u>**ction plan:

> "...use the **transition** tree to **design the process that will create the necessary transitions from the conditions present in the current reality to the different conditions you desire** at some point in the future [reality tree]. With your **transition tree**, you will **define the specific steps** (actions) **that will transform your current reality** (raw materials) **into a specific future reality** (objectives)...The **<u>transition tree is the tool to use when you need to create an action or implementation plan</u>**, and you already have some ideas in mind relative to what you're actually going to do. The objective is something you know is within reach. You may even have already determined some of the actions that you are going to take in order to reach the objective, yet it's not a "no brainer" objective. You sense that it would be really beneficial to sit down and do some planning so you can be confident that by executing the plan, the objectives will be achieved in a way that doesn't create unwanted side effects (Figure 6.3. Of course, there are times when we are assigned a task or have an objective that we want or need to achieve and we simply have no clue on just what to do to achieve it. In such cases, use the **prerequisite tree** (see Chapter 10) before the transition tree. The **prerequisite tree** will guide you through verbalizing and addressing the obstacles to reaching your objective and turn what seems almost impossible into a series of reachable milestones."

> **Exhibit 528**, at pp. 85-87. (Emphasis added).

*1716.* In practice, the **Transition Tree** is the **<u>most</u> <u>detailed</u>** logic map because of the compounding logic distilled from the **Current Reality Tree**, the **injection** from the **Evaporating Cloud**, *<u>each</u>* required-intermediate objective from the **Prerequisite Tree**, and *<u>each</u>* negative and positive effect

as recognized from the **Future Reality Tree**—the **Transition Tree** takes **all** of this content and sequences the **a**ction plan to achieve the Systems' primary objective while navigating reality.

*1717.* *For example*, see below and remember the need to implement Drum-Buffer-Rope too:



**Exhibit 528**, at p. 85. (Emphasis added).

*1718.* Once the **a**ction has been **d**ecided, the **third step** of the Theory of Constraints "**Five Focusing Steps**" is to **subordinate everything** to **implementation** of the **d**ecided-**a**ction plan.

*1719.* *Framed differently*—the **a**ction is a form of communication and is feedback to the Sender.

*1720.* Specifically, recall Mrs. Scheinkopf's explanation of "**Step 3**" from *Thinking for a Change*:

> "**Step 3**. Subordinate everything else to the decisions made in steps one and two. **Make sure the rest of the organization is aligned with the exploitation decisions**. The **job of every person in the organization is to enable the organization to accomplish all that its physical constraint is capable of. This is often the most difficult step to implement**."
>
> *Id*. at pp. 17-18. (Emphasis added).

*1721.* *Remember*—this communication may happen instantaneous with this decision-making process and there may not be a formal "*plan*" to act upon, *e.g.*, a sports team can run a planned play, but the moment that order breaks down the experience and placement of those teammates in that system will dictate the subsequent **o**rientation of future **a**ctions towards the mutual objective.

*1722.* The **fourth step** of the Theory of Constraints "**Five Focusing Steps**" is to elevate the **d**ecided **a**ction plan until a change in **o**rientation exists, and/or subordination is warranted because of noise, corruption, abandonment, or decay that occurs within the scope of the environment being observed within field-of-observation.

*1723.* The term "**elevate**" *focus*es on the systems' objective associated with the **d**ecided **a**ction plan and specifically seeks to enable the system to "**attain even more**," as explained by Mrs. Scheinkopf in *Thinking for a Change*:

> "**Step 4**. Elevate the system's constraint(s). **Increase the capacity** of the constrained resource, **enabling the system to attain even more of its goal** (e.g., generate even more throughput) than its current optimal capabilities. Think of the organization as a funnel with a one-inch-diameter neck. In the exploit step, you are doing everything you can to make sure as much fluid as possible flows through that one inch. **In the elevate step**, you are **enlarging the diameter** of the neck itself, thus enabling even more fluid to **flow** through it **faster**."

> *Id*. at pp. 17-18. (Emphasis added).

*1724.* Similarly, Defendant, Dr. James T. Low, has concurred with this explanation of the "elevation" terminology as previously stated:

> "**Step 4** elevation means, if possible, to reduce the effects of the constraint in limiting the system. This could mean to off-load some of its demand, or expand its capability. Continuous improvement efforts should be *focus*ed on the constraint."

> **Exhibit 242**, at p. 27. (Emphasis added), *recall*, **Exhibit 130**, at p. 44; **Exhibit 247**, at p. 4.

*1725.* The **fifth step** of the Theory of Constraints "Five Focusing Steps" is the **final step** which acts to pause the ongoing flow-of-thought to revert this decision-making process to the beginning.

*1726.* Plainly, this is **the value** of the Theory of Constraints as a process of ongoing improvement ("POOGI") that which allows for repetitive realignment using gained experience within the Users' environment relative to the elevated systems' objective(s). The idea is to avoid "inertia," which is simply defined as losing ***focus*** of the core objective and allowing your environment to shape your alternative-possible reality. Again, as this final step is explained by Mrs. Scheinkopf as follows:

> "**Step 5**. Don't allow inertia to be the system's constraint. When a constraint has been broken, go back to step one. This **involves aligning policies and paradigms with the exploitation** and subordination decisions. If the physical constraint changes **without changes to the policies and paradigms** that govern its management, the system will not achieve as much of its goal (e.g., generate the throughput) that it is now capable of."

> **Exhibit 528**, at pp. 17-18. (Emphasis added).

*1727.* Even more direct—this final step exemplifies the relentless *focus* of the dogfighters' battle for survival—as similarly defined by Defendant, Dr. James T. Low, explaining importantly:

> "**Step 5** the **restart of the process** completes the cycle of improvement, **without allowing inertia or self-congratulation to halt the process**. A caution is that the **next constraint** (that will then limit the system) **should be anticipated** before breaking the current constraint. **This avoids being unready to deal with the next constraint**."

> **Exhibit 242**, at p. 27. (Emphasis added).

*1728.* And with that, this process **continuously loops** as we trek forward through time and space communicating our **a**ctions as we **d**ecide how **to survive** along the way based on the careful deliberation between our sense impressions (**o**bservations) and acquired experiences (**o**rientation).

**1729.** The collective logic of **Cochrane's Theory of Constraints' Full Flex** is easily demonstrated utilizing Walt Disney's *Inside Out* released in 2015; the second installment is slated for released in June 2024. Simply, this children's animated film illustrates the complexity of life and the consequences of the decision-making process from the perspective of our emotions living in *our minds* as referenced below *as* Headquarters:      [*www.movies.disney.com/inside-out*]



"Growing up can be a bumpy raid, and it's no exception for Riley, who is uprooted from her Midwest life when her father starts a new job in San Francisco. Like all of us, Riley is guided by her emotions—Joy (Amy Poehler), Fear (Bill Hader), Anger (Lewis Black), Disgust (Mindy Kaling) and Sadness (Phyllis Smith). The emotions live in Headquarters, the control center inside Riley's mind, where they help advise her through everyday life. As Riley and her emotions struggle to adjust to a new life in San Francisco, turmoil ensues in Headquarters. Although Joy, Riley's main and most important emotion, tries to keep things positive, the emotions conflict on how best to navigate a new city, house and school."

**1730.** Plainly, each of us as intelligent organisms have emotions and a control center—**a mental headquarters—**where we process our **o**bservations as thoughts and **a**ct by communicating the **o**rientation of those ideas through our active engagement within our unfolding environment.



*1731.*   We see from *Inside Out* that Riley's Headquarters (the mind) and **control panel** evolved as each experience accumulated (represented as glowing-memory orbs) to develop a more complex decision-making process. Specifically, this is illustrated in the depiction of Riley's **control panel** evolving from birth at the beginning of the film to age twelve (*12*) at the end which allowed for deeper reasoning capabilities.

*1732.*   *First*, see Riley's *limited*-**control panel** at birth with the *only* emotion present being *Joy*:



*1733.*   Next, Riley's **control panel** is seen evolving as she grows with her experiences as a child, introducing new emotions along the way:



*1734.*   Finally, by the end of the film Riley's **control panel** had evolved with her maturity:



*1735.*  This transformation of the decision making was intentional by the film's designers and is comparatively mimicked in depiction of Riley's parent's Headquarters and **control panels**:



*1736.*  Explicitly—*each* of us has a <u>Headquarters</u> and *each* of us has a **<u>control panel</u>**.

*1737.*  Finally, **ECHO**ing Dr. Goldratt's mission to teach the World *how* to think—the final objective gained by implementing the compounding logic of **Cochrane's Theory of Constraints' Full Flex** is to—*simply*, **<u>Defend Your Brain</u>**!

*1738.*   This *idea* is central to the Communication Process, and to achieve this objective is to also implement Boyd's OODA Loop opposite **<u>invalid</u>** communication successfully.

*1739.*   To mock up this defensive strategy three (*3*) examples are used to demonstrate this objective: (***a***) *the combination* of the 1978 Japanese video game aptly named: **Space Invaders,** and the 1980 American video game *also* aptly named: **Missile Command;** *and* (***b***) the Iron Dome, *also known as a* C-RAM (Counter rocket, artillery, and mortar) defensive system.

*1740.*   Intuitively, our headquarters is much like **Space Invaders** in that the bunkers as buffers shield our mental infrastructure from destruction subject to their environment *and* friendly fire.



*1741.*   Similarly, on the same premise as **Space Invaders**, the *idea* of **Missile Command** is to maintain the integrity of the stationary 'cities' (as headquarters) being attacked by an <u>endless barrage</u> of ballistic missiles. Defending this system involves accurately timing the placement of *counter*-missiles that defensively explode in midair to shield the 'cities' from destruction.



*1742.*   Now, thinking in abstract terms, these 'cities' and bunkers as buffers are parts of our headquarters, or more specifically our brains *and* consciousness, and the decision to **defend your brain** is maintained by the individual's **control panel**, *or* the authorized Agent in control.

*1743.*   This decision is again based on the logic of **Cochrane's Theory of Constraints' Full Flex** and is not universal meaning that every headquarters is different, and each **control panel** has a distinct configuration of 'buttons' if you will that guide the decision maker through their **o**bservation, **o**rientation, and **d**ecision to **a**ct in accordance with their evolving environment.

*1744.*   Thus, we as *Homo Sapiens sapiens* have through our generational development hardwired-action paradigms within our communicative system that act as a C-RAM to detect communication from Senders for **o**rientation relative to the system's preprogramming, *e.g.*, our instinct **to survive**.



*1745.*   Specifically, relative to this *innate* C-RAM that is our ability to communicate, the Receiver's Communication Process detects (**o**bserves) communication with their range of comprehension and computes the **o**rientation of these **o**bservations as **_invalid_** *or* **_valid_** messages.

*1746.*  This **o**rientation of the Sender's communication by the Receiver as **_invalid_** *or* **_valid_** allows the Receiver to **_accept_** *or* **reject** (counter defend) the communication relative to the objectives of the system and **d**ecision to **a**ct, *e.g.*, accepting a cordial '*hello*' *or* countering with a block punch.

*1747.*  Doing this mentally and with intention, in terms of **_accepting_** or **_rejecting_** the endless barrage of communication that inundates a Receiver during each day, allows a Receiver to improve their ability to **o**bserve with objectivity, properly **o**rient relative to the systems' objectives, and **d**ecide to **a**ct in accordance with this subjective calculation based on **_valid_** truth.

*1748.*  Therefore, it is this ability to cut through the noise and communicative-informational warfare to reach a **_valid_** and objective reality *for proper* decision making to—**_Defend Your Brain_**.

# **THE THEORY OF CONSTRAINTS AND HIGHER EDUCATION**

*1749.*  Now, the following list is **_not_** exhaustive and instead demonstrates the breadth of the academic use of the Theory of Constraints throughout the Higher Education ecosystem beginning in Michigan and thereafter expanding to known hubs of this knowledge throughout the World.

*1750.*  Specifically, this list consists of educational institutions that teach or have connections with the Theory of Constraints:

> (***a***) *within* the State of Michigan;
>
> (***b***) within the 6th Circuit Court of Appeals' jurisdiction;
>
> (***c***) *outside* the jurisdiction of the 6th Circuit Court of Appeals,
>     *but within* the United States of America; *and*
>
> (***d***) institutions *outside* the jurisdiction of the United States.

## *Within* **the State of Michigan**

*1751.*  Of course, as identified exhaustively *herein*—**Wayne State University** has used the Theory of Constraints operationally *and* offered [**_VERY_**] Ambitious Goal Curriculum to

**STUDENTS**, <u>even</u> sponsoring Dr. Goldratt's TOCICO event in 1993 that explicitly contributed to the creation of TOCFE making possible this entire reality; recall, **Exhibit 109**, at p. 24.

*1752.* Also, we know in 2021 communication involving TOCICO Treasurer and, Defendant, Deborah L. Habel, noted that "Jim has <u>passed</u> <u>the</u> TOC <u>torch</u> to Deborah <u>to</u> <u>continue</u> including TOC in the courses she teaches." **Exhibit 328**, at p. 37. (Emphasis added).

*1753.* Interestingly, this email continues by establishing the still ongoing effort of Defendant, Deborah L. Habel, to obtain a Ph.D. with "a TOC ***focus***," as such was continuously identified to Plaintiffs during 2020. *Id*. at pp. 35-37. (Emphasis added).

*1754.* Frankly—this <u>unsanctioned</u> <u>research</u> by Defendant, Deborah L. Habel, towards a Ph.D. *focus*ed on the Theory of Constraints was possible by leveraging [***VERY***] Ambitious Goal Curriculum, the research/strategic missions of Wayne State and—plainly, the **<u>STUDENTS</u>**.

*1755.* *Next*—**<u>Western Michigan University</u>** offers the Theory of Constraints in a restricted course requiring approval to take under the synonym "constraints management" known as MGMT 6140—Supply Chain and Process Management and cross listed as another course known as MKTG 6140. **Exhibit 530**—*Western Michigan University MGMT 6140 2023 Catalog.*

*1756.* *Next*—**<u>Michigan Technological University</u>** ranked by Forbes among "**Top 25 STEM Colleges**" in the United States, identifies "[e]ssential online quality Engineering Courses," including "Introduction to Lean Manufacturing" that includes explicitly topics that include the Theory of Constraints. **Exhibit 531**—*Michigan Tech Top 25 Advertising.*

*1757.* Specifically, there are three (*3*) courses that Michigan Technological University offers the Theory of Constraints to **STUDENTS**: (***a***) MEEM 5656—Advanced Production Planning (Spring 2024); (***b***) MEEM 4655—Production Planning (Fall 2023); *and* (***c***) MEEM 4665—Introduction to Lean Manufacturing (Fall 2023). **Exhibit 532**—*Michigan Tech 2024 Course List, at p. 2*; and **Exhibit 532**—*Michigan Tech 2023 Course List.*

*1758.* *Next*—**Michigan State University** identifies that the Theory of Constraints is a management core concept used as a method to teach **STUDENTS** in their Supply Chain Management Department. **Exhibit 533**—*Michigan State Core Concept Overview*.

*1759.* *Next*—**Saginaw Valley State University** it appears has a connection to both Audrey Taylor and Defendant, Dr. James. T. Low, in that Dr. Danilo Sirias as Professor at Saginaw Valley has taught Jonah courses in Detroit; this connection is made when Ms. Taylor relays Dr. Sirias' need for a "*cucumber*" to Dr. Low in 2016 (this term is unfamiliar to Plaintiff, and is similar to other cryptic terms used by Dr. Cox). **Exhibit 428**—*January 8, 2016, Taylor to Low Email*.

*1760.* Explicitly, we know that Saginaw Valley State University offers at least two (*2*) courses *focus*ed on "Constraints Management" known as MGT 333 and MGT 633. **Exhibit 534**—*Saginaw Valley State Course Catalog*.

*1761.* *Next*—the final educational institution in Michigan, being the *first private* college in this non-exhaustive list—**Kettering University** offers an online Master of Science in Lean Manufacturing which is the "only program of its kind in North America—**Developed in Partnership with General Motors**," that includes a course involving the Theory of Constraints known as MFGO 633. **Exhibit 535**—*Kettering University Program Overview*.

## ***Outside* the State of Michigan<br>*but within* the Jurisdiction of the 6th Circuit Court of Appeals**

*1762.* *First*—the **University of Dayton** has a direct connection with Dr. Goldratt who taught Jonah Course in 1991 as explained by Defendant, Dr. James T. Low. See again, **Exhibit 430**.

*1763.* In fact—we know that sometime in and around February 9th, 1989, the University of Dayton issued a "*News Release*" for a one-day seminar of TOC and a two-day seminar taught by Dr. Goldratt of then the Avraham Y. Goldratt Institute. **Exhibit 536**—*Dayton's 1989 News Release*.

*1764.*   *Next*, a one-day program introducing the Theory of Constraints is offered at the Center for Corporate and Professional Development at **Kent State University**. **Exhibit 537**—*Kent State Program Overview*.

*1765.*   *Next*—the **Air Force Institute of Technology** offers two (*2*) courses focusing exclusively on the Theory of Constraints and "how TOC principles have been applied across the Air Force." **Exhibit 538**—*Air Force Institute WKTOC 101*; **Exhibit 539**—*Air Force Institute WKTOC 201*.

*1766.*   *Next*—on March 07, 2013, Dr. James Cox connects by email with Dr. Paul H. Pittman a Professor of Management Marketing and Info-Ops Management at the **School of Business at Indiana University**. **Exhibit 456**, at p. 25.

*1767.*   Specifically, we know that Indiana University offers two (*2*) courses involving the Theory of Constraints in BUS-A 437 labeled as "Advanced Managerial Accounting" with BUS-A 325 focused on "Cost Accounting" as a required prerequisite. **Exhibit 540**—*Indiana University Course Catalog*.

*1768.*   Also, *remember* Defendant, Dr. James T. Low, relaying Audrey Taylor's obstacle to delivering an excellent TOC class: "I have titled this course, "TOC and Management Accounting" when the bulk of the subject matter is not directly linked to Accounting." **Exhibit 248**, at p. 5.

*1769.*   *Next*—we know definitively that the **University of Tennessee** Center for Executive Education College of Business Administration sponsored the 2012 TOCICO International Conference. **Exhibit 456**, at pp. 9-10; *see also*, **Exhibit 141**, at pp. 5-6.

*1770.*   *Finally*—with the most comparable public university to the Defendants' implementation of the Theory of Constraints—the **University of Louisville College of Business**—at the time I, Attorney Cochrane began this journey both Dr. Lynn Boyd and Dr. Mahesh Gupta were both

listed as Professors for Louisville's "Theory of Constraints (TOC) Resource Center," though after my conversation with Dr. Boyd he also subsequently vacated his position.

*1771.* Specifically, Dr. Boyd informed me that the College of Business at the University of Louisville offers the Theory of Constraints to **STUDENTS** and requires each to sign a non-disclosure agreement and informed consent *prior to* commencement of the course.

*1772.* We learn from watching Dr. Gupta's introduction video the following:

> "Hello, this is Professor Mahesh Gupta from College of Business in the University of Louisville Kentucky. I have been here teaching, researching, and serving for the past twenty-five (25) years. My areas of expertise and interest include evaluating and improving the organizational performance by using management philosophies such as Theory of Constraints, Lean Thinking, Six Sigma, Activity-Based Cost Management, and market orientation. **I have worked extensively with local companies**, small and medium sized companies, **primarily by my graduate [STUDENTS] and have published my research in numerous journals** including: Journal of Operations Management; Decision Science Journal; International Journal of Operations and Productions Management; International Journal of Productions Research; Production and Inventory Management Journal; Journal of Operations and Research Society; European Journal of Operational Research; Computers and Operational Research; *etc*. When not teaching or researching I like to read about spirituality and help our local churches and temple in whatever capacity I can. You can learn more about my research and teaching interests by accessing my resume available online, just search for Mahesh Gupta and Louisville. I am also on the ResearchGate, my all publications are online available for you to take a look and would welcome any opportunity to work with you if possible. Thank you so much."

**Exhibit 541**—*Louisville's TOC Webpage.*

*1773.* Specifically, we know that "Mahesh attended an academic Jonah course that I [Dr. James Cox] taught at the University of Georgia," where both have as of sometime in and around 2012 "started conducting research," together. **Exhibit 456**, at pp. 12-13.

*1774.* Furthermore, we know that both Dr. Boyd and Dr. Gupta were involved in contributing to the writing and editing of the Theory of Constraints Handbook with Dr. Cox. **Exhibit 328**, at p. 11; **Exhibit 141**, at pp. 5-6; and **Exhibit 454**, at p. 1. (Emphasis added).

## *Outside* the Jurisdiction of the 6th Circuit Court of Appeals *but within* the United States of America

*1775.*  *First*, according to Mr. John Covington's 2017 tribute to Dr. Goldratt—we know that sometime in and around 1990/91 **Clemson University** hosted a Jonah Course taught by Dr. Goldratt and Mr. Covington:

> "My closets interaction with Eli was the activity before and during the **Apparel Supply Chain project** where we did a Jonah Course for an entire supply chain at **Clemson University**. We had executives from the fiber producer, textile company, apparel company, retailer and also member of academia and the **US Department of Commerce**. Many, many "late nights" and lots of learning and challenging assumptions. Also some lighthearted moments. One such moment involved Eli and his then, ever-present cigar."

**Exhibit 507**, at p. 2. (Emphasis added).

*1776.*  *Next*—we recall Dr. Cox's proclamation that "[**Baylor University**] had more TOC faculty than any other school for a while with Charlene, the Umbles, Marjorie Cooper, and someone in IS." **Exhibit 141**, pp. 5-6. (Emphasis added).

*1777.*  Specifically, we know that "Charlene" is the same "Dr. Charlene Spoede Budd" that Defendant, Dr. James T. Low, solicited and confessed his ongoing '*research*' having usurped his **STUDENTS**' pedagogical experience piercing through the veil to reengineer this forced speech for the Defendants' dual benefit. *Id*. at pp. 2-4. (Emphasis added).

*1778.*  Furthermore, we know that Dr. Budd also contributed to the of the Theory of Constraints Handbook identified by Dr. Cox. **Exhibit 328**, at p. 11; **Exhibit 454**, at p. 1. (Emphasis added).

*1779.*  *Next—again*, Dr. Cox connects us with Dr. Ed Walker, Department Head and Professor of Management at **Valdosta State University** in Georgia, as contributor to the Theory of Constraints Handbook. **Exhibit 328**, at p. 11; **Exhibit 454**; and **Exhibit 456**, at pp. 25-26.

*1780.*   Specifically, we know sometime in and around 2010 Valdosta State University offered a course known as "MBA 7300-Advanced Production Techniques" that offered the "Theory of Constraints operations philosophies." **Exhibit 542**—*Valdosta State Course Catalog, at pp. 2-3*.

*1781.*   *Next—again*, Dr. Cox connects us with the **University of Minnesota** where we learn that sometime prior to August 21st, 2023, the course known as SCO 3059—Quality Management and Lean Six Sigma offered process improvement concepts and principles involving the Theory of Constraints. **Exhibit 481**, at p. 1; **Exhibit 543**—*Minnesota University Course Catalog*.

*1782.*   *Next—again*, Dr. Cox connects us with Dr. James R. Holt, Emeritus Professor for the Engineering & Technology Management Department at **Washington State University**, as contributor to the Theory of Constraints Handbook. **Exhibit 328**, at p. 11; **Exhibit 141**, at pp. 5-6; **Exhibit 454**; and **Exhibit 456**, at p. 39.

*1783.*   Specifically, we know that Washington State University offers at least nine (*9*) courses involving the Theory of Constraints **in addition to** a "Constraints Management Certificate from Washington State University," including: (*1*) EM 526 Constraints Management; (*2*) EM 530 Applications in Constraints Management; (*3*) EM 534 Contemporary Topics in Constraints Management; (*4*) EM 538 Lean Agility; (*5*) EM 501 Management of Organizations; (*6*) EM 505 Financial Management for Engineers (Throughput Accounting); (*7*) EM 540 Operations Research for Managers; (*8*) EM 555 Enterprise Resource Planning; *and* (*9*) EM 564 Project Management (Critical Chain). **Exhibit 544**—*Washington State Holt TOC*; **Exhibit 545**—*Washington State TOC Certificate*; *and* **Exhibit 546**—*Washington Graduate Certificate*.

*1784.*   **Importantly**—the Washington State University course known as EM 526 Constraints Management is as identified by the course description below what is synonymous in form to the Defendants' [*VERY*] Ambitious Goal Curriculum:

"**EM 526 Constraints Management**. This course **teaches the TOC Thinking Processes slowly** and offers the student the time to synthesis the TP material along with other interrelated TOC Topics. **Students complete a Thinking Process Project related to their work environment** as well as participate in two group projects. As part of the learning, **students** scrutinize other student's work and **have their own work scrutinized**. This is the favorite elective of the ETM Masters Program. **Students can receive the TOCICO Certificate of Recognition for a TOC TP program**. It is also an excellent preparation for the TOCICO Thinking Process exam. **(Note: The next offering in January 2016. If you want to attend, begin admission and registration by October2015.)**"

**Exhibit 545**, at p. 1. (Emphasis added).

*1785.  Next—again*, Dr. Cox connects us with **Brigham Young University** to both Associate Professor of Supply Chain and Operational Management in the Department of Marketing & Global Supply Chain Management, Dr. John W. Gardner, and Brigham Young University Management Society Speaker, Executive Director of the **University of Utah: David Eccles School of Business' Initiative on Government Improvement**, and *former* Executive Director of the Governor's Office of Management and Budget for the State of Utah, Mrs. Kristen Cox, *respectfully*. **Exhibit 458**, at p. 1; pp. 13-14.

*1786.  **Notably**, similar to the Defendants *herein*, the University of Utah offers a "Top Operations & Performance" Certificate that *is designed* with "**personalized coaching**, [where] you'll develop a **System** Design **Plan related to your current work** to help you" **Exhibit 547**—*Utah University TOC Certificate*. (Emphasis added).

*1787.  Next*—interestingly when considering the Theory of Constraints topic known *herein* as "**Systems' Thinking Logic**" and as briefly identified previous—Dr. Goldratt's "*The Goal* is

required reading for [*all*] **Harvard Business School** [**STUDENTS** as of 1999].” **Exhibit 548**—*Harvard Business School Article*. (Emphasis added).

*1788.* *Finally*—the **University of Georgia: Terry College of Business** has been used by Dr. Goldratt to disseminate the Theory of Constraints to **STUDENTS** and faculty primarily leveraging Dr. Cox’s “academic Jonah courses” as a direct conduit of diffusion from the source of this continuously evolving knowledge base often being visited by Dr. Goldratt himself. **Exhibit 328**, at pp. 1; 36; **Exhibit 456**, at pp. 19. (Emphasis added).

*1789.* Specifically, we know that the University of Georgia was a powerhouse in graduating “PhDs with extensive (**not based on today’s knowledge**) TOC knowledge,” but that “program died long ago...[m]ost of our UGA PhD [**STUDENTS**] are **lone rangers** at their school; some have continued to teach TOC in some of their courses and **others have abandoned** TOC.” **Exhibit 141**, pp. 5-6. (Emphasis added).

*1790.* Similarly, we know that other professors at the University of Georgia offered the Theory of Constraints to **STUDENTS** in Fall of 2021 in a course known as MGMT 4000 Operations Management. *Recall*, **Exhibit 125**.

# *Outside* **the Jurisdiction of the United States of America**

*1791.* *First*—Dr. Cox identifies specifically the **Victoria University of Wellington School of Management** in New Zealand as taught by Emeritus Professors Dr. Vicky Mabin and Mr. John Davies. **Exhibit 141**, pp. 5-6; **Exhibit 429**, at p. 2.

*1792.* We know that Dr. Mabin was a contributor to the Theory of Constraints Handbook; also, *perhaps,* Mr. Davies. **Exhibit 328**, at p. 11.

*1793.* *In fact*—Dr. Cox "in 2003 spent a quarter teaching at Victoria University in their evening MBA program (what fun!)," where he "had the class form teams and **they did TOC projects in industry and <u>government</u>**." **Exhibit 456**, at p. 19—23. (Emphasis added).

*1794.* *Continuing*—Dr. Cox explains, that "Vicky does **a similar exercise** as **both** she *and* John Davies teach TOC in their courses." *Id.* (Emphasis added).

*1795.* From Dr. Goldratt's 2017 tribute we peer into the Victoria University of Wellington's book store and see The Goal waiting for **STUDENTS** to begin this journey when taking a course known as MGMT206 Systems Thinking and Decision. **Exhibit 507**, at p. 6.

*1796.* *Next*—Mrs. Kathy Suerken on or about November 6th, 2012, identified in an email to Dr. Cox, Mrs. Audrye Taylor, and Dr. Holt from Washington State University that TOCFE's Director of Japan identified that "he was going to use our [TOCFE] materials to teach his University business [**STUDENTS**]!" at **<u>Kyoto University</u>** in Japan. **Exhibit 429**, at pp. 1-2.

*1797.* *Next*—we learn through Defendant, Deborah L. Habel, and further Dr. Cox's reply to TOCICO Treasurer, Mr. Rocco Surace, that **<u>Nottingham Trent University</u>** in the United Kingdom through Dr. Roy Stratton has some connection with the Theory of Constraints. **Exhibit 328**, at pp. 35-37. (Emphasis added).

*1798.* Specifically, this is a strong connection between this collaborating group as we see that sometime in and around September 14th, 2017, Dr. Stratton writes requesting contribution of Dr. Cox regarding a Theory of Constraints paper written for what is the International Journal of Project Management (IJOPM). **Exhibit 458**, at pp. 21.

*1799.* Next—we see from a communication received by Dr. Cox sometime in and around March 8th, 2012, from a Professor from **<u>Aalto University</u>** in Finland, Dr. Paul Lillrank, that the Theory of Constraints was being used for dissertations. **Exhibit 456**, at pp. 12-13.

*1800.*   Specifically, we learn that the dissertation process in Finland and at Aalto University follows "the Central European tradition," where the "Ph.D. candidate defends his/her thesis in a public disputation against an opponent appointed by the Faculty." *Id*. Further, the "defense usually attracts an audience of colleagues, friends, and family...[lasting] two to three hours." *Id*.

*1801.*   We learn too that "[b]efore the manuscript is approved for a public defense, it is subject to pre-examination by two external examinators," where regarding the context of the email— "[i]n this case those two have been people **you** surely **know**, **Prof. Mahesh Gupta**, University of Louisville, and Prof. John Blackstone, **University of Georgia**." *Id*. at p. 13. (Emphasis added).

*1802.* ***Finally***—we learn again from Dr. Cox another vertex of this Theory of Constraints' academic web in that **IE University** of Segovia, Spain, has a suspicious connection with the Theory of Constraints related to specifically a Professor of Operations Management and Organization Design, Dr. Mikko Ketokivi. **Exhibit 328**, at pp. 31-34. (Emphasis added).

*1803.*   Specifically, Dr. Cox learns of Dr. Ketokivi because he was a "coauthor on Johan Groops dissertation on implementing the TOC rapid response supply chain solution in Finland's home healthcare system. [Dr. Cox] was the opponent for Johan's dissertation defense." *Id*.

*1804.*   We learn though, sometime in and around February 15th, 2021, that Dr. Ketokivi while giving a webinar for the "JOM (Journal of Operations Management)" he "showed an [Evaporating Cloud] in his webinar presentation but failed to define it or give credit to Goldratt." *Id*.

*1805.*   Candidly—Dr. Cox expresses his subjective suspicion as we have *herein* regarding *Chen*, identifying— "Miko is familiar with TOC **but makes attempts to hide it**." *Id*. (Emphasis added).

## **PRINCIPAL FACTUAL ALLEGATIONS**

*1806.*   The facts sparking *this matter* are unequivocally entombed within the **February 5th, 2021**, Formal Complaint for Discrimination and Harassment filed with the Wayne State University Office of Equal Opportunity ("WSUOEO") by Plaintiff, Attorney, Bradley E. Cochrane, in

accordance with the Wayne State University Code Annotated (WSUCA) under policy *in the least*: **2.28.01**: *Non-Discrimination/Affirmative Action Policy*; **2.28.06**: *Sexual Harassment*; **2.31.01**: ***STUDENT** Rights and Responsibilities*; **2.41.01**: *University Research Policy*; **UP-05-3**: *Discrimination and Harassment Complaint Process*; **UP 01-4**: *Freedom of Information Act*; and **UP 16-4**: *Family Educational Rights and Privacy Act (FERPA)*. **Exhibit 170**; **Exhibit 266**; **Exhibit 549**—*WSU Office of Equal Opportunity Complaint*.

*1807.* *Prior to* submitting the complaint to the WSUOEO, on **September 24th, 2020**, at or around the same time *I*, Attorney Cochrane, sought redress from multiple veins of authority within the Defendants' organization—*I* received a communication from WSUOEO, specifically "Lead Secretary/Intake Manage," Ms. Shalandria Cooper, who provided the links to the WSUOEO complaint intake form. **Exhibit 550**—*September 24, 2020, WSUOEO Email*.

*1808.* After being silenced by Defendant, Dr. David Strauss, as will be shown in this following complaint, *I*, Attorney Cochrane, filed with the WSUOEO the formal complaint identified above by filling out Defendants' WSUOEO Intake Form. **Exhibit 551**—*WSUOEO Intake Form*; **Exhibit 552**—*WSUOEO Intake Answers*; **Exhibit 553**—*WSUOEO Confirmation Numbers*.

*1809.* On **February 5th, 2021**, Mrs. Shalandria Cooper emailed confirmation of Plaintiff, Attorney Cochrane's, formal complaint was filed as depicted below inclusive the exhibits identified *herein,* requesting then *I* schedule an intake interview to discuss the complaint filed with WSUOEO; this *is not* a formalized step in the intake process. **Exhibit 554**—*February 5th, 2021, WSUOEO Email*.

*1810.* After filing this formal complaint with WSUOEO—on **February 22nd, 2021**, *I* followed up with emails to Defendants, Ms. Nikki Wright, Mr. Lousi Lessem, and Mrs. Laura Johnston requesting a status update regarding the filed complaint where Defendant, Ms. Wright replied three (*3*) days later. **Exhibit 555**—*February 22nd and 25th, 2021, WSUOEO Update Emails*.

*1811.*   From **February 25ᵗʰ, 2021**, to **March 1ˢᵗ, 2021**, *I*, Attorney Cochrane, coordinated with WSUOEO Equal Opportunity Specialist, Mr. Tommy Martin, following along with WSUOEO's *unwritten*-intake process proceeding to schedule the **March 4ᵗʰ, 2021**, Intake Meeting with Mr. Martin. **Exhibit 556**—*WSUOEO Intake Communications*.

*1812.*   On **March 4ᵗʰ, 2021**, *I*, Attorney Cochrane, met virtually with WSUOEO Equal Opportunity Specialist, Mr. Tommy Martin, using Microsoft Teams; notice the detail of Mr. Martin's review, specifically, the routinely misspelled "Cochran" name. **Exhibit 557**—*WSUOEO March 1ˢᵗ Intake Meeting Invite*; **Exhibit 558**—*WSUOEO Microsoft Teams Chat*.

*1813.*   During this **March 4ᵗʰ, 2021**, Microsoft Teams meeting with WSUOEO Equal Opportunity Specialist, Mr. Tommy Martin, he confirms the information contained in **Exhibit 552** and otherwise attempted to elicit additional elaboration of the positions contained in **Exhibit 549**.

*1814.*   Specifically, it was identified to Mr. Martin that the WSUOEO Intake Form was deficient and did not have a 'checkbox' allowing the designation of "**Student**" as a protected classification as would allow in accordance with Wayne State University Policy and Procedure and the Wayne State University Non-Discrimination/ Affirmative Action Policy. **Exhibit 170**; **Exhibit 266**.

*1815.*   Explicitly, recall again the all-encompassing language of the Wayne State University Non-Discrimination/Affirmative action policy at **WSUCA 2.28.01.020**:

> "**This policy embraces all persons regardless of** race, color, sex (including gender identity), national origin, religion, age, sexual orientation, familial status, marital status, height, weight, disability, or veteran status **and expressly forbids sexual harassment** and **discrimination in** hiring, terms of employment, tenure, promotion, placement and discharge of employees, **admission, training and treatment of students**, extracurricular activities, **the use of University services, facilities**, and the awarding of contracts. **This policy also forbids retaliation and/or any form of harassment against an individual as a result of filing a complaint of discrimination or harassment** or participating in an investigation of a complaint of discrimination or harassment. It shall not preclude the University from

implementing those affirmative action measures which are designed to achieve full equity for minorities and women."

**Exhibit 170**, at p. 3. (Emphasis added).

*1816.* Moreover, recall the applicability of federal and state law regarding non-discrimination and affirmative action to Wayne State University's commitment to institutional "diversity to achieve **full equity in all areas** of University life and service," at **WSUCA 2.28.01.030**:

> "The University, as an equal opportunity/affirmative action employer, **complies with all applicable federal and state laws** regarding non-discrimination and affirmative action. **In furtherance of this policy**, the **University is** also **committed to institutional diversity to achieve full equity in all areas** of University life..."

*Id*. (Emphasis added).

*1817.* Candidly, this language complies with federal and state law by protecting **ALL STUDENTS** "**REGARDLESS**" of suspect classification from all forms of discrimination prohibiting the full utilization of the benefits of Wayne State University, and specifically amplifies these well-established substantive rights, privileges, and protections under **MCL 37.2402** providing for "**full utilization of or benefit** from the **institution**, or the **services, activities, or programs provided by the institution**..." as explicitly established by the Elliot Larsen Civil Rights Act ("ELCRA").

*1818.* Continuing, during this **March 4th, 2021**, meeting with Mr. Tommy Martin, he did expressly confirm my position that "**STUDENT**" was my suspect classification and I designated "weight" only because the WSUOEO form was inadequate; all the fields were required to submit this virtual form digitally, so a variable was required.

*1819.* Continuing further, during this **March 4th, 2021**, meeting with Mr. Tommy Martin, he did expressly confirm my **adversarial** position against Defendant, Dr. Daivd Strauss, by explicitly identifying Dr. Strauss as an adverse party listed in **Exhibit 552**.

*1820.*   On **March 16th, 2021**, *I*, Attorney Cochrane received an email update from Lead Secretary & Intake Manager, Shalandria Cooper, for my "February 8th, 2021," complaint; again, this date is incorrect as my complaint was filed **February 5th, 2021**, instead. **Exhibit 549**; **Exhibit 553**; **Exhibit 559**—*WSUOEO Closure & Proper Forum Emails*.

*1821.*   Specifically, attached to Ms. Cooper's email was an **unsigned letter** from Defendant, Attorney Ms. Nikki Wright, **summarily dismissing** the **February 5th, 2021**, WSUOEO complaint for "Discrimination, Harassment, Sexual Harassment, OEO-2021-004," where in pertinent part Ms. Wright erroneously identifies the following:

> "Pursuant to University Policy 2005-03 (Discrimination and Harassment Complaint Process), individuals who allege a violation of Wayne State University's non-discrimination or harassment policies may file a complaint with the Office of Equal Opportunity (OEO). The OEO is required to perform an initial assessment of all complaints to determine whether any allegations fall within the scope and jurisdiction of the non-discrimination or harassment policies. **I have conducted this initial assessment based upon the information you provided to the OEO. Unfortunately, this information does not set forth any allegations that establish a potential violation of the non-discrimination or harassment policies of Wayne State University. Accordingly, the Office of Equal Opportunity will not take any further action in this matter**.
>
> In order to go forward in the Discrimination and Harassment Complaint Process, **an individual must allege they were subjected to conduct that, if substantiated, would be a violation of the non-discrimination or harassment policies. The allegations presented in this case do not reach the standard. The allegations presented do not indicate you have been denied a benefit of education or that any adverse action towards your education was taken against you because of a protected basis at this point**."

**Exhibit 57**—*WSUOEO Complaint Rejection Letter. (Emphasis added).*

*1822.*   Following up with WSUOEO and specifically Defendant, Ms. Nikki Wright, on the same day of March 16th, 2021, *I*, Attorney Cochrane sought clarification of then the "proper forum to

address my concerns," under **WSUCA 2005-03, Section 2.3**, **as** Ms. Wright's letter **omitted** this required direction. **Exhibit 57**; **Exhibit 170, at p. 25; Exhibit 559**.

*1823.* On **March 17th, 2021**, Defendant, Ms. Nikki Wright, identified via email that: "**We are looking into who** you should contact regarding your concerns and will provide that information to you by Friday." **Exhibit 559**. (Emphasis added).

*1824.* On **March 18th, 2021**, Defendant, Ms. Nikki Wright, directed Plaintiff, Attorney Cochrane, to contact the acknowledged adversary, Defendant, Dr. David Strauss, for redress in regard to the WSUOEO complaint:

> "Please **contact Dean David Strauss** regarding your concerns. **He will refer you if it is appropriate** for you **to speak with another department**."

> **Exhibit 559**. (Emphasis added);
> *see also*, **Exhibit 549**; **Exhibit 552**.

*1825.* Finally, on this **March 18th, 2021**, Defendant, "**Dean David Strauss**," emailed Plaintiff, Attorney Cochrane, directly as directed—*this email went ignored* as would ethically implicate Attorney Cochrane as identified herein *this* Complaint—with no follow up thereafter:

> "Hello—I was asked by OEO to follow-up with you. How can I assist you?"

> **Exhibit 94**—*WSUOEO Dean Strauss Follow Up Email*.

*1826.* Explicitly because the Defendants' summarily dismissed this valid-formal complaint filed with the WSUOEO, these truths were themselves discriminated against *in retaliation* and went ignored by Wayne State University as to violate further Plaintiff, Attorney Cochrane's, clearly established Substantive and Procedural Due Process Rights in violation of the Equal Protection Clause of the 14th Amendment to the Constitution, *in the very least*, thus unequivocally quashing this free-speech approach to protect *the People* and freedom of speech itself.

*1827.* The facts that follow begin as you *step through* the Principal Door and continue on with the stream of reality, we began with in our Background Factual Allegations. Plainly, *again* these facts

were summarily dismissed in violation of Plaintiff, Attorney Cochrane's, Fundamental Constitutional Rights to Due Process and Equal Protection under the law in a manner that was specifically intended to silence this truthful approach **in retaliation** of the diffusion of this objection through the right to redress these Civil Rights with the government guaranteed by the First Amendment of the United States Constitution.

*1828.* Aside from rearranging exhibit numbers for presentation purposes, *again*, these **sense impressions** were as *I*, Attorney Cochrane, understood these facts in *that* space and time. **Now**, based on my extensive research, these unfolding facts have evolved into *this* Complaint testing the validity of the Defendants' decision making leading to this effect-cause-effect reality.

*1829.* At the time *I* wrote this complaint attached, *I* did not understand many things including the *depth* that the Defendants, nor *frankly* the Global Academic Educational Industry, were using the Theory of Constraints, the history and evolution of the Theory of Constraints' connection to education, nor the true intent of TOCFE's "Ambitious Goal Application" curriculum, *or* in *this* case the Defendants' 'turnt-up' "[*VERY*] Ambitious Goal Application" variant. The more *I* understood TOC, the more the Defendants' unconstitutional system of intrusive-corporate espionage and trade secret theft became clear—*see in full*, **Exhibit 549**. (Emphasis added).

*1830.* *Now*—as of *this* Complaint—each of the categories of damages itemized in **Exhibit 622** have expounded exponentially as a result of the Defendants' offensive defense in direct retaliation of this unequivocally truth contained explicitly within the complaint filed with the WSUOEO.

*1831.* Plainly, *I*, Plaintiff, Attorney Cochrane, must exacerbate furthered the irreparable harm by the disclosure of *this* information to Defendants let alone to *this* Honorable Court, typographical errors, and all—as such, inclusive within *this* Complaint, is the culmination of at least thirty (*30*) years of formal education intertwined with my personal **AMERICAN DREAM**.

*1832.* Candidly, *I* have been metaphorically running intellectually, *alone*, for the last fifteen (*15*) years doing my best to survive let alone prosper to live this dream—which Defendants have distorted into a **nightmare**.

*1833.* To summarize the Defendants' position, we as **STUDENTS** are no longer allowed to dream freely and quietly to ourselves. You are not allowed to challenge the status quo or question authority when your subjective reality does not mesh with our collective-objective reality.

*1834.* Plainly, *I*, Attorney Cochrane, will wear the egg on my face *here* if *I* am wrong—that is part of life—living, learning, making mistakes and standing back up to continue forward through the thickness of this objective reality we all share. All *I* ever wanted to do was help *the People* in the simplest way using what *I* have been taught and experienced through failure; nothing is perfect.

*1835.* The result of this reality is the usurping of the individual liberties of those **STUDENTS** who pass through the Principal Door. I understand the other side's argument too, we were supposed to push you, to move you to think beyond the box—but those arguments are not objective truth in my opinion based on the leveraging of the product as excess capacity and the marketing to amplify the elicit results. Why bury this curriculum and the processes to push **STUDENTS** in a direction that benefits as a win-win the professor and school first while maximizing *the taking* of the research subjects', *i.e.* **STUDENTS**', resources *without* providing formalized-informed consent.

*1836.* This is one of the reasons why this paradigm of acquiescence has allowed this 'curriculum' to foster and take shape over the last twenty years. Plainly, you as Attorneys yourself can see from this in-depth analysis that what *I* was then chasing is enormous in scale and this disclosed data, intellectual property and trade secrets of The Traveling Attorney, *P.C.*®, well frankly—no one should know any of this. *I* have thrown myself onto the coals to rebuke the Defendants' erroneous conduct and as President of The Traveling Attorney, *P.C.* ®, have chosen to throw everything into this furnace to see what materializes. *I* could have walked away like the

Defendants wanted as noted by their thieving silence; they even stole my FOIA money to attempt to lure me prematurely into the light to dispute my claims, claims *I* was still researching, and that is further evidence of the retaliatory defense the Defendants have entrenched themselves within.

*1837.*  *I*, Attorney Cochrane, will say here candidly that the impact this matter has had on me, and my family is far beyond toxic if such could be described in greater terms and in our deepest hope will only last as long as necessary to allow Justice to take shape in what we know to be objective.

*1838.*  Furthermore, *I*, Attorney Cochrane, must place onto *this* record the whole truth and that includes how my son, Conner David Cochrane, saved my life and shifted my **focus** onto *this* Complaint. Plainly, this is where my journey turns **dark**, as insanity crept in during the fall of 2020 as *I* assessed the facts that provoked a myriad of emotions. *I* was then still on my conveyor-belt of learning, enrolled in at least three (*3*) classes at Wayne State University, slapped with repeated debt-collection calls from the Defendants, reliving the communications with Defendants and principal facts involved—while still balancing the effects of the Global Pandemic—truly as you can imagine having reached *this* page, the onslaught of thoughts; thinking; analysis; ideas and the work-life balance involved to accomplish *this* in my altered reality...*I* fought desperately not to succumb to the toxicity the boy *I* was would have likely welcomed.

*1839.*  In a stupor ladened by sleepless nights, days without food, endless manic episodes of vigorously bingeing intellectual value associated with the Defendants' systems—*I* was learning to become someone *I* wasn't while struggling with the depression and emotional weight of having to fight this battle—*alone*—while *I* pushed those who *were* by my side *further away* desperately piecing this puzzle together while not understanding the full truth nor seeing the full picture.

*1840.*  *I* hit my absolute lowest point sometime in and around the second week of November 2020. The Defendants know they take their Plaintiffs as they find them, and *I* am no exception, *I* made it clear to them in **Exhibit 571** and thus the emotional and intellectual intrusion that has occurred

*here* led to the conscious decision to rest the barrel of my pistol against my right temple. *I* am ok, now. But in *that moment*, a virtual tsunami of thoughts; ideas; analysis; wonder; anxiety; fear; guilt; failure; confusion—all of this circling my prefrontal cortex—*endlessly*. Yet, here *I* am, entirely in control of my decisions making *this* sound and legal objection for the betterment of my future and for *the People*—and for those Attorneys who are in the **dark** like *I* was—**you are not alone,** and **you can** accomplish what you have set out to achieve.

**1841.**   Frankly*, I* will never be the same after this. *I* suppose *I* could have pulled the trigger, but nothing was in the chamber, that decision systematically required taking another step towards that selfish ending. Luckily, *my boy*, Mr. Conner David Cochrane, burst through my bedroom door before *I* took this next step out of curiosity…likely saving my life in making his *own* decisions that day. Again—*I* am ok, it is 2024 and the people in my corner know of this story and have helped in whatever way they can to pour this **focused** energy into *this* Complaint.

**1842.**   Candidly, *I* am saying this truly to save the life of the Attorney who hears this **ECHO** and gains the **FOCUS** necessary to overcome whatever obstacles they may face knowing that they are not alone in the **dark**. For—to know that standing resolute on their **valid** positions, dedication; and perseverance—objective truth will *always* triumph and dispel the darkness of erroneous assumptions and invalid decision—*even when you find yourself alone*.

**1843.**   It is because of the Defendants' intentional and specific intent stated *herein* that *I* experienced "toxic stress" on a level that manifested insomnia, manic episodes, weight loss, other physical pain, depression, and suicidal ideations.

## ***GARY B., v. WHITMER* AND THE EFFECT OF SUE SPONTE MOOTNESS**

**1844.**   One of the first lessons learned by law school **STUDENTS** is the story of *the bell*—it is difficult to forget information once it is publicly known—"**you cannot unring the bell**."

*1845.* Candidly—this is the characterization of the United States District Court Eastern District of Michigan Southern Division **Case No. 16-cv-13292** originally known as *Gary B., et al.*, *v. Snyder, et al.*, later known principally as ***Gary B., et al., v. Whitmer, et al.***, *respectfully*.

*1846.* The journey that *Gary B., et al., v. Whitmer, et al.*, ("*Gary B., v. Whitmer*") takes is synonymous with *the bell* and demonstrates for us through our judicial communication process the **ECHO** of our fundamental framework of democratic objectiveness while firmly laying the guidestone pavers in the Yellow Brick Road towards *this* Complaint establishing that:

> **A Fundamental Right to a Public Education *Free Of* Discrimination, Harassment, Threats, and Coercion For *All* Students *Regardless* of Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth—*EXISTS* in the United States—*unequivocally*!**

*1847.* It is clear, and as Defendants will likely point out—*Gary B., v. Whitmer*, is not precedent and should not be relied upon substantively as stare decisis—which, *yes*, this technically true.

*1848.* However, *the bell* is unequivocally the reasoning and the law used by the United States Court of Appeals for the Sixth Circuit that which remains firmly in place and supports the monumental arguments *herein* as such could not be stricken themselves by *sua sponte mootness*.

*1849.* Firmly, there are but four (*4*) filings that trace this sound logic from start to finish:

(*1*) United States District Court Eastern District of Michigan 2:16-cv-13292-SJM-APP, Doc #1, pg. 1 to pg. 136;

(*2*) United States District Court Eastern District of Michigan 2:16-cv-13292-SJM-APP, ECF No. 117, PageID. 2785 to PageID. 2824;

(*3*) United States Court of Appeals for the Sixth Circuit Nos. 18-1855/1871; Opinion Decided and Filed: April 23, 2020;  *and*

(*4*) United States Court of Appeals for the Sixth Circuit Nos. 18-1855/1871; Order, Decided and Filed: May 19th, 2020.

**1850.**  From here, we concern ourselves by incorporating the entirety *herein* by express reference *#3* and *#4*, **focus**ing on the April 23rd, 2020, Opinion Decided and Filed by the 6th Circuit Court of Appeals for the Sixth Circuit in a *2-1* Decision before the Honorable Judges Clay, Stranch, and Murphy, *respectfully*.

**1851.**  Writing the Opinion for the Majority, the Honorable Judge Clay outlines the generalized ideas of *Gary B., v. Whitmer* clearly in the introduction:

> "CLAY, Circuit Judge. Plaintiffs in this appeal are students at several of Detroit's worst-performing public schools. They credit this substandard performance to poor conditions within their classrooms, including missing or unqualified teachers, physically dangerous facilities, and inadequate books and materials. Taken together, Plaintiffs say these conditions deprive them of a basic minimum education, meaning one that provides a chance at foundational literacy.
>
> In 2016, Plaintiffs sued several Michigan state officials, who they say are responsible for these abysmal conditions in their schools. **Plaintiffs allege that state actors are responsible, as opposed to local entities, based on the <u>state's general supervision of all public education</u>, and also on the state's <u>specific interventions</u> in Detroit's public schools**. The state argues that it recently returned control to local officials, and so it is now the wrong party to sue.
>
> **Plaintiffs'** underlying **claims, brought under 42 U.S.C. § 1983**, are **all based on the Due Process and Equal Protection Clauses of the Fourteenth Amendment**. Plaintiffs argue that while other Michigan students receive an adequate education, the students in Plaintiffs' schools do not, amounting to a violation of their **right to equal protection of the laws**. **They also argue** that the schools are **forced to attend** are schools in name only, **and so the state cannot justify the restriction on their liberty imposed by compulsory attendance**. **<u>And in their most significant claim</u>**, **Plaintiffs ask this Court to <u>recognize a fundamental right to a basic minimum education</u>, an issue the Supreme Court <u>has</u> repeatedly <u>discussed but never decided</u>**.
>
> While the **<u>district court found</u>** that **<u>Defendants were in fact the proper parties to sue</u>**, it **<u>dismissed Plaintiffs' complaint on the merits</u>**. **<u>First</u>**, it found that Plaintiffs **<u>had not</u>** alleged a proper comparator for their equal protection claim, **<u>nor</u>** had they highlighted any state policy or action that was not supported by a rational basis. **<u>Second</u>**, it found that Plaintiffs **<u>had not</u>** sufficiently pleaded their

compulsory attendance theory, **and so the court only viewed their due process claim as seeking an affirmative fundamental right. Third**, the **court held** that a **basic minimum education is not a fundamental right**, and so Plaintiffs' due process claim was dismissed. **Plaintiffs then appealed.**

**Though Plaintiffs <u>failed to adequately plead</u> their equal protection and compulsory attendance claims, the same cannot be said for their central theory: that they have been denied a basic minimum education, and thus have been deprived of access to literacy**. <u>**A review of the Supreme Court's education cases, and an application of their principles to our substantive due process framework, demonstrates that we should recognize a basic minimum education to be a fundamental right.**</u> Furthermore, under this circuit's precedents, Defendants are proper parties to sue in this case. Accordingly, we affirm in part and reverse in part the district court's order, and remand this case for further proceedings."

*Gary B., et al. v. Whitmer, et al*., at pp. 2-3. (Emphasis added).

*1852.*  It is said that the Plaintiff's complaint controls the parameters of the argument within the legal communication process, *i.e*., litigation process, applying this to *Gary B., v. Whitmer*, although *136* pages in length, the complaint filed by those **STUDENTS** in many regards failed to adequately demonstrate the plaintiffs' basis for their claims and led to the subsequent settlement.

*1853.*  Candidly, to summarize this point would be to say that the arguments in *Gary B., v. Whitmer* were stretched far to reach the outcome of briefly establishing a fundamental right to literacy—as such the arguments *herein* cognitively straddle-the-line between the Majority and Dissent.

*1854.*  The Majority in *Gary B., v. Whitmer* reminds us that "[t]he Michigan Supreme Court has "repeatedly held that education in this state is not a matter of local concern, but belongs to the state at large. *Bd. of Educ. v. Bacon*, 162 N.W. 416, 416 (Mich. 1917) (quoting *Collins v. City of Detroit*, 161 N.W. 905, 907 (Mich. 1917))." *Gary B., v. Whitmer*, *No*. 18-1855/187, at p. 4. [L96-L97]

*1855.*  As applicable *herein* given the Defendants' positions as State Actors with direct oversight authority, the Majority explains the authority oversight in *Gary B., v. Whitmer was not* as clear:

"Under Michigan law, the state board of education has oversight authority over school districts and public schools within the state. *See,*

*e.g.*, Mich. Comp. Laws §§ 380.1281, 388.1007, 388.1009; *see also Council of Orgs. & Others for Educ. About Parochiaid, Inc. v. Engler*, 566 N.W.2d 208, 216 (Mich. 1997) (noting that state funding and oversight provisions place public schools "under the ultimate and immediate control of the state and its agents"). But beneath this oversight and supervisory authority, the day-to-day administration of Michigan schools is usually entrusted to the boards of local school districts and their appointees. *See, e.g.*, Mich. Comp. Laws § 380.1282.

**But usually is not always**. Beyond the state's general authority with respect to public education, Plaintiffs also allege that the state **has repeatedly intervened in the day-to-day management** of Detroit's schools, and that it **directly oversaw public education** in Detroit from 1999 through the time the complaint was filed in this case. *See Gary B. v. Snyder*, 329 F. Supp. 3d 344, 350–54 (E.D. Mich. 2018) (discussing state interventions in Detroit's schools)."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at p. 4. (Emphasis added).

*1856.*   For those **STUDENTS** in *Gary B., v. Whitmer*, "the inadequacies that Plaintiffs point to can be grouped into three main categories: teaching, facilities, and materials." *Id*. at p. 8.

*1857.*   Specifically, the Plaintiffs' claims summarized regarding "**teaching**" in *Gary B. v., Whitmer*:

"With respect to teaching, **Plaintiffs claim** that their schools **lack the qualified teaching staff required to bring students to literacy**—that is, teachers who are certificated, properly trained, and assigned to a class within the area of their qualifications and expertise." (*Id.* at #15.)

[...]

In **perhaps the most notable case**, "an eighth grade student was **put in charge** of teaching seventh and eighth grade math classes **for a month** because no math teacher was available." (*Id.* at #16.)."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at p. 4. (Emphasis added).

*1858.*   Specifically, Plaintiffs' claims summarized regarding "**facilities**" in *Gary B., v. Whitmer*, in addition to "*overcrowding*," these **STUDENTS** were routinely subjected to indecent conditions:

"**Turning to the schools themselves**, Plaintiffs allege that their **classrooms feature decrepit or even unsafe physical conditions**, meaning they "have been unable to satisfy minimal state health and safety standards." (*Id.* at #12.) "The **City of Detroit admitted** that during the 2015–16 academic year, *none* of the school district's **buildings were in compliance with city health and safety codes**," and that some of Plaintiffs' schools were still not in compliance at the time

the complaint was filed. (*Id.* at #87.) **Taken together**, **Plaintiffs claim that these conditions "make learning nearly impossible."** (*Id.* at #12.)

[...]

"**Mice, cockroaches**, and other vermin **regularly inhabit** Plaintiffs' **classroom**s, and the **first thing some teachers do each morning is attempt to clean up rodent feces before their students arrive**. Hallways and classrooms **smell of dead vermin** and **black mold . . . .**" (*Id.* at #13.) "Students and teachers have frequently encountered mice, mice droppings, **rats, bedbugs, and/or cockroaches**." (*Id.* at #88; *see also id.* at #88–89 (including additional allegations and pictures).)

"The **drinking water** in some of Plaintiffs' schools **is hot**, **contaminated and undrinkable**. **Bathrooms are filthy** and **unkempt**; sinks do not work; **toilet stalls lack doors and toilet paper**. In some classrooms, ceiling tiles and plaster regularly fall during class time." (*Id.* at #13.) At several of Plaintiffs' schools, **pipes or roofs leaked as well**, and **broken windows are covered with cardboard**. (*See id.* at #95, #97 (pictures of damaged facilities.).)"

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 9-10. (Emphasis added).

**1859.** Specifically, the third and final category of variables summarizing Plaintiffs' claims involve "**materials**" in Gary B. v. Whitmer:

"Plaintiffs allege that their schools **lack the books and materials needed to plausibly provide literacy**. "Many classes in Plaintiffs' **schools do not have appropriate textbooks**.

**Where they are provided**, they are **often long out of date**, **torn** and **beyond repair**, **or marked up to be unreadable in places**." (*Id.* at #11; *see also id.* at #84–85 (pictures of Plaintiffs' textbooks).) Plaintiffs also allege **there were so few copies that they had to share a single book among four or more students during class**, and **could not take them home after school**, meaning their **teachers could not assign meaningful homework**. In several cases, the **schools' libraries were inaccessible or had no books available** either, even outside of textbooks."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 10-11. (Emphasis added).

**1860.** Accordingly, the Plaintiffs in *Gary B., v. Whitmer* claimed that "the school conditions discussed above led to abysmal educational outcomes, which further supports the claim that their schools cannot provide access to literacy," while also identifying:

"While **literacy is the crux** of Plaintiffs' complaint, they also note that the failure of their schools is **uniform** across "**nearly all subject areas**." (*Id.* at #7.) "[B]ecause the **rest of the curriculum assumes a level of literacy** that the students do not attain, they are also unable to learn State-mandated content in all other subject areas." (*Id.* at #7–8.) Of Plaintiffs' high schools that remain open, each of their **eleventh-grade** classes scored "**0% proficiency** in at least one of Math, Science, or Social Studies." (*Id.* at #10 (emphasis omitted).)"

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 11;13. (Emphasis added).

**1861.** The Eastern District's July 27th, 2018, Opinion and Order to Dismiss the Plaintiffs' Complaint with prejudice in *Gary B., v. Whitmer* was the initial effect of the Defendants claiming:

"**Defendants moved to dismiss**. First, while not expressly phrased in terms of mootness, Defendants argued that they no longer control Plaintiffs' schools, and so cannot be sued for those schools' conditions. **Defendants** also **claimed** that the **Eleventh Amendment barred Plaintiffs' requested relief on sovereign-immunity grounds**.

Turning to the merits, **Defendants argued** that **there is no fundamental right to access to literacy, calling it "a mere proxy for a right to education, which has long been rejected as a fundamental right**." (Mot. to Dismiss, R. 60 at PageID #519–27.) **And since there is no such right**, **any equal protection claim not based on a protected class must be reviewed under the rational-basis standard**, **a review that Defendants argued would show that the claim fails under the Supreme Court's prior education cases**. Finally, Defendants said that Plaintiffs failed to plead a race-based equal protection claim because the conditions they complain of "**equally** affect **all students** within the same schools **regardless** of race." (*Id.* at #532–35.)."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 13-14. (Emphasis added).

**1862.** <u>How</u> the District Court reached the conclusion to dismiss the **STUDENTS** claims in *Gary B., v. Whitmer* was important and on appeal the Majority summarizes as follows:

"While the district court ultimately granted Defendants' motion, *Gary B.*, 329 F. Supp. 3d at 369, **how it came to that conclusion is important on appeal**. <u>Before reaching the merits of Plaintiffs'</u>

complaint, the **district court first addressed Defendants' argument** that they did not operate Plaintiffs' schools and so **were the wrong parties to sue**. *Id.* at 349. **The court rejected this view, <u>finding</u>** that **Plaintiffs had "adequately pled that state actors effectively control the schools, at least in part, and are therefore proper parties."** *Id.* at 354. The **court also rejected Defendants' Eleventh Amendment argument**, finding that **<u>Plaintiffs sought prospective injunctive relief</u>, and <u>therefore could sue state officers in their official capacities</u>**. *Id.* at 356–57.

**<u>Plaintiffs fared worse on the merits</u>**. Turning **<u>first to their due process claims</u>**, the **<u>court noted</u>** that "**a case like this one could be argued on either <u>positive</u>- or <u>negative-right</u> theories.**" *Id.* at 364. **<u>Negative rights</u>**, in this view, **<u>are freedoms from government intervention or intrusion</u>; <u>positive rights</u>, <u>by contrast</u>, <u>entail affirmative obligations that the state must afford its citizens</u>.** "**<u>But the relief sought [was] exclusively positive in nature</u>,**" and so **<u>the district court only considered the due process claim in terms of whether access to literacy is a fundamental right</u>**. *Id.* at 364–65. And on that point, **<u>noting federal courts' "reticence to find positive rights [even] to unquestionably important necessities of life</u>,**" **<u>the court held there was no such fundamental right</u>**. *Id.* at 365–66.

**<u>On the equal protection claim</u>**, the **court first found that** while **Plaintiffs attempted to compare their education to that provided by other schools throughout the State of Michigan, this was not the right comparison**. *Id.* at 367. **According to the court**, because schools like Plaintiffs'—those **under emergency management or experiencing other state interventions—were in a different position from other schools**, only schools undergoing state interventions could serve as comparators in assessing their equal protection claims. *Id.* **Using that framework, the district court rejected Plaintiffs' race-based equal protection claim**, finding that the **complaint failed to allege "any instance where Defendants intervened in a school with a different racial makeup and treated that school disparately."** *Id.* at 367–68. **<u>Left with only rational basis review</u>**, the **court found that Plaintiffs had failed to allege any specific, irrational actions taken by Defendants, holding that Plaintiffs could not use the conditions in their schools alone to dispel the presumption of rationality**. *Id.* at 368. **<u>Accordingly</u>**, the **<u>district court dismissed Plaintiffs' complaint in its entirety with prejudice</u>**. *Id.* at 369."

> *Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 13-14. (Emphasis added.)

**1863.** Principally, the Plaintiffs in *Gary B., v. Whitmer* "alleged ***three causes of action***" at issue on appeal, voluntarily abandoning two original causes of action, advocating for:

"**(1)** denial of their "fundamental right of access to literacy," violating both the substantive due process and equal protection requirements of the Fourteenth Amendment; **(2)** violation of the Equal Protection Clause due to race-based discrimination; *and* **(3)** a claim for declaratory relief based on these other causes of action. (Compl., R. 1 at PageID #126–30.)**"

*Gary B., v. Whitmer*, *No.* 18-1855/187, at p. 13. (Emphasis added.)

*1864.*  Both parties in *Gary B., v. Whitmer* argue on appeal that the "district court erred (though Defendants of course believe the ultimate outcome was correct)." *Id*. at p. 15.

*1865.*  <u>**On appeal**</u>—the Plaintiffs' claims are summarized in four (*4*) arguments by the Court:

"**Plaintiffs say** that the court was wrong in finding there is no fundamental right to access to literacy, and thus the district court should not have dismissed their due process claim. **They also argue** that the court should have considered a negative-rights version of their due process theory, under which Defendants violated their right to liberty by compelling them to attend "schools in name only" that fail to provide even a minimal education. (Pls.' Br. at 36–43.)

**On equal protection**, while not addressing their race-based claims, **Plaintiffs say** that because Defendants control the entire statewide education system, other schools throughout the state are proper comparators. When **viewed against** these statewide **comparators**, **Plaintiffs say** their schools are so much worse that Defendants' actions **violate the Equal Protection Clause <u>under</u> <u>any</u> <u>level</u> <u>of</u> <u>scrutiny</u>**."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at p. 15. (Emphasis added.)

*1866.*  <u>**On appeal**</u>—the Defendants' claims are summarized in three (*3*) arguments by the Court:

"For **Defendants'** part, they begin by **reiterating** that they do not control Plaintiffs' schools, and so are **not proper defendants** in this case. **They now raise** this argument **under the guise of mootness**, contending that changes in state law and practice have **removed their day-to-day control** over education in Detroit. As a result, **they also argue** that any remaining claims are for retroactive rather than prospective relief, and so are barred by the Eleventh Amendment."

*Id*. (Emphasis added.)

**1867.** *Now*—*this* Complaint in large part is predicated upon the trajectory of *Gary B., v. Whitmer* and anticipating the Defendants' arguments this is intentionally thorough to firmly establish a claim beyond a reasonable doubt claim upon which Plaintiffs may prevail <u>exceeding</u> plausibility.

**1868.** Specifically, *this* follows the Majority's declaration of the Standard of Review in *Gary B., v. Whitmer* regarding motions to dismiss <u>and</u> *in general* pleading **fraud** in the particularity:

> "We review a district court's grant of a motion to dismiss **de novo**. *E.g.*, *Majestic Bldg. Maint., Inc. v. Huntington Bancshares, Inc.*, 864 F.3d 455, 458 (6th Cir. 2017). A motion to dismiss is **properly granted if** the **plaintiff has "fail[ed] to state a claim upon which relief can be granted**." Fed R. Civ. P. 12(b)(6).
>
> The **reviewing court must accept the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff**. *E.g.*, *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005). But **we may affirm the district court's dismissal of the plaintiff's claims on any grounds present in the record**, **including grounds not relied upon by the district court**. *E.g.*, *Long v. Insight Commc'ns of Cent. Ohio, LLC*, 804 F.3d 791, 794 (6th Cir. 2015); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 547–48 (6th Cir. 1999).
>
> <u>**To survive a motion to dismiss**</u>, the **plaintiff must allege facts that are sufficient** "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "**A claim has facial plausibility when the plaintiff <u>pleads factual content that allows the court to draw the reasonable inference that the defendant is liable</u> for the misconduct alleged**." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, **supported by mere conclusory statements**, <u>**do not suffice**</u>." *Id.* The **determination to dismiss with prejudice**, as opposed to without, **is reviewed under an abuse of discretion standard**. *E.g.*, *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990)."

> *Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 16-17. (Emphasis added).

**1869.** In *Gary B., v. Whitmer*, before reaching the merits of the Plaintiffs' claims at both the District Court level and on appeal, the Majority first affirms the District Court's reasoning involving Defendants' failed claims to (**a**) Mootness, *and* (**b**) protection under the Eleventh Amendment, *i.e.*, Sovereign Immunity:

> "While the Eleventh Amendment generally prohibits lawsuits against states in federal court, under *Ex parte Young*, 209 U.S. 123, 155–56 (1908), **a plaintiff can sue state officers to enjoin an unconstitutional state policy**. When challenging a state policy, the officer sued must "have some connection" with the policy's enforcement or execution. *Id.* at 157. **Even when** a function is administered on a day-to-day level by local officials, a state officer's supervisory authority can still make her a proper defendant under *Ex parte Young. E.g.*, *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048–49 (6th Cir. 2015). **So long as** the named defendants are "**actively involved**" with the challenged conduct, **they can be sued for injunctive relief without implicating the Eleventh Amendment**. *Id.*; *accord Doe v. DeWine*, 910 F.3d 842, 848–49 (6th Cir. 2018)."

> *Gary B., v. Whitmer*, *No*. 18-1855/187, at p. 17. (Emphasis added).

1870.  Furthermore, the Majority explains that even "[a]s Defendants themselves repeatedly argue, Plaintiffs are requesting affirmative injunctive relief to __improve the conditions in their schools__," continuing in full explaining:

> "Such an injunction "**fits squarely within the prospective-compliance exception**" to the Eleventh Amendment, **even if** funds from the state treasury are needed to carry it out. *Milliken v. Bradley*, 433 U.S. 267, 289 (1977); *see also id.* at 288–90 (affirming an order requiring Michigan state officers to fund remedial education measures)."

> *Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 19-20. (Emphasis added).

1871.  __Here__—the claims involving as Defendants, the Governor of the State of Michigan and the Michigan Attorney General, are proper under *Ex Parte Young* as eliciting prospectively injunctive relief seeking to evoke the executive duty and authority of these oversight positions to maintain the safety, security, and compliance with Federal, State, and Administrative law applicable to Defendants, the Board of Governors of Wayne State University, as the constitutionally established body of State Actors with <u>clear</u> authority operating the instrumentality of the fraudulent harms

*herein* as Wayne State University. The Majority in *Gary B., v. Whitmer* expresses analogous application *even with* the transfer of authority away from Defendants with prior-daily oversight:

> "**This logic applies here too**. The state board of education has "[l]eadership and general supervision over all public education." Mich. Const. art. VIII, § 3. The superintendent executes the board's policies and is the chief education officer of Michigan. *Id.* **The governor is the chief executive officer**. *Id.* art. V, § 1. **And while the state has delegated much of the management** of individual school districts and schools to local authorities, **these remain "under the ultimate and immediate control of the state and its agents**." *Parochiaid*, 566 N.W.2d at 216."

> *Gary B., v. Whitmer*, *No.* 18-1855/187, at p. 18. (Emphasis added).

**1872.**   Specifically, *even when* the Defendants transferred "day-to-day management" this "would *still not* require dismissal," as the court identified:

> ""A defendant's '**voluntary cessation of a challenged practice' does not moot a case**. Rather, voluntary conduct moots a case **only in the rare** instance where 'subsequent events made it **absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur**.'" *League of Women Voters*, 548 F.3d at 473 (citations omitted) (first quoting *Ammex, Inc. v. Cox*, 351 F.3d 697, 704 (6th Cir. 2003); and then quoting *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003)) .... **Despite the greater consideration afforded to government officials' cessation of allegedly unlawful conduct**, *e.g.*, *Ammex*, 351 F.3d at 705; *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990), **there is no basis to believe this change is a permanent one**.

> [Just as is the case herein this Complaint as Defendant, Deborah Habel, seeks to continue using the Theory of Constraints to teach in her classroom as she also continues her simultaneous *Ph.D.* pursuit, and Wayne State University continues to leverage the IMC established by Defendants, Dr. James T. Low and Dr. John Taylor, who have worked with Defendants, Mr. Louis Lessem and Mrs. Laura Johnston, to offensively defend against Plaintiff, Attorney Cochrane, in retaliation of his objective objection to this unlawful conduct by Defendants as a whole].

> *Gary B., v. Whitmer*, *No.* 18-1855/187, at p. 19. (Emphasis added).

**1873.**   Having ***dismissed*** the Defendants' arguments involving mootness and sovereign immunity—the Court was then faced with the merits of Plaintiffs' complaint outlined below:

"....*C*. **Plaintiffs' Equal Protection Claim**
    *1*. Equal Protection Framework
    *2*.Application to Plaintiffs' Claims
    *3*. Leave to Amend

    *D*. **Plaintiffs' Compulsory Attendance Claim**
       *1*. Substantive Due Process and Compulsory Attendance
       *2*. Application to Plaintiffs' Complaint
    *E*. **The Fundamental Right to a Basic Minimum Education**
       *1*. Recognition of Fundamental Rights Under Substantive Due Process
       *2*. The Supreme Court's Education Cases
       *3*. Is Access to Literacy a Fundamental Right?
         *a*. The Historical Prevalence and Significance of Education
         *b*. Whether a Basic Minimum Education Is "Implicit in
           the Concept of Ordered Liberty"
         *c*. Some Arguments (and Responses) Against
           Recognizing a Fundamental Right
           *i*. Judicial Restraint Suggests Deference to the
             Political Process
           *ii*. The Due Process Clause Provides Only
             Negative, Not Positive Rights
         *d*. Contours of the Right to a Basic Minimum Education
       *4*. Application of the Right to Plaintiffs' Allegations

**Conclusion**

**Dissent**"

*1874.* **Here**, the Plaintiffs offer the following legal positioning as a primer to frame the following arguments <u>drawn from</u> *Gary B., v. Whitmer* as such are distinguished by the facts and arguments *herein this* Complaint and are intended to highlight this different path for the analysis of the legal precedent applicable to the Plaintiffs *herein* as to argue for recognition of a Fundamental Right to a Public Education ***free of*** discrimination, harassment, threat, and coercion for **all STUDENTS** ***regardless of*** suspect classification as such is existent in the United States, *unequivocally*.

*1875.* Again, as discussed in *this* Complaint—the *idea of education* is objectively rooted in this Nation's long history and traditions and is implicit in the concept of ordered liberty, where "**neither liberty nor justice would exist if they were sacrificed**" to permit the Defendants—*or anyone else*—to use **STUDENTS** as bridges for **corporate espionage** under the First Amendment

guise of 'research' while using the [**VERY**] Ambitious Goal Curriculum of the Theory of Constraints and TOCFE. *Glucksberg*, 521 U.S. at 721 (quoting Palko, 302 U.S. at 325-26).

*1876.* It is the genuine belief of Plaintiff, Attorney Cochrane, that by following the First Amendment precedent relative and applicable to Education in the form of various First Amendment Freedoms, such as Freedom of Speech; Right to Peacefully Assemble; Academic Freedom; Religion; and Redress of Government that where the State has stepped forward to further the subjective-nationalistic mission of the State through public education—those fundamental freedoms implicit in the concept of ordered liberty historical tied to the Freedom of Speech <u>apply</u> <u>and</u> <u>establish</u> that **STUDENTS** <u>**do**</u> <u>**not**</u> "<u>**shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.**</u>" *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 506, 89 S. Ct. (1969). (Emphasis added).

*1877.* This argument is furthered substantively and applicable through the 14th Amendment to the States when the individual State has unequivocally enacted *further* subjective-state legislation recognizing that **STUDENTS** enjoy substantive rights to an unabridged education *free of* discrimination, harassment, and retaliation but for the advancement of the ordered liberty deeply rooted in our nation's history.

*1878.* <u>**Here**</u>, as discussed above *in brief*—the State of Michigan has enacted ECLRA and specifically <u>**MCL 37.2402**</u> granting substantive rights relative to public education for **STUDENTS** establishing the "Full utilization of or benefit from the institution, or the services, activities or programs provided by the institution..."

*1879.* Where, <u>elevating</u> this substantive right <u>even further</u>, the State Actors ordained with authority by the Michigan Constitution *herein* as Defendants, the Board of Governors for Wayne State University, unequivocally established policy under <u>**WSUCA 2.28.01.020**</u> and <u>**WSUCA 2.28.01.030**</u>, that grant <u>further</u> substantive rights as applicable to <u>all</u> **STUDENTS** and

unequivocally "embraces **all persons regardless**," while "*expressly*" forbidding retaliation, "sexual harassment and discrimination in...admission, training and treatment **of students**." **Exhibit 170**, at p. 3; **Exhibit 266**.

*1880.* By granting these unequivocal rights to **STUDENTS**, *even further* under **WSUCA 2.28.01.030** the Defendants remains steadfast in the commitment towards "**full equity in all areas** of University life," by complying "with all applicable federal and state laws regarding non-discrimination and affirmative action." *Id.* (Emphasis added).

*1881.* Again, remember our differentiated meaning of **subjective** and **objective** truth as such is directly applicable to the Court's review of the Supreme Court's rulings regarding the Education Cases that establish our *current*-objective precedent—*while also remembering* the fundamentals of the communication process involved as the mechanism-of-speech represented as the facts involved in each matter setting this precedent. Candidly, most if not all of the cases discussed involve what would be categorized as **subjective variables**, or factors involved, like the facts in *Gary B., v. Whitmer*, as **subjective characteristics** of the individual State's decision making relative to supplying the public education, *i.e.*, choices relative to supplying teachers; facilities; physical materials; taxes; state funding; payments of tuition; and compulsory attendance. Distinguishably these **subjective variables** were then interpreted to determine voidability in the form of discrimination amongst the framework of the **objective characteristics** that govern stare decisis *throughout* our Constitutional Republic as a whole, *i.e.*, such as the **subjective** characteristics of "*separate but equal*" found **inherently discriminatory** and **objectively void** in the paramount Educational Case: *Brown v. Board of Education*, 347 U.S. 483 (1954). [L101]

*1882.* Plainly, the splitting of this intellectual paradigm when considering **objective characteristics** closely relates to speech *and* forms of speech exhibiting **inherent** discrimination, harassment, threats, and coercion provides a heightened objectionable form in *every forum* of deliberation as to shield, like the Plaintiffs *herein* as **STUDENTS** used unknowingly as human-research subjects to further the Defendants' corporate-espionage crimes—amounts to violations of their First Amendment Rights to pursue a public

education *free of* compulsory State Actions that rise to this **objective level**; *again* see, *i.e.*, *Brown v. Board of Education*:

> "*Brown* of course examined whether **racially segregated schools inherently violated** the Equal Protection Clause of the Fourteenth Amendment. *Id*. at 487—88. **The Court found they did**, holding that "in the **field of public education** the doctrine of 'separate but equal' **has no place**."
>
> *Id*. at p. 495. (Emphasis added).

*1883.* ***Firmly***—it is Plaintiff, Attorney Cochrane's, limited belief and understanding that *Brown* **established** a fundamental right to education, "[s]uch an opportunity, where the state has undertaken to provide it, **is a right** which **must be** made **available** to all on **equal terms**," and ***could have been*** argued from the position of the First Amendment, but perhaps was limited to the Fourteenth by the social constructs at the time embedded within the Mid-*20th* Century's inherently flawed and discriminatory paradigm that could not see beyond color. *Id*. at p. 495. (Emphasis added). Explicitly—it was but for *Brown*'s ruling in 1954 that expelled Jim Crow from the educational setting as **inherently** discriminatory and that sparked the Civil Rights Era in American History. This period of change was in itself representative of the **Freedom of Speech** through the words and actions of *every* individual advocating for an **objective** just and equal change stemming for their individual-subjective education—*Dr. Martin Luther King*, *Jr*; *Rosa Parks*; *John F. Kennedy*, *Jr*.; *Ralph Waldo Ellison*; *Harry Tyson Moore*; *Thurgood Marshall*; *Lyndon B. Johnson*; *Malcom X*; *Members of the Student Nonviolent Coordinating Committee participating in sit-ins and bus boycotts*; *Patsy T. Mink*; *Core's Freedom Riders*; *John Lewis*; **and many more**—*each* with their *own* *subjective* reality contributing to the whole-*new*-objective reality *that was then and is now* the United States of America.

*1884.* Similarly, understanding the dichotomy between **subjective** and **objective characteristics** allows then for a more precise application of the Substantive, Procedural, *and* Equal Protection of the **STUDENT** under the Fourteenth Amendment utilizing strict scrutiny, where if such facts subjectively **do rise** to the objective level applicable establishing that the public education **is *free of*** discrimination, harassment,

threat, and coercion for those involved **STUDENTS**—**then** rational basis will test the applicable-subjective variables in accord with the deference provided to the States under such review.

*1885.* Plainly—the degree of education sought by Plaintiffs through *this* lawsuit is *negative* in scope and seeks only to construct in objective form the apparatus *in the basement to dispel* discrimination, harassment, threats, and coercion from within the educational setting when offered by the State; each of these forms of speech is objectively **unprotected** by the First Amendment, and thus will *protect all* those effected **STUDENTS** that come behind this shift-in-**focus**. Without this **objective standard**—the American Schoolhouse is subjected to intruders lurking behind-the-veil leveraging the **most valuable asset we share as American Citizens**—the **American Dream** through the **minds of our children** as the mechanism that transforms our future into **prosperity** *or* **doom**.

*1886.* Shifting back to *Gary B., v. Whitmer*, the Majority discussed the Plaintiffs' **Equal Protection Claim** by outlining the "**Equal Protection Framework**" non-exhaustively as follows:

> "When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Zobel v. Williams*, 457 U.S. 55, 60 (1982). At its core, the Clause says that "**all persons similarly situated should be treated alike**." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, **plaintiffs alleging an equal protection claim have to make two showings**: **first**, that the defendants treated them differently from other similarly situated persons, **and second**, that this difference in treatment **is not supported** by a sufficiently strong governmental interest. *E.g.*, *id.* at 439–40; *Jolivette v. Husted*, 694 F.3d 760, 771 (6th Cir. 2012); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011); *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).
>
> Much of the Supreme Court's equal protection case law concerns the second part of this test, and specifically how strong the governmental interest must be. For example, if a government policy discriminates based on race or another immutable, protected characteristic, the Court applies "**strict scrutiny**" and will uphold the policy only if it furthers a "**compelling state interest**"

and is **narrowly tailored in doing so**. *Cleburne*, 473 U.S. at 440; *accord, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003); *see also, e.g.*, *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (**also applying strict scrutiny** "[w]hen a statutory classification **significantly interferes with the exercise of a fundamental right**").

**On the other hand**, **if** the policy does **not** concern a **protected class**, "**rational basis**" review is used, and the **policy will be sustained if it "is rationally related to a legitimate state interest**." *Cleburne*, 473 U.S. at 440. This **rational basis standard is extremely forgiving**. The challenged action **is presumed to be constitutional**, and the **burden is on Plaintiffs to negate "every** conceivable basis" that might support **it**. *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Further, "[w]hen social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude." *Cleburne*, 473 U.S. at 440.

***Plyler v. Doe* throws a wrench in this**. In *Plyler*— **discussed more extensively later**, *see infra* Part II.E.2—the Supreme Court faced a Texas policy that required **undocumented children to pay tuition** before they could attend public school, 457 U.S. at 205–06, 206 n.2. In assessing the plaintiffs' equal protection challenge, the **court noted** that "[u]**ndocumented aliens cannot be treated as a suspect class**," and that education as a general matter is not a fundamental right. *Id.* at 223. And so, **rational basis must apply**.

But the Court went on:

> [M]ore is involved in these cases than the abstract question whether [the challenged policy] discriminates against a suspect class, or whether education is a fundamental right. [The policy] imposes a lifetime hardship on a discrete class of children not accountable for their disabling status. The stigma of illiteracy will mark them for the rest of their lives. By denying these children a basic education, **we deny them the ability to live within the structure of our civic institutions**, and foreclose any realistic possibility that they will contribute in even the smallest way to the

progress of our Nation. **In determining the rationality of [the policy], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims**. In light of these countervailing costs, the discrimination contained in [Texas's policy] can hardly be considered rational *unless it furthers some substantial goal of the State. Id.* at 223–24 (emphasis added).

Thus, **while still couched in rational basis review**, the *Plyler* court **held that when a discrete group of children is denied a basic public education**, **such** a **policy can survive only if "if furthers some substantial state interest."** *Id.* at 223–24, 230.**"**

*Gary B., v. Whitmer, No.* 18-1855/187, at pp. 21-23. (Emphasis added).

**1887.** Applying this precedent to the Plaintiffs' claims in *Gary B., v. Whitmer* the Majority notes:

"As noted above, to state an equal protection claim, a **plaintiff must allege both** a **difference in treatment from others and** that **this difference cannot be supported by a sufficiently important governmental interest**. *E.g.*, *Ctr. For Bio-Ethical Reform*, 648 F.3d at 379. But the current version of **Plaintiffs' complaint fails** to demonstrate disparate treatment, because it **focuses on school conditions** and inadequately alleges state policies or actions that caused those conditions within Plaintiffs' schools and not in others. **Plaintiffs' allegations thus fail to highlight any difference in treatment** that suggests the **state discriminated against them**, and so they have failed to adequately allege that "the government treated [Plaintiffs] disparately as compared to similarly situated persons." *Jolivette*, 694 F.3d at 771 (quoting *Ctr. For Bio-Ethical Reform*, 648 F.3d at 379); *see also, e.g., Scarbrough*, 470 F.3d at 260 ("The threshold element of an equal protection claim is disparate treatment . . . .")."

*Gary B., v. Whitmer, No.* 18-1855/187, at p. 23. (Emphasis added).

**1888.** Similar to the Plaintiffs' compelled speech involuntarily elicited by the Defendants' use of [*VERY*] Ambitious Goal Curriculum without complying with the WSUIRB's requirements regarding human-research subjects leading to the violation of Plaintiffs' fundamental rights under

the First, Fourth, Fifth, *and* Fourteenth Amendments—the Majority in *Gary B., v. Whitmer* addresses the Plaintiffs' "Substantive Due Process and Compulsory Attendance" claims in detail:

> "The main case Plaintiffs rely on to support their **compulsory attendance** theory is *Youngberg v. Romeo*, 457 U.S. 307 (1982). In *Youngberg*, a thirty-three-year-old man with severe intellectual disability was deemed unable to care for himself and involuntarily committed to a state facility. *Id.* at 309–10. After a series of injuries and physical restraints imposed during his commitment, Romeo **sued under the Fourteenth Amendment**, arguing that that the **state failed to protect his liberty interests in "safety, freedom of movement, and training within the institution.**" *Id.* at 310–11, 314–15.
>
> First discussing his safety claim, the **Court "noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause.**" *Id.* at 315 (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)). Similarly, the **Court found that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.**" *Id.* at 316 (alteration in original) (quoting *Greenholtz v. Neb. Penal Inmates*, 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part)).
>
> Romeo's last claim proved to be more complicated. He **conceded** that, because of the **severity of his disability**, no amount of training would make it possible for him to be released. *Id.* at 317. That said, Romeo **still argued he was entitled to training** that would reduce his aggression, thereby increasing his safety and decreasing the need for restraint within the facility. *Id.* at 317–18.
>
> In addressing his claims, the **Court noted** that while **Romeo retained "liberty interests in safety and freedom from bodily restraint," these interests were not absolute**. *Id.* at 319–20. For example, the **facility would be entitled to restrain the movement of residents to protect their safety and the safety of others**. *Id.* at 320. "**The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint . . . is such as to violate due process.**" *Id.* In answering this question, the **Court balances "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty**." *Id.* Applying this principle to Romeo's claim, the **Court held that he was entitled to improved safety, lesser restraint, and appropriate training, but that in shaping this remedy on remand, the trial court should afford significant deference to the professionals responsible for** Romeo's **care**. *Id.* at 321–25.

Other cases indicate **that this balancing principle is the crux of any due process analysis where the state restrains core liberty interests like freedom of movement**. For example, in **_Cruzan_**—a case about the right to refuse life-saving medical care—the Supreme **Court reiterated** that "**whether [a plaintiff's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests**." *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990) (quoting *Youngberg*, 457 U.S. at 321). *United States v. Salerno*, 481 U.S. 739, 750–51 (1987), similarly observed this balancing principle, **finding** that while individuals have a "**strong interest in liberty[,] . . . this right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society**." And in *Foucha v. Louisiana*, 504 U.S. 71 (1992), the **Court held that "[d]ue process requires that the nature of [a] commitment bear some reasonable relation to the purpose for which the individual is committed**," *id.* at 79; *see also Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("**At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed**."). While the degree of deprivation is obviously greatest in a case like involuntary commitment, there is no reason why this balancing principle should not apply to less-extensive restraints as well. *See Youngberg*, 457 U.S. at 319–21.

**Compulsory** school **attendance** laws are a restraint on Plaintiffs' freedom of movement, and thus **implicate the core protections of the Due Process Clause**. *See, e.g.*, *Foucha*, 504 U.S. at 80; *Youngberg*, 457 U.S. at 316. If the state required a group of people to sit in a building for several hours a day without any justification, such a restraint would clearly offend their right to liberty. *See, e.g.*, *Ly v. Hansen*, 351 F.3d 263, 276–77 (6th Cir. 2003) (citing *Demore v. Kim*, 538 U.S. 510, 531–33 (2003) (Kennedy, J., concurring)) (**noting that the Due Process Clause prohibits arbitrary deprivations of liberty**), *abrogated on other grounds by Jennings*, 138 S. Ct. 830; *see also, e.g.*, *Jennings*, 138 S. Ct. at 861 (Breyer, J., dissenting) ("**The Due Process Clause—itself reflecting the language of the Magna Carta—prevents arbitrary detention**."); *Reno v. Flores*, 507 U.S. 292, 315 (1993) (O'Connor, J., concurring) (same); *cf. Meyer v. Nebraska*, 262 U.S. 390, 402 (1923) ("**In order to submerge the individual and develop ideal citizens, <u>Sparta</u> assembled the <u>males at seven</u> into barracks and intrusted their subsequent <u>education and training to official guardians</u>. . . . [But] it <u>hardly will be affirmed</u> that any Legislature [in our country today] could impose such restrictions upon the people of a state without doing violence to both letter and spirit of the Constitution.**"). And so, if compulsory school attendance is constitutional, **it must be because the relevant state interest outweighs any deprivation of liberty**.

On the other hand, while never directly addressing this issue, the Supreme Court has recognized that, **given the important governmental interest in educating its citizens, the state generally has the power to compel attendance at school**. *E.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925); *Meyer*, 262 U.S. at 402. **Given this repeated dictum**, it seems clear that in most cases, a state-provided education will justify the deprivation of liberty caused by compulsory attendance.

Taken together, it is clear from these cases that, at least for compulsory education in a general sense (which is the only type of schooling that the complaint concerns), there is some level of education that justifies whatever deprivation of liberty is caused by a mandatory attendance or schooling requirement. *See, e.g.*, *Pierce*, 268 U.S. at 534; *Meyer*, 262 U.S. at 402. But at the same time, forcing students to attend a "school" in which they are simply warehoused and provided no education at all would run afoul of the Due Process Clause's protections.

**Such a deprivation would bear no reasonable relationship to the state's asserted purpose,** *see, e.g.*, *Foucha*, 504 U.S. at 79, **and thus would be outweighed by the individual's interest in liberty,** *see, e.g.*, *Cruzan*, 497 U.S. at 279; *Salerno*, 481 U.S. at 750–51; *Youngberg*, 457 U.S. at 320. **For cases in the middle, the question is whether the state's interest—here, the education it provides—is enough to justify the restraint.**"

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 28-31. (Emphasis added).

*1889.*  In *Gary B., v. Whitmer*, the Majority highlighted Plaintiffs' **failure to plead sufficient factual allegations** to allow the Court to assess the viability of their claims to the extent or nature demonstrating the restraint on those **STUDENTS'** liberty. Frankly—that is why *this* Complaint is *so* thorough in that *I*, Plaintiff, Attorney Cochrane, had to learn and become **an expert** in these topics to disseminate the particularities to *this* Honorable Court encapsulating the totality of Defendants' **fraud** for assessment of the viability of the claims *herein*, *respectfully*.

*1890.*  Specifically, in regards to the Plaintiffs' claims against compulsory attendance in *Gary B., v. Whitmer*, as plead in their brief on appeal *rather* than in their initial complaint, the Court highlights that the Plaintiffs "***never expand***" on the "special relationship" claimed and the "only cause of action regarding

due process **puts it solely in terms** of "the **fundamental right of access to literacy**," and not any right to freedom from restraint," reiterating the lack-of-creativity *or* brevity in writing the initial complaint led to disposition by Motion to Dismiss by the Defendants:

> "While Plaintiffs' negative-rights claim seems to have support in the law and **was argued in their brief on appeal, it is noticeably absent from their complaint**. The complaint certainly includes the statement that Michigan has compulsory school attendance (*see, e.g.*, Compl., R. 1 at PageID #27 ("Michigan . . . compels children to attend school full time . . . ."); *id.* at #43 (same)), **but there is no indication that Plaintiffs are alleging that this deprivation of liberty is unconstitutional**. The **closest Plaintiffs come to highlighting this claim** is by saying that, since education "**is *required* of every child**," there is "**a special relationship** between the state and children between the ages of 6 and 18." (*Id.* at #42.) **But Plaintiffs never expand this beyond noting** the "special relationship," **and their only cause of action regarding due process puts it solely in terms of "the fundamental right of access to literacy," and not any right to** freedom from restraint. (*Id.* at #126–27.)**13 Other than these two statements, Plaintiffs do not mention** compulsory attendance **anywhere else in their complaint or otherwise indicate that the requirement could play any role in a violation of their constitutional rights**.
>
> **To satisfy the federal rules**, while a "**short and plain statement of the claim**" is enough, **the complaint must still** "give the defendant fair notice of what the . . . claim is **and the grounds upon which it rests**." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (first quoting Fed. R. Civ. P. 8(a)(2); and then quoting *Twombly*, 550 U.S. at 555). In this case, **Plaintiffs' complaint gave no notice of their claim that Defendants violated their right** to freedom of movement, or any other right through the compulsory attendance requirement.
>
> **Additionally**, Plaintiffs' **factual allegations are insufficient** for us to **assess the viability of this claim, because they fail to provide information** about the extent or nature of the restraint on their liberty. **Other than the broader allegations concerning the conditions** of their schools, the only allegation relevant to this theory is that "Michigan's compulsory attendance laws require Plaintiffs to attend [their] schools." (Compl., R. 1 at PageID #4; *accord, e.g., id.* at #27, #42–43.)
>
> **By *Youngberg*'s own terms, analyzing this claim requires balancing the extent of the deprivation against the education being provided by the state**. *See* 457 U.S. at 320 ("In determining whether a substantive right protected by the Due Process Clause **has been violated**, it is **necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'**" (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961)

(Harlan, J., dissenting))). **For such a claim to be viable outside a fundamental right to a basic minimum education, Plaintiffs** would **have to show that the degree of restraint imposed on them cannot be justified by whatever education, however negligible, they are receiving. While Plaintiffs have alleged sufficient facts to infer the extent of the education they are being provided** (or at least the extent it does not exceed), **<u>they provide inadequate information about</u>** the **duration or nature <u>of the restraint</u> faced in their schools,** such as the hours per day of compulsory attendance, the number of days per year, or the restrictions on Plaintiffs' liberty throughout the typical school day. **<u>Without these allegations</u>, <u>it is impossible</u> for us to conduct *Youngberg* balancing and "draw the reasonable inference that [Defendants are] liable for the misconduct alleged.**" *Iqbal*, 556 U.S. at 678.

As with their equal protection claim, after this case is remanded, Plaintiffs could seek leave to amend from the district court and attempt to correct these deficiencies. **<u>But as their complaint stands now</u>**, their **allegations <u>fail</u> to provide <u>sufficient</u> notice of their claim**, **and are <u>insufficient</u> for the Court to <u>assess</u> its <u>viability</u>.** Accordingly, Plaintiffs' negative-rights claim was correctly dismissed."

> *Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 31-32. (Emphasis added).

**1891.** <u>**Next**</u> the Majority in *Gary B., v. Whitmer*, "having addressed Plaintiffs' two alternative claims for relief," were "*left with the <u>central</u> <u>issue</u>*" on appeal **<u>as framed</u> by** the **Plaintiffs** in their **initial complaint**: "*whether Plaintiffs have a fundamental right to a basic minimum education, meaning one that provides access to literacy.*" *Id*. at p. 33. (Emphasis added).

**1892.** <u>**Here**</u>—framed differently in a negative connotation, Plaintiff, Attorney Cochrane, calls upon *this* Honorable Court **<u>with</u>** sufficient notice and adequate information to assess the merits of *these* claims to unequivocally acknowledge what has stood lurking in the shadows of our great republic *from the beginning* "as to be "implicit in the concept of ordered liberty." *Id*. Where, in short—**<u>without</u>** the existence of <u>a Fundamental Right to a Public Education **Free Of** Discrimination, Harassment, Threats, and Coercion For **All** Students **Regardless** of Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth</u>—**ordered liberty** will *continue to decline* **<u>with</u>** the history and traditions of our unalienable rights to pursue the **American Dream** *now more than ever* derived from a publicly subsidized **system of education**.

**1893.** Specifically, the Court in *Gary B., v. Whitmer* explained the **<u>objective</u>** precedent used to recognize Fundamental Rights under Substantive <u>and</u> Procedural Due Process, *applicable in this matter as follows*:

> "The **Due Process Clause of the Fourteenth Amendment says that no state shall** "**deprive any person of life, liberty, or property, without due process of law.**" **The Clause is most commonly seen as guaranteeing procedural protections whenever the state attempts to deprive someone of their life, liberty, or property interests—so-called procedural due process.** *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). **But the Clause has also been read to recognize that certain interests are so substantial that no process is enough to allow the government to restrict them, at least absent a compelling state interest.** *E.g.*, *Glucksberg*, 521 U.S. at 719–21; *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846–47 (1992); *Collins*, 503 U.S. at 125. This **substantive due process** is the basis for Plaintiffs' claim.

> "The **most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights,**" **which are deemed to be "incorporated" into the Due Process Clause.** *Casey*, 505 U.S. at 847. But **this is not the end of the Clause's protections**, which **also extend to other rights and liberties recognized by the courts to be "fundamental."** *E.g.*, *Glucksberg*, 521 U.S. at 720–21; *Flores*, 507 U.S. at 301–02. For example, in *Meyer*, the Court stated:

>> While [**the Supreme Court**] **has not attempted to define with exactness the liberty thus guaranteed** [by the Due Process Clause], the term has received much consideration and some of the included things have been definitely stated. **Without doubt, it denotes not merely freedom from bodily restraint but also the right of the <u>individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience,</u> and generally to <u>enjoy those privileges</u> long recognized at common law <u>as essential to the orderly pursuit of happiness</u> by free men.**

> 262 U.S. at 399.

> Despite the breadth of the Court's statement in *Meyer*, later cases prescribe circumspection when deciding whether an asserted right is fundamental. "**<u>As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area</u>**

are scarce and open-ended." *Collins*, 503 U.S. at 125. But this reluctance is not the end of the matter:

> The inescapable fact is that adjudication of substantive due process claims may call upon the Court in interpreting the Constitution to exercise that same capacity which by tradition courts always have exercised: reasoned judgment. Its boundaries are not susceptible of expression as a simple rule. That does not mean we are free to invalidate state policy choices with which we disagree; **yet neither does it permit us to shrink from the duties of our office**.

*Casey, 505 U.S. at 849.*

**Faced with this tension**, the **Supreme Court has developed a two-prong analysis** it applies **when determining whether an asserted right is fundamental**. *First*, "the **Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'"** *Glucksberg*, 521 U.S. at 720–21 (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion)). The **Supreme Court has applied a holistic approach to this historical analysis, tracing the evolution of an asserted right through or even beyond the history of our country**, *e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593–97 (2015); *Glucksberg*, 521 U.S. at 710–19. A **few Justices have instead embraced a narrower version**, however, **looking to whether the right in question would have been recognized as a protected interest at the time the Fourteenth Amendment was adopted**. *E.g.*, *Obergefell*, 135 S. Ct. at 2628 (Scalia, J., dissenting).

**Even if a specific iteration of a right lacks substantial historical roots, this alone is not enough to foreclose recognition under the Due Process Clause**. As the Court noted in *Casey*, "**[i]t is tempting, as a means of curbing the discretion of federal judges**, . . . to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified. **But such a view would be inconsistent with our law**." 505 U.S. at 847 (citation omitted); *see also Obergefell*, 135 S. Ct. at 2598 (majority opinion) ("**History and tradition guide and discipline this inquiry but do not set its outer boundaries. That method respects our history and learns from it without allowing the past alone to rule the present**." (citation omitted)).

Thus, **the second prong** of the inquiry **looks to whether the asserted right is "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'"** *Glucksberg*,

521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325–26). While **these prongs are sometimes tied together**, *see, e.g.*, *Kerry v. Din*, 135 S. Ct. 2128, 2134 (2015) (plurality opinion), ***Obergefell* made clear that this historical inquiry may illuminate even newly recognized injustices that reveal a fundamental right**:

> **The nature of injustice is that we may not always see it in our own times**. The generations that **wrote** and **ratified** the Bill of Rights and the Fourteenth Amendment did not presume to know the **extent of freedom** in all of its dimensions, **and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty <u>as</u> <u>we</u> <u>learn</u> its meaning**. When **new insight reveals discord between the Constitution's central protections and a received legal stricture, a <u>claim</u> <u>to</u> <u>liberty</u> <u>must</u> <u>be</u> <u>addressed</u>**.

135 S. Ct. at 2598."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 33-36. (Emphasis added).

**1894.**   Importantly, the Majority continues by outlining a relevant chronology of The Supreme Court's Education Cases that addressed from various **subjective**-perspectives the "extent of constitutional rights with respect to state-provided education." Importantly, remember our **subjective** and **objective** distinction, and the position each of these arguments were based:

> "**Beyond the general framework** for assessing whether an asserted right is fundamental, the **Supreme Court has also**, in a series of cases, **addressed the extent of constitutional rights with respect to state-provided education**. Its education jurisprudence teaches several lessons. **<u>First</u>**, the Court has found that there is no broad, general **<u>right to</u>** education. *Rodriguez*, 411 U.S. at 33–39; *see also, e.g.*, *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (citing *Rodriguez*, 411 U.S. at 33–37). **<u>Second</u>**, while no general right to education exists, **the Supreme Court has specifically distinguished and <u>left</u> <u>open</u>** "whether a **<u>minimally</u> <u>adequate</u> education is a fundamental right**." *Papasan v. Allain*, 478 U.S. 265, 285 (1986); *see also Rodriguez*, 411 U.S. at 36–37. **The Sixth Circuit <u>also</u> appears to have been <u>silent</u> on this issue. <u>Third</u>, education is**, at minimum, **<u>highly important to</u>** "maintaining our basic institutions," **and so the denial of public education** to a discrete group of students "**<u>must</u> <u>be</u> <u>justified</u> <u>by</u> a <u>showing</u> that it furthers some <u>substantial</u> state interest**." *Plyler*, 457 U.S. at 221–24, 230. And **<u>fourth</u>**, the Court has addressed the critical link between education and race discrimination in America. We discuss

the **Court's relevant education cases in turn**, <u>**beginning chronologically**</u>.

<u>**First**</u>, the **history of public education** in this country, as with many things, **is inextricably tied to race**. *See infra* Part II.E.3.a. And so, while it did not directly concern substantive due process, <u>***Brown v. Board of Education***</u>, <u>**347 U.S. 483 (1954)**</u>, <u>**is important**</u> in assessing whether any aspect of <u>**education amounts to a fundamental right**</u>. *Brown* of course examined whether <u>**racially segregated schools inherently**</u> **violated the Equal Protection Clause of the Fourteenth Amendment**. *Id.* at 487–88. The **Court found they did**, **holding** that "in **the field of public education the doctrine of** <u>**'separate but equal' has no place**</u>." *Id.* at 495.

**During** this **equal protection discussion**, the <u>**Court noted**</u> the <u>**critical importance of education**</u>:

> Today, <u>**education is**</u> perhaps <u>**the most important function of state and local governments**</u>. **Compulsory school attendance laws** and the **great expenditures for education** both <u>**demonstrate our recognition of the importance of education to our democratic society**</u>. <u>**It is required in the performance of our most basic public responsibilities, even service in the armed forces**</u>. <u>**It is the very foundation of good citizenship**</u>. <u>**Today it is a principal instrument in awakening the child to cultural values**</u>, <u>**in preparing him for later professional training**</u>, <u>**and in helping him to adjust normally to his environment**</u>. In these days, <u>**it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education**</u>. **Such an opportunity,** <u>**where the state has undertaken to provide it**</u>, <u>**is a right**</u> which <u>**must be made available to all on equal terms**</u>.

> *Id.* at 493.

As argued by the parties, this passage can be read two ways. On the one hand, if "education is perhaps the most important function of state and local governments" and is "required in the performance of our most basic public responsibilities," *id.*, how could it not be "implicit in the concept of ordered liberty" or otherwise fundamental to our social order? *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325). On the other, how could the state be compelled to provide an education if education needs to be equal only "where the state has undertaken to provide it"? *Brown*, 347 U.S. at 493.

Nearly twenty years after *Brown*, this question returned to the Supreme Court. In ***San Antonio Independent School District v. Rodriguez***, the

plaintiffs challenged the **constitutionality of Texas's public-school finance system**, arguing that **differences in funding across school districts denied them equal protection of the law**. 411 U.S. at 4–6, 15–16. Texas employed a "dual approach" to school finance, a system to which both local school districts and the state contributed. *Id.* at 6–7. But **local funding (via property taxes) rapidly outpaced what was provided by the state**, meaning that **variations in property values led to substantial disparities in available funds**. *Id.* at 7–15. During the litigation, "**Texas virtually concede[d]**" that the **system could not survive strict scrutiny**, and so if the uneven funding of schools interfered with a fundamental constitutional right, it would have to be invalidated by the Court. *Id.* at 16–17.

**In assessing whether education was a fundamental right**, the **Court began by referencing *Brown*, noting** the country's "**historic dedication to public education**" and **agreeing that "'the grave significance of education both to the individual and to our society' cannot be doubted.**" *Id.* at 29–30 (quoting *Rodriguez v. San Antonio Indep. Sch. Dist.*, 337 F. Supp. 280, 283 (W.D. Tex. 1971), *rev'd*, 411 U.S. 1). Despite this, the Supreme Court found that education was not a fundamental right, saying that "the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a **State's social** and **economic legislation**." *Id.* at 35.

**In denying the plaintiffs' claim**, the **Court specifically responded** to their argument **that "education is itself a fundamental personal right because it is essential to the effective exercise of First Amendment freedoms and to intelligent utilization of the right to vote**." *Id.* The **Court found this argument lacking, as the plaintiffs**' claim to "**effective**" **First Amendment speech and** "**intelligent utilization**" of the ballot **was** tantamount to **demanding** a **guarantee of** "**the most effective speech or the most informed electoral choice**," **neither** of which **were protected by** the Constitution. *Id.* at 35–36.

The Court's conclusion regarding this argument is especially **notable**:

> Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of **educational expenditures in Texas** provide an education that falls short. Whatever merit appellees' argument might have if a **State's financing system** occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights **where only relative differences**

**in spending levels are involved** and where—**as is true in the present case**—**no charge** fairly **could be made that** the **system fails** to **provide** each child with **an opportunity to acquire the basic minimal skills necessary for** the **enjoyment of** the <u>rights of speech</u> and of **full participation in** the **political process.**

*Id.* at 36–37. Thus, the <u>**Court never ruled on the right to such a basic minimum education**</u>, and as shown more explicitly in its later cases, <u>**saved the question for another day**</u>.

Next is <u>***Plyler v. Doe***</u>. In <u>***Plyler***</u>, the plaintiffs— "undocumented school-age children" also living in Texas—sued to **challenge policies that denied** <u>state</u>-<u>level</u> <u>funding</u> **and** <u>charged</u> <u>tuition</u> **for students** "**who could not establish that they had been legally admitted into the United States.**" 457 U.S. at 205–06, 206 n.2. The **question was whether these policies violated the** <u>Equal Protection Clause</u>, **and** <u>what</u> <u>level</u> <u>of</u> <u>scrutiny</u> **to use** in that analysis. *Id.* at 216–18.

**Looking to** the **interaction between education and the Constitution**, the **Court reiterated** the holding in *Rodriguez*, **while** also **noting** the <u>**heightened significance of education**</u> and the special constitutional considerations that follow:

Public education is not a "**right**" **granted to** individuals by the Constitution. **But neither is it** merely **some** governmental "**benefit**" **indistinguishable from other forms of** <u>social</u> <u>welfare</u> <u>legislation</u>. Both the <u>**importance of education in maintaining our basic institutions**</u>, and the <u>**lasting impact of its deprivation on the life of the child**</u>, mark the distinction. . . . <u>**We have recognized**</u> "the <u>**public schools as a most vital civic institution for the preservation of a democratic system of government**</u>," **and as** the <u>**primary vehicle for transmitting**</u> "<u>**the values on which our society rests**</u>." "[A]s . . . **pointed out early in** <u>our history</u>, . . . **some degree of** <u>education</u> <u>is</u> <u>necessary</u> to prepare citizens to participate effectively and intelligently in our open political system <u>if we are to preserve freedom and independence</u>." . . . **In addition,** <u>education provides</u> the <u>basic tools</u> by <u>which individuals might lead economically productive lives to</u> the <u>benefit of us all</u>. <u>In sum, education has a fundamental role in maintaining the fabric of our society</u>. <u>We cannot ignore the significant social costs borne by our Nation when select groups are denied</u>

the **means** **to** **absorb** the **values** **and** **skills** upon **which**
**our** **social** **order** **rests**.

*Id.* at 221 (some alterations in original) (citations omitted) (first
quoting *School Dist. v. Schempp*, 374 U.S. 203, 230 (1963)
(Brennan, J., concurring); then quoting *Ambach v. Norwick*, 441
U.S. 68, 76 (1979); and then quoting *Yoder*, 406 U.S. at 221).

**Invoking *Brown***, the *Plyler* **Court also noted** the **distinct role** of
**education as a social equalizer**:

> In addition to the **pivotal** role of education in
> **sustaining** our political and cultural **heritage**, **denial
> of education** to some isolated group of children **poses
> an affront to one of the goals of the Equal Protection
> Clause**: the **abolition of governmental barriers
> presenting unreasonable obstacles to advancement
> on the basis of individual merit**. Paradoxically, by
> depriving the children of any disfavored group of an
> education, **we foreclose the means by which that
> group might raise the level of esteem in which it is
> held by the majority**.

*Id.* at 221–22.

**Based on this reasoning**, the **Court found** that the **challenged
provisions violated the Equal Protection Clause**. *Id.* at 223–30.
The **Court noted** that the **denial of a** "basic education"—**framed
in the context of literacy**—would have a **substantial negative
impact on** both the children in question and **society at large**, and so
**any assessment of rationality must also account for these costs**.
*Id.* at 223–24. Thus, "[i]n **light of these countervailing costs**," the
**challenged provisions could only be upheld if they** "further[ed]
**some substantial goal of the State**." *Id.* at 224. Since **the state's**
proffered **interests failed to meet this standard, the Court
invalidated the Texas policy**. *Id.* at 224–30.

**After** *Rodriguez* and *Plyler* comes ***Papasan v. Allain*. In *Papasan*,**
schoolchildren in **counties** originally held by the Chickasaw Nation
**received a reduced amount of state educational funding
compared to other counties** in Mississippi, and **so they sued** the
governor and state officials in federal court. 478 U.S. at 268–74.
**While this might sound like a repeat of *Rodriguez*, their
allegations contained a twist**: while the *Rodriguez* plaintiffs did not
claim a failure to provide them with "**an opportunity to acquire . .
. basic minimal skills**," 411 U.S. at 36–37, the ***Papasan* plaintiffs
did exactly that, arguing** that the **state's funding scheme deprived**

them of **a "minimally adequate level of education" and that their right to such an education was fundamental**, 478 U.S. at 274, 285.

**In assessing this claim**, the **Court noted** that, "[a]s *Rodriguez* and *Plyler* indicate, [the Supreme Court] has not yet definitively settled the question[] [of] whether a minimally adequate education is a fundamental right.**" *Id.* at 285. But *Papasan* did not provide an answer**. Instead, the **Court found that, <u>assuming such a right existed</u>, the <u>plaintiffs had failed to allege sufficient facts in support of their claim</u>**. *Id.* at 286. They did not allege that they were "not taught to read or write," or that they did not receive "instruction on even the educational basics." *Id.* **<u>In short</u>, "they allege[d] no actual facts in support of their assertion that they have been deprived of a minimally adequate education.**" *Id.* **An answer on pleadings**, sure, **but not on constitutional law**.

**<u>Finally</u>**, the **Court essentially repeated this non-answer in *<u>Kadrmas v. Dickinson Public Schools</u>*, 487 U.S. 450, 452–56 (1988)**, a **case** that **concerned** a **<u>fee charged for use of the school bus</u>**. While the **plaintiff there argued** that **those who could not afford the bus fee were deprived of "minimum access to education," <u>she still attended the school despite this fee</u>, <u>meaning</u>** her **claim could not have been for actual deprivation of a basic minimum education**, **but rather that the fee made it harder for** poor families **to access the school** than rich families. *Id.* at 458. **The Court** then proceeded to **uphold the statute under rational-basis review**, since wealth is not a protected class and there were alternative means by which students could still access the school. *Id.* at 458, 460–62, 465.

**In his dissent** in *Kadrmas*, **<u>Justice Marshall noted</u>** that **the Court had <u>still</u> not decided "whether a State constitutionally could deny a child access to a minimally adequate education.**" *Id.* at 466 n.1 (Marshall, J., dissenting). **This question**—whether "a minimally adequate education is a fundamental right," *Papasan*, 478 U.S. at 285—**<u>remains unanswered today</u>**."

> *Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 36-41. (Emphasis added).

**1895.** **<u>Here</u>**—within this present matter before this Honorable Court—the Plaintiffs **ECHO** these cases explicitly and *<u>bind them</u>* with *and through* Free Speech Clause establishing a robust consensus of persuasive authority: *Tinker v. Des Moines Independent Community School District*; *Kaplan v. Uni. Louisville*; *Uni. Of PA. v. EEOO*; *Keyishian v. Bd. Of Regents*; *Adler v. Board of Education*; *Ewing v. Bd. Of Regents*; *Sweezy v. New Hampshire*; *EEOC v. Frankin v. Marshall*

*College*; *Wooley v. Maynard*; *West Virginia Bd. of Ed. v. Barnette*; *Abood v. Detroit*; *Janus v. AFSCME*; *Keller v. State Bar*; *Glickman v. Wileman Brother & Elliott, Inc.*; *United States v. United Foods*; *Clapper v. Amnesty International USA*; *Elrod v. Burns*; *Gerber v. Herskovitz*; *Laird v. Tatum*; *Meese v. Keene*; *Morrison v. Bd. of Educ.*; *Socialist Workers Party v. Attorney Gen.*; *Speech First, Inc. v. Schlissel*; *W. Va. State Bd. Of Edu. v. Barnette*; *Wieman v. Updegraff*; *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*; *United Mine Workers v. Pennington*; *California Motor Transport Co., v. Trucking Unlimited*; *Eaton v. Newpor*t Bd. of Educ.; *Campbell v. PMI Food Equip. Group, Inc.*; *Borough of Duryea v. Guarnieri*; *De Jonge v. Oregon*; *Hague v. Committee for Indus. Org.*; *Thomas v. Collins*; *Crawford v. Britton*; *Woodward v. Etue*; *Dewyse v. Federspiel*; *Connally v. General Construction Co.*; *Kolender v. Lawson*; *Grayred v. City of Rockford*; *NAACP v. Button*; *Fieger v. State of Michigan*; *Thornhill v. Aladama*; *Cantwell v. Connecticut*; *Broderick v. Oklahoma*; *Hill v. Colorado*; *United States v. Stevens*; *Waste Management v. Metropolitan Govt.*; *American Express Travel Related Serv. v. Sidamon-Eristoff*; *Wayside Church v. Van Buren Cnty*; *D.A.B.E., Inc. v. City of Toledo*; *Puckett v. Lexington-Fayette Urban County Govt.*; *Hardin v. Bureau of Alcohol*; *Palazzolo v. Rhode Island*; *Hall v. Meisner*; *Ostipow v. Federspiel*; *Sacramento v. Lewis*; *Guertin v State of Michigan*; *Rochin v. California*; *Kallstrom v. City of Columbus*; *Cruzan v. Director, Missouri Dept. of Health*; *Boler v. Earley*; *In re Cincinnati Radiation Litigation*; *Lillard v. Shelby County Bd. of Education*; *Claybrook v. Birchwell*; *Ewolski v. City of Brunswick*; *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d at 542; *Garret v. Lyng*, 877 F.2d 472, 476 (6th Cir. 1989); *Ashcroft v. Al-Kidd*; *Griswold v. Connecticut*; *Eisenstadt v. Baird*; *Roe v. Wade*; *Lawerence v. Texas*; *Lambert v. Hartman*; *Whalen v. Roe*; *Bloch v. Ribar*; *JP v. DeSanti*; and *Thorne v. City of El Sequigdo*.

*1896.* **Candidly**—the *non-exhaustive list* above are those cases that in totality contribute individually to the whole of Plaintiff, Attorney Cochrane's, legal arguments that a fundamental

right to pursue the **American Dream** through "***a basic minimum education***" is that public education ***free of*** discrimination, harassment, threats, and coercion for ***all* STUDENTS *regardless*** of suspect classification as such is consistent with "**history and tradition**" and is "**implicit in the concept of ordered liberty**," such that "**'nether liberty nor justice would exist if they were sacrificed**" to permit Defendants' acts *herein*. *Gary B.,* at p. 33. (Emphasis added).

***1897.*** Continuing with *Gary B., v. Whitmer* where the Majority analyzed the **first prong** related to public education's **objective** foundation "**deeply rooted in this Nation's history and tradition**." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593-97 (2015); *Glucksberg*, 521 U.S., at 710.19. (Emphasis added). Specifically, the Majority outlines the following *seam* of objective "history and tradition" as follows:

> "*a*. *The Historical Prevalence and Significance of Education*
>
> > "**We begin**, as we do in all due process cases, by examining our **Nation's history**, **legal traditions**, **and practices**." *Glucksberg*, 521 U.S. at 710. **This examination reveals that state-provided education is ubiquitous throughout all** but **the earliest days of the United States, a historical fact that today leads its citizens to expect a basic public education as of right**. Such an expectation demonstrates that the right to **a basic minimum education is** "**deeply rooted in this Nation's history and tradition**," *id.* at 720–21 (quoting *Moore*, 431 U.S. at 503), **supporting its recognition as a fundamental right** under the Due Process Clause.
> >
> > **The Supreme Court's cases on education repeatedly discuss the historical prevalence and importance of state-provided education**. For example, in **_Wisconsin v. Yoder_**, the state noted that **the essential nature of education was touted by Thomas Jefferson in the earliest days of our history**. 406 U.S. at 221. **_Meyer v. Nebraska_** similarly **noted that "[t]he American people have always regarded education and acquisition of knowledge as matters of supreme importance**," **pointing to** the **Northwest Ordinance's prescription**, in **1787**, that "**schools and the means of education shall forever be encouraged**." 262 U.S. at 400. Similarly, **_Papasan_** extensively discussed the **history of public-school land grants**, which "**stretche[d] back over 200 years**" and **predated the Constitution itself**. 478 U.S. at 268–69. **And outside the education context**, when **discussing the right to privacy** in

marriage, the Court compared marriage to other bulwark institutions of American society and democracy, calling it "older than the Bill of Rights—older than our political parties, *older than our school system*." ***Griswold v. Connecticut***, 381 U.S. 479, 486 (1965) (emphasis added).

**This historical prevalence of education supports the view that it is deeply rooted in our history and tradition**, **even under an originalist view**. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2628 (**Scalia, J.**, dissenting) (analyzing the fundamental right to marriage based on state policies "[w]**hen the Fourteenth Amendment was ratified in 1868**"); *McDonald v. City of Chicago*, 561 U.S. 742, 777 (2010) (**same for the right to keep and bear arms**). "**An astonishing thirty-six out of thirty-seven states in 1868**—an Article V, three-quarters consensus [i.e., **well over the number of states needed to amend the Constitution**]—<u>**imposed**</u> **a** <u>**duty**</u> **in** <u>**their**</u> <u>**constitutions**</u> **on state government** <u>**to provide**</u> **a** <u>**public**</u>**-school** <u>**education**</u>." Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions when the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 108 (2008). **These states accounted for** <u>**92%**</u> **of the population**. *Id.* at 109. And **near the time of the Fourteenth Amendment's adoption, Senator Charles Sumner argued** that "[t]**he New England system of common schools is part of the republican form of government** <u>**as**</u> <u>**understood**</u> **by** <u>**the**</u> <u>**framers**</u> **of the Constitution**." (Amicus Br. of ACLU of Mich. at 22 (quoting David Herbert Donald, *Charles Sumner* 426 (1996)).)

Furthermore, **this history should not be viewed as only a static point**. **The continued expansion of education through the adoption of the Fourteenth Amendment resulted in** <u>**universal**</u> <u>**compulsory**</u> <u>**education**</u> **by 1918,** <u>**and it has continued to develop**</u> <u>**since**</u>. *See* Barry Friedman & Sara Solow, *The Federal Right to an Adequate Education*, 81 Geo. Wash. L. Rev. 92, 127–32 (2013). And while state-supported education may have a different cultural significance than marriage, *see Obergefell*, 135 S. Ct. at 2593–94 (majority opinion) (framing the marriage right as the product of "untold references . . . in religious and philosophical texts spanning time, cultures, and faiths"), it is certainly both so longstanding and uniform as to be taken for granted in twenty-first-century America.

<u>**Though focused on the equal protection context instead of due**</u> <u>**process**</u>, <u>**the**</u> <u>**words**</u> **of** <u>***Brown v. Board of Education***</u> are still instructive: "**In approaching this problem,** <u>**we**</u> <u>**cannot**</u> <u>**turn**</u> <u>**the**</u> <u>**clock**</u> <u>**back**</u> to 1868 when the Amendment was adopted . . . . <u>**We**</u> <u>**must**</u> <u>**consider**</u> <u>**public**</u> <u>**education**</u> <u>**in**</u> <u>**the**</u> <u>**light**</u> <u>**of**</u> <u>**its**</u> <u>**full**</u> <u>**development**</u> <u>**and**</u> <u>**its**</u> <u>**present**</u> <u>**place**</u> <u>**in**</u> <u>**American**</u> <u>**life**</u> <u>**throughout**</u> <u>**the**</u> <u>**Nation**</u>." 347 U.S. at 492–93. <u>**Such a view reveals state-**</u>

sponsored (and even <u>mandated</u>) education as a ubiquitous feature of our country, provided as of right to the people. Based on **this <u>uniform</u> <u>presence</u>, <u>the</u> <u>people</u> have come to <u>expect</u> <u>and</u> <u>rely</u> <u>on</u> <u>this</u> <u>education</u>**—second perhaps only to the immediate family—**in order <u>to</u> <u>provide</u> <u>the</u> <u>basic</u> <u>skills</u> <u>needed</u> <u>for</u> <u>our</u> <u>children</u> <u>to</u> <u>participate</u> <u>as</u> <u>members</u> <u>of</u> <u>American</u> <u>society</u> and democracy**.

**Our nation's history of racial discrimination further reveals** the historical and **lasting importance of education**, and the significance of its modern ubiquity. **Education, and particularly <u>access</u> <u>to</u> <u>literacy</u>, has <u>long</u> been <u>viewed</u> <u>as</u> <u>a</u> <u>key</u> <u>to</u> political <u>power</u>. Withholding that <u>key</u>, slaveholders and segregationists used the deprivation of <u>education</u> <u>as</u> <u>a</u> <u>weapon</u>, <u>preventing</u>** African **Americans from obtaining the political power needed to achieve <u>liberty</u> and <u>equality</u>**. While most starkly displayed during the time of slavery, **this <u>history</u> <u>is</u> <u>one</u> <u>of</u> <u>evolution</u>** rather than paradigm shift, **and so what began in the slave codes of the antebellum South transformed into separate-and-unequal education policies that persisted well after *Brown v. Board of Education*.**

**In the beginning of our country's history**, <u>teaching</u> slaves <u>to</u> read **was a crime**. *E.g.*, *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 387–88 (1978) (Marshall, J., concurring in part and dissenting in part); *South Carolina v. Katzenbach*, 383 U.S. 301, 311 n.10 (1966). These laws were widespread among Southern states, driven by a desire to prevent escapes or rebellion. (*See, e.g.*, Amicus Br. of ACLU of Mich. at 18–19); *see also, e.g.*, *United States v. Rhodes*, 27 F. Cas. 785, 793 (C.C.D. Ky. 1866) ("[A law in Louisiana] not only forbids any person teaching slaves to read or write, but it declares that any person using language in any public discourse from the bar, bench, stage, or pulpit, or in any other place, or in any private conversation, or making use of any sign or actions having a tendency to produce discontent among the free colored population or insubordination among the slaves, or who shall be knowingly instrumental in bringing into the state any paper, book, or pamphlet having a like tendency, shall, on conviction, be punishable with **imprisonment or death, at the discretion of the court**."); *cf.* <u>Frederick Douglass</u> Bicentennial Commission Act, Pub. L. No. 115-77, § 2(3), 131 Stat. 1251, 1251 (2017) ("**Douglass continued to teach himself to read and write and taught other slaves to read despite risks including death**.").

**This trend continued through extrajudicial violence during the Reconstruction era**. (*See, e.g.*, Amicus Br. of ACLU of Mich. at 19–22.) During this period, "**Klansmen targeted schoolteachers** for violent retribution and Black parents who sent their children to school frequently 'received visits from white men eager to reinforce

the nuances of the established racial order.'" (*Id.* at 20 (quoting George C. Rable, ***But There Was No Peace: The Role of Violence in the Politics of Reconstruction*** 97 (2007)).) **And while the federal government responded through civil rights legislation and prosecutions**, *see, e.g.*, *Rhodes*, 27 F. Cas. at 785–86, 793–94; (Amicus Br. of ACLU of Mich. at 20–21), **the end of Reconstruction heralded legislative and policy efforts <u>designed to limit</u> the <u>education</u> of African Americans**, *see Katzenbach*, 383 U.S. at 310–13, 311 n.10 (noting that **Southern states "rapidly instituted <u>racial segregation</u> in their <u>public schools</u>"** following the Civil War, and **discussing the interplay between these efforts to <u>restrict literacy</u> and efforts to <u>restrict the vote</u>**).

While ***<u>Plessy v. Ferguson</u>***, 163 U.S. 537 (**1896**), ***overruled by Brown***, 347 U.S. 483, is perhaps the best-known case of the Supreme Court's "separate but equal" doctrine, several other cases upheld segregation specifically with respect to American schools. For example, in ***<u>Cumming v. Board of Education</u>***, 175 U.S. 528, 544 (1899), the **Court declined** to intervene when a local school board closed a preexisting black high school and "used the funds in its hands to assist in maintaining a high school for white children without providing a similar school for colored children." Similarly, the **Court upheld** the ability of states to force private schools to segregate themselves based on race. ***<u>Berea Coll. v. Kentucky</u>***, 211 U.S. 45, 51–54, 58 (1908), *abrogated by Brown*, 347 U.S. 483. And in ***<u>Lum v. Rice</u>***, 275 U.S. 78, 85–87 (1927), *abrogated by Brown*, 347 U.S. 483, the **Court upheld** the state's decision to bar a Chinese American student from attending a white public high school.

While ***<u>Brown</u> <u>was handed down in 1954</u>*** and held that "[s]eparate educational facilities are inherently unequal," 347 U.S. at 495, **segregation and unequal treatment in schools <u>have persisted</u> long after that decision**. Despite the Supreme Court's instruction for desegregation "**with all deliberate speed**," *Brown v. Bd. of Educ.* (*Brown II*), 349 U.S. 294, 301 (1955), school segregation cases **continued to reach the Court for decades**, *see, e.g.*, *Milliken v. Bradley*, 418 U.S. 717 (1974).

There are **two main takeaways from this history of racial discrimination in education**, as well as from past interventions by the courts. **<u>First</u>, <u>access to literacy was</u> viewed as <u>a</u> prerequisite to the exercise of political power**, **with a strong correlation between those who were viewed as <u>equal</u> citizens <u>entitled</u> to <u>self-governance</u> and those who were provided access to education by the state**. **<u>Second</u>, when faced with exclusion from public education, would-be students have repeatedly been forced to rely on the courts for relief**. The **denials of education seen in these cases <u>and beyond</u> are now <u>universally accepted</u> as serious**

**<u>injustices</u>, <u>ones</u> <u>that</u> <u>conflict</u> <u>with</u> <u>our</u> <u>core</u> <u>values</u> <u>as</u> <u>a</u> <u>nation</u>**. Furthermore, the substantial litigation devoted to addressing these exclusions **reveals the <u>unparalleled</u> <u>value</u> assigned to <u>literacy</u>**, which is **<u>viewed</u> by our society <u>as</u> <u>essential</u> <u>for</u> <u>students</u> to obtain even a chance at political and economic opportunity**.

**For all of these reasons**, we find that the right to **a basic minimum education—access to literacy—is** so **"deeply rooted in this Nation's history and tradition" as to meet the historical prong of the Supreme Court's substantive due process test**. *Glucksberg*, 521 U.S. at 720–21 (quoting *Moore*, 431 U.S. at 503)."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 41-46. (Emphasis added).

*1898.*  **<u>Next</u>**, the Majority shifts to the **<u>second prong</u>** of the Supreme Court's substantive due process test outlined in *Gary B., v. Whitmer* to determine whether that "a basic minimum education" is "**implicit in the concept of ordered liberty**," such that '**neither liberty nor justice would exist if they were sacrificed**," opining as follows:

"*b. <u>Whether a Basic Minimum Education Is "Implicit in the Concept of Ordered Liberty</u>*"

Beyond this look to our history, **we must also assess whether an asserted right is "implicit in the concept of ordered liberty**," *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325). Put differently, **<u>this</u> <u>Court</u> <u>must</u>** "**<u>exercise</u> <u>reasoned</u> <u>judgment</u> <u>in</u> <u>identifying</u> <u>interests</u> <u>of</u> <u>the</u> <u>person</u> <u>so</u> <u>fundamental</u> <u>that</u> <u>the</u> <u>State</u> <u>must</u> <u>accord</u> <u>them</u> <u>its</u> <u>respect</u>**." *Obergefell*, 135 S. Ct. at 2598.

As Plaintiffs note, **individuals with low or no literacy are incomparably disadvantaged in their economic and social lives**, *see, e.g.*, **<u>*Plyler*</u>**, 457 U.S. at 222 ("**Illiteracy is an enduring disability. The inability to read and write will handicap the individual deprived of a basic education each and every day of his life.**"). Even **<u>*Meyer*</u> indicated** that the right "**<u>to acquire useful knowledge</u>**" **<u>was protected</u> by the Due Process Clause**. 262 U.S. at 399. But neither of these is enough to transform the right into one that is fundamental and thus guaranteed by the Constitution. *See, e.g.*, *Maher v. Roe*, 432 U.S. 464, 479 (1977) ("[**T**]he Constitution does not provide judicial remedies for every social and economic ill." (quoting *Lindsey v. Normet*, 405 U.S. 56, 74 (1972))). Rather, a basic minimum education—meaning one that **plausibly** provides access to literacy—is fundamental because it is necessary for even the most limited participation in our country's democracy.

The Supreme Court has recognized that basic literacy is foundational to our political process and society. In *Yoder*, the **Court noted** that "**some degree of <u>education</u> is <u>necessary</u> to prepare <u>citizens</u> to <u>participate</u> <u>effectively</u> <u>and</u> <u>intelligently</u> in our open political system <u>if</u> <u>we</u> <u>are</u> <u>to</u> <u>preserve</u> <u>freedom</u> <u>and</u> <u>independence</u>**." 406 U.S. at 221. And while *Rodriguez* rejected a general **right <u>to</u>** education on the grounds that **no one is guaranteed the *<u>most</u>* <u>effective</u> <u>or</u> <u>intelligent</u> political participation**, 411 U.S. at 35–36, **the <u>right asserted by</u> <u>Plaintiffs in</u> *this* case is *far more* <u>fundamental</u>. The degree of education they seek through *this* lawsuit**—namely, access to basic literacy—**is <u>necessary</u> for essentially *any* political participation**.

**Effectively every interaction between a citizen and her government depends on literacy. <u>Voting</u>, <u>taxes</u>, the <u>legal</u> <u>system</u>, <u>jury duty</u>—<u>all of these are predicated on the ability</u> <u>to read and comprehend written thoughts</u>. <u>Without</u> <u>literacy</u>,** how can someone understand and complete a voter registration form? Comply with a summons sent to them through the mail? Or afford a defendant due process when sitting as a juror in his case, especially if documents are used as evidence against him?

**Even things like road signs and other posted rules, backed by the force of law, are inaccessible without a basic level of literacy.** In this sense, **access to literacy "is required in the performance of our most basic public responsibilities,"** ***<u>Brown</u>***, 347 U.S. at 493, **as our government has placed it "at the center of so many facets of the legal and social order,"** *Obergefell*, 135 S. Ct. at 2601; *see also* Steven G. Calabresi & Michael W. Perl, *Originalism and Brown v. Board of Education*, 2014 Mich. St. L. Rev. 429, 552 ("**At a <u>minimum</u>, children <u>must</u> <u>be</u> <u>taught</u> <u>to</u> <u>read</u> so they can read the laws for themselves—a task that many of the Framers would have thought was fundamental.**").

**Access to literacy also "draws meaning from related rights,"** **further indicating that it must be protected.** *Obergefell*, 135 S. Ct. at 2590. "**[<u>T]he right to</u> <u>receive</u> <u>ideas</u> <u>is</u> <u>a</u> <u>necessary</u> <u>predicate</u> <u>to</u> the <u>recipient's</u> <u>meaningful</u> <u>exercise</u> <u>of</u> <u>his</u> <u>own</u> <u>rights</u> <u>of</u> <u>speech</u>, <u>press</u>, and <u>political freedom</u>.**" ***<u>Bd. of Educ.</u>*** ***<u>v. Pico</u>***, 457 U.S. 853, 867 (1982) (plurality opinion) (emphasis omitted); *see also Rodriguez*, 411 U.S. at 35 ("**The <u>'marketplace of ideas'</u> <u>is</u> <u>an</u> <u>empty</u> <u>forum</u> <u>for those lacking</u> <u>basic communicative tools</u>.**"). In this sense, **access to literacy is itself fundamental because it is essential to the enjoyment of these other fundamental rights**, such as participation in the

political process. *See, e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964)). And "**the political franchise**" **is** perhaps the **most fundamental of all** such rights, because it is the central element of our democracy. *Id.* (quoting *Yick Wo*, 118 U.S. at 370).

While the Supreme Court in **_Rodriguez_** said that "**the importance of a service performed by the State does not determine whether it must be regarded as fundamental,**" 411 U.S. at 30, **this principle is stretched past its breaking point when the right in question is important because it is necessary to other, clearly fundamental rights**, *cf., e.g.*, *id.* at 35 n.78 (noting that there is a "protected right, implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters"). **And this is not just a right deemed to be important, or even very important; rather**, "[**p**]**roviding** **public** **schools** **ranks** **at** **the** **very** **apex** **of** the **function** **of** a **State**." **_Yoder_**, 406 U.S. at 213. **It is hard to see how this apex function could be fulfilled by a system that does not provide** a reasonable opportunity to obtain literacy, **the foundation necessary to the exercise of many other fundamental rights**.

Defendants argue that "[a]ccess to literacy is not so fundamental to ordered liberty and justice." (Defs.' Br. at 49.) To support this view, they note that "at the time of the adoption of the U.S. Constitution, public education that went beyond rudimentary local cooperation was nonexistent." (*Id.* at 51–52 (citing *Gary B.*, 329 F. Supp. 3d at 365–66).) According to Defendants, since the country existed at that time, how could "ordered society" require a state-provided education? (*Id.*)

**Suffice it to say that the practices of the 1700s cannot be the benchmark for what a democratic society requires**. "**The nature of injustice is that we may not always see it in our own times.**" *Obergefell*, 135 S. Ct. at 2598. That **states uniformly created entitlements to education in the years leading up to and soon after the Fourteenth Amendment's adoption reflects the identification of such an injustice, and demonstrates the people's view that such a right is "implicit in the concept of ordered liberty.**" *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325); *see also Obergefell*, 135 S. Ct. at 2598 (**cautioning against "allowing the past alone to rule the present**").

Beyond the fact that a basic minimum education is essential to participation in our political system, there is another reason

why access to literacy is implicit in the ordered liberty of our nation. "[T]hat **education is a means of achieving equality in our society" is a belief "that has persisted in this country since the days of Thomas Jefferson**." *Hunnicutt v. Burge*, 356 F. Supp. 1227, 1237 (M.D. Ga. 1973) (citing Godfrey Hodgson, *Do Schools Make a Difference?*, Atlantic, Mar. 1973, at 35). In this sense, **education has historically been viewed as a "great equalizer**": **regardless of** the circumstances of a child's birth, a minimum education provides **some chance** of **success according to that child's innate abilities**. *See, e.g.*, David Rhode et al., *The Decline of the "Great Equalizer*," Atlantic, Dec. 19, 2012 (quoting **Horace Mann**, politician and education reformer, in **1848**, and Arne Duncan, Secretary of Education, in 2011); Roslin Growe & Paula S. Montgomery, *Educational Equity in America: Is Education the Great Equalizer?*, Prof. Educator, Spring 2003, at 23 (discussing Mann and the history of the "great equalizer" concept).

As the ***Plyler*** **Court noted, "education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all**. . . . [**The**] **denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit**." 457 U.S. at 221–22. And ***Brown*** **further supports this view, finding that** "[i]**n** ***these*** **days**, it is **doubtful** that any child may **reasonably** be expected to succeed in life **if** he is **denied the opportunity of an education**." 347 U.S. at 493.

**This is especially true considering our history of segregated and unequal education based on race**, **a history that began for the express purpose of limiting** African Americans' **political power**. *See supra* Part II.E.3.a. The Supreme Court's desegregation cases make clear that state-provided public education is important not just to provide a shot at achievement in the face of inequalities of wealth and power, but specifically as a means of addressing past racial discrimination that restricted educational opportunities, and of course to maintain as best we can whatever equal opportunity has already been achieved.

It may never be that each child born in this country has the same opportunity for success in life, without regard to the circumstances of her birth. But even so, the Constitution cannot permit those circumstances to foreclose *all* opportunity and deny a child literacy without regard to her potential. *See Plyler*, 457 U.S. 219–20 ("[**I**]**mposing disabilities on the . . . child is contrary to the basic concept of our system that legal**

burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth . . . ." (second alteration in original) (quoting *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972))). **Providing a basic minimum education is necessary to prevent such an arbitrary denial, and so is essential to our concept of ordered liberty**.

**We hold**, therefore, **that the right to a basic minimum education—one that can plausibly impart literacy—is "implicit in the concept of ordered liberty**." *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325). **When combined with the historical analysis discussed above**, this means that **access to such a basic minimum education is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment**."

> *Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 46-46. (Emphasis added).

**1899.** **Continuing even further**—the Majority in *Gary B., v. Whitmer* continues their analysis after declaring that "*a basic minimum education is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment*" as to add two (*2*) relevant positions:

"***i. Judicial Restraint Suggests Deference to the Political Process***

The **classic argument against extending substantive due process is that recognition of a right as "fundamental" removes it from and so short-circuits the political process**. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2625 (Roberts, C.J., dissenting) ("By deciding this question under the Constitution, **the Court removes it from the realm of democratic decision**. There will be consequences to shutting down the political process on an issue of such profound public significance."); *see also, e.g.*, *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. by Any Means Necessary (BAMN)*, 572 U.S. 291, 313 (2014) (plurality opinion) ("First Amendment dynamics would be disserved if this Court were to say that the question here at issue is beyond the capacity of the voters to debate and then to determine."). **Since the political branches are better equipped to address general social wrongs, the argument goes, the courts should not intervene by recognizing calcified and inflexible constitutional rights**. *See, e.g.*, *Griswold*, 381 U.S. at 482 ("**We do not sit as a super-legislature to determine the wisdom, need, and propriety**

of laws that touch economic problems, business affairs, or social conditions.").

But it is unsurprising that our political process, one in which participation is effectively predicated on literacy, would fail to address a lack of access to education that is endemic to a discrete population. The affected group—**students** and families of students **without access to literacy**—**is especially vulnerable and faces a built-in disadvantage at seeking political recourse**. The lack of literacy of which they complain is exactly what prevents them from obtaining a basic minimal education through the normal political process. **This double bind provides increased justification for heightened judicial scrutiny and the recognition of the right as fundamental**. *See, e.g.*, ___Rodriguez___, 411 U.S. at 28 (noting that heightened scrutiny is warranted when a class is "saddled with . . . disabilities" or is "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"); *cf. Schuette*, 572 U.S. at 334–35 (Breyer, J., concurring in the judgment) (discussing the Supreme Court's "political process" equal protection cases)."

### *ii.* ___The Due Process Clause Provides Only Negative, Not Positive Rights___

**Another often-repeated argument** raised by Defendants **and the dissent** is that **the Fourteenth Amendment**—which speaks in terms of deprivation or denial—**does not provide positive, affirmative rights**. **The Due Process Clause says what the government** cannot do, **not** what it must do, **and so recognizing an obligation of the state to provide a basic minimum education would turn the language of the Clause "on its head."** (Defs.' Br. at 43.)

**To be sure**, several cases have reflected this view of the Clause. For example, in ___Jackson v. City of Joliet___, 715 F.2d 1200, 1203 (7th Cir. 1983), Judge Posner **said** that "**the Constitution is a** charter of negative **rather than positive liberties.**" And the **Supreme Court itself has held** "that the **Due Process Clauses generally confer no affirmative right to governmental aid**, **even where such aid may be necessary to secure life**, **liberty**, **or property interests of which the government itself may not deprive the individual.**" ___DeShaney v. Winnebago Cty. Dep't of Soc. Servs.___, 489 U.S. 189, 196 (1989).

Though not as explicitly described, **this negative liberty framing is also imbedded in several of the Supreme**

Court's key substantive due process cases. For example, in **_Casey_**, the **Court portrayed its decision as** defending "**a realm of personal liberty which the government may not enter**." *Casey*, 505 U.S. at 847. And even **_Obergefell_ framed substantive due process as protecting** "certain **personal choices**," implicitly a negative-rights **construction**. 135 S. Ct. at 2597 (majority opinion).

**But the Court has recognized affirmative fundamental rights**. **Aside from specifically enumerated rights incorporated into the Fourteenth Amendment**, such as the right to counsel, *see, e.g.*, **_Strickland v. Washington_**, 466 U.S. 668, 684–86 (1984); **_Gideon v. Wainwright_**, 372 U.S. 335, 339–43 (1963), one affirmative right repeatedly endorsed by the Court is the right to marry. For example, in **_Loving v. Virginia_**, 388 U.S. 1 (1967), the Court found that "[**m**]**arriage is one of the 'basic civil rights of man**,'" *id.* at 12 (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)). That marriage is a fundamental right and must be provided by the state without undue restriction was further affirmed in *Zablocki v. Redhail*, 434 U.S. at 385–87, and in *Turner v. Safley*, 482 U.S. 78, 94–96 (1987). And in *Obergefell*, despite using the negative-rights frame of "choice" discussed above, 135 S. Ct. at 2597, the Court reiterated that the "**right to marry is protected by the Constitution**" and "**is fundamental under the Due Process Clause**," *id.* at 2598.

Since access to marriage was so uniformly provided by the states and expected by the people as of right, it took on a fundamental character under the Due Process Clause, even though the performance of a marriage is an affirmative act by the state. **The same could be said for education**. *See supra* Part II.E.3.a (discussing the historical evolution and prevalence of state-sponsored education in the United States). **And while the burden involved in performing a marriage is substantially less than the burden in providing an education, the marriage cases at least show that the Constitution does not categorically rule out the existence of positive rights**.

**Further**, the **Supreme Court's cases expressly left open the possibility of the right to a basic minimum education, which works to negate the argument that its recognition is impossible given its positive or affirmative nature**. **If** Defendants were **correct**, the **Court could easily** have **disposed of any claim to an education-related fundamental right**, **instead** of taking pains to distinguish

and reserve decision on "whether a minimally adequate education is a fundamental right." *Papasan*, 478 U.S. at 285. While **the dissent distinguishes** these cases by **arguing that the Supreme Court was referring to an equal protection fundamental right**, and **not a substantive due process fundamental right, that distinction finds no support in the Supreme Court's case law and is foreclosed by our own, which holds that a fundamental right is a fundamental right,** *regardless of* which clause the claim is brought under. *See Scarbrough*, 470 F.3d at 260–61 (discussing **the merger of equal protection and substantive due process claims based on the deprivation of a fundamental right**).

One additional point from the dissent is worth noting. The dissent compares the right to a basic minimum education to a right to state-provided food, housing, or health care, and claims that *DeShaney* foreclosed any affirmative right to these or other benefits. This is because, our colleague says, *DeShaney* stands for the proposition that "[s]ubstantive due process does not regulate a state's failure to provide public services," regardless of the context. (Dissent at 76 (citing *DeShaney*, 489 U.S. at 194–97).)

But *DeShaney*—a case in which a child sued the state for failing to stop his father from abusing and seriously injuring him—concerned the state's failure to prevent harm caused by a private actor. 489 U.S. at 191–95. The dissent's alternative reading—that *DeShaney* forecloses any affirmative obligation of the state under any circumstance, regardless of whether a private harm is at issue—is divorced from the text of that case. ***DeShaney* itself couched its holding in this public-private distinction**, saying "[a]s a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *see also id.* at 195 ("[**N**]**othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.**"); ***Jones v. Reynolds***, 438 F.3d 685, 688, 690 (6th Cir. 2006) ("[**W**]**hen a claimant argues that government officials failed to prevent private individuals from causing another injury, . . . [***DeShaney***] and its progeny rarely permit the claim to go forward.**").

Simply put, **education is different**. As discussed above, *see supra* Part II.D.3.a, universal, **state-provided public education was nearly ubiquitous at the time the**

**Fourteenth Amendment was adopted**, and has only grown since then to be <u>expected</u> as a given by the public. Through this, **the state has come to effectively occupy the field in public education, and so is the only practical source of learning for the vast majority of students**. <u>We can think of no other area of day-to-day life that is so directly controlled by the state</u>. <u>And with that control must come responsibility</u>, particularly because some **minimal education**—enough to provide access to literacy—**is a prerequisite to a citizen's participation in our political process**. <u>*DeShaney* implied such a responsibility</u>, resting its holding on the fact that **the state had played <u>no role</u> in creating <u>or</u> worsening the threat of harm the victim faced**. 489 U.S. at 201.

Thus, even if *DeShaney*'s framework were applied here (despite the lack of a private harm), <u>**this Court has recognized substantive due process claims under the state-created danger doctrine**</u>. <u>***Kallstrom v. City of Columbus***</u>, 136 F.3d 1055, 1065–67 (6th Cir. 1998). While the dissent argues against the right to a basic minimum education by comparing it to a constitutional right to food, a **better analogy is a world in which the state took charge of the provision of food to the public, to the exclusion of nearly all private competitors. If the state then left the shelves on all the stores in one city bare, with no compelling governmental reason for this choice, such an action would place the residents of that city in heightened danger no less than the actions of the state in other cases where courts have allowed claims under the Due Process Clause**. *See, e.g.*, *id.* at 1059–60, 1069–70; <u>***Kneipp v. Tedder***</u>, 95 F.3d 1199, 1201–03, 1213–14 (3d Cir. 1996). Thus, while the dissent's arguments amount to sound advice for us to proceed with special caution when considering any positive fundamental right, <u>**the case law on this issue does not foreclose recognizing the right to a basic minimum education**</u>."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 51-56. (Emphasis added.)

***1900.*** Candidly, the Majority and Plaintiffs in *Gary B., v. Whitmer* wane in their arguments when 'carefully describing' the asserted fundamental liberty interest to "*what* constitutes a basic minimum education" and this description becomes more so convolutedly speculative with the Majority highlighting the need for "*at least* three basic components" for the Plaintiffs' <u>positive</u>-right scheme to exist. *Id*. at p. 56.

**1901.** Frankly—*I*, Plaintiff, Attorney Cochrane, side with the Dissent against this analysis and find when scaling this description to a "comprehensive" level the enormously <u>subjective</u> nature of the implementation Statewide <u>and</u> Nationwide becomes legislative in nature. Again, recall our *40,000 ft.* view from the <u>subjective</u> *v*. <u>objective</u> perspective with the Nation as the <u>objective</u> perspective being composed of individual States, each themselves with Counties, Parishes, and *in general* communities with some type of public education. Now—**<u>EVERY</u>** <u>single</u> <u>one</u> of these communities will on a <u>subjective</u> level demand **DIFFERENT** needs relative to the proposed-<u>objective</u> standards set by the Majority's open-ended description of "*at least* three basic components: facilities, teaching, and educational materials (*e.g.*, books)." *Id*. at p. 57.

**1902.** Conversely, the contours of the *herein* proclaimed **Right to a Public Education *free of* discrimination, harassment, threats, and coercion *for all* STUDENTS *regardless of* Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth**—in large effect **<u>already</u> <u>EXISTS</u>** throughout the United States. Plainly there is no need to define the *actual* infrastructure on a systematic top-to-bottom scale. Instead by adopting this Societal upgrade our <u>local</u> systems will define more accurately **inherent** discrimination, harassment, threats, and coercion on a <u>subjective</u> level *by conforming* to the <u>objective</u> standard formalized through *this* process. From there by leveraging this judicative process, those genuine disputes that spark ripeness would then **ECHO** reinforcement of the objective truth to add immediate value to the <u>entire</u> system. The mechanism for enforcement is straightforward and again streamlines the application of the Right to a Public Education ***<u>free of</u>*** discrimination, harassment, threats, and coercion ***<u>for all</u>* STUDENTS *<u>regardless of</u>*** suspect classifications as a <u>negative</u> fundamental right secured jointly through the First Amendment's substantive rights, *i.e.*, Freedom of Speech; Freedom of Religion; Right to Petition/Redress the Government; Right to Peacefully Assemble—and *also collectively* those substantive rights under the Fourteenth Amendment, *i.e.,* the Right to

Academic Freedom; Right to Bodily Integrity; Right to Privacy, *etc*. Taken together—*Brown* leads the charge and establishes the **objectively inherent** precedent that discrimination, harassment, threats, and coercion **must be absent** from the public-educational system as such was the effect of State policy/action that found "*separate but equal*" under *Plessey v. Ferguson* as void and unconstitutional. Procedurally, if the State policy/action does not rise to this objective level, *or* the objective level adopted by *this* Honorable Court—*then* the Fourteenth Amendment Substantive, Procedural, and Equal Protection Clauses applies as to question under strict scrutiny the State policy/action involved to determine whether the action/policy rises to a level of objectively violative *or* remains subjectively valid giving deference to the State policy/action.

**1903.** Returning now to *Gary B., v. Whitmer*—the Majority makes the attempt to carve the contours of the Right to a Basic Minimum Education in stone yet yields by conceding:

> "[a]t this stage of the litigation—a motion to dismiss in which no evidence has been discovered or presented—it would be difficult to define the exact limits of what constitutes a basic minimum sufficient to provide such assess."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 51-56. (Emphasis added).

**1904.** *Continuing further*—the Majority outlines its hesitation by explaining the precedential conditions that require as noted above the "'careful description' of the asserted fundamental liberty interest" to *at least* "define the extent of the right needed to resolve the matter at hand," in full identifying the following:

> "**Beyond simply recognizing the existence of a right** to a basic minimum education, **it is also important to define its contours**, at least for the purposes of this case. The **Supreme Court has** "**required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest**." *Glucksberg*, 521 U.S. at 721 (quoting *Flores*, 507 U.S. at 302). **This description does not need to circumscribe the outermost limit of the right, but must at least define the extent of**

the right needed to resolve the matter at hand. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2602 (noting that rights can be described in a more "**comprehensive sense**," **leaving questions on** whether **a particular state action or inaction** is required by that right **for subsequent determination**).

**Importantly, the right defined in this opinion is narrow in scope**. It does not guarantee an education at the quality that most have come to expect in today's America (but that many are nevertheless denied). **Rather, the right only guarantees the education needed to provide access to skills that are essential for the basic exercise of other fundamental rights and liberties**, **most importantly participation in our political system**. As described by Plaintiffs, **this amounts to an education sufficient to provide access to a foundational level of literacy**—the degree of comprehension needed for participation in our democracy.

**At this stage of the litigation—a motion to dismiss in which no evidence has been discovered or presented—it would be difficult to define the exact limits of what constitutes a basic minimum education sufficient to provide such access. This task is best suited for the district court in the first instance**. But a few key principles can trace the contours of the right, providing guideposts for the parties as they continue this litigation.

At **the** outset, **Defendants are correct that this Court cannot prescribe a specific educational outcome**, such as literacy or proficiency rates. Though these measures may provide some useful evidence of whether the state is in fact providing a basic minimum education, they are not sufficient evidence alone, because **a court order cannot guarantee that educational opportunity is translated into student performance**. **Rather**, **the requirement** to provide a basic minimum education **means the state must ensure that [STUDENTS] are afforded at least a rudimentary educational infrastructure, such that it is plausible to attain literacy within that system**.

**While the precise contours of this infrastructure must be defined though the course of further litigation and examination of the parties' evidence**, it would seem to include at least three basic components: facilities, teaching, and educational materials (e.g., books). For each of these components, the quality and quantity provided must at least be sufficient for students to plausibly attain literacy within the educational system at issue. **This question of fact is entrusted to the trial court**, which can assess the sufficiency of these

measures in the first instance **after hearing evidence and likely employing the assistance of expert witnesses as to what resources are necessary**.

**<u>Our dissenting colleague criticizes this approach</u>, implying that <u>our</u> <u>holding</u> today <u>will</u> <u>create</u> a free-wheeling right that allows [*or requires*] federal judges to micromanage the work of local school boards**. We do not believe this is a fair description of the limited right embraced in our opinion, which promises only an education sufficient to provide basic access to literacy. And while this right could be impacted by the conditions of a school's facilities, the age of its textbooks, or the number of teachers in its classrooms, this does not mean that any of these things individually has a "constitutionally required" minimum level. (Dissent at 63.) **Rather, the question is whether the education the state offers a student—when taken as a whole—can plausibly give her the ability to learn how to read**.

Similarly, the dissent suggests that the recognition of this right—requiring that a state's system of public education provide at least a shot at literacy, irrespective of which school district a student is assigned to—would somehow stymie innovation and create a one-size-fits-all, national program of education. **But <u>how each state reaches the basic minimum level of education discussed above can vary dramatically</u>, <u>and nothing in our recognition of this right</u>—<u>or even any resulting remedy in this case</u>—<u>could alter the broad powers of the states under our federalist system</u>. The <u>state</u> <u>is</u> <u>free</u> <u>to</u> <u>fashion</u> <u>its</u> <u>own</u> <u>school system</u> <u>in</u> <u>any</u> <u>number</u> <u>of ways</u>, <u>but</u> <u>however</u> <u>it</u> <u>does</u> <u>so</u>, <u>it</u> <u>must</u> <u>give</u> <u>all</u> [STUDENTS] <u>at</u> <u>least</u> <u>a</u> <u>fair</u> <u>shot</u> at access <u>to</u> <u>literacy</u>—<u>the</u> <u>minimum</u> <u>level</u> <u>of</u> <u>education</u> <u>required</u> to participate in our nation's democracy**."

> *Gary B., v. Whitmer*, No. 18-1855/187, at pp. 56-58. (Emphasis added).

**1905.**   Again, the Majority applies this above logic to the facts of *Gary B., v. Whitmer* to determine under *Iqbal* whether the Plaintiffs have plead "**<u>factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged</u>**," while "[l]ooking to their **<u>complaint as a whole</u>**." *Gary B., v. Whitmer,* at p. 58. (Emphasis added).

**1906.**   Again—*respectfully*, that is why *this* Complaint is *so* inclusive—teaching the *contours* of these facts was *required* to give *this* Honorable Court the entire frame—and frankly without the

adequate development *herein this* objective truth would have extinguished *with* Plaintiff, Attorney Cochrane's, <u>silenced</u> acquiescence. Candidly, there is no malice *nor* retribution that should be read into these words—*simply*, *I* cannot <u>and</u> will not live with these questions resting on my conscious so heavily *doing what we do* for the next fifty years given that the evidence supporting my hypotheses are as weighty on this scale; <u>if</u> *I* am wrong, <u>everything</u> *I* have ingested <u>is a fallacy</u> and there is no better time to move on from *this* field and become a farmer to feed *the People*.

**1907.**   The Majority's opinion to reverse in part and remand the proceedings to rest in contemplation with the Eastern District is the summation of the following closing application to the Plaintiffs' case against the State of Michigan in *Gary B., v. Whitmer*:

> "**Beyond the abstract question of whether <u>there is</u>** a fundamental right to a basic minimum education, **Plaintiffs <u>must</u> also have <u>plausibly alleged</u>** that they were deprived of such an education. *See <u>Iqbal</u>*, 556 U.S. at 678 ("**A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged**."). <u>**Looking to their complaint as a whole,**</u> Plaintiffs' allegations—**if proven true**—would demonstrate **that** they have been deprived of an education providing access to literacy.
>
> The core of Plaintiffs' complaint is that they are forced to "sit in classrooms where not even the pretense of education takes place, in schools that are functionally incapable of delivering access to literacy." (Compl., R. 1 at PageID #4; *see also id.* at #19 ("[Plaintiffs' schools] wholly lack the capacity to deliver basic access to literacy, functionally delivering no education at all.").) **But we cannot simply credit Plaintiffs' legal conclusions**. *Iqbal*, 556 U.S. at 677–78 (citing *Twombly*, 550 U.S. at 555–57, 570). <u>**To avoid dismissal, Plaintiffs must have pleaded enough factual material to plausibly support this claim**</u>. *Id.* at 678–79.
>
> The **most important allegations** for this point concern the **specific conditions** in Plaintiffs' schools. **Plaintiffs allege** significant teacher shortages, coupled with unqualified instructors when they do have someone in the classroom. **They allege** dangerous and significantly distracting conditions within their school buildings, including extreme temperatures, overcrowding, and a lack of hygiene. **They also allege** a dearth of textbooks and other school supplies, with those they do have being in an abysmal or near unusable condition. **These**

**allegations** are supported **by specific examples**, including **several photographs reproduced within the complaint**. At the motion-to-dismiss stage, this permits an inference that Plaintiffs' schools cannot provide access to literacy.

**Plaintiffs further support their claim by citing data** that show a zero or near-zero percentage of subject-matter proficiency among students at their schools. As noted above, **these figures alone are not enough to state a claim**, **because the right to a basic minimum education** **cannot guarantee a specific educational outcome**. *See supra* Part II.E.3.d. **Further development** of the record will be **necessary** to determine how these measures—largely put in terms of "grade level" or "proficiency"—**are correlated** with the type of foundational literacy at issue here. But for now, these data further support the inference that Plaintiffs' schools are woefully insufficient, especially when combined with qualitative descriptions of their classes' literacy shortcomings.

In sum, **Plaintiffs allege facts** concerning inadequate books and materials, insufficient or unqualified teaching staff, and decrepit and dangerous school conditions (and include photographs within their complaint). **They then allege** that nearly zero percent of students at these schools were graded as proficient in English or other subject-matter tests administered by the state. **Taking the allegations of the complaint as true, and drawing all reasonable inferences in Plaintiffs' favor**, *see, e.g.*, *Cahoo v. SAS Analytics, Inc.* 912 F.3d 887, 897 (6th Cir. 2019), **Plaintiffs have plausibly been deprived of an education** that could provide access to literacy. **Defendants have not argued otherwise—they rest on the legal argument that there is no implicated fundamental right—and also have not argued that this deprivation is narrowly tailored to advance a compelling state interest**. *E.g.*, *Glucksberg*, 521 U.S. at 721 (citing *Flores*, 507 U.S. at 302). While Plaintiffs still face the burden of proving their factual contentions at trial, under the standards governing a motion to dismiss, **this is enough to get them through the courthouse doors**. Accordingly, the **district court's dismissal of this claim must be reversed**."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 58-60. (Emphasis added).

***1908.*** *Here—in part—*the Plaintiffs were used as human-research subjects by the Defendants but for the specific intent to avoid the abidance to those Federal and State conditions *herein* as required for such intrusive and invasive conduct. The Plaintiffs as the Defendants' prey were sequestered by the Theory of Constraints' intellectual dragnet and subjected to the Defendants' <u>refined</u>

processes being pushed to compel *through* the manipulated Plaintiffs' free speech that valuable-intellectual property the **STUDENTS** held *within* their consciou*s*—while simultaneously financially subsidizing the Defendants' conduct *in full* 'obtaining' in return a fraudulently-leveraged certificate valueless to the holders—the Defendants individually <u>and</u> systematically reaped the spoils of the Plaintiffs' divulged intellectual property *continuing as you read this today*.

*1909.* <u>**The Dissent**</u> written by the Honorable Judge Murphy provides *this* Complaint with more clarity bolstering the Plaintiffs' argument for fundamental right *herein*. It appears that the Dissent's argument is positioned *against* the right demanded <u>in</u> *Gary B., v. Whitmer* relative to the particular 'positive' right to "**a one-size-fits-all duty** on **all 50 states** to devote an <u>**unspecified**</u> **level of taxpayer dollar** to an <u>**unspecified**</u> **level of education**." *Id*. at p. 62. (Emphasis added).

*1910.*  It can be easily seen from the Dissent's opening that the focus was drawn to the subjective variables identifying that the framed "positive right to a minimum education [in *Gary B., v. Whitmer*] will jumble our separation of powers," and it "would immerse federal courts in a host of education disputes far outside our constitutionally assigned role to interpret," citing in full:

> "MURPHY, J., **dissenting**. The complaint in this case **alleges school conditions** that would significantly impair any child's ability to learn. **If I sat in the state legislature or** on the **local school board**, **I would work diligently to investigate and remedy the serious problems that the plaintiffs assert**. <u>**But I do not serve in those roles**</u>. And I see <u>**nothing in the complaint**</u> that **gives federal judges the power to oversee Detroit's schools** in the name of the United States Constitution. That document does not give federal courts a **roving power to redress "every social and economic ill**." *Lindsey v. Normet*, 405 U.S. 56, 74 (1972). **It instead gives federal courts a limited power "to say what the law is**." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). And the law has long been clear: Unlike the right to free speech in the First Amendment or the right to a jury trial in the Seventh, education "is not among the rights afforded explicit protection under our Federal Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973). So, while **I agree with the majority** that the defendants have not shown that this case is moot, **I must respectfully dissent**

from its view that the complaint alleges a valid "substantive due process" claim.

The plaintiffs argue that the Due Process Clause imposes a one-size-fits-all duty on all 50 states to devote an unspecified level of taxpayer dollars to an unspecified level of education. Their novel request for a positive right to education will "mark a drastic change in our understanding of the Constitution." *Harris v. McRae*, 448 U.S. 297, 318 (1980). The Due Process Clause has historically been viewed, consistent with its plain text, as a negative limit on the states' power to "deprive" a person of "liberty" or "property." U.S. Const. amend. XIV, § 1. It has not been viewed as a positive command for the states to protect liberty or provide property. A state's decision "not to subsidize the exercise of a fundamental right" has never been thought to "infringe the right," even in areas where the states have long provided that assistance. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983). While, for example, a party may have a constitutional right against state aggression, the party has no constitutional right to state protection against private violence. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989). This traditional understanding ends today. The states that make up this circuit now must meet the school-quality standards that federal judges find necessary to enforce the plaintiffs' nebulous right to "access literacy." That is now the law of this circuit even though the Supreme Court has repeatedly explained that "[p]ublic education is not a 'right' granted to individuals by the Constitution." *Plyler v. Doe*, 457 U.S. 202, 221 (1982).

This positive right to a minimum education will jumble our separation of powers. It will immerse federal courts in a host of education disputes far outside our constitutionally assigned role to interpret legal texts. *Cf. Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). How should those courts remedy the schools that they conclude are not meeting the constitutionally required quality benchmarks? May they compel states to raise their taxes to generate the needed funds? Or order states to give parents vouchers so that they may choose different schools? How old may textbooks be before they become constitutionally outdated? What minimum amount of training must teachers receive? Which HVAC systems must public schools use? Our judicial commissions give us no special insights into these "difficult questions of educational policy." *Rodriguez*, 411 U.S. at 42. But the states' ability to experiment with diverse solutions to challenging policy problems has long been a cherished aspect of our federalism.

*United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring). **I would leave the difficult problems of education policy <u>presented</u> <u>by</u> <u>this</u> <u>case</u> where they have traditionally been—<u>with</u> <u>the</u> <u>states</u> <u>and</u> <u>their</u> <u>people</u>.**

These legal points are not meant to deny much of what the majority eloquently says. **The <u>majority</u> <u>correctly</u> <u>recognizes</u> "the <u>vital</u> <u>role</u> <u>of</u> <u>education</u> in a <u>free</u> <u>society</u>."** *Rodriguez*, 411 U.S. at 30. <u>**No one disputes the importance of education**</u> for children to have a chance at life, just as no one disputes the importance of their having enough food to eat or a sturdy roof over their heads. **Yet my view that education is important as a <u>policy</u> <u>matter</u> says nothing about whether I may find it compelled as a constitutional one**. *Id.* at 32–34**. That is what our Framers meant when they said that judges exercise "neither <u>FORCE</u> nor <u>WILL</u> <u>but</u> merely <u>judgment</u>."** The *Federalist No.* 78, at 464 (A. Hamilton) (Clinton Rossiter ed., 1961). The constitutional question <u>in</u> <u>this</u> <u>case</u> turns on a legal judgment about the meaning of the Constitution's words; it does not turn on a policy assessment about education's societal value. **And I see nothing in the Constitution's language that creates a substantive entitlement to a <u>state</u>-<u>funded</u> education**.

The majority also correctly notes that the Fourteenth Amendment does include words designed to remedy our country's sad history of racial discrimination in the public schools. ***<u>Brown v. Board of Education</u>***, 347 U.S. 483 (1954), <u>**stands out as a bedrock Supreme Court precedent**</u>, <u>**righting the legal wrong that was** ***Plessy v. Ferguson***</u>, 163 U.S. 537 (1896). **The Equal Protection Clause compels courts to apply the most exacting scrutiny to a <u>state's</u> racially <u>discriminatory</u> <u>decisions</u>**. *Johnson v. California*, 543 U.S. 499, 505 (1995). **But the plaintiffs' due-process <u>claim</u> <u>here</u> <u>does</u> not implicate this equality mandate. They do not argue that the purported school conditions arose from racial discrimination violating core equal-protection guarantees. And, as the majority explains, their equal-protection claim fails because <u>they merely allege poor school conditions</u>. <u>They do not identify any discrete unequal treatment by the state defendants</u>.**

For these reasons and those that follow, I would affirm the district court's judgment."

      *Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 62-64. (Emphasis added).

*1911.* It appears that the Dissent beings *incorrectly* with *Rodriquez* **ignoring** *Brown's* **explicit designation** that public education, "[s]uch an opportunity, **where the state has undertaken** to provide it, **is a right** which **must be** made **available to all on equal terms**." *Brown*, 347 U.S. 483, at p. 495. (Emphasis added).

*1912.* Instead, the line-of-logic followed by the Dissent does not follow *Brown's* inherently-objective-voidability standard, and follows the subjective analysis related to the subjective-State needs involving the policy/action in *Rodriquez* (local taxes); *Plyler* (tuition of illegal immigrants); *Papasan* (funding produced from local-real estate taxes); and *Kadrmas* (requiring bus fees)—each devoid of the inherently objective criteria of *Brown* to demonstrate discrimination, harassment, threats, or coercion that was infused within the challenged subjective-State policy/action. *Gary B., v. Whitmer*, at pp. 64-66. (Emphasis added). In full analyzing this logic as follows:

> "The **plaintiffs allege** that they have a fundamental "right to State-provided access to literacy protected by the Due Process Clause." Apt. Br. 25. Both portions of this proposed right—the state-provided portion and the access-to-literacy portion—depart from settled doctrine. The Supreme Court has repeatedly held that education is not a "fundamental right." And even if some minimum education could attain fundamental-right status, the plaintiffs' claim still must fail. **Substantive due process has never compelled states to provide their residents with the funds they need to exercise fundamental rights. It has instead barred states from interfering with the exercise of those rights. In short**, the **plaintiffs seek an unprecedented subsidy** for an unprecedented right.
>
> At the outset, the plaintiffs' assertion that they have a fundamental right to a minimum education faces stiff precedential headwinds. The Supreme Court has refused to treat education as a fundamental right every time a party has asked it to do so. ***Kadrmas v. Dickinson Pub. Sch.***, 487 U.S. 450, 458 (1988); ***Papasan v. Allain***, 478 U.S. 265, 284–86 (1986); ***Plyler v. Doe***, 457 U.S. 202, 223 (1982); *San Antonio Indep. Sch. Dist. v. **Rodriguez***, 411 U.S. 1, 35, 37 (1973). **From a circuit judge's perspective**, these decisions should make us think long and hard before adopting the plaintiffs' novel right to a minimally adequate education.

**This line of precedent begins with _Rodriguez_**. It considered whether Texas's reliance on **local taxes to fund schools, which caused** gross financial disparities across school districts, violated the Equal Protection Clause. 411 U.S. at 9–15. While conceding education's importance to our society, **the Court recognized** that "the importance of a service performed by the State does not determine whether it must be regarded as fundamental." _Id._ at 30. Rather, **education's status as a fundamental right turns on whether "there is a right to education explicitly or implicitly guaranteed by the Constitution."** _Id._ at 33. The Court could find no such right. Education "is not among the rights afforded explicit protection under our Federal Constitution." _Id._ at 35. **And the Court refused to find education implicitly guaranteed on the ground that it was necessary to exercise other rights, such as the right to free speech or to vote**. _Id._ at 35–36.

In a trio of equal-protection decisions since, the Court has repeatedly reaffirmed this conclusion. In _**Plyler**_, a **Texas law gave school districts discretion** to deny education to immigrant children who were **in this country illegally**. 457 U.S. at 205. Some of these children challenged a school **district's decision to require them to pay tuition**. _Id._ at 206 & n.2. While the **Court ultimately found that this law violated equal protection under the relaxed standards** that apply when fundamental rights are not at stake, it repeated: "Nor is education a fundamental right." _Id._ at 223. _Papasan_ next addressed a challenge to Mississippi's unequal **distribution of the income produced from its public-school lands**. 478 U.S. at 267–68. The **Court interpreted _Rodriguez_ and _Plyler_ to hold** that "education is not a fundamental right." _Id._ at 284–85. _Kadrmas_ lastly considered a challenge to North Dakota laws that **allowed some school districts to charge for bus services but mandated that others offer those services for free**. 487 U.S. at 452. The Court noted for a fourth time: "Nor have we accepted the proposition that education is a 'fundamental right[.]'" _Id._ at 458. **These decisions could not be clearer**: "[A]ccess to education is not guaranteed by the Constitution." _Ambach v. Norwick_, 441 U.S. 68, 77 n.7 (1979).

**The plaintiffs assure us that we can disregard these many statements**. **That is so**, they say, because _**Papasan**_ **noted** that the Court has "**not yet definitively settled the question**[] **whether a minimally adequate education is a fundamental right**." 478 U.S. at 285. Unlike the complaint in _Papasan_, the plaintiffs add, their complaint pleads that the state has not given them even a "minimally adequate" education. I am skeptical that we may sidestep this long line of authority so easily. But we need not decide whether the Constitution includes a fundamental right to a minimum education (or "access to literacy"). Even if the

Constitution contains this implied right, the plaintiffs' substantive-due-process claim must fail for a more rudimentary reason [being the positive-right demand]."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 64-66. (Emphasis added).

**1913.**   Following the Dissent's logic further reveals the perspective of the application of law to the **positive** demand in *Gary B., v. Whitmer*—and demonstrates the **distinguishable** characteristics that are sought by the *herein* Plaintiffs' **negative** right to a public education **_free of_** discrimination, harassment, threats, and coercion **_for all_** **STUDENTS** **_regardless of_** Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth—differentiating the two by the Dissent's explanation in full as follows:

> "The **Supreme Court has long recognized a "basic" constitutional difference between a state's use of its coercive power to regulate its residents and the state's refusal to use its spending power to give them things**. *Maher v. Roe*, 432 U.S. 464, 475 (1977). To list **one** of many **example**s: **Just because the Free Speech Clause bars a state from banning its citizens' political speech**, *Eu v. San Francisco Cty. Democratic Cent. Comm*., 489 U.S. 214, 222–23 (1989), **does not mean** that the clause requires the state to give them the funds they need to engage in that speech, *Ysursa v. Pocatell Educ. Ass'n,* 555 U.S. 353, 364 (2009). Under the **Due Process Clause**, **too**, this **difference between state coercion and state assistance finds support in constitutional text**, in Supreme Court precedent, in our federalist structure, and in the nature of the judicial power. These factors all lead me to reject the plaintiffs' novel claim that the Due Process Clause compels every state in this nation to affirmatively provide some minimum level of education.
>
> **Start with text**. The **Due Process Clause provides**: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law**." U.S. Const. amend. XIV, § 1. **This language is "phrased in the negative**". *Archie v. City of Racine*, 847 F.2d 1211, 1220 (7th Cir. 1988) (en banc). **By barring a state** from "depriv[ing]" individuals of their "life, liberty, or property," **the clause limits** the **state's power** to "take away" the people's lives, their liberty, or their property (**at least without due process**). Noah Webster, An American Dictionary of the English Language 358 (1882); *see Joseph E. Worcester, A Dictionary of the English Language* 386 (1878). **The text would be a poor choice of words if the clause's Framers meant to compel a state to protect its people**'s lives, to promote their liberties, or to provide them with property.

This ordinary meaning comports with the way in which the text would have been viewed at the time of its enactment: **as a limit on the states' power to intrude on private rights**. **By 1868**, the **Supreme Court had already held that the Fifth Amendment's Due Process Clause has its roots in Magna Carta and so imposes a "restraint on the legislative as well as on the executive and judicial powers of the government**." M*urray's Lessee v. Hoboken Land & Improvement Co*., 59 U.S. 272, 276 (1856). Conversely, "[t]he **Framers would have been astounded to hear**" that the clause **compelled** Congress to offer public services. *David P. Currie, Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864, 865–66 (1986). **Similar provisions in state constitutions were also interpreted to limit "the aggressive tendency of power," not to command** state assistance. Thomas M. Cooley, *A Treatise on the Constitutional Limitations which Rest upon the Legislative Power of the States of the American Union* 351 (1868); see Edward J. Eberle, Procedural Due Process: The Original Understanding, 4 Const. Comment. 339 (1987) (discussing cases). The Supreme Court **thus quickly read the Fourteenth Amendment's Due Process Clause in the same limited fashion—as "secur[ing] the individual from the arbitrary exercise of the powers of government**." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)); see *Davidson v. City of New Orleans*, 96 U.S. 97, 101–04 (1878).

**The plaintiffs have not even attempted to reconcile their proposed positive right with this constitutional text**. They do not argue that the State of Michigan has "take[n] away" their liberty to obtain a minimum education of their choice. *Webster*, supra, at 358. They do not, for example, allege that the state bars them from attending a private school, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925), or from learning a particular subject, *Meyer v. Nebraska*, 262 U.S. 390, 400–03 (1923). **No, the plaintiffs say that the state has deprived them of an education because the state has not provided them with an education. But the text does not require states to provide their people with** any services, let alone an unidentified level of schooling. Only in an area where "process" equals "substance" could "deprive" equal "provide."

**Nor would Americans at the time of the Due Process Clause's adoption have read it to compel states to operate schools**. No one would have viewed the clause as a check on the states' "aggressive tendency" to be stingy with their public services. *Cooley*, supra, at 351; see *Daniels*, 474 U.S. at 331. Such an unusual reading would have meant that Congress had been violating the Fifth Amendment for decades. After all, the federal government had not adopted a national system of schools. And most people would have thought that Article I of the Constitution did not give it that power. See *United*

*States v. Lopez*, 514 U.S. 549, 565–66 (1995). Simply put, any claim that the Due Process Clause imposes a duty on **states to provide** a minimum education to their residents requires us to rewrite the text and to ignore the backdrop against which it was enacted."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 66-68. (Emphasis added).

*1914.* Using this logic expressed by the Dissent in *Gary B., v. Whitmer* relative to the positive/negative language of the Plaintiffs' argued for Substantive Rights—the Dissent continues with this perspective of "state subsidies," and spending "funds to promote...a taxpayer-funded education," although that is what already exists here in Michigan. *Id*. at pg. 70. (Emphasis added). Recall, that the "State of Michigan has supported higher education [in 2018] by **increasing state appropriations to public universities by 2 percent** in fiscal year 2018 and fiscal year 2019, *respectively*." **Exhibit 287**, at p. 8. (Emphasis added).

*1915.* Plainly, in **2024** these state appropriations equate to nearly **32%** of Wayne State University's Funds Budget on **$1B** of annual expenditures, or approximately **$208.4M** of approved funds in 2023.**Exhibit 623**—*2024 Wayne State University Budget*, at pg. 3; 5; & 14.

*1916.* Plainly—it should be noted that the application under *Gary B., v. Whitmer* is on one side of the spectrum and *this* Complaint the complete opposite leveraging the negative language *herein* where inherently **no** such **affirmative spending** or policy change would be required as mandated by adoption of Plaintiffs' arguments. Instead, *to the contrary*—the States in *this* Circuit *and beyond* would maintain control through our federalist society and the district courts will then maintain control over ripened questions affording States deference to subjectively "experiment" with public education, should they enact legislation to provide such privileges; this is inherently the Due Process system of checks and balances and a **good example** is the 2024 State of Michigan's bipartisan legislation signed by Defendant, Governor Whitmer, that ensures all public school **STUDENTS** receive free breakfast and lunch.

*1917.*  Continuing with *Gary B. v. Whitmer*, the Dissent's argument was fixated on the <u>subjective</u> variables of the State and the implementation **focus**ed on compelling communities within the precedential jurisdiction to affirmatively "<u>provide</u>" <u>substance</u> usurping the decision-making process from the States' individualized legislators; framed *in full* by the Dissent as follows:

"**Turn to precedent**. The Supreme Court's substantive-due-process decisions have long been controversial "**because guideposts for responsible decisionmaking** (sic) **in this unchartered area are scarce and open-ended.**" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). But these controversies have involved a different topic altogether—the meaning of the phrase "due process," not the verb "deprive." **Justices have debated when language sounding in process can impose absolute limits on a state's power to take away a person's liberty or property no matter the process provided**. The Court has considered such things as **whether states may limit the hours that people work**, *compare Lochner v. New York*, 198 U.S. 45, 56 (1905), *with id.* at 75–76 (Holmes, J., dissenting); **eliminate their ability to obtain an abortion**, *compare Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846–53 (1992), *with id.* at 979–81 (Scalia, J., dissenting); **or impose large punitive-damages awards**, *compare State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416–18 (2003), *with id.* at 430–31 (Ginsburg, J., dissenting). <u>**Whoever has the better of these debates, they unquestionably addressed limits on the states' regulatory power**</u>.

**These decisions <u>have not</u>, by contrast, touched the <u>states' spending power</u>**. Until now, **the Due Process Clause has left little room for debate that a state generally "is under no constitutional duty to provide substantive services for those within its border.**" *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982). While minimum levels of food, housing, and medical care are critical for human flourishing and for the exercise of constitutional rights, **due process <u>does not compel states to spend funds</u> on these necessities of life**. True, the Supreme Court has never treated food, housing, or medical care themselves as "fundamental rights" triggering heightened scrutiny. *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*, 485 U.S. 360, 369 (1988) (food); *Maher*, 432 U.S. at 469 (medical care); *Lindsey v. Normet*, 405 U.S. 56, 73–74 (1972) (housing). **But the Court has drawn this same <u>distinction between state coercion</u> and <u>state subsidies</u> when fundamental rights were on the line. The Due Process Clause generally confers "<u>no affirmative right to governmental aid</u>, even** where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the

individual." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

Take abortion. **The Court has held that substantive due process forbids the states from banning all abortions**. *Casey*, 505 U.S. at 846. But **the Court has rejected the notion that substantive due process also requires them to pay for abortions**, *Rust v. Sullivan*, 500 U.S. 173, 201 (1991), **or to provide access to abortion facilities**, *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 507–08 (1989). **That is because** "[a] **refusal to fund protected activity**, <u>**without more**</u>, **cannot be equated with the imposition of a 'penalty' on that activity**." *Rust*, 500 U.S. at 193 (citation omitted). Or, in the Constitution's words, **a state does not "deprive" individuals of their "liberty" interest in abortion merely by failing to provide access to the procedure**.

**The Court has kept to this rule even where the inclination to create an exception would reach its apex**. <u>**Substantive due process bars a state from arbitrarily injuring its residents**</u> (which deprives them of their liberty or lives). *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998); *Guertin v. State*, 912 F.3d 907, 917, 920–21 (6th Cir. 2019). Yet the doctrine gave four-year-old Joshua DeShaney no relief when a county failed to protect him from his abusive father. *DeShaney*, 489 U.S. at 195–96. Joshua's father beat him "so severely that he fell into a life- threatening coma" and was "expected to spend the rest of his life confined to an institution." *Id.* at 193. The boy nevertheless could not use substantive due process to challenge the state's deficient aid because "**a State's failure to protect an individual against** <u>**private**</u> <u>**violence**</u> **simply does not constitute a violation of the Due Process Clause**." *Id.* at 197.

**The plaintiffs' claim all but requires us to overrule this caselaw**. I do not see how the Due Process Clause can compel Michigan to provide the plaintiffs with educational services when it did not require Winnebago County to provide Joshua DeShaney with protective services. Their claim must fail for the same reason his did: **The Due Process Clause "confer[s]** <u>**no**</u> <u>**affirmative**</u> **right to governmental** <u>**aid**</u>[.]" *Id.* at 196. Nor can the plaintiffs sidestep this rule with *Papasan*'s dicta <u>**reserving**</u> **whether a minimum education might qualify as** <u>**a**</u> **"**<u>**fundamental**</u> **right**." 478 U.S. at 285. **Even when constitutional rights are at stake, the government has** <u>**no**</u> <u>**duty**</u> <u>**to**</u> <u>**spend**</u> <u>**funds**</u> **to promote those rights**. *Rust*, 500 U.S. at 201. Before today, **this rule would have foreclosed any due-process request for a** <u>**taxpayer**</u>-<u>**funded**</u> <u>**education**</u>. The plaintiffs' new right thus unmoors substantive due process (an already amorphous doctrine) from a clear limit on its reach."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 68-70. (Emphasis added).

**1918.**   The Dissent continues *even further* by analyzing the "Framers' constitutional design" that **ECHO**s the *40,000 ft.* <u>subjective</u> *v.* <u>objective</u> decision-making process leveraged by our de-centralized federalist republic. This entity of *the People* by and through *the People* was specifically established to preserve state sovereignty, not create an all-powerful central government such as the absolute authority of the Crown:

> "**<u>Next consider the Framers' constitutional design</u>**. **The Constitution's federalist structure gives "few and defined" powers to the federal government and leaves "<u>numerous and indefinite</u>" powers to the states**. The Federalist No. 45, at 289 (J. Madison) (Clinton Rossiter ed., 1961). **<u>This federalism enhances our liberty by allowing local communities to make local decisions free from a less accountable and more distant central power</u>**. *Bond v. United States*, 564 U.S. 211, 221–22 (2011). **<u>So "[t]he maintenance of the principles of federalism is a foremost consideration in interpreting any of the pertinent constitutional provisions under which this Court examines state action</u>**." *Rodriguez*, 411 U.S. at 44 (citation omitted); *cf.* Kurt T. Lash, *The Lost History of the Ninth Amendment* 352–53 (2009). **<u>That is especially true for substantive due process. Federal courts undercut the people's interest in local decisionmaking</u>** (sic) **<u>whenever they nationalize new extratextual rights. That expansion</u>** "**<u>place[s] the matter outside the arena of public debate and legislative action</u>**" **<u>within each state</u>**. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).
>
> **<u>This federalism concern has great urgency here</u>**. The plaintiffs' **proposed right** to a state-provided education **asks the federal government to intervene in an area that has long been "a traditional concern of the States**." *Lopez*, 514 U.S. at 580 (Kennedy, J., concurring); *see Horne v. Flores*, 557 U.S. 433, 448 (2009). Countless examples show this tradition. To give but one, when a member of Congress proposed **a national school system in** 1870, many **express**ed **constitutional doubt**s and the bill did not even get a vote. *See* David P. Currie, *The Reconstruction Congress*, 75 U. Chi. L. Rev. 383, 466–67 (2008); Gordon Canfield Lee, *The Struggle for Federal Aid, First Phase: A History of the Attempts to Obtain Federal Aid for the Common Schools, 1870-1890*, 42–55 (1949). (The legislator had relied primarily on the Constitution's Preamble and its Guarantee Clause as the purported basis for this congressional power.) Yet the plaintiffs' view that due process compels the states to provide a minimum education would trigger Congress's enforcement power under the Fourteenth Amendment, U.S. Const. amend. XIV, § 5,

and so could allow Congress for the first time to "regulate the educational process directly," *Lopez*, 514 U.S. at 565.

To be sure, "**it is doubtful that any State**" would disagree with **the plaintiffs' goal**: States should strive to alleviate poor school **conditions**. *Id.* at 581 (Kennedy, J., concurring). But "considerable disagreement exists about how best to accomplish that goal." *Id.* **Should states fix the problem of failing schools by sending <u>more</u> <u>money</u> into them**? *Cf. DeRolph v. State*, 780 N.E.2d 529, 537–38 (Ohio 2002) (Moyer, C.J., dissenting). Or should they fix the problem by giving children a choice to attend other schools? *Cf. Zelman v. Simmons-Harris*, 536 U.S. 639, 644–45 (2002). **<u>Each</u> <u>state</u> <u>may</u> <u>choose</u> <u>a</u> <u>different</u> <u>policy</u> <u>mix</u> <u>to</u> <u>confront</u> the "intractable <u>economic</u>, <u>social</u>, and even <u>philosophical</u> <u>problems</u>" associated <u>with</u> <u>this</u> <u>issue</u>.** *Rodriguez*, 411 U.S. at 42 (citation omitted). "**<u>In this</u> <u>circumstance</u>, <u>the</u> <u>theory and utility of our federalism are revealed</u>, <u>for the States</u> <u>may perform their role as laboratories for experimentation to</u> <u>devise various solutions where the best solution is far from</u> <u>clear</u>.**" *Lopez*, 514 U.S. at 581 (Kennedy, J., concurring); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). **<u>The plaintiffs' nationwide right</u>** would undercut the **<u>educational experimentation so necessary to find solutions</u> <u>that work</u>**. *Cf. District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 73 (2009).

**Public education also requires <u>public</u> <u>funds</u>. States facing <u>tight</u> <u>budgets</u> must make delicate tradeoffs about <u>how</u> <u>much</u> <u>money</u> to** devote to education as compared to other priorities like healthcare, welfare, or police protection. "Higher quality [education] may come at **the <u>expense</u>** of a higher budget for the police or [the roads], or at the **<u>expense</u>** of **<u>higher</u> <u>taxes</u>** that induce people to relocate to low-service (and low-tax) jurisdictions." *Archie*, 847 F.2d at 1223–24. **<u>The Supreme Court has traditionally given</u> <u>states wide discretion to make these financial tradeoffs</u>**. *Rodriguez*, 411 U.S. at 40. Yet the plaintiffs' claim would disrupt state **<u>fiscal</u> <u>policies</u>** too by creating an "extraordinary" positive right to education. *Harris v. McRae*, 448 U.S. 297, 318 (1980).

And while **the Due Process Clause has traditionally imposed <u>only negative limits on states</u>, <u>the people of each state may</u> <u>impose positive duties in their state constitutions</u>**. Jeffrey S. Sutton, *51 Imperfect Solutions* 35 (2018). **<u>For centuries</u>, <u>states</u> <u>have done just that in this educational setting</u>**. *See* Steven G. Calabresi & Michael W. Perl, *Originalism and Brown v. Board of Education*, 2014 Mich. St. L. Rev. 429, 450–54 & nn.97–126 (2015). Yet, **as evidenced by the "<u>linguistic diversity of the</u>**

various states' education clauses," *Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 244 (Conn. 2010), **their decisions have been far from uniform**. **While many courts have recently read their states' education clauses as giving them the authority to compel a certain level of education**, *id.* at 244–50 & n.55, **many others have read their clauses as leaving education policies to state legislatures**, *see, e.g.*, *Citizens for Strong Sch., Inc. v. Fla. State Bd. of Educ.*, 262 So. 3d 127, 129–30 (Fla. 2019) (per curiam); *King v. State*, 818 N.W.2d 1, 4 (Iowa 2012); *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 521–22 (Ind. 2009). Some two years before this case, for example, Michigan courts **rejected a claim** that the Michigan Constitution **<u>required</u> public schools <u>to meet a certain level of educational quality</u>**. *See LM v. State*, 862 N.W.2d 246, 253 (Mich. Ct. App. 2014), *appeal denied*, *SS v. State*, 869 N.W.2d 273 (Mich. 2015). The plaintiffs' nationwide rule thus would deprive the people in each state of their "political" liberty to decide for themselves **the scope of any educational right that they want in their state constitutions**. *Bond*, 564 U.S. at 221."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 70-72. (Emphasis added).

**1919.**  Stated simply by the Dissent— "<u>**we**</u> <u>**have**</u> <u>**the**</u> <u>**authority**</u> to *interpret the law*; we possess neither the expertise nor the prerogative to make policy judgments." *Id*. at p. 73. Candidly, this powerfully delicate checks-and-balances between the Judicial Branch and Legislative Branch is the invisible mesh that has been woven through time and holds our Great Nation together—*the Dissent explained in full*:

"**<u>Lastly consider the nature of our own authority</u>**. **<u>Article III</u> gives federal courts the "judicial Power<u>." U.S. Const. art. III, § 1</u>. This power <u>does</u> <u>not</u> allow federal courts to declare state action unconstitutional "<u>merely</u> because it is, in their judgment, contrary to the principles of natural justice**." *Calder v. Bull*, 3 U.S. 386, 399 (1798) (opinion of Iredell, J.). **<u>It</u> <u>allows</u> them to declare state action <u>unconstitutional only</u> <u>because</u> the <u>Constitution's</u> text <u>qualifies</u> <u>as</u> "<u>law</u>" <u>and</u> <u>takes</u> <u>supremacy</u> <u>over</u> <u>state</u> <u>law</u> <u>when</u> an "<u>irreconcilable variance</u>" <u>exists</u> <u>between</u> <u>the</u> <u>two</u>**. The Federalist No. 78, *supra*, at 466–67; *Marbury v. Madison*, 5 U.S. 137, 177 (1803). In other words, **we have "the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments**." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (Roberts, C.J.). **<u>So we must</u> '"<u>exercise the utmost care</u> whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process**

Clause be subtly transformed into the policy preferences of the Members of this Court." *Glucksberg*, 521 U.S. at 720 (citations omitted).

**The proposed right to a state-provided education shows why courts must exercise this caution**. The right would entangle courts in policy controversies well outside their authority "to say what the law is." *Marbury*, 5 U.S. at 177. **Many education disputes, for example, arise from a "shortage of money**." Sutton, *supra*, at 38. Does the right to "access literacy" give federal judges the power to direct states to **increase their taxes** to provide the required education? Or allow courts to compel **spending cuts for healthcare** to free up the needed funds? **I, for one, would be troubled by a federal court instructing a state legislature that "[b]ecause education is one of the state's most important functions**, lack of financial resources will not be an acceptable reason for failure to provide the best educational system." *Campbell Cty. Sch. Dist. v. State*, 907 P.2d 1238, 1279 (Wyo. 1995). **The Supreme Court has told us not "to second-guess state officials charged with** the difficult responsibility of **allocating** [their] **limited public** . . . **funds** among the myriad of potential" programs. *Dandridge v. Williams*, 397 U.S. 471, 487 (1970). And it has said that we "lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of **public revenues**." *Rodriguez*, 411 U.S. at 41.

Debates over the best way to help children stuck in failing schools likewise "involve[] the most persistent and difficult questions of **educational policy**." *Id.* at 42. Consider, for example, questions about the **root cause**s of poorly performing schools. The plaintiffs in this case allege that "**high teacher turnover**," including heavy reliance on teachers from Teach for America, has partially caused the poor learning environments. Compl., R.1, PageID#101. A similar California suit, by contrast, alleged that the **state's tenure rules**—which entrenched bad teachers in the state's public schools—caused those poor learning environments. *See Vergara v. California*, 209 Cal. Rptr. 3d 532, 539–40 (Cal. Ct. App. 2016). **Who's right?** Federal courts are **not equipped to determine personnel policies or teacher-certification rules for the schools across this country**.

Next consider questions about the best solutions for failing schools. The plaintiffs in this case request an injunction that would require Michigan to, among other things, fix public

schools with "**insufficient teacher capacity**" or "**deplorable school conditions**." Compl., R.1, PageID#132. A similar Connecticut suit, by contrast, sought to enjoin "**Anti-Opportunity Laws**" that reduced the ability of children to choose other schools. *See Martinez v. Malloy*, 350 F. Supp. 3d 74, 80–81 (D. Conn. 2018). Do federal courts get to pick between **investing** more in traditional schools **or investing** more in alternatives? **It would be ironic if the voucher system that the Supreme Court narrowly upheld for the City of Cleveland could be constitutionally compelled for the entire nation**. *See Zelman*, 536 U.S. at 653.

Our judicial power gives us no "specialized knowledge and experience" **about** the best education **policies**. *Rodriguez*, 411 U.S. at 42. **Just as the Due Process Clause** "does not **enact Mr. Herbert Spencer's**" views in the economic **sphere**, *Lochner*, 198 U.S. at 75 (Holmes, J., dissenting), **so too it does not enact <u>Milton Friedman's</u>, <u>Horace Mann's</u>, or any other individual's views in this education sphere**. The Constitution instead leaves these debates about education policy with the states and their people."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 70-72. (Emphasis added).

**1920.** As *I*, Plaintiff, Attorney Cochrane, stated at the outset of this analysis, *this* Complaint rests firmly in the center of these great products-of-thought. Yet—*this* Complaint distinguishes the Majority <u>and</u> Dissent of *Gary B., v. Whitmer* to form a new linage-of-thought as such would be resting on the ideas of Spencer's '*survival of the fittest*," while simultaneously applying Friedman's *consumption analysis* to understand the supply and demand by **STUDENTS** *for* higher education in our current time—the effect is, *you betcha'*—<u>survival</u> <u>of</u> <u>the fittest</u> <u>to</u> <u>survive</u> by chasing the **American Dream** <u>through</u> <u>the</u> <u>education</u> we now must ingest <u>to</u> <u>compete</u> in our intellectually-<u>competitive</u> reality *as most often* the product of the State.

**1921.** Again, the Majority invokes *Rodriguez* and *Glucksberg* and the Dissent rests firmly with *DeShaney*—from a <u>positive</u>-right perspective on one side of the spectrum—*this* Complaint rests firmly with *Brown* in the <u>negative</u>-right perspective where **we** **<u>know</u>** the State's discrimination, harassment, threats, **and** coercion employed <u>is</u> **inherently** void and unconstitutional—where a '*careful description'* of the argued for Fundamental Right sets the stage to hoist *Brown* even higher as the **objective** **standard** that public education "such an <u>opportunity</u>, **where the state has undertaken to provide it, <u>is</u> <u>a</u> right which**

**must** be made **available** **to** **all** **on** **equal** **terms**," *free of* discrimination, harassment, threats, and coercion *for all* STUDENTS *regardless of* suspect classification. *Brown*, 347 U.S. 483, at p. 495. (Emphasis added).

***1922.*** Following the Dissent with *DeShaney*—it is important to remember the dicta that the States may fail to provide a public education from a positive perspective as reinforced by *DeShaney's* tragic lesson:

> "The majority cites *Glucksberg*'s historical framework for substantive-due-process claims and notes that **most state constitutions have long included some type of clause about education or schools**. Majority Op. 41–51. But ***Glucksberg*'s framework does not extend to this distinct <u>subsidy</u> context**, and it would not justify the plaintiffs' proposed right even if it did.
>
> *Glucksberg* considered a law that banned physician-assisted suicide; **it did not consider a law refusing <u>to</u> <u>pay</u> for the practice**. In that regulatory context, the Supreme Court asked whether the activity that the state prohibited (suicide) was "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721 (citation omitted). This test should not even enter the field when a plaintiff challenges a state's alleged failure <u>**to**</u> <u>**provide**</u> a public service (as in this case), as opposed to its deprivation of a liberty or property interest (as in cases like *Glucksberg* or *Casey*). Relying on *Glucksberg* to find a right to a <u>**taxpayer-funded**</u> education is like relying on *Roe v. Wade*, 410 U.S. 113 (1973), to find a right to a <u>**taxpayer-funded**</u> abortion. *But see Maher*, 432 U.S. at 475–76.
>
> ***DeShaney* proves my point**. That case did not ask whether state protection from private violence was deeply rooted in our history or implicit in the concept of ordered liberty. *See* 489 U.S. at 194–203. **It is**, **of course**, **both**. As for history, "[p]rotection" from private violence has always been the government's job.** *Corfield v. Coryell*, 6 F. Cas. 546, 551 (Washington, Circuit Justice, C.C.E.D. Pa. 1823). **Early state constitutions noted that "[e]<u>ach</u> <u>individual</u> <u>of</u> <u>the</u> <u>society</u> <u>has</u> <u>a</u> <u>right</u> <u>to</u> <u>be</u> <u>protected</u> <u>by</u> <u>it</u> <u>in</u> <u>the</u> <u>enjoyment</u> <u>of</u> <u>his</u> <u>life</u>, <u>liberty</u>, <u>and</u> <u>property</u>, according to standing laws**." Mass. Const. of <u>**1780**</u>, pt. I, art. X; *cf.* Pa. Const. of <u>**1776**</u>, Declaration of Rights, art. VIII; Va. Declaration of Rights § 3 (<u>**1776**</u>). **As for ordered liberty**, <u>**under**</u> the <u>**original social contract**</u>, **individuals give up some of their freedom in exchange for security** (not education) **from the government**. *See* <u>**John Locke**</u>, *Two Treatises of Government* 184–86 (Thomas I. Cook, ed., Hafner Publ'g Co. 1947) (<u>**1690**</u>); 1 William Blackstone, *Commentaries on*

*the Laws of England* \*226. If *Glucksberg*'s test extends to public services, *DeShaney* cannot stand. **_DeShaney_** instead **adopted** a much simpler rule: Substantive due process **does not** regulate **a state's failure to provide** public services. 489 U.S. at 194–97. Any claim **for a state-provided** education falls within *DeShaney*'s rule, not *Glucksberg*'s.

Even if *Glucksberg*'s framework applied, the plaintiffs' proposed right would not satisfy it. Other than the fact that they label their claim a right to "access literacy," I see little daylight between that claim and the one *Rodriguez* rejected. The plaintiffs rely on state constitutional provisions as their main support for the argument that literacy is "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 721 (citation omitted). But these clauses address schools or education generally; they do not mention access to literacy specifically. *See* Calabresi & Perl, *supra*, at 450–54 & nn.97–126. The provisions thus provide no basis for a *standalone* right to literacy apart from a general right to education. If the Supreme Court thought that these clauses justified a fundamental right to education, it would have said so in *Rodriguez*.

The **plaintiffs also merely cite these state education clauses**; t**hey do not discuss how the states have applied them**. For most of our country's history, "[t]he overwhelming majority of States" did not treat the clauses as creating judicially enforceable individual rights to a minimum education (in contrast to a general mandate for the legislature to set up a statewide school system). John C. Eastman, *When Did Education Become a Civil Right? An Assessment of State Constitutional Provisions for Education 1776-1900*, 42 Am. J. Legal Hist. 1, 2 (1998). That is why, in 1992, a commentator could describe an "**emerging**" right to education, not a longstanding one. *See* Allen W. Hubsch, *The Emerging Right to Education Under State Constitutional Law*, 65 Temple L. Rev. 1325 (1992). And even under an approach using "**reasoned judgment**" **to discover new rights**, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015), these more recent suits have been met with decidedly mixed results. *See* Sutton, *supra*, at 30. Some courts have declined to adopt a state right to a minimum education precisely because of the way in which their sister courts have "struggled in [their] self-appointed role[s] as overseer[s] of education" **to find workable standards**. *City of Pawtucket v. Sundlun*, 662 A.2d 40, 59 (R.I. 1995); *cf. Ex Parte James*, 836 So. 2d 813, 819 (Ala. 2002) (per curiam). This practical concern has far greater force as applied to the

national due-process right that the plaintiffs ask us to mandate for all 50 states.

In that respect, ***Glucksberg* requires a plaintiff to articulate "a 'careful description' of the asserted fundamental liberty interest**." 521 U.S. at 721 (citation omitted). **Here**, however, the **plaintiffs propose a vague right to the "access to literacy" without clearly identifying its contours**. Their proposal would mandate far more day-to-day federal oversight of the states' schools than any narrow claim that children "are not taught to read or write." ***Papasan***, 478 U.S. at 286. **The complaint suggests** that **this right will require federal courts to evaluate** such things as the **minimum qualifications** for teachers, Compl., R.1, PageID#120, the **maximum number of students per class**, *id.*, PageID#97–98, and the **appropriate types** and **conditions of textbooks**, *id.*, PageID#82–83. **Their** proposed **right also does not appear limited to literacy**, as the **complaint makes allegations about physics and economics courses too**. *Id.*, PageID#82, 104. All told, the plaintiffs seek to enforce the right to education that *Rodriguez* rejected simply by relabeling it."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 75-77. (Emphasis added).

***1923.*** Fighting the Majority's characterization of the Plaintiffs' arguments in *Gary B., v. Whitmer* for a **positive** right, the Dissent *continues* by dispelling the Majority resting on two-claimed exceptions:

"Even if *DeShaney* sets the default rule **in this subsidy context**, the majority next says, the Supreme Court has created two other "exceptions" that are like the exception that the majority creates today. Majority Op. 52–53. Neither justifies the majority's departure from *DeShaney*.

As its **first exception**, the **majority notes** that the **Sixth Amendment's right to counsel** (as incorporated by the Due Process Clause) **requires a state to provide a criminal defendant with a taxpayer-funded lawyer**. ***Gideon v. Wainwright***, 372 U.S. 335, 344 (1963). **But the state's prosecution triggering this right seeks to *deprive* the defendant of life, liberty, or property**. So *Gideon* "did not expand the definition of deprivation to encompass the failure to provide services; **it merely determined what constituted the process due when the state sought actively to deprive the individual of life, liberty, or property by means of the criminal law**." **Currie**, *supra*, 53 U. Chi. L. Rev. at 874; *Archie*, 847 F.2d at 1221–22. It no more establishes a right

to "public services" than does the **right to a jury trial**, which a state likewise must furnish before taking a person's liberty. Regardless, **the Sixth Amendment right to "counsel" contains <u>affirmative</u> language**; the Constitution contains no similar right to "education" that could be applied against the states under modern incorporation principles. *See McDonald v. City of Chicago*, 561 U.S. 742, 763–67 (2010).

As its <u>**second exception**</u>, the <u>**majority notes**</u> that the **Due Process Clause protects the right to marry even though "the performance of a marriage is an <u>affirmative</u> act by the State."** Majority Op. 53. But the **Supreme Court has treated the "right to marry" not as a right to state aid, but as "part of the fundamental 'right of privacy'" that <u>bars</u> <u>a</u> <u>state</u> <u>from</u> <u>interfering</u> in an individual's intimate decisions**. <u>***Zablocki v. Redhail***</u>, 434 U.S. 374, 384 (1978). "[I]t would make little sense to recognize a right of privacy with respect to other matters of family life," the Court has said, "and not with respect to the decision to enter the relationship that is the foundation of the family in our society." *Id.* at 386. **It has thus found this right violated by criminal laws that deprived people of liberty merely for marrying**. *Id.* at 387; <u>***Loving v. Virginia***</u>, 388 U.S. 1, 2–3 (1967); *cf.* <u>***Poe v. Ullman***</u>, 367 U.S. 497, 545–46 (1961) (Harlan, J., dissenting). **The Court made this same connection when holding that same-sex couples have the right to marry:** "<u>**Like choices concerning**</u> contraception, family relationships, procreation, and <u>**childrearing**</u>, <u>**all of which are protected by the Constitution**</u>, decisions concerning marriage are among the most intimate that an individual can make." <u>***Obergefell***</u>, 135 S. Ct. at 2599.

**These decisions have not**, however **compelled states to provide <u>public</u> <u>assistance</u> so that parties may exercise their privacy rights.** Apart from the abortion cases I have discussed, *Rust*, 500 U.S. at 201, other examples support this distinction. **Families have a right to live together**, *Moore v. City of East Cleveland*, 431 U.S. 494, 504–06 (1977) (plurality op.), **but they do not have a right to <u>public</u> <u>funds</u> <u>for</u> the <u>rent</u>**, *cf. Lindsey*, 405 U.S. at 73–74. **Parents have a right to send their children to private schools**, *Pierce*, 268 U.S. at 534–35**, but they do not have a right to <u>public</u> <u>funds</u> <u>for</u> the <u>tuition</u>**, *cf. Harris*, 448 U.S. at 318. The right to marry fits this same mold. While the government may not bar two people from marrying, *Obergefell*, 135 S. Ct. at 2605, the Supreme Court has never held that the government must give married couples any minimum level of public benefits. To the contrary, the Court has held that the

government does not violate the right even when it stops providing benefits to individuals who choose to marry. *Califano v. Jobst*, 434 U.S. 47, 53–54 (1977); *see Druker v. Comm'r*, 697 F.2d 46, 50 (2d Cir. 1982) (Friendly, J.).

If the majority believes that *Obergefell* jettisoned *DeShaney* and allows courts to discover a new font of positive rights, I disagree. *Obergefell* "held invalid" state marriage laws "to the extent they exclude[d] same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." 135 S. Ct. at 2605. It did not set any minimum "terms and conditions" for those laws. **And even were I wrong on this point**, the **Supreme Court has given clear marching orders to lower courts in this context**: "[I]f a precedent of this **Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls [*Brown*], leaving to this Court the prerogative of overruling its own decisions.**" *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (citation omitted). *DeShaney* has direct application to, and so controls, this case."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 77-79. (Emphasis added).

***1924.*** The Dissent reiterates the positioning of the Plaintiffs' arguments in the 'educational precedent' stating that *Rodriguez* and *Papasan* "did not involve substantive due process..." and instead "these cases considered equal-protection claims—[t]hat makes all the difference." *Gary B., v. Whitmer,* at p. 79. As mentioned previously, this was the case for *Brown* as well—where this *narrowed the scope* of application leaving open room for supplemental precedent to support those pillars as they were placed on the board:

"The **majority** next **notes** that ***Rodriguez* and the Supreme Court's other education cases** "**left open the possibility of the right to** a basic minimum **education, which works to negate the argument that its recognition is impossible** given its positive or affirmative nature." Majority Op. 54. When *Rodriguez* refused to find a right to education in the right to speak or vote, it stated: "**Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short.**" 411 U.S. at 36–37. ***Papasan* read this sentence to reserve "whether** a minimally adequate **education is a fundamental right.**" 478 U.S. at 285. Even

assuming these statements could be read to support a fundamental right to a minimum education, **these decisions did not involve substantive due process, so their statements do not support any education exception to *DeShaney*'s default rule**.

**These cases instead considered equal-protection claims**. **That makes all the difference. Unlike the Due Process Clause**, which does not generally compel a minimum level of public services, the **Equal Protection Clause does sometimes compel an equal level of public services**. The rigor with which courts review the unequal provision of **state aid turns on whether a state's distinctions "proceed[] along suspect lines" or "involv[e] fundamental rights." *Heller v. Doe***, 509 U.S. 312, 319 (1993). **If state action does either, the Court applies demanding "strict scrutiny" review**; **if it does not, the Court applies forgiving rational-basis review**. *See id.* at 319–20. **As has been clear since *Brown v. Board of Education***, 347 U.S. 483 (1954), **strict scrutiny applies to suspect racial classifications in education**. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). Absent those pernicious classifications, **parties have asked the Court to apply strict scrutiny to any unequal treatment in education on the ground that education is a "fundamental right." The Court has repeatedly said "no."** *See **Kadrmas***, 487 U.S. at 458.

This context clarifies what ***Papasan*** meant when it said that **the Court has left open "whether** a minimally adequate **education is a fundamental right**." 478 U.S. at 285. **The Court did not reserve whether the Constitution contains a positive right to a minimum education. It reserved only "whether a statute alleged to discriminatorily infringe that [potential] right should be accorded heightened equal protection review."** *Id.* If, **for example**, a **state refused to set up a school system in disfavored counties, *Papasan* suggests** (perhaps) **that this discrimination could trigger stricter equal-protection scrutiny. The majority, by contrast**, reads *Papasan* **to conflict with cases holding that states need not subsidize fundamental rights**. Yet by the time of *Papasan*, the Court had already "held in several contexts that a **legislature's decision not to subsidize** the exercise of a fundamental right **does not infringe** the right[.]" *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983). Nothing in *Papasan* so much as hints at a retreat from this rule.

*Rodriguez*'s **reasoning confirms this conclusion. Any hypothetical <u>right</u> <u>to</u> a minimum <u>education</u> <u>would</u> <u>in</u> <u>part</u> <u>flow</u> <u>out</u> <u>of</u> <u>the</u> <u>right</u> <u>to</u> <u>free</u> <u>speech</u>.** *Rodriguez*, 411 U.S. at 35–37. It has, however, been **<u>black-letter</u> <u>law</u>** for decades that the **Free Speech Clause <u>does</u> <u>not</u> <u>require</u>** states **<u>to</u> "<u>affirmatively</u> <u>assist</u>**" speech. *Ysursa*, 555 U.S. at 364. As Justice Douglas said, the Supreme Court has rejected any "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Cammarano v. United States*, 358 U.S. 498, 515 (1959) (Douglas, J., concurring). If we were to conclude that a state must **subsidize** education because individuals need education to exercise free speech, we would be concluding that states must **subsidize** speech in conflict with this longstanding authority.

**Nor is this distinction between substantive due process and equal protection meant to deny, as the majority rightly notes, that "a fundamental right is a fundamental right.**" Majority Op. 54. **But the fundamental-rights analysis differs depending on the constitutional clause at issue**. A state's provision of ***<u>unequal</u> <u>public</u> <u>aid</u> <u>to</u> <u>subsidize</u>*** a fundamental right of some (without extending that aid to others) **can trigger heightened equal-protection scrutiny**. *See Shapiro v. Thompson*, 394 U.S. 618, 638 (1969). **And a state's <u>regulatory</u> <u>restriction</u> on the exercise of a fundamental right can trigger heightened substantive-due-process scrutiny**. *See Casey*, 505 U.S. at 846. But a state's refusal to *subsidize* a fundamental right (**<u>in contrast to its</u> <u>restriction</u> <u>on the right</u>**) has not traditionally triggered heightened substantive-due-process scrutiny. *See Maher*, 432 U.S. at 475–76. And here, all agree that the plaintiffs' equal-protection claim fails. Nor do the plaintiffs argue that Michigan has unconstitutionally prohibited them from obtaining a minimum education from other sources. *See Pierce*, 268 U.S. at 534–35. Instead, they seek something quite novel: heightened scrutiny under substantive due process for Michigan's failure to properly **subsidize** their alleged fundamental right to a minimum education. **The Supreme Court's equal-protection cases do not support that substantive-due-process request**.

In all events, I do not think the Court's statements in these decisions can justify the plaintiffs' alleged fundamental right. Whatever *Papasan* meant by a fundamental right to a "minimally adequate education," 478 U.S. at 285, ***Plyler*** shows that this language does not cover the plaintiffs' claim that they have been "**functionally excluded** from Michigan's statewide system of public education," Compl., R.1,

PageID#20. The immigrant children in *Plyler* were legally excluded from Texas's statewide system of public education because they could not attend without paying a "full tuition fee." 457 U.S. at 206 n.2. That case thus would have implicated any fundamental right to state-provided literacy if such a thing existed. But the Court made clear that "[p]ublic education is not a 'right' **granted to** individuals by the Constitution." *Id.* at 221. And while courts have read *Plyler* as using heightened rational-basis review, *see Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006), the Court certainly did not apply the strict scrutiny that would govern if that case concerned a fundamental right, *cf. Shapiro*, 394 U.S. at 634. If the *legal* exclusion from a free education did not implicate a fundamental right, *Plyler*, 457 U.S. at 223, I cannot see how the *functional* exclusion from a free education could either.

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 79-82. (Emphasis added).

*1925.* Lastly, the Dissent's final analysis highlights the difference between substantive rights and right to equality, focusing on only one aspect of the Fourteenth Amendment being to end racial discrimination during the Reconstruction Era. Making this argument, the Dissent illuminates *Brown* again by quoting in regard to the "right to an education, "*where the state has undertaken to provide it*, is a right which must be made available to all on equal terms." *Id*. at p. 82.

*1926.* The distinction drawn from *Gary B., v. Whitmer* and *this* Complaint is a bifurcation of the Plaintiffs' arguments that a substantive right to a Public Education, where the **STUDENT** has preverbally stepped into the schoolhouse *to speak* through their *actions* by assignment *to* attendance, must be *free of* Federal **and** State discrimination, harassment, threats, *and* coercion each inherently and objectively void as *forms of* counter-*speech* where the public education is available *for all* **STUDENTS**' *regardless of* suspect classification—this is the *delicate* balance between 'traditional' education cases and one visible from *Brown*, *Tinker*, and *this* Complaint.

*1927.* Furthermore, where this *speech* is objectively void such **STUDENT** would be protected **from State** interference under the 14th Amendment's Substantive Due Process Clause as such

public education *as speech* is a fundamental right *free of* the inherently void characteristics of *Brown*, *Tinker*, and the facts *herein*.

**1928.** Even further, as found *herein*, the **STUDENTS** would also be protected **from State** action/policy on **equality terms for all STUDENTS regardless of** suspect classification have **equal opportunity** to obtain a public education *free of* inherently void discrimination, harassment, threats, and coercion.

**1929.** The fall back *for all* **STUDENTS** where *this* Honorable Court fails to accept the Plaintiffs' arguments *herein* is **rational basis** that ensues leading to regardless the violation by the Defendants of the Plaintiffs' life, liberty, property, and pursuit of happiness by acquiring knowledge for decision making through their education—those public **STUDENTS must** still be protected as a suspect classification.

**1930.** Plainly, the Dissent explains these guideposts from the skewed perspective of *Gary B., v. Whitmer*:

> "**The majority lastly notes that our country's history of racial injustice in education supports a right to a minimum education**. Majority Op. 44–46. <u>I agree that the Fourteenth Amendment was designed to stop the rampant discrimination that the majority describes</u>. But I respectfully disagree that **the amendment's Framers did** so by creating a *substantive* right to a minimum education. **They** instead **created an *equality* right that applies once the state decides to provide for education. Both precedent and original meaning support this distinction**.
>
> Since at least *Strauder v. West Virginia*, 100 U.S. 303 (**1880**), the **Supreme Court has explained that the "central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States**." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017) (citation omitted). The amendment thus bars racial distinctions in the provision of many public services that **a state**, **as an initial matter**, **has no constitutional duty to provide**. **A state**, for example **need not provide protection against private violence**, **but it cannot discriminate along racial lines in any protection it grants**. *See DeShaney*, 489 U.S. at 195–97 & 197 n.3. **A state also need not provide welfare to poorer residents, but it cannot engage in racial discrimination if it chooses to offer that aid**. *See Dandridge*, 397 U.S. at 485–86 & 485 n.17.

**The Supreme Court's decision in _Brown_ extended this logic to the educational context**. _Brown_ **recognized that "education is perhaps the most important function of state and local governments**." 347 U.S. at 493. **But nowhere did it suggest that the Constitution compels all states to provide a minimum education**. **Rather, it held that the right to an education**, "_where the state has undertaken to provide it_, **is a right** which must be made available to all on equal terms." _Id._ (emphasis added). **And it found** that **segregated schools deny** "children of the minority group . . . equal educational opportunities." _Id._ **No other Supreme Court decision suggests that the Due Process Clause creates an educational entitlement**. When, for example, **the Court held that a state must give students process before expelling them** from schools that they have a **state-law right to attend**, **it suggested that the states were** not **"constitutionally obligated to establish and maintain a public school system**." _Goss v. Lopez_, 419 U.S. 565, 574 (1975); _cf. Kadrmas_, 487 U.S. at 462.

**This same substance-versus-equality distinction permeates the congressional debates over what became the Civil Rights Act of 1875, an act passed under Congress's power to enforce the Fourteenth Amendment**. _See_ Michael W. McConnell, _Originalism and the Desegregation Decisions_, 81 Va. L. Rev. 947, 1036–45 (1995); John Harrison, _Reconstructing the Privileges or Immunities Clause_, 101 Yale L.J. 1385, 1425–33, 1462–63 (1992). That law, as enacted, **barred** racial **discrimination** in public accommodations and jury selection. Civil Rights Act of 1875, ch. 114, §§ 1, 4, 18 Stat. 335, 336–37. (**The Supreme Court would later hold that the public-accommodations provisions exceeded Congress's power as applied against private actors**. _Civil Rights Cases_, 109 U.S. 3, 11 (1883).) **But earlier versions of the law also would have barred segregated schools**. McConnell, _supra_, at 987–90 & 987 n.183. As **Congress debated these bills**, "**half or more** [of the legislators] **voted repeatedly to abolish segregated schools under authority of the Fourteenth Amendment**." _Id._ at 986.

**The supporters of this desegregation decree did not dispute that the _substantive_ "decision whether to have public schools** . . . **was regarded as a question of policy for the states**." Harrison, _supra_, at 1428. **Rather, they contended that, once a state opted to have schools, the state must open the schools _equally_ to all races**. _Id._ One senator, for example, "explained that the civil rights bill 'does not say that schools shall be kept at all, but it contemplates this: that **where there**

are free schools kept at public expense, . . . **in such cases there shall be an equal right to participate in the benefit of those schools created by common taxation**.'" McConnell, *supra*, at 1041 (quoting Cong. Globe, 42d Cong., 2d Sess. 3191 (**1872**)). And when opponents argued that southern states would close their schools if this desegregation mandate passed, the proponents responded with statements like the following: "**Let justice be done though the common schools and the very heavens fall.**" *Id.* at 1045 (quoting 2 Cong. Rec. 4151 (1874)). **These legislators recognized that the Fourteenth Amendment <u>required</u> states <u>to desegregate</u> the schools that they opened, <u>even if</u> it did <u>not compel them to open schools to begin with</u>. *Brown* <u>thus</u> <u>has</u> <u>roots</u> <u>in</u> <u>the</u> Fourteenth Amendment's <u>original</u> <u>understanding</u> <u>in</u> <u>a</u> <u>way</u> <u>that</u> <u>today's</u> <u>decision</u> <u>does</u> <u>not</u>.**"

*Gary B., v. Whitmer*, *No*. 18-1855/187, at pp. 82-83. (Emphasis added).

**1931.** *On appeal*, the Plaintiffs in *Gary B., v. Whitmer* argue for the first time a "negative" substantive-due process right claiming that "Michigan's compulsory-attendance laws force most children to attend school and so do deprive them of liberty," where the Dissent **ECHO**s the Majority identifying this claim was procedurally waived—*nonetheless*, the Dissent outlines below that this **<u>subjective</u>** aspect of public education "*passes constitutional muster*:"

"**Aside from a positive right to a state-funded education, the plaintiffs fall back on a "negative" substantive-due-process right. They point out that Michigan's compulsory-attendance laws force most children to attend school and so do deprive them of liberty. <u>This restriction on children's liberty passes constitutional muster</u>, the <u>plaintiffs argue</u>, only if** a state reciprocates by operating **schools** that **meet** a minimum **<u>level of quality</u>. I agree with the majority that the plaintiffs did not raise this claim below and so have forfeited it here**. Majority Op. 31–32. But I disagree with any suggestion that this theory otherwise has "strong support in the law." *Id.* at 27.

The **plaintiffs rely on *Youngberg*** for their claim. **That decision carved out a narrow exception to the rule that a state has no duty to provide public aid**, but this **exception generally applies only for those individuals under strict state control**. *See* 457 U.S. at 317. "[W]hen **the State by the affirmative exercise of its power so**

restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and **reasonable safety**—**it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause**." *DeShaney*, 489 U.S. at 199–200. **The Court has applied this rule to prisoners**, *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), **and to individuals that the state has civilly "institutionalized**," *Youngberg*, 457 U.S. at 317. **The rule might also apply** if, for example, **a state monopolized the distribution** of food to its citizens and barred them from obtaining food from private sources. *See* Majority Op. 56; *see also Archie*, 847 F.2d at 1222.

**This exception, though, has never reached students**. Courts have "consistently rejected" the argument that *Youngberg*'s custody exception covers children "based on compulsory attendance laws." *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 854 (6th Cir. 2016); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) (collecting cases). **Although "a school system has an unmistakable duty to create and maintain a safe environment for its students as a matter of common law**," its *in loco parentis* status or a state's compulsory attendance laws do not sufficiently 'restrain' students to raise a school's common law obligation to the rank of a *constitutional* duty." ***Doe v. Claiborne County***, 103 F.3d 495, 510 (6th Cir. 1996). If compulsory-attendance laws do not trigger a constitutional duty **to provide** students with a *safe* learning environment, *see id.*, those laws also cannot trigger a constitutional duty for states **to provide** an *adequate* learning environment.

This precedent comports with the nature of compulsory-attendance laws. ***Youngberg's*** **exception applies** only in situations in which **the state has "restrain[ed] the individual's freedom to act on his own behalf**." *DeShaney*, 489 U.S. at 200. **When, by contrast, "the government does not monopolize the avenues of relief . . . it has no further obligation to give aid**." *Archie*, 847 F.2d at 1222. Michigan's compulsory-attendance laws (like those of all other states) do not establish "a legal or a practical monopoly" on the schools that children must attend. *Kadrmas*, 487 U.S. at 460. **The Supreme Court has held for nearly a century that substantive due process would in fact bar states from forcing children to attend public schools against their parents' wishes**. *Pierce*, 268

U.S. at 534–35. **Michigan law thus provides several options to satisfy its school-attendance requirement**, including charter schools, private schools, cyber schools, and homeschooling. *See* Mich. Comp. Laws §§ 380.501, 380.553a, 380.1561. **It does not compel attendance at any particular school**, including the schools about which the plaintiffs complain in this case."

*Gary B., v. Whitmer*, *No.* 18-1855/187, at pp. 84-85. (Emphasis added).

*1932.*  Leaving *Gary B., v. Whitmer* brings us back to *this* Complaint as the ripened convergence of these established rights reach the flashpoint where no precedential interpretation, past or present, exists to guide this Honorable Court to permit the Defendants' unconstitutional-intellectual checkpoint to permit thus requiring serious debate of this totality.

## **THE STORY OF EDUCATION: PAST, PRESENT, & FUTURE**

"What you give, *the World has*, but what you keep—*is lost forever*."

**Swami Chinmayananda**

*1933.*   *Next*, having now *received* your upgrade in decision making and analytical analysis, we recall the measurement of change explained by "the Supreme Court [which] has developed a two-prong analysis it applies when determining whether an asserted right is fundamental:"

"**First**, "the Due Process Clause specially **protects those fundamental rights and liberties which as, objectively, deeply rooted in this Nation's history and tradition**." *Glucksberg*, 521 U.S. at 720-21 (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion)). The Supreme Court has applied a **holistic approach** to **this historical analysis, tracing the evolution of an asserted right through or even beyond the history of our country**. *E.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2548, 2593-97 (2015); *Glucksberg*, 521 U.S. at 710-19. **A few Justices have** instead **embraced a narrower version**, however, **looking to whether the right in question would have been recognized as a protected interest at the time of the Fourteenth Amendment was adopted [1868]**. *E.g.*, *Obergefell*, 135 S. Ct. at 2628 (Scalia, J., dissenting).

Even if a specific iteration of a right lacks substantial historical roots, **this alone is not enough** to foreclose recognition under the Due Process Clause.

[...]

Thus, **<u>the second prong</u>** of the inquiry looks to whether the asserted right is "'**<u>implicit in the concept of ordered liberty</u>**,' **<u>such that 'neither liberty nor justice would exist if they were sacrificed.</u>**'" *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325-26). While **<u>these prongs are</u>** sometimes **<u>tied together</u>**, see *e.g. Kerry v. Din*, 135 S. Ct. 2128, 2134 (2015) (plurality opinion), *Obergefell* made clear that this **<u>historical inquiry may illuminate even newly recognized injustices that reveal a fundamental right</u>**."

*Gary B., v. Whitmer*, *No*. 18-1855/187, at p. 35. (Emphasis added).

***1934.*** **Here**, the specific iteration of the illuminated and implicit-natural right, but the not yet recognized fundamental right reads as explicitly argued *herein* this Complaint, that:

"**a fundamental right to a public education** *free of* **discrimination, harassment, threat, and coercion** *for all* **STUDENTS** *regardless of* **race, color, religion, gender, age, familial status, national origin, disability, and wealth exists in the United States—***unequivocally.*"

***1935.*** The objectively-holistic inquiry necessary to properly plead a well-pled complaint to establish the asserted fundamental right while balancing the considerations of history, tradition, justice, *and* ordered liberty in the United States, *and beyond*, *is* rather *overwhelming* to contemplate. If you truly sit back, *understand*, and connect the **Effect-Cause-Effect** logic in each era of enlightenment *and* oppression, you see that the story of education *is actually the story of man* and his *survival* at his station in that moment in space and time given the *decision making* he employs with the *knowledge of the good* he has attained.

***1936.*** The Story of Education **is** the story of Man and to write properly the history of Education from the time of the formation of the United States to the present as required by *Gary B., v. Whitmer's Yellow Brick Road* **is** to write the history of the progression of human thought *from the beginning*…for the formation of the United States as a utopic republic formed under the duress **of**

**survival** was derived from *what was left across the Atlantic*. A splitting of the inceptual conceptual intellectual atom of human thought and function known then and now as **The American Experiment**—we are a product of the Fundamental Right to Free Thought and Expression which is in essence the pedagogical purpose of *ideas expressed through our continuous*-communication process that which requires learning as a subjective accumulation of *ideas* gained and shaped over time and space from our various sense impressions.

*1937.* A few things to highlight before we dive into this *deep* recess of our collective-objective reality. *Remember*, man is <u>still</u> learning, *permissively searching*, and he cannot predict the future in <u>absolutes</u>. This is important, because that means knowledge too is evolving as more curiosity is sparked in the various forms of *ideas* and *questions* by those searching for *knowledge of the good*. This idea that knowledge is evolving with mans' acceptance of its' effects can be seen throughout the evolution of education, as knowledge was either soaked up by the masses or "*<u>exploited</u>*" <u>by</u> <u>a</u> <u>guardian</u> <u>class</u>.

*1938.* This struggle between knowledge *and* stupidity has long plagued mankind, and the loss of *knowledge of the good*, such that has become carbonized-particulate matter burned by the hoards at the *Library of Alexandria* or the thousands of pagan texts locked away and forgotten over the centuries—this has only *set man back* further in <u>constructing</u> this discovered *knowledge of the good* to better serve *the whole*. Finally, history is easier to understand when you begin with the past and move towards the future, utilizing the objective **Effect-Cause-Effect** Logic of the improvements in knowledge made by man in his conquest for *knowledge of the good* **for survival**.

*1939.* The synthesis that follows is largely constructed as an outline of *The Story of Education: Philosophical and Historical Foundations*, by I.N. Thut, printed by McGraw-Hill in 1957; *I* incorporate <u>the</u> <u>entirety</u> of this book by reference given its value to mankind and the foundation of *this* Complaint. *I* have chosen this text for two reasons: (1) the content is extraordinarily detailed

and objective in nature; and (2) the Defendants themselves agree with this content having sold the *exact* copy at the Wayne State University Bookstore some time ago for *$6.40; I* stumbled upon *my used copy* at an estate sale for a dollar ($*1.00*) in *2021* by chance itself and was blown away by the applicability the content had on my life. **Exhibit 624—*WSU Bookstore Thut Tag*.**

**1940.**   Interestingly, one of the consulting editors is also the eminent Dr. Harlan Hagman, a Wayne State University Emeritus Professor, who himself "contributed immeasurably to the advancement of knowledge." **Exhibit 625—*Obituary of Dr. Hagman*.**

**1941.**   This logic is twofold in that the information is admissible and not subject to unnecessary scrutiny from the Defendants from an evidentiary standpoint. Also, even if the Defendants chose to challenge this clearly objective knowledge, presumably only to delay these proceedings, this edition is registered with the Library of Congress: Catalog Card Number *57-7246*, *respectfully*, and thus qualifies as a learned treatise given the objective contributions to man it contains within.

**1942.**   It is my true and genuine belief that Dr. Goldratt was ***at first*** seeking *knowledge of the good* to achieve his *great* objective in provoking the World *to think for themselves*. But, somewhere along the way, the knowledge associated with the Theory of Constraints was *trapped at the top* and convoluted *so much*—that ordinary man, the man of clay, was neither curious nor intellectually provoked to look towards the *light* that the Theory of Constraints provides:

> "The backward look induced nostalgic longings precisely because the past is now safely beyond the power of living men to change it. **No knowledge we now possess or may hope to acquire can give us the ability to bring about a line of developments or a sequence of events other than that already written in the records of time**. The issues which agitated the people of the past have already been resolved, whether for good or for bad, and no necessity can arise from the circumstances which created them to force us to return to them against our will. Retrospect therefore affords a restful view. All the decisions have already been made, and weighing the possibility that some

course other than the one chosen might have been elected is not merely an idle speculation and of no practical consequence *except **as it might have bearing upon future decision making**.*"

**Exhibit 626**—*Story of Education Chapter 1 to Chapter 3*, at p. 3.
*The Story of Education*, by *I.N.THUT*,
*Library of Congress Catalog Card Number* 57-7246 (Emphasis added)

*1943.* It is ***this idea***, that "***no knowledge we now possess [in 1957] or may hope to acquire*** can ***give us the ability*** to ***bring about a line of developments*** or a ***sequence of events*** other than that already written in the records of time," it is *this* that ***must be highlighted***. For, it is my belief that Dr. Eliyahu Moshe Goldratt's Theory of Constraints and Cochrane's Theory of Constraints' Full Flex **is exactly this**—the Decision-Making Process *within* the Communication Process capable of bringing about a line of developments and a sequence of events specifically *as designed* by the User(s). Continually improving, the Theory of Constraints is Mans' critical thinking upgrade that will take us far into the distance future as we are guided by our objective-collective past, working together ethically, **creating our own reality**, individually *and* collectively, ultimately making the *im*possible—*possible.*

"If *you can* dream it—*you can* do it."

**Walter "Walt" Elias *Disney***

*1944.* From the dawn of humanity, when early man used sounds and painted on cave walls to communicate—to Gutenberg's printing press—to the revolution of digital technology born from tirelessly slapping a keyboard in a garage in California—Epcot's *Spaceship Earth* at Walt Disney World in Orlando, Florida, orates the Story of Man from the perspective of communication and demonstrates *as will be attempted here* how fundamental reading, writing, and literacy overall are necessary to obtain the knowledge of the good through the pedagogical experience of the STUDENT that which establishes the foundation for *every* Fundamental Right and those liberties

we share individually inherent to all *Homo sapiens sapiens* as we *continue* to individually shape our subjective *and* objective reality as the effect of our continuous-decision making.

*1945.*   Plainly, '*education*' in America existed *long before* the Puritans and Pilgrims settled on the Eastern Coast of North America. The Bering Land Bridge between Russia and Alaska brought '*education*' to the Americas as such bridge provided the early-nomadic people of Earth the ability to roam freely following herds of animals crossing the same strait to reach the North and South American Continents some ***10,000* to *16,500* years ago**.

*1946.*   These tribal civilizations existed because knowledge of the good life, or '*education*,' was communicated effectively from generation to generation orally through storytelling, Socratic learning, sensory experiences, *i.e.*, Empiricism, artwork, and other forms of communication all echoed for the 'nationalistic mission' **of survival** for the individual *and* civilization.

*1947.  **Now***, to bridge the idea of '*education*' as a fundamental and natural right through this distance of *at least* **16,500 years** *or* the birth of the American Experiment **less than three hundred years ago** as required by *Gary B., v. Whitmer*, we *respectfully* recall I.N. Thut and *The Story of Education* understanding: ***first***, the role that knowledge plays in decision making in general; ***secondly***, how 'school' in general is a symbol of faith in a particular form of knowledge; *and **third***, the philosophical guideposts for searching for knowledge of the good life as is relative to those who do the searching submissively to discover. **Exhibit 626**—*Story of Education, Chapter 1 through Chapter 3*. (Highly emphasized; *required for full comprehension*).

*1948.*   To ***focus*** on education as a fundamental right is to at the same time link this knowledge of the good with the origin of our species and **survival** of man as a species stemming from genuinely the earliest forms of our creature. The genesis of our story is the beginning of our nations history and the evolution of man's intellectual development over that period; without this journey there is no education, this is itself education *through* the experiences of the past.

**1949.** According to *the Smithsonian Institution* modern man known today as the *Homo sapiens sapiens* is the last species and only man standing as a result of an approximately six (*6*) million-year evolutionary journey of objective and tangible fact.

**1950.** Specifically, this journey begins approximately **six million to four million years ago** in *Africa* where the **_Ardipithecus_** primate group began walking upright allowing this *good* to further the free use of their hands for toolmaking, weaponry, and other forms **of survival** needs.

**1951.** Next, this change brought about the distinguished species known as the **_Australopithecus_** group that survived **between two and four million years ago**, followed then by the **_Paranthropus_** group that existed between approximately **one million and three million years ago**; each group distinguished the previous by physical characteristics in size, shape, and cognitive functions often the result of subtle differentiations in physical-skull design leading to new *ideas*, customs, behaviors and the adaptations that evolved through time and space.

**1952.** Then, approximately **two million years ago** the **_Homo_** group began evolving having larger brains, more distinguished tool-making capabilities, and the migration patterns that brought *our* species to dominate the world over all other forms of *hominin*. Specifically, around **200,000 years ago** the **_Homo sapiens_** aside the **_Homo erectus_**, **_Homo neaderthalensis_**, **_Homo floresiensis_**, and *others*—distinguished itself and outlasted these ancestral lineages of evolution becoming our direct-ancestral cousins separated by time and genetic sequence.

**1953.** It was then, around **60,000 to 80,000 years ago** that the *Homo sapiens* used the combination of these superior-evolutionary characteristics to **survive** by migrating with hurds of animals across the globe reaching the Americas while developing along the way *knowledge of the good* relative to **survival** of the individual *and* of their civilization.

**1954.** As the time and *knowledge transfer* continued the accumulation of knowledge of the good allowed early man to understand the complexity of nature. Sometime around the end of the

Last Glacial Period, *i.e.*, the Last Ice Age, *or about* **12,500 years ago** man came to understand the benefits of controlling the growth and development of certain plants and animals leading to ultimately changing his surroundings and social structures *as food* became more plentiful.

*1955.*   This break in the evolutionary structure from *natural selection* to *artificial selection* had significant impacts on man and his ability to design and control his reality using knowledge of the good to advance the **survival** of the individual *and* society at a rate of higher efficiency.

*1956.*   Specifically, as this collective of **Prehistoric** and **Stone Age** knowledge of the good was transferred *through time* by rudimentary forms of *education* for the **survival** of man and his offspring—this led to the collective-decision making of man and objectively the **Neolithic Revolution** at various places throughout the world by cultivating *not only crops* but also societies of individuals capable of accumulating collectively knowledge of the good forming early variations of an *social contract*. From this, knowledge of the good *continued* to prove fundamental to the **survival** of the individual *and* of the community ultimately *leading to* the **Copper Age** (*c.* 6,000 BC); the **Bronze Age** (*c.* 3,300 BC); *and* the **Iron Age** (*c.* 2,200 BC).

*1957.*   It wasn't until roughly **6,000 years ago** do we recall the establishment of civilization as we know it, let alone the industrialization of the world we *now* call home, shaped directly from the ***Age of Enlightenment*** from sometime in and around 1685 to the early 1800s flowing then into the beginning of the ***First Industrial Revolution***—to our *current* ***Information Age***.

*1958.*   As man continued through this evolutionary journey the need to communicate with himself and his community grew symmetrically with the evolved complexities of the good life.

*1959.*   Intrinsically, man has always communicated as a matter of self-preservation, of self-**survival**—but this *skill*, writing and reading, became a necessary component of civilization during the **Neolithic Revolution** as centralized economies, political and social hierarchies, and personal-property rights became prevalent requiring communication for **survival**.

*1960.*   As we have learned thus far, communication as defined is fundamentally endless in shape and scope, and as man *continues* to evolve so will the forms and types of communication he wields in his quiver for **survival**.

*1961.*   The History of Writing, and *intrinsically* that of reading, is also a part of the Story of Man and his evolutionary journey for **survival**.

*1962.*   The earliest forms of writing are **Prehistoric** in nature and remain stationary most often in the dark strewn about the cave walls visible only as imitations of early man's two-dimensional and artistically limited perspective of the world he experienced.



Plato's Allegory of the Cave, *Republic*, *c*. 375 BC

*1963.*   Explicit and metaphorically speaking, it is Plato's <u>*Allegory of the Cave*</u> that depicts man turning from these cave walls and walking towards *the light* of the outside world *representing* the *permissive acquisition of knowledge of the good*, an alteration of reality, *first* <u>subjectively</u> for the self and *then* objectively for the whole derived from a collective of the subjective.

*1964.*   As the **Neolithic Revolution** took root so did the written word as excess capacity developed economies around this agricultural revolution. Having this need for advanced communication, early man found ways to communicate using a large classification of *proto-writing systems* using small clay tokens, clay tablets, and reed pens. These distinct forms of communication themselves continued to evolve as with man through his **survival** leading to

most importantly the Phoenician-*phonetic* alphabet in *c.* **1050 BC** becoming one of the most widely used writing system throughout the region and led to adaptations such as *Greek* script.

*1965.*   Moreover, even before the Phoenicians developed a uniform script to communicate throughout their trade routes—the Code of Hammurabi's *lex talionis* ("eye for an eye") principal was evident and written with over *4,130* lines of cuneiform-legal text composed during *c.* **1755-1750 BC** "*to prevent the strong from oppressing the weak,*" encompassing a broad scope of criminal law, family law, property law, *and* commercial law.

*1966.*   Plainly—from *thereon* civilization and the knowledge of the good continued to grow rising and falling as we do breathe life into *our* everyday reality through *our* decision making.

*1967.*   It was from this basis that we as a species continued to accumulate knowledge of the good around the world as we learned the limitations of our great-early civilizations during the end of the **Iron Age (***c.* 1,200 BC**)** as **Classical Antiquity** emerged around *c.* **1200-800 BC** paving way for the fall of *Greece* to the *Roman Republic* in Europe, North Africa, and Western Asia in *c.* **146 BC** and throughout the world as *the Olmecs* and *Han Dynasty* ruled supreme developing *independent* civilizations based on *accumulated knowledge of the good*.

*1968.*   During this period, *Yeshua* or—**Jesus Christ**—was born in Bethlehem *c.* **6-4 BC** and was thereafter crucified by the *Roman Empire* at the direction of the Roman governor, Pontius Pilate, leading to his death around *c.* **30-33 AD**; virtually all modern scholars of antiquity agree that *Yeshua* existed historically entombed for his *disruption of the status quo* and martyrdom.

*1969.*   It was the fall of the *Western Roman Empire* that caused the collapse of the *Roman Empire* in *c.* **476 AD** leading to the split in the rule of Europe between the Eastern and Western rule fueled in the East by an *Islamic Golden Age* of intellectual exploration. After the fall of the Roman world, led in part by the *Byzantine Empire*, this Western region later evolving during the **Middle Ages** into the *Ottoman Empire c.* **1453 AD** with the fall of Constantinople, and

*even later* flowing into *our* **Modern Era** *c.* **1721 AD** to the *Russian Empire*, the *Soviet Union*, and modern *Russia* in East-North Eastern Europe and Western Asia *thereafter*.

*1970.* Principally—the line of development of the *Homo sapiens* that survived utilizing *knowledge of the good* in Western Europe during the **Middle Ages**, *also known as* the **Dark Ages**, are who we are most concerned with as such objective history <u>directly</u> caused *this* Nation's—the **United States of America's**—history and tradition, that which public education *free of* discrimination, harassment, threats, and coercion *for all* **STUDENTS** is implicit in the concept of ordered liberty as such neither liberty nor justice would exist if this was sacrificed.

*1971.* Plainly, during the beginning of the **Middle Ages** around *c.* **450-500 AD** the Western European world was consumed by large numbers of *Germanic Tribes*, those groups later formalizing into sporadic civilizations known during the **Middle Ages** as the *Vikings*, *Anglo Saxons*, and *Franks* principally during this dark age of *feudalism*.

*1972.* It was during this period of turmoil that the ability to read, even among the clergy and nobility of the time, ***all but disappeared*** in Western Europe by *c.* **800 AD** as knowledge of the good *receded into the cave* with modern man to the point that **survival** took precedent as fealty, *i.e.*, a formal tribute of loyalty to the ruling lord or king, by vow or express action was required.

*1973.* It was by and through *Charlemagne*'s rule over Western Europe beginning in *c.* **768 AD** that as an effect of his conquest he did unite the region and revived the nationalistic need for classical learning as for education, *specifically literacy*, was taught *through* Christianity to clergyman, sometimes through force, with the specific intent to consolidate this knowledge in favor of the theologian-*priest class*. This censorship of education was intentional, and by which strengthened the *future hereditary*-ruling classes of this redeveloping civilization—leveraged most importantly by the established Christian Church, which following *Charlemagne*'s death in *c.* **814 AD** the *Holy Roman Empire* emerged consuming rule in the east as Western Europe

split again *c*. **850-900 AD** into our more **Modern** form of Europe <u>*even more* directly related</u> to the objectively deeply rooted history and tradition of *our* Nation.

*1974.*   *I*, Plaintiff, Bradley Edward Cochrane, *respectfully* place within this chronology in accord with the artistic free will of the creator my own ancestorial lineage having traced my existence back through time twenty-six (*26*) generations from where my sons stand today *to* Scotland, United Kingdom, *c*. **1033 AD** where *William De Blair* (*b*. 1033 – *d*. 1087) is our direct descendent. Where specifically in *c*. **1593 AD** *Lord Alexander Blair* (*b*. 1570 – *d*. 1641) married *Elizabeth Cochrane*, and as a condition of marriage the "*Blair*" surname was hyphened, and "*Cochrane*" was thereafter distinguished as the surname used by this lineage of ancestors to date.

*1975.*   Back to Europe, and *candidly* Thut, as this time in our objective past is the **<u>root cause</u>** for what has objectively stood firm as *the beginning* of the intellectual renaissance that shaped not only our Nation—but the world, and our *<u>current reality</u>*.

*1976.*   To explain this trajectory that develops explicitly the expressive and implicit characteristics of *our* Nation's History is to delve *even deeper* into these objective roots as the record were written relative to our modern standard of documenting where in comparison to antiquity these records are *robust*. Thus, to add another one-hundred and fifty pages *herein* this Complaint would be easy. Instead, *candidly*, *I* censor this work and point expressly to **Chapters 11 _<u>through</u>_ Chapter 19** of *<u>The Story of Education</u>* to develop through Thut's lens the exhaustive variables directly effecting development of *every aspect* of our Nation's history and traditions *from the beginning to today* centered on the <u>indivisible</u> **<u>freedom</u>** *through* education for which permissive acquisition of knowledge of the good leads directly to **<u>the American Dream</u>**, or— *the good life*. See, **Exhibit 627**—*The Story of Education*, ***Chapter 11***; **Exhibit 628**—*The Story of Education*, **Chapter 12**; **Exhibit 629**—*The Story of Education*, ***Chapter 13***; **Exhibit 630**—

*The Story of Education*, **Chapter 14**; **Exhibit 631**—*The Story of Education*, **Chapter 15**; **Exhibit 632**—*The Story of Education*, **Chapter 16**; **Exhibit 633**—*The Story of Education*, **Chapter 17**; **Exhibit 634**—*The Story of Education*, **Chapter 18**; **Exhibit 635**—*The Story of Education*, **Chapter 19**; *and* **Exhibit 636**—*The Story of Education, **Thut's Look Ahead***.

*1977.*   Frankly, after you have digested those chapters and Thut's *Look Ahead*—my words here seem juvenile as his commentary is *deeply* **focus**ed on his objective as to explain the objective roots of the historical foundations of education *in full*. *I* researched many supportive arguments and there are no works in comparison to Thut—candidly, *I* do not believe an Amicus would even compare as *The Story of Education* is an <u>invaluable</u> treasure trove of information <u>for man</u>.

*1978.*   Now, *respectfully*—while many civilizations around the world have played parts in shaping our current reality, it was the **United States of America** and the energetic influence of democratic freedom—*the power of the People*—that principally framed our reality the most during this Modern era of *the American Experiment*.

*1979.*   To continue with our chronology, we know that Western Europe principally is where the world *we* now *know* was born and cast about as discrimination, harassment, threats, and coercion **_against_** freedom of thought, of speech, of life, of liberty, of property, of education, existed and the individual *in general* was censored and marginalized by the *authoritarian systems* of governance that consolidated knowledge of the good against everything opposing the status quo relative to the ruling class in order to subjugate those voiceless subjects.

*1980.*   Leading up to this period in our collective history, around the world—education was necessary **for survival**—yet education *itself* was <u>used as a weapon</u> to subvert and control power for **survival** held in the hands of the few, *i.e.*, Sophists *acting as* Philosopher Kings; Priest Classes; the established Church; Royalty and *other* hereditary structures; intellectual aristocracy; <u>*the elite few*</u>; *etc*., while the common man—*the People*—were leveraged for the

benefit of these ruling classes of *authorities* by expressly withholding all forms of individual rights, <u>including</u> access to knowledge of the good with some notable exceptions such as sponsorship like our modern scholarships—"**the issue here** is clearly between individual responsibility and freedom, on the one hand, and submission to some form of authority, on the other:" (*The Story of Education*, at Chapter 8, p. 374).

> "<u>Should a single generation be allowed to grow up without making [Thut's] knowledge the basis of its way of life</u>, **the entire heritage would be in danger of being lost for all time**. This fact places a special responsibility upon each generation of adults to teach the children the ways of their fathers [individual freedom] and to be secure their allegiance to that way. The necessity of transmitting the way of life, it will be recalled from an earlier chapter, is the **prime motivation for all education**."

*The Story of Education, Chapter 8,* at p. 97. (Emphasis added).

**1981.**   As man collectively through—*the People*—began to rebuff this authoritarian grip on reality <u>being controlled by knowledge</u> of the good "*received*" from celestial origins ordinary man was thought incapable of attaining himself—knowledge of the good shifts into the hands of common man during the **Middle Ages**. Specifically, though not necessarily inclusive towards ordinary man, an example of this shift that motioned away from an authoritarian reign and towards a representative charter of human rights was the **Magna Carta** signed by King John of England in *c*. **1215 AD** which also *directly* influencing the founding fathers' formation of the **United States Constitution** in *c*. **1789 AD**, more than *500* years later.

**1982.**   One of the most important shifts of logic during this period of the **Middle Ages** involves the competing ideas of two important Philosophers, **Thomas Aquinas** (*b*. 1225 – *d*. 1274) and **William of Ockham** (*b*. 1285 – *d*. 1347). ***First***, during the early **Middle Ages**, Thomas Aquinas based in Sicily and being taught by **Albertus Magnus**, was a philosopher, theologian, and scholastic *focus*ed on "*Averroism*" or what was then known as "**radical** Aristotelianism."

*1983.* It was Thomas Aquinas' life work to synthesize portions of Aristotelian Philosophy with the principles of Christianity. During this period, this concept was largely debated and found to be radical as Philosophy and Theology were knowledge of the good thought to be "*received*" by the select and instead *this good*, that of Aristotelian Philosophy, was most often "*discovered*" through open debate by use of **dialectical reasoning** furthered significantly by the growing **Scholasticism** schools of the **Middle Ages**.

*1984.* Moreover, Scholasticism itself contributed to the development of medieval universities teaching monks in Western Europe, *mainly* England, France, Italy, Portugal, and Spain, which overall contributed significantly to the ***rise of questioning the status quo*** as knowledge of the good continued to *compound* into our Nation's objective history and tradition quite explicitly.

*1985.* ***Secondly***, through this idea of **dialectical reasoning** we come to **William of Ockham** and what is known as "**Ockham's Razor**," or in general the splitting of thought into **<u>secular</u>** form differentiating theology and philosophy, and later *even further* the differentiation of philosophy from science as the *focus* of Ockham's Razor was **simplicity** derived from **efficient reasoning** only to those variables necessary to prove a cause(*s*) and thus with this simplicity comes inherently a deeper-fundamental understanding of the problem set to be solved.

*1986.* The secular separation of theology from philosophy—known as **<u>the Twofold Truth</u>**—was advanced even further by **<u>Francis Bacon</u>** and his flat-out refusal to discuss theology which spurred *the People* even closer to *our* Nation's objective history and traditions as authoritarian rule was limited *even further* by the rationalism movement of Bacon's ***Novum Organum***, resembling a fundamental pillar of the United States of America with—**<u>the separation of church and state</u>**—itself as an idea an early form representative of Ockham's Razor and Bacon's inductive reasoning, *later* developed explicitly during the **Age of Enlightenment**, *or*

**Age of Reason**, throughout Europe and Colony America by our Founders pre-*and*-post signing of the **United States Constitution** *c.* **1789 AD** *and* the **Bill of Rights** *c.* **1791 AD**, *respectfully*.

*1987.*   There is much debate over *when* this next period began, but it is universally accepted that with the rise of <u>individualized</u> <u>freedoms</u> and by that *the People* permissively acquiring knowledge of the good through education in Europe—**the Renaissance** led to great social change in *every* aspect of life: art; architecture; politics; literature; exploration; and most importantly the **Scientific Revolution** *preceded* the **Age of Enlightenment** through the collective works of those pioneering minds such as: **Leonardo de Vinci** (*b. 1452 – d. 1519*); **Nicholaus Copernicus** (*b. 1473 – d. 1543*); **Giordano Bruno** (*b. 1548 – d. 1600*); **Francis Bacon** (*b. 1561– d. 1626*); **Galileo Galilei** (*b. 1564 – d. 1642*); **Johannes Kepler** (*b. 1571 – d. 1630*); **Thomas Hobbes** (*b. 1588 – d. 1679*); **Rene Descartes** (*b. 1596 – d. 1650*); **John Locke** (*b. 1632 – d. 1704*); **Baruch Spinoza** (*b. 1632 – d. 1677*); **Gottfried Wilhelm Leibniz** (*b. 1646 – d. 1716*); *and* **Sir Isaac Newton** (*b. 1642 – d. 1727*).

*1988.*   It was the **Scientific Revolution** that spurred modern man—and our Nation's history and tradition—on the <u>exact</u> course it is now.

*1989.*   Specifically, the **Scientific Revolution** is the *root cause* of the Age of Enlightenment and the notion that <u>ordinary</u> <u>man</u> <u>is</u> <u>not</u> <u>powerless</u> in using his **natural rights** to shape the reality he lives. From this movement, *we learn through experience* from the **Empiricists** arguing that knowledge of the good is "*constructed*" through sense data, *i.e.*, individual experience, compounded through the individual's life to construct relative new knowledge of the good.

*1990.*   More specifically, it was the work of the Empiricists such as **Newton**; **Locke**; *F.* **Bacon**; but also that of **Joseph Priestly** (*b. 1733 – d. 1804*); **Pierre-Simon de Laplace** (*b. 1749 – d. 1827*); **John Dalton** (*b. 1766 – d. 1844*); **Michael Faraday** (*b. 1791 – d. 1867*); *and* **Jeremey Bentham** (*b. 1748 – d. 1832*), that collectively through their work called for sweeping changes

to European *and* American schooling throughout this **Age of Enlightenment** spawning a movement of **individual freedom of thought** and the precepts for the **American** and French **Revolution**s from the voice and actions of *the People*.

***1991.*** Plainly, it was concepts like Locke's ***tabula rasa*** and **Laplace's Demon** (*the past completely determines the future*) that advanced Newton's **determinism** to define our mechanical universe of ***cause*** and ***effect*** stemming from scientific works like ***Naturalis Principia Mathematica*** that led to the development of our modern **Scientific Method** of deductive reasoning *and which* ultimately led to the **birth of** the Age of Enlightenment *c.* **1680 to 1820**, and that of the **United State of America** following the **American Revolution** *c.* **1776**.

***1992.*** Moreover, it was early Empiricists like **Jeremy Bentham**, **John Mill** (*b. 1773 – d. 1836*) and **John Stuart Mill** (*b. 1806 – d. 1873*), that gave birth to "Social Sciences" and the **Utilitarian** dictum of— "***the greatest good for the greatest number***," that modern Social Scientist—**Dr. Eliyahu Moshe Goldratt**—is best situated given his work to synchronize hierarchical-social structures, specifically organizations *to* governments *in general*, through "*constructing*" processes by using the **Theory of Constraints** for collective problem solving:

> "*The Social Sciences*
>
> Limitations of time and space do not permit more than a passing reference to the manner in which the scientific discoveries of Newton, Laplace, Priestley, Dalton, Faraday, Helmholtz, and many others equally eminent scientists brought powerful support to the theory that true knowledge may be discovered by those who begin their search with sense data and confirm their inductively established hypotheses with further sense data. As a result of their successes, the methods of scientific inquiry soon came to be regarded as the proper method for discovering truth in all fields of endeavor, and there came a demand to use this method to point the way to social and political reforms as well.
>
> The problem of extending scientific techniques into the social realm is not a simple one, however. Observations made of the social processes cannot readily be stated in precise, quantitative terms, such as those used to describe physical processes. **Nor do human subjects and social institutions readily lend themselves to the purpose of controlled experimentation, as do the inanimate materials and objects studied by the physical scientists**.

Nevertheless, the effort to develop a social science seemed justified to many who longed for reforms, and several beginnings were attempted.

One of the better known among the early efforts to develop a **social science** was that made by Jeremy Bentham. In searching for a way to describe the workings of the social process and to measure the effects of specific social factors in quantitative terms, he concluded: "Nature has placed mankind under the governance of two sovereign masters, *pain* and *pleasure*. It is for them alone to point out what we out to do, as well as to determine what we shall do. On the one hand the standard of right and wrong, on the other the chain of causes and effects, are fastened to their throne."

The implications of Bentham's premise are obvious. When two courses of actions are open to us, one producing pain, the other pleasure, clearly it is right for us to choose the latter; when two courses are before us, both leading to pleasurable consequences, the course which results in the greatest pleasure is to be preferred; and when the choice lies between two courses that result in pain, it is the lesser pain which shall be our choice. The good can thus be distinguished from the less good or the not-good on a strictly quantitative basis. We need merely employ scientific techniques of observation and measurement to determine the quantity of pleasure or pain that follows from a given act or arrangement in order to learn the measure of its goodness or badness. For Bentham, it followed logically that the **social scientists** must make it their central business to measure and make known the relative value of each practice, institution, and arrangement, and it was he who gave us the idea of "***the greatest good for the greatest number***" as the objective of the good society.

Bentham's social principle is known as ***utilitarianism***. It was adopted and expanded by James Mill and John Stuart Mill, father and son. In the hands of the latter, utilitarianism and a throughgoing philosophical system reached its highest level. "The whole empirical logic of Mill," wrote Dewey," professedly, and as far as consistent with itself, is an endeavor to show that all propositions involving reflections and ideas must be proved, or demonstrated to be true, by reduction to propositions consisting only of material directly given in sensation."

In the eyes of the utilitarians, as well as French *physiocrats*, **man and his society now appeared to be subject to the same kinds of cause-effect operations as are the inanimate objects of the physical universe. Human behavior was said to be <u>controlled</u> and <u>predicted</u> just as readily as events in the laboratory of the physicist. Accordingly, the <u>social scientist</u> <u>was</u> <u>urged to discover</u> the laws which govern social change and, <u>by that knowledge, to control the actions of men</u> in such ways that the maximum measure of happiness would prevail for the largest number possible**.

**<u>The actions of men may be controlled</u>**, it now was said, **<u>by controlling their environments</u>**. Thus, **<u>Helvètius proclaimed</u>** that **<u>education is the all-powerful instrument by which any chosen type of society may be produced</u>**.

And **Robert Owen**, the philanthropic English industrialist, **built model villages for his workers** on the theory that **ideal surroundings would produce ideal individuals**. Other experimental social organizations and community projects were launched in the firm belief that men of evil natures would inevitably become good when given the proper environmental conditions. In brief, the future of man seemed at long last to be assured. **That future**, it was believed, **rested in the hands of** the *social engineers*—**the social technicians who, by virtue of scientific discovery, knew what was positively good and were equipped with the means to make the good prevail**. To the social scientists of this persuasion, **man as well as his society was regarded as an integral part of the great machine universe and subject to the domination of similar machine principles**.

**Exhibit 627**, at pp. 224—226. (Emphasis added).

*1993.*  These **social engineers**, as social scientists constantly dreamt of **utopic** solutions of what the perfect society looked like encompassing **individualized liberty** and **free thought** unrestrained by authoritarian dictation. This idea was not new; nearly three hundred years prior in *c.* **1516 AD**, it was **Sir Thomas More** (*b. 1478 – d. 1535*) that coined the term "*Utopia*," expressing a functional society impossible of realization, that possesses highly desirable or near-perfect qualities for its ideal members. Even before More wrote about his *Utopia*, Plato in his *Republic* emulated his ideal society *c.* **375 BC** ruled by the intellectual elite—the **Philosopher Kings**—even then, following Plato and More, *other* Philosophers, Scientists, and business men of the time alike all throughout the Middle Ages *and* Age of Reason wrote subjectively about the *ideal* system man should erect. Specifically, it was the subsequent works of the following educated intellectuals that compounded to spawn both the American Revolution *and* French Revolutions, works like Plato and More include: **Joannes Lodovicus Vives'** (*b. 1493 – d. 1540*) *c.* **1531 AD** pedagogical utopias found in *De Corruptis Artibus* and *De Tradendis Disciplinis*; **Thomas Campanella's** (*b. 1568 – d. 1639*) *Civitas Solis sev idea republicae philosophicae* (*City of the Sun*) *c.* **1602 AD**; *again*, **Sir Francis Bacon** and his *c.* **1627 AD** work *Novus Atlantis* (*New Atlantis*); **James Harrington's** (*b. 1611 – d. 1677*) *c.* **1656 AD** *The Commonwealth of Oceana*; **John Locke's** *c.* **1689 AD** *Two Treatises of*

*Government*; **David Hume's** (*b. 1711 – d. 1776*) *c.* **1752 AD** *Essays, Moral, Political, and Literary* and *Idea of a Perfect Commonwealth c.* **1777 AD**; **Etienne-Gabriel Morelly's** (*b. 1717 – d. 1778*) *Code de la Nature c.* **1755 AD** and *Naufrage des isles flottantes, ou Basiliade du célèbre Pilpai c.* **1753 AD***;* and again deeply influenced by *Locke* and inspiring *herein the People's* natural rights to an education *free of* discrimination, harassment, threats, and coercion *for all* **STUDENTS**, **Jean-Jacques Rousseau's** *c.* **1762 AD** *The Social Contract; or, Principles of Political Right*, with the central idea that absolute authority is a collective of *the People* who are *born free* with *inherent* natural liberty of individual thought and to live accordance with individual design through natural law; **Etienne Cabet's** (b. 1788 – d. 1856) *c.* **1840 AD** *The Voyage to Icaria*; *and finally*, **William Morris'** (*b. 1834 – d. 1896*) *c.* **1890 AD** *News from Nowhere.*

**1994.** Candidly—*I*, Plaintiff, Attorney Cochrane, cannot recant every variable involving '*education*' although each and every single pedagogical variable involving '*education*' as the progression of man, natural law, liberty, *and* freedom of thought is "*objectively deeply rooted in this Nation's history and tradition*" as such intellectual renaissances opposing oppression of knowledge are themselves "*implicit in the concept of ordered liberty such that neither liberty nor justice would exist is they were sacrificed,*" and thus to permit the Defendants *herein* to intellectually rape **STUDENTS** through discrimination, harassment, threats, and coercion as human-search subjects places the Defendants in the tomes of history uniquely positioned as manipulative oppressors of the objective and well-established truth. **Exhibit 636**—*Story of Education, Thut's Look Ahead*.

**1995.** *Our Nation*—the **United States of America**—is a tangible depiction of our Founders' utopia—**the land of the *free* and home of the brave**—representative of the time from which this great Nation arose from the martyrdom-like sacrifice ***for freedom*** that set the Pilgrims a

sail to America *c*. **1620 AD** to erect from amongst the trees and unforgiving wilderness *a system of systems* that which evolved through ***this freedom*** into a *united front* in the *minds* and hearts of *the People* generated through those *works above* and that of Thomas Paine's *Common Sense* the **Declaration of Independence** when England's King George *III*'s authoritarianism crept across the Atlantic *c*. **1776 AD**, and thereafter *c*. **1789 AD** when signing the **United States Constitution** following the **American Revolution**. And, *even thereafter*, once the quell of revolution subsided *the People* through this new form of bicameralism representation ratified—the **Bill of Rights** *c*. **1791 AD**—and *further enshrined* this ***fought-for-freedom*** by and for *the People* guaranteeing *to all* American Citizens the freedom of thought, of speech, of life, of liberty, of property, *of education*, existed *free of* discrimination, harassment, threats, and coercion for *the People* as individuals by the **Federal Government** to which was thereafter ***incorporated*** and enforceable against **State Governments** through the **Fourteenth Amendment** *c*. **1868 AD** following the **American Civil War** during our **Reconstruction Era** reinforcing therein the individualized ***freedoms*** of the American Revolution and of natural law.

***1996.*** *Thus*—the objective roots of this Nation's history and tradition were founded with the inherent need for *at least* a rudimentary education from the original Thirteen Colonies *to* the Western shores of California. The nearest point in our epoch of evolution and intellectual revolution expresses this explicitly even during the earliest stages of our Nation's history as the Pilgrims *required education* to function within <u>*our*</u> independently developing society.

***1997.*** *Firmly*—the United States of America in all forms was and ***is still today*** the epicenter of Earth's individualized revolution of intellectual renaissance centered on man's **natural right** to freedom of inquiry and of life, liberty, and pursuit of happiness—to inquire the question of whether **education is a fundamental right** deeply rooted in our nation's history and tradition is to at the same time answer the question—without such concept of ordered liberty implicit

within the history of *the People's* Revolution for individualized freedom—public education *free of* discrimination, harassment, threats, and coercion *for all* **STUDENTS**—such as evident *herein* as the ceiling situated aside *Brown*—neither liberty nor justice would exist if such concept was sacrificed as the **AMERICAN DREAM** would fail to survive such a direct attack.

## <u>CLASS ACTION ALLEGATIONS</u>

*1998.* This cause of action is maintainable as a class action pursuant to Federal Rule of Civil Procedure Rule 23.

*1999.* Plaintiff, Attorney Cochrane, by and through his individual person and separately as President and General Counsel for The Traveling Attorney, *P.C.*®, did file *this* Complaint seeking class action certification against the Defendants in their respective capacities.

*2000.* Plaintiff, Attorney Cochrane, by and through his individual capacity has filed *this* Complaint on behalf of past, present, *and* future **STUDENTS** *including but not limited to those* enrolled in public schools throughout the State of Michigan at large and specifically those past, present, *and* future **STUDENTS** enrolled at Wayne State University.

*2001.* Plaintiff, Attorney Cochrane, by and through his authority and capacity as President and General Counsel of The Traveling Attorney, *P.C.*®, has filed *this* Complaint on behalf of past, present, *and* future **STUDENTS** *including but not limited to* those enrolled in public schools throughout the State of Michigan at large and specifically those past, present, *and* future **STUDENTS** enrolled at Wayne State University.

*2002.* As a member of a class known *herein* as "**STUDENTS**," Plaintiff, Attorney Cochrane, moves this Honorable Court to certify the class of Plaintiffs pursuant to Fed. R. Civ. P. Rule 23(a).

*2003.* Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(a)(1), the class of **STUDENTS** is so numerous that joinder of all members is impracticable.

*2004.*  Based upon information and belief, there is one (1) **STUDENT** from courses taken in 1997 identifiable by name and work product. *See*, **Exhibit 594**.

*2005.*  Based upon information and belief, there is one (1) **STUDENT** from courses taken in 2000 identifiable by name and work product. *See*, **Exhibit 143**.

*2006.*  Based upon information and belief, there is one (1) **STUDENT** from courses taken in 2004 identifiable by name and work product that is inclusive of two identifiable **ENTITIES**. *See*, **Exhibit 591; Exhibit 595**.

*2007.*  Based upon information and belief, there is one (1) **STUDENT** from courses taken in 2009 identifiable by name and work product that is inclusive of one identifiable **ENTITY**. *See*, **Exhibit 260; Exhibit 261; and Exhibit 262**.

*2008.*  Based upon information and belief, there is one (1) **STUDENT** from courses taken in 2011 identifiable by name and work product that is inclusive of one identifiable **ENTITY**. *See*, **Exhibit 592; Exhibit 596**.

*2009.*  Based upon information and belief, there is one (1) **STUDENT** from courses taken in 2014 identifiable by name and work product that is inclusive of two identifiable **ENTITIES**. *See*, **Exhibit 593; Exhibit 597**.

*2010.*  On May 25th, 2014, at 8:29 PM, Defendant, Dr. James T. Low, on behalf of himself and the Defendants at large and by email confesses admitting that "[t]here **are *well over* 250 former** [**STUDENTS**] **of the course out there now**, working in a variety of industries and locations around SouthEast Michigan." **Exhibit 141**, at p. 3. (Emphasis added).

*2011.*  Based upon information and belief, there is nineteen (19) **STUDENTS** from courses taken in 2014 identifiable by abbreviation and work product that is inclusive of twenty-one (21) **ENTITIES** all but one is identifiable by abbreviation, the other is explicitly identified by its commonly known name. *See*, **Exhibit 142**.

*2012.*   Based upon information and belief, there are twenty-one (21) **STUDENTS** from courses taken in 2020 identifiable by name, inclusive Plaintiff, Attorney Cochrane, and The Traveling Attorney, *P.C.*®, as representatives of these proposed classes. *See*, **Exhibit 120; Exhibit 121**.

*2013.*   Based upon information and belief, there are six (6) **STUDENTS** from courses taken in 2021 identifiable by seats taken. *See*, **Exhibit 116; Exhibit 117**.

*2014.*   Based upon information and belief, there are fifteen (15) **STUDENTS** from courses taken in 2022 identifiable by seats taken. *See*, **Exhibit 111; Exhibit 112;** *and* **Exhibit 114**.

*2015.*   Based upon information and belief, the size of the proposed class of **STUDENTS** is *at least* "...well over 250 former **STUDENTS**" and is approximately based on classroom size caps of on average thirty for each course (GSC 7260 & GSC 5670) and time between 2014 and 2022 a maximum class of $[(30x2) x8] = 480 + at\ least$ the "*well over*" 250 = 730 **STUDENTS**.

*2016.*   Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(a)(2), the class of **STUDENTS** share questions of law and facts common to the class.

*2017.*   Based upon information and belief, the "free-standing certificate" known herein as the "WSU Jonah Certificate" is valueless, was not authorized, and was otherwise used as an artifice to commit the Defendants' fraud compelling **STUDENTS** through coercive manipulation to disclosure value held in secret as a pseudo-loyalty oath.

*2018.*   May 25th, 2014, Defendant, Dr. James T. Low, on behalf of himself and the Defendants at large and by email confesses admitting that "...I have been **issuing a certificate** to [**STUDNETS**] **who complete the course**, declaring each to be a Wayne State University Jonah." **Exhibit 141**, at p. 3. (Emphasis added).

*2019.*   Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(a)(3), the class of **STUDENTS** share the claims and defenses of the representative parties typical of the claims and defenses of the class.

*2020.* Based upon information and belief, the Defendants have used varieties of [*VERY*] Ambitious Goal Curriculum over the past twenty years which over this time the structure and design of the Defendants' implementation of this 'curriculum' was continuously improved materializing into the current design at issue *herein* this Complaint.

*2021.* The Plaintiffs as **STUDENTS** were targeted by the Defendants based on the structure and designed flow of the higher education industry likening to an intellectual supply chain.

*2022.* The Defendants collectively and individually used the placement of [*VERY*] Ambitious Goal Curriculum to compel **STUDENTS** to disclose valuable trade secrets and intellectual property of those **STUDENTS**' employer being those Plaintiffs **ENTITIES** causing irreparable harm to both the **STUDENTS** and **ENTITIES**.

*2023.* As confirmed by WSU FOIA Records that "*do not exist,*" the Defendants failed in every respect to comply with the WSUIIRB in violation of Non-Discrimination and Harassment Policy; State and Federal law, including the United States Constitution and the National Research Act, and in essence violated the integrity of autonomous dignity, free and informed choice, and the free speech of each **STUDENT** with the specific intent to "use [**STUDENTS**] as bridges to [the **ENTITIES**]" as disguised 'research' without regard to the consequences of this secretive psychological operation. **Exhibit 277**, at p. 1. (Emphasis added).

*2024.* Based upon information and belief, the representative parties share the claims and defenses typical of the claims and defenses of the class of **STUDENTS** *including but not limited to* whether Plaintiffs have a fundamental right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS** *regardless of* suspect classification.

*2025.* Based upon information and belief, the representative parties share the claims and defenses typical of the claims and defenses of the class of **STUDENTS** *including but not limited to* whether

the Defendants practices and policies violated Substantive Due Process by violating by and through the Fourteenth Amendment the United States Constitution.

*2026.*   Based upon information and belief, the representative parties share the claims and defenses typical of the claims and defenses of the class of **STUDENTS** *including but not limited to* whether the Defendants practices and policies violated Procedural Due Process by violating by and through the Fourteenth Amendment the United States Constitution.

*2027.*   Based upon information and belief, the representative parties share the claims and defenses typical of the claims and defenses of the class of **STUDENTS** *including but not limited to* whether the Defendants practices and policies violated the Equal Protection Clause by violating by and through the Fourteenth Amendment the United States Constitution.

*2028.*   Based upon information and belief, the representative parties share the claims and defenses typical of the claims and defenses of the class of **STUDENTS** *including but not limited to* whether the Defendants breached an implied contract (or in the alternative express contract) made with the Plaintiffs as **STUDENTS** to provide among other things an educational environment free of state-created danger in compliance with WSUCode, State law, and Federal law.

*2029.*   Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(a)(4), the representative party, Plaintiff, Attorney Cochrane, will fairly and adequately protect the interests of the class of **STUDENTS**.

*2030.*   Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(b)(1)(A), as it relates to the protection of interests of the class of **STUDENTS** prosecuting separate actions by or against individual class members would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class" of **STUDENTS**. Fed. R. Civ. P. 23(b)(1)(A).

*2031.*  As a member of a class known *herein* as "**ENTITIES**," Plaintiff, The Traveling Attorney, *P.C.*®, respectfully moves this Honorable Court to certify the class of Plaintiffs pursuant to Fed. R. Civ. P. Rule 23(a).

*2032.*  Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(a)(1), the class of **ENTITIES** is so numerous that joinder of all members is impracticable.

*2033.*  Based upon information and belief, the Defendants' placement of [*VERY*] Ambitious Goal Curriculum was specifically chosen for exploitation of this 'research' 'curriculum as a clearly definable model of extraction of trade secrets and intellectual property.

*2034.*  Based upon information and belief, for every **STUDENT** who involuntarily participated in the Defendants' discriminatory application of [*VERY*] Ambitious Goal Curriculum there could potentially be a multiple of **ENTITIES** involved based on the fact that placement was chosen at primarily the executive level for more valuable trade secrets.

*2035.*  For instance, *recall* **Exhibit 142**; **Exhibit 593**; *and* **Exhibit 591**, each depict individual products of a single **STUDENTS**, but each yield trade secrets and intellectual property expressly identifying *at least* two (2) **ENTITIES** involved in the compelled speech as the **STUDENTS**' pedagogical experience.

*2036.*  Based upon information and belief, the number of **ENTITIES** pierced through the **STUDENTS**' compelled pedagogical experience is around a class size of *at least* 700 **ENTITIES** situated in and around the State of Michigan, inclusive punitive class members located outside the State of Michigan and Outside of the United States of America as Foreign **ENTITIES**, *i.e.*, "*Major Japanese Auto Maker*" in **Exhibit 142**, p. 4.

*2037.*  Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(a)(2), the class of **ENTITIES** share questions of law and facts common to the class.

*2038.*   Based upon information and belief, the **ENTITIES** class shares in essence the same questions of law and facts common to the **STUDENTS'** class.

*2039.*   Based upon information and belief, the **ENTITIES** are involved because the **STUDENTS** were discriminatorily misled to an outrageous degree and both prospective classes have suffered irreparable harm at the behest and direct result of the Defendants' intentional conduct.

*2040.*   Based upon information and belief, the **ENTITIES** did not authorize the Defendants use of [***VERY***] Ambitious Goal Curriculum on **STUDENTS**.

*2041.*   Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(a)(3), the class of **ENTITIES** share the claims and defenses of the representative parties typical of the claims and defenses of the class.

*2042.*   The Defendants collectively and individually used the placement of [***VERY***] Ambitious Goal Curriculum to compel **STUDENTS** to disclose valuable trade secrets and intellectual property of those **STUDENTS'** employer being those Plaintiffs **ENTITIES** causing irreparable harm to both the **STUDENTS** and **ENTITIES**.

*2043.*   Based upon information and belief, the Defendants have engaged in unethical activity contrary to well established law and business standards causing an irreparable and tortious interference with Plaintiff, The Traveling Attorney, *P.C.*®, and those Plaintiff **ENTITIES**.

*2044.*   Based upon information and belief, the Defendants have engaged in a civil conspiracy under color of law having over the last twenty years used Wayne State University as a proving ground for 'research' in secret and unauthorized by WSUIRB in violation of the National Research Act damaging **ENTITIES** as a result of their failure to give informed notice to **STUDENTS** of the true form and function of this application of the Theory of Constraints.

*2045.*   Based upon information and belief, the Defendants by usurping the **STUDENTS**' autonomy to act free of manipulative compulsion did so take the **ENTITIES**' property by fraud in violation of the Economic Espionage Act for public and private use without a legitimate reason or interest.

*2046.*   Based upon information and belief, the Defendants' permanent retention of both the **STUDENTS**' and **ENTITIES**' trade secrets and intellectual property amounts to unfair competition and deceptive trade practices cause the Defendants to be unjustly enriched by the ongoing acts contributing to this crime.

*2047.*   Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(a)(4), the representative party, Plaintiff, The Traveling Attorney, *P.C.*®, will fairly and adequately protect the interests of the class of **ENTITIES**.

*2048.*   Based upon information and belief pursuant to Fed. R. Civ. P. Rule 23(b)(1)(A), as it relates to the protection of interests of the class of **ENTITIES** prosecuting separate actions by or against individual class members would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class" of **ENTITIES**. Fed. R. Civ. P. 23(b)(1)(A).

*2049.*   An Order to appointing Plaintiff, Attorney Cochrane, as Class Representative under Fed. R. Civ. P. 23(c)(1)(A) for prospective class known collectively as "**STUDENTS**" *herein* is appropriate and should be entered in this matter;

*2050.*   An Order to appointing Plaintiff, The Traveling Attorney, *P.C.*®, as Class Representative under Fed. R. Civ. P. 23(c)(1)(A) for prospective class known collectively as "**ENTITIES**" *herein* is appropriate and should be entered in this matter;

*2051.*   An Order appointing Plaintiff, Attorney Cochrane, as Class Counsel under Fed. R. Civ. P. 23(g) for prospective class known collectively as "**STUDENTS**" *herein* while considering Fed. R. Civ. P. 23(g)(1) and (4), is appropriate and should be entered in this matter;

*2052.* An Order appointing Plaintiff, Attorney Cochrane, as Class Counsel under Fed. R. Civ. P. 23(g) for prospective class known collectively as "**ENTITIES**" *herein* while considering Fed. R. Civ. P. 23(g)(1) and (4), is appropriate and should be entered in this matter;

*2053.* In the alternative, an Order appointing Plaintiff, Attorney Cochrane, as Interim Class Counsel under Fed. R. Civ. P. 23(g)(1) and (4), and Fed. R. Civ. P. 23(g)(3), in full where fully he is fully authorized to find competent, willing, and non-conflicted co-counsel to serve a co-Class Counsel to facilitate this matter jointly.

*2054.* An Order certifying known collectively as "**STUDENTS**" *herein* pursuant to Fed. R. Civ. P. 23(c)(1)(A) and Fed. R. Civ. P. 23(c)(1)(B);

*2055.* An Order certifying known collectively as "**ENTITIES**" *herein* pursuant to Fed. R. Civ. P. 23(c)(1)(A) and Fed. R. Civ. P. 23(c)(1)(B).

## CAUSES OF ACTION

### COUNT I
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of <u>First</u> Amendment**
***by and through the***
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**Academic Freedom**
Fundamental Right to a Public Education *Free of* Discrimination, Harassment, Threats, and Coercion for All Students *Regardless Of* Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth
**ALL STUDENT PLAINTIFFS**
*vs.*
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2056.* The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2057.* Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy a Fundamental Right to a Public Education *Free of* Discrimination, Harassment, Threats, and Coercion for All Students *Regardless Of* Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth.

*2058.* In Constitutional law, according to Black's Law Dictionary "discrimination" is in part the effect of an established practice which confers particular privileges on a class of persons arbitrarily selected from a large number of persons, all of whom stand in the same relation to the privileges granted and between whom not favored where no reasonable distinction can be found; otherwise plainly stated as a failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored.

*2059.* The Plaintiffs' First Amendment right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS** *regardless of* suspect classification, applicable against the Defendants specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

*2060.* The Plaintiffs' First Amendment fundamental right is supported principally by *Brown v. Board of Education*, and a robust consensus of persuasive authority, *i.e*, including but not limited to *Keyishain*, *Sweezy*, *Tinker*, *Glucksberg*, *Rodriquez*, *Barnette*, *Abood*, *Keller*, *Wooley*, *Franklin*, *etc*., each distinguishable as representative of supportive precedent tailoring Plaintiffs' arguments that such fundamental right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS** *regardless of* suspect classification is clearly established as such contours of these objective variables are sufficiently clear that a

reasonable official would understand that in the context of *this* Complaint what he was doing violates the objective notions of the Plaintiffs' Constitutional and common law rights essential to the orderly pursuit of happiness by free men and women as citizens of the United States.

*2061.* The Defendants have with specific intent refined their application of [*VERY*] Ambitious Goal Curriculum to openly exploit the vulnerabilities of **PLAINTIFFS**' pedagogical experience and status as **STUDENTS** leveraging through discrimination, harassment, threats, coercion, express fraud, false and misleading advertisements, force, and by suppressing those **STUDNENTS**' rights and liberties by knowingly using the Plaintiffs as human research subjects to gain value without providing informed consent in violation of those clearly established rights and required processes—the Defendants' deliberate indifference brewed under color of law exploited their sacred relationship as educators to "use [**STUDENTS**] as bridges to companies" with callous disregard of the effect so offensive to human dignity that the Defendants' discretionary conduct that deprived Plaintiffs' Constitutionally protected interests is constitutionally repugnant and objectively shocks the conscious.

*2062.* The Plaintiffs' First Amendment Right as it applies to a public education *free of* discrimination, harassment, threats, and coercion was violated by the Defendants' actions which *include but are not limited to* discrimination in having been arbitrarily selected from the Wayne State University **STUDENT** body by placement of the Defendants' intellectual dragnet and were thereafter unknowingly deceived being used as human-research subjects by Defendants collectively to yield 'research' for public and private gain violating in the least the First Amendment and informed consent requirements established to preserve individual autonomy of the subject under the National Research Act and Wayne State University's Institutional Review Board policy enacted to enforce the Common and Revised Rule in conformity with the Belmont Report to protect the dignity of human research subjects being used for research.

*2063.*  The Plaintiffs' First Amendment Right as it applies to a public education *free of* discrimination, harassment, threats, and coercion was violated by the Defendants' actions which *include but are not limited to* harassment of **STUDENTS** by leveraging a three-tier grading scheme to manipulate disclosure of targeted valuable information by compelling the **STUDENTS**' speech through responses synthesized to leverage the design of the Theory of Constraints logic maps by using [*VERY*] Ambitious Goal Curriculum to repetitiously target and extract value *through* the **STUDENTS**' pedagogical experience for public and private gain.

*2064.*  The Plaintiffs' First Amendment Right as it applies to a public education *free of* discrimination, harassment, threats, and coercion was violated by the Defendants' actions which *include but are not limited to* threats such as that experienced by the Plaintiffs, Attorney Cochrane and The Traveling Attorney, *P.C.*®, where Defendants, Dr. James T. Low and Mrs. Deborah L. Habel, expressly threatening Plaintiff advocating to shield his individual person and duty owed to his business from the Defendants' unconstitutional intrusions of his autonomy to choose the depth of participation where if Plaintiff made no substantive disclosures as demanded by the Defendants the Plaintiff as a result would—and did receive—discriminatory treatment for standing firm for the American Dream and those rights and liberties argued herein.

*2065.*  The Plaintiffs' First Amendment Right as it applies to a public education *free of* discrimination, harassment, threats, and coercion was violated by the Defendants' actions which *include but are not limited to* coercion by knowingly leveraging through express fraudulent representation the value and validity of the "Wayne State University Jonah Certificate" to vulnerable **STUDENTS** with the specific intent to obtain valuable information in the form of the compelled and manipulated pedagogical records as a required condition of [*VERY*] Ambitious Goal Curriculum where no such certificate was authorized by the Wayne State University Board of Governors as required by Wayne State University Policy.

**2066.** The Plaintiffs' First Amendment Right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS** *regardless of* suspect classification, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

**2067.** Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent ***and*** maintains complete control over the autonomy of their participation.

**2068.** The Plaintiffs' Procedural Due Process Rights were violated by the Defendants' actions which *include but are not limited to* the absence of a *legitimate* compelling state interest to design and continuously improve their application of [***VERY***] Ambitious Goal Curriculum to exploit Plaintiffs to "use [those **STUDENTS**] as bridges to companies," and with specific intent the Defendants did avoid the WSUIRB process in full by callously disregarding Plaintiffs' clearly established rights by failing to obtain departmental authorization and maintaining informed consent violating WSUIRB procedures and the Revised Common Rule.

*2069.* The Plaintiffs' Procedural Due Process rights were further violated by the Defendants' actions which *include but are not limited to* the arbitrary dismissal of Plaintiff's discrimination complaint filed validly with the Wayne State University Office of Equal Opportunity citing ample evidence of the Defendants' ongoing discrimination, harassment, threats, and coercion consistent with that conduct appliable to Plaintiff *regardless* of suspect classification.

*2070.* The Plaintiffs' First Amendment Right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS** *regardless of* suspect classification, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

*2071.* The Plaintiffs' Equal Protection Rights were violated by the Defendants' actions which *include but are not limited to* the unconstitutional intent to exploit the Plaintiffs by "using [those **STUDENTS**] as bridges to companies" through the continuously improved [**VERY**] Ambitious Goal Curriculum where even when Plaintiffs chilled their speech this mitigation still produced concrete and imminent-future harm generating the disparate treatment of those caught in Defendants' intellectual trap and who thereby coerced to divulge pirated information by deliberate compulsory techniques leveraging the designed communication process where similarly situated **STUDENTS** avoided these concrete injuries where other Wayne State University affiliated investigators expressly followed WSUIRB procedures to obtain departmental authorization and maintained informed consent prior to conducting as a condition precedent such human subject research thus establishing objectively that no conceivable basis of legitimacy furthering a compelling state interest existed authorizing this public and private gain to avoid strict scrutiny of the ongoing violations of the Plaintiffs' fundamental rights.

**2072.** Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2073.** The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

**2074.** The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent

placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2075.* The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2076.* The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2077.* Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2078.* Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

_____

## COUNT II

**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
*by and through the*
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**Compelled Speech (Viewpoint)**
**ALL STUDENT PLAINTIFFS**
*vs.*
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2079.* The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2080.* Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy pursuant to the Free Speech Clause what is commonly known as the compelled speech doctrine establishing the fundamental right to speak freely and the right to refrain from speaking at all permitting the dissociation with official law, policies, and state action that compels speech of a particular viewpoint, *i.e.*, "(a) to affirm a religious, political, or ideological belief he disagrees with or (b) to be a moving billboard for a governmental ideological message." *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 1035, 51 L. Ed. 2d 752 (1977).

*2081.* The Plaintiffs' First Amendment Right to reject state compelled speech centered on processes of obtaining 'research' through exploitation of the **STUDENTS'** pedagogical experience by compelling manipulated disclosures of protected information as the ideological beliefs to 'socialism of ideas' as the 'research' viewpoint Plaintiffs disagrees while also serving

as the Defendants' moving billboard known erroneously as 'WSU Jonahs,' as applicable against the Defendants specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, and as precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

**2082.**   The Plaintiffs' First Amendment Right as it applies to be autonomously *free of* compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* the Defendants' choice in placement of the [**VERY**] Ambitious Goal Curriculum to use the Theory of Constraints logic maps as modes of speech while leveraging the [**VERY**] Ambitious Goal Curriculum for 'research' as Defendant, Dr. James T. Low, has opined that quasi ownership, *i.e.* 'socialism of ideas,' may be claimed from the product of this compelled speech derived from the **STUDENTS**' pedagogical experience most often inclusive of those Business Entity Plaintiffs' intellectual property unknowingly disclosed through this back door.

**2083.**   The Plaintiffs' First Amendment Right as it applies to be autonomously *free of* compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* the Defendants' use of the '*WSU Jonah*' Certificate as evidence of those submissive **STUDENTS** acquiescing to the compelling nature of the Defendants' strategic use of [**VERY**] Ambitious Goal Curriculum and 'research' focus as "moving billboards" of this constitutionally repugnant application of ideological belief infused within every aspect of the Defendants' integrated marketing plan and institutional functions.

**2084.**   The Plaintiffs' First Amendment Right as it applies to be autonomously *free of* compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* the Defendants' expressly threatening Plaintiff, Attorney Cochrane, following his expressed objection to this invalid compulsion of protected information by exploiting his

pedagogical experience and vulnerabilities as a **STUDENT** to comply with such discrimination, harassment, threats, and coercion supporting this conscious shocking ideological mission establishing objectively that no conceivable basis of legitimacy furthering a compelling state interest existed authorizing this public and private gain to avoid strict scrutiny of the ongoing violations of the Plaintiffs' fundamental rights.

*2085.*  The Plaintiffs' First Amendment right as it applies to be autonomously *free of* compelled speech of a particular viewpoint, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

*2086.*  Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomy of their participation.

*2087.*  The Plaintiffs' Procedural Due Process Rights as it applies to be autonomously *free of* compelled speech of a particular viewpoint were violated by the Defendants' actions which *include but are not limited to* in general the avoidance of the WSUIRB protocol and conditions precedent requiring *in the least* departmental authorization and ongoing informed consent of

the Plaintiffs as **STUDENTS** unknowingly leveraged as human research subjects for Defendants' ideological beliefs to 'socialism of ideas' as 'research' for public and personal gain.

*2088.*   The Plaintiffs' Procedural Due Process Rights as it applies to be autonomously *free of* compelled speech of a particular viewpoint were violated by the Defendants' actions which *include but are not limited to* the ongoing failure to provide Plaintiffs as human research subjects with the requisite informed consent necessary to conduct behavioral research on Plaintiffs as **STUDENTS** while exploiting the [*VERY*] Ambitious Goal Curriculum for personal and public gain absent disclosure of this intentionally designed conflict of interest.

*2089.*   The Plaintiffs' Procedural Due Process Rights as it applies to be autonomously *free of* compelled speech of a particular viewpoint were violated by the Defendants' actions which *include but are not limited to* the unconstitutional retaliation of the Wayne State University Office of Equal Opportunity through violations of the Wayne State University Discrimination and Harassment Policy validly filed by Plaintiff, Attorney Cochrane, in opposition to the ideological mission of 'research' infused at all levels of the Defendants' public institution.

*2090.*   The Plaintiffs' First Amendment right to be autonomously *free of* compelled speech of a particular viewpoint, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

*2091.*   The Plaintiffs' Equal Protection Rights were violated by the Defendants' actions which *include but are not limited to* the Defendants' intentional avoidance of WSUIRB policy requiring express disclosure of the form and function of an investigators proposed research where similarly situated **STUDENTS** did not encounter such behind-the-veil violations.

2092.  The Plaintiffs' Equal Protection Rights were violated by the Defendants' actions which *include but are not limited to* the unconstitutional intent to exploit the Plaintiffs by "using [those **STUDENTS**] as bridges to companies" through the continuously improved [*VERY*] Ambitious Goal Curriculum where even when Plaintiffs chilled their speech this mitigation still produced concrete and imminent-future harm generating the disparate treatment of those caught in Defendants' intellectual trap and who thereby coerced to divulge pirated information by deliberate compulsory techniques leveraging the designed communication process where similarly situated **STUDENTS** avoided these concrete injuries where other Wayne State University affiliated investigators expressly followed WSUIRB procedures to obtain departmental authorization and maintained informed consent prior to conducting as a condition precedent such human subject research thus establishing objectively that no conceivable basis of legitimacy furthering a compelling state interest existed authorizing this public and private gain to avoid strict scrutiny of the ongoing violations of the Plaintiffs' fundamental rights.

2093.  Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

2094.  The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th

Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

**2095.** The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscience. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

**2096.** The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

**2097.** The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express

purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2098.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2099.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

-------------------------------------------------

## COUNT III
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
*by and through the*
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**Compelled Speech (Subsidizing Speech)**
**ALL STUDENT PLAINTIFFS**
*vs.*
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
*&*
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2100.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

**2101.**   Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy pursuant to the Free Speech Clause the right to oppose state law, policy, and action compelling speech requiring certain individuals, commercial or otherwise, "to pay subsidies for speech to which they object." *United States v. United Foods*, 533 U.S. 405, *445, 121 S.Ct. 2334, 150 L. Ed. 2d 438 (2001).

**2102.**   The Plaintiffs' First Amendment Right to autonomously reject subsidizing state compelled speech centered on unconstitutional ideological beliefs as the subsidized speech Plaintiffs disagrees, financially and by personal involvement conveying value, as applicable against the Defendants specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, and as such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

**2103.**   The Plaintiffs' First Amendment Rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* the Defendants' compelling Plaintiffs as **STUDENTS** to subsidize through course tuition the assessment made for facilitating the course functions designed to exploit and research those same **STUDENTS** by fraud and omission.

**2104.**   The Plaintiffs' First Amendment Rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* the Defendants' compelling Plaintiffs as **STUDENTS** to subsidize the Defendants' public and private unconstitutional 'research' through disclosure of valuable-proprietary information leveraging the Defendants' ideological beliefs and the vulnerabilities of the **STUDENTS**' pedagogical experience with specific intent.

**2105.**   The Plaintiffs' First Amendment Rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* directly subsidizing Defendant, Deborah H. Habel, in that based upon information, belief, and common knowledge that 'research' conducted by Defendant Habel while leveraging her pedagogical status to secretly use [*VERY*] Ambitious Goal Curriculum to 'research' **STUDENTS** materially advanced her ongoing pursuit of Ph.D. 'research' *focus*ed on the Theory of Constraints through subsidized public and private speech.

**2106.**   The Plaintiffs' First Amendment Rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* the Defendants' attempts to compel Plaintiff, Attorney Cochrane, to further subsidize the Defendants' ideological 'research' mission by vexatiously seeking repayment of debts allegedly due in retaliation of his ongoing objection.

**2107.**   The Plaintiffs' First Amendment Rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* the Defendants' use of the Freedom of Information Act process to further subsidize the Defendants' ideological 'research' mission by vexatiously seeking recoupment of debts allegedly due in retaliation of Plaintiff, Attorney Cochrane's, valid and constitutionally protected right to seek redress by mitigating his damages requesting responsive records when responsive records were identified, paid for, and thereafter Defendants continued to offensively defend by their ongoing silence in retaliation of this ongoing dispute.

**2108.**   The Plaintiffs' First Amendment Rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint was violated by the Defendants' actions which *include but are not limited to* the Defendants' use of the Plaintiffs' financial and proprietary subsidy to subsidize the broader ideological 'research' mission of the Defendants'

individually and collectively as a public institution leveraged throughout the ongoing integrated marketing campaign and as a 'capability' sold to individuals, businesses, and investment firms through the Defendants' development and implementation of their ongoing strategic plans.

*2109.* The Plaintiffs' First Amendment rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

*2110.* Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomy of their participation.

*2111.* The Plaintiffs' Procedural Due Process Rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint were violated by the Defendants' actions which *include but are not limited to* in general the avoidance of the WSUIRB protocol and conditions precedent requiring *in the least* departmental authorization and ongoing informed consent of the Plaintiffs as **STUDENTS** were knowingly leveraged to subsidize

financially tuition as human research subjects for Defendants' ideological beliefs to 'socialism of ideas' as the 'research' subjects themselves exploited for public and personal gain.

*2112.* The Plaintiffs' Procedural Due Process Rights as it applies to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint were violated by the Defendants' actions which *include but are not limited to* the designed effect and illegitimate purpose of [*VERY*] Ambitious Goal Curriculum to compel the Plaintiffs, individual and Business Plaintiffs alike, to subsidize the Defendants' ideological beliefs expressly through those compelled and manipulated **STUDENTS**' pedagogical records inclusive pirated-proprietary information of significant value unjustly enriching the Defendants in far excess of any value conveyed if any.

*2113.* The Plaintiffs' First Amendment right to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

*2114.* The Plaintiffs' Equal Protection Rights to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint were violated by the Defendants' actions which *include but are not limited to* the Defendants' manipulating the Plaintiffs' compelled subsidy for public and private 'research' through the design of the **STUDENTS**' pedagogical experience while knowingly avoiding WSUIRB policy requiring express disclosure of the form and function of an investigators proposed research where similarly situated **STUDENTS** did not encounter such behind-the-veil illegitimate purpose furthered by Defendants' void intent.

*2115.* The Plaintiffs' Equal Protection Rights to be autonomously *free from* subsidizing the compelled speech of a particular viewpoint were violated by the Defendants' actions which *include but are not limited to* the unconstitutional intent to exploit the Plaintiffs by "using [those

STUDENTS] as bridges to companies" through the continuously improved [*VERY*] Ambitious Goal Curriculum where even when Plaintiffs chilled their speech this mitigation still produced concrete and imminent-future harm generating the disparate treatment of those caught in Defendants' intellectual trap and who thereby coerced to divulge pirated information by deliberate compulsory techniques leveraging the designed communication process where similarly situated **STUDENTS** avoided these concrete injuries where other Wayne State University affiliated investigators expressly followed WSUIRB procedures to obtain departmental authorization and maintained informed consent prior to conducting as a condition precedent such human subject research thus establishing objectively that no conceivable basis of legitimacy furthering a compelling state interest existed authorizing this public and private gain to avoid strict scrutiny of the ongoing violations of the Plaintiffs' fundamental rights.

*2116.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2117.*   The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering

with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2118.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS'** pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscience. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2119.* The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2120.* The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly

situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2121.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2122.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## COUNT IV
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
***by and through the***
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**Compelled Speech (Objective Chilling Effect)**
**ALL STUDENT PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2123.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2124.*   Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and

collectively as a prospective class, enjoy pursuant to the Free Speech Clause the right to be free of state law, policy, and action that by effect are deterrents, or otherwise objectively chills, the valid exercise of fundamental rights, and where such chilling effect causes concrete harms or places the chilled actor in danger of sustaining a direct injury as a result of the state action.

*2125.*  The Plaintiffs' First Amendment Rights allows Plaintiffs to autonomously squelch and otherwise chill protected speech where objectively the Plaintiffs have suffered concrete harms or is immediately in danger of sustaining further harm, as applicable against the Defendants specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, and as such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

*2126.*  The Plaintiffs' First Amendment Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* the Defendants' placement and use thereof [*VERY*] Ambitious Goal Curriculum as designed to illegitimately compel elicit proprietary information as "excess value" disguised as 'research' from the Plaintiffs as vulnerable and uninformed **STUDENTS** while Defendants knowingly avoiding the WSUIRB oversight processes to continuously improve the public and private gain derived from this constitutionally repugnant concrete harm that objectively shocks the conscious.

*2127.*  The Plaintiffs' First Amendment Rights as it applies to autonomously chilled speech *to* mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* those concrete harms incurred by Plaintiff, Attorney Cochrane, as express threats in retaliation of the valid and constitutionally protected attempt to curtail the deluge of disclosure 'required' by the Defendants express fraud.

**2128.**   The Plaintiffs' First Amendment Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* the arbitrary dismissal of Plaintiff, Attorney Cochrane's, validly filed discrimination and sexual harassment complaint filed with the Wayne State University Office of Equal Opportunity in violation of the Wayne State University Discrimination and Sexual Harassment Policy filed against Defendants at large while naming explicitly principally relevant here, Dr. David Strauss, where such executive actions chilled Plaintiffs' fundamental rights where Plaintiff was redirected as an Attorney investigating objective and concrete harms against in part Dr. Strauss individually.

**2129.**   The Plaintiffs' First Amendment Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* Defendants using the FOIA processes to recoup from Plaintiff, Attorney Cochrane, actual value negotiated in good faith as to mitigate and otherwise pursue his fundamental rights to the access responsive public records where Defendants withheld identified responsive records, having been paid in full, and have since failed to communicate in any way with Plaintiff establishing this chilled-stalemate argument.

**2130.**   The Plaintiffs' First Amendment Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* the Defendants' executive structure implicates a conflicts-of-interest relative to institutional 'research' established by Defendants using value derived from [***VERY***] Ambitious Goal Curriculum throughout its IMC and strategic plan, and more explicitly where the WSUIRB oversight committee, processes, and policies are adversarial to Plaintiffs' positions giving the Defendants this dissertation like objection leading to immediate exacerbation of Plaintiffs' ongoing objectively concrete harms.

**2131.** The Plaintiffs' First Amendment right as it applies to autonomously chilled speech *to* mitigate concrete harms and prevent immediate danger of future harms, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

**2132.** Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomy of their participation.

**2133.** The Plaintiffs' Procedural Due Process Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* in general the concrete avoidance of the WSUIRB protocol and conditions precedent requiring *in the least* departmental authorization and ongoing informed consent of the Plaintiffs as **STUDENTS** were knowingly leveraged to subsidize Defendants' 'research' by disclosing personal and proprietary information advancing Defendants' ideological beliefs to 'socialism of ideas' as the 'research' subjects themselves exploited for public and personal gain.

*2134.*   The Plaintiffs' Procedural Due Process Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* those express threats by Defendants, Dr. James T. Low and Deborah L. Habel, as a direct result of Plaintiff, Attorney Cochrane, refusal to divulging Plaintiffs' personal and business intellectual property at a depth that objectively would add further concrete harm while Defendants threatened imminent retaliatory harm if this quid-pro-quo of piracy remained chilled by the refusal to comply with this discrimination, harassment, threats, and coercion advancing Defendants' 'research' mission.

*2135.*   The Plaintiffs' Procedural Due Process Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* the Defendants' unconscionable  and unethical to use the illegitimate byproduct of Defendants' 'research' to conspire and coordinate the attempt to lure Plaintiff prematurely into litigation to force his hand to compel disclosure of the responsive public records Plaintiff, Attorney Cochrane, paid for in his attempt to mitigate the Plaintiffs' concrete harms and pursue fundamental rights protected by the Constitution.

*2136.*   The Plaintiffs' Procedural Due Process Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* the Defendants arbitrary dismissal of the discrimination and sexual harassment complaint filed with the Wayne State University Office of Equal Opportunity where such violation of the Wayne State University Policy and Procedures chilled Plaintiffs' rights where the 'proper forum' of redress was identified as a respondent of the same complaint being investigated by Attorney Cochrane where legal ethics prohibited this communication absent Defendant, Attorney Louis Lessem's, prior authorization.

*2137.*   The Plaintiffs' Procedural Due Process Rights as it applies to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* the Defendants' executive structure relative to the WSUIRB prevented disclosure of the Plaintiffs' complaint as such breath of information implicated through executive oversight and strategic plans the head investigator in an institutional conflict-of-interest and otherwise would submit Plaintiffs to an adversarial process lopsided in Defendants' favor that required disclosure of this information.

*2138.*   The Plaintiffs' First Amendment right to autonomously chilled speech *to* mitigate concrete harms and prevent immediate danger of future harms, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

*2139.*   The Plaintiffs' Equal Protection Rights to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms where objectively the harms attributable directly from the Defendants' actions which *include but are not limited to* the Defendants' placement and use of [**VERY**] Ambitious Goal Curriculum with the specific intent to exploit the Plaintiffs as vulnerable **STUDENTS** by design while knowingly avoiding WSUIRB policy requiring express disclosure of the form and function of an investigators proposed research where similarly situated **STUDENTS** did not encounter such behind-the-veil illegitimate purpose furthered by Defendants' void and fraudulent intent.

*2140.*   The Plaintiffs' Equal Protection Rights to autonomously chilled speech to mitigate concrete harms and prevent immediate danger of future harms was violated by the Defendants' actions which *include but are not limited to* the unconstitutional intent to exploit the Plaintiffs by "using [those **STUDENTS**] as bridges to companies" through the continuously improved [**VERY**]

Ambitious Goal Curriculum where even when Plaintiffs chilled their speech this mitigation still produced concrete and imminent-future harm generating the disparate treatment of those caught in Defendants' intellectual trap and who thereby coerced to divulge pirated information by deliberate compulsory techniques leveraging the designed communication process where similarly situated **STUDENTS** avoided these concrete injuries where other Wayne State University affiliated investigators expressly followed WSUIRB procedures to obtain departmental authorization and maintained informed consent prior to conducting as a condition precedent such human subject research thus establishing objectively that no conceivable basis of legitimacy furthering a compelling state interest existed authorizing this public and private gain to avoid strict scrutiny of the ongoing violations of the Plaintiffs' fundamental rights.

*2141.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2142.* The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering

with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2143.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscience. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2144.* The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2145.* The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly

situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2146.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2147.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## <u>COUNT V</u>
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
***by and through the***
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**Right to Petition the Government**
**ALL STUDENT PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
***&***
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2148.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2149.*   Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and

collectively as a prospective class, enjoy pursuant to the Free Speech Clause that extends to all departments of the government the fundamental right to petition the government for a redress of grievances where to violate such right by preventing individuals and groups from using channels and processes of state agencies to advocate their causes and points of view respecting resolution of their business and economic interests vis-à-vis their competitors—unless these processes are shams used to harass and deter respondents from the free and unlimited access to the right to petition the government for a redress of grievances.

*2150.* The Plaintiffs' First Amendment Rights allows Plaintiffs to petition Wayne State University advocating points of view objectively establishing that the Defendants violated Plaintiffs' right through sham processes made in genuine attempt to mitigate concrete harms and to avoid imminent-future harms where this right to petition caused further damage as the chilled-stalemate argument claims imminent harms exist given Defendants' silence, and as applicable against the Defendants specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

*2151.* The Plaintiffs' First Amendment Rights as it applies to the right to petition the government to redress a grievance was violated by the Defendants' actions which *include but are not limited to* the Defendants ongoing silence spurred by the Plaintiffs' legitimate and constitutionally protected right to petition Wayne State University.

*2152.* The Plaintiffs' First Amendment Rights as it applies to the right to petition the government to redress a grievance was violated by the Defendants' actions which *include but are not limited to* the Defendants arbitrarily foreclosing the Wayne State University Office of Equal Opportunity process in violation of the Wayne State University Discrimination and Harassment

Policy based upon information and belief by and through Defendant, Attorney Louis Lessem's, control and guidance as the Defendants chief-legal architect at the time.

*2153.* The Plaintiffs' First Amendment Rights as it applies to the right to petition the government to redress a grievance was violated by the Defendants' actions which *include but are not limited to* the Defendants, by and through with actual knowledge Defendant, Attorney Louis Lessem's, deliberate use of the State of Michigan Freedom of Information Act to obtain recoupment as payment for identified responsive public records only to then withhold those identified records following payment where no additional communication was made to Plaintiff.

*2154.* The Plaintiffs' First Amendment right as it applies to the right to petition the government to redress a grievance, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

*2155.* Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomy of their participation.

2156. The Plaintiffs' Procedural Due Process Rights as it applies to the right to petition the government to redress a grievance was violated by the Defendants' actions which *include but are not limited to* in general the concrete avoidance of the WSUIRB protocol and conditions precedent requiring *in the least* departmental authorization and ongoing informed consent of the Plaintiffs as **STUDENTS** were knowingly leveraged to subsidize Defendants' 'research' by disclosing personal and proprietary information advancing Defendants' ideological beliefs to 'socialism of ideas' as the 'research' subjects themselves exploited for public and personal gain.

2157. The Plaintiffs' Procedural Due Process Rights as it applies to the right to petition the government to redress a grievance was violated by the Defendants' actions which *include but not limited to* the sham enforcement of the Wayne State University Non-Discrimination and Sexual Harassment policy enforced to harass and detour Plaintiffs' free and unlimited access to the right to petition the government for a redress of grievances.

2158. The Plaintiffs' First Amendment right to petition the government to redress a grievance, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

2159. The Plaintiffs' Equal Protection Rights to the right to petition the government to redress a grievance where objectively the harms attributable directly from the Defendants' actions which *include but are not limited to* the Defendants' arbitrary enforcement of vague and overbroad policy facial applicable causing Plaintiffs' disparate treatment in concrete form and placed Plaintiff in a position of immanent danger having been directed Defendant Strauss.

2160. The Plaintiffs' Equal Protection Rights the right to petition the government to redress a grievance was violated by the Defendants' actions which *include but are not limited to* the unconstitutional intent to exploit the Plaintiffs by "using [those **STUDENTS**] as bridges to

companies" through the continuously improved [*VERY*] Ambitious Goal Curriculum where even when Plaintiffs chilled their speech this mitigation still produced concrete and imminent-future harm generating the disparate treatment of those caught in Defendants' intellectual trap and who thereby coerced to divulge pirated information by deliberate compulsory techniques leveraging the designed communication process where similarly situated **STUDENTS** avoided these concrete injuries where other Wayne State University affiliated investigators expressly followed WSUIRB procedures to obtain departmental authorization and maintained informed consent prior to conducting as a condition precedent such human subject research thus establishing objectively that no conceivable basis of legitimacy furthering a compelling state interest existed authorizing this public and private gain to avoid strict scrutiny of the ongoing violations of the Plaintiffs' fundamental rights.

**2161.**   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2162.**   The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering

with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2163.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2164.* The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2165.* The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly

situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2166.* Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2167.* Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## COUNT VI
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
*by and through the*
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**Right to Peaceful Assembly**
**ALL STUDENT PLAINTIFFS**
*vs.*
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
*&*
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2168.* The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2169.* Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and

collectively as a prospective class, enjoy pursuant to the Free Speech Clause the right to peacefully assembly in a public place for anything connected with the powers or the duties of the national government is as a solum attribute under the protection of, and guaranteed by, the First Amendment of the United States Constitution.

*2170.*   The Plaintiffs' First Amendment Rights allows Plaintiffs to peacefully assemble to engage in the full and equal utilization of public accommodations, public service, and educational facilities free of discrimination, harassment, threats, and coercion, as applicable against the Defendants specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, where such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

*2171.*   The Plaintiffs' First Amendment Rights as it applies to the right to peacefully assembly was violated by the Defendants' actions which *include but are not limited to* the Defendants' discrimination, harassment, threats, and coercion used to leverage compliance for violation of Plaintiffs' fundamental rights by failing to comply with WSUIRB policy and exploiting **STUDENTS** by implementing [*VERY*] Ambitious Goal Curriculum.

*2172.*   The Plaintiffs' First Amendment right as it applies to the right to peacefully assembly, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

*2173.*   Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural

Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomy of their participation.

*2174.* The Plaintiffs' Procedural Due Process Rights as it applies to the right to peacefully assembly was violated by the Defendants' actions which *include but are not limited to* in general the concrete avoidance of the WSUIRB protocol and conditions precedent requiring *in the least* departmental authorization and ongoing informed consent of the Plaintiffs as **STUDENTS** were knowingly leveraged to subsidize Defendants' 'research' by disclosing personal and proprietary information advancing Defendants' ideological beliefs to 'socialism of ideas' as the 'research' subjects themselves exploited for public and personal gain disturbing the sanctity of this forum.

*2175.* The Plaintiffs' First Amendment to the right to peacefully assembly, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

*2176.* The Plaintiffs' Equal Protection Rights to the right to peacefully assembly was violated by the Defendants' actions which *include but are not limited to* the Plaintiffs' disparate treatment generated from Defendants' arbitrary placement of [*VERY*] Ambitious Goal Curriculum designed to exploit the constitutional precepts of the Plaintiffs' full and equal utilization of public accommodations, public service, and educational facilities where other similarly situated **STUDENTS** enjoyed the full and equal utilization of these variables as a condition precedent

of such human subject research thus establishing objectively that no conceivable basis of legitimacy furthering a compelling state interest existed authorizing this public and private gain to avoid strict scrutiny of the ongoing violations of the Plaintiffs' fundamental rights.

*2177.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2178.*   The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2179.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies"

unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2180.*   The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2181.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2182.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2183.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as

citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## COUNT VII
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
***by and through the***
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**Right Against Retaliation**
**ALL STUDENT PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2184.* The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2185.* Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy pursuant to the Free Speech Clause the fundamental right against state retaliation for communicating speech in a constitutionally protected manner.

*2186.* The Plaintiffs' First Amendment Rights allows Plaintiffs to communicate speech in a constitutionally authorized way in which the state is forbidden from retaliating against this speech through adverse action that would chill or silence a person of ordinary firmness from future First Amendment activities as such is applicable against the Defendants specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, as such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the

concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

2187. The Plaintiffs' First Amendment Rights as it applies to the right against state retaliation was violated by the Defendants' actions which *include but are not limited to* the Defendants' discrimination, harassment, threats, and coercion used to leverage compliance for violation of Plaintiff, Attorney Cochrane's, express objection to Defendants' ongoing adverse actions that have objectively chilled those persons of ordinary firmed from future fundamental advocacy.

2188. The Plaintiffs' First Amendment right as it applies to the right against state retaliation, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

2189. Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomy of their participation.

2190. The Plaintiffs' Procedural Due Process Rights as it applies to the right against state retaliation was violated by the Defendants' actions which *include but are not limited to* the

Defendants retaliation placing Plaintiff, Attorney Cochrane, into collections following his valid complaint filed with the Wayne State University Office of Equal Opportunity.

**2191.** The Plaintiffs' First Amendment to the right against state retaliation, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

**2192.** The Plaintiffs' Equal Protection Rights to the right against state retaliation was violated by the Defendants' actions which *include but are not limited to* the Plaintiffs' disparate treatment generated from Defendants' arbitrary retaliation generated as a result of the Plaintiffs' valid and fundamentally protected speech.

**2193.** Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2194.** The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering

with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2195.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscience. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2196.* The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2197.* The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly

situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2198.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2199.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## COUNT VIII
**Injunctive & Declaratory Relief**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
*by and through the*
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**Facial Challenge (Vagueness & Overbreadth)**
**MCL § 37.2102 (1)**
**MCL § 37.2402 (a)**
**MCL § 37.2701 (a); (b); (f)**
**ALL STUDENT PLAINTIFFS**
*vs.*
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**

*2200.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2201.*   Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually

and collectively as a prospective class, enjoy pursuant to the Free Speech Clause the fundamental right to challenge the facial construction and as applied application of state statutes and policy for vagueness and overbreadth that impermissibly delegates policy matters on an ad hoc and subjective basis threatening arbitrary and discriminatory effect from facial construction and state application inhibiting the exercise of Constitutionally protected rights.

*2202.* The State of Michigan has enacted for the health, safety, and general welfare of all its citizens pursuant to **MCL § 37.2102 (1)** the express "recognition and declaration of [a] civil right" granting "the full and equal utilization of public accommodations, public services, and educational facilities without discrimination..."

*2203.* The State of Michigan has 'limited' the enforceability of **MCL § 37.2102 (1)** to "...discrimination because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, heigh, weight, familial status, or marital status..."

*2204.* On the face of **MCL § 37.2102 (1)** a person of ordinary intelligence has a reasonable opportunity to know that public education is recognized and declared by the State of Michigan as a civil right, so that they may act accordingly—*free of* discrimination.

*2205.* The State of Michigan has enacted explicit standards of enforcement by those state actors relative to "Educational Institutions" under **MCL § 37.2402 (a)**, and prohibited conduct under **MCL § 37.2701 (a)**; **(b)**; *and* **(f)**.

*2206.* Under **MCL § 37.2402 (a)**— "An educational institution shall not do any of the following:

> "(**a**) Discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression."

*2207.* Under **MCL § 37.2701 (a)**; **(b)**; *and* **(f)**— "Two or more persons shall not conspire, or a person shall not:

"(**a**) Discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression.

(**b**) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act.

(f) Coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act."

*2208.*   The State of Michigan has enacted **MCL § 37.2102 (1)** in a unconstitutionally **vague** manner unequal on its face expressly recognizing and declaring for the health, safety, and general welfare that all **STUDENTS** are entitled to a "civil right" to the "full and equal utilization of public accommodations, public service, and education facilities without discrimination," supported by arbitrary and discriminatorily unequal enforcement standards under **MCL § 37.2402 (a)** and **MCL § 37.2701 (a)**; **(b)**; *and* **(f).**

*2209.*   The State of Michigan has enacted **MCL § 37.2102 (1)** in a unconstitutionally **overbroad** manner unequal on its face expressly recognizing and declaring for the health, safety, and general welfare that all **STUDENTS** are entitled to a "civil right" to the "full and equal utilization of public accommodations, public service, and education facilities without discrimination," supported by arbitrary and discriminatorily unequal enforcement standards under **MCL § 37.2402 (a)** and **MCL § 37.2701 (a)**; **(b)**; *and* **(f).**

*2210.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2211.*   The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare

executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2212.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2213.*   The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2214.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2215.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2216.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

*INTENTIONALLY LEFT BLANK*

## COUNT IX
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
*by and through the*
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**As-Applied Challenge (Vagueness & Overbreadth)**
**MCL § 37.2102 (a)**
**MCL §37.2402 (a)**
**MCL §37.2701 (a); (b); (f)**
**ALL STUDENT PLAINTIFFS**
*vs.*
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2217.* The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2218.* Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy pursuant to the Free Speech Clause the fundamental right to challenge the facial construction and as applied application of state statutes and policy for vagueness and overbreadth that impermissibly delegates policy matters on an ad hoc and subjective basis threatening arbitrary and discriminatory effect from facial construction and state application inhibiting the exercise of Constitutionally protected rights.

*2219.* The State of Michigan has enacted for the health, safety, and general welfare of all its citizens pursuant to **MCL § 37.2102 (1)** the express "recognition and declaration of [a] civil right" granting "the full and equal utilization of public accommodations, public services, and educational facilities without discrimination..."

*2220.*  The State of Michigan has 'limited' the enforceability of **MCL § 37.2102 (1)** to "...discrimination because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, heigh, weight, familial status, or marital status..."

*2221.*  On the face of **MCL § 37.2102 (1)** a person of ordinary intelligence has a reasonable opportunity to know that that public education is recognized and declared by the State of Michigan as a civil right, so that they may act accordingly—*free of* discrimination.

*2222.*  The State of Michigan has enacted explicit standards of enforcement by those state actors relative to "Educational Institutions" under **MCL § 37.2402 (a)**, and prohibited conduct under **MCL § 37.2701 (a)**; **(b)**; *and* **(f)**.

*2223.*  Under **MCL § 37.2402 (a)**— "An educational institution shall not do any of the following:

> "(**a**) Discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression."

*2224.*  Under **MCL § 37.2701 (a)**; **(b)**; *and* **(f)**— "Two or more persons shall not conspire, or a person shall not:

> "(**a**) Discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression.
>
> (**b**) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act.
>
> (f) Coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act."

*2225.*  The State of Michigan has enacted **MCL § 37.2102 (1)** in a unconstitutionally **vague** manner unequal on its face expressly recognizing and declaring for the health, safety, and general welfare that all **STUDENTS** are entitled to a "civil right" to the "full and equal

utilization of public accommodations, public service, and education facilities without discrimination," supported by arbitrary and discriminatorily unequal enforcement standards under **MCL § 37.2402 (a)** and **MCL § 37.2701 (a)**; **(b)**; *and* **(f).**

*2226.* The State of Michigan has enacted **MCL § 37.2102 (1)** in a unconstitutionally **overbroad** manner unequal on its face expressly recognizing and declaring for the health, safety, and general welfare that all **STUDENTS** are entitled to a "civil right" to the "full and equal utilization of public accommodations, public service, and education facilities without discrimination," supported by arbitrary and discriminatorily unequal enforcement standards under **MCL § 37.2402 (a)** and **MCL § 37.2701 (a)**; **(b)**; *and* **(f).**

*2227.* The Plaintiffs' Substantive Due Process, Procedural Due Process, and Equal Protection rights under the 1st, 5th, and 14th Amendments in the vague and overbroad context of the plain reading of **MCL § 37.2102 (1)** were violated by the Defendants' intentional actions which *include by are not limited to* the arbitrary and discriminatory application of the enforcement standards under **MCL § 37.2402 (a)** and **MCL § 37.2701 (a)**; **(b)**; *and* **(f)** in turn violating *these very statutes* where the Plaintiffs as **STUDENTS** were subjected to concrete discrimination, harassment, threats, and coercion by the Defendants' limited and arbitrary interpretation of the applicability of Plaintiffs' expressly declared and codified "civil right" to the "full and equal utilization of public accommodations, public service, and education facilities without discrimination," a right the **STUDENTS** hold regardless of the state's choice of applicability resulting in disparate treatment of those left without enforcement mechanisms where the Defendants in concert retained impermissible delegation of authority inhibiting the exercise of Plaintiffs' constitutionally protect rights while acting under color of law.

*2228.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2229.** The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

**2230.** The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value,

that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2231.* The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2232.* The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2233.* Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2234.* Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

*INTENTIONALLY LEFT BLANK*

## COUNT X
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>First</u> Amendment to the U.S. Constitution**
***by and through the***
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Free Speech Clause**
**As-Applied Challenge (Vagueness & Overbreadth)**
**Wayne State University Code Annotated 2.28.01.020 *et seq*.**
**ALL STUDENT PLAINTIFFS**
***vs*.**
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2235.* The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2236.* Pursuant to the First Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy pursuant to the Free Speech Clause the fundamental right to challenge the facial construction and as applied application of state statutes and policy for vagueness and overbreadth that impermissibly delegates policy matters on an ad hoc and subjective basis threatening arbitrary and discriminatory effect from facial construction and state application inhibiting the exercise of Constitutionally protected rights.

*2237.* The State of Michigan by and through Defendants, the Wayne State University Board of Governors, has enacted for the health, safety, and general welfare of all citizens as **STUDENTS** at Wayne State what is pursuant to Wayne State University Code Annotated 2.28.01.020 *et seq*. known common as the "Wayne State University Non-Discrimination/Affirmative Action Policy," expressly representing the breadth of applicability embracing "***all*** persons ***regardless of*** [suspect classification]" the right to "the full and equal

utilization of public accommodations, public services, and educational facilities *without* discrimination...." *See*, **Exhibit 170**, at pp. 3-4; **Exhibit 266**.

*2238.*   On the face of Wayne State University Code Annotated 2.28.01.020 *et seq*. a person of ordinary intelligence has a reasonable opportunity to know what is recognized and declared by the State of Michigan as a civil right so that they may act accordingly—*free of* discrimination—guaranteed explicitly by Wayne State University Code Annotated 2.31.01.020 & Wayne State University Code Annotated 2.28.01.020. *See*, **Exhibit 170**, at p. 6.

*2239.*   The State of Michigan by and through the Defendant Board of Governors has enacted explicit standards of enforcement by those state actors relative to the Wayne State University's Non-Discrimination and Harassment Policy under UP 05-3: Discrimination and Harassment Complaint Process. *See*, **Exhibit 170**, pp. 25-28.

*2240.*   The State of Michigan has applied Wayne State University Code Annotated 2.28.01.020 *et seq*. in a unconstitutionally **vague** manner although clear on its face expressly recognizing and declaring for the health, safety, and general welfare that the policy "embraces *all* [**STUDENTS**] *regardless of* [suspect classification]" as such is a matter of fact in the State of Michigan that all **STUDENTS** are entitled to a "civil right" to the "full and equal utilization of public accommodations, public service, and education facilities without discrimination" guaranteed *internally* under  Wayne State University Code Annotated 2.31.01.020 & Wayne State University Code Annotated 2.28.01.020 and *externally* under **MCL § 37.2102 (1),** where Defendants' concert of actions applied invalid logic to treat Plaintiffs disparately through arbitrary and discriminatorily unequal enforcement standards applied under UP 05-3: Discrimination and Harassment Complaint Process that caused actual and ongoing harm.

*2241.*   The State of Michigan has applied Wayne State University Code Annotated 2.28.01.020 *et seq*. in a unconstitutionally **overbroad** manner although clear on its face expressly recognizing

and declaring for the health, safety, and general welfare that the policy "embraces *all* [**STUDENTS**] *regardless of* [suspect classification]" as such is a matter of fact in the State of Michigan that all **STUDENTS** are entitled to a "civil right" to the "full and equal utilization of public accommodations, public service, and education facilities without discrimination" guaranteed *internally* under  Wayne State University Code Annotated 2.31.01.020 & Wayne State University Code Annotated 2.28.01.020 and *externally* under **MCL § 37.2102 (1),** where Defendants' concert of actions applied invalid logic to treat Plaintiffs disparately through arbitrary and discriminatorily unequal enforcement standards applied under UP 05-3: Discrimination and Harassment Complaint Process that caused actual and ongoing harm.

*2242.*   The Plaintiffs' Substantive Due Process, Procedural Due Process, and Equal Protection rights under the 1st, 5th, and 14th Amendments in the vague and overbroad context of the plain reading of Wayne State University Code Annotated 2.28.01.020 *et seq*.; 2.31.01.020; & Code Annotated 2.28.01.020 were violated by the Defendants' disparate treatment of Plaintiff(s) which *include by are not limited to* the arbitrary and discriminatory application of the enforcement standards under UP 05-3: Discrimination and Harassment Complaint Process in turn violating these same policies and procedures where the Plaintiff(s) as **STUDENTS** were subjected to concrete discrimination, harassment, threats, and coercion by the Defendants' limited and arbitrary interpretation of the applicability of Plaintiffs' expressly declared and codified "civil right" to the "full and equal utilization of public accommodations, public service, and education facilities without discrimination" under **MCL § 37.2102 (1),** a right the **STUDENTS** hold *regardless of* the state's choice of applicability resulting in disparate treatment of those left without enforcement mechanisms where the Defendants retained impermissible delegation of authority inhibiting the exercise of Plaintiffs' constitutionally protect rights through sham proceedings under color of law.

*2243.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2244.* The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2245.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent

placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2246.*   The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2247.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2248.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2249.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

<u>**COUNT XI**</u>
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>Fourth</u> Amendment to the U.S. Constitution**
*by and through the*
<u>**Fourteenth**</u> **Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Unreasonable Search & Seizure**
**ALL STUDENT PLAINTIFFS**
*vs.*
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2250.* The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2251.* Pursuant to the Fourth Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy the Constitutional protection to the full enjoyment of the rights of personal security, personal liberty, and private property by prohibiting unreasonable searching and seizures by the government preserving the right "to be secure in their persons, houses, papers, and effects..." U.S. Const. amend IV.

*2252.* "[F]rom the time of the founding to the present," when speaking of property, "the word 'seizure' has meant a 'taking possession.'" *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *California v. Hodari D.*, 499 U.S. 621, 624 (1991)). So, "a 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Fox v. Van Oosterum*, 176 F.3d 342, 350 (6th Cir. 1999) (quoting *Soldal v. Cook County*, 506 U.S. 56, 61 (1992)).

*2253.* The Plaintiffs' Fourth Amendment Rights as it applies the rights of personal security, personal liberty, and private property being secure in their persons, houses, papers, and effects

was violated by the Defendants' actions which *include but are not limited to* the Defendants' entering the Plaintiff(s) homes through wire with specific intent to fraudulent induce the Plaintiffs as STUDENTS through discrimination, harassment, threats, and coercion leveraging Plaintiffs' papers generated during this term of pedagogical focus to illegitimately illicit compelled papers and thereby taking possession of the Plaintiffs' person and papers.

*2254.* The Plaintiffs' Fourth Amendment Rights as it applies the rights of personal security, personal liberty, and private property being secure in their persons, houses, papers, and effects was violated by the Defendants' actions which *include but are not limited to* seizing and searching of the Plaintiffs' person by failing to adhere to condition precedents necessary to conduct human subject research, where the investigator must *in the least* obtain departmental authorization, *i.e.*, from Defendant, Dr. John Taylor, and provide the Plaintiffs with ongoing-informed consent outlining the form and function of the 'research' being conducted on behalf of the Defendants institution and those individual Defendants, *i.e.*, such as Defendant Habel using the course to supplement her ongoing Ph.D. pursuit with such empirical research.

*2255.* The Plaintiffs' Fourth Amendment Rights as it applies the rights of personal security, personal liberty, and private property being secure in their persons, houses, papers, and effects was violated by the Defendants' actions which *include but are not limited to* the Defendants' intentional failure to provide the Plaintiffs with informed consent demonstrates the dominion over the Plaintiffs' pedagogical experience situated in Defendants' intellectual checkpoint where those **STUDENTS** were manipulated by discrimination, harassment, threats, and coercion where the Plaintiffs' property interests in their persons, houses, papers, and effects were interfered with to a level that shocks the conscious where Defendants themselves usurped this value and argues ownership attachment by using [***VERY***] Ambitious Goal Curriculum.

*2256.*  Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2257.*  The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2258.*  The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent

placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2259.*   The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2260.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2261.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2262.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

## **COUNT XII**
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of <u>Fifth</u> Amendment**
*by and through the*
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Taking Clause**
**Facial 'Public Use' *v.* 'Private Use'**
**Per Se Taking**
**ALL STUDENT PLAINTIFFS**
**&**
**ALL BUSINESS ENTITY PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2263.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2264.*   Pursuant to the Fifth Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy the Constitutional protection consistent with those fundamental rights to life, liberty, and property making governmental taking of "private property...for public use, without just compensation," unconstitutional. U.S. Const. amend V.

*2265.*   The Plaintiffs' Fifth Amendment Rights as it applies to private property taken for both public *and* private use the Plaintiffs' rights were violated by the Defendants' actions which *include but are not limited to* taking the Plaintiffs' intellectual property and other **STUDENT** records containing value obtained through [*VERY*] Ambitious Goal Curriculum as the mode of fraudulent misrepresentation in violation of Federal and State law requiring *in the least* ongoing informed consent of the form and function of Defendants' research.

*2266.*  The Plaintiffs' Fifth Amendment Rights, when a fundamental right is at stake, limits governmental action or inaction that is arbitrary, or shocks the conscious, specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, as such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

*2267.*  The Plaintiffs' Fifth Amendment Rights to be secure in their life, liberty, and property free of illegitimate governmental taking for private use was violated by the Defendants' actions which *include but not limited to* the Defendants' taking was illegitimate and a plain violation of policies and procedures well established and entirely avoided by the Defendants' with specific intent to conduct research on the Plaintiffs as **STUDENTS** usurping the value gained from [**VERY**] Ambitious Goal Curriculum for *both* public and private use over a twenty-year period.

*2268.*  The Plaintiffs' Fifth Amendment Rights to be secure in their life, liberty, and property free of illegitimate governmental taking for private use, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

*2269.*  Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A

fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomy of their participation.

*2270.*   The Plaintiffs' Procedural Due Process Rights as it applies to be secure in their life, liberty, and property free of illegitimate governmental taking for private use was violated by the Defendants' actions which *include but are not limited to* the Defendants' leveraging the [***VERY***] Ambitious Goal Curriculum to exploit the Plaintiffs as **STUDENTS** without affording the Plaintiffs with the legitimate procedural protections the Constitution requires.

*2271.*   The Plaintiffs' First Amendment to be secure in their life, liberty, and property free of illegitimate governmental taking for private use, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

*2272.*   The Plaintiffs' Equal Protection Rights to be secure in their life, liberty, and property free of illegitimate governmental taking for private use was violated by the Defendants' actions which *include but are not limited to* the Plaintiffs' disparate treatment generated from Defendants' arbitrary retaliation generated as a result of withholding informed consent and exploiting the continuously improved design of [***VERY***] Ambitious Goal Curriculum to permanently usurp the Plaintiffs' intellectual property for public and private gain in violation of the Plaintiffs' fundamentally protected right and liberties.

*2273.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2274.**   The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

**2275.**   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value,

that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2276.*   The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2277.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2278.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2279.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

*INTENTIONALLY LEFT BLANK*

**<u>COUNT XIII</u>**
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of <u>Fifth</u> Amendment**
***by and through the***
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Taking Clause**
**Unconstitutional-Conditions Doctrine**
**ALL STUDENT PLAINTIFFS**
**&**
**ALL BUSINESS ENTITY PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2280.*  The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2281.*  Pursuant to the Fifth Amendment of the United States Constitution and applicable through the Fourteenth Amendment to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy the Constitutional protection consistent with those fundamental rights to life, liberty, and property where "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz*, 570 U.S. at 604 (quoting *Regan. v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983)). In practice, the doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id*. Moreover, the government has authority to choose how they implement their action—but that action "may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Id*. at 606.

**2282.**  The Plaintiffs' Fifth Amendment Rights as it applies to the Unconstitutional-Conditions Clause was violated by the Defendants' actions which *include but are not limited to* coercing the Plaintiffs through a entirely illegitimate course leveraging the **STUDENTS**' pedagogical experience through discrimination, harassment, threats, and coercion while demanding Plaintiffs completely relinquish and submit to the Defendants' demands for intellectual property owned and kept secret by Plaintiff **ENTITIES** in exchange for course credit and an illegitimate "WSU Jonah Certificate" in direct violation to the United State Constitution.

**2283.**  The Plaintiffs' Fifth Amendment Rights as it applies to the Unconstitutional-Conditions Clause was violated by the Defendants' actions which *include but are not limited to* Defendant, Dr. James T. Low, expressly threatening Plaintiff, Attorney Cochrane, offering to "sign any NDA" while demanding disclosure of substantive intellectual property *even further* than what was captured up to that point in compliance with Defendant's secretive piracy.

**2284.**  The Plaintiffs' Fifth Amendment Rights, when a fundamental right is at stake, limits governmental action or inaction that is arbitrary, or shocks the conscious, specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, as such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

**2285.**  The Plaintiffs' Fifth Amendment Rights as it applies to the Unconstitutional-Conditions Clause was violated by the Defendants' actions which *include but not limited to* the Defendants' taking was illegitimate in form and function as required by the WSUIRB and a plain violation of policies and procedures well established being avoided by the Defendants in secret with specific intent to conduct 'research' on the Plaintiffs as **STUDENTS** usurping the value gained from [***VERY***] Ambitious Goal Curriculum for *both* public and private use.

*2286.* The Plaintiffs' Fifth Amendment Rights as it applies to the Unconstitutional-Conditions Clause, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

*2287.* Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomy of their participation.

*2288.* The Plaintiffs' Procedural Due Process Rights as it applies as it applies to the Unconstitutional-Conditions Clause was violated by the Defendants' actions which *include but are not limited to* the Defendants' leveraging the [*VERY*] Ambitious Goal Curriculum to exploit the Plaintiffs as **STUDENTS** without affording the Plaintiffs with the legitimate procedural protections the Constitution requires.

*2289.* The Plaintiffs' Fifth Amendment as it applies to the Unconstitutional-Conditions Clause, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

**2290.** The Plaintiffs' Equal Protection Rights as it applies to the Unconstitutional-Conditions Clause was violated by the Defendants' actions which *include but are not limited to* the Plaintiffs' disparate treatment generated from Defendants' arbitrary retaliation generated as a result of withholding informed consent and exploiting the continuously improved design of [*VERY*] Ambitious Goal Curriculum to permanently usurp the Plaintiffs' intellectual property for public and private gain in violation of the Plaintiffs' fundamentally rights and liberties.

**2291.** Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2292.** The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

**2293.** The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the

Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

**2294.** The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

**2295.** The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

**2296.** Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

**2297.**   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

### COUNT XIV
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of <u>Thirteenth</u> Amendment**
***by and through the***
**<u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Slavery & Involuntary Servitude**
**ALL STUDENT PLAINTIFFS**
**vs.**
**ALL OFFICIAL CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

**2298.**   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

**2299.**   *The People* of the State of Michigan, by and through their elected representative, have for the health, safety, and general welfare enacted a State Constitution that has established pursuant to Article I, § 9 the objective footing declaring "[n]either slavery, nor involuntary servitude unless for the punishment of crime, shall ever be tolerated in this state."

**2300.**   The Plaintiffs' Constitutional Rights as it applies to the **Thirteenth Amendment** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights to maintain autonomy and to be *free of* state slavery and involuntary servitude were violated by the Defendants' constitutionally repugnant conduct.

*2301.*   Based upon information and belief, which *include but are not limited to* the objective facts that by avoiding WSUIRB authorization, training, and departmental authorization—Defendants' used the Plaintiffs as **STUDENTS** who at the time were vulnerable, submissive, uninformed, unknowledgeable, and in a position framed with the express purpose by Defendants' design to restrict the Plaintiffs' freedoms and exhaust their intellectual labor in disguise while exploiting this protected 'relationship' to specifically coerce the compelled as speech in Defendants' favor for a *larger return* before arbitrarily passing the **STUDENTS** off on their intellectual journey while maintaining permanent control over the product of this involuntary servitude in perpetuity and branding those submissive **STUDENTS** as "WSU Jonahs" through the invalid "WSU Jonah Certificate."

*2302.*   Based upon information and belief, the Defendants retained possession of the products of the **STUDENTS**' Pedagogical experience in perpetuity leveraging the trade secrets and proprietary value of those Plaintiff **ENTITIES** for the benefit of the Defendants individually and collectively as a whole while acting under color of law.

*2303.*   The Plaintiffs enjoy the Substantive unalienable right granted by natural law and by man through the Thirteenth Amendment to be free from the dominion of man unless for an objective and justifiable reason inapplicable *herein*.

*2304.*   The Plaintiffs enjoy the Substantive unalienable right granted by natural law and by modern civilized man through the Thirteenth Amendment to be openly informed and free to choose autonomously with adequate information what cause he/she will advance—to be free from involuntary servitude, laboring against their free will for causes in secret or contrary to that which he freely believes compelled against this free will.

*2305.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2306.** The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

**2307.** The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value,

that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2308.*   The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2309.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2310.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

*INTENTIONALLY LEFT BLANK*

## **COUNT XV**
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Right to Bodily Integrity**
**ALL STUDENT PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2311.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2312.*   Pursuant to the Fourteenth Amendment of the United States Constitution and applicable therein to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy the Constitutional protection consistent with those fundamental rights to life, liberty, and property where "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891); cf. *Schmerber v. California*, 384 U.S. 757, 772 (1966) ("The integrity of an individual's person is a cherished value of our society.").

*2313.*   The United States Supreme Court has "...never retreated ...from our recognition that any compelled intrusion into the human body implicate significant, constitutionally protected...interests." *Missouri v. McNeely*, 569 U.S. 141, 159 (2013) (emphasis added).

*2314.*   To establish claims that the government has violated one's right to bodily integrity, a plaintiff need not "establish any constitutional significance to the means by which the harms occurs[.]" This standard is because those plaintiffs as "individuals possess a constitutional right

to be free from forcible intrusions on their bodies, against their will, absent a [legitimate] compelling state interest." *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012).

*2315.* Involuntarily subjecting nonconsenting individuals to research as human subjects—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of bodily integrity protection.

*2316.* The "right to bodily integrity's anchor is control of one's own person **by way of informed consent**, and thus the method upon which the government enters the body is irrelevant. Boler, 865 F.3d at 408 n.4; see also Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 857 (1992) (plurality op). (Emphasis added).

*2317.* If the Constitution protects personal autonomy in making certain types of important decisions, the decision whether to participate in the Human Experiments was one that each individual Plaintiff was entitled to make freely and with full knowledge through informed consent protocol established by WSUIRB and the National Research Act.

*2318.* The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Bodily Integrity were violated by the Defendants' actions which *include but are not limited to* coercing Plaintiffs through the illegitimate [*VERY*] Ambitious Goal Curriculum with specific intent to leverage those uninformed **STUDENTS** as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith is constitutionally repugnant and shocks the conscious from a subjective standard. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2319.* The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Bodily Integrity were violated by the Defendants' actions which *include but are not limited to* the concrete harms derivative of Defendants' specific intent employed to "maliciously and sadistically [form] the very [specific] purpose for causing [the constitutional] harm." *Lewis*, 523 U.S. at 850 (quoting *Betts v. Brady*, 316 U.S. 455, 462 (1942)).

*2320.* The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Bodily Integrity was violated by the Defendants' actions which *include but are not limited to* acting with specific intent leveraging their application of [**VERY**] Ambitious Goal Curriculum to openly exploit the vulnerabilities of **PLAINTIFFS**' pedagogical experience and status as **STUDENTS** leveraging through discrimination, harassment, threats, coercion, express fraud, false and misleading advertisements, force, and by suppressing those **STUDNENTS**' rights and liberties by knowingly using the Plaintiffs as human research subjects to gain value without providing informed consent in violation of those clearly established rights and required processes—the Defendants' deliberate indifference brewed under color of law exploited their sacred relationship as educators to "use [**STUDENTS**] as bridges to companies" with callous disregard of the effect so offensive to human dignity that the Defendants' discretionary conduct that deprived Plaintiffs' Constitutionally protected interests is constitutionally repugnant and objectively shocks the conscious.

*2321.* The Plaintiffs' Fourteenth Amendment Rights, when a fundamental right is at stake, limits governmental action or inaction that is arbitrary, or shocks the conscious, specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, as such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

*2322.*   The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Bodily Integrity was violated by the Defendants' actions which *include but not limited to* the Defendants' taking was illegitimate in form and function as required by the WSUIRB and a plain violation of policies and procedures well established being avoided by the Defendants in secret with specific intent to conduct 'research' on the Plaintiffs as **STUDENTS** usurping the value gained from [***VERY***] Ambitious Goal Curriculum for *both* public and private use over a twenty-year period.

*2323.*   The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Bodily Integrity, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

*2324.*   Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent ***and*** maintains complete control over the autonomy of their participation.

*2325.*   The Plaintiffs' Procedural Due Process Rights as it applies as it applies to the Fourteenth Amendment was violated by the Defendants' actions which *include but are not limited to* the Defendants' leveraging the [***VERY***] Ambitious Goal Curriculum to exploit the Plaintiffs as

**STUDENTS** without affording the Plaintiffs with the legitimate procedural protections the Constitution requires by following the WSUIRB policies and procedures *in full*.

*2326.* The Plaintiffs' Fourteenth Amendment as it applies to the Right to Bodily Integrity Clause, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

*2327.* The Plaintiffs' Equal Protection Rights as it applies to the Right to Bodily Integrity was violated by the Defendants' actions which *include but are not limited to* the Plaintiffs' disparate treatment generated from Defendants' arbitrary retaliation generated as a result of withholding informed consent and exploiting the continuously improved design of [*VERY*] Ambitious Goal Curriculum to permanently usurp the Plaintiffs' intellectual property for public and private gain in violation of the Plaintiffs' fundamentally protected right and liberties.

*2328.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2329.* The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond

dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2330.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2331.*   The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2332.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly

situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2333.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2334.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## COUNT XVI
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the <u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Right to Privacy**
**ALL STUDENT PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2335.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2336.*   Pursuant to the Fourteenth Amendment of the United States Constitution and applicable therein to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy the Constitutional protection consistent with those fundamental rights

to life, liberty, and property where consistent with Lousi Brandeis' co-authored Harvard Review article "*The Right to Privacy*," where he advocated for the "*right to be let alone*," where the United States Supreme Court has recognized an implicit Right to Privacy derived *from the penumbras* of other explicitly states constitutional protections stated in the First, Third, Fourth, Fifth, and Ninth Amendments creating an impenetrable—"***Zone of Privacy***"— only by a *legitimate* compelling state interest narrowly tailored to serve the governmental purpose. *Griswold v. Connecticut*, 381 U.S. 479 (1965).

*2337.*   The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Privacy was violated by the Defendants' actions which *include but are not limited to* coercing the Plaintiffs through a entirely illegitimate course leveraging the **STUDENTS'** pedagogical experience through discrimination, harassment, threats, and coercion while demanding Plaintiffs completely relinquished and submitted to the Defendants' demands those **STUDENTS'** intellectual property in exchange for course credit and an illegitimate "WSU Jonah Certificate" in direct violation to the United State Constitution.

*2338.*   The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Privacy was violated by the Defendants' actions which *include but are not limited to* Defendant, Dr. James T. Low, expressly threatening Plaintiff, Attorney Cochrane, offering to "sign any NDA" while demanding disclosure of substantive intellectual property *even further* than what was captured up to that point using Defendants "three-tiered grading scheme" coerced to comply with the Defendant's secretive piracy.

*2339.*   The Plaintiffs' Fourteenth Amendment Rights, when a fundamental right is at stake, limits governmental action or inaction that is arbitrary, or shocks the conscious, specifically *herein* by and through Substantive Due Process of the Fourteenth Amendment, as such precedent is objectively "deeply rooted in this Nation's history and tradition, and implicit in the concept of

ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

**2340.** The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Privacy was violated by the Defendants' actions which *include but not limited to* the Defendants' strategic plan was illegitimate in form and function as required by the WSUIRB and a plain violation of policies and procedures well established being avoided by the Defendants in secret with specific intent to conduct 'research' on the Plaintiffs as **STUDENTS** usurping the value gained from [**VERY**] Ambitious Goal Curriculum for *both* public and private use over a twenty-year period.

**2341.** The Plaintiffs' Fourteenth Amendment Rights as it applies to the Right to Privacy, is applicable against the Defendants specifically *herein* by and through Procedural Due Process of the Fourteenth Amendment requiring that no state shall "deprive any person of life, liberty, or property, without due process of law," absent a *legitimate* compelling state interest narrowly tailored to serve such governmental purpose.

**2342.** Where the United States Congress has enacted legislation, *including but not limited to* that identified *herein* known commonly as the National Research Act Title 45, Part 46 of the Code of Federal Regulations: *Protection of Human Subjects*, such legislation guarantees Procedural Due Process to Plaintiffs formalizing therein the processes to protect the life, liberty, and property of persons used as human research subjects by establishing local Institutional Review Boards (IRBs) such as the Wayne State University Institutional Review Board (WSUIRB). A fundamental pillar of the purpose for which the National Research Act was enacted, and the duty of oversight requiring WSUIRB to ensure that the individual subjected to an investigators' research is fully informed of the parameters of the research through express informed consent *and* maintains complete control over the autonomous privacy of their Constitutional Rights.

*2343.* The Plaintiffs' Procedural Due Process Rights as it applies as it applies to the Fourteenth Amendment was violated by the Defendants' actions which *include but are not limited to* the Defendants' leveraging the [***VERY***] Ambitious Goal Curriculum to exploit the Plaintiffs as **STUDENTS** without affording the Plaintiffs with the legitimate procedural protections the Constitution requires under WSUIRB and National Research Act protocol.

*2344.* The Plaintiffs' Fourteenth Amendment as it applies to the Right to Privacy Clause, is applicable against the Defendants *herein* by and through the Equal Protection Clause of the Fourteenth Amendment requiring that all persons similarly situated should be treated alike as to avoid disparate treatment by furthering a narrowly tailored *legitimate* state interest.

*2345.* The Plaintiffs' Equal Protection Rights as it applies to the Right to Privacy was violated by the Defendants' actions which *include but are not limited to* the Plaintiffs' disparate treatment generated from Defendants' arbitrary retaliation generated as a result of withholding informed consent and exploiting the continuously improved design of [***VERY***] Ambitious Goal Curriculum to permanently usurp the Plaintiffs' intellectual property for public and private gain in violation of the Plaintiffs' fundamentally protected right and liberties.

*2346.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2347.* The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are*

within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2348.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2349.* The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2350.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2351.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2352.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## COUNT XVII
**Injunctive & Declaratory Relief**
**Violation of the <u>Fourteenth</u> Amendment to the U.S. Constitution**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**State Created Civil Right to Full and Equal Public Utilization**
***Of***
**Public Accommodations, Public Service, *&* Public Education Institutions**
**Recognition and Declaration of Civil Right *&* Property Interest**
**MCL § 37.2102 (1)**
***&***
**Wayne State University Code Annotated 2.28.01.020**
**ALL STUDENT PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
***&***
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2353.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2354.*   Pursuant to the Fourteenth Amendment of the United States Constitution and applicable therein to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy the Constitutional protection consistent with those fundamental rights to life, liberty, and property where the Supreme Court has recognized and enforced State Created Civil Rights when those plaintiffs maintain an objective and legitimate claim of entitlement to the property interests of such established right.

*2355.*   No property interests are created by the Constitution. Rather, they are created and their dimensions "are defined by existing rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. at 577.

*2356.*   In *Goss v. Lopez*, the Court declared that state laws guaranteeing access to primary and secondary schooling gave the students a "property interest in education." *Goss v. Lopez*, 419 U.S. 565, 575-76 (1975).

*2357.*   The State of Michigan has enacted for the health, safety, and general welfare *of all its citizens* pursuant to **MCL § 37.2102 (1)** the express "recognition and declaration of [a] civil right" granting "the **full and equal** utilization of public accommodations, public services, and educational facilities without discrimination..."

*2358.*   The State of Michigan has 'limited' the enforceability of **MCL § 37.2102 (1)** to "...discrimination because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, heigh, weight, familial status, or marital status..."

*2359.*   On the face of **MCL § 37.2102 (1)** a person of ordinary intelligence has a reasonable opportunity to know that public accommodations, public services, and public education is

recognized and declared by the State of Michigan as a "civil right," so those individuals must then act accordingly based on this express language—*free of* discrimination.

*2360.*   The State of Michigan has enacted explicit standards of enforcement by those state actors relative to "Educational Institutions" under **MCL § 37.2402 (a)**, and prohibited conduct under **MCL § 37.2701 (a)**; **(b)**; *and* **(f)**.

*2361.*   Under **MCL § 37.2402 (a)**— "An educational institution shall not do any of the following:

> "(**a**) Discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression."

*2362.*   Under **MCL § 37.2701 (a)**; **(b)**; *and* **(f)**— "Two or more persons shall not conspire, or a person shall not:

> "(**a**) Discriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression.
>
> (**b**) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act.
>
> (f) Coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act."

*2363.*   The State of Michigan has expressly enacted for the health, safety, and general welfare of **all its citizens** pursuant to **MCL § 37.2102 (1)** the express "recognition and declaration of [**a**] **civil right**" guaranteeing "the full and equal utilization of public accommodations, public services, and educational facilities without discrimination..." that objectively establishes a legitimate property interest for Plaintiffs' and all other **STUDENTS** within the State of Michigan as a "civil right."

*2364.* The State of Michigan has 'limited' the enforceability of **MCL § 37.2102 (1)** to "...discrimination because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, heigh, weight, familial status, or marital status..."

*2365.* The State of Michigan has enacted objective standards of enforcement by those state actors relative to this express "civil right" relative to "Educational Institutions" under **MCL § 37.2402 (a)**, and prohibited conduct under **MCL § 37.2701 (a)**; **(b)**; *and* **(f)**.

*2366.* Under **MCL § 37.2402 (a)**— "An educational institution shall not do any of the following:

> "(**a**) **Discriminate against an individual in the <u>full</u> utilization of or benefit from the institution**, **or the services**, **activities**, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression."

*2367.* Under **MCL § 37.2701 (a)**; **(b)**; *and* **(f)**— "Two or more persons shall not conspire, or a person shall not:

> "(**a**) **Discriminate against an individual in the <u>full</u> utilization of or benefit from the institution**, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression.
>
> (**b**) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act.
>
> (f) Coerce, intimidate, threaten, or interfere with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act."

*2368.* The State of Michigan by and through Defendants, the Wayne State University Board of Governors, has enacted for the health, safety, and general welfare of all citizens as **STUDENTS** at Wayne State what is pursuant to Wayne State University Code Annotated 2.28.01.020 *et seq.* known common as the "Wayne State University Non-Discrimination/Affirmative Action Policy," where the Non-Discrimination Policy objectively

establishes a property interest embracing "**_all_** persons **_regardless of_** [suspect classification]" guaranteeing the right to "the full and equal utilization of public accommodations, public services, and educational facilities *without* discrimination..." *See*, **Exhibit 170**, at pp. 3-4; **Exhibit 266**.

*2369.*   On the face of Wayne State University Code Annotated 2.28.01.020 *et seq*. a person of ordinary intelligence has a reasonable opportunity to know public education is recognized and declared by the State of Michigan as a "civil right" so that they may act accordingly—*free of* discrimination—guaranteed explicitly by Wayne State University Code Annotated 2.31.01.020 *&* Wayne State University Code Annotated 2.28.01.020. **Exhibit 170**, at p. 6.

*2370.*   The State of Michigan by and through the Defendant Board of Governors has enacted explicit standards of enforcement by those state actors relative to the Wayne State University's Non-Discrimination and Harassment Policy under UP 05-3: Discrimination and Harassment Complaint Process. *See*, **Exhibit 170**, pp. 25-28.

*2371.*   The Plaintiffs' Fourteenth Amendment Rights as it applies to the state created right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS** *regardless of* suspect classification was violated by the Defendants' actions which *include but are not limited to* the deliberate and systematic avoidance of the WSUIRB policy and procedures requiring (*a*) departmental authorization, and (*b*) ongoing express-informed consent as conditions precedent to the unconstitutional human research conducted by the Defendants on the Plaintiffs as **STUDENTS** leveraging the pedagogical experience to discriminate, exploit, compel, and manipulate the Plaintiffs' disclosure of value for public and private unjust enrichment.

*2372.*   The Plaintiffs' Fourteenth Amendment Rights as it applies to state created right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS**

*regardless of* suspect classification was violated by the Defendants' actions which *include but are not limited to* the deliberate avoidance of the Wayne State University Non-Discrimination and Harassment Policy and Procedures by the Defendants discriminatory retaliation of Plaintiffs' opposition of Defendants' unconstitutional conduct by filing a formal complaint against Defendants at large.

*2373.*   The Plaintiffs' Fourteenth Amendment Rights as it applies to state created right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS** *regardless of* suspect classification was violated by the Defendants' actions which *include but are not limited to* the Defendants' offensively-defensive silence and discriminatory retaliation by disregarding the formalities of enforcement of the Non-Discrimination and Harassment Policy and further retaliated by preventing Plaintiff, Attorney Cochrane, from **graduating** with the minimum credit requirements prior to 2020, and thereafter placing him into collections for the valid opposition to the violations of the well established state "civil right" to a public education free of discrimination while attempting to utilize the "the full and equal utilization of public accommodations, public services, and educational facilities without discrimination..." where relying upon collectively **MCL § 37.2102 (1); MCL § 37.2402 (a); MCL § 37.2701 (a); (b); & (f);** Wayne State University Code Annotated 2.31.01.020; Wayne State University Code Annotated 2.28.01.020; *and* UP 05-3: Discrimination and Harassment Complaint Process—the Defendants have *again*, **preventing graduation** and withheld his *earned* Masters of Business Administration degree in retaliation of this ongoing dispute.

*2374.*   The Plaintiffs' Fourteenth Amendment Rights, specifically regarding the Equal Protection Clause as it applies to the state created right to a public education *free of* discrimination, harassment, threats, and coercion for all **STUDENTS** *regardless of* suspect classification was violated by the Defendants' actions which *include but are not limited to* the Defendants failure

to comply with the express language of **MCL § 37.2102 (1);** Wayne State University Code Annotated 2.31.01.020; Wayne State University Code Annotated 2.28.01.020; and UP 05-3: Discrimination and Harassment Complaint Process—is in and of itself a demonstrative example of the Defendants' objective discrimination of the Plaintiffs' legitimate claim of entitlement to enforce their "civil right" to "the full and equal utilization of public accommodations, public services, and educational facilities without discrimination..." that which caused disparate treatment leaving Plaintiffs irreparably harmed by unequal application of these precedents.

*2375.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2376.*   The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq.* of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

*2377.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as

**STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2378.* The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2379.* The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2380.* Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting

constituted authorities of the State of Michigan from giving and securing to those Plaintiffs equal protection under the law.

*2381.*   Therefore, the Defendants having engaged and caused the express furtherance of the object of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges as citizens of the United States and any one or more of the conspirators are thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## COUNT XVIII
**Injunctive & Declaratory Relief**
**42 U.S.C. § 1983**
**42 U.S.C. § 1985 (3)**
**Violation of the Higher Education Act**
**20 U.S.C. § 1011 (a)**
**Substantive Due Process, Procedural Due Process, and Equal Protection**
**Recognition and Declaration of Civil Right *&* Property Interest**
**ALL STUDENT PLAINTIFFS**
***vs.***
**ALL <u>OFFICIAL</u> CAPACITY DEFENDANTS**
**&**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2382.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2383.*   Pursuant to the Fourteenth Amendment of the United States Constitution and applicable therein to the States, the Plaintiffs as Public **STUDENTS**, individually and collectively as a prospective class, enjoy the Constitutional protection consistent with those fundamental rights to life, liberty, and property where Congress has enacted the National Research Act establishing under **20 U.S.C. § 1011 (a)** an objective and legitimate claim of entitlement to the property

interests of such established right to the protection of **STUDENT** speech and association rights as protected under the First and Fourteenth Amendments.

***2384.*** No property interests are created by the Constitution. Rather, they are created and their dimensions "are defined by existing rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. at 577.

***2385.*** In *Goss v. Lopez*, the Supreme Court declared that state laws guaranteeing access to primary and secondary schooling gave the students a "property interest in education." *Goss v. Lopez*, 419 U.S. 565, 575-76 (1975).

***2386.*** The United States Congress has enacted for the health, safety, and general welfare ***of all its citizens*** as **STUDENTS** pursuant to **20 U.S.C. § 1011 (a)** the express recognition and declaration of a civil right establishing the protection of speech in an "institution of higher education" codified in full:

"**<u>20 U.S.C. §1011a. Protection of student speech and association rights</u>**

(a) Protection of rights

(1) It is the sense of Congress that no student attending an institution of higher education on a full- or part-time basis should, on the basis of participation in protected speech or protected association, be excluded from participation in, be denied the benefits of, or be subjected to discrimination or official sanction under any education program, activity, or division of the institution directly or indirectly receiving financial assistance under this chapter, whether or not such program, activity, or division is sponsored or officially sanctioned by the institution.

(2) It is the sense of Congress that-

(A) the diversity of institutions and educational missions is one of the key strengths of American higher education;

(B) individual institutions of higher education have different missions and each institution should design its academic program in accordance with its educational goals;

(C) an institution of higher education should facilitate the free and open exchange of ideas;

(D) students should not be intimidated, harassed, discouraged from speaking out, or discriminated against;

(E) students should be treated equally and fairly; and

(F) nothing in this paragraph shall be construed to modify, change, or infringe upon any constitutionally protected religious liberty, freedom, expression, or association.

(b) Construction

Nothing in this section shall be construed-

(1) to discourage the imposition of an official sanction on a student that has willfully participated in the disruption or attempted disruption of a lecture, class, speech, presentation, or performance made or scheduled to be made under the auspices of the institution of higher education, provided that the imposition of such sanction is done objectively and fairly; or

(2) to prevent an institution of higher education from taking appropriate and effective action to prevent violations of State liquor laws, to discourage binge drinking and other alcohol abuse, to protect students from sexual harassment including assault and date rape, to prevent hazing, or to regulate unsanitary or unsafe conditions in any student residence.

(c) Definitions

For the purposes of this section:

(1) Official sanction

The term "official sanction"-

(A) means expulsion, suspension, probation, censure, condemnation, reprimand, or any other disciplinary, coercive, or adverse action taken by an institution of higher education or administrative unit of the institution; and

(B) includes an oral or written warning made by an official of an institution of higher education acting in the official capacity of the official.

(2) Protected association

The term "protected association" means the joining, assembling, and residing with others that is protected under the first and 14th amendments to the Constitution, or would be protected if the institution of higher education involved were subject to those amendments.

(3) Protected speech

The term "protected speech" means speech that is protected under the first and 14th amendments to the Constitution, or would be protected if the institution of higher education involved were subject to those amendments."

*2387.*  The Plaintiffs, individual and collectively as a prospective class, are or were as **STUDENTS** attending an institution of higher education—Wayne State University—and are members of the class for whose especial benefit this Act was enacted.

*2388.*  There is objective evidence of legislative intent to create a legitimate claim of entitlement to the private civil property rights enacted by Congress under **20 U.S.C. § 1011 (a)**.

*2389.*  The Plaintiffs' Fourteenth Amendment Rights as it applies to **20 U.S.C. § 1011 (a)** enacted by Congress establishing an objective and legitimate claim of entitlement to the Plaintiffs' property right as **STUDENTS** to a public education *free of* discrimination, harassment, threats, and coercion *for all* **STUDENTS** was violated by the Defendants' actions which *include but are not limited to* the Defendants' deliberate avoidance of the Human Subject Research protocol required under WSUIRB's policies established in conformity with the National Research Act while exploiting **STUDENTS** for public and private 'research' by using [***VERY***] Ambitious Goal Curriculum to manipulate the **STUDENTS**' compelled speech by express fraud.

*2390.*  The Plaintiffs' Fourteenth Amendment Rights as it applies to **20 U.S.C. § 1011 (a)** enacted by Congress establishing an objective and legitimate claim of entitlement to the Plaintiffs' property right as **STUDENTS** to a public education *free of* discrimination, harassment, threats, and coercion *for all* **STUDENTS** was violated by the Defendants' actions which *include but are not limited to* the Defendants' deliberate and secretive avoidance of informed consent requirements coercing **STUDENTS** to compel proprietary information in violation of those civil rights protected under the United State Constitution.

**2391.**  The Plaintiffs' Fourteenth Amendment Rights as it applies to **20 U.S.C. § 1011 (a)** enacted by Congress establishing an objective and legitimate claim of entitlement to the Plaintiffs' property right as **STUDENTS** to a public education *free of* discrimination, harassment, threats, and coercion *for all* **STUDENTS** was violated by the Defendants' actions which *include but are not limited to* the Defendants' deliberate avoidance of enforcement mechanisms under the Wayne State University Non-Discrimination and Harassment Complaint Process established objectively for all **STUDENTS** "*regardless of*" suspect classification.

**2392.**  Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2393.**  The *Official* Capacity Defendants are not immune from this lawsuit—where explicitly, by the authority and virtue of their office as to sufficiently connect the Governor and the Attorney General of the State of Michigan with the general duty of law enforcement under Article X § 1 *et. seq*. of the Michigan Constitution, which conveys for the health, safety, and general welfare executive-oversight authority of the rights and powers to enforce the statutes of the State under Article V § 8; Article V § 10; Schedule, § 1; and MCL 14.29, including those governing the actions herein questioned in violation of federal law, such Official Capacity Defendants *are* within a federal court's jurisdiction to issue "prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Doe v. Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994). Moreover, as applicable herein for *all Official* Capacity Defendants, "[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (citing *Ex parte Young*, 209 U.S. at 160-62, 28 S.Ct. 441).

**2394.**  The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as

**STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

*2395.*   The Defendants, excluding the Governor and Attorney General of the State of Michigan, are persons acting in official and individual capacities under color of state law within the State of Michigan thereby liable to Plaintiffs pursuant to 42 U.S. Code § 1983 for the intentional deprivation of Plaintiffs' rights, privileges, and immunities secured by the Constitution.

*2396.*   The Defendants collectively defined as more than two persons, excluding the Governor and Attorney General of the State of Michigan, directly and indirectly conspired for the express purpose of depriving the Plaintiffs', individually and collectively as a class of persons similarly situated as **STUDENTS**, the equal protection of those privileges and immunities under the law clearly established by the Constitution.

*2397.*   Whereby the Defendants with specific intent deceived the Plaintiffs through express fraud leveraging by conspiracy an offensively defensive hinderance by objectively chilling the acting

1    constituted authorities of the State of Michigan from giving and securing to those Plaintiffs

2    equal protection under the law.

3    **2398.**   Therefore, the Defendants having engaged and caused the express furtherance of the object

4    of such still ongoing conspiracy that is directly causing injury to Plaintiffs' person and property

5    because of the Defendants' designed to violate the Plaintiffs' suppressed rights and privileges

6    as citizens of the United States and any one or more of the conspirators are thereby liable to

7    Plaintiffs pursuant to 42 U.S. Code § 1985 (3) for such unconstitutionally corrupt conduct.

---

## COUNT XIX
**Injunctive & Declaratory Relief**
**Violation of the Michigan Constitution Article I, § 2**
**Equal Protection & Discrimination**
**ALL STUDENT PLAINTIFFS**
**vs.**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

16    **2399.**   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of

17    the paragraphs throughout *this* Complaint.

18    **2400.**   *The People* of the State of Michigan, by and through their elected representative, have for

19    the health, safety, and general welfare enacted a State Constitution that has objectively established

20    pursuant to Article I, § 2 the right that "no person shall be denied the equal protection of the laws;

21    nor shall any person be denied the enjoyment of his civil...rights...or be discriminated against in

22    the exercise thereof..."

23    **2401.**   The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I,**

24    **§ 2** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights

25    were violated by the Defendants' actions which *include but are not limited to* the Defendants'

26    arbitrary placement of and enriching use thereof [***VERY***] Ambitious Goal Curriculum for the

express and specific purpose to compel value from the Plaintiffs as **STUDENTS** by discrimination, harassment, threats, coercion, and fraudulent manipulation.

*2402.* The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 2** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights were violated by the Defendants' actions which *include but are not limited to* the Defendants silent and deliberate avoidance of the WSUIRB Human Research Subject policies and procedures enacted in conformity with the National Research Act and the Belmont Report, known collectively as the Common Rule, and more recently as the Revised Common Rule requiring in the least and prior to an investigator's 'research' utilizing human subjects (*a*) departmental authorization approving a legitimate 'research' protocol and (*b*) ongoing informed consent from participants.

*2403.* The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 2** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights were violated by the Defendants' actions which *include but are not limited to* the Defendants' tactical and offensively defensive retaliation in and of itself a second layer of discrimination following Plaintiff, Attorney Cochrane's, valid objection(s) and pursuit thereof to remedy this still ongoing dispute given the Defendants' ongoing discriminatory retaliation in violation of Federal and State law, inclusive the Wayne State University Non-Discrimination and Harassment Policy.

*2404.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2405.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the

**STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

## COUNT XX
**Injunctive & Declaratory Relief**
**Violation of the Michigan Constitution Article I, § 3**
**Peaceably Assembly, Common Good, & Petition for Redress**
**ALL STUDENT PLAINTIFFS**
**vs.**
**ALL INDIVIDUAL CAPACITY DEFENDANTS**

*2406.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2407.*   *The People* of the State of Michigan, by and through their elected representative, have for the health, safety, and general welfare enacted a State Constitution that has objectively established pursuant to Article I, § 3 the right to "peaceably, to consult for the common good, to instruct their representatives and to petition the government for redress of grievances."

*2408.*   The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 3** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights were violated by the Defendants' actions which *include but are not limited to* the Defendants' discrimination, harassment, threats, and coercion that contributed to a concrete failure to erect an

environment to afford Plaintiffs as vulnerable and submissive **STUDENTS** the ability to peaceably assemble to contribute to the common good in furtherance of Article VIII, § 1 of the Michigan Constitution encouraging education—"Religion, morality and **knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged**."

*2409.* The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 3** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights were violated by the Defendants' actions which *include but are not limited to* the Defendants' deliberate avoidance of the Wayne State University Non-Discrimination and Harassment Policy collapsing due process arbitrarily against the Plaintiffs' complaint depicting concrete harms at the behest of the Defendants' clear discrimination, harassment, threats, coercion, and express fraud as a result of Defendants' intentional placement of [*VERY*] Ambitious Goal Curriculum and unjust 'research' utilizing Plaintiffs as **STUDENTS** in secret devoid of WSUIRB authority.

*2410.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2411.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of

the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

## COUNT XXI
### Injunctive & Declaratory Relief
### Violation of the Michigan Constitution Article I, § 5
### Freedom of Speech
### ALL STUDENT PLAINTIFFS
### vs.
### ALL <ins>INDIVIDUAL</ins> CAPACITY DEFENDANTS

*2412.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2413.*   F *The People* of the State of Michigan, by and through their elected representative, have for the health, safety, and general welfare enacted a State Constitution that has objectively established pursuant to Article I, § 5 the right that "[e]very person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and now law shall be enacted to restrain or abridge the liberty of speech or of the press."

*2414.*   The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 5** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights were violated by the Defendants' actions which *include but are not limited to* the Defendants' ideological 'socialism of ideas' mission infused throughout the body corporate of Wayne State University, inclusive the Defendants' implementation of [**VERY**] Ambitious Goal Curriculum as a back door used to elicit proprietary information from **STUDENTS** "...as bridges to companies"

in violation of the National Research Act and the Economic Espionage Act at §1832 regarding theft of trade secrets in industrial settings.

*2415.*   The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 5** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights were violated by the Defendants' actions which *include but are not limited to* the Defendants' secretive avoidance of WSUIRB policy and procedures that allowed the Defendants more than twenty years to continuously improve the delivery of [***VERY***] Ambitious Goal Curriculum to yield through the manipulative compulsion of **STUDENTS**' speech a compendium of unauthorized 'research' for the Defendants to use for public and private gain as seen by the Defendants personal achievements and in whole the Wayne State University Mike Ilitch School of Business Marketing and Supply Chain Management Program rising through the ranked in the Top 10 Globally over the last ten years as a direct result of the Defendants vigorous deployment of this intellectual sword as a punitive weapon exploiting **STUDENTS**.

*2416.*   The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 5** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights were violated by the Defendants' actions which *include but are not limited to* the concrete harms caused by the Defendants' forceful discrimination, harassment, threats, coercion, and express fraud compelling the Plaintiffs to subsidize the Defendants' ideological mission and viewpoint of piracy as 'socialism of ideas' by exploiting the Plaintiffs as vulnerable and reliant **STUDENTS** both financially by tuition payment and through value derived from the secretive avoidance of WSUIRB policy to unjustly enrich the institution and individual Defendants by leveraging the placement of [***VERY***] Ambitious Goal Curriculum to exploit uninformed **STUDENTS**.

*2417.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2418.**  The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

## COUNT XXII
### Injunctive & Declaratory Relief
### Violation of the Michigan Constitution Article I, § 9
### Slavery & Involuntary Servitude
### ALL STUDENT PLAINTIFFS
### vs.
### ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS

**2419.**  The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

**2420.**  *The People* of the State of Michigan, by and through their elected representative, have for the health, safety, and general welfare enacted a State Constitution that has established pursuant

to Article I, § 9 the objective footing declaring "[n]either slavery, nor involuntary servitude unless for the punishment of crime, shall ever be tolerated in this state."

**2421.** The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 9 establishing** an objective and legitimate claim of entitlement to the Plaintiffs' property rights to maintain autonomy and to be *free of* state slavery and involuntary servitude were violated by the Defendants' constitutionally repugnant conduct.

**2422.** Based upon information and belief, which *include but are not limited to* the objective facts that by avoiding WSUIRB authorization, training, and departmental authorization—Defendants' used the Plaintiffs as **STUDENTS** who at the time were vulnerable, submissive, uninformed, unknowledgeable, and in a position framed with the express purpose by Defendants' design to restrict the Plaintiffs' freedoms and exhaust their intellectual labor in disguise while exploiting this protected 'relationship' to specifically coerce the compelled as speech in Defendants' favor for a *larger return* before arbitrarily passing the **STUDENTS** off on their intellectual journey while maintaining permanent control over the product of this involuntary servitude in perpetuity and branding those submissive **STUDENTS** as "WSU Jonahs" through the invalid "WSU Jonah Certificate."

**2423.** Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

**2424.** The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies"

unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

### COUNT XXIII
**Injunctive & Declaratory Relief**
**Violation of the Michigan Constitution Article I, § 11**
**Searches and Seizures**
**ALL STUDENT PLAINTIFFS**
**vs.**
**ALL INDIVIDUAL CAPACITY DEFENDANTS**

*2425.*  The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2426.*  *The People* of the State of Michigan, by and through their elected representative, have for the health, safety, and general welfare enacted a State Constitution that has objectively established pursuant to Article I, § 11 the right that absent proper justification "[t]he person, houses, papers, possession, electronic data, and electronic communications of every person shall be secure from unreasonable search and seizures."

*2427.*  The Plaintiffs' Constitutional Rights as it applies to the **Michigan Constitution Article I, § 11** establishing an objective and legitimate claim of entitlement to the Plaintiffs' property rights were violated by the Defendants' actions which *include but are not limited to* the Defendants' placement and implementation of [**VERY**] Ambitious Goal Curriculum as an

arbitrary chokepoint in the Plaintiffs intellectual pursuit where this intellectual checkpoint was used with specific intent by the Defendants to compel **STUDENTS** to divulge intellectual property through discrimination, harassment, threats, coercion, and express fraud yielding the concrete harms at the behest of this unconstitutional search and seizure of Plaintiffs.

*2428.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2429.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

***INTENTIONALLY LEFT BLANK***

## COUNT XXIV
**Injunctive & Declaratory Relief**
**Breach of Contract (Implied)**
**ALL STUDENT PLAINTIFFS**
**vs.**
**ALL _INDIVIDUAL_ CAPACITY DEFENDANTS**

*2430.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2431.*   In the State of Michigan, courts recognized an implied contract "where the parties assume obligations by their conduct." *Williams v Litton Systems, Inc*, 433 Mich 755, 758; 449 NW2d 669 (1989).

*2432.*   "A contract implied in law is an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended.  A contract may be implied in law where there is a receipt of a benefit by a defendant from a plaintiff and retention of the benefit is inequitable, absent reasonable compensation."  *In re McKim Estate*, 238 Mich App 453, 457; 606 NW2d 30 (1999), quoting *In re Lewis Estate*, 168 Mich App 70, 74-75; 423 NW2d 600 (1988). Elements required to establish an implied contract include: (1) parties being competent to contract, (2) proper subject matter, (3) consideration, (4) mutuality of agreement, and (5) mutuality of obligation.  *Mallory v Detroit*, 181 Mich App 121, 127; 449 NW2d 115 (1989).

*2433.*   Candidly, as it relates to specifically Plaintiff, Attorney Cochrane, *I* do not explicitly recall signing any documents with the Defendants at large nor with any particular instructors that would qualify as an express contract. Although an electronic signature(s) when applying might have been signed by Plaintiff(s), this would simply alter this argument prospectively from the 'implied' position of these facts and arguments currently into alternatively a claim classified as a breach of an express contract instead.

*2434.*   The Defendants and Plaintiff(s) were competent to contract as it relates generally to the pursuit of and distribution thereof knowledge whereby in exchange for tuition, the University

defendants impliedly promised *in general* education, instructors, and an environment *free of* discrimination, harassment, threats, coercion, and fraud for all **STUDENTS** "*regardless of*" suspect classification—and yet, these reasonable services they indisputably did not deliver.

*2435.* The Defendants breached an implied contract to provide Plaintiff(s) with public accommodations, public service, and a public education *free of* discrimination, harassment, threats, and coercion for "all [**STUDENTS**] *regardless of*" classification pursuant to 2.28.01.010 Wayne State University Code Annotated ("WSUCode"). *See*, **Exhibit 170**, at p. 3. (Emphasis added).

*2436.* The Defendants breached an implied contract to provide Plaintiff(s) with public accommodations, public service, and a public education *free of* sexual harassment pursuant to WSUCode 2.28.06.10 et seq. *Id*. at p. 4.

*2437.* The Defendants' breach pursuant to WSUCode 2.28.06.10 specifically includes as defined in WSUCode 2.28.06.30 "sexual harassment which means unwelcome sexual...communication of a sexual nature when:" [as defined in WSUCode 2.28.06.040] "(i) Submission to such...communication is made a term or condition either explicitly or implicitly to obtain...public accommodations or public services, education," *or* [as defined in WSUCode 2.28.06.060] "(iii) Such...communication has the purpose or effect of substantially interfering with an individual's...public accommodations or public services, education...creating an...offensive...public accommodations, public services, educational...environment." *Id*. at pp. 4-5. (emphasis added).

*2438.* As a term and condition explicitly to obtain education as defined by WSUCode 2.28.06.030 and WSUCode 2.28.06.040, Plaintiffs were submitted to Dr. Goldratt's "*Critical Chain*" containing unwelcome communications of a sexual nature made on condition to receive public education and services. *See*, **Exhibit 118** & **Exhibit 121**, at p. 1.

*2439.* As a term and condition explicitly to obtain education as defined by WSUCode 2.28.06.030 and WSUCode 2.28.06.060, Plaintiffs were submitted to Dr. Goldratt's "*Critical Chain*" containing unwelcome communications of a sexual nature made on condition to receive public education and services that rises to the level of offensiveness which had the effect of substantially interfering with Plaintiff(s') public services and education by creating an offensive educational environment. *See*, **Exhibit 42**; **Exhibit 43**. (Emphasis added).

*2440.* Specifically, Dr. Goldratt's "*Critical Chain*" as Defendants' blueprint to "use [**STUDENTS**] as bridges to companies," contains a character by the name "**B.J.** vonBraun" and what Dr. Goldratt does *so well* is write between the lines and thus implants **78 references to blowjobs** by intentionally naming this pillar of his book as such; Dr. Goldratt himself ejects this insensitive position as the last line of this book, filling the void leaving little room for wonder: "By the way, **what does B.J. stand for**?" **Exhibit 43**, at p. 28.

*2441.* The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.010 et seq. **Exhibit 170**, at pp. 5-6.

*2442.* The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.020 specifically warrantying that **STUDENTS** "[have] a right to competent instruction, good counseling, and adequate facilities..." *Id*. at p. 6.

*2443.* The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.020 specifically warrantying that **STUDENTS** "[have] a right to expect the highest degree of excellence possible within the resources of the University." *Id*. (Emphasis added).

*2444.* The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.020 specifically warrantying that **STUDENTS**

"[have] a right to protection from unreasonable and capricious actions by faculty, administration, and student organizations." *Id*. (Emphasis added).

**2445.**   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.050 specifically warrantying that **STUDENTS** "[have] a right to advocate changes in any rule by which he/she is governed." *Id*.

**2446.**   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.070 specifically warrantying that **STUDENTS** "[have] a right to free inquiry and scholarly investigation..." *Id*.

**2447.**   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.070 specifically warrantying that **STUDENTS** "[have] a right to discuss, exchange, and publish finding or recommendations, either individually or in association with others, provided he/she makes no claim to represent the University without due authorization," allowing **STUDENTS** to remain autonomous as to the free use and enjoyment of the First Amendment. *Id*. (Emphasis added).

**2448.**   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.090 specifically warrantying that **STUDENTS** "[have] a right to advocate any policy or change in existing policy in all matters affecting [**STUDENTS**]," such as Defendants' *backdoor* to industry or *the stolen* Wayne State University Double Dip to the *void* Jonah Certificate. *Id*. at pp. 6-7.

**2449.**   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.31.01.100 specifically warrantying that **STUDENTS** "[have] a right to be secure in his/her rights as a citizen without prejudice to her/her standing in the University, provided that 1 (sic) he/she makes no claim to represent the University without due authorization." *Id*. at p. 7.

*2450.*   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.41.01.150 warrantying that all **STUDENTS** have a right in "all research programs accepted by the University, [to] respect for the dignity of human beings and the humane treatment of research animals must be assured." *Id*. p. 9.

*2451.*   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.41.01.010 specifically warrantying to **STUDENTS** that "Institutions of higher education are conducted for the common good and not to further the interests of either the individual teacher or the institution as a whole. The common good depends upon the free search for truth and its free exposition." *Id*. at p. 21. (Emphasis added).

*2452.*   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.41.01.030 specifically warrantying to **STUDENTS** that teachers are "...entitled to full freedom in research and in the publication of the results, subject to the adequate performance of his/her other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution." *Id*. (Emphasis added).

*2453.*   The Defendants breached an implied contract to provide Plaintiff(s) with those Rights and Responsibilities pursuant to WSUCode 2.41.01.040 specifically warrantying to **STUDENTS** that teachers are "...entitled to freedom in the classroom in discussing his/her subject, but he/she should be careful not to introduce into his/her teaching controversial matter which has no relation to his/her subject." *Id*. (Emphasis added).

*2454.*   The Defendants breached an implied contract by providing Plaintiff(s) with an educational environment utilizing [*VERY*] Ambitious Goal Curriculum as an educational policy pursuant to UP 04—07, 2.1, approved erroneously with final authority by the Defendants Wayne State University Board of Governors and President. *Id*. at p. 23. (Emphasis added).

*2455.*   The Defendants breached an implied contract by providing Plaintiff(s) with an educational environment coercing vulnerable and susceptible STUDENTS by leveraging what was known as "WSU Jonah Certificate" and offered to compel submission of valuable intellectual property through corporate espionage when in fact pursuant to Approval of Educational Policies 4.1(a) the Defendant Wayne State University Board of Governors has never authorized the "WSU Jonah Certificate" as a free-standing certificate. *Recall*, **Exhibit 93**; **Exhibit 141**, at p. 3; **Exhibit 307**; **Exhibit 308**; **Exhibit 309**; **Exhibit 310**; **Exhibit 317**; *and* **Exhibit 318**.

*2456.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2457.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

_____

## COUNT XXV
### Injunctive & Declaratory Relief
### Fraudulent Inducement
### ALL STUDENT PLAINTIFFS
### vs.
### ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS

*2458.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2459.*   Under Michigan law, a claim for fraud in the inducement is actionable when "a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C.*, 276 Mich. App. 146, 161 (2007) (citations omitted).

*2460.*   To state a claim, a party must show:  (1) the defendant made a material misrepresentation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that [it] was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.  *Id*.

*2461.*   Defendants made a material representation *including but not limited* to making courses GSC 7260 & GSC 5670 available to **STUDENTS** representing that each conformed to WSUCode and WSUIRB perquisites. *Recall*, **Exhibit 123**; **Exhibit 284**; **Exhibit 325**.

*2462.*   Defendants made a material representation *including but not limited* to claiming comparable courses to GSC 7260 & GSC 5670 would cost **STUDENTS** "$10,000" to take elsewhere.

*2463.*   Defendants made a material representation including but not limited to offering to Plaintiffs as **STUDENTS** the "WSU Jonah Certificate" impliedly representing this "free-standing certificate" as a pillar of the course available to assenting Plaintiffs who comply.

*2464.* Based upon information and belief, at the time the Defendants made *including but not limited to* the preceding representations such material statement was known to be false or made recklessly without knowledge of its truth as a positive assertion.

*2465.* Based upon information and belief, at the time *including but not limited to* the preceding representations the Defendants made such representation with the specific intent to induce the Plaintiffs as **STUDENTS** to act in reliance upon such representations.

*2466.* Based upon information and belief, the Plaintiffs, individually, did act upon the Defendants' material representations and do thereby qualify as class members but for such reliance.

*2467.* Based upon information and belief, the Plaintiffs, individually, did act upon the Defendants' material representations and do thereby qualify as class members as a result of the damages sustained as a result of the Defendants' fraudulent inducement.

*2468.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2469.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value,

that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6ᵗʰ Cir. 1996).

---

## COUNT XXVI
### Injunctive & Declaratory Relief
### Fraudulent Misrepresentation
### ALL STUDENT PLAINTIFFS
### vs.
### ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS

**2470.** The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

**2471.** "The elements of fraudulent misrepresentation are (1) the defendant made a material representation, (2) the representation was false, (3) when making the representation, the defendant knew or should have known it was false, (4) the defendant made the representation with the intention that the plaintiff would act upon it, and (5) the plaintiff acted upon it and suffered damages as a result." *M&D, Inc v W B McConkey*, 231 Mich App 22, 27 (1998).

**2472.** "A claim of fraudulent misrepresentation must be based on a statement relating to a past or an existing fact, not a future promise." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976).

**2473.** Defendants made a material representation *including but not limited* to making courses GSC 7260 & GSC 5670 available to **STUDENTS** representing that each conformed to WSUCode and WSUIRB perquisites. *Recall*, **Exhibit 123**; **Exhibit 284**; **Exhibit 325**.

**2474.** Defendants made a material representation *including but not limited* to claiming comparable courses to GSC 7260 & GSC 5670 would cost **STUDENTS** "$10,000" to take elsewhere.

*2475.* Defendants made a material representation including but not limited to offering to Plaintiffs as **STUDENTS** the "WSU Jonah Certificate" impliedly representing this "free-standing certificate" as a pillar of the course available to assenting Plaintiffs who comply.

*2476.* Based upon information and belief, at the time the Defendants made *including but not limited to* the preceding representations such material statement was known to be false or made recklessly without knowledge of its truth as a positive assertion.

*2477.* Based upon information and belief, at the time *including but not limited to* the preceding representations the Defendants made such representation with the specific intent to induce the Plaintiffs as **STUDENTS** to act in reliance upon such representations.

*2478.* Based upon information and belief, the Plaintiffs, individually, did act upon the Defendants' material representations and do thereby qualify as class members but for such reliance.

*2479.* Based upon information and belief, the Plaintiffs, individually, did act upon the Defendants' material representations and do thereby qualify as class members as a result of the damages sustained as a result of the Defendants' fraudulent misrepresentation.

*2480.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2481.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these

uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

### COUNT XXVII
**Injunctive & Declaratory Relief**
**Intentional Infliction of Emotional Distress**
**PLAINTIFF COCHRANE**
**vs.**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2482.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2483.*   The Defendants conduct, both individually and collectively as a whole, based upon an objective and reasonable standard is extreme and outrageous as such conduct was furthered with specific intent to remove the dignity of personhood with callous disregard for the Plaintiff(s) as designed by the Defendants for secretive personal and public enrichment.

*2484.*   The Defendants had the specific intent to cause the Plaintiff(s), Attorney Cochrane, with emotional distress having knowledge of Plaintiffs' then state of mind and placement in life with extreme and explicit detail. *See*, **Exhibit 139**; and specifically, **Exhibit 571**.

*2485.*   The Defendants' specific intent and recklessness includes but not limited to the refined continuous improvement process to implement and infuse [*VERY*] Ambitious Goal Curriculum into Wayne State University from course to strategic plan for the purpose of using "...[**STUDENTS**] as bridges to companies" to pecuniarily enrich the individual instructors and

1    institution as a whole in violation of in the least WSUCode 2.42.01.010 and 2.41.01.150 in

2    addition to well established law and WSUIRB prerequisites.

3    *2486.*   Candidly—the fact this Honorable Court *and* the invading eyes of the Defendants' opposing

4    counsel are reading *this* sentence, reading the personal development of Plaintiff, Attorney

5    Cochrane, during his "significant and unique phase of [his] intellectual growth and [his] social

6    development" (WSUCode 2.31.01.010, Exhibit 170 at p. 6) in the very field he has just so

7    recently entered—and now thrust forward as a sacrifice for *the People* so that the Defendants

8    can no longer intellectually rape unknowing and susceptible **STUDENTS** who have *submitted*

9    *out of necessity for survival in our current society seeking only knowledge of the good*—**by**

10   **these** **very** **words** Plaintiffs' emotional distress has been egregiously severe as a direct result

11   of Defendants' irreparable conduct that "...has been so outrageous in character, and so extreme

12   in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and

13   utterly intolerable in a civilized community," and is otherwise constitutionally repugnant

14   shocking the conscious of all those competent of this objective truth. *Doe v. Claiborne County*

15   *ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

16   *2487.*   Absent injunctive and declaratory relief against such violation of clearly established law,

17   the Plaintiff(s) have and will continue to be harmed by the Defendants' void acts.

18   *2488.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing

19   violations of the Plaintiffs' clearly established Constitutional and statutory rights as

20   **STUDENTS** were known to the Defendants over at least a twenty-year period where the

21   Defendants' specifically designed and refined through gross negligence a process of ongoing

22   improvement the processes to elicit unreasonably with specific intent—*through* the

23   **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies"

24   unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the

enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

### COUNT XXVIII
**Injunctive & Declaratory Relief**
**Gross Negligence**
**ALL STUDENT PLAINTIFFS**
**vs.**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2489.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2490.*   The Michigan Legislature enacted the Government Torts Liability Act ('GTLA") which in part immunizes State Officers from tort liability. However, the "[i]mmunity provided in MCL § 691.1407(2) encompasses only negligent tort liability because Michigan's Government Tort Liability Act expressly preserves the law of intentional torts as it existed before July 7, 1986." *Kreipke*, at 783-784.

*2491.*   The State of Michigan by and through the Michigan Supreme Court has interpreted the GTLA to define gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

*2492.*   The Defendants owed to the Plaintiffs as **STUDENTS**, individually and collectively, a duty *including but not limited to* providing an environment and public services *in the least* consistent

with and within the scope of in totality WSUCode Annotated, Wayne State University Non-Discrimination and Harassment Policy, *and* WSUIRB policy and procedures.

*2493.*   The Defendants breached their duty owed to Plaintiffs as **STUDENTS** in ways that *include but are not limited to* deliberately creating through a process of continuous improvement an unsafe environment leveraging in secret by avoiding WSUIRB policy by violating the National Research Act the relationship and sanctity of the educators and **STUDENT** for the express purpose of compelling protected speech in the specific form of intellectual property taken for public and private gain through the manipulative [*VERY*] Ambitious Goal Curriculum.

*2494.*   The Defendants breached their duty owed to Plaintiffs as **STUDENTS** in a way that was the direct and proximate cause of the Plaintiffs' concrete harms because of the Defendants' constitutionally repugnant and conscious shocking intrusive breach of duty.

*2495.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2496.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value,

that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

### COUNT XXIX
**Injunctive & Declaratory Relief**
**Tortious Interference with a Business**
**ALL STUDENT PLAINTIFFS**
**&**
**ALL BUSINESS ENTITY PLAINTIFFS**
**vs.**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2497.*  The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2498.*  "The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff. . . ." *BPS Clinical Laboratories v Blue Cross & Blue Shield of Michigan*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996).

*2499.*  Based upon information and belief, the Plaintiffs individually and collectively as **STUDENTS** were in a position that encompassed a valid business relationship or expectancy as is related to Defendants' use of [*VERY*] Ambitious Goal Curriculum.

*2500.*  The Defendants with concrete certainty had actual knowledge of the Plaintiffs' as **STUDENTS'** current reality inclusive the Plaintiffs as Entities directly involved given the privity of these distinctive parties.

*2501.* Specifically, the Defendants' used a "[**STUDENT**] Information Sheet" to catalog and probe the **STUDENTS**' for the beginning development of the current reality being recreated for targeting purposes of those Plaintiff Entities involved. *See in full*, **Exhibit 561**.

*2502.* The Defendant, Dr. James T. Low and Deborah Habel certainly had actual knowledge of Plaintiff, The Traveling Attorney, *P.C.*®, and other avenues of business-*like* Peerless Foundation and Fadeless Publicity being worked into fruition by Plaintiff, Attorney Cochrane, prior to and during the Defendants' intentional inference.

*2503.* The Defendants intentional interference with the Plaintiffs as **STUDENTS** breached duty of care held between those **STUDENTS** and Plaintiff Entities.

*2504.* The Defendants intentional interference with the Plaintiffs as **STUDENTS** breached duty of good faith held between those **STUDENTS** and Plaintiff Entities.

*2505.* The Defendants intentional interference with the Plaintiffs as **STUDENTS** breached duty of fiduciary loyalty held between those **STUDENTS** and Plaintiff Entities.

*2506.* The Defendants' secretive exploitation of the Plaintiffs as **STUDENTS** amounts to a financial subsidy and an unconstitutional loyalty oath in favor of the Defendants as a whole.

*2507.* As a result of the Defendants' intentional interference with the Plaintiffs' pedagogical experience as **STUDENTS**—those **STUDENTS** and Plaintiff Entities were damaged by the disclosure of trade secrets and proprietary information to an extraordinary depth providing the Defendants with an unparalleled advantage only capable of exploiting under color of law the sacred position held by the State of Michigan.

*2508.* Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2509.* The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as

**STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

### COUNT XXX
**Injunctive & Declaratory Relief**
**Unfair Competition**
**ALL STUDENT PLAINTIFFS**
**&**
**ALL BUSINESS ENTITY PLAINTIFFS**
**vs.**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2510.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2511.*   Michigan's common law of unfair competition prohibits unfair and unethical trade practices that are harmful to one's competitors or to the general public. *See, e.g., Clairol, Inc v Boston Discount Center of Berkley, Inc*, 608 F2d 1114, 118 [(CA 6, 1979)]. Each unfair competition case "is determined upon its own facts and relief is based upon the principles of common business integrity." *Good Housekeeping Shop v Smitter*, 254 Mich 592, 596[;] 236 NW 872

(1931) (citation omitted). The term *unfair competition* may encompass any conduct that is fraudulent or deceptive and tends to mislead the public. *Clairol*, [*supra*,] at 1120 (citing *Revlon, Inc v Regal Pharmacy, Inc*, 29 FRD 169, 174 (ED Mich[,] 1961)); *Hayes–Albion v Kuberski*, 421 Mich 170[;] 364 NW2d 609 (1984) (misappropriation of trade secrets); *Heritage Optical Center, Inc v Levine*, 137 Mich App 793[;] 359 NW2d 210 (1984) (defamation of competitor). [Pappas and Steiger, Michigan Business Torts, pp 60-62 (citations omitted).]

*2512.* Based upon information and belief—the Defendants by establishing a "Decisive Competitive Edge" leveraged this "Edge" as a sword against the Plaintiffs as STUDENTS aimed at acquiring through discrimination, harassment, threats, coercion, and fraud that value held within the **STUDENTS**' conscious as excess capacity—knowledge of the good—where this sword allowed the Defendants with specific intent to "use [**STUDENTS**] as bridges to companies" to acquired exactly what was sought in an unfair and unethical manner.

*2513.* Based upon information and belief, the Defendants have more than six million files the Defendants have on their servers disguised as 'research' derived in violation of the Economic Espionage Act §1832.

*2514.* Based upon information and belief, the Defendants, by and through Dr. James T. Low and Deborah Habel, used information derived from employing [***VERY***] Ambitious Goal Curriculum to gain trade secrets related to Peerless Foundation leading to purchasing a competing website violation of the Economic Espionage Act §1832.

*2515.* Based upon information and belief, the Defendants used Plaintiffs as **STUDENTS** undercover to spy on those Plaintiff Entities to obtain through this shocking triangle of privity valuable information in violation of the Economic Espionage Act §1832.

*2516.* Based upon information and belief—the Defendants' conduct, collectively, is harmful to the Plaintiffs as **STUDENTS** and Business Entities, natural competitors of labor and service,

where these **STUDENTS** were unknowingly duped by the Defendants disguised 'research' and led through a series of processes designed to exploit the pedagogical mission. As a result, those **STUDENTS** who complied are now in jeopardy of being targeted by those same Plaintiff Entities in retaliation of this inadvertent submission to Defendant.

*2517.*   Based upon information and belief—the Defendants' conduct, collectively, is harmful to the general public at large—*the People*—where in such form and fashion the Defendants' piercing conduct transforms the pedagogical landscape into an adversarial plateau absent the trust and illuminates those corners of this sacred calling that where this Honorable Court fails on its judicative duty to remedy such wrongs—*our Nation is in trouble*, and may never recover.

*2518.*   Including but not limited to the Defendants' conduct above—the Defendants collectively engaged in a concerted activity to continuously improve the method of exploiting Plaintiffs as **STUDENTS** in ways that violate the common sanctity of common business integrity.

*2519.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2520.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct

is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

### COUNT XXXI
**Injunctive & Declaratory Relief**
**Civil Conspiracy**
**ALL STUDENT PLAINTIFFS**
**&**
**ALL BUSINESS ENTITY PLAINTIFFS**
**vs.**
**ALL <u>INDIVIDUAL</u> CAPACITY DEFENDANTS**

*2521.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2522.*   "A civil conspiracy is a combination of two or more persons, by some concerted action to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins Co v Columbia Casualty Ins Co*, 194 Mich App 300, 313; 486 NW2d 351 (1992). "In order to prove a claim of concert of action, the plaintiff must show that 'all defendants acted tortiously, pursuant to a common design . . ..'" *Jodway v Kennametal, Inc*, 207 Mich App 622, 631; 525 NW2d 883 (1994) (citation omitted). Further, "a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort." *Early Detection Center, PC v Life Ins Co*, 157 Mich App 618, 632; 403 NW2d 830 (1986).

*2523.*   Based upon information and belief—the Defendants acted in concert to develop, improve, refine, shape, use, and gain from the tortious use of [*VERY*] Ambitious Goal Curriculum.

*2524.*   Based upon information and belief—the very nature of The Theory of Constraints supports the premise of civil conspiracy in that individual members of the team are expendable—it is the

ideological mission of the whole that is supreme and total submission to the objective leads to success and supports the "Decisive Competitive Edge" for the whole.

*2525.*   Based upon information and belief, former President, Dr. M. Roy Wilson, led a relentless charge to change the image of Wayne State University spurring the implementation of a "Critical Chain" makeover leveraging the Barthwell Group to consult and connect with local businesses—"...93% of the Interviewees indicated that they do not have a clear understanding of the School's research capabilities, 20% of those surveyed expressed interest in exploring search and development activities...provided...expertise...that could add value to their organization." *See*, **Exhibit 17**, at p. 29-30; *also see in full* "Appendix 6" at pp. 27-30.

*2526.*   Based upon information and belief, Defendant, Dr. David Strauss, aided and abetted the Defendants, Dr. James T. Low and Deborah Habel, in furnishing the invalid "free-standing certificate" leveraged against those exploited Plaintiffs as "WSU Jonah Certificate."

*2527.*   Based upon information and belief—the Defendants' institutional conflict of interest prevented the Defendants from following clearly established law *including but not limited to* the Wayne State University Non-Discrimination and Harassment Policy in retaliation of this ongoing dispute.

*2528.*   Based upon information and belief—the Defendants' institutional conflict of interest prevented the Defendants from following clearly established law *including but not limited to* the Michigan Freedom of Information Act despite responsive records identified and paid for by Plaintiff, Attorney Cochrane, in retaliation of this ongoing dispute.

*2529.*   Based upon information and belief, the Defendants' 2013—2018 Wayne State University School of Business was modeled after Dr. Goldratt's "Critical Chain" developed to exploit the pedagogical mission for 'research' and to "use [**STUDENTS**] as bridges to companies." *See*,

**Exhibit 17**, at p. 4 ("***By design***, **we seek to fully exploit** the point of intersection between these foci."). (Emphasis added).

*2530.*   Based upon information and belief—the 2013—2018 WSU Strategic Implementation Team included Defendant, Dr. John Taylor, who oversaw and sanctioned the invalid behind-the-veil infusion of The Theory of Constraints into the Wayne State University Mike Ilitch School of Business by implementing [***VERY***] Ambitious Goal Curriculum and advertising the same.

*2531.*   Based upon information and belief—every level of authority at Wayne State University has been "infected" by Defendant, Dr. James T. Low, with the Theory of Constraints as identified by Audrey Taylor in her dissertation. *See*, **Exhibit 109**, at p. 7. (Emphasis added).

*2532.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2533.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally

permissible...” and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6ᵗʰ Cir. 1996).

---

### COUNT XXXII
**Injunctive & Declaratory Relief**
**Unjust Enrichment**
**ALL STUDENT PLAINTIFFS**
**&**
**ALL BUSINESS ENTITY PLAINTIFFS**
**vs.**
**ALL INDIVIDUAL CAPACITY DEFENDANTS**

*2534.*   The Plaintiffs reallege and incorporate by reference all the allegations set forth in *each* of the paragraphs throughout *this* Complaint.

*2535.*   The legal definition of "Unjust Enrichment," is "[t]he retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected."  Black's Law Dictionary (2d ed, 2004).

*2536.*   "[T]o sustain the claim of unjust enrichment, plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant."  *Belle Isle Grill Corp v Detroit*, 256 Mich App 463, 478; 666 NW2d 271 (2003).

*2537.*   The Defendants received a benefit from Plaintiffs as **STUDENTS** in a manner that *includes but is not limited to* direct financial subsidy in the form of tuition payments supporting the Defendants' ideological 'research' mission.

*2538.*   The Defendants received a benefit from Plaintiffs as **STUDENTS** in a manner that *includes but is not limited to* producing value as trade secrets and proprietary information as a direct result of the Defendants' secretive implementation and avoidance of WSUIRB protocol through [*VERY*] Ambitious Goal Curriculum.

*2539.*   Based upon information and belief—the Plaintiffs, both as **STUDENTS** and Entities, have sustained an irreparable inequity as a result of the Defendants' fraudulent retention of the benefits received through including by not limited to the Defendants' discrimination, harassment, threats, coercion, fraud, and use thereof [***VERY***] Ambitious Goal Curriculum.

*2540.*   Absent injunctive and declaratory relief against such violation of clearly established law, the Plaintiffs have and will continue to be harmed by the Defendants' void acts.

*2541.*   The *Individual* Capacity Defendants are not immune from this lawsuit—the ongoing violations of the Plaintiffs' clearly established Constitutional and statutory rights as **STUDENTS** were known to the Defendants over at least a twenty-year period where the Defendants' specifically designed and refined through gross negligence a process of ongoing improvement the processes to elicit unreasonably with specific intent—*through* the **STUDENTS**' pedagogical experience—"using these [**STUDENTS**] as bridges to companies" unjustly by means of discrimination, harassment, threats, coercion, and malicious fraud the enriching value of the compelled intellectual property for public and private gain from these uninformed **STUDENTS** leveraged as human-research subjects absent informed consent placing the unconstitutionality of the Defendants' conduct "beyond debate," as such "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual would believe...[the Defendants' corrupt conduct] is constitutionally permissible..." and otherwise the Defendants' bad faith shocks the conscious. *Doe v. Claiborne County ex rel. Claiborne County Board of Education*, 103 F.3d 495 (6th Cir. 1996).

---

## **REQUEST FOR RELIEF**

*2542.*   Wherefore—the Plaintiffs respectfully requests that this Honorable Court expressly issue:

*2543.*   A Declaration that a **Fundamental Right to a Public Education *Free Of* Discrimination, Harassment, Threats, and Coercion For *All* Students *Regardless* of Race, Color, Religion, Gender, Age, Familial Status, National Origin, Disability, and Wealth—*EXISTS* in the United States—<u>unequivocally</u>**—and is fundamental under the First Amendment to the United States Constitution, applicable to the States by and through the Fourteenth Amendment, and that restrictions on fundamental rights are presumed unconstitutional;

*2544.*   Immediately stay or restraining order and preliminarily and permanently enjoin the Defendants from conducting 'research' utilizing *any and all forms* of [*VERY*] Ambitious Goal Curriculum without WSUIRB authorization, inclusive express-informed consent;

*2545.*   A Declaration that the Defendants conduct herein is "so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe… [their conduct] is constitutionally permissible...";

*2546.*   A Declaration that the Official Capacity Defendants do not have immunity;

*2547.*   A Declaration that the Individual Capacity Defendants do not have immunity;

*2548.*   A Declaration that the Defendants' actions, policies, and practices as alleged *herein* are unlawful, void, and violate the Plaintiffs' civil and constitutional rights as **STUDENTS**;

*2549.*   A Declaration that the Defendants actions, policies, and practices as alleged *herein* are in violation of the National Research Act and WSUIRB policy and procedures;

*2550.*   A Declaration that the Plaintiffs as STUDENTS were used by the Defendants as human-research subjects without informed consent;

*2551.*   A Declaration that the State of Michigan has created a state created liberty interest as declared and recognized as a "civil right" "in the full and equal use" of public accommodations, public services, and educational facilities that is enforceable against Defendants as Plaintiffs' property interest in a public education *free of* discrimination, harassment, threats, and coercion;

*2552.*   A Declaration that the Defendants have breached and implied contract, or in the alternative an express contract, held with the Plaintiffs where such breach has led directly to the concrete harms suffered by the Plaintiffs as **STUDENTS**;

*2553.*   A Declaration that the Defendants actions, policies, and practices as alleged *herein* are in violation of the Wayne State University Non-Discrimination and Sexual Harassment Policy;

*2554.*   A Declaration that the Defendants have created an educational environment that is hostile and adverse to the Plaintiffs' rights to autonomy and human dignity;

*2555.*   A Declaration that the Defendants conducted 'research' on Plaintiffs as **STUDENTS** with the specific intent to elicit value in the form of trade secrets and intellectual property without providing WSUIRB required informed consent;

*2556.*   A Declaration that the "free-standing certificate" known as the "WSU Jonah Certification" is null and void used only to manipulate the Plaintiffs' cooperative compulsion of value;

*2557.*   A Declaration that the Defendants were unjustly enriched by their ongoing and systematic use of [*VERY*] Ambitious Goal Curriculum used to exploit Plaintiffs as **STUDENTS**;

*2558.*   A Declaration that the Defendants, individually, worked in concert collectively to "use [**STUDENTS**] as bridges to companies" under color of law for personal unethical gain;

*2559.*   A Declaration that the Defendants acted under color of law and in concert with the intent to violate the Plaintiffs' civil and constitutional rights as **STUDENTS;**

*2560.*   A Declaration that the Defendants violated the Plaintiffs' First Amendment rights;

*2561.*   A Declaration that the Defendants violated the Plaintiffs' Fourth Amendment rights;

*2562.*   A Declaration that the Defendants violated the Plaintiffs' Fifth Amendment rights;

*2563.*   A Declaration that the Defendants violated the Plaintiffs' Fourteenth Amendment rights;

*2564.*   A Declaration that the Wayne State University Non-Discrimination and Harassment Policy was vague and overbroad as-applied to Plaintiff, Attorney Cochrane, violating rights *herein*;

*2565.*   A Declaration that MCL § 37.2101 (1) was vague and overbroad as-applied to Plaintiff, Attorney Cochrane, violating right *herein*;

*2566.*   A Declaration that the Defendants violated the Higher Education Act 20 U.S.C. § 1011 (a);

*2567.*   A Declaration that the Defendants violated the Constitution of the State of Michigan;

*2568.*   A Declaration that the Defendants, individually and collectively, did violate the Plaintiff, Attorney Cochrane's, rights expressly and in retaliation of his valid objections to being used unethically as a human-research subject;

*2569.*   An Order directing the Defendants to immediately preserve the electronics files compiled and located on those servers maintained by the Defendants;

*2570.*   An Order directing the Defendants to immediately retract the marketing and advertising utilizing value derived from the secretive use of the Theory of Constraints;

*2571.*   An Order to the resident agent and/or authorized person of the entity known commonly as www.GoDaddy.com, an digital website-brokerage company doing business throughout the world, or to any other entity with information related to the 2020 purchase of "www.ThePeerlessFoundation.org" as such information would be specifically sought to determine the then owner of this website suspected based upon information and belief to be either Defendants, Dr. James T. Low and/or Deborah Habel, having motive, knowledge, intent, and capabilities of cybersquatting in interference with Plaintiff(s) at this time;

*2572.*   An Order instructing the Defendants, its officers, agents, and employees to refrain from engaging in any of the predicate acts forming the objective basis of the pattern or practice of conduct described *herein*—including but not limited to the disgorgement of information obtained permanently restricting the use of, control, and possession of all data and information obtained unlawfully even if restricting causes express retractions, recission of contracts, public notice(s), or whatever else necessary to remedy class members damaged by the Defendants;

*2573.*   An Order instructing the Defendants, its officers, agents, and employees to refrain from using prospective class members' acquired trade secrets and proprietary information in any and all forms from the predicate acts by the Defendants forming the objective basis of the pattern or practice of conduct described *herein*;

*2574.*   An Order instructing the Defendants, its officers, agents, and employees to adopt and implement policies, procedures, and mechanisms that identify, correct, and prevent the unlawful conduct described *herein* that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States;

*2575.*   An Order appointing Plaintiff, Attorney Cochrane, as Class Representative under Fed. R. Civ. P. 23(c)(1)(A) for prospective sub-class known collectively as "**STUDENTS**" *herein*;

*2576.*   An Order appointing Plaintiff, Attorney Cochrane, as Class Representative under Fed. R. Civ. P. 23(c)(1)(A) for prospective sub-class known collectively as "**ENTITIES**" *herein*;

*2577.*   An Order appointing Plaintiff, Attorney Cochrane, as Class Counsel under Fed. R. Civ. P. 23(g) for prospective sub-class known collectively as "**STUDENTS**" *herein* while considering Fed. R. Civ. P. 23(g)(1) and (4), *and* Fed. R. Civ. P. 23(g)(3);

*2578.*   An Order appointing Plaintiff, Attorney Cochrane, as Class Counsel under Fed. R. Civ. P. 23(g) for prospective sub-class known collectively as "**ENTITIES**" *herein* while considering Fed. R. Civ. P. 23(g)(1) and (4), *and* Fed. R. Civ. P. 23(g)(3);

*2579.*   An Order certifying known collectively as "**STUDENTS**" *herein* pursuant to Fed. R. Civ. P. 23(c)(1)(A) and Fed. R. Civ. P. 23(c)(1)(B);

*2580.*   An Order certifying known collectively as "**ENTITIES**" *herein* pursuant to Fed. R. Civ. P. 23(c)(1)(A) and Fed. R. Civ. P. 23(c)(1)(B).

*2581.*   Award Plaintiff, Attorney Cochrane, damages including but not limited to those damages outlined at the time of filing the complaint with the Wayne State University Office of Equal

Opportunity (*see*, **Exhibit 622**; these variables have increased with time, and this is not a full reflection of the complete damages sustained as of this filing);

*2582.*   Award Plaintiffs nominal damages for the loss of their rights as protected by the United States and Michigan Constitution as determine by this Honorable Court;

*2583.*   Award to Plaintiffs *including but not limited to* economic damages as a direct result of the Defendants' conduct *herein* as determine by this Honorable Court;

*2584.*   Award to Plaintiffs *including but not limited to* non-economic damages as a direct result of the Defendants' conduct *herein* as determine by this Honorable Court;

*2585.*   Award to Plaintiffs *including but not limited to* compensatory, consequential and future damages, including damages for severe emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined by this Honorable Court as determine by this Honorable Court;

*2586.*   Award to Plaintiffs *including but not limited to* punitive and/or exemplary damages as a direct result of the Defendants' conduct *herein* as determine by this Honorable Court;

*2587.*   Award to Plaintiffs *including but not limited* to in general costs, including expert witness fees, all other fees, and Attorneys' fees as a direct result of the Defendants' conduct *herein* as determine by this Honorable Court;

*2588.*   Award to Plaintiffs *including but not limited* in general to costs, fees, and Attorneys' fees as a direct result of the Defendants' conduct *herein* as determine by this Honorable Court;

*2589.*   Award to Plaintiffs *including but not limited to* costs, fees, and Attorneys' fees pursuant to 42 U.S. Code § 1988 (b) as a direct result of the Defendants' violation of 42 U.S. Code § 1983 and 42 U.S. Code § 1985 (3) as established *herein* and as determine by this Honorable Court;

*2590.* Award to Plaintiffs *including but not limited to* nontaxable costs, fees, and Attorneys' fees pursuant to Fed. R. Civ. P. 23(h) as established *herein* and as determine by this Honorable Court;

*2591.* Class Action Reasonable Attorney Fees pursuant to Fed. R. Civ. P. 23(h) where applicable;

*2592.* An Order by a Writ of Mandamus as an appropriate reaction to the objective truther *herein* directing the Governor of the State of Michigan, Attorney Gretchen Whitmer, and the Attorney General for the State of Michigan, Attorney Dana Nessel, consistent with the Constitution of the State of Michigan and declaratory relief as determined appropriate by this Honorable Court;

*2593.* Award such other and further relief as this Honorable Court deems equitable and just.

*2594.* **JURY DEMAND**: Plaintiffs request a trial by jury on all issues so triable.

## **COMPLAINT CONCLUSION**

*2595.* ***FOCUS***. Take a deep breath through your nose, exhale through your mouth, *and repeat* this as you contemplate your *new* reality. *Did I succeed*? Do we now share the same "*objective*" reality, *or* do *I* have this *all* wrong? **I need to know**. *This* Complaint presents itself much like a Doctoral Thesis would, *ironically*, time the Defendants stole that *I* will *never* recoup to pursue the same. *This* *is* *not* your '*typical*' lawsuit, instead, this is *positioned* as an objection *by* *man* for *mankind* in the *only true-objective forum* we share *as* *equals*.

*2596.* If so, what ensues as a consequential effect is metaphorically encapsulated in *Colorful Triangles* from *Symphony Number Five*, the first segment in Walt Disney's *Fantasia 2000—I* being representative of the yellow-paper butterfly, my sons and the rest of the eternal **STUDENT** population of the United States **FOREVER** freed by the ensnared torment of the swarmed abusers with *the effects* that which *this* Complaint will have on and by *this* Honorable Court—*the light that breaks the cycle of this swarm.*

**2597.** *I* have solved—*at least from my perspective*—the Defendants' Kobayashi Maru; caught lighting in a bottle; **_and_** given mankind *the key* in the same breath!

**2598.** These facts should **disturb** every[one] who digests them properly. For the Defendants to argue against what is proposed *herein* is treason against the very institutional-pedagogical purpose for which the formation of Wayne State University and to which the educational roots they themselves have strived to advance for decades.

**2599.** It just so happens that the untested forum constraining Dr. Goldratt's Theory of Constraints is the legal industry, and these facts present the genuine best-case scenario to try this Trojan Horse in the open for what it is objectively in accordance with this Nation's history and tradition.

**2600.** *I* do not know what is on the other side of *this*, but *I* am willing to advance *these* **TRUTHS** despite all that is against them…it is *this* that which establishes my objectives for the remainder of my time here on mortal Earth. After all, we live in the precepts of time for revolution. *Here*, *I* seek to invoke the revolution of the *individual* mind, a shock to the conscious, a *new* perspective. If at all that *I* have done in the very least, *I* have told the tale of *this* line of Cochrane blood in this space and time now entombed in *the Peoples'* Record for eternity accompanied by the 31st Circuit Court **Case No. #22—001403—CZ** as the foreshadowing backdrop of this *ongoing* and decaying reality.

**2601.** We often forget in our tangible electronic world that the meaning of life is much more than what technology offers. Education is the keystone of our democracy, the great equalizer, a tangible force sparked only through permissive submission to understanding fundamental objective truth; but now, more than ever, that fundamental truth is under attack and being used as a sword against *the* **PEOPLE** absent objective truth to the contrary. **Ask yourself**—is what the Defendants have done not artificial selection of mankind? Have the Defendants not taken

on the form of self-proclaimed Guardian Kings and usurped this position for unjust enrichment while violating <u>every</u> individual right to freedom opposite submission to tyranny?

*2602.*   **<u>Now</u>**—*it is after all*—the Defendants' "*moment in time*," <u>*so*</u>, do let us give the Defendants *the floor* to speak more on ***this***…*moment in time*.

*Respectfully submitted,*

**Date**: <u>3-15-2024</u>

<u>*/S/Bradley Edward Cochrane*</u>
Bradley E. Cochrane, *Esq.*, *M.B.A.*, (*P82640*)
*In Pro Per, as prospective Class Representative of STUDENTS*
as *General Counsel* for The Traveling Attorney, *P.C.*®
       *as prospective Class Representative of ENTITIES*
as *Proposed Punitive Class Counsel pending appointment by this Honorable Court*

***INTENTIONALLY LEFT BLANK***

MED (Rev. 5/05) Statement of Disclosure of Corporate Affiliations and Financial Interest

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

Bradley E. Cochrane,
The Traveling Attorney, *P.C.*,
all others similaly situated,

    *Plaintiff(s),*

v.

Gretchen Whitmer, Dana Nessel, Board of Governors of
Wayne State University, Kimberly Espy, Masao Wilson, Louis
Lessem, Laura Johnston, Nikki Wright, Linda Lowe, Robert
Forsythe, Kiantee-Rupert Jones, David J. Strauss, John
Taylor, James T. Low, and Deborah Habel, as *Defendant(s).*

Case No. 2:24-cv-10648

Hon. Judge Paul D. Borman

Hon. Magistrate Judge Curtis Ivy, *Jr.*

## STATEMENT OF DISCLOSURE
## OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Pursuant to E. D. Mich. LR 83.4,     The Traveling Attorney, P.C.
                     [ Name of Party]

makes the following disclosure: *(NOTE: A negative report, if appropriate, is required.)*

1.  Is said corporate party a subsidiary or affiliate of a publicly owned corporation?

  Yes ❑ No ☒

  If the answer is yes, list below the identity of the parent corporation or affiliate and the relationship

  between it and the named party.

  Parent Corporation/Affiliate Name: _____

  Relationship with Named Party: _____

2.  Is there a publicly owned corporation or its affiliate, not a party to the case, that has a substantial financial

  interest in the outcome of the litigation?

  Yes ❑ No ☒

  If the answer is yes, list the identity of such corporation or affiliate and the nature of the financial interest.

  Parent Corporation/Affiliate Name: _____

  Nature of Financial Interest: _____

Date: 3 -15-2024

Bradly E. Cochrne as President
Signature

PB2640
Bar No.

51150 Washington Street, Room A113
Street Address

New Baltimore, MI 48047
City, State, Zip Code

586.419.1632
Telephone Number

Cochrane @ Traveling Attorney.com
Primary Email Address

## **END OF INITIAL COMPLAINT**